## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO.: _____

SECURITIES AND EXCHANGE COMMISSION,

       **Plaintiff,**

v.

ARBITRADE LTD.,
CRYPTOBONTIX INC.,
TROY R.J. HOGG,
JAMES L. GOLDBERG,
STEPHEN L. BRAVERMAN, and
MAX W. BARBER,

       **Defendants, and**

SION TRADING FZE,

       **Relief Defendant.**

## COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF AND DEMAND FOR JURY TRIAL

Plaintiff Securities and Exchange Commission (the "Commission") alleges:

### I.      INTRODUCTION

1.     The Commission brings this action as a result of a crypto asset pump-and-dump scheme perpetrated by Arbitrade Ltd. ("Arbitrade"), a Bermudan company, and Cryptobontix Inc. ("Cryptobontix"), a Canadian company, and their principals, Troy R. J. Hogg ("Hogg"), James L. Goldberg ("Goldberg"), and Stephen L. Braverman ("Braverman"), and a so-called international gold trader, Max W. Barber ("Barber"). The misconduct involved in this matter centered on an

Ethereum-based[1] crypto asset that Arbitrade and Cryptobontix owned and controlled called "Dignity" or "DIG," which was traded exclusively on a crypto asset-trading platform called Livecoin.

2.      Although this case involves crypto assets, it bears the hallmarks of a classic pump and dump scheme.

3.      Between May 2018 and January 2019, Arbitrade and Cryptobontix, through Hogg, Goldberg, Braverman, and Barber, made material misrepresentations and omissions to investors while they were offering and selling DIG in a series of news and press releases issued to the public and a press conference.  They also participated in a scheme to defraud.  Among other things, the releases falsely claimed that Arbitrade had acquired and received title to $10 billion in gold bullion and intended to back each DIG token issued and sold to investors with $1.00 worth of this gold. Arbitrade claimed to have acquired the gold through a purchase transaction with Barber and his company, SION Trading FZE ("SION").  The Defendants also misrepresented that independent accounting firms had performed an "audit" of the gold and verified its existence.  In reality, the gold acquisition transaction with Barber and SION was a sham.

4.      Arbitrade and Cryptobontix, through Hogg, Goldberg, and Braverman, used the false and misleading releases and press conference to generate demand for DIG on the Livecoin trading platform.  The fraudulent releases had a material impact on the price of DIG sales on this trading platform.  Simultaneous with Arbitrade and Cryptobontix conducting the fraudulent promotional campaign, Hogg and Goldberg, with Braverman's assistance, sold DIG tokens on the

---

[1] Ethereum describes itself as a technology for building apps and organizations, holding assets, transacting and communicating without being controlled by a central authority.  It supports smart contracts, which digitize agreements by turning the terms of an agreement into computer code that automatically executes when the contract terms are met.

Livecoin trading platform at artificially inflated prices, which resulted in proceeds totaling about $36.8 million.

5.     As a result of the conduct alleged in this Complaint:

a.     Arbitrade, Cryptobontix, Hogg, and Goldberg violated Sections 5(a) and (c) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77e(a) and (c)];

b.     Hogg and Goldberg violated Sections 17(a)(1), (2), and (3) of the Securities Act [15 U.S.C. § 77q(a)(1), (2), and (3)]; and

c.     Arbitrade, Cryptobontix, Hogg, and Goldberg violated Section 10(b) [15 U.S.C. § 78(j)(b)], and Rules 10b-5(a), (b), and (c) [17 C.F.R. § 240.10b-5(a), (b), and (c)] of the Securities Exchange Act of 1934 ("Exchange Act").

d.     Hogg is liable as a control person under Section 20(a) of the Exchange Act [15 U.S.C. § 78t(a)] for Cryptobontix's violations of Section 10(b) [15 U.S.C. § 78(j)(b)], and Rules 10b-5(a), (b), and (c) [17 C.F.R. § 240.10b-5(a), (b), and (c)] of the Exchange Act.

e.     Hogg and Goldberg are liable as control persons under Section 20(a) of the Exchange Act [15 U.S.C. § 78t(a)] for Arbitrade's violations of Section 10(b) [15 U.S.C. § 78(j)(b)], and Rules 10b-5(a), (b), and (c) [17 C.F.R. § 240.10b-5(a), (b), and (c)] of the Exchange Act.

f.     Braverman and Barber aided and abetted violations by Arbitrade, Cryptobontix, Hogg, and Goldberg of Section 10(b) [15 U.S.C. § 78(j)(b)], and Rules 10b-5(a), (b), and (c) [17 C.F.R. § 240.10b-5(a), (b), and (c)] of the Exchange Act.

g.     Relief Defendant SION, a company that Barber controlled, received proceeds of Defendants' securities violations without any legitimate entitlement to the funds.

6. The Commission requests, among other things, that this Court enter orders: (a) permanently restraining and enjoining Defendants from violating these provisions of the federal securities laws; (b) directing Defendants and Relief Defendant to pay disgorgement with prejudgment interest based upon these violations; (c) directing Defendants to pay civil money penalties; and (d) issuing an officer and director bar against Hogg, Goldberg, Braverman, and Barber.

## II. DEFENDANTS AND RELIEF DEFENDANT

### A. Defendants

7. **Arbitrade** is a Bermudan corporation based in Hamilton, Bermuda. Arbitrade and its securities have never been registered with the Commission in any capacity.

8. **Cryptobontix** is a Canadian corporation with principal offices in Grand Bend, Ontario, Canada. Cryptobontix and its securities have never been registered with the Commission in any capacity.

9. **Hogg** is a resident of Grand Bend, Ontario, Canada. Hogg is the founder, owner, and sole officer and director of Cryptobontix. Although Hogg never held a title as an officer or director of Arbitrade, Hogg was an undisclosed control person of the company. He exercised overall control over Arbitrade and was the 60% owner of the company.

10. **Goldberg** is a resident of Miami, Florida. Goldberg was an undisclosed control person of Arbitrade because he exercised significant control over the day-to-day business affairs of Arbitrade and had the second largest ownership interest in the company. From April 1989 through April 2018, Goldberg was a registered representative associated with 12 broker-dealers registered with the Commission.

11.     **Braverman** is a resident of Newbury Park, California.  Braverman was held out as the Chief Operations Officer of Arbitrade.  From September 1988 through June 2018, Braverman was a registered representative associated with 21 broker-dealers registered with the Commission.

12.     **Barber** is a resident of Salt Lake City, Utah.  Barber is the founder, owner, and sole officer of SION.

### B.       Relief Defendant

13.     **SION** is a United Arab Emirates company engaged in the business of precious metals trading with principal place of business in Dubai, United Arab Emirates.  SION has never been registered with the Commission in any capacity.  SION received ill-gotten gains in the form of proceeds from fraudulent and unregistered sales of DIG tokens.

### III.      JURISDICTION AND VENUE

14.     This case involves the offer and sale of securities in the form of investment contracts related to a crypto asset. The investment contracts are securities under Section 2(a)(1) of the Securities Act [15 U.S.C. § 77b(a)(1)] and Section 3(a)(10) of the Exchange Act [15 U.S.C. § 78c(a)(10)].  This Court has jurisdiction over this action pursuant to Sections 20(b), 20(d)(1), and 22(a) of the Securities Act [15 U.S.C. §§ 77t(b), 77t(d)(1), and 77v(a)] and Sections 21(d), 21(e), and 27(a) of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), and 78aa(a)].

15.     This Court has personal jurisdiction over Defendants, and venue is proper in the Southern District of Florida, because, among other things, one Defendant resides in this District, Defendants participated in the offer, purchase, or sale of securities in this District, and many of Defendants' acts and transactions constituting violations of the Securities Act and Exchange Act occurred in this District.

16.     In connection with the conduct alleged in this Complaint, Defendants, directly or indirectly, singly or in concert with others, have made use of the means or instrumentalities of interstate commerce, the means or instruments of transportation and communication in interstate commerce, or of the mails.

## IV.     FACTUAL ALLEGATIONS

### A.     Background on Defendants

17.     In early 2017, Hogg, through his company Cryptobontix, used Russian developers to create a new Ethereum-based crypto asset, which was later called "Dignity" or "DIG."

18.     Hogg's purported plan was to fund a variety of crypto asset related business ventures, including a proprietary crypto asset-trading platform, a merchant payment platform, and a crypto asset mining operation, through sales of these newly created DIG tokens.

19.     All three billion DIG tokens created were owned and controlled by Hogg and Cryptobontix, who arranged for them to begin trading exclusively on a Russian crypto asset-trading platform called Livecoin around the end of 2017.

20.     Hogg recruited Goldberg and Braverman to assist with this new venture, and he used Arbitrade, another shell company he controlled, to be the corporate face behind the enterprise.

21.     Arbitrade and Cryptobontix's plan was to do an "initial coin offering" of DIG tokens.

22.     Arbitrade and Cryptobontix promoted their business plans and the DIG tokens through Arbitrade's website and social media.

23.     Arbitrade's website stated that DIG purchasers could expect profits based on the success of its underlying business ventures, including mining of crypto assets and the creation of a crypto asset-trading platform and merchant payment platform.

24.     In particular, Arbitrade's website represented that DIG tokens would be redeemable for gold, and that the supply of gold available for investor redemptions would be directly dependent on the extent to which the companies' business activities generated profits to fund gold purchases.

25.     While Arbitrade and Cryptobontix did undertake efforts to build a crypto asset-trading platform and merchant payment platform, none of these ventures was ever completed. They were only minimally successful with crypto asset mining and generated very little revenue for the business.  Likewise, the initial coin offering that Arbitrade and Cryptobontix planned to carry out never occurred.

**B.      The Sham Acquisition of Gold Bullion**

26.     Arbitrade and Cryptobontix consistently advertised through electronic news releases their intention to back the DIG tokens with gold worth $1 per token, despite the fact that DIG always sold for prices far below $1 per token.

27.     In the spring of 2018, Hogg and Goldberg were introduced to Barber and his company SION as a potential source to acquire that gold.

28.     Following negotiations that were handled by Hogg, in late June 2018, Arbitrade and SION executed a "Memorandum of Understanding" (MOU) pursuant to which they "agreed to execute a definitive contract" under which Arbitrade would purportedly purchase $10 billion of its "bullion requirements" from SION within the term of 15 years in exchange for, among other things, an equity interest in Arbitrade and 150 million DIG.

29.     Under this MOU, Arbitrade also agreed to pay SION an annual fee based on a certain percentage of the bullion value, payable in monthly installments of approximately $1 million.

30.     Within a few days of executing the MOU, Arbitrade and SION signed an "Asset Pledge Agreement," under which SION agreed to provide to Arbitrade a "Safe Keeping Receipt" purportedly holding title to the $10 billion in gold bullion.

31.     This purported gold purchase deal was finalized in September 2018 when Arbitrade and SION executed an "Assignment Agreement" purporting to transfer to Arbitrade "all of [SION's] ownership rights and title in the Gold which vests in [SION] pursuant to the [Safe Keeping Receipt]."

32.     The one page Safe Keeping Receipt issued by G4S Cash Services LLC ("G4S"), a company that specializes in vaulting and transport of valuable assets, was attached to the Assignment Agreement.

33.     The Safe Keeping Receipt does not refer to Arbitrade or to SION holding title to any gold of any value.

34.     Instead, it makes cryptic reference to some sort of "package" held in a vault under an account in SION's name purportedly containing a gold "Certificate of Guarantee."

35.     All of the agreements regarding this purported gold acquisition transaction were signed by Barber on behalf of SION.

36.     Hogg handled the negotiations between Arbitrade and SION and had the final word on the deal.

37.     The agreements between Arbitrade and SION, along with the Safe Keeping Receipt, constitute the entire basis for Arbitrade's claim to have acquired title to $10 billion worth of gold.

38.     Arbitrade never received any information from Barber or SION regarding the origin of the gold, the identity of the seller, or its storage location.

39.     It is highly unlikely that the gold referred to in the Safe Keeping Receipt even exists.

40.     The "Certificate of Guarantee" and related documentation purportedly issued by "UBS" as referenced in the G4S Safe Keeping Receipt appear to be forgeries as they contain numerous spelling and punctuation errors, and significant portions are illegible.

41.     To create the appearance that the gold transaction was legitimate, Arbitrade also engaged the services of two accounting firms to evaluate and confirm certain details of the transaction.

42.     In August 2018, Arbitrade retained an accounting firm recommended by Barber, Elliott Davis, LLC ("Elliott Davis"), to confirm the issuance of the Safe Keeping Receipt and that the Assignment Agreement was properly executed and contained provisions assigning SION's purported ownership rights and title to the gold to Arbitrade.

43.     Although Elliot Davis returned a report acknowledging this information, the report did not confirm – and Arbitrade never asked Elliot Davis to do so – whether SION actually possessed real, much less transferable, ownership rights or title to gold bullion.

44.     Similarly, in September 2018 Arbitrade retained BDO USA, LLP ("BDO") purportedly to assess the authenticity of the Safe Keeping Receipt.

45.     Based upon Arbitrade's request, BDO issued a report stating only that it had confirmed that G4S issued the Safe Keeping Receipt, after SION provided BDO with a copy of a document that had certified an unspecified value in holdings to G4S personnel and proof that this document was placed in a vault there.  BDO's report did not confirm whether SION possessed ownership rights or title to gold bullion.

46.     Arbitrade, Hogg, Goldberg, and Braverman never asked Elliott Davis or BDO to confirm the existence, location, ownership, or origin of the gold itself.

47.     Neither Hogg, Goldberg, nor Braverman objected to the narrow parameters of Elliott Davis' work that SION dictated.

48.     Moreover, they ignored the red flag presented when SION told BDO to drop its request for a video conference with the G4S employee whose signature purportedly appears on the Safe Keeping Receipt.

49.     Arbitrade also acquiesced to SION's requirement that Arbitrade should have no direct communications with G4S personnel.

50.     Around October 2018, Arbitrade tasked Braverman with hiring Bureau Veritas, a company that specializes in inspection and certification services, to provide an opinion about the existence of the gold that Arbitrade purportedly purchased from SION.

51.     Bureau Veritas refused to accept the engagement when it became clear that Arbitrade wanted the firm to issue its opinion without conducting any physical examination of the gold, with Braverman telling the firm that "[c]ounting bars I believe is overkill."

### C.     Materially False and Misleading Statements in News Releases Regarding the Gold Acquisition

52.     To increase demand for DIG on the Livecoin trading platform, beginning in around March 2018 and continuing until January 2019, Arbitrade and Cryptobontix engaged in a promotional campaign to tout the business and DIG tokens through emailed news releases and press releases disseminated to the public, and at least one "press conference."

53.     During the course of this promotional activity, Arbitrade and Cryptobontix, through Hogg, Goldberg, Braverman, and Barber, made material misstatements or omissions in several releases and in the press conference concerning Arbitrade's purported acquisition of billions of dollars' worth of gold bullion.

54.     Hogg and Goldberg reviewed and approved at least three of the false and misleading releases before they were issued to the public, and Hogg participated in the press conference.

55.     Braverman also reviewed at least one of the false press releases prior to its issuance, and Barber reviewed two of the releases before they went out.

56.     On May 24, 2018, Arbitrade and Cryptobontix issued an email news release purporting to correct various "online rumors," including the companies' gold acquisition plans.

57.     The news release claimed that Arbitrade was acquiring $8.7 billion worth of "four bullions (gold, silver, platinum, and palladium) that will back the company's four major tokens," including DIG.

58.     The news release compared this bullion acquisition to the purchase of a house with a mortgage, whereby Arbitrade would be receiving title to the bullion from the seller, who would then place a debt against the bullion under a structured financing plan over a certain period of time.

59.     According to the release, Cryptobontix and Arbitrade planned to use half of the daily proceeds from their crypto asset operations to pay off the debt on the $8.7 billion bullion purchase.

60.     The news release also claimed that investors would be able to redeem their DIG crypto assets for bullion.

61.     On June 28, 2018, Arbitrade held a telephonic "press conference" during which Hogg announced and discussed the company's "partnership" with SION through which he claimed Arbitrade would be receiving title to $10 billion worth of physical gold.

62.     During this call, Hogg also stated that Arbitrade had "basically recreated the gold standard for the cryptocurrency sector."

63.     On July 5, 2018, Arbitrade and Cryptobontix issued another email news release announcing, among other things, Arbitrade's "definitive deal" to acquire $10 billion in gold bullion from SION that will be held at a "Brinks' vault."

64.     This news release claimed that Arbitrade would have the title certificate to the gold bullion, which was described as the Safe Keeping Receipt, in hand within two weeks, and the gold would be "audited by a major accounting firm."

65.     According to this release, out of the $10 billion of gold bullion acquired, $3 billion worth ($1.00 worth of gold for every token issued) was allocated to backing DIG, with the remainder allocated to Arbitrade and Cryptobontix's alleged other crypto assets.

66.     A few months later, on November 5, 2018, Arbitrade issued a press release announcing that the company had received title to gold bullion worth "in excess of $10 billion," which would be used to back its tokens, and that this gold was being "stored at independent security facilities."

67.     In this press release, Arbitrade further claimed to have completed the required "regulatory gold vaulting verification compliance."   The release also stated that an independent public accounting firm had "verified the account in good standing" and "confirmed" a Safe Keeping Receipt of the gold through "direct confirmation from the independent secure vaulting company."

68.     On January 9, 2019, Arbitrade issued a press release announcing that its December "shipment of gold" from SION "has been vaulted and secured" in the form of an "additional $3.8m of hallmarked gold bars."

69.   The release also stated that, "[u]tilizing SION's procurement network, Arbitrade ensures consistent growth of its precious metals holdings, going above and beyond the $10 billion announced earlier in 2018."

70.   The release further claimed that SION had "provided $250 million in credit" to facilitate these purchases on Arbitrade's behalf.

71.   The representations made in these news and press releases and the conference call concerning Arbitrade's purported acquisition of billions of dollars' worth of gold bullion were blatantly false and misleading.

72.   Arbitrade never acquired or received title to $10 billion in gold bullion.

73.   Moreover, no audit of the $10 billion in gold was ever performed by a major accounting firm as represented in the July 5, 2018, news release.

74.   BDO never audited the gold, but merely confirmed certain documentation that Arbitrade and SION presented to it.

75.   Likewise, the statements made in the November 5, 2018, press release regarding verification of the account and the Safe Keeping Receipt by an independent accounting firm are misleading given that Arbitrade's title to real gold did not exist and Arbitrade never completed any required "gold vaulting verification compliance."

### D.      Sales of DIG on Livecoin

76.   The false and misleading news releases and conference call served to create demand for DIG and had a material impact on the price of DIG sales on the Livecoin trading platform.

77.   Except for the January 9, 2019, press release, each of the fraudulent releases resulted in a spike in the price of DIG.

78.     For example, following the May 24, 2018, email news release, the price of DIG jumped from about $0.11 to $0.16 a token, an over 45% increase in price.

79.     Simultaneous with Arbitrade and Cryptobontix conducting the false promotional campaign, Hogg and Goldberg sold DIG tokens, which were owned by Cryptobontix, on the Livecoin trading platform at artificially inflated prices for proceeds totaling about $36.8 million.

80.     Between the end of 2017 and mid-2019, the entire time period during which Hogg and Goldberg sold DIG tokens on Livecoin, they made proceeds totaling about $45 million.

81.     Hogg and Goldberg exclusively handled all of these sales of DIG on Livecoin and generally sold DIG in exchange for Bitcoin.

82.     DIG investors committed funds in the form of Bitcoin or other crypto assets to participate in an investment opportunity.

83.     DIG investors' fortunes were inextricably tied to the success or failure of the management of Cryptobontix and Arbitrade to generate a profit for investors, namely an increase in the value of their DIG tokens.  The fortunes of investors and the companies' management were also intertwined because management held and received DIG tokens through which they expected to receive a profit.

84.     DIG investors' role was limited to purchasing the DIG tokens through the Livecoin trading platform.  Investors had no role in the business operations of Cryptobontix or Arbitrade and were entirely passive.  Instead, investors relied solely on Arbitrade and Cryptobontix, and their management, to generate a profit for investors, namely an increase in the value of their DIG tokens. Investors' expectation of those profits came from, among other things, the representations that Arbitrade and Cryptobontix would obtain the promised gold to back the DIG tokens, and that investors would be able to redeem DIG tokens for gold, of which the supply would be directly

dependent on the extent to which revenues were generated to fund company gold purchases. Investors would have also expected profits based on the success of Arbitrade's underlying business ventures, including mining of crypto assets and the creation of a crypto asset trading platform and merchant payment platform.

85.    No registration statement was filed or in effect for the DIG tokens during the time of the events set forth in this Complaint.  Furthermore, no exemptions from registration are available, including exemptions under the Securities Act.

86.    Braverman was responsible for converting the Bitcoin proceeds of their DIG sales to cash through an account he had at a U.S.-based crypto asset-trading platform in the name of Rozgold, an entity he owned and controlled.

87.    The cash would be transferred into Rozgold's bank account, which Braverman would then distribute based on instructions from Hogg or Goldberg.

88.    Braverman also retained some of the proceeds from the Bitcoin sales for himself.

89.    Braverman falsely represented to the crypto asset-trading platform that he was trading for the benefit of Rozgold and failed to disclose that he was in fact engaged in crypto asset transactions for the benefit of third parties.

90.    SION received at least $2.5 million in ill-gotten gains in the form of proceeds from fraudulent and unregistered sales of DIG tokens.

91.    The DIG token has since been delisted from the Livecoin trading platform as of February 2020, when it reached a sustained valuation of zero.

## V.   CLAIMS FOR RELIEF

### COUNT I
### Violations of Sections 5(a) and (c) of the Securities Act
### (Against Arbitrade, Cryptobontix, Hogg and Goldberg)

92.     The Commission repeats and realleges Paragraphs 1 through 91 of its Complaint as if fully set forth herein.

93.     No registration statement was filed or in effect with the Commission pursuant to the Securities Act with respect to the securities Arbitrade, Cryptobontix, Hogg and Goldberg offered and sold as described in this Complaint and no exemption from registration existed with respect to these securities.

94.     From at least May 2018 to January 2019, Arbitrade, Cryptobontix, Hogg and Goldberg, directly or indirectly:

> (a)   made use of any means or instruments of transportation or communication in interstate commerce or of the mails to sell securities, through the use or medium of a prospectus or otherwise;

> (b)   carried or caused to be carried securities through the mails or in interstate commerce, by any means or instruments of transportation, for the purpose of sale or delivery after sale; or

> (c)   made use of any means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell or offer to buy through the use or medium of any prospectus or otherwise any security,

without a registration statement having been filed or being in effect with the Commission as to such securities.

95.     By reason of the foregoing, Arbitrade, Cryptobontix, Hogg and Goldberg violated, and unless enjoined, are reasonably likely to continue to violate Sections 5(a) and (c) of the Securities Act [15 U.S.C. § 77e(a) and (c)].

**COUNT II**
**Violations of Section 17(a)(1) of the Securities Act**
**(Against Hogg and Goldberg)**

96.     The Commission repeats and realleges Paragraphs 1 through 91 of its Complaint as if fully set forth herein.

97.     From at least May 2018 to January 2019, Hogg and Goldberg, in the offer or sale of any securities by the use of any means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly, knowingly or recklessly employed any device, scheme, or artifice to defraud.

98.     By reason of the foregoing, Hogg and Goldberg violated, and, unless enjoined, are reasonably likely to continue to violate, Section 17(a)(1) of the Securities Act [15 U.S.C. § 77q(a)(1)].

**COUNT III**
**Violations of Section 17(a)(2) of the Securities Act**
**(Against Hogg and Goldberg)**

99.     The Commission repeats and realleges Paragraphs 1 through 91 of its Complaint as if fully set forth herein.

100.    From at least May 2018 to January 2019, Hogg and Goldberg, in the offer or sale of securities by the use of any means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly, negligently obtained money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

101.    By reason of the foregoing, Hogg and Goldberg violated, and, unless enjoined, are reasonably likely to continue to violate, Section 17(a)(2) of the Securities Act [15 U.S.C. § 77q(a)(2)].

## COUNT IV
### Violations of Section 17(a)(3) of the Securities Act
### (Against Hogg and Goldberg)

102.     The Commission repeats and realleges Paragraphs 1 through 91 of its Complaint as if fully set forth herein.

103.     From at least May 2018 to January 2019, Hogg and Goldberg, in the offer or sale of securities by the use of any means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly, negligently engaged in transactions, practices and courses of business which operated or would have operated as a fraud or deceit upon the purchasers and prospective purchasers of such securities.

104.     By reason of the foregoing, Hogg and Goldberg violated, and, unless enjoined, are reasonably likely to continue to violate, Section 17(a)(3) of the Securities Act [15 U.S.C. § 77q(a)(3)].

## COUNT V
### Violations of Section 10(b) and Rule 10b-5(a) of the Exchange Act
### (Against Arbitrade, Cryptobontix, Hogg and Goldberg)

105.     The Commission repeats and realleges Paragraphs 1 through 91 of its Complaint as if fully set forth herein.

106.     From at least May 2018 to January 2019, Arbitrade, Cryptobontix, Hogg and Goldberg, directly and indirectly, by use of any means or instrumentality of interstate commerce, or of the mails, knowingly or recklessly employed devices, schemes, or artifices to defraud in connection with the purchase or sale of securities.

107.     By reason of the foregoing, Arbitrade, Cryptobontix, Hogg and Goldberg violated, and, unless enjoined, are reasonably likely to continue to violate, Section 10(b) [15 U.S.C. § 78(j)(b)] and Rule 10b-5(a) of the Exchange Act [17 C.F.R. § 240.10b-5(a)].

## COUNT VI
### Violations of Section 10(b) and Rule 10b-5(b) of the Exchange Act
(Against Arbitrade, Cryptobontix, Hogg and Goldberg)

108.     The Commission repeats and realleges Paragraphs 1 through 91 of its Complaint as if fully set forth herein.

109.     From at least May 2018 to January 2019, Arbitrade, Cryptobontix, Hogg and Goldberg, directly and indirectly, by use of any means or instrumentality of interstate commerce, or of the mails, knowingly or recklessly made untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading in connection with the purchase or sale of securities.

110.     By reason of the foregoing, Arbitrade, Cryptobontix, Hogg and Goldberg violated, and, unless enjoined, are reasonably likely to continue to violate, Section 10(b) [15 U.S.C. § 78(j)(b)] and Rule 10b-5(b) of the Exchange Act [17 C.F.R. § 240.10b-5(b)].

## COUNT VII
### Violations of Section 10(b) and Rule 10b-5(c) of the Exchange Act
(Against Arbitrade, Cryptobontix, Hogg and Goldberg)

111.     The Commission repeats and realleges Paragraphs 1 through 91 of its Complaint as if fully set forth herein.

112.     From at least May 2018 to January 2019, Arbitrade, Cryptobontix, Hogg and Goldberg, directly and indirectly, by use of any means or instrumentality of interstate commerce, or of the mails, knowingly or recklessly engaged in acts, practices and courses of business which operated or would have operated as a fraud or deceit upon any person in connection with the purchase or sale of securities.

113.     By reason of the foregoing, Arbitrade, Cryptobontix, Hogg and Goldberg violated, and, unless enjoined, are reasonably likely to continue to violate, Section 10(b) [15 U.S.C. § 78(j)(b)] and Rule 10b-5(c) of the Exchange Act [17 C.F.R. § 240.10b-5(c)].

## COUNT VIII
### Control Person Liability under Section 20(a) of the Exchange Act for Violations of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder by Cryptobontix
### (Against Hogg)

114.     The Commission repeats and realleges Paragraphs 1 through 91 of its Complaint as if fully set forth herein.

115.     At all relevant times, Hogg was a control person of Cryptobontix for purposes of Section 20(a) of the Exchange Act [15 U.S.C § 78t(a)].

116.     As alleged above in Counts V-VII, from approximately May 2018 through January 2019, Cryptobontix violated Section 10(b) of the Exchange Act [15 U.S.C. § 78(j)(b)], and Rules 10b-5(a), (b), and (c) thereunder [17 C.F.R. § 240.10b-5(a), (b), and (c)].

117.     As a control person of Cryptobontix, Hogg is jointly and severally liable with and to the same extent as Cryptobontix for each of the violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78(j)(b)], and Rules 10b-5(a), (b), and (c) thereunder [17 C.F.R. § 240.10b-5(a), (b), and (c)].

118.     By reason of the foregoing, Hogg has violated, and unless enjoined, is reasonably likely to continue to violate Section 10(b) of the Exchange Act [15 U.S.C. § 78(j)(b)], and Rules 10b-5(a), (b), and (c) thereunder [17 C.F.R. § 240.10b-5(a), (b), and (c)].

## COUNT IX
### Control Person Liability under Section 20(a) of the Exchange Act for Violations of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder by Arbitrade
### (Against Hogg and Goldberg)

119.     The Commission repeats and realleges Paragraphs 1 through 91 of its Complaint as if fully set forth herein.

120.     At all relevant times, Hogg and Goldberg were control persons of Arbitrade for purposes of Section 20(a) of the Exchange Act [15 U.S.C § 78t(a)].

121.     As alleged above in Counts V-VII, from approximately May 2018 through January 2019, Arbitrade violated Section 10(b) of the Exchange Act [15 U.S.C. § 78(j)(b)], and Rules 10b-5(a), (b), and (c) thereunder [17 C.F.R. § 240.10b-5(a), (b), and (c)].

122.     As control persons of Arbitrade, Hogg and Goldberg are jointly and severally liable with and to the same extent as Arbitrade for each of the violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78(j)(b)], and Rules 10b-5(a), (b), and (c) thereunder [17 C.F.R. § 240.10b-5(a), (b), and (c)].

123.     By reason of the foregoing, Hogg and Goldberg have violated, and unless enjoined, are reasonably likely to continue to violate Section 10(b) of the Exchange Act [15 U.S.C. § 78(j)(b)], and Rules 10b-5(a), (b), and (c) thereunder [17 C.F.R. § 240.10b-5(a), (b), and (c)].

## COUNT X
### Aiding and Abetting Violations of Section 10(b) and Rule 10b-5(a) of the Exchange Act by Cryptobontix, Arbitrade, Hogg and Goldberg
**(Against Braverman and Barber)**

124.     The Commission repeats and realleges Paragraphs 1 through 91 of its Complaint as if fully set forth herein.

125.     As alleged above in Count V, Cryptobontix, Arbitrade, Hogg and Goldberg violated Section 10(b) of the Exchange Act [15 U.S.C. § 78(j)(b)], and Rule 10b-5(a) thereunder [17 C.F.R. § 240.10b-5(a)].

126.     From at least May 2018 to January 2019, Braverman and Barber knowingly, or with extreme recklessness, provided substantial assistance to, and thereby aided and abetted violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78(j)(b)], and Rule 10b-5(a) thereunder [17 C.F.R. § 240.10b-5(a)] by Arbitrade, Cryptobontix, Hogg and Goldberg.

127.     By reason of the foregoing, pursuant to Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)].  Braverman and Barber aided and abetted, and unless enjoined, are reasonably

likely to continue to aid and abet, violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78(j)(b)], and Rule 10b-5(a) thereunder [17 C.F.R. § 240.10b-5(a)].

**COUNT XI**
**Aiding and Abetting Violations of Section 10(b) and Rule 10b-5(b) of the Exchange Act**
**by Cryptobontix, Arbitrade, Hogg and Goldberg**
**(Against Braverman and Barber)**

128.    The Commission repeats and realleges Paragraphs 1 through 91 of its Complaint as if fully set forth herein.

129.    As alleged above in Count VI, Cryptobontix, Arbitrade, Hogg and Goldberg violated Section 10(b) of the Exchange Act [15 U.S.C. § 78(j)(b)], and Rule 10b-5(b) thereunder [17 C.F.R. § 240.10b-5(b)].

130.    From at least May 2018 to January 2019, Braverman and Barber knowingly, or with extreme recklessness, provided substantial assistance to, and thereby aided and abetted violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78(j)(b)], and Rule 10b-5(b) thereunder [17 C.F.R. § 240.10b-5(b)] by Arbitrade, Cryptobontix, Hogg and Goldberg.

131.    By reason of the foregoing, pursuant to Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)].  Braverman and Barber aided and abetted, and unless enjoined, are reasonably likely to continue to aid and abet, violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78(j)(b)], and Rules 10b-5(b) thereunder [17 C.F.R. § 240.10b-5(b)].

**COUNT XII**
**Aiding and Abetting Violations of Section 10(b) and Rule 10b-5(c) of the Exchange Act**
**by Cryptobontix, Arbitrade, Hogg and Goldberg**
**(Against Braverman and Barber)**

132.    The Commission repeats and realleges Paragraphs 1 through 91 of its Complaint as if fully set forth herein.

133.     As alleged above in Count VII, Cryptobontix, Arbitrade, Hogg and Goldberg violated Section 10(b) of the Exchange Act [15 U.S.C. § 78(j)(b)], and Rule 10b-5(c) thereunder [17 C.F.R. § 240.10b-5(c)].

134.     From at least May 2018 to January 2019, Braverman and Barber knowingly, or with extreme recklessness, provided substantial assistance to, and thereby aided and abetted violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78(j)(b)], and Rule 10b-5(c) thereunder [17 C.F.R. § 240.10b-5(c)] by Arbitrade, Cryptobontix, Hogg and Goldberg.

135.     By reason of the foregoing, pursuant to Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)].  Braverman and Barber aided and abetted, and unless enjoined, are reasonably likely to continue to aid and abet, violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78(j)(b)], and Rule 10b-5(c) thereunder [17 C.F.R. § 240.10b-5(c)].

### COUNT XIII
### Unjust Enrichment
### (Against Relief Defendant SION)

136.     The Commission repeats and realleges Paragraphs 1 through 91 of this Complaint as if fully set forth herein.

137.     SION received at least $2.5 million in ill-gotten gains in the form of proceeds from fraudulent and unregistered sales of DIG tokens, to which it lacks a legitimate claim.

138.     SION obtained these funds as part of the securities law violations alleged above, under circumstances in which it is not just or equitable for it to retain the funds.

139.     By reason of the foregoing, SION has been unjustly enriched and must disgorge its ill-gotten gains.

### VI.     RELIEF REQUESTED

**WHEREFORE**, the Commission respectfully requests the Court find the Defendants committed the violations alleged and:

**A.**

## **Permanent Injunctive Relief**

Issue a Permanent Injunction enjoining Defendants, their officers, agents, servants, employees, attorneys, and all persons in active concert or participation with them, and each of them, from violating the federal securities laws alleged in this Complaint.

**B.**

## **Disgorgement**

Issue an Order directing Defendants and Relief Defendant SION to disgorge all ill-gotten gains or proceeds received including prejudgment interest thereon as a result of the acts and/or courses of conduct alleged in this Complaint.

**C.**

## **Penalties**

Issue an Order directing Defendants to pay civil money penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and/or Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)].

**D.**

## **Officer and Director Bar**

Issue an Officer and Director bar against Hogg, Goldberg, Braverman, and Barber pursuant to Section 20(e) of the Securities Act and/or Section 21(d)(2) of the Exchange Act.

**E.**

**Further Relief**

Grant such other and further relief as may be necessary and appropriate.

**F.**

**Retention of Jurisdiction**

Retain jurisdiction over this action and over the Defendants in order to implement and carry out the terms of all orders and decrees that may hereby be entered, or to entertain any suitable application or motion by the Commission for additional relief within the jurisdiction of this Court.

**VII.    DEMAND FOR JURY TRIAL**

The Commission hereby demands a jury trial on any and all issues so triable.

September 30, 2022                    Respectfully submitted,

                                                     Alice K. Sum
                                                     _____
                                                     Alice K. Sum, Esq.
                                                     Trial Counsel
                                                     Fla. Bar No. 354510
                                                     Direct Dial: (305) 416-6293
                                                     Email:  sumal@sec.gov

                                                     Attorneys for Plaintiff
                                                     **SECURITIES AND EXCHANGE COMMISSION**
                                                     801 Brickell Avenue, Suite 1950
                                                     Miami, Florida 33131
                                                     Telephone:    (305) 982-6300
                                                     Facsimile:     (305) 536-4154