# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

### CASE NO.:  1:22-cv-23171-BLOOM/Otazo-Reyes

SECURITIES AND EXCHANGE COMMISSION,

      Plaintiff,

v.

ARBITRADE LTD., CRYPTOBONTIX INC.,
TROY R.J. HOGG, JAMES L. GOLDBERG,
STEPHEN L. BRAVERMAN, and
MAX W. BARBER,

      Defendants, and

SION TRADING FZE,

      Relief Defendant.

_____/

## DEFENDANT STEPHEN L. BRAVERMAN'S PARTIAL MOTION TO DISMISS COUNTS X, XI, AND XII OF PLAINTIFF'S COMPLAINT FOR INJUNCTIVE RELIEF AND INCORPORATED MEMORANDUM OF LAW

131547335

**Table of Contents**

**Page**

I.   BACKGROUND AND STATEMENT OF FACTS ..........................................................1

II.  STANDARD OF REVIEW ...............................................................................................5

III. ARGUMENT .....................................................................................................................6

    A.   Mr. Braverman is not an Aider and Abettor Because the Complaint Fails to Allege He had a General Awareness that His Role was Part of an Overall Pump and Dump Scheme...........................................................................................................6

        1.   Mr. Braverman Had No Role in the Gold Acquisition Transaction............6

        2.   The Complaint Fails to Allege Mr. Braverman was Generally Aware of any Material Misstatements or Omissions. ................................................8

    B.   The Complaint Fails to Allege Substantial Assistance. ........................................9

    C.   Counts X, XI, and XII Should be Dismissed Because the Complaint Fails to Allege a Primary Securities Law Violation........................................................11

        1.   The Complaint Fails to Allege Deceptive or Manipulative Conduct in Furtherance of a Scheme to Defraud. .......................................................11

        2.   The Complaint Fails to Allege the Requisite Scienter Necessary for a Primary Violation of Section 10b and Rule 10b-5(a) and (c)..................12

        3.   The Complaint Fails to Allege Any Material Misrepresentations or Materially Misleading Omissions. ..........................................................14

            a.   Without an Illegitimate Transaction, There Can be No Material Misrepresentations or Materially Misleading Omissions. ....................15

            b.   The Complaint Fails to Allege Any Material Misrepresentations or Materially Misleading Omissions with Particularity..............................15

            c.   The Complaint Fails to Allege Scienter with Respect to Any Purported Material Misrepresentations or Materially Misleading Omissions. .......18

IV.  CONCLUSION ................................................................................................................20

131547335

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ................................................................................................5

*Bryant v. Avado Brands, Inc.*,
  187 F.3d 1271 (11th Cir. 1999) ...........................................................................13

*Day v. Taylor*,
  400 F.3d 1272 (11th Cir. 2005) .............................................................................8

*Hart v. Internet Wire, Inc.*,
  145 F. Supp. 2d 360 (S.D.N.Y. 2001) ............................................................ 13, 18

*IBEW Local 595 Pension & Money Purchase Pension Plans v. ADT Corp.*,
  660 F. App'x 850 (11th Cir. 2016) ............................................................ 11, 16, 19

*In re Apple Computer. Inc. Sec. Litig.*,
  243 F. Supp. 2d 1012 (N.D. Cal. 2002) ...............................................................19

*In re Tupperware Brands Corp. Securities Litig.*,
  2021 WL 247870 (M.D. Fla. Jan. 25, 2021) ........................................................11

*Janus Capital Group, Inc. v. First Derivative Traders*,
  564 U.S. 135 (2011) ........................................................................................ 15, 16

*Mizzaro v. Home Depot, Inc.*,
  544 F.3d 1230 (11th Cir. 2008) ........................................................... 6, 13, 15, 17

*Murdeshwar v. Search Media Holdings Ltd.*,
  11-CIV-20549, 2011 WL 7704347 (S.D. Fla. Aug. 8, 2011) ...............................14

*S.E.C. v. City of Miami, Fla.*,
  988 F. Supp. 2d 1343 (S.D. Fla. 2013) ..................................................................5

*S.E.C. v. Complete Bus. Sols. Group, Inc.*,
  538 F. Supp. 3d 1309 (S.D. Fla. 2021) ................................................................14

*S.E.C. v. Conrad*,
  2017 WL 3485766 (N.D. Ga. Feb. 22, 2017) .......................................................10

*S.E.C. v. Frohling*,
  851 F.3d 132 (2d Cir. 2016) .................................................................................14

*S.E.C. v. Hope Advisors, LLC*,
  1:16-CV-01752-LMM, 2017 WL 6997134 (N.D. Ga. Nov. 28, 2017)...............................6, 9

*S.E.C. v. Levin*,
  2013 WL 5588224 (S.D. FL. Oct. 10, 2013) ...................................................................9, 10

*S.E.C. v. Quiros*,
  No. 16-cv-21301-GAYLES, 2016 WL 11578637 (S.D. Fla. Nov. 21, 2016)..........................9

*S.E.C. v. Rio Tinto PLC*,
  2019 WL 1244933 (S.D.N.Y. Mar. 18, 2019) ......................................................................10

*S.E.C. v. Roanoke Tech. Corp.*,
  No. 05-CIV-01880, 2006 WL 2470329 (M.D. Fla. Aug. 24, 2006)...............................18, 19

*S.E.C. v. Sason*,
  433 F. Supp. 3d 496 (S.D.N.Y. 2020) ..................................................................................12

*S.E.C. v. Solow*,
  2007 WL 917269 (S.D. Fla. Mar. 23, 2007).............................................................................6

*S.E.C. v. Wey*,
  246 F. Supp. 3d 894 (S.D.N.Y. 2017) ..................................................................................10

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
  551 U.S. 308 (2007) .........................................................................................8, 13, 18

*Woods v. Barnett Bank of Ft. Lauderdale*,
  765 F.2d 1004 (11th Cir. 1985).................................................................................................9

**Federal Rules of Civil Procedure**

  Rule 9(b) ........................................................................................ 1, 5, 6, 16, 19

  Rule 12(b)(6)........................................................................................................1, 5

**Securities Exchange Act**

  Section 10b ...................................................................................9, 12,14,15,18,19

  Rule 10b-5 ...................................................................................... 9, 14, 15

  Rule 10b-5(a) ........................................................................... 11, 12, 14, 19

  Rule 10b-5(b) ....................................................................................... 14, 15, 18

  Rules 10b-5(c) ........................................................................... 11, 12, 14, 19

iv

Defendant Stephen L. Braverman, pursuant to Federal Rules of Civil Procedure 12(b)(6) and 9(b), moves to dismiss Counts X, XI, and XII of Plaintiff's Complaint for Injunctive Relief (the "Complaint") (Doc. 1). Counts X, XI, and XII fail as a matter of law, and the Court should dismiss these Counts with prejudice.

## I.     BACKGROUND AND STATEMENT OF FACTS

The Complaint alleges that defendants Troy Hogg and James Goldberg fraudulently boosted the price of "Dignity" or "DIG" – an Ethereum-based crypto asset that Arbitrade Ltd. ("Arbitrade") and Cryptobontix Inc. ("Cryptobontix") owned and controlled – and then sold DIG owned by Cryptobontix for a profit of over $36.8 million. Doc. 1 ¶¶ 1-2, 4. Although the Complaint alleges in conclusory fashion that Mr. Braverman "substantially assisted" this purported "pump and dump scheme" (*id.* ¶¶ 4, 126, 130, 134), the allegations belie this assertion.

### Background of Arbitrade and Cryptobontix

In early 2017, Mr. Hogg developed DIG through Cryptobontix, a company he founded, owned, and of which he was the sole officer and director. *Id.* ¶ 17. Mr. Hogg arranged for DIG to trade exclusively on Livecoin, a crypto asset-trading platform. *Id.* ¶¶ 17, 19. Arbitrade, owned and controlled by Mr. Hogg and Mr. Goldberg, was the "corporate face" behind DIG. *Id.* ¶¶ 9-10, 20.

According to the Complaint, Mr. Hogg's "purported plan was to fund a variety of crypto asset related business ventures, including a proprietary crypto asset-trading platform, a merchant payment platform, and a crypto asset mining operation, through the sales of" DIG, *id.* ¶ 18, and "Arbitrade and Cryptobontix's plan was to do an 'initial coin offering' of DIG tokens," *id.* ¶ 21. The companies began building the related ventures, but none was completed, and the crypto asset mining was "only minimally successful." *Id.* ¶ 25.

131547335

The Complaint asserts that Mr. Braverman "was held out as the Chief Operations Officer of Arbitrade." *Id.* ¶ 11. That is incorrect. In fact, Mr. Braverman was Chief Operations Officer of the proprietary crypto asset-trading platform, Arbitrade Exchange (Bermuda) Ltd ("Exchange"). *See id.* ¶ 18. That distinction is significant because, as COO of Exchange, Mr. Braverman had no authority to take any action on behalf of Arbitrade.

### The Acquisition of Gold Bullion

The SEC challenges the promotion of DIG's unique feature – Arbitrade intended to back each DIG token with a dollar in gold. *Id.* ¶ 26. Arbitrade took steps to acquire the gold to back the tokens through Max Barber and his company, SION Trading FZE ("SION"). *Id.* ¶¶ 26-37. Mr. Hogg handled all aspects of the negotiations and acquisition of gold bullion. *Id.* ¶¶ 28, 36. In late June 2018, Arbitrade and SION executed a "Memorandum of Understanding" (MOU), regarding a contract to "purchase $10 billion of [Arbitrade's] 'bullion requirements' from SION within the term of 15 years in exchange for, among other things, an equity interest in Arbitrade and 150 million DIG." *Id.* ¶ 28. A few days later, Arbitrade and SION executed an "Asset Pledge Agreement," with SION agreeing to provide a "Safe Keeping Receipt" (SKR) holding title to the $10 billion in gold bullion. *Id.* ¶ 30. In September 2018, Arbitrade and SION executed an "Assignment Agreement" that transferred SION's ownership rights and title in the Gold to Arbitrade. *Id.* ¶ 31. G4S Cash Services LLC ("G4S"), which "specializes in vaulting … valuable assets," issued the SKR. *Id.* ¶ 32.

The Complaint makes much of the fact that because the SKR fails to reference who holds title to any gold of any value, *id.* ¶ 33, and without information regarding the "origin of the gold, the identity of the seller, or its storage location," *id.* ¶ 38, the gold acquisition transaction was, allegedly, a "sham," *id.* ¶¶ 39-45. Yet, noticeably absent from the Complaint are any rules or

standards for purchasing gold bullion or how Arbitrade's gold acquisition transaction departs from them.

Instead, notwithstanding the SEC's extensive investigation prior to filing its Complaint, the Complaint fails to allege with any particularity its claim that the gold acquisition transaction was a "sham," vaguely relying on purported "spelling and punctuation errors" and "illegible" portions of the "Certificate of Guarantee," *id.* ¶ 40, two limited-scope audits of the transaction, *id.* ¶¶ 41-47, and purported "red flags" associated with attempts to speak with G4S employees, *id.* ¶¶ 48-49. Importantly, there are no allegations that Mr. Braverman had any role in the gold acquisition process.

### The Purported False and Misleading Statements Regarding the Gold Acquisition

Relying on vague allegations of a "sham" acquisition, the Complaint identifies five press releases and one press conference that made up a "promotional campaign" to purportedly "increase demand for DIG" on Livecoin between March 2018 and January 2019, *id.* ¶¶ 52, 56-70:

- A <u>May 24, 2018, email news release</u> distributed to "correct various online rumors," including the gold acquisition plans of Arbitrade and Crypotbontix, set forth Arbitrade's plan to acquire gold bullion to back DIG tokens. *Id.* ¶¶ 56-57.

- A <u>June 28, 2018 telephonic "press conference"</u> and a <u>July 5, 2018 email news release</u> announcing a partnership with SION to acquire title of $10 billion worth of physical gold. *Id.* ¶¶ 61, 63-65. The July 5 news release also stated that the gold would be audited by a major accounting firm. *Id.* ¶ 64.

- A <u>November 5, 2018 email news release</u> announcing that Arbitrade received title to gold bullion worth "in excess of $10 billion" that would back DIG tokens. *Id.* ¶ 66. This release also stated that Arbitrade completed the "regulatory gold vaulting verification compliance" and that "an independent public accounting firm had 'verified the account in good standing' and 'confirmed' a Safe Keeping Receipt." *Id.* ¶ 67.

- A <u>January 9, 2019 email news release</u> announced vaulting an additional $3.8 million of gold and a $250 million credit from SION to facilitate the purchase. *Id.* ¶¶ 68-70.

The Complaint baldly asserts that the representations contained in these news releases and press conference were "blatantly false and misleading." *Id.* ¶ 71. The Complaint alleges, with no factual support, "Arbitrade never acquired or received title to $10 billion in gold bullion." *Id.* ¶ 72. The Complaint also alleges, "no audit of the $10 billion in gold was ever performed as represented in the July 5, 2018, news release," *id.* ¶ 73, but according to the Complaint, the July 5 statement announced that an audit *would* take place, not that it had. *Id.* ¶ 64. Further, the Complaint acknowledges that "around October 2018" Arbitrade attempted to engage Bureau Veritas, "a company that specializes in inspection and certification services," to audit the gold. *Id.* ¶ 50. The Complaint fails to allege the false or misleading nature of the January 9 press release. Importantly, there are no allegations of actions or omissions by Mr. Braverman regarding the releases or press conference.

### Sales of DIG on Livecoin

According to the Complaint, the releases and press conference "create[d] demand for DIG and had a material impact on the price of DIG sales on Livecoin." *Id.* ¶ 76. The Complaint alleges, "Except for the January 9, 2019, press release, each of the fraudulent releases resulted in a spike in the price of DIG," *id.* ¶ 77, but offers only a single example of the DIG price rising from "about $0.11 to $0.16 a token" after the May 24, 2018 email news release, which refuted online rumors regarding Arbitrade's plans to acquire gold bullion to back DIG tokens, *id.* ¶ 56. As noted above, however, the allegations as to the false or misleading nature of the May 24 release are conclusory.

The Complaint further alleges, "Simultaneous with Arbitrade and Cryptobontix conducting the [purportedly] false promotional campaign, [Mr.] Hogg and [Mr.] Goldberg sold DIG tokens, which were owned by Cryptobontix, on the Livecoin trading platform." *Id.* ¶ 79. Once again the Complaint is silent on any further details, including any dates, amounts, or proceeds, of these

"simultaneous" sales of DIG. The most the Complaint offers is an overall total of proceeds from an unspecified timeframe amounting to $36.8 million. *Id.*

According to the Complaint, Mr. Braverman "was responsible for converting the Bitcoin proceeds of the[] DIG sales to cash through an account he had at a U.S.-based crypto asset-trading platform" through a separate entity he owned and controlled. *Id.* ¶ 86. Mr. Braverman distributed the cash "based on instructions from Mr. Hogg or Mr. Goldberg." *Id.* ¶ 87. Aside from these general allegations of converting Bitcoin to cash, the Complaint does not allege that Mr. Braverman participated in the purportedly unlawful sales of DIG, had any role in acquiring the SKR, or took any specific steps regarding the "promotional campaign." Further, the Complaint fails to allege any details of the conversion of Bitcoin to cash, including any dates or amounts of the conversions.

## II.      STANDARD OF REVIEW

To survive a motion to dismiss under Rule 12(b)(6), a pleading must include a "short and plain statement of the claim showing that the pleader is entitled to relief." *Ashcroft v. Iqbal*, 556 U.S. 662, 677-78 (2009) (quoting Fed. R. Civ. P. 8(a)(2)). Labels, conclusions, and formulaic recitations of the elements of a cause of action are insufficient. *Id*. (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). Furthermore, mere naked assertions are not enough. *Id*. A complaint must contain sufficient factual matter, which, if accepted as true, would "state a claim to relief that is plausible on its face." *Id*. (quoting *Twombly*, 550 U.S. at 570).

Securities fraud claims are subject to the heightened pleading requirements of Rule 9(b) of the Federal Rules of Civil Procedure. *S.E.C. v. City of Miami, Fla.*, 988 F. Supp. 2d 1343, 1353 (S.D. Fla. 2013). Rule 9(b) requires a party to "state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b). Under Rule 9(b), it is "sufficient to plead the who,

131547335

what, when, where, and how of the [alleged fraud] and then allege generally … the requisite intent." *Mizzaro v. Home Depot, Inc.*, 544 F.3d 1230, 1237 (11th Cir. 2008).

## III.   ARGUMENT

The Complaint fails to allege that Mr. Braverman knowingly and substantially assisted any fraudulent or misleading conduct that violated securities law. Thus, the Court should dismiss Counts X - XII for failure to state a claim and for failure to plead fraud with particularity.

To state a claim against Mr. Braverman for aiding and abetting a securities law violation pursuant to Section 20(e), the SEC must allege (1) some other party has committed a securities law violation (the "Primary Defendants"); (2) Mr. Braverman had general awareness that his role was part of an overall activity that is improper; and (3) Mr. Braverman knowingly and substantially assisted the violation. *S.E.C. v. Solow*, 2007 WL 917269, at *3 (S.D. Fla. Mar. 23, 2007).

Here, the Complaint fails to allege that Mr. Braverman had a general awareness that his role was part of an improper activity, fails to allege that Mr. Braverman substantially assisted a securities law violation, and fails to allege a primary securities law violation.

### A.   Mr. Braverman is not an Aider and Abettor Because the Complaint Fails to Allege He had a General Awareness that His Role was Part of an Overall Pump and Dump Scheme.

The facts set forth in the Complaint do not establish that Mr. Braverman had a general awareness that his role was part of "pump and dump" scheme.

### 1.   Mr. Braverman Had No Role in the Gold Acquisition Transaction.

Although a complaint does not need to allege that aiding and abetting defendants *knew* they were violating a specific legal provision; the SEC must allege a "general awareness" that their roles were part of an improper activity by the Primary Defendants. *S.E.C. v. Hope Advisors, LLC*, 1:16-CV-01752-LMM, 2017 WL 6997134, at *3 (N.D. Ga. Nov. 28, 2017). Here, the Complaint alleges that negotiations between Arbitrade and SION regarding the acquisition of title to gold

bullion "were handled by [Mr. Hogg]," and Mr. Hogg "had the final word on the deal." *Id.* ¶¶ 28, 36. The Complaint fails to allege that Mr. Braverman had any role in, or was involved with, the negotiations for gold bullion, the MOU, the Asset Pledge Agreement, the SKR, the Assignment Agreement, or the Certificate of Guarantee. In fact, the Complaint fails to allege any circumstances whatsoever that connect Mr. Braverman to the gold transaction or otherwise indicate any awareness of the gold transaction or any "red flags" or "improper activity" connected to it.

Similarly, the Complaint makes only passing references to Mr. Braverman regarding the reports issued by Elliot Davis or BDO and fails to establish that Mr. Braverman had any awareness of either company's scope of work, their reports, or the contents and/or purported shortcomings of those reports. The Complaint fails to establish that Mr. Braverman would have known to request any confirmations of the existence, location, ownership, or origin of the gold with either company, *see id.* ¶ 46, or that he had the authority to do so. And, despite the Complaint's assertion that there was no objection to the narrow scope of Elliott Davis' work, *id.* ¶ 47, the allegations confirm that Arbitrade continued to investigate the gold transaction by engaging BDO and attempting to engage Bureau Veritas to confirm the gold's existence. *Id.* ¶ 50.

The Complaint attempts to cast doubt on this continued investigation, but merely references a single out-of-context statement by Mr. Braverman to conclude that Arbitrade "wanted the firm to issue its opinion without conducting any physical examination of the gold." *Id.* ¶ 51. The email exchange referenced in Paragraph 51 of the Complaint, however, establishes that Mr. Braverman was at the initial stages of negotiating the scope of an engagement with Bureau Veritas and did not outright reject a physical examination of the gold. *See* **Exhibit A**, *Email String RE: Arbitrade –*

*Au, Ag, Pt, Pd Bullion Audits*.[1] If anything, Mr. Braverman's exchange with Bureau Veritas high-lights his lack of general awareness as to the gold transaction and audits. In response to Bureau Veritas' question as to the scope of the audit, Mr. Braverman states, "We have an SKR that has already been audited by 3 accounting firms. I really wanted to discuss with you what the options are." *Id.* Mr. Braverman's response demonstrates his lack of familiarity with Arbitrade's audit needs and the type of audit services available through Bureau Veritas, and further demonstrates his lack of familiarity with the number and scope of audits related to the SKR or gold transaction. In sum, the Complaint fails to allege that Mr. Braveman had any "general awareness" that his role was part of any improper activity by the Primary Defendants.

> ## 2. The Complaint Fails to Allege Mr. Braverman was Generally Aware of any Material Misstatements or Omissions.

The Complaint fails to establish Mr. Braverman was generally aware of any false or materially misleading misstatements in news releases regarding the gold acquisition. Again, the Complaint fails to allege any action or omission Mr. Braverman purportedly took or what he purportedly reviewed. The Complaint merely asserts, "[Mr.] Braverman [] reviewed at least one of the [purportedly] false press releases prior to its issuance." Doc 1 ¶ 55. But the Complaint fails to allege which press release Mr. Braverman reviewed, when he reviewed it, the contents of the reviewed release, or any action or omission as a result of his purported review. Without further details on the release purportedly reviewed, the Complaint fails to establish Mr. Braverman's general knowledge of (i) any circumstances regarding any aspect of the gold transaction or related

---

[1] This court may consider documents incorporated by reference into the complaint on a motion to dismiss. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007). Materials are incorporated by reference if the document is central to plaintiff's claim and undisputed. *Day v. Taylor*, 400 F.3d 1272, 1276 (11th Cir. 2005). Here, Paragraph 51 of the Complaint directly quotes **Exhibit A**, which relates to the Complaint's central argument that the gold acquisition transaction was a "sham."

131547335

audits discussed in any release or (ii) the purported false or misleading nature of the contents of any release. Nor does the Complaint allege that Mr. Braverman knew anything that contradicted the representations to potential investors about the purchase of gold bullion.

Accordingly, the Complaint fails to establish Mr. Braverman was generally aware of any improper behavior. Because the SEC has had several years to investigate Mr. Braverman's role and his knowledge of that role, it is unlikely that the Commission will be able to correct its pleading deficiencies. Accordingly, Counts X, XI, and XII should be dismissed with prejudice.

### B.   The Complaint Fails to Allege Substantial Assistance.[2]

Counts X, XI, and XII fail for another reason: the Complaint fails to allege Mr. Braverman substantially assisted a primary violation of Section 10b or Rule 10b-5. To plead substantial assistance the SEC must allege that "the accused aider and associated himself with the venture, participated in the venture as something that he wished to bring about, and sought to make the venture succeed." *S.E.C. v. Quiros*, No. 16-cv-21301-GAYLES, 2016 WL 11578637, at *15 (S.D. Fla. Nov. 21, 2016). In other words, aiders and abettors must be "instrumental" to the alleged fraud schemes. *See S.E.C. v. Levin*, 2013 WL 5588224, *15 (S.D. FL. Oct. 10, 2013). Whether a defendant "substantially assisted the violation" depends on the totality of the circumstances. *Woods v. Barnett Bank of Ft. Lauderdale*, 765 F.2d 1004, 1010 (11th Cir. 1985).

According to the Complaint, Mr. Braverman's role, at most, consisted of:

(1) reviewing "at least one" unspecified news release with unspecified, purported material misstatements or omissions;

(2) failing to expand the scope of two audits in which he played no role;

(3) failing to secure a third audit; and

---

[2] Although the elements describe "substantial assistance" as "knowingly and substantially assisting" a primary securities law violation, "the knowing portion of this test is necessarily encompassed by the analysis in the general awareness" element. *Hope Advisors*, 2017 WL 6997134, at *3 n.2.

> (4) converting the Bitcoin proceeds of Mr. Hogg's and Mr. Goldberg's sales of DIG, owned by Cryptobontix, to cash through Mr. Braverman's corporate crypto asset trading account.

But there are no allegations that Mr. Braverman shared a common intent with anyone to commit the alleged wrong.

Moreover, the Complaint fails to establish any action or inaction by Mr. Braverman that was "instrumental" to the fraud. *See Levin*, 2013 WL 5588224, *15; *see also S.E.C. v. Conrad*, 2017 WL 3485766, at *15 (N.D. Ga. Feb. 22, 2017), *on reconsideration in part*, 2017 WL 3500364 (N.D. Ga. May 2, 2017) (finding SEC failed to plead "substantial assistance" where it failed to show defendant had ability to control underlying decisions relating to the fraud); *S.E.C. v. Rio Tinto PLC*, 2019 WL 1244933, at *16 (S.D.N.Y. Mar. 18, 2019) ("failure to correct" misleading statement, without more, fails to amount to "substantial assistance"); *S.E.C. v. Wey*, 246 F. Supp. 3d 894, 928 (S.D.N.Y. 2017) ("While the SEC urges that a defendant need not know every aspect of a fraudulent scheme to be liable for aiding and abetting it the complaint fails to allege that [defendant] knew of any part of the scheme apart from his own actions.").

As noted above, the Complaint fails to allege what Mr. Braverman knew about the gold acquisition transaction; that he was aware of any "red flags" related to the transaction; that he had any role in or knowledge of the first two audits of the transaction; and the extent to which he "reviewed" any news releases or what knowledge he possessed regarding any of the information therein. At most, the Complaint alleges that Mr. Braverman was involved in the conversion from Bitcoin to fiat currency after the DIG sales. But the Complaint does not allege that Mr. Braverman or the conversion was integral to the sales of DIG. Thus, it is insufficient to conclude that Mr. Braverman's role in the conversion of Bitcoin to fiat currency after any DIG sales was a central

part of the alleged "pump and dump scheme." Accordingly, Counts X - XII should be dismissed with prejudice.

**C.     Counts X, XI, and XII Should be Dismissed Because the Complaint Fails to Allege a Primary Securities Law Violation.**

Even if the Complaint alleges aider and abettor liability against Mr. Braverman, which it does not, the Complaint fails for another reason: Mr. Braverman cannot be liable as an aider and abettor if there is no primary violation. None exists here.

**1.  The Complaint Fails to Allege Deceptive or Manipulative Conduct in Furtherance of a Scheme to Defraud.**

The SEC contends that Mr. Braverman aided and abetted a violation of Rules 10b-5(a) and (c) involving a "scheme" to defraud investors. Scheme liability requires showing that the Primary Defendants participated in an illegitimate, sham, or inherently deceptive transaction where their conduct or role had the purpose and effect of creating a false appearance that would mislead investors. *See IBEW Local 595 Pension & Money Purchase Pension Plans v. ADT Corp.*, 660 F. App'x 850, 858 (11th Cir. 2016). To state a scheme liability claim, the SEC must allege that the defendant (1) committed a deceptive or manipulative act; (2) in furtherance of the alleged scheme to defraud; (3) with scienter. *In re Tupperware Brands Corp. Securities Litig.*, 2021 WL 247870, at *5 (M.D. Fla. Jan. 25, 2021).

Here, the Complaint fails to plead deceptive or manipulative conduct devised to defraud investors. Despite conclusory allegations that the acquisition of gold bullion was a "sham" used to inflate the price of DIG, there are no allegations that the plan to back DIG tokens with gold worth $1 per token was designed to deceive or defraud investors. Instead, the facts alleged show that the Primary Defendants – Arbitrade, Cryptobontix, Mr. Hogg, and Mr. Goldberg – took action to acquire gold bullion to back DIG, Doc. 1 ¶ 27, negotiated a gold acquisition agreement, *id.* ¶¶ 28-37, and received a SKR holding title to the $10 billion in gold bullion, *id.* ¶¶ 30-34.

The Complaint's attempt to allege that the Primary Defendants failed to confirm the existence, location, ownership, or origin of the gold, *id.* ¶¶ 46-47, and that a red flag was "ignored" when SION told BDO not to interview the signatory of the SKR, *id.* ¶ 48, is disingenuous at best. To the contrary, "Arbitrade engaged the services of two accounting firms to evaluate and confirm certain details of the transaction." *Id.* ¶ 41. Rather than accepting the limited evaluations and confirmations from those two firms, Arbitrade sought an opinion from a third firm, Bureau Veritas, to verify the existence of the gold. *Id.* ¶ 50.

The Complaint references an out-of-context statement by Mr. Braverman to conclude erroneously that Arbitrade merely "wanted the firm to issue its opinion without conducting any physical examination of the gold." *Supra* Part IV(A)(2); *id.* ¶ 51. The email exchange referenced in Paragraph 51 of the Complaint, however, establishes that Mr. Braverman was merely at the initial stages of negotiating the scope of an engagement with Bureau Veritas and did not outright reject a physical examination of the gold. *See* **Exhibit A**.

Even if the SEC alleged "abnormalities" in the gold acquisition transaction, "a significant abnormality [in a transaction], without more, does not plausibly support the SEC's much larger inference" of a scheme to defraud. *See S.E.C. v. Sason*, 433 F. Supp. 3d 496, 511–12 (S.D.N.Y. 2020) (dismissing Section 10b and Rule 10b-5(a) and (c) claims where the SEC did not "lay out any specific factual details regarding the alleged agreement to implement this scheme" and "simply allege[d] in conclusory fashion that [] transactions were a sham designed to facilitate a public offering"). Similarly here, the Complaint alleges a lack of due diligence in investigating the gold acquisition transaction, rather than alleging any deceptive conduct to defraud investors.

**2. The Complaint Fails to Allege the Requisite Scienter Necessary for a Primary Violation of Section 10b and Rule 10b-5(a) and (c).**

The SEC must allege sufficient facts to create a "strong inference" of scienter by the Primary Defendants. *Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1287 (11th Cir. 1999). Knowing misconduct or severe recklessness can establish scienter. Recklessness requires allegations that the defendant's conduct was an extreme departure of the standards of ordinary care, which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it. *Mizzaro v. Home Depot, Inc.*, 544 F. 3d 1230, 1238 (11th Cir. 2008) (quoting *Bryant*, 187 F. 3d at 1284). The Supreme Court held that a strong inference of scienter "must be more than merely 'reasonable' or 'permissible'—it must be cogent and compelling, thus strong in light of other explanations." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 323-24 (2007).

The Complaint attempts to allege scienter by relying on circumstantial evidence of severe recklessness, but the allegations fall short of a "strong inference of scienter." The Complaint contends that the Primary Defendants ignored purported signs of fraud in the dealings with SION related to the gold acquisition transaction. Doc. 1 ¶¶ 33-40. Rather than deliberately ignore red flags, the Primary Defendants actively took steps to evaluate and confirm the details of the transaction. *Id.* ¶¶ 41, 50; *see also supra* Part IV(C)(1). The Complaint attempts to invalidate those steps with its conclusory allegation that accounting firms were only engaged to "create the appearance that the gold was legitimate" and noting purported shortcomings of the scope of work of each firm. Doc. 1 ¶¶ 41-51. The pleading suggests that the Primary Defendants should have been more skeptical, but nothing alleged indicates that they agreed or schemed to implement a "sham" acquisition of gold bullion. *See Hart v. Internet Wire, Inc.*, 145 F. Supp. 2d 360, 368-69 (S.D.N.Y. 2001) (collecting cases cautioning against "allowing plaintiffs to proceed with allegations of 'fraud by

hindsight'" and noting that "even an egregious failure to gather information will not establish 10b-5 liability as long as the defendants did not deliberately shut their eyes to the facts").

Moreover, flagrant red flags and irregularities in the documents of a company on one side of a transaction do not give rise to a strong inference of scienter as to a director or officer of a company on the other side of the transaction. *See Murdeshwar v. Search Media Holdings Ltd.*, 11-CIV-20549, 2011 WL 7704347, at *18 (S.D. Fla. Aug. 8, 2011) (finding that irregularities within Company A's financial statements may compel an inference that Company A acted with scienter, but does not compel an inference that Company B, on the other side of a transaction with Company A, acted with scienter). Here, any purported irregularities and red flags stemming from the SION-side of transaction (including the SKR, Certificate of Guarantee, and refusing access to G4S employees) does not rise to a strong inference of scienter on the Arbitrade-side of the transaction. Thus, the Complaint fails to allege a primary violation of Section 10b and Rule 10b-5(a) and (c).

### 3. The Complaint Fails to Allege Any Material Misrepresentations or Materially Misleading Omissions.

The SEC asserts that the Primary Defendants violated Section 10(b) and Rule 10b-5(b) by purportedly misrepresenting that the gold acquisition transaction was legitimate in a promotional campaign. Doc. 1 Part C. Like the scheme liability claims, the misstatement claims also fail. To state a claim under Section 10(b) and Rule 10b-5(b), the SEC must allege that the Primary Defendants made a material representation or omission with scienter in connection with the purchase or sale of securities. *S.E.C. v. Complete Bus. Sols. Group, Inc.*, 538 F. Supp. 3d 1309, 1329 (S.D. Fla. 2021). A Primary Defendant makes a false statement with scienter when he has "intent to deceive, manipulate, or defraud." *S.E.C. v. Frohling*, 851 F.3d 132, 136 (2d Cir. 2016). The SEC's misstatement claims fail for three reasons.

**a. Without an Illegitimate Transaction, There Can be No Material Misrepresentations or Materially Misleading Omissions.**

First, as discussed above, the Complaint fails to allege that the gold acquisition transaction was a sham, which is fatal to the misstatement claims because the representations as to the gold acquisition cannot have been false or misleading unless the transaction was illegitimate. Here, as the Complaint acknowledges, the Primary Defendants sought to acquire gold to back DIG tokens, entered an agreement with SION to acquire that gold, received an SKR transferring SION's rights in gold bullion to Arbitrade, conducted audits of the transaction, and took steps to engage an auditor to audit the existence of the gold. Doc. 1 ¶¶ 27-32, 37, 42, 44-45, 50.

**b. The Complaint Fails to Allege Any Material Misrepresentations or Materially Misleading Omissions with Particularity.**

Second, for claims sounding in fraud, the SEC must allege the who, what, when, where, and how of the allegedly material misrepresentations or materially misleading omissions. *Mizzaro v. Home Depot, Inc.*, 544 F.3d 1230, 1237 (11th Cir. 2008). The facts set forth in the Complaint fail to do so and, therefore, fail to allege a primary violation of Section 10b and Rule 10b-5(b).

<u>**The Complaint fails to allege who "made" a false or misleading statement.**</u>

The Complaint must allege the "maker" of a statement with the "ultimate authority" over the statement. *See Janus Capital Group, Inc. v. First Derivative Traders*, 564 U.S. 135, 142 (2011) ("maker" of a statement under Rule 10b-5 "is the person or entity with ultimate authority over the statement … [w]ithout control, a person or entity [cannot] "make" a statement in its own right). Here, the Complaint generally alleges, "During the course of [a campaign promoting DIG], Arbitrade and Cryptobontix, through Hogg, Goldberg, Braverman, and Barber, made material misstatements or omissions in several releases and in the press conference concerning Arbitrade's purported acquisition of billions of dollars' worth of gold bullion." Doc. 1 ¶¶ 52-53. But the Complaint fails to support this conclusory statement with particularized allegations.

15

The Complaint vaguely alleges that Mr. Hogg and Mr. Goldberg "reviewed and approved *at least three* of the [purportedly] false and misleading releases before they were issued to the public, and [Mr.] Hogg participated in the press conference." *Id.* ¶ 54. The Complaint continues its vague allegations by asserting that Mr. Braverman "also reviewed *at least one* … and [Mr.] Barber reviewed two of the releases before they when out." *Id.* ¶ 55. But these vague and thin assertions of the "review and approval" of *some* releases untethered to any of the five releases identified in the Complaint fails to meet the particularity required by Rule 9(b). In sum, the Complaint fails to allege who had "ultimate authority" over any statement such that any individual or company "made" any statement. *See Janus*, 564 U.S. at 142.

### The Complaint fails to allege with particularity the false or misleading statements in any of the five news and press releases and the press conference.

The Complaint asserts that the May 24, 2018, new release distributed to "correct various online rumors," set forth Arbitrade's plan to acquire $8.7 billion worth of gold bullion to back DIG tokens. *Id.* ¶ 56-57. But the Complaint fails to allege – let alone with particularity – the false or misleading content of this release discussing the company's *plans* to acquire gold, particularly given the allegations that the Primary Defendants took steps to do so. There is no allegation that the Primary Defendants did not intend to acquire gold for backing DIG tokens.

Next, the Complaint alleges that a June 28, 2018 "press conference" and a July 5, 2018 news release announced a partnership with SION to acquire title of $10 billion worth of physical gold. *Id.* ¶¶ 61, 63-65. Again, the Complaint fails to allege with particularity the false or misleading content of the press conference and July 5 news release, particularly given the MOU and Asset Pledge Agreement executed around this time. The July 5 news release also stated that a major accounting firm *would* audit the gold. *Id.* ¶ 64. The Complaint alleges this statement was false

because no audit took place. *Id.* ¶ 73. Yet, the Complaint acknowledges that "around October 2018" Arbitrade *initiated* discussions with Bureau Veritas to audit the gold. *Id.* ¶ 50.

The Complaint asserts that a November 5, 2018 news release announced Arbitrade received title to gold bullion worth "in excess of $10 billion" to back its tokens. *Id.* ¶ 66. The Complaint alleges, without any factual support, that this announcement is false because "Arbitrade never acquired or received title to $10 billion in gold bullion." *Id.* ¶ 72.

The November 5 release also stated that Arbitrade completed the "regulatory gold vaulting verification compliance" and that "an independent public accounting firm had 'verified the account in good standing' and 'confirmed' a Safe Keeping Receipt." *Id.* ¶ 67. The Complaint concludes that these statements are misleading because "Arbitrade's title to real gold did not exist and Arbitrade never completed any required 'gold vaulting verification compliance.'" *Id.* ¶ 75. Yet, the Complaint alleges that the accounting firms, Elliot Davis, LLC ("Elliot Davis") and BDO USA, LLP ("BDO"), confirmed the issuance of the SKR, and that Elliot Davis confirmed the Assignment Agreement was properly executed and contained provisions assigning SION's ownership rights and title to the gold to Arbitrade." *Id.* ¶ 42-43, 44-45. The Complaint fails to allege the requirements for "gold vaulting verification compliance" and thus fails to support factually the allegation that the Primary Defendants never completed those requirements.

Finally, on January 9, 2019, Arbitrade announced the vaulting of an additional $3.8 million of gold from SION and further announced a $250 million in credit from SION to facilitate the purchase." *Id.* ¶¶ 68-70. The Complaint is silent as to the falsity or misleading nature of these allegations. Without alleging the who, what, when, where, and how of the allegedly false or materially misleading misrepresentations, there can be no primary securities law violation. *Mizzaro v. Home Depot, Inc.*, 544 F.3d 1230, 1237 (11th Cir. 2008).

**c. The Complaint Fails to Allege Scienter with Respect to Any Purported Material Misrepresentations or Materially Misleading Omissions.**

Finally, with respect to the Section 10(b) and Rule 10b-5(b) claims, the Complaint fails to allege that the Primary Defendants acted with scienter. As with the scheme liability claim, the SEC tries to predicate scienter on purported signs of fraud in the gold acquisition transaction that the Primary Defendants purportedly ignored. Doc. 1 ¶¶ 33-40. As described below, those allegations fall short of establishing a strong inference that the defendant acted in a severely reckless manner. *S.E.C. v. Roanoke Tech. Corp.*, No. 05-CIV-01880, 2006 WL 2470329, \*5-\*6 (M.D. Fla. Aug. 24, 2006) (dismissing complaint alleging securities fraud violations where the SEC failed to satisfy the pleading requirements for scienter); *see Hart v. Internet Wire, Inc.*, 145 F. Supp. 2d 360, 368-69 (S.D.N.Y. 2001) (collecting cases cautioning against "allowing plaintiffs to proceed with allegations of 'fraud by hindsight'").

To survive dismissal, scienter must be alleged such that "a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs*, 551 U.S. at 324. Here, only Mr. Hogg is alleged to have been involved in the gold acquisition transaction. And the facts of the Complaint belie the inference that Mr. Hogg deliberately ignored purported signs of fraud in the transaction. To the contrary, Arbitrade hired two accounting firms to audit the documents involved in the transaction and attempted to audit the gold as well. Doc. 1 ¶¶ 42-45, 50.

Moreover, rather than use any purportedly false or misleading statements to improperly generate demand for DIG on Livecoin, the Complaint sets forth an alternative purpose for the news releases and press conference:  Arbitrade and Cryptobontix distributed news and information "to correct various online rumors," which included rumors related to the companies' gold acquisition plans. *See id.* ¶ 56. This alternative purpose is supported by the fact that most of the purportedly

18

false or misleading news releases and press conference discuss Arbitrade's *plans* to purchase and audit the gold. In other words, countering and staying ahead of online rumors and speculation is a far more cogent and compelling reason for the news releases and press conference than undertaking an elaborate scheme to concoct the purchase of billions of dollars of gold and manipulate audits in order to inflate the price of DIG tokens.

The totality of the facts alleged in the Complaint does not support the requisite scienter needed to show a primary violation of Section 10(b) or Rule 10b-5(a) or (c). *See Roanoke Tech. Corp.*, 2006 WL 2470329, *6 (M.D. Fla. Aug. 24, 2006) (finding no allegations that a defendant knowingly or recklessly acted with the intent to deceive, manipulate, or defraud, and no allegations providing circumstantial evidence that he did so). Accordingly, the Complaint fails to allege the material misstatements or omissions with the requisite particularity required by Rule 9(b) and should be dismissed with prejudice.

Moreover, corporate liability is properly alleged only where one of its agents makes a false statement and possesses the requisite scienter. *In re Apple Computer. Inc. Sec. Litig.*, 243 F. Supp. 2d 1012, 1023 (N.D. Cal. 2002) ("It is not enough to establish fraud on the part of a corporation that one corporate officer makes a false statement that another officer knows to be false. A defendant corporation is deemed to have the requisite scienter for fraud only if the individual corporate officer making the statement has the requisite level of scienter…."). Because the Complaint fails to allege a false or materially misleading misstatement on the part of any corporate officer of either Cryptobontix or Arbitrade, *see supra* Part IV(C)(3)(b), and fails to allege the requisite scienter on the part of any corporate officer, the Complaint also fails to allege a primary violation on the part of either company.

131547335

Because no aiding or abetting claims survives without a primary violation of securities law, Counts X, XI, and XII should be dismissed with prejudice.

## IV.    CONCLUSION

For the foregoing reasons, Mr. Braverman requests that the Court dismiss the Complaint with prejudice and award such further relief as the Court deems appropriate.

Date:   January 13, 2023                          Respectfully submitted,

                                                                   */s/ Adam P. Schwartz*
Adam P. Schwartz
Florida Bar No. 83178
Erin J. Hoyle
Florida Bar No. 117762
CARLTON FIELDS, P.A.
P.O. Box 3239
Tampa, FL 33601-3239
Telephone:  813.223.7000
Facsimile:  813.229.4133
E-mail:  aschwartz@carltonfields.com
E-mail:  ehoyle@carltonfields.com

*Counsel for Stephen L. Braverman*

131547335