UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 22-cv-23171-BLOOM/Otazo-Reyes

SECURITIES AND EXCHANGE COMMISSION,

    Plaintiff,

v.

ARBITRADE LTD.,
CRYPTOBONTIX INC.,
TROY R.J. HOGG,
JAMES L. GOLDBERG,
STEPHEN L. BRAVERMAN, and
MAX W. BARBER,

    Defendants.

**PLAINTIFF'S RESPONSE IN OPPOSITION TO STEPHEN L. BRAVERMAN'S MOTION TO DISMISS COUNTS X, XI, AND XII**

Plaintiff Securities and Exchange Commission (the "Commission" or the "SEC"), files its Response in Opposition to Defendant Stephen L. Braverman's Motion to Dismiss Counts X, XI, and XII, ECF No. [30]:

### I. INTRODUCTION

The SEC's Complaint has more than adequately stated a claim against Braverman for aiding and abetting liability under Counts X, XI, and XII. Instead of looking squarely at what the SEC alleged in its Complaint, which is more than sufficient to survive a motion to dismiss, Braverman focuses on the hypothetical facts that the SEC did not allege. When considering the surrounding circumstances alleged in the Complaint it is clear that the SEC has sufficiently alleged aiding and abetting liability against Braverman because (1) there is a primary securities law violation; (2) Braverman had a general awareness his role was part of an overall activity that is

1

improper; and (3) Braverman provided "substantial assistance" to his co-Defendants. Accordingly, Braverman's Motion to Dismiss should be denied.

## II.   BACKGROUND

This case involves a crypto asset pump-and-dump scheme perpetrated by Arbitrade Ltd. ("Arbitrade") and Cryptobontix Inc. ("Cryptobontix"), and their principals, Hogg, Goldberg, and Stephen L. Braverman ("Braverman"), and a so-called international gold trader, Max W. Barber ("Barber"). *See* Complaint, ECF No. [1] at ¶ 1-2. Braverman was held out as the Chief Operations Officer of Arbitrade. *Id*. at ¶ 11. This case centers on an Ethereum-based crypto asset that Arbitrade and Cryptobontix owned and controlled called "Dignity" or "DIG," which was traded exclusively on a Russia based crypto asset trading platform called "Livecoin." *Id*. at ¶ 17. Arbitrade and Cryptobontix operated or planned to operate a variety of crypto asset related business ventures, including a crypto asset trading platform, a merchant payment platform, and a crypto asset mining operation, through sales of the DIG tokens. *Id*. at ¶ 18.

Between May 2018 and January 2019, Arbitrade and Cryptobontix, through Hogg, Goldberg, Braverman, and Barber made material misrepresentations and omissions to investors in a series of news and press releases and a press conference issued to the public. *Id*. at ¶ 3. This misconduct occurred while Arbitrade, Cryptobontix, Hogg, and Goldberg were offering and selling DIG. *Id*. Among other things, the announcements falsely claimed that Arbitrade had acquired and received title to $10 billion in gold bullion and that the company intended to back each DIG token issued and sold to investors with $1.00 worth of this gold. *Id*. This is despite the fact that DIG always sold for prices far below $1 per token. *Id*. at ¶ 26.

Arbitrade claimed to have acquired the gold through a purchase transaction with Barber and his company, SION Trading FZE ("SION"). *Id*. at ¶ 3. The Defendants also misrepresented that independent accounting firms had performed an "audit" of the gold and verified its existence.

*Id*. In August 2018, Arbitrade retained an accounting firm recommended by Barber, Elliott Davis, LLC ("Elliott Davis"), to confirm the issuance of the Safe Keeping Receipt and that the Assignment Agreement was properly executed and contained provisions assigning SION's purported ownership rights and title to the gold to Arbitrade. *Id*. at ¶ 42. Although Elliot Davis returned a report acknowledging this information, the report did not confirm – and Arbitrade never asked Elliot Davis to do so – whether SION actually possessed real, much less transferable, ownership rights or title to gold bullion. *Id*. at ¶ 43. Similarly, in September 2018 Arbitrade retained BDO USA, LLP ("BDO") purportedly to assess the authenticity of the Safe Keeping Receipt. *Id*. at ¶ 44. Based upon Arbitrade's request, BDO issued a report stating only that it had confirmed that G4S issued the Safe Keeping Receipt, after SION provided BDO with a copy of a document that had certified an unspecified value in holdings to G4S personnel and proof that this document was placed in a vault there. BDO's report did not confirm whether SION possessed ownership rights or title to gold bullion. *Id*. at ¶ 45.

Braverman never asked Elliott Davis or BDO to confirm the existence, location, ownership, or origin of the gold itself. *Id*. at ¶ 46. Braverman objected to the narrow parameters of Elliott Davis' work that SION dictated. *Id*. at ¶ 47. Moreover, Braverman ignored the red flag presented when SION told BDO to drop its request for a video conference with the G4S employee whose signature purportedly appears on the Safe Keeping Receipt. *Id*. at ¶ 48. Around October 2018, Arbitrade tasked Braverman with hiring Bureau Veritas, a company that specializes in inspection and certification services, to provide an opinion about the existence of the gold that Arbitrade purportedly purchased from SION. *Id*. at ¶ 50. Bureau Veritas refused to accept the engagement when it became clear that Arbitrade wanted the firm to issue its opinion without conducting any physical examination of the gold, with Braverman telling the firm that "[c]ounting bars I believe is overkill." *Id*. at ¶ 51. There is no credible evidence of Arbitrade actually receiving title to $10

billion in gold bullion or that this gold even exists. *Id*. at ¶ 39. By all indications, the gold acquisition transaction with Barber and SION was merely a sham. *Id*. at ¶ 3.

To increase demand for DIG on the Livecoin trading platform, Arbitrade and Cryptobontix engaged in a promotional campaign to tout the business and DIG tokens through emailed news releases and press releases disseminated to the public, and at least one "press conference." *Id*. at ¶ 52. The press releases were issued on May 24, 2018, July 5, 2018, November 5, 2018, and January 9, 2019. *Id*. at ¶¶ 56, 63, 66, and 68. The telephonic press conference occurred on June 28, 2018. *Id*. at ¶ 61. During the course of this promotional activity, Arbitrade and Cryptobontix, through Hogg, Goldberg, Braverman, and Barber, made material misstatements or omissions in each release and in the press conference concerning Arbitrade's purported acquisition of billions of dollars' worth of gold bullion. *Id*. at ¶¶ 57, 60, 63, 64, 65, 66, 67, 68, and 71. Braverman reviewed at least one of the false press releases prior to its issuance, and Barber reviewed two of the releases before they went out. *Id*. at ¶ 55. Arbitrade and Cryptobontix, through Hogg, Goldberg, and Braverman, used the false and misleading releases and press conference to establish a market and generate demand for DIG on the Livecoin trading platform. *Id*. at ¶ 76. The fraudulent releases had a material impact on the price of DIG sales on this trading platform. *Id*. For example, following the May 24, 2018, email news release, the price of DIG jumped from about $0.11 to $0.16 a token, an over 45% increase in price. *Id*. at ¶ 78.

During the same period that Arbitrade and Cryptobontix were conducting the fraudulent promotional campaign, Hogg and Goldberg, with Braverman's assistance, sold DIG tokens on the Livecoin trading platform at artificially inflated prices for proceeds totaling about $36.8 million. *Id*. at ¶ 79. Braverman was responsible for converting the Bitcoin proceeds of their DIG sales to cash through an account he had at a U.S.-based crypto asset-trading platform in the name of Rozgold, an entity he owned and controlled. *Id*. at ¶ 86. The cash would be transferred into

Rozgold's bank account, which Braverman would then distribute based on instructions from Hogg or Goldberg. *Id*. at ¶ 87. Braverman also retained some of the proceeds from the Bitcoin sales for himself. *Id*. at ¶ 88. Braverman falsely represented to the crypto asset-trading platform that he was trading for the benefit of Rozgold and failed to disclose that he was in fact engaged in crypto asset transactions for the benefit of third parties. *Id*. at ¶ 89.

### III.     MEMORANDUM OF LAW

**A.     Legal Standard**

When reviewing a motion under Rule 12(b)(6), a court, as a general rule, must accept the plaintiff's allegations as true and evaluate all plausible inferences derived from those facts in favor of the plaintiff. *See Miccosukee Tribe of Indians of Fla. v. S. Everglades Restoration Alliance*, 304 F.3d 1076, 1084 (11th Cir. 2002); *AXA Equitable Life Ins. Co. v. Infinity Fin. Grp., LLC*, 608 F. Supp. 2d 1349, 1353 (S.D. Fla. 2009). However, this tenet does not apply to legal conclusions, and courts "are not bound to accept as true a legal conclusion couched as a factual allegation." *Twombly*, 550 U.S. at 555; *see Iqbal*, 556 U.S. at 678; *Thaeter v. Palm Beach Cnty. Sheriff's Office*, 449 F.3d 1342, 1352 (11th Cir. 2006). Moreover, "courts may infer from the factual allegations in the complaint 'obvious alternative explanations,' which suggest lawful conduct rather than the unlawful conduct the plaintiff would ask the court to infer." *Am. Dental Ass'n v. Cigna Corp.*, 605 F.3d 1283, 1290 (11th Cir. 2010) (quoting *Iqbal*, 556 U.S. at 682).

Where a complaint states securities fraud claims, as with other types of fraud claims, the complaint must also satisfy the heightened pleading requirements of Rule 9(b), stating "with particularity the circumstances constituting fraud." *Mizzaro v. Home Depot, Inc.*, 544 F.3d 1230, 1237 (11th Cir.2008); see *also Edward J. Goodman Life Income Trust v. Jabil Circuit, Inc*., 594 F.3d 783, 789 (11th Cir.2010) (citations omitted). Under Rule 9(b), it is sufficient to plead the

5

who, what, when, where, and how of the allegedly false statements and then allege generally that those statements were made with the requisite intent." *Id.*

**B.  The SEC Has Sufficiently Plead Its Claim for Aiding and Abetting**

The SEC states a claim for aiding and abetting liability.  The Complaint more than plausibly alleges: (1) a primary violation by another party; (2) a general awareness by the aider and abettor that his role was part of an overall activity that is improper; and (3) the aider and abettor provided "substantial assistance" to the violator.  *SEC v. Big Apple Consulting USA, LLC*, 783 F.3d 786, 800 (11th Circ. 2015)(citing *Woods v. Barnett Bank of Ft. Lauderdale*, 765 F.2d 1004, 1009-10 (11th Cir. 1985)).   Here, the SEC has alleged that Braverman's co-Defendants have violated Section 10(b) and Rules 10b-5(a), (b), and (c) of the Exchange Act; Braverman had a general awareness based upon the surrounding circumstances that he was part of an overall improper activity; and Braverman provided substantial assistance to his co-Defendants.

*1.  The SEC Sufficiently Alleges that Braverman Had General Awareness*

The SEC more than sufficiently alleges that Braverman had a general awareness that he was a part of improper activity by his co-Defendants.  General awareness may be inferred by the surrounding circumstances and expectations of the parties. *Woods*, 765 F.2d at 1009.  Here, when looking at the surrounding circumstances and expectation of the parties alleged in the Complaint, it is clear that Braverman had a general awareness that he was engaging in improper activity.

Braverman was held out as the Chief Operations Officer of Arbitrade.  *Id*. at ¶ 11.  In August 2018, Arbitrade retained Elliott Davis to confirm the issuance of the Safe Keeping Receipt and that the Assignment Agreement was properly executed and contained provisions assigning SION's purported ownership rights and title to the gold to Arbitrade.  *Id*. at ¶ 42.  Elliot Davis did not confirm whether SION actually possessed real, much less transferable, ownership rights or title to gold bullion.  *Id*. at ¶ 43. When Arbitrade retained BDO to assess the authenticity of the Safe

Keeping Receipt for the gold bullion, BDO issued a report stating only that it had confirmed that G4S issued the Safe Keeping Receipt. BDO's report did not confirm whether SION possessed ownership rights or title to gold bullion. *Id*. at ¶ 44. Despite being COO of Arbitrade and the critical importance that Arbitrade acquired title to $10 billion in gold bullion and intended to back each DIG token issued and sold to investors with $1.00 worth of this gold, Braverman never asked Elliott Davis or BDO to confirm the existence, location, ownership, or origin of the gold itself. *Id*. at ¶ 46. Also, Braverman never objected to the narrow parameters of Elliott Davis' work that SION dictated and ignored the red flag presented when SION told BDO to drop its request for a video conference with the G4S employee whose signature purportedly appears on the Safe Keeping Receipt. *Id*. at ¶ 47-48.

Then, around October 2018, Arbitrade tasked Braverman with hiring Bureau Veritas, a company that specializes in inspection and certification services, to provide an opinion about the existence of the gold that Arbitrade purportedly purchased from SION. *Id*. at ¶ 50. Bureau Veritas refused to accept the engagement when it became clear that Arbitrade wanted the firm to issue its opinion without conducting any physical examination of the gold, and Braverman told the firm that "[c]ounting bars I believe is overkill."[1] *Id*. at ¶ 51.

To increase demand for DIG on the Livecoin trading platform, beginning in around March 2018 and continuing until January 2019, Arbitrade and Cryptobontix engaged in a promotional campaign to tout the business and DIG tokens through emailed news releases and press releases disseminated to the public, and at least one "press conference." *Id*. at ¶¶ 56, 61, 63, 66, and 68. In each press release and press conference, Arbitrade and Cryptobontix, through Hogg, Goldberg,

---

[1] Braverman recasts and attempts to explain this language as demonstrating his lack of general awareness as to the gold transaction and audits. Considering the email in context – that there were already insufficient prior audits – his immediate conclusion that "[c]ounting bars is overkill" actually demonstrate his awareness of his role was a part of improper activity and an intent to summarily dispense with the task for which he was assigned and responsible.

Braverman, and Barber, made at least one material misstatement or omission concerning Arbitrade's purported acquisition of billions of dollars' worth of gold bullion. *Id*. at ¶¶ 57, 60, 63, 64, 65, 66, 67, 68, and 71. Braverman reviewed at least one of the false press releases prior to its issuance. *Id*. at ¶ 55.[2] Arbitrade and Cryptobontix, through Hogg, Goldberg, and Braverman, used the false and misleading releases and press conference to establish a market and generate demand for DIG on the Livecoin trading platform. *Id*. at ¶ 76. The fraudulent releases had a material impact on the price of DIG sales on this trading platform. *Id*.

During the same period that Arbitrade and Cryptobontix were conducting the fraudulent promotional campaign, Hogg and Goldberg, with Braverman's assistance, sold DIG tokens on the Livecoin trading platform at artificially inflated prices for proceeds totaling about $36.8 million. *Id*. at ¶ 79. Braverman was responsible for converting the Bitcoin proceeds of their DIG sales to cash through an account he had at a U.S.-based crypto asset-trading platform in the name of Rozgold, an entity he owned and controlled. *Id*. at ¶ 86. The cash would be transferred into Rozgold's bank account, which Braverman would then distribute based on instructions from Hogg or Goldberg. *Id*. at ¶ 87. Braverman also retained some of the proceeds from the Bitcoin sales for himself. *Id*. at ¶ 88. Braverman falsely represented to the crypto asset-trading platform that he was trading for the benefit of Rozgold and failed to disclose that he was in fact engaged in crypto asset transactions for the benefit of third parties. *Id*. at ¶ 89.

Bottom line, Braverman was the COO and was fully aware of the importance of the existence of the gold bullion, was directly aware of and involved in attempts to confirm the

---

[2] Braverman complains that the SEC fails to allege which of the four press releases Braverman reviewed and that Braverman's general knowledge thus cannot be established. The SEC submits that there is a tiny universe of four press releases, one of which Braverman is alleged to have reviewed. The press release allegations, coupled with allegations concerning his COO role, hiring Bureau Veritas to confirm the existence of the gold, helping sell DIG on LiveCoin, and converting the Bitcoin proceeds of their DIG sales to cash through an entity that he owned, are more than sufficient to satisfy the general awareness requirement.

existence of the gold bullion, including reviewing at least one of the false press releases prior to its issuance, was responsible for converting the Bitcoin proceeds of the DIG sales to cash through an account he had at a U.S.-based crypto asset-trading platform in the name of Rozgold, an entity he owned and controlled, retained some of the proceeds from the Bitcoin sales for himself, and falsely represented to the crypto asset-trading platform that he was trading for the benefit of Rozgold and failed to disclose that he was in fact engaged in crypto asset transactions for the benefit of third parties.  That Braverman was not involved in the actual gold acquisition is inconsequential; he was COO of Arbitrade and actively was involved as noted above.  The Court may clearly infer from these surrounding circumstances that Braverman was general aware of the material misstatements and omissions and that his role was part of an improper activity.

      2.  *The SEC Sufficiently Alleges Substantial Assistance*

The SEC also more than sufficiently alleges that Braverman provided substantial assistance to his co-Defendants.  "Substantial assistance" can be proved by demonstrating the accused aider and abetter associated himself with the venture, participated in the venture "as something that he wished to bring about," and sought to make the venture succeed.  *SEC v. Quiros*, 2016 WL 11578637 at *15 (S.D. Fla. Nov. 21, 2016)(citing *SEC v. Apuzzo*, 689 F.3d 204, 214 (2d Cir. 2012)).  Similar to the general awareness requirement, Braverman clearly associated and participated in the venture by: being responsible for hiring Bureau Veritas to confirm the existence of the gold bullion, reviewing at least one of the false press releases prior to its issuance, being responsible for converting the Bitcoin proceeds of the DIG sales to cash through an account he had at Rozgold, which he owned and controlled, retaining some of the proceeds from the Bitcoin sales for himself, and falsely represented to the trading platform that he was trading for the benefit of Rozgold and failing to disclose that he was in fact engaged in crypto asset transactions for the benefit of third parties.  Braverman's responsibility for converting the sales proceeds through his

9

Rozgold account was in fact instrumental to the fraud. *SEC v. Levin*, 2013 WL 5588224 at *15 (S.D. Fla. Oct. 10, 2013). Simply put, the SEC has not only alleged Braverman's substantial assistance, it can clearly be inferred from the allegations that, but for Braverman's involvement, the venture would not have been successful.

### C. The Complaint Alleges a Primary Securities Law Violation

The SEC more than adequately alleges its claims against Cryptobontix, Arbitrade, Hogg, and Goldberg for violations of Section 10(b) and Rule 10b-5(a), (b), and (c) of the Exchange Act. As such, Braverman can be held liable as an aider and abettor.

#### 1. The Complaint Alleges Deceptive or Manipulative Conduct in Furtherance of a Scheme to Defraud

Scheme liability occurs when a defendant employs "any device, scheme, or artifice to defraud," 17 C.F.R. § 240.10b–5(a) (Rule 10b–5(a)), or "any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person," 17 C.F.R. § 240.10b–5(c) (Rule 10b–5(c)). Braverman again ignores the detailed allegations in the Complaint concerning Arbitrade, Cryptobontix, Hogg, and Goldberg's dissemination of false and misleading statements in releases and a press conference with the intent to deceive issued to the public at a time in which the DIGs were publicly trading. These releases and conference call falsely claimed, among other things, that Arbitrade had acquired and received title to billions of dollars' worth of gold bullion. They also misrepresented that accounting firms had performed an "audit" of the gold and verified its existence, when in fact they knew that the audits never came close to doing this. Contrary to Braverman's assertions, these were not merely "abnormalities" in the gold acquisition transaction but rather evidence of deceptive and manipulative conduct in furtherance of a scheme to defraud.

### 2. The Complaint Alleges Requisite Scienter for a Violation of Section 10(b) and Rule 10b-5(a) and (c)

The allegations in the Complaint reflect that the primary Defendants acted with scienter. Scienter may be established by a showing of knowing misconduct or severe recklessness. *SEC v. Carriba Air, Inc.*, 681 F.2d 1318, 1324 (11th Cir. 1982). Hogg and Goldberg either knew, or were severely reckless in not knowing, that the statements made regarding the gold bullion were false and misleading. For example, Hogg and Goldberg reviewed and approved at least three of the false and misleading releases before they were issued to the public, despite no audit firm ever confirming the existence of the gold bullion. Hogg was the one who handled the negotiations for the sham gold purchase between Arbitrade and SION, and Goldberg was kept informed of the details of the deal. Arbitrade and Cryptobontix also violated these same anti-fraud provisions because Hogg and Goldberg's scienter may be imputed to them. *See SEC v. Manor Nursing Centers, Inc.*, 458 F.2d 1082, 1089 n.3 (2d Cir. 1972) (an individual's "knowledge is imputed to the corporations which he controlled"). Contrary to Braverman's assertions, the Complaint is replete with allegations of the primary Defendants' knowing misconduct or severe recklessness.

### 3. The Complaint Alleges Material Misrepresentations or Materially Misleading Omissions for a Violation of Section 10(b) and Rule 10b-5(b)

The Complaint sufficiently alleges material misrepresentations or materially misleading omissions for a violation of Section 10(b) and Rule 10b-5(b).

First, the SEC has sufficiently alleged that the gold acquisition transaction was a sham, *supra* Section B.1.

Second, the SEC has alleged the who, what, when and where, and how of the material misrepresentations and omissions. For each press release, the SEC identified the specific release, alleged the statements made, and how they were materially misleading or contained omissions. Complaint at ¶¶ 56, 61, 63, 66, and 68 and ¶¶ 57, 60, 63, 64, 65, 66, 67, 68, and 71, respectively.

11

Arbitrade and Cryptobontix were the makers of the misstatements contained in the respective news and press releases attributable to them. Hogg and Goldberg were also both the makers of all the false and misleading statements made in the news and press releases. Hogg, as the owner and sole officer and director of Cryptobontix and a *de facto* principal officer of Arbitrade, had ultimately authority over the statements both companies made to the public. Similarly, Goldberg, as a *de facto* principal officer of Arbitrade and the second largest shareholder of the company, also had ultimately authority over those statements. For example, Hogg drafted the email news releases and approved at least one of the press releases issued by Cryptobontix and Arbitrade, and Goldberg reviewed all of the email news releases and press releases prior to dissemination. Separately, Hogg was the maker of the statements he made during the press conference. These news and press releases each contained material misrepresentations and/or misleading omissions. The SEC is not required to go through every press release or statement made during a press conference and identify every single statement made and whether the statement is false and why. The SEC has more than sufficiently identified certain statements made by Arbitrade, Cryptobontix, Hogg and Goldberg that were material misrepresentations or omissions.

Third, the Complaint more than sufficiently alleges scienter, which can be demonstrated through a strong inference that the defendant acted in a severely reckless manner. Contrary to Braverman's assertions, the SEC alleges that Defendants made repeated false or misleading statements to generate demand for DIG on LiveCoin. Hogg and Goldberg reviewed and approved at least three of the false and misleading releases before they were issued to the public. For example, Arbitrade and Cryptobontix issued the May 24, 2018 email news release falsely claiming that "investors would be able to redeem their DIG crypto assets for bullion." *Id.* at ¶ 60. That there was an additional purpose of correcting "online rumors" does not negate the false statement. During the June 28, 2018 telephonic "press conference" Arbitrade held, Hogg stated announced

12

the partnership with SION pursuant to which Arbitrade would receive title to $10 billion worth of physical gold, which in fact had never been verified. *Id.* at ¶ 61. Hogg and Goldberg knew, or were severely reckless in not knowing, that the statements made regarding the gold bullion were false and misleading, especially when none of the hired auditors actually confirmed the existence of the gold bullion. In addition, Hogg was the one who handled the negotiations for the sham gold purchase between Arbitrade and SION, and Goldberg was kept informed of the details of the deal.

The SEC's Complaint, taken in its totality, more than sufficiently alleges a primary violation by Braverman's co-Defendants, and thus the Motion to Dismiss should be denied.

## IV. CONCLUSION

For the foregoing reasons, Braverman's Motion to Dismiss should be denied.[3]

February 13, 2023.                                      Respectfully submitted,

 

Alice K. Sum
Alice K. Sum, Esq.
Trial Counsel
Fla. Bar No. 354510
Direct Dial: (305) 416-6293
Email: sumal@sec.gov

Attorneys for Plaintiff
**SECURITIES AND EXCHANGE COMMISSION**
801 Brickell Avenue, Suite 1950
Miami, Florida 33131
Telephone:   (305) 982-6300
Facsimile:    (305) 536-4154

---

[3] To the extent that this Court determines that there are any pleading deficiencies, the Commission is entitled to leave to amend its Complaint.