UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 22-cv-23171-BLOOM/Otazo-Reyes

SECURITIES AND EXCHANGE COMMISSION,

    Plaintiff,

v.

ARBITRADE LTD.,
CRYPTOBONTIX INC.,
TROY R.J. HOGG,
JAMES L. GOLDBERG,
STEPHEN L. BRAVERMAN, and
MAX W. BARBER,

    Defendants.

**PLAINTIFF'S RESPONSE IN OPPOSITION TO
JAMES L. GOLDBERG AND TROY R.J. HOGG'S[1] MOTION TO DISMISS**

Plaintiff Securities and Exchange Commission (the "Commission" or "SEC"), files its Response in Opposition to Defendant James L. Goldberg ("Goldberg") and Troy R.J. Hogg's ("Hogg") Motion to Dismiss for Lack of Subject Matter Jurisdiction and Failure to State a Claim, ECF No. [25]:

## I.    INTRODUCTION

At the heart of Goldberg and Hogg's Motion to Dismiss is their wish that this Court disregard substance for form and focus solely on the name of the industry or thing involved in this case – crypto assets – to reach an unsupported position that the SEC has no authority to pursue Defendants for their involvement in a pump and dump scheme. Defendants' broad statement that "Congress has not clearly authorized the SEC's encroachment into the digital currency market"

---

[1] Hogg joined in Goldberg's Motion to Dismiss and incorporated by reference Goldberg's Declaration (including exhibits) and his memorandum of law, ECF No. [27; 27-1].

flatly ignores that Congress has, for 90 years, clearly authorized the SEC's authority over securities, which has run the gamut from interests in a citrus grove to EB-5 visa investor programs to, more recently, crypto assets. This Court should soundly reject Defendants' contorted argument and conclude that the DIG crypto assets in this case constituted investment contracts under *SEC v. W.J. Howey Co.*, 328 U.S. 293 (1946) and its progeny, and deny Defendants' Motion to Dismiss.

## II.     BACKGROUND

This case involves a crypto asset pump-and-dump scheme perpetrated by Arbitrade Ltd. ("Arbitrade") and Cryptobontix Inc. ("Cryptobontix"), and their principals, Hogg, Goldberg, and Stephen L. Braverman ("Braverman"), and a so-called international gold trader, Max W. Barber ("Barber"). *See* Complaint, ECF No. [1] at ¶ 1-2. This case centers on an Ethereum-based crypto asset that Arbitrade and Cryptobontix owned and controlled called "Dignity" or "DIG," which was traded exclusively on a Russia based crypto asset trading platform called "Livecoin." *Id*. at ¶ 17. Arbitrade and Cryptobontix operated or planned to operate a variety of crypto asset related business ventures, including a crypto asset trading platform, a merchant payment platform, and a crypto asset mining operation, through sales of the DIG tokens. *Id*. at ¶ 18.

Between May 2018 and January 2019, Arbitrade and Cryptobontix, through Hogg, Goldberg, Braverman, and Barber made material misrepresentations and omissions to investors in a series of news and press releases and a press conference issued to the public and also participated in a scheme to defraud. *Id*. This occurred while Arbitrade, Cryptobontix, Hogg, and Goldberg were offering and selling DIG. *Id*. Among other things, the announcements falsely claimed that Arbitrade had acquired and received title to $10 billion in gold bullion and that the company intended to back each DIG token issued and sold to investors with $1.00 worth of this gold. *Id*. Arbitrade claimed to have acquired the gold through a purchase transaction with Barber and his

company, SION Trading FZE ("SION"). *Id*. These Defendants misrepresented that independent accounting firms had performed an "audit" of the gold and verified its existence. *Id*.

Investors committed funds in the form of Bitcoin or other crypto assets to purchase DIG tokens, which would be redeemable for gold. *Id.* at ¶¶ 24, 82. The fortunes of investors and the companies' management were also intertwined because management held and received DIG tokens through which they expected to receive a profit. *Id.* at ¶ 83. DIG investors' fortunes were inextricably tied to the success or failure of the management of Cryptobontix and Arbitrade to generate a profit for investors, namely an increase in the value of their DIG tokens. *Id.* In particular, investors were told that the supply of gold available for investor redemptions would be directly dependent on the extent to which profits were generated to fund company gold purchases. *Id.* at ¶ 24. DIG investors' role was limited to purchasing the DIG tokens through the Livecoin trading platform. *Id.* at ¶ 84. Investors had no role in the business operations of Cryptobontix or Arbitrade and were entirely passive. *Id.* Instead, investors relied solely on Arbitrade and Cryptobontix, and their management, to generate a profit for investors, namely an increase in the value of their DIG tokens. *Id.* Investor's expectation of those profits came from, among other things, the representations that Arbitrade and Cryptobontix would obtain the promised gold to back the DIG tokens, and that investors would be able to redeem DIG tokens for gold. *Id.* Investors would have expected profits based on the success of Arbitrade's underlying business ventures, including mining of crypto assets and the creation of a crypto asset trading platform and merchant payment platform. *Id.*

There is no credible evidence of Arbitrade actually receiving title to $10 billion in gold bullion or that this gold even exists. *Id*. at ¶ 39. By all indications, the gold acquisition transaction with Barber and SION was merely a sham. *Id*. at ¶ 3.

### III.     MEMORANDUM OF LAW

**A.     Standard of Review**

Goldberg and Hogg have moved to dismiss pursuant to Rule 12(b)(1), lack of subject matter jurisdiction, and 12(b)(6), failure to state a claim, though their Motions to Dismiss do not specifically differentiate between the two subsections/standards.

A motion to dismiss brought pursuant to Federal Rule of Civil Procedure 12(b)(1) challenges the district court's subject-matter jurisdiction and takes one of two forms: a "facial attack" or a "factual attack." *Lawrence v. Dunbar*, 919 F.2d 1525, 1528-29 (11th Cir. 1990). "A 'facial attack' on the complaint 'require[s] the court merely to look and see if [the] plaintiff has sufficiently alleged a basis of subject matter jurisdiction, and the allegations in his complaint are taken as true for the purposes of the motion.'" M*cElmurray v. Consol. Gov't of Augusta-Richmond Cty.*, 501 F.3d 1244, 1251 (11th Cir. 2007) (quoting *Lawrence*, 919 F.2d at 1529). "A 'factual attack,' on the other hand, challenges the existence of subject matter jurisdiction based on matters outside the pleadings." *Kuhlman v. United States*, 822 F. Supp. 2d 1255, 1256-57 (M.D. Fla. 2011) (citing Lawrence, 919 F.2d at 1529); *see also Stalley ex rel. U.S. v. Orlando Reg'l Healthcare Sys., Inc.*, 524 F.3d 1229, 1233 (11th Cir. 2008) ("[A] factual attack on a complaint challenges the existence of subject matter jurisdiction using material extrinsic from the pleadings, such as affidavits or testimony."). However, where jurisdiction was "inextricably intertwined" with the merits of the lawsuit, courts have reversed the district court's dismissal, on a Rule 12(b)(1) motion, of the complaint based on a factual attack on subject matter jurisdiction and remanded for further discovery of jurisdictional facts. *See Eaton v. Dorchester Development, Inc.*, 692 F.2d 727, 734 (11th Cir. 1982); *see also Lawrence*, 919 F.2d at 1530 (vacating district court's dismissal for lack of subject matter jurisdiction and remanding for discovery because the motion was functionally an indirect attack on the merits of the plaintiff's claim); *Chatham Condominium Ass'n v. Century*

4

*Village, Inc.*, 597 F.2d 1002, 1011 (5th Cir.1979) (stating that "the jurisdictional issues [in such a case] should be referred to the merits, for it is impossible to decide one without the other.").

To survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6), "a complaint must include 'enough facts to state a claim to relief that is plausible on its face.'" *Hunt v. Aimco Properties, L.P.*, 814 F.3d 1213, 1221 (11th Cir. 2016) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). When reviewing a motion to dismiss pursuant to Rule 12(b)(6), a court must accept as true all factual allegations contained in the complaint, and the plaintiff should receive the benefit of all favorable inferences that can be drawn from the facts alleged. *See Chaparro v. Carnival Corp.*, 693 F.3d 1333, 1335 (11th Cir. 2012); *Ashcroft v. Iqbal*, 556 U.S. 662, 678. Although the court is required to accept as true all allegations contained in the complaint, courts "are not bound to accept as true a legal conclusion couched as a factual allegation." *Twombly*, 550 U.S. at 555; *Iqbal*, 556 U.S. at 678.

For the reasons stated below, Defendants do not meet either the Rule 12(b)(1) or 12(b)(6) standards for dismissal of the SEC's Complaint.

**B.    The DIG Crypto Assets Are Securities Under the *Howey* Test**

As a threshold matter, the foundation for Defendants' Motion to Dismiss is flawed and depends on this Court ignoring the Securities Act of 1933 ("Securities Act"), Securities Exchange Act of 1934 ("Exchange Act"), and settled Supreme Court securities precedent and its progeny. Defendants' argument that there is no act of Congress stating explicitly that the SEC can regulate crypto or digital assets is wholly misplaced and absurdly implies that Congress must supplement the definition of the term "security" every time a new industry emerges or an existing one evolves.

The SEC has alleged that Goldberg and Hogg violated the securities registration provisions under Sections 5(a) and c) of the Securities Act; and the antifraud provisions under Section 17(a)(1), (2), and (3) of the Securities Act, Section 10(b) and Rules 10b-5(a), (b), and (c) of the

5

Exchange Act; and are also liable as control persons under Section 20(a) of the Exchange Act. All of these causes of action address their violations of securities laws. The SEC has more than adequately pled subject matter jurisdiction because the DIG crypto assets are in fact securities, and there are enough facts in the Complaint to state a claim to relief that is plausible on its face.

The purpose of the securities laws is to regulate investments, "in whatever form they are made and by whatever name they are called," and to that end, Congress enacted a definition of "security" broad enough "to encompass virtually any instrument that might be sold as an investment." *In re Bitconnect Securities Litigation*, 2019 WL 9104318 (S.D. Fla. August 23, 2019)(quoting *Reves v. Ernst & Young*, 494 U.S. 56, 61 (1990). The Securities Act defines the term "security" to encompass "any note, stock, treasury stock, security future, security-based swap, bond, debenture, . . . investment contract, . . . or, in general, any interest or instrument commonly known as a 'security.'" 15 U.S.C. § 77b(a)(1).

While the term "investment contract" is not defined by the statute, the Supreme Court established a three-part test for whether a particular scheme is an investment contract in *SEC v. W.J. Howey Co.*, 328 U.S. 293 (1946)(finding that investment in orange groves managed by promoter's company to be an "investment contract" and therefore a security). The *Howey* test requires courts to determine "whether the scheme involves an investment of money in a common enterprise with profits to come solely from the efforts of others." *Id*. at 301. Consistent with the broad reach of the Securities Act, This definition "embodies a flexible rather than a static principle, one that is capable of adaptation to meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits." *Id*. at 299. In analyzing whether something is a security, "form should be disregarded for substance," *Tcherepnin v. Knight*, 389 U.S. 332, 336 (1967), "and the emphasis should be on economic realities underlying a transaction, and not on the name appended thereto." *United Hous. Found., Inc. v. Forman*, 421 U.S. 837, 849

6

(1975).  Ultimately, *Howey* asks "'whether, under all the circumstances, the scheme was being promoted primarily as an investment or as a means whereby participants could pool their own activities, their money and the promoter's contribution in a meaningful way.'" *Leonard*, 529 F.3d 83, 88 (2d Circ. 2008) (quoting *SEC v. Aqua-Sonic Products Corp.*, 687 F.2d 577, 582 (2d Cir. 1982)).  In applying *Howey,* "courts can (and should) look beyond the formal terms of a relationship to the reality of the parties' positions." *Id*. at 85.  The *Howey* test provides the mode of analysis for an unconventional scheme or contract alleged to fall within the securities laws. *Howey* itself determined that a "scheme" involving the sale of small tracts of land, evidenced by contracts of sale and warranty deeds, together with service contracts for the growing of oranges on the land amounted to an "investment contract" that was a "security."  *SEC v. Telegram Grp., Inc.*, 448 F. Supp. 3d 352, 365 (S.D.N.Y. 2020) (citing *Howey*, 328 U.S. at 299–300).  Courts have found other schemes and contracts governing a range of intangible and tangible assets to be securities.  *See, e.g., Glen-Arden Commodities*, 493 F.2d 1027 (2d Cir. 1989((whiskey casks); *Miller v. Cent. Chinchilla Grp., Inc.*, 494 F.2d 414 (8th Cir. 1974) (chinchillas); *Balestra v. ATBCOIN LLC*, 380 F. Supp. 3d 340 (S.D.N.Y. 2019) (digital tokens).

In this case, DIG crypto assets were offered and sold by Cryptobontix on the Livecoin trading platform as investment contracts and are therefore securities under the analysis in *Howey*.

    *1.  Investors Made an Investment in the Form of Bitcoin or Other Crypto Assets*

The first element of the *Howey* test asks whether the purported investment contract required an "investment of money." *Id*. at 301. "An 'investment of money' refers to an arrangement whereby an investor commits assets to an enterprise or venture in such a manner as to subject himself to financial losses." *SEC v. Friendly Power Co. LLC*, 49 F. Supp. 2d 1363, 1368–69 (S.D. Fla. 1999) (citing *Stowell v. Ted S. Finkel Inv. Servs., Inc*., 489 F. Supp. 1209, 1224 (S.D. Fla. 1980)).  The first element is satisfied because investors committed funds in the form of Bitcoin or

7

other crypto assets to participate in an investment opportunity, specifically to purchase DIG tokens which would be redeemable for gold. Complaint at ¶¶ 24, 82. Out of the $10 billion of gold bullion acquired, $3 billion worth ($1.00 worth of gold for every token issued) was allocated to backing DIG. *Id.* at ¶ 65. "It is well established that cash is not the only form of contribution or investment that will create an investment contract." *In re Bitconnect*, 2019 WL 9104318 at *7 (quoting *Uselton v. Commercial Lovelace Motor Freight, Inc.*, 940 F.2d 564, 574 (10th Cir. 1991) and finding that investment of Bitcoin satisfies the first element of the *Howey* test).

> 2. *DIG Investors' Fortunes Were Tied to the Success or Failure of the Management of Cryptobontix and Arbitrade to Generate a Profit*

With respect to the second element – common enterprise – the Eleventh Circuit has adopted the concept of vertical commonality, which maintains that a common enterprise exists where "the fortunes of the investor are interwoven with and dependent on the efforts and success of those seeking the investment or of third parties." *Villeneuve v. Advanced Business Concepts Corp.*, 698 F.2d 1121, 1124 (11th Cir. 1983), aff'd en banc, 730 F.2d 1403 (11th Cir. 1984) (quoting *SEC v. Glenn W. Turner Enterprises, Inc.*, 474 F.2d 476, 482 n. 7 (9th Cir. 1973)); *SEC v. Unique Financial Concepts, Inc.*, 196 F.3d 1195, 1199-1200 (11th Cir. 1999)(stating the Eleventh Circuit adopted "broad vertical commonality" for the common enterprise element, which requires only a finding that the fortunes of the investors are "inextricably tied to the efficacy of the [promoter]") (quoting *SEC v. Koscot Interplanetary, Inc.*, 497 F.2d 473, 479 (5th Cir. 1974)); s*ee also Eberhardt v. Waters*, 901 F.2d 1578, 1580–81 (11th Cir. 1990) ("The thrust of the common enterprise test is that the investors have no desire to perform the chores necessary for a return.").

Here, broad vertical commonality exists because the DIG investors' fortunes were inextricably tied to the success or failure of the management of Cryptobontix and Arbitrade to generate a profit for investors, namely an increase in the value of their DIG tokens. Complaint at ¶ 83. Investors would have expected profits based on the success of Arbitrade's underlying

8

business ventures, including mining of crypto assets and the creation of a crypto asset trading platform and merchant payment platform. In particular, investors were told that the supply of gold available for investor redemptions would be directly dependent on the extent to which profits were generated to fund company gold purchases. *Id.* at ¶ 84. The fortunes of investors and the companies' management were also intertwined because management held and received DIG tokens through which they expected to receive a profit. *Id.* at ¶ 83. Thus, the second *Howey* element is satisfied.

### 3. DIG Investors Had Reasonable Expectations of Profits

The third *Howey* element is satisfied when an investor "is led to expect profits solely from the efforts of the promoter or a third party." 328 U.S. at 298–299. The Eleventh Circuit traditionally looks at "the amount of control that investors retain[ed over their investment]" as well as the actual ability of the investors to manage their investments, in determining whether the investment meets the third prong of the *Howey* test. *Unique Financial Concepts*, 196 F.3d at 1201. "Although the [Supreme] Court used the word 'solely' in the *Howey* decision, it should not be interpreted in the most literal sense." *Williamson v. Tucker*, 645 F.2d 404, 418 (5th Cir. 1981). The test is "'whether the efforts made by those other than the investor are the undeniably significant ones, those essential managerial efforts which affect the failure or success of the enterprise.'" *Id.* (quoting *SEC v. Glenn W. Turner Enters.*, 474 F.2d 476, 482 (9th Cir. 1973)). "An interest thus does not fall outside the definition of investment contract merely because the purchaser has some nominal involvement with the operation of the business. Rather, 'the focus is on the dependency of the investor on the entrepreneurial or managerial skills of a promoter or other third party.'" *SEC v. Merch. Capital, LLC*, 483 F.3d 747, 755 (11th Cir. 2007) (quoting *Gordon v. Terry*, 684 F.2d 736, 741 (11th Cir. 1982)). "An investor who has the ability to control the profitability of his

investment, either by his own efforts or by majority vote in a group venture, is not dependent upon the managerial skill of others." *Gordon*, 684 F.2d at 741.

Here, the DIG investors' role was limited to purchasing the DIG tokens through the Livecoin trading platform. Complaint at ¶ 84. Investors had no role in the business operations of Cryptobontix or Arbitrade and were entirely passive. *Id.* Instead, investors relied solely on Arbitrade and Cryptobontix, and their management, to generate a profit for investors, namely an increase in the value of their DIG tokens. *Id.* Investor's expectation of those profits came from, among other things, the representations that Arbitrade and Cryptobontix would obtain the promised gold to back the DIG tokens, and that investors would be able to redeem DIG tokens for gold. *Id.* In addition, the DIG tokens had no consumptive use.[2] Therefore, this element of the *Howey* test is also met.

The DIG crypto assets satisfy all three elements of the *Howey* test, and thus are securities. Such a conclusion is consistent with other courts similarly concluding that crypto and digital assets satisfy the *Howey* test and are securities. *See, e.g., Rensel v. Centra Tech, Inc.*, No. 1:17-CV 24500-RNS/JB, 2022 WL 2103051, at *3 (S.D. Fla. May 31, 2022)(citations omitted), report and recommendation adopted, 2022 WL 2104210 (S.D. Fla. June 10, 2022)(adopting a report and recommendation finding that a cryptocurrency "transaction qualifies as a security . . . . Indeed, an investment of cryptocurrency constitutes an 'investment of money"); *SEC v. LBRY, Inc.*, 2022 WL

---

[2] Defendants state, with no support, that the DIG crypto assets had real-world consumptive uses. None of the exhibits filed in support of the Motion to Dismiss, including the White Paper dated *after* the pump and dump scheme had occurred, identify any consumptive use. While the Commission disputes that the DIG crypto assets had consumptive use, even if there were some, nothing in the case law suggests that a token with both consumptive and speculative uses cannot be sold as an investment contract. *SEC v. LBRY, Inc.*, 2022 WL 16744741 at * 7 (Dist. N.H. November 7, 2022). "Were it otherwise, the Securities Act would be unable to adapt to the "countless and variable schemes devised by those who seek the use of the money of others on the promise of profits" wherever a token held some consumptive utility." *Id.* (citing *Howey*, 328 U.S. at 299).

16744741 at * 8 (Dist. N.H. Nov. 7, 2022)(holding that LBC digital tokens issued pre-ICO are securities and granting summary judgment); *SEC v. Kik Interactive, Inc.*, 492 F. Supp. 3d 169, 177 (S.D.N.Y. 2020) (finding Kin cryptocurrency constituted an investment contract and granting SEC summary judgment); *SEC v. Telegram Grp., Inc.*, 448 F. Supp. 3d 352, 365 (S.D.N.Y. 2020) (finding that the contracts and understandings surrounding the Gram, a cryptocurrency, amount to the distribution of securities and granting preliminary injunction); *SEC v. Blockvest*, 2019 WL 625163, at *9 (S.D. Cal. Feb. 14, 2019) (finding that BLV tokens constituted a security and granting preliminary injunction); *SEC v. NAC Found.*, 512 F. Supp. 3d 988, 996-97 (N.D. Cal. 2021) (finding that SEC sufficiently plead that ABTC tokens and AML BitCoins are securities and denying motion to dismiss); *Balestra v. ATBCOIN LLC*, 380 F. Supp. 3d 340, 357 (S.D.N.Y. 2019) (finding that complaint plausibly alleges facts demonstrating that the ATB Coin qualifies as an "investment contract" and denying motion to dismiss); *Beranger v. Harris*, 2019 WL 5485128, at *4 (N.D. Ga. Apr. 24, 2019) (finding plaintiffs sufficiently alleged that FLiK tokens are securities and denying motion to dismiss); *Solis v. Latium Network, Inc.*, 2018 WL 6445543, at *3 (D.N.J. Dec. 10, 2018) (concluding that plaintiff sufficiently alleged that LATX tokens are investment contracts under the *Howey* test and denying motion to dismiss); *see also Audet v. Fraser*, 2022 WL 1912866, at *12-18 (D. Conn. June 3, 2022) (finding cryptocurrency "wallets" were not investment contracts, but cryptocurrency was).

Defendants attempt to distinguish the DIG assets because they were issued and sold before any ICO took place, but that is a distinction without a difference. *LBRY*, 2022 WL 16744741 at * 7-8 (rejecting attempt to distinguish digital tokens in question because they were issued pre-ICO). In reaching its ruling, the court noted that:

> The SEC has not based its enforcement action here on a novel interpretation of a rule that by its terms does not expressly prohibit the relevant conduct. Instead, the SEC has based its claim on a straightforward application of a venerable Supreme Court precedent that has been applied by hundreds of federal courts across the

11

> country over more than 70 years. While this may be the first time it has been used against an issuer of digital tokens that did not conduct an ICO, LBRY is in no position to claim that it did not receive fair notice that its conduct was unlawful.

*Id.* Goldberg and Hogg also gravely warn the Court any finding that the DIG assets constitute securities or investment contracts would have a chilling effect for the digital economy. This Court should reject such hyperbole and address the Motion to Dismiss based upon longstanding and well-established precedent as to what constitutes a security. The SEC seeks a finding that the DIG crypto assets in *this* case constitute investment contracts. It does not seek a blanket ruling – without context or conducting a *Howey* analysis– that all crypto and digital assets are securities, just as it did not seek rulings in the past that *all* orange groves, chinchillas, and whiskey casks are categorically securities.

For these reasons, Defendants' Motion to Dismiss based on a facial Rule 12(b)(1) attack and Rule 12(b)(6) must be denied.

**C.     The Court Should Not Consider the Exhibits Attached to Goldberg's Declaration**

Although the Court may consider extrinsic evidence in a factual Rule 12(b)(1) attack on subject matter jurisdiction, this is not an instance where it would be appropriate because (1) the extrinsic evidence attached is incomplete, irrelevant, inaccurate, or contradictory and (2) the purported facial attack is intertwined with the merits of this case. In support of the Motion to Dismiss, Goldberg filed a Declaration and included as exhibits:

- an email exchange purporting to reflect advice of counsel that DIG was not a security, Exhibit A at ECF No. [25-1 at p. 5];

- an Arbitrade "White Paper" "dated" December 21, 2018, Exhibit B at ECF No. [25-1 at pp. 7-93];

- a Register of Arbitrade's Members reflecting Goldberg's shares, Exhibit C at ECF No. [25-1 at pp. 95-960; and

- an Order entered by Judge Scola in a case filed by the CFTC, ECF No. [25-1 at pp. 104-126].

12

First, Exhibit A does not reflect or confirm that any counsel rendered advice that DIG was not a security. At best, Exhibit A is an incomplete email chain wherein an unknown author states that "one of the best cryptocurrency lawyers in the United States" will be retained after the company is funded and an opinion letter can be created to "make sure we are 100% legal," which certainly implies that no counsel has in fact opined that DIG is not a security. Notably, Goldberg did not attach such an opinion letter to his Declaration, and he never mentions whether counsel was hired or if the opinion letter was created. Second, Exhibit B's relevance to this case and whether DIG is a security is entirely unclear. It is similarly ambiguous who authored Exhibit B, whether it is a draft or a final version, and to whom it was disseminated. It appears to be a White Paper dated December 21, 2018, which is *after* the four false and misleading releases that resulted in a spike in the price of DIG, Complaint at ¶¶ 56-67, 77-78. Notably, the words investment and "investor" appear in the White Paper 39 and 30 times, respectively. Third, Exhibit C reflects shares held by Arbitrade's members and nothing more. Fourth, Exhibit D is merely a Consent Order entered by Judge Scola and does not reflect the Court *opining* that *only* the CFTC has jurisdiction over crypto and digital assets. In direct contrast to their argument, Defendants also cite to *Rensel v. Centra Tech, Inc.*, No. 1:17-CV 24500-RNS/JB, 2022 WL 2103051, at *3 (S.D. Fla. May 31, 2022)(citations omitted), *report and recommendation adopted*, 2022 WL 2104210 (S.D. Fla. June 10, 2022), Motion to Dismiss at pp. 8-9, wherein Judge Scola adopted a report and recommendation finding that a cryptocurrency "transaction qualifies as a security . . . . Indeed, an investment of cryptocurrency constitutes an 'investment of money." Finally, Goldberg's Declaration amounts to nothing more than a denial of the allegations in the Complaint regarding his involvement with Arbitrade and attempt to deflect blame on his co-Defendants.

The Court should not consider these mischaracterized, irrelevant, contradictory, and unreliable exhibits or Goldberg's Declaration as extrinsic evidence. At a minimum, the exhibits

and the information contained therein are disputed, and the SEC does not stipulate to them. In the event the Court is inclined to consider a factual attack based on the exhibits, the Court should first allow discovery in this case and possibly revisit Defendants' arguments at the motion for summary judgment stage because their lack of subject matter jurisdiction argument is "inextricably intertwined" with the merits of this lawsuit and whether the DIG crypto assets are securities. *Lawrence*, 919 F.2d at 1529. Therefore, Defendants' purported Rule 12(b)(1) factual attack must be rejected.

### D.     Defendants Misinterpret Former SEC Officials' Statements

Defendants misinterpret statements made by former SEC Director of Corporation Finance William Hinman and former SEC-Chairman Jay Clayton as "protests," in order to support their position that the SEC does not have authority to regulate crypto and digital assets. However, upon close examination of both speeches and the quotes therefrom, former Director Hinman and former Chairman Clayton's statements do not contradict the SEC's position in this case and, in fact, demonstrate the thoughtful approach the SEC takes in deciding whether to pursue an enforcement action.

With respect to former Director Hinman's statement that "the token – or coin or whatever the digital information packet is called – all by itself is not a security, just as the orange groves in Howey were not," the point was that the orange groves cannot be viewed in a vacuum and the surrounding facts are central to determining whether a security is being sold:

> [S]imply labeling a digital asset a "utility token" does not turn the asset into something that is not a security. I recognize that the Supreme Court has acknowledged that if someone is purchasing an asset for consumption only, it is likely not a security. But, the economic substance of the transaction always determines the legal analysis, not the labels. The oranges in Howey had utility. Or in my favorite example, the Commission warned in the late 1960s about investment contracts sold in the form of whisky warehouse receipts. Promoters sold the receipts to U.S. investors to finance the aging and blending processes of Scotch whisky. The whisky was real – and, for some, had exquisite utility. But Howey was not selling oranges and the warehouse receipts promoters were not selling whisky

14

for consumption. They were selling investments, and the purchasers were expecting a return from the promoters' efforts.

*See* https://www.sec.gov/news/speech/speech-hinman-061418 (last checked February 10, 2023). It is clear that the SEC has considered and continues to consider the "economic substance of the transaction" – as it has alleged in this case regarding DIG – and not just the name. Thus, former Director Hinman's speech and Defendants' one-line quote do not support Defendants' position.

Similarly, former Chairman Clayton's "concurrence" with former Director Hinman's quote dovetails with the SEC's actions in this case. The SEC did not merely look at the DIG crypto assets in a vacuum – just like the Supreme Court did not only look at the orange groves in *Howey* – but rather, conducted a *Howey* analysis as set forth in the Complaint at ¶¶ 82-84, establishing that the DIG crypto assets meet the definition of an "investment contract" under *Howey*.

## IV. CONCLUSION

For the foregoing reasons, Goldberg and Hogg's Motion to Dismiss pursuant to Rule 12(b)(1) and Rule (12(b)(6) should be denied.

February 13, 2023

Respectfully submitted,

Alice K. Sum
Alice K. Sum, Esq.
Trial Counsel
Fla. Bar No. 354510
Direct Dial: (305) 416-6293
Email: sumal@sec.gov

Attorneys for Plaintiff
**SECURITIES AND EXCHANGE COMMISSION**
801 Brickell Avenue, Suite 1950
Miami, Florida 33131
Telephone:  (305) 982-6300
Facsimile:  (305) 536-4154