## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### Case No. 22-cv-23171-BLOOM/Otazo-Reyes

SECURITIES AND EXCHANGE COMMISSION,

     Plaintiff,

v.

ARBITRADE LTD.;
CRYPTOBONTIX INC.;
TORY R.J. HOGG;
JAMES L. GOLDBERG;
STEPHEN L. BRAVERMAN;
MAX W. BARBER;
SION TRADING FZE,

     Defendants.

_____/

## <u>ORDER ON MOTIONS TO DISMISS</u>

**THIS CAUSE** is before the Court upon Defendant James L. Goldberg's ("Goldberg") Motion to Dismiss, ECF No. [25] ("Goldberg's Motion"), filed on January 12, 2023, which was joined by Defendant Tory R.J. Hogg ("Hogg"), ECF No. [27]; and Defendant Stephen L. Braverman's ("Braverman") separate Motion to Dismiss, ECF No. [30] ("Braverman's Motion"), filed on January 13, 2023. Plaintiff Securities and Exchange Commission ("SEC") filed Responses to both Motions. *See* ECF No. [48] (responding to Goldberg's Motion); ECF No. [47] (responding to Braverman's Motion). Goldberg filed a Reply in support of his Motion, ECF No. [62], which was joined by Hogg, ECF No. [63]. Braverman filed a Reply in support of his Motion. ECF No. [61]. The Court has carefully considered the Motions, the Responses, the Replies, the record in this case, the applicable law, and is otherwise fully advised. For the reasons set forth below, Defendants' Motions are denied.

## I.      INTRODUCTION

On September 30, 2022, the SEC filed a 13-count Complaint against Arbitrade Ltd. ("Arbitrade"), its "control person" Goldberg, and its Chief Operations Officer, Braverman; Cryptobontix Inc. ("Cryptobontix") and its "control person" Hogg; and SION Trading FZE ("SION") and its founder, owner, and sole officer, Max W. Barber ("Barber"). ECF No. [1] ¶ 1. The SEC accuses Defendants of engaging in "a classic pump and dump scheme" involving a crypto asset called "Dignity" or "DIG." *Id*. ¶ 2. The Complaint sets forth the following scheme:

In early 2017, Hogg, through his company Cryptobontix, developed a crypto asset, which was later named "Dignity" or "DIG." *Id*. ¶ 17. Three billion DIG tokens were created, and they were all owned by Hogg and Cryptobontix. *Id*. ¶ 19. Hogg and Cryptobontix began trading the tokens on a crypto asset-trading platform called "Livecoin." *Id*.

Hogg recruited Arbitrade and the individuals who controlled it, Goldberg and Braverman, to assist in promoting an "initial coin offering" of DIG tokens. *Id*. ¶¶ 10-11, 20-21. Arbitrade's website represented that DIG tokens would eventually be redeemable for gold. *Id*. ¶ 24. Arbitrade and Cryptobontix "consistently advertised" that they would back the DIG tokens with gold worth $1 per token. *Id*. ¶ 26.

In the Spring of 2018, Hogg and Goldberg were introduced to Barber and SION as a potential source to acquire gold. *Id*. ¶ 27. Arbitrade and SION executed a "Memorandum of Understanding" ("MOU") in which they agreed to execute a definitive contract under which Arbitrade would purchase $10 billion of gold bullion from SION, in exchange for an equity interest in Arbitrade, 150 million DIG tokens, and monthly installments of approximately $1 million. *Id*. ¶¶ 28-29.

Several days after executing the MOU, Arbitrade and SION signed an "Asset Pledge Agreement," under which SION agreed to provide Arbitrade a "Safe Keeping Receipt" indicating that Arbitrade held title to $10 billion in gold bullion. *Id.* ¶ 30. The deal was finalized in September 2018 when Arbitrade and SION executed an "Assignment Agreement" that purportedly transferred to Arbitrade "all of [SION's] ownership rights and title in the Gold which vests in [SION] pursuant to the [Safe Keeping Receipt]." *Id.* ¶ 31. The Safe Keeping Receipt is a single-page document issued by G4S Cash Services LLC ("G4S"), a company specializing in vaulting and transport of valuable assets. *Id.* ¶ 32. The Safe Keeping Receipt does not refer to Arbitrade or SION holding title to gold of any value, but rather references a gold "Certificate of Guarantee." *Id.* ¶¶ 32-34. That "Certificate of Guarantee" and related documentation are replete with errors and "appear to be forgeries[.]" *Id.* ¶ 40.

To strengthen the appearance that the gold transaction was legitimate, Arbitrade engaged two accounting firms to evaluate and confirm details of the transaction. *Id.* ¶ 41. The scope of one firm's investigation was narrowly dictated by SION, and neither of the firms confirmed whether SION actually possessed rights or title to gold bullion. *Id.* ¶¶ 43-47. Defendants "ignored the red flag presented when SION told [one of the firms] to drop its request for a video conference with the G4S employee whose signature purportedly appears on the Safe Keeping Receipt." *Id.* ¶ 48. "Arbitrade also acquiesced to SION's requirement that Arbitrade should have no direct communications with G4S personnel." *Id.* ¶ 49.

In October 2018, Braverman on behalf of Arbitrade attempted to hire Bureau Veritas, a company that specializes in inspection and certification services, to provide an opinion about the existence of the gold bullion that Arbitrade purportedly purchased from SION. *Id.* ¶ 50. Bureau Veritas "refused to accept the engagement when it became clear that Arbitrade wanted the firm to

issue its opinion without conducting any physical examination of the gold, with Braverman telling the firm that '[c]ounting bars I believe is overkill.'" *Id.* ¶ 51.

From March 2018 through January 2019, Defendants Arbitrade, Cryptobontix, Hogg, Goldberg, Braverman, and Barber "made material misstatements or omissions" concerning Arbitrade's purported acquisition of billions of dollars of gold bullion. *Id.* ¶ 53. In actuality, "Arbitrade never acquired or received title to $10 billion in gold bullion," and no audit of the $10 billion in gold was ever performed by a major accounting firm," as represented in one of the news releases. *Id.* ¶¶ 72-73. Braverman personally reviewed at least one of the false press releases prior to its issuance. *Id.* ¶ 55. The representations in the news and press releases concerning Arbitrade's acquisition of gold bullion "were blatantly false and misleading." *Id.* ¶ 71.

The effect of the false and misleading news stories was to create artificial demand for DIG tokens and inflate their price. *Id.* ¶¶ 76-77. DIG investors bought the DIG tokens with Bitcoin or other crypto assets. *Id.* ¶ 82. They relied on Defendants' representations that the value of DIG tokens would increase once Arbitrade and Cryptobontix secured sufficient gold to back the DIG tokens. *Id.* ¶ 84.

While Arbitrade and Cryptobontix were engaged in "the false promotional campaign," Hogg and Goldberg sold their DIG tokens, making proceeds "totaling about $36.8 million." *Id.* ¶ 79-80. Braverman converted those proceeds to cash, which he then redistributed between Hogg, Goldberg, and himself. *Id.* ¶¶ 86-88. By February 2020, the DIG token "reached a sustained valuation of zero." *Id.* ¶ 91.

For Defendants' roles in the scheme, the SEC brings the following claims:

Count I (against Arbitrade, Cryptobontix, Hogg, and Goldberg) for registration violations of Sections 5(a) and (c) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. § 77e(a) and (c);

Count II (against Hogg and Goldberg) for defrauding investors, in violation of Section 17(a)(1) of the Securities Act, 15 U.S.C. § 77q(a)(1);

Count III (against Hogg and Goldberg) for negligently making untrue statements while selling securities, in violation of Section 17(a)(2) of the Securities Act, 15 U.S.C. § 77q(a)(2);

Count IV (against Hogg and Goldberg) for negligently engaging in practices of "fraud or deceit," in violation of Section 17(a)(3) of the Securities Act, 15 U.S.C. § 77q(a)(3);

Count V (against Arbitrade, Cryptobontix, Hogg, and Goldberg) for knowingly or recklessly employing devices, schemes, or artifices to defraud in connection with the purchase or sale of securities, in violation of Section 10(b) and Rule 10b-5(a) of the Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78(j)(b) and 17 C.F.R. § 240.10b-5(a);

Count VI (against Arbitrade, Cryptobontix, Hogg, and Goldberg) for knowingly or recklessly making untrue statements of material facts in connection with the purchase or sale of securities, in violation of Section 10(b) and Rule 10b-5(b) of the Exchange Act, 15 U.S.C. § 78(j)(b) and 17 C.F.R. § 240.10b-5(b);

Count VII (against Arbitrade, Cryptobontix, Hogg, and Goldberg) for knowingly or recklessly engaging in acts, practices, and courses of business which operated as a fraud or deceit in connection with the purchase or sale of securities, in violation of Section 10(b) and Rule 10b-5(c) of the Exchange Act, 15 U.S.C. § 78(j)(b) and 17 C.F.R. § 240.10b-5(c);

Count VIII (against Hogg) as the control person liable for Cryptobontix's violations of the Exchange Act;

Count IX (against Hogg and Goldberg) as control persons liable for Arbitrade's violations of the Exchange Act;

Count X (against Braverman and Barber) for aiding and abetting Arbitrade, Cryptobontix, Hogg, and Goldberg's violations of the Exchange Act as set forth in Count V;

Count XI (against Braverman and Barber) for aiding and abetting Arbitrade, Cryptobontix, Hogg, and Goldberg's violations of the Exchange Act as set forth in Count VI;

Count XII (against Braverman and Barber) for aiding and abetting Arbitrade, Cryptobontix, Hogg, and Goldberg's violations of the Exchange Act as set forth in Count VII; and

Count XIII (against SION) for unjust enrichment.

In his Motion to Dismiss, Goldberg argues that this case must be dismissed for lack of subject matter jurisdiction because the SEC lacks the authority to regulate DIG tokens, which Goldberg asserts are not securities. ECF No. [25]. The SEC responds that Defendants' sales of DIG tokens constitute investment contracts under the traditional *Howey* test. ECF No. [48] at 5 (citing *SEC v. W.J. Howey Co.*, 328 U.S. 293 (1946)).

In Braverman's separate Motion to Dismiss, Braverman argues that Counts X, XI, and XII against him must be dismissed because (A) the Complaint fails to allege that he had a general awareness of the pump and dump scheme, (B) the Complaint fails to allege how Braverman provided substantial assistance in that scheme, and (C) the Complaint fails to allege a primary Securities Law violation. ECF No. [30]. The SEC contests Braverman's arguments and argues that the Complaint sufficiently alleges Braverman's liability as an aider and abettor for the foregoing acts. ECF No. [47].

## II.     LEGAL STANDARD

A motion to dismiss brought under Federal Rule of Civil Procedure 12(b)(1) challenges the district court's subject-matter jurisdiction and takes one of two forms: a "facial attack" or a "factual attack." *Lawrence v. Dunbar*, 919 F.2d 1525, 1528-29 (11th Cir. 1990). "A 'facial attack'

on the complaint 'require[s] the court merely to look and see if [the] plaintiff has sufficiently alleged a basis of subject matter jurisdiction, and the allegations in his complaint are taken as true for the purposes of the motion.'" *McElmurray v. Consol. Gov't of Augusta-Richmond Cnty.*, 501 F.3d 1244, 1251 (11th Cir. 2007) (quoting *Lawrence*, 919 F.2d at 1529). "'Factual attacks,' on the other hand, challenge the existence of subject matter jurisdiction in fact, irrespective of the pleadings, and matters outside the pleadings, such as testimony and affidavits are considered." *Id*. (quotation marks omitted); *see also Stalley ex rel. U.S. v. Orlando Reg'l Healthcare Sys., Inc.*, 524 F.3d 1229, 1233 (11th Cir. 2008) ("[A] factual attack on a complaint challenges the existence of subject matter jurisdiction using material extrinsic from the pleadings, such as affidavits or testimony." (citation omitted)). "[F]ederal claims should not be dismissed on motion for lack of subject matter jurisdiction when that determination is intermeshed with the merits of the claim and when there is a dispute as to a material fact." *Lawrence*, 919 F.2d at 1531; *see, e.g.*, *Eaton v. Dorchester Dev., Inc.*, 692 F.2d 727, 734 (11th Cir. 1982) (reversing district court's dismissal when jurisdictional determination was "inextricably intertwined" with the merits of the lawsuit").

To survive a motion to dismiss for failure to state a claim under Rule 12(b)(6), a pleading in a civil action must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Although a complaint "does not need detailed factual allegations," it must provide "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citations omitted); *see Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (explaining that Rule 8(a)(2)'s pleading standard "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation"). Nor can a complaint rest on "'naked assertion[s]' devoid of 'further factual enhancement.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557 (alteration in original)).

"To survive a motion to dismiss a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Id.* (quoting *Twombly*, 550 U.S. at 570). When a defendant moves to dismiss for failure to state a claim upon which relief can be granted under Rule 12(b)(6), the court must accept the plaintiff's allegations as true and evaluate all possible inferences derived from those facts in favor of the plaintiff. *See Am. Marine Tech, Inc. v. World Grp. Yachting, Inc.*, 418 F. Supp. 3d 1075, 1079 (S.D. Fla. 2019).

Securities fraud claims, "like other types of fraud claims, have always been subject to Fed. R. Civ. P. 9(b)'s heightened pleading requirements, which require a complaint "to state with particularity the circumstances constituting fraud." *Mizzaro v. Home Depot, Inc.*, 544 F.3d 1230, 1237 (11th Cir. 2008). Rule 9(b) requires a party to "state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b). Under Rule 9(b), "it is sufficient to plead the who, what, when, where, and how of the allegedly false statements and then allege generally that those statements were made with the requisite intent." *Mizzaro*, 544 F.3d at 1237.

## III.    DISCUSSION

The Court begins with Goldberg's Motion, which contests the SEC's jurisdiction to bring this lawsuit. It then turns to Braverman's Motion, which challenges the sufficiency of the SEC's allegations.

### A.  Goldberg's Motion

In his Motion, Goldberg argues that the SEC does not have jurisdiction to bring this action because the crypto assets at issue are not "securities" within the meaning of the Securities Act. ECF No. [25]. He argues that Congress has not clearly authorized the SEC to regulate the digital currency market, and the SEC is overreaching its authority in bringing this case. *See generally id*.

In Response, the SEC correctly points out that Congress defined the term "security" broadly "to encompass virtually any instrument that might be sold as an investment." *In re Bitconnect Securities Litigation*, No. 18-cv-80086, 2019 WL 9104318, at *6 (S.D. Fla. Aug. 23, 2019) (quoting *Reves v. Ernst & Young*, 494 U.S. 56, 61 (1990)). The Securities Act defines the term "security" to encompass "any note, stock, treasury stock, security future, security-based swap, bond, debenture, . . . investment contract, . . . or, in general, any interest or instrument commonly known as a 'security.'" 15 U.S.C. § 77b(a)(1). The SEC asserts that Defendants' offering of DIG tokens constitutes an "investment contract" under the test set forth in *SEC v. W.J. Howey Co*., 328 U.S. 293 (1946).

In *Howey*, the Supreme Court established a test to determine whether a particular scheme constitutes an "investment contract": "whether the scheme involves an investment of money in a common enterprise with profits to come solely from the efforts of others." 328 U.S. at 301. That definition "embodies a flexible rather than a static principle, one that is capable of adaptation to meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits." *Id*. at 299. In analyzing whether something is a security, "form should be disregarded for substance and the emphasis should be on economic reality." *Tcherepnin v. Knight*, 389 U.S. 332, 336 (1967) (citing *Howey*, 328 U.S. at 298). According to the *Howey* test, "an investment contract exists if there is (a) an investment of money, (b) in a common enterprise, (c) based on an expectation of profits to be derived from the entrepreneurial or managerial efforts of others."[1] *SEC v. Friendly Power Co. LLC*, 49 F. Supp. 2d 1363, 1368 (S.D. Fla. 1999).

---

[1] This third element is sometimes broken apart into two factors: whether there is an expectation of profits, and whether the profits are derived solely from the efforts of others. *See, e.g.*, *SEC v. ETS Payphones, Inc.*, 408 F.3d 727, 732 n.1 (11th Cir. 2005). Given the posture and facts alleged in this case, there is presently no need to break apart this element.

Beginning with the first *Howey* element, an "'investment of money' refers to an arrangement whereby an investor commits assets to an enterprise or venture in such a manner as to subject himself to financial losses." *Friendly Power*, 49 F. Supp. 2d at 1368–69 (citation omitted). Here, the Complaint alleges that investors committed funds in the form of Bitcoin and other crypto assets to buy DIG tokens, which would later be redeemable for gold. ECF No. [1] ¶¶ 24, 82. Goldberg does not dispute that an "investment of Bitcoin satisfies the first element of the *Howey* test." *In re Bitconnect*, 2019 WL 9104318, at *7. The first *Howey* element is satisfied.

Turning to the second element – "common enterprise" – the Eleventh Circuit employs a "broad vertical commonality" test. *SEC v. ETS Payphones, Inc.*, s, 732 (11th Cir. 2005) (citation omitted). "That test requires the movant to "show that the investors are dependent upon the expertise or efforts of the investment promoter for their returns." *Id.* (quotation marks omitted). Here, the Complaint alleges that investors' expectation of profits derived from their expectation that the value of their DIG tokens would increase due to the efforts of Arbitrade and Cryptobontix to back the tokens with gold bullion. ECF No. [1] ¶¶ 83-84. "Investors' expectation of those profits came from, among other things, the representations that Arbitrade and Cryptobontix would obtain the promised gold to back the DIG tokens, and that investors would be able to redeem DIG tokens for gold, of which the supply would be directly dependent on the extent to which revenues were generated to fund company gold purchases." *Id*. ¶ 84. In light of those plausible allegations, and absent argument from Goldberg, the Court finds that the Complaint sufficiently alleges that investors were "dependent upon the expertise or efforts of the investment promoter for their returns." *ETS Payphones*, 408 F.3d at 732.

The third element of the *Howey* test asks whether "investors expect their 'profits to come solely from the efforts of others.'" *SEC v. Unique Fin. Concepts, Inc.*, 196 F.3d 1195, 1201 (11th

Cir. 1999) (quoting *Howey*, 328 U.S. at 301). "[T]he crucial inquiry [for the third prong] is the amount of control that the investors retain" over their investment. *Id.* at 1201 (quotation marks omitted). Here, the DIG investors' role was limited to purchasing the DIG tokens. ECF No. [1] ¶ 84. Investors had no role in the business operations of Cryptobontix or Arbitrade and were entirely passive. *Id.* They had no "ability to control the profitability of [their] investment, either by [their] own efforts or by majority vote in a group venture[.]" *Gordon v. Terry*, 684 F.2d 736, 741 (11th Cir. 1982). According to the Complaint, investors' expectation of profits derived solely from the actions of Arbitrade and Cryptobontix, including their efforts to back the value of DIG tokens with gold bullion. ECF No. [1] ¶ 84. The Complaint sufficiently alleges that DIG investors' fortunes depended on the actions of Arbitrade and Cryptobontix, so the third prong of *Howey* is satisfied. *See, e.g.*, *In re Bitconnect*, 2019 WL 9104318 at *9 (concluding that the third *Howey* element was satisfied in similar circumstances).

The allegations within the Complaint satisfy all three elements of the *Howey* test that determines whether an investment contract exists. Somewhat tellingly, Goldberg does not attempt to apply the *Howey* test to the DIG scheme alleged in the Complaint, nor does Goldberg specify which element of the *Howey* test is not satisfied. *See generally* ECF No. [25] (Goldberg's Motion); ECF No. [62] (Goldberg's Reply).

Rather, Goldberg criticizes the SEC's analysis as attempting "to demonstrate that the subject tokens are themselves securities." ECF No. [62] at 4. Goldberg argues that "the underlying asset (whether oranges or digital tokens)" can never constitute investment contracts in and of themselves. *Id.* (citing *SEC v. Telegram Grp. Inc.*, No. 19-cv-9439 (PKC), 2020 WL 1547383, at *1 (S.D.N.Y. Apr. 1, 2020)). As Goldberg correctly points out, "the analysis of whether a digital asset is offered or sold as a security is not static and does not strictly inhere to the instrument."

ECF No. [25] at 13 (quoting former SEC-Chairman Jay Clayton). However, contrary to Goldberg's assertion, the SEC does not argue that DIG tokens are securities merely because they are crypto assets. *See generally*, ECF No. [48]. Rather, the SEC argues – and the Court agrees – that "the entire scheme" involving DIG tokens, as alleged in the Complaint, constitutes an "investment contract" under the *Howey* test. *Telegram*, 2020 WL 1547383 at *1.

The Court is likewise unpersuaded by Goldberg's discussion of how other crypto assets were categorized in circumstances not analogous to those alleged in the Complaint. *See* ECF No. [25] at 11-13 (discussing XRP coins and citing, *inter alia*, a consent judgment in *CFTC v. Omega Knight 2,* No. 18-cv-22377-RNS (S.D. Fla. 2019)). Whether other crypto assets constitute securities or commodities is not the issue before this Court. Goldberg has provided no cognizable argument as to why the specific scheme described in the Complaint does not constitute an investment contract under the well-established *Howey* test.

Lastly, Goldberg offers a policy argument, warning that "tremendous implications for the digital economy" will result if the Court accepts the SEC's position that the DIG tokens constitute securities in this case. ECF No. [25] at 9. The Court is not convinced. This is by no means the first time a federal court has applied the *Howey* test to conclude that the sale of crypto assets may constitute securities. *See, e.g.*, *Rensel v. Centra Tech, Inc.*, No. 17-cv-24500, 2022 WL 2103051, at *3-4 (S.D. Fla. May 31, 2022), *report and recommendation adopted*, 2022 WL 2104210 (S.D. Fla. June 10, 2022); *SEC v. LBRY, Inc.*, No. 21-cv-260, 2022 WL 16744741, at * 7 (D.N.H. Nov. 7, 2022); *SEC v. Kik Interactive, Inc.*, 492 F. Supp. 3d 169, 178 (S.D.N.Y. 2020); *see also* ECF No. [48] at 11 (citing additional cases).

Finally, Goldberg attached five exhibits to his Motion. ECF No. [25-1]. The parties dispute whether the Court may consider them at the present stage of the case. *See* ECF No. [48] at 13 (SEC

arguing that the extrinsic evidence "is incomplete, irrelevant, inaccurate, or contradictory"); ECF No. [62] at 5 (Goldberg explaining that "the exhibits are submitted for this Court's convenience, to provide minimal context for the proper consideration of jurisdiction and for no other purpose."). The Court agrees with the SEC that none of the five exhibits are relevant to the Rule 12(b)(1) jurisdictional issue of whether DIG tokens constitute securities. They cannot be considered at this Motion to Dismiss stage of the case.

Accordingly, Goldberg's Motion, which was joined by Hogg, is denied. The Court turns to Braverman's Motion to Dismiss, which attacks the sufficiency of the Complaint's allegations under Federal Rule of Civil Procedure 12(b)(6).

## B.   Braverman's Motion

Counts X, XI, and XII of the Complaint seek to hold Braverman liable as an aider and abettor for alleged violations of the Exchange Act committed by Goldberg, Hogg, Arbitrade, and Cryptobontix ("the Primary Defendants"). ECF No. [1] at 21-23. Braverman moves to dismiss those Counts because the Complaint (i) fails to allege a primary securities law violation, (ii) fails to allege Braverman's "general awareness" of the Primary Defendants' scheme, and (iii) fails to allege that Braverman provided "substantial assistance" to the scheme. ECF No. [30]. The SEC responds that the Complaint sufficiently alleges all necessary elements to hold Braverman liable as an aider and abettor. ECF No. [47].

To state a claim for aiding and abetting a securities law violation, a complaint must allege "(1) a primary violation by another party; (2) a 'general awareness' by the accused aider-abettor 'that his role was part of an overall activity that is improper'; and (3) that 'the accused aider-abettor' must have 'knowingly and substantially assisted the violation.'" *SEC v. Big Apple Consulting USA, LLC*, 783 F.3d 786, 800 (11th Circ. 2015) (quoting *Woods v. Barnett Bank of Ft.*

*Lauderdale*, 765 F.2d 1004, 1009-10 (11th Cir. 1985)); *see also FTC v. WV Universal Mgmt., LLC*, 877 F.3d 1234, 1241 (11th Cir. 2017) ("[T]he test for liability [] requires a primary violation, substantial assistance, and a culpable state of mind.").

### i.     Primary Violations

In Counts X, XI, and XII, the Complaint accuses Braverman of aiding and abetting the Primary Defendants' violations of Section 10(b) of the Exchange Act, as alleged in Counts V, VI, and VII of the Complaint, respectively. ECF No. [1] at 21-23. Thus, the first step is to determine whether Counts V, VI, and VII state claims for relief under Section 10(b) of the Exchange Act.

"In order to prove a violation under § 10(b), the SEC must show the defendants: (1) employed a device, scheme or artifice to defraud or made materially false statements; (2) in connection with the purchase or sale of securities; (3) using an instrumentality of interstate commerce; and (4) with scienter." *SEC v. Monterosso*, 768 F. Supp. 2d 1244, 1262 (S.D. Fla. 2011) (citing *SEC v. Merchant Cap., LLC*, 483 F.3d 747, 766 (11th Cir. 2007)). Securities fraud claims are also subject "Fed. R. Civ. P. 9(b)'s heightened pleading requirements, which require a complaint "to state with particularity the circumstances constituting fraud." *Mizzaro*, 544 F.3d at 1237. Under Rule 9(b), "it is sufficient to plead the who, what, when, where, and how of the allegedly false statements and then allege generally that those statements were made with the requisite intent." *Id.* at 1237.

Count V asserts liability under 17 CFR § 240.10b-5(a), which imposes liability for "employ[ing] any device, scheme, or artifice to defraud[.]" Count VI is based on § 240.10b-5(b), which prohibits making untrue statements or omitting material facts. Count VII invokes § 240.10b-5(c), which refers to "any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person[.]" "The main difference between a 10b-5(b) misrepresentation

claim and a 10b-5(a) and (c) scheme liability claim is that, while 10b-5(b) involves 'deceptive statements,' 10b-5(a) and (c) scheme liability involves 'deceptive conduct.'" *In re Tupperware Brands Corp. Secs. Litigation*, No. 20-cv-357, 2021 WL 247870, at *5 (M.D. Fla. Jan. 25, 2021) (quoting *IBEW Local 595 Pension & Money Purchase Pension Plans v. ADT Corp.*, 660 F. App'x 850, 856 (11th Cir. 2016)).

## 1. Scheme Liability

Braverman first argues that "the Complaint fails to plead deceptive or manipulative conduct devised to defraud investors." ECF No. [30] at 15. The Complaint alleges a scheme whereby the Primary Defendants (a) offered the sale of DIG tokens to investors, ECF No. [1] ¶¶ 22-23; (b) consistently advertised that those tokens would be backed by gold and redeemable for gold, *id.* ¶¶ 24, 26; (c) entered into a "sham" transaction to create the appearance that they had acquired billions of dollars of gold bullions, *id.* ¶¶ 26-51; (d) misrepresented facts concerning that gold transaction and auditing of the supposed gold bullion to make the transaction appear legitimate, *id.* ¶¶ 52-75; and (e) sold their own DIG tokens at prices that were inflated due to investors' reliance on the Primary Defendants' misrepresentations related to the gold bullion. *Id.* ¶¶ 77-79. Those allegations sufficiently allege a "scheme" to defraud investors.

Braverman argues that the Complaint sets forth mere "'abnormalities' in the gold acquisition transaction,'" which "'without more, does not plausibly support the SEC's much larger inference' of a scheme to defraud." ECF No. [30] at 16 (quoting *SEC v. Sason*, 433 F. Supp. 3d 496, 511–12 (S.D.N.Y. 2020)). The Court disagrees. The Complaint goes far beyond alleging "abnormalities" related to the Arbitrade-SION gold transaction. Rather, it alleges that the entire gold transaction was a sham and that Arbitrate never actually acquired title to the billions of dollars of gold bullion. ECF No. [1] ¶¶ 72. The inference that the gold transaction was a sham is supported

by plausible allegations that the Safe Keeping Receipt was deficient, *id*. ¶¶ 33-34, related documents are replete with "spelling and punctuation errors" and "appear to be forgeries," *id*. ¶ 40, SION intentionally limited the scope of the auditing firms' investigation, *id*. ¶¶ 43-49, Braverman explicitly instructed Bureau Veritas not to conduct a physical examination of the purported gold, *id*. ¶ 51, and Arbitrade never actually acquired $10 billion in gold bullion. *Id*. ¶ 72. The Court finds that the Complaint contains sufficient allegations to support the SEC's inference that the gold transaction was a sham.

## 2. Misrepresentations

Braverman argues that the Complaint fails to allege with particularity any material misrepresentations or materially misleading omissions to support Count VI. ECF No. [30] at 20. Federal Rule of Civil Procedure 9(b) requires that the Complaint set forth "(1) precisely what statements or omissions were made in which documents or oral representations; (2) the time and place of each such statement and the person responsible for making (or, in the case of omissions, not making) them; (3) the content of such statements and the manner in which they misled the plaintiff; and (4) what the defendant obtained as a consequence of the fraud." *FindWhat Inv'r Grp. v. FindWhat.com*, 658 F.3d 1282, 1296 (11th Cir. 2011) (citations omitted).

The Complaint asserts five misrepresentations. On May 24, 2018, Arbitrade and Cryptobontix issued an email news release claiming that Arbitrade was acquiring $8.7 billion worth of bullions and that investors would be able to redeem their DIG tokens for that bullion. ECF No. [1] ¶¶ 55-60. On June 28, 2018, Hogg, on behalf of Arbitrade, announced at a press conference that Arbitrade would be receiving title to $10 billion worth of physical gold. *Id*. ¶ 61. On July 5, 2018, Arbitrade and Cryptobontix issued a news release stating that they had reached a "definitive deal" to acquire gold billion, and that $3 billion worth of gold would be allocated to

backing DIG tokens. *Id*. ¶¶ 63, 65. On November 5, 2018, Arbitrade issued a press release announcing that the company had received over $10 billion in gold bullion and "completed the required 'regulatory gold vaulting verification compliance.'" *Id*. ¶¶ 66-67. Finally, on January 9, 2019, Arbitrade issued a press release announcing that its shipment of gold from SION was "vaulted and secured," and Arbitrade ensured "consisted growth of its precious metals holdings." *Id*. ¶¶ 68-69.

In each of these statements, Arbitrade stated that it would acquire or had acquired title to billions of dollars of gold bullion. Accepting as true the Complaint's plausible allegation that the gold transaction was a sham, those statements were false and misleading. *Id*. ¶ 71. Except for the January 9, 2019 press release, each of the statements "resulted in a spike in the price of DIG." *Id*. ¶ 77. As a result, Hogg, Goldberg, and Cryptobontix were able to sell their DIG tokens at "artificially inflated prices[.]" *Id*. ¶ 79.

The Court concludes that, under the heightened pleading requirements of Federal Rule of Civil Procedure 9(b), the Complaint sufficiently alleges the Primary Defendants' liability under Count VI. Arbitrade is responsible for each of the five statements, Cryptobontix is responsible for the May 24 and July 5 statements, and Hogg is responsible for the June 28 statements on behalf of Arbitrade. The SEC has "attributed allegedly fraudulent statements and omissions to specific defendants," namely, Arbitrade, Cryptobontix, and Hogg. *Phillips v. Scientific-Atlanta, Inc.*, 374 F.3d 1015, 1019 (11th Cir. 2004). As for Goldberg, the Complaint alleges that he "was an undisclosed control person of Arbitrade" who "exercised significant control over the day-to-day business affairs of Arbitrade and had the second largest ownership interest in the company," *id.* ¶ 10, and he "reviewed and approved at least three of the false and misleading releases[.]" ECF No. [1] ¶ 54. The Complaint plausibly alleges Goldberg's liability for statements within

Arbitrade's press release. *See Phillips*, 374 F.3d at 1018-19 (discussing the "group pleading doctrine"). Accordingly, the five misrepresentations are alleged with sufficient particularly under Rule 9(b).

### 3. Scienter

Braverman additionally argues that the Complaint fails to allege the Primary Defendants' scienter. ECF No. [30] at 16-17. He cites *Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1287 (11th Cir. 1999) for the proposition that the SEC must allege sufficient facts to create a "strong inference" of scienter. However, the *Bryant* court was discussing the heightened level of scienter that must be alleged in cases brought under the Private Securities Litigation Act (PSLRA). *Id*. "The PSLRA applies only to private actions, not to actions filed by the SEC." *SEC v. Betta*, No. 09-cv-80803, 2010 WL 963212, at *5 (S.D. Fla. Mar. 15, 2010) (citing 15 U.S.C. § 78u–4(a)(1) ("The provisions of this subsection shall apply in each private action arising under this chapter")). Here, the Rule 9(b) standard applies, under which "it is sufficient to plead the who, what, when, where, and how of the allegedly false statements and then allege generally that those statements were made with the requisite intent." *Mizzaro*, 544 F.3d at 1237. That requisite is satisfied by "'an intent to deceive, manipulate, or defraud,' or 'severe recklessness.'" *Id*. at 1238 (quoting *Bryant*, 187 F.3d at 1282).

Braverman argues that the Complaint merely alleges that the Primary Defendants "ignored purported signs of fraud in the dealings with SION related to the gold acquisition transaction." ECF No. [30] at 17. According to Braverman, the Primary Defendants "actively took steps to evaluate and confirm the details of the transaction." *Id*. The Court disagrees. As discussed above, the Complaint contains substantial and plausible allegations that Arbitrade's gold transaction with SION was a sham. Given that Hogg and Goldberg were the primary owners and controllers of

Arbitrade, ECF No. [1] ¶ 10, they would have been aware that Arbitrade never actually received title to $10 billion in gold bullion. *Id*. ¶ 72. Assuming, as it must at this stage of the case, that the gold transaction was a sham, the Primary Defendants made knowing or extremely reckless misrepresentations when stating that the DIG tokens were backed by gold.

It is certainly possible, as Braverman asserts, that the Primary Defendants truly intended to back the DIG tokens with gold bullion, purchase gold bullion from SION, and confirm the gold's existence through three outside firms. ECF No. [30] at 15-16. However, in light of the abnormalities and imprecision of the documents reflecting the Arbitrade-SION transaction, ECF No. [1] ¶¶ 31-34, 39-40, the narrow scope of the three firms' auditing, which never entailed a physical inspection of gold bullion, *id*. ¶¶ 42-51, and that Arbitrade never actually acquired $10 billion in gold bullion,[2] *id*. ¶ 71, the Complaint contains sufficient facts "giving rise to a strong inference that the defendants either intended to defraud investors or were severely reckless when they made the allegedly materially false or incomplete statements." *Mizzaro*, 544 F.3d at 1238 (quotation marks omitted). Accordingly, the Complaint sufficiently alleges that the Primary Defendants acted with scienter.

In sum, the Complaint sufficiently alleges in Counts V-VII violations of Section 10(b) of the Exchange Act. The remaining issues are whether Braverman had "general awareness" of the scheme, and whether he knowingly provided substantial assistance.

### ii.   General Awareness

Braverman argues that the Complaint fails to establish Braverman's "general awareness" of his participation in an improper activity." *Big Apple Consulting*, 783 F.3d at 800. General awareness may be inferred by the "surrounding circumstances and expectations of the parties."

---

[2] At this stage in the case, the Court must accept this key allegation as true. *Mizzaro*, 544 F.3d at 1239.

*Woods*, 765 F.2d at 1009. The "awareness requirement can be satisfied by extreme recklessness, which can be shown by 'red flags,' 'suspicious events creating reasons for doubt,' or 'a danger . . . so obvious that the actor must have been aware of" the danger of violations." *S.E.C. v. K.W. Brown & Co.*, 555 F. Supp. 2d 1275, 1307 (S.D. Fla. 2007) (quoting *Howard v. SEC*, 376 F.3d 1136, 1143 (D.C.Cir.2004)).

According to the Complaint, Braverman was held out as the Chief Operations Officer of Arbitrade. [3] ECF No. [1] ¶ 11. Despite that role and the critical importance of the gold bullion to Arbitrade's business, Braverman never asked an auditing firm to confirm the existence, location, ownership, or origin of the gold itself. *Id.* ¶ 46. He ignored the red flag that SION – a company with whom Arbitrade ostensibly entered into an arm's length transaction to purchase billions of dollars' worth of gold – narrowly dictated the scope of an auditing firm's investigation. *Id.* ¶ 47. He also "ignored the red flag presented when SION told [one of the accounting firms] to drop its request for a video conference with the G4S employee whose signature purportedly appears on the Safe Keeping Receipt." *Id.* ¶ 48. He overlooked issues that should have been readily obvious upon inspecting the Safe Keeping Receipt. *Id*. ¶¶ 33-40. Braverman was tasked with hiring Bureau Veritas to provide an opinion about the existence of gold, but he instructed Bureau Veritas not to physically inspect the gold. *Id*. ¶¶ 50-51.[4] Braverman reviewed at least one of the five false press

---

[3] Braverman asserts that he was not the Chief Operations Officer of Arbitrade, but rather of "Arbitrade Exchange (Bermuda) Ltd." ECF No. [30] at 6. For purposes of ruling on Braverman's Motion to Dismiss, the Court accepts as true the factual assertion within the Complaint. *Iqbal*, 556 U.S. at 678.

[4] Braverman attached to his Motion to Dismiss an email chain between Braverman and Bureau Veritas, which is the source of the allegation in the Complaint that Braverman instructed the firm that "[c]ounting bars I believe is overkill." *See* ECF No. [31-1]. The SEC does not contest Braverman's assertion that the Court may consider the email as a document incorporated by reference into the Complaint. *See* ECF No. [30] at 8 n.1. The Court concludes that the Complaint's statement is not taken "out-of-context," as Braverman asserts, *id.* at 11, but rather supports the Complaint's allegation that Braverman did not want Bureau Veritas to physically inspect the gold bullion.

releases prior to its issuance.[5] *Id*. ¶ 55. He converted Hogg and Goldberg's Bitcoin proceeds from their DIG sales to cash, which he then redistributed among Hogg, Goldberg, and himself. *Id*. ¶¶ 86-89.

The Court concludes that the allegations "create, at the very least, an inference that [Braverman] had a general awareness that his role was part of an overall activity that is improper[.]" *SEC v. Monterosso*, No. 07-cv-61693, 2008 WL 11333251, at * 4 (S. D. Fla. Sept. 26, 2008). He acted with at least "extreme recklessness" by assuming without confirming that the gold transaction was legitimate, despite numerous "red flags" indicating it was not. *K.W. Brown*, 555 F. Supp. 2d at 1307. Accordingly, the "general awareness" element is satisfied.

### iii. Substantial Assistance

Lastly, Braverman argues that the Complaint fails to allege that Braverman provided "substantial assistance" in the fraudulent scheme. ECF No. [30] at 14. "The element of substantial assistance is met when, based upon all the circumstances surrounding the conduct in question, a defendant's actions are a 'substantial causal factor' in bringing about the primary violation." *K.W. Brown*, 555 F. Supp. 2d at 1307 (quoting *Woods*, 765 F.2d at 1013).

The SEC argues that Braverman provided substantial assistance by "being responsible for hiring Bureau Veritas," "reviewing at least one of the false press releases prior to its issuance," and "being responsible for converting the Bitcoin proceeds of the DIG sales to cash[.]" ECF No. [47] at 9. The SEC's first two arguments are unconvincing. Given that Bureau Veritas refused to accept the engagement, Braverman's failed attempt to hire it did not assist the scheme in any way.

---

[5] Braverman faults the Complaint for failing to specify which of the press releases Braverman reviewed. ECF No. [30] at 8. That failure to specify might prevent Braverman from being held directly liable for making a false statement. Nonetheless, the fact that he reviewed at least one unspecified release helps to show his "general awareness" because it shows his involvement in the firm's operations and therefore supports the inference that he was aware of the general scheme.

ECF No. [1] ¶ 51. Absent specificity regarding *which* of the false press releases Braverman reviewed, the Court cannot conclude that his review of an unidentified release constitutes "substantial assistance." *Id.* ¶ 55. However, the Court agrees with the SEC that Braverman provided substantial assistance by converting Hogg and Goldberg's Bitcoin proceeds into cash. *Id.* ¶ 86. Braverman provides no citations for the proposition that the Complaint must specifically allege "the amount of Bitcoin proceeds converted to cash or when the conversions took place," or the timing and amounts of Braverman's distributions to Hogg and Goldberg. ECF No. [61] at 8. The allegation that he converted and redistributed the Defendants' Bitcoin proceeds suffices to support the inference that he played a "substantial causal factor" in the Defendants' scheme. *K.W. Brown*, 555 F. Supp. 2d at 1307 (quotation marks omitted).

## IV.   CONCLUSION

Accordingly, it is **ORDERED AND ADJUDGED** as follows:

1. Defendant Goldberg's Motion to Dismiss, **ECF No. [25]**, is **DENIED**.

2. Defendant Hogg's Motion to Dismiss, **ECF No. [27]**, is **DENIED**.

3. Defendant Braverman's Motion to Dismiss, **ECF No. [30]**, is **DENIED**.

4. Goldberg, Hogg, and Braverman shall file a Response to the Complaint **no later than April 19, 2023**.

**DONE AND ORDERED** in Chambers at Miami, Florida, on April 5, 2023.

_____
**BETH BLOOM**
**UNITED STATES DISTRICT JUDGE**

Copies to:

Counsel of Record