UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

SECURITIES AND EXCHANGE COMMISSION,
Plaintiff,

v.

ARBITRADE LTD.;
CRYPTOBONTIX INC.;
TROY R.J. HOGG;
JAMES L. GOLDBERG;
STEPHEN L. BRAVERMAN; and
MAX W. BARBER,
Defendants,

and

SION TRADING FZE,
Relief Defendant.

FILED BY _MCO_ D.C.

DEC 03 2025

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - MIAMI

Case No. 22-cv-23171-DAMIAN/D'ANGELO

**JOINT NOTICE OF ADDITIONAL FOREIGN-LAW AUTHORITIES
PURSUANT TO FED. R. CIV. P. 44.1
(NO RELIEF REQUESTED)**

Defendants Troy R.J. Hogg and James L. Goldberg, appearing pro se, respectfully provide this Joint Notice pursuant to Federal Rule of Civil Procedure 44.1. This Notice identifies additional foreign-law authorities that may be relevant to matters expected to arise at trial.

This Notice:

• does not request relief;
• does not seek reconsideration;
• does not present argument; and
• is submitted solely to identify foreign law, as Rule 44.1 permits.

Rule 44.1 authorizes the Court to consider "any relevant material or source" in determining foreign law, and treats such determinations as questions of law.

## I. BERMUDA LAW — CORPORATE GOVERNANCE AND DIRECTOR AUTHORITY

### A. *Bermuda Companies Act 1981 — Board Management Authority*

*Section 91(1)* of the *Bermuda Companies Act 1981* provides:

"The business and affairs of a company shall be managed by, or under the direction or supervision of, the board of directors."

Under Bermuda law:

• management authority resides in the board, unless otherwise provided by statute or bye-laws;
• shareholders do not possess executive authority by virtue of ownership;
• operational decisions, corporate communications, and corporate affairs are functions of the board.

These principles reflect the foreign-law framework applicable to Bermuda corporations, including Arbitrade Ltd. ("Arbitrade Bermuda").

### B. Distinction Between Share Ownership and Corporate Control

Under Bermuda law:

• ownership of shares does not confer managerial control;
• only directors (or persons appointed as officers under bye-laws) exercise management authority;
• shareholders who are not directors do not act as the "controlling mind" of the corporation.

These principles derive from statutory interpretation of the Companies Act 1981 and the corporate-governance model recognized under Bermuda law.


## II. ONTARIO, CANADA — COMPELLED TESTIMONY & FUNDAMENTAL JUSTICE

### A. Ontario Evidence Act, R.S.O. 1990, c. E.23 — Section 9(2)

*Section 9(2)* provides that when a person is compelled to answer questions:

"No answer given shall be used or be admissible in evidence against that person in any civil proceeding or in any proceeding under any Act of the Legislature."

Canadian authorities interpreting s.9(2) include:

- *Re Securities Commission and Mitchell (1978);*
- *Re Sextant Capital Management Inc., 2011 ONSEC 15;*
- *Agueci (Re), 2013 ONSEC 45;*
- *Todorov v. Ontario Securities Commission, 2018 ONSC 4503;*
- *College of Physicians and Surgeons v. Yazdanfar, 2013 ONSC 6420.*

These authorities reflect foreign-law protections regarding compelled testimony.

### B. *Canadian Charter of Rights and Freedoms — Section 7*

*Section 7* provides:

"Everyone has the right to life, liberty and security of the person and the right not to be deprived thereof except in accordance with the principles of fundamental justice."

Under Canadian law, "principles of fundamental justice" include:

- protection against self-incrimination;
- fairness in administrative enforcement;
- procedural safeguards when compelled testimony is obtained.

Relevant authorities include:

- *R. v. S.(R.J.), [1995] 1 S.C.R. 451;*
- *R. v. White, [1999] 2 S.C.R. 417;*
- *Thomson Newspapers v. Canada, [1990] 1 S.C.R. 425;*
- *R. v. Hebert, [1990] 2 S.C.R. 151.*

These decisions establish foreign-law rules concerning compelled statements and their admissibility.

## III. CANADIAN SECURITIES LAW — INVESTMENT CONTRACT ANALYSIS

### A. *Pacific Coast Coin Exchange v. OSC, [1978] 2 S.C.R. 112*

In *Pacific Coast Coin*, the Supreme Court of Canada adopted an investment-contract analysis influenced by *SEC v. W.J. Howey Co.*, 328 U.S. 293 (1946).

The Court emphasized flexibility:

"Any definition of investment contract must embody a flexible rather than a static principle..." (*Pacific Coast Coin*, at p. 128)

### B. Canadian Investment-Contract Test

Canadian securities law identifies four elements:

1. an investment of money;

2. an investment with a view to profit;

3. in a common enterprise where the fortunes of investors are interwoven with those of others; and

4. where the efforts of those others significantly affect the success or failure of the enterprise.

(See: *Pacific Coast Coin*, applied in **Hogg (Re)**, 2024 ONCMT 15, ¶109.)


## IV. CANADIAN JURISDICTIONAL DOCTRINE —
## THE "REAL AND SUBSTANTIAL CONNECTION" TEST

Canadian courts apply a "real and substantial connection" test to determine when provincial securities legislation may regulate cross-border activities.

Key authorities include:

- *Unifund Assurance Co. v. ICBC, 2003 SCC 40;*
- *R. v. Libman, [1985] 2 S.C.R. 178;*
- *Moran v. Pyle National, [1975] 1 S.C.R. 393;*
- *British Columbia Securities Commission v. Branch, [1995] 2 S.C.R. 3.*

These authorities recognize limits on extraterritorial application of provincial securities law.


## V. PURPOSE AND SCOPE OF THIS NOTICE

This Notice is submitted solely to identify foreign-law authorities under Rule 44.1. It:

- requests no relief;
- challenges no factual or legal assertion;
- offers no argument;
- and seeks no ruling.

Defendants reserve all rights to address issues of foreign law in the appropriate procedural posture.

Dated: December 3rd, 2025

Respectfully,


_____

James L. Goldberg

Pro Se Defendant

515 NW 120th St, Miami, FL 33168

james_goldberg@msn.com | (305) 785-6900



_____

Troy R. J. Hogg

Pro Se Defendant

72859 Sunridge Crescent

Dashwood, Ontario, Canada

troyhogg2020@protonmail.com | (519) 330-6570

**Exhibit A – Capital Markets Tribunal,** *Hogg (Re)*, **2024 ONCMT 15 (Merits Decision)**



Ontario

| Capital | Tribunal | 22nd Floor | 22e étage |
| Markets | des marchés | 20 Queen Street West | 20, rue Queen ouest |
| Tribunal | financiers | Toronto ON M5H 3S8 | Toronto ON M5H 3S8 |

Citation: *Hogg (Re)*, 2024 ONCMT 15
Date: 2024-06-14
File No. 2022-20

2024 ONCMT 15 (CanLII)

## IN THE MATTER OF
## TROY RICHARD JAMES HOGG, CRYPTOBONTIX INC., ARBITRADE EXCHANGE INC., ARBITRADE LTD., T.J.L. PROPERTY MANAGEMENT INC. and GABLES HOLDINGS INC.

## REASONS AND DECISION

**(Subsection 127(1) of the *Securities Act*, RSO 1990, c S.5)**

| **Adjudicators:** | Andrea Burke (chair of the panel) |
| | Sandra Blake |
| | M. Cecilia Williams |
| **Hearing:** | November 21, 22, 30, 2023 and February 7, 2024; final written submissions received February 23, 2024 |
| **Appearances:** | Erin Hoult          For the Ontario Securities Commission |
| | Alvin Qian |
| | No one appearing for Troy Richard James Hogg, Cryptobontix Inc., Arbitrade Exchange Inc., Arbitrade Ltd., T.J.L. Property Management Inc. and Gables Holdings Inc. |

# TABLE OF CONTENTS

1.   OVERVIEW ................................................................................................. 1

2.   PRELIMINARY ISSUES .............................................................................. 3

   2.1   The Adjournment Motion .................................................................... 3

      2.1.1  Background .................................................................................. 3

      2.1.2  Law on adjournments .................................................................. 3

      2.1.3  Analysis ....................................................................................... 4

   2.2   Proceeding in the absence of the respondents ..................................... 10

3.   BACKGROUND ........................................................................................... 11

   3.1   The respondents ................................................................................. 11

      3.1.1  Hogg   11

      3.1.2  Cryptobontix ................................................................................ 11

      3.1.3  Arbitrade Exchange ..................................................................... 11

      3.1.4  Arbitrade Bermuda ....................................................................... 12

      3.1.5  TJL and Gables ............................................................................ 12

   3.2   Factual background relevant to the Tokens .......................................... 12

      3.2.1  The development of the Tokens .................................................... 12

      3.2.2  How the Unity Ingot and Dignity tokens were sold ...................... 13

      3.2.3  The promotion campaign for the Tokens ....................................... 15

      3.2.4  Sales of the Tokens ...................................................................... 18

4.   ISSUES AND ANALYSIS .............................................................................. 20

   4.1   Are the alleged breaches in relation to securities? ................................ 20

      4.1.2  "Security" must be interpreted broadly and purposively .............. 21

      4.1.3  Is the "investment contract" test met in this case? .................... 21

   4.2   Other Preliminary Matters ................................................................... 29

      4.2.1  The roles and involvement of Cryptobontix, Arbitrade Exchange and

            Arbitrade Bermuda ...................................................................... 30

      4.2.2  Jurisdiction .................................................................................. 30

   4.3   Did the respondents engage in a fraud contrary to s. 126.1(1)(b) of the

      *Act*? ................................................................................................... 31

      4.3.1  Law on fraud ............................................................................... 31

      4.3.2  Gold title and audit fraud ............................................................ 35

2024 ONCMT 15 (CanLII)

4.3.3 Misappropriation of investor funds fraud....................................42

4.4 Did Hogg, Cryptobontix, Arbitrade Exchange, and Arbitrade Bermuda engage in the business of trading securities without registration contrary to s. 25(1) of the *Act*? ................................................................49

4.4.1 Law   49

4.4.2 Hogg, Cryptobontix, Arbitrade Exchange, and Arbitrade Bermuda traded securities................................................................50

4.4.3 Hogg, Cryptobontix, Arbitrade Exchange, and Arbitrade Bermuda engaged in the business of trading ...........................................52

4.4.4 Hogg, Cryptobontix, Arbitrade Exchange, and Arbitrade Bermuda were not registered.................................................................54

4.4.5 No exemptions were available ...............................................54

4.4.6 Conclusion regarding s. 25(1) of the *Act* .................................54

4.5 Did Hogg, Cryptobontix, Arbitrade Exchange, and Arbitrade Bermuda illegally distribute securities contrary to s. 53(1) of the *Act*?.................55

4.5.1 Law   55

4.5.2 No prospectus was filed and no exemptions were available .........56

4.5.3 Conclusion regarding s. 53(1) of the *Act* ..................................56

4.6 Did Hogg permit, authorize or acquiesce in the corporate respondents' breaches? ................................................................................56

4.6.1 The principle in *Kienapple* ....................................................58

5. CONCLUSION....................................................................................60

2024 ONCMT 15 (CanLII)

2024 ONCMT 15 (CanLII)

**REASONS AND DECISION**

## 1.    OVERVIEW

[1]    This enforcement case is about the sale and promotion of crypto assets by unregistered parties, without a prospectus. Significant funds were raised from investors based on broadly circulated promotional materials allegedly containing false and misleading statements.

[2]    The Ontario Securities Commission makes allegations against six respondents:

a.    Troy Richard James Hogg, the only individual respondent, and the alleged directing mind of the five corporate respondents;

b.    Cryptobontix Inc., Arbitrade Exchange Inc. and Arbitrade Ltd. (**Arbitrade Bermuda**), all three of which allegedly promoted and sold crypto tokens issued by Cryptobontix, under Hogg's direction; and

c.    T.J.L. Property Management Inc. (**TJL**) and Gables Holdings Inc., two other companies of Hoggs', that were not directly involved in the promotion and sale of the crypto tokens, but that allegedly benefited from those activities.

[3]    The Commission alleges that between May 2017 and June 2019 (the **Material Time**), Hogg, Cryptobontix, Arbitrade Exchange and Arbitrade Bermuda promoted and sold Unity Ingot tokens and, later, Dignity tokens (together, the **Tokens**), to investors around the world. They raised approximately US $51 million by selling the Tokens.

[4]    The Commission alleges that the Tokens are securities, something that must be established for there to be any breaches of the *Securities Act* (the **Act**)[1].

[5]    The Commission further alleges that Hogg, Cryptobontix, Arbitrade Exchange and Arbitrade Bermuda each:

a.    perpetrated a fraud on investors by distributing promotional materials which contained false and misleading statements regarding the acquisition of gold

---

[1] RSO 1990, c S.5

2024 ONCMT 15 (CanLII)

       bullion to support the value of the Tokens and regarding the audit of such gold bullion, contrary to s. 126.1(1)(b) of the *Act*;

b.    engaged in the business of trading in securities without registration, contrary to s. 25(1) of the *Act*; and

c.    traded in securities where the trades were a distribution of securities, without a prospectus, contrary to s. 53(1) of the *Act*.

[6]   As well, the Commission alleges that all the respondents perpetrated a fraud on investors, contrary to s. 126.1(1)(b) of the *Act*, by misappropriating investor funds, contrary to representations to investors that the funds would be used to purchase cryptocurrency mining equipment to increase the value of the Tokens.

[7]   Finally, the Commission alleges that, in addition to Hogg directly breaching these provisions of the *Act*, Hogg as a director or officer of each of the corporate respondents authorized, permitted or acquiesced in their non-compliance with Ontario securities law and should be deemed liable under s. 129.2 of the *Act*.

[8]   For the reasons below, we find that:

a.    the sale of Tokens, considering all the surrounding circumstances of the sale, including the related representations made to prospective purchasers, are "investment contracts" and therefore securities under the *Act*;

b.    Hogg, Cryptobontix, Arbitrade Exchange and Arbitrade Bermuda acted fraudulently by falsely representing to investors that the Tokens were backed by gold or that gold was acquired and confirmed through an audit;

c.    the respondents acted fraudulently by misappropriating funds raised from the sale of Tokens for purposes other than those represented to investors;

d.    Hogg, Cryptobontix, Arbitrade Exchange and Arbitrade Bermuda engaged in the business of trading in securities without registration and without an exemption from registration; and

e.    Hogg, Cryptobontix, Arbitrade Exchange and Arbitrade Bermuda distributed the Tokens without complying with the prospectus requirements.

[9]   We also find that Hogg, as a director and officer of Arbitrade Bermuda authorized, permitted or acquiesced in all of Arbitrade Bermuda's breaches of

2

Ontario securities law. As a result, Hogg is deemed under s. 129.2 of the *Act* to also have not complied with Ontario securities law in respect of each of Arbitrade Bermuda's breaches. The Commission asked us to make similar findings against Hogg in respect of the other corporate respondents' breaches of the *Act*. We decline to do so because we attributed these other corporate respondents' breaches of the *Act* to Hogg when finding Hogg's direct breaches of the *Act*.

[10]  Before moving to outline the background facts, we first address two preliminary issues:

    a.   our denial of Hogg's and various corporate respondents' request for an adjournment of the merits hearing; and

    b.   our decision to proceed with the merits hearing despite the respondents' decision not to participate.

## 2.  PRELIMINARY ISSUES

### 2.1  The Adjournment Motion

#### 2.1.1 Background

[11]  The dates for the merits hearing were set in April 2023. The hearing was scheduled for 28 days beginning on November 21, 2023.

[12]  On October 20, 2023, we approved a request to withdraw brought by counsel for Hogg, Arbitrade Exchange, TJL and Gables. A week later, Hogg filed notice that he intended to act on his own behalf and on behalf of Arbitrade Exchange, TJL and Gables (but not Cryptobontix and Arbitrade Bermuda).

[13]  On October 30, 2023, Hogg, Arbitrade Exchange, TJL and Gables (together, the **Moving Respondents**) moved to adjourn the start of the merits hearing (the **Adjournment Motion**). We heard the motion on November 10, 2023. We were not satisfied that there were exceptional circumstances requiring an adjournment of the merits hearing.

#### 2.1.2 Law on adjournments

[14]  Rule 29(1) of the Tribunal's *Rules of Procedure and Forms* (the **Rules** that were in place at the time of the Adjournment Motion) provides that every merits hearing in an enforcement proceeding shall proceed on the scheduled date

3

unless the party requesting an adjournment "satisfies the Panel that there are exceptional circumstances requiring an adjournment".

[15]  That standard is difficult to meet. It reflects the important objective, set out in r. 1 of the *Rules*, that Tribunal proceedings be "conducted in a just, expeditious and cost-effective manner".

[16]  That objective must, however, be balanced against the parties' ability to participate meaningfully in hearings and present their case. A determination about whether to grant an adjournment is necessarily dependent on the circumstances of the case.[2]

## 2.1.3 Analysis

### 2.1.3.a  Introduction

[17]  The Moving Respondents requested the adjournment because:

    a.  their counsel recently withdrew, and they were trying to raise funds to retain their former counsel again or to retain new counsel, who would need time to prepare;

    b.  Hogg was unable to access files that the Commission had disclosed;

    c.  the process to compel foreign witnesses on the Moving Respondents' witness list to give evidence in this proceeding was still underway and would take another two to two-and-a-half months; and

    d.  a civil proceeding by the US Securities and Exchange Commission against some of the same respondents (**SEC proceeding**) was scheduled to be heard in April 2024, and evidence from that hearing would help the Moving Respondents defend this proceeding.

[18]  We needed to decide whether any of these grounds, considered alone or together, constituted exceptional circumstances requiring an adjournment of the merits hearing. We considered the following factors:

    a.  whether the principal delay was caused by unforeseen circumstances;

---

[2] *Money Gate Mortgage Investment Corporation (Re)*, 2019 ONSEC 40 (*Money Gate*) at para 54

2024 ONCMT 15 (CanLII)

4

b.    the Moving Respondents' conduct, including whether they tried to delay or manipulate the process;

c.    the seriousness of the potential consequences to the Moving Respondents;

d.    whether the Moving Respondents needed more time to respond;

e.    the Tribunal's interest in making decisions on a full factual record; and

f.    any prejudice because of an adjournment.[3]

[19]   The allegations against the Moving Respondents, and the potential consequences of this proceeding, are serious. The Commission submitted that while this factor may weigh in favour of an adjournment, there was no evidence that but for an adjournment, these respondents would not receive a fair hearing.

**2.1.3.b   Withdrawal of counsel**

[20]   The Commission submitted that counsel's inability to continue to represent the respondents was clearly foreseeable. In their motion asking to be removed from the record, counsel had relied on the non-payment of their accounts dating back to January 2022. The motion materials also included correspondence from counsel advising Hogg that because of non-payment of fees, they were only working on issues related to compelling the attendance of foreign witnesses, and not on other matters related to the merits hearing. The Commission submitted that the Moving Respondents had provided no evidence to prove that they were retaining new counsel or even whether they had the funds to retain new counsel. The Commission further submitted that withdrawal of counsel alone does not meet the exceptional circumstances test.

[21]   Because the Moving Respondents were without counsel, Hogg submitted that he needed more time to prepare for the merits hearing. He based this submission on several scenarios.

[22]   Hogg submitted that he was trying to secure funds to pay former counsel but that this might take several weeks, and former counsel might become unavailable because they might take on new cases. Hogg advised that if he was self-represented, he would need time to prepare for the merits hearing because

---

[3] *Pro-Financial Asset Management (Re)*, 2018 ONSEC 18 (**Pro-Financial**) at para 29

2024 ONCMT 15 (CanLII)

2024 ONCMT 15 (CanLII)

he did not understand the Tribunal's processes and the case is complex. Hogg said that he had spoken to several potential new lawyers, all of whom would need additional time (approximately six months) to prepare. Hogg said it was unclear whether and when he might be able to raise funds through family and friends to pay counsel.

[23]   This situation is like that in *First Global Data (Re)*.[4] In that case, a respondent lost his counsel and became self-represented. He argued that he was ill-equipped to represent himself, he was close to retaining counsel, and his health issues further delayed his preparation. The Tribunal denied the adjournment request, stating that the right to counsel is not absolute. Respondents in Tribunal proceedings often represent themselves and there are many protections in place to ensure they get a fair hearing.[5]

[24]   We decided that in this case, counsel's recent withdrawal did not amount to exceptional circumstances. The withdrawal was reasonably foreseeable, the Moving Respondents were uncertain whether and when they might be able to raise sufficient funds to retain counsel, and they would receive a fair hearing even without counsel.

### 2.1.3.c   Access to disclosure files

[25]   Hogg submitted that he had been unable to open thousands of files in the Commission's electronic disclosure because of broken links. Despite getting advice from his lawyer and from the Commission, he had been unable to resolve the issue. He submitted that he had developed a "work around" but that it was a time-consuming process. He therefore needed more time to prepare for the merits hearing.

[26]   We did not find this submission compelling. The Moving Respondents and their counsel received the Commission's disclosure on October 27, 2022, more than one year before the scheduled commencement of the merits hearing. Other than an inquiry in November 2022, neither the Moving Respondents nor their counsel complained about the Commission's disclosure or brought a disclosure-related

---

[4] 2022 ONCMT 23 (**First Global**)
[5] *First Global* at para 13

6

motion. Hogg raised his issue with the Commission for the first time on October 20, 2023, and the Commission promptly helped him.

[27]   We were not satisfied that there were any technical issues with the Commission's disclosure that might require an adjournment. Parties do bear some responsibility to be able to access electronic records. At the very least, respondents must promptly raise any issues regarding access to electronic records they receive. The Moving Respondents did not do that.

### 2.1.3.d   Foreign witnesses

[28]   In March 2023, the Moving Respondents said they intended to call multiple foreign witnesses at the merits hearing. The hearing dates were set on consent of the parties with that in mind. Hogg submitted that his former counsel told him to "wait" until they had received an order from the Ontario Superior Court of Justice issuing letters of request addressed to foreign courts before making efforts in those foreign jurisdictions to seek to compel the foreign witnesses to provide their evidence. We understood Hogg to be saying that he relied on advice of former counsel to wait before retaining foreign counsel and preparing any materials for the foreign courts. Hogg confirmed that although the Court issued the order on September 21, 2023, he still needed to retain multiple foreign counsel and he had not yet filed anything in the foreign courts seeking to compel the foreign witnesses to provide evidence. Hogg's US lawyer informed him that it would take two to two-and-a-half months from November 10, 2023, to have the foreign courts recognize the letters of request.

[29]   The Commission submitted that the Moving Respondents caused the delay in compelling the foreign witnesses and would benefit from delaying the proceeding as a result. In addition, the Commission submitted that the Moving Respondents acknowledged that their lack of funding made it uncertain whether they would even pursue the process to compel foreign witnesses, and even if they did, there was no guarantee that they would succeed.

[30]   While compelling foreign witnesses takes time and is not entirely within a party's control, the Moving Respondents failed to take any steps in the seven weeks since the issuance of the letters of request by the Court. That failure is

2024 ONCMT 15 (CanLII)

significant. A party seeking an adjournment for this reason must show that they have moved diligently.

[31] Because of the uncertainty as to whether the Moving Respondents would even pursue the process to compel the foreign witnesses, we declined to grant an adjournment on this ground. When we advised the parties of our decision, we told Hogg that because the Commission would present its case first, and given the Commission's proposed timetable for the merits hearing, the Moving Respondents would likely not need to call their witnesses before January 2024, which was two months away. We urged Hogg to take steps to compel the foreign witnesses.

### 2.1.3.e    The SEC proceeding

[32] The Moving Respondents submitted that the SEC proceeding would be critical in telling the full story. They asserted that the SEC proceeding would bring forward evidence that would help their defence in this proceeding. They therefore asked that we adjourn this proceeding until after the disposition of the SEC proceeding.

[33] The Commission explained that the SEC proceeding was commenced on the same day as this proceeding. It arose out of an SEC investigation that was conducted in parallel to the Commission's investigation that resulted in this proceeding. Although many of the same facts will be in issue in both proceedings, the proceedings are not the same. The parties are not identical and different laws apply.

[34] The Moving Respondents had never previously raised the timing of the SEC proceeding as an issue, including when the merits hearing dates were set in April 2023, at which time the hearing for the SEC proceeding had already been scheduled to begin after the merits hearing here. Given that the SEC proceeding was not scheduled to start until April 2024, the requested adjournment until after the disposition of the SEC proceeding could be very lengthy.

[35] Generally, the Tribunal will not stay its proceedings in favour of other proceedings. It is fundamental to properly functioning capital markets that a regulator be able to respond efficiently and effectively to protect the investing

2024 ONCMT 15 (CanLII)

8

public. It is in the public interest for the Tribunal to hear proceedings as soon as possible.[6]

[36]   We distinguish this case from *Hollinger Inc. (Re)*,[7] in which the Tribunal stayed a proceeding in favour of a US proceeding. In that case, the US matter was a criminal proceeding with a risk of incarceration. The Tribunal recognized that issues might arise if the Tribunal proceeding went ahead of the US criminal proceeding, given the different approaches to the right to protection against self-incrimination under Canadian and American law. Here, the SEC proceeding is civil and not criminal, and the same concerns are not engaged.

[37]   We did not find that the SEC proceeding constituted exceptional circumstances requiring an adjournment.

### 2.1.3.f   Cases cited by the Moving Respondents

[38]   The Moving Respondents submitted that the Tribunal has granted adjournments in circumstances that were not as "exceptional" as here. However, every case that Hogg cited is distinguishable because, the adjournment was on consent, did not involve the adjournment of the merits hearing, pre-dated the adoption of r. 29(1) of the *Rules* in 2017, or did meet the high bar of exceptional circumstances.

### 2.1.3.g   Prejudice

[39]   Finally, the Moving Respondents submitted that an adjournment would cause no prejudice (*i.e.*, risk of harm to the capital markets) because the courts had frozen all of Hogg's money, and the subject "cryptocurrency" and corporation were no longer operating in Canada or in Hogg's name.

[40]   Lack of prejudice arising from an adjournment does not meet or obviate the exceptional circumstances test. In any event, there is generally always prejudice, including time and expense thrown away, that arises as a result of the adjournment of a merits hearing, especially when the adjournment is sought close in time to scheduled hearing dates.

---

[6] *Robinson (Re)*, (1993) 16 OSCB 5667 at paras 11-14; *David Charles Phillips et al*, 2015 ONSEC 1 at paras 51-59

[7] 2006 ONSEC 2 (*Hollinger*)

2024 ONCMT 15 (CanLII)

### 2.1.3.h   Conclusion on the adjournment motion

[41]   We concluded that many months had passed since this proceeding began, during most of which time the Moving Respondents had the benefit of counsel to navigate securing foreign witnesses and managing the SEC proceeding. In fact, Hogg was still represented by US counsel when we heard the Adjournment Motion. In addition, there was a lengthy scheduled gap between the close of the Commission's case and the start of the Moving Respondents' case. The Moving Respondents had a reasonable opportunity to prepare their defence.

[42]   The Moving Respondents failed to demonstrate that any of the grounds advanced, even taken together, amounted to exceptional circumstances that would require an adjournment. We therefore dismissed the motion.

## 2.2   Proceeding in the absence of the respondents

[43]   The respondents chose not to participate in the merits hearing and we proceeded in their absence.

[44]   Hogg, Arbitrade Exchange, TJL and Gables participated in earlier hearings in this proceeding and consented to the scheduled merits hearing dates. However, on the first day of the merits hearing, Hogg advised the Tribunal in writing that "under advisement from my attorneys" he would not be attending the hearing.

[45]   Neither Cryptobontix nor Arbitrade Bermuda attended any hearings in this proceeding, despite having been given reasonable notice.

[46]   Where notice of a hearing has been given to a party to a proceeding and the party does not attend the hearing, the Tribunal may proceed without the party's participation and the party is not entitled to any further notice in the proceeding.[8]

[47]   All respondents had proper notice of the proceeding. It was appropriate to proceed in their absence.

---

[8] *Statutory Powers Procedure Act*, RSO 1990, c S.22, s 7(1); *Rules of Procedure*, r 21(3)

2024 ONCMT 15 (CanLII)

2024 ONCMT 15 (CanLII)

### 3.     BACKGROUND

### 3.1     The respondents

### 3.1.1 Hogg

[48]   Hogg was a resident of Ontario at all relevant times. He founded Cryptobontix and was its sole officer and director throughout the Material Time. Hogg was also the company's sole shareholder until he sold his shares to SION Trading FZE in or about June 2019.

[49]   Throughout the Material Time, Hogg was also the sole director, officer and shareholder of Arbitrade Exchange.

[50]   During the Material Time, Hogg was also the majority shareholder of Arbitrade Bermuda, indirectly owning 67% of its shares through his personal holding company.

### 3.1.2 Cryptobontix

[51]   Cryptobontix is an Ontario company incorporated in 2014.

[52]   Cryptobontix developed and issued a family of crypto tokens that were represented as backed by precious metals. These tokens included the Unity Ingot token, which was later replaced with the Dignity token. Both the Unity Ingot token and the Dignity token were represented to be backed by gold bullion.

[53]   In 2018 there was a plan that Arbitrade Bermuda would acquire the business or assets of Cryptobontix. Although no evidence established that this happened, Arbitrade Bermuda treated Cryptobontix and the Tokens as part of its business and represented this to be the case.

### 3.1.3 Arbitrade Exchange

[54]   Arbitrade Exchange is an Ontario company incorporated in 2014. Originally a retail business, Hogg later used it for the crypto asset business until Arbitrade Bermuda was established.

[55]   In June 2018, counsel for Arbitrade Exchange advised the Commission that Arbitrade Exchange had engaged in promotional activity consisting of the issuance of press releases and emailing business updates to a subscriber list developed by Cryptobontix to raise market awareness of the business intended

11

to be conducted by Cryptobontix (or in Arbitrade Bermuda after its intended acquisition of the business or assets of Cryptobontix).

### 3.1.4 Arbitrade Bermuda

[56]   Arbitrade Bermuda is a Bermuda corporation incorporated on May 30, 2018.

[57]   Arbitrade Bermuda was established by Hogg and others with the intention that it acquire or combine with Cryptobontix and Arbitrade Exchange and operate a digital asset business, including a "cryptocurrency exchange".

[58]   Hogg was the majority shareholder of Arbitrade Bermuda. Although he was not formally appointed a director or officer of Arbitrade Bermuda, he was to own enough shares of the company to appoint a majority of its board of directors and control it once its organization was completed, which he did. Hogg was also the "technical advisor" to Arbitrade Bermuda. His responsibilities included marketing, and preparing press releases, government documents, white papers, and presentations. Hogg said that his role as a consultant at Arbitrade Bermuda included "all the technical aspects and marketing materials".

### 3.1.5 TJL and Gables

[59]   TJL is an Ontario corporation incorporated on April 30, 2014. Throughout the Material Time, Hogg was TJL's sole shareholder, director and officer.

[60]   Hogg operates various businesses through TJL, including consulting, advertising, software developing, real estate developments, and restaurants in Grand Bend, Ontario.

[61]   Gables is an Ontario corporation incorporated on June 8, 2018. Hogg owns Gables, which holds approximately half of his real property and other local business interests.

[62]   From June 8, 2018, to at least April 12, 2019, Hogg was the sole director of Gables.

### 3.2   Factual background relevant to the Tokens

### 3.2.1 The development of the Tokens

[63]   Hogg developed the concept of the Tokens. At Hogg's direction, Cryptobontix arranged for a developer to create and deploy on the blockchain Unity Ingot

2024 ONCMT 15 (CanLII)

tokens (also known as UNY tokens) and, later, the Dignity tokens (also known as DIG tokens), which replaced the Unity Ingot tokens. Cryptobontix described these tokens as "cryptocurrencies based on the Ethereum Smart Contract technology".

[64]  Initially, Cryptobontix stated that 10 billion Unity Ingot tokens would be released. This number was later reduced to 3 billion. It is not clear whether this reduction occurred during what Cryptobontix described as a November 2017 "reissuance" or in or about February 2018 when the Unity Ingot tokens were replaced with Dignity tokens which were provided to holders of Unity Ingot tokens on a 1-to-1 exchange basis. Cryptobontix "released" 3 billion Dignity tokens in total. We understand that the "released" figure represented the maximum amount of tokens that were available for purchase. It was not explained whether 3 billion tokens were created.

### 3.2.2 How the Unity Ingot and Dignity tokens were sold

[65]  The Unity Ingot tokens (and, later, the Dignity tokens) were sold on two crypto asset trading platforms: Livecoin and C-CEX. The Unity Ingot tokens first traded on Livecoin and C-CEX on May 2, 2017.

[66]  During the Material Time, Hogg engaged two individuals, Stephen Braverman and James Goldberg, to sell the Unity Ingot tokens and Dignity tokens. Braverman and Goldberg both became shareholders of Arbitrade Bermuda. Braverman was its Chief Operating Officer and Goldberg was an assistant to the Chairman and CEO.

[67]  The Tokens were generally sold in the following manner:

a.   Hogg was responsible for the relationship with Livecoin in connection with the Tokens.

b.   Hogg controlled the Unity Ingot tokens (and later the Dignity tokens) in a master account.

c.   On request, Hogg would transfer blocks of Tokens to Braverman and Goldberg, each of whom had accounts on the Livecoin and C-CEX crypto asset trading platforms.

2024 ONCMT 15 (CanLII)

13

2024 ONCMT 15 (CanLII)

    d.   Braverman and Goldberg, in turn, sold the Tokens to purchasers through Livecoin and C-CEX in exchange for bitcoin (or other cryptocurrency).

    e.   Braverman sold Tokens on the trading platforms to purchasers who were known to him. According to Hogg, Goldberg sold Tokens to anyone who was willing to buy them on the trading platforms without knowing who the purchaser was. The Commission's evidence about the knowledge of the investors who purchased Tokens from both Braverman and Goldberg was not detailed.

    f.   Purchasers of Tokens sent their payments (in bitcoin or other cryptocurrency or crypto asset) to accounts on Livecoin controlled by Hogg, or Braverman or Goldberg. In each case, the payments then went from the applicable Livecoin account to an account on the Genesis trading platform held by Braverman's company Rozgold Capital LLC.

    g.   On the Genesis platform, Rozgold converted the bitcoin (or other cryptocurrency or crypto asset) received from purchasers of the Tokens into US dollars.

    h.   Upon confirmation of receipt of the purchaser's funds, the purchased Tokens were released to the purchaser either from Hogg directly or through Braverman.

[68]   In addition, on a "couple" of occasions Hogg transferred Tokens directly from his master account to purchasers at blockchain addresses or wallets that Braverman identified. He also sold Tokens directly or indirectly to two friends of his.

[69]   Below, we analyze the flow of proceeds from Token sales. To summarize, Arbitrade Bermuda received approximately US $41.6 million. In addition, Cryptobontix and Arbitrage Exchange also received proceeds in an amount that the Commission did not establish and used them to develop their respective businesses. Finally, an additional approximately US $10.1 million was transferred by Rozgold to, or used for the personal benefit of, Hogg and his companies TJL and Gables.

### 3.2.3  The promotion campaign for the Tokens

### 3.2.3.a          How the Tokens were described to potential purchasers

[70]   The Commission introduced extensive evidence of the various promotional materials that were created and made available to the public about the Tokens.

[71]   Beginning in November 2017, some materials stated that the Tokens operated as a "coupon". Apart from that, though:

    a.   the materials presented a generally consistent picture as to what purchasers could expect in connection with the Tokens; and

    b.   the materials gave similar descriptions of the two tokens. Purchasers of the Dignity token, and individuals who exchanged their Unity Ingot tokens for Dignity tokens, would reasonably have understood that the promotional materials referring to the Unity Ingot tokens (including the Cryptobontix White Paper dated November 5, 2017, discussed below) also extended to the Dignity tokens after they were issued as a replacement for the Unity Ingot tokens in February 2018.

[72]   From as early as May 8, 2017, the materials included the following representations:

    a.   **The Tokens are backed by cryptocurrency "mining":** Cryptocurrency mining involves using hardware to run programs and provide computing power needed to generate cryptocurrencies. The miner is rewarded with the cryptocurrency that is supported by the mining activity. A percentage of the proceeds received from selling the Tokens was to go directly into purchasing mining rigs (also referred to as mining servers) and the related infrastructure that would be used to mine other cryptocurrencies and generate earnings.

    b.   **The earnings from the cryptocurrency mining would be used as follows:**

        i.   50% of the mining earnings would be used to purchase physical gold bullion (in earlier materials there was also reference to the purchase of bitcoin in addition to gold bullion) that would "back" the Tokens and create a guaranteed intrinsic "floor value" for each Token;

15

2024 ONCMT 15 (CanLII)

    ii.    15% (later in November 2017 this percentage increased to 20%) would be reinvested into additional mining servers so that the size of the cryptocurrency mining operations backing the Tokens would continue to grow;

    iii.    15% would be used to buy back Tokens from sellers in the market (later materials referred to both "buy back" and Token "burning" programs); and

    iv.    20% (later in November 2017 this percentage decreased to 15%) would be used for operations, expansions and upkeep, including hydro expenses for mining operations, keeping the mining servers operating, and staffing and insurance costs.

c.    **The Tokens were consistently touted as a "store of wealth" (due to the gold bullion backing) with a "growth component" (due to the cryptocurrency mining activities and related earnings as well as the growth in investment in gold bullion):** Descriptions of the Tokens like the following were repeatedly used:

    i.    "a compounding interest model in the way that it grows both daily mining abilities and the store of wealth on reserve";

    ii.    "will grow in a physical asset value of 35% or greater per year and never dropping [*sic*] below its initial value";

    iii.    "it exponentially grows in value with every passing day. Many are viewing this strategy as the most attractive compound growth strategy ever introduced to the investment community to date";

    iv.    "operates on a model that 'exponentially' scales";

    v.    "the potential for this token is into the billions. Those that are investment savvy and can buy and hold should prove to make substantial returns"; and

    vi.    "exponential earnings are predicted by bringing new mining rigs online daily in the cryptocurrency mining facilities. Thus, as the daily purchase volume of bullion and additional mining rigs grows, the net

16

2024 ONCMT 15 (CanLII)

holding that each token represents makes the Cryptobontix tokens the most secure and valuable cryptocurrency in the sector".

d. **Beginning in the Cryptobontix White Paper, the Tokens were also described as a "coupon" for the physical bullion backing them.** It was explained that "after year two", holders of the Tokens could liquidate their position and exchange the Tokens for the physical bullion that backs the Tokens.

### 3.2.3.b   The extensive public promotion of the Tokens

[73]   The above representations about the investment opportunity, and periodic updates about the Tokens, were extensively and repeatedly made available to the public and to prospective purchasers of the Tokens. Some updates related to cryptocurrency mining, the acquisition of mining rigs, and efforts to acquire and audit gold bullion. The representations and updates were made in many forms, including the following:

a.   between May 8, 2017, and May 30, 2019, the Bitcoin Talk Forum at bitcointalk.org contained a dedicated page and discussion thread entitled "[ANN] DIGNITY (DIG) Official Page – Formerly Unity Ingot." The thread was authored by a user who self-identified as the "admin for Cryptobontix and the UNY/DIG token". That user began the thread by posting promotional materials regarding the Unity Ingot token on May 8, 2017. The thread was later updated to clarify that it also applied to the Dignity token;

b.   between May 28, 2017, and June 15, 2018, Livecoin made several paid email announcements regarding the Tokens;

c.   Braverman gave several prospective investors a PowerPoint presentation about the Unity Ingot token, prepared by Hogg around July 11, 2017;

d.   Braverman provided the Cryptobontix White Paper to potential institutional investors as early as November 7, 2017. The White Paper was circulated to subscribers to the Cryptobontix website by February 12, 2018, and made available to the public via a website link on cryptobontix.com in 2018;

e.   during the Material Time the Cryptobontix website and the "Arbitrade" website, purporting to speak for Arbitrade Exchange and then, later,

17

2024 ONCMT 15 (CanLII)

Arbitrade Bermuda, allowed members of the public to subscribe for email newsletters regarding the Tokens. These were sent to over 3,800 subscribers to those websites, including in newsletters between March 7, 2018, and May 22, 2019;

f.  between February 26, 2018, and January 11, 2019, multiple press releases were issued on behalf of Cryptobontix, Arbitrade Exchange, the prospective Arbitrade Bermuda entity and Arbitrade Bermuda. The press releases issued between February 26, 2018, and June 23, 2018, were distributed to various worldwide regions, including the United States and Canada;

g.  during February to May 2018, the Cryptobontix Twitter social media account posted several tweets and the Cryptobontix Telegram Channel disseminated messages, which contained links to many of the email newsletters and press releases noted above;

h.  during the period between May 2018 and May 2019, the Arbitrade Twitter social media account posted several tweets and the Arbitrade Telegram Channel disseminated messages, which contained links to many of the email newsletters and press releases noted above;

i.  an Arbitrade Bermuda June 28, 2018, telephone press conference was open to the public and was announced via some of the press releases and email newsletters noted above; and

j.  an analyst report on the Unity Ingot token (recommending a "buy") from an analyst that Hogg, Braverman and Goldberg hired to prepare such a report. On February 10, 2018, the analyst sent the report to his subscribers, more than 360 of whom purchased the Dignity token.

## 3.2.4 Sales of the Tokens

### 3.2.4.a    Number of Tokens sold and amount raised

[74]  We find that at least 1.5 billion Tokens were sold between May 2017 and November 2018. There was insufficient evidence for us to find, on a balance of probabilities, the total number of Tokens that were sold during the Material Time.

18

2024 ONCMT 15 (CanLII)

[75]   Arbitrade Exchange and Cryptobontix confirmed to the Commission during its investigation that they used an unspecified amount of capital raised from Token sales to develop their businesses.

[76]   The Commission introduced a memorandum titled, "Cryptobontix Tax Planning" dated March 25, 2019, that was prepared by Arbitrade Bermuda and shared with Hogg at the time (**Arbitrade Memorandum**). The Arbitrade Memorandum specifies that Arbitrade Bermuda received US $41,622,965.27 from Cryptobontix in 2018. Based upon the Arbitrade Memorandum and other related evidence, we find that in 2018 Arbitrade Bermuda received US $41,622,965.27 in Cryptobontix "token sale proceeds", and that all or nearly all this amount was proceeds from the sale of the Tokens.

[77]   Further, as we find below, additional Tokens were sold, resulting in a further US $10,109,038 of proceeds from Token sales not identified in the Arbitrade Memorandum that was transferred to or used for the benefit of Hogg, TJL and Gables. In making this finding, we reject the evidence provided by Hogg and Cryptobontix to the Commission during its investigation that all US dollars from Rozgold's conversion of the proceeds received from purchasers of the Tokens were forwarded to Arbitrade Bermuda.

[78]   These two amounts combine to establish that the proceeds of Token sales were at least US $51,732,003.27. Some evidence suggested there may have been additional sales, but that evidence does not meet the balance of probabilities standard.

**3.2.4.b    The purchasers of the Tokens**

[79]   Hogg said he knew the identity of two purchasers and knew that Braverman and Goldberg had sold Tokens. However, apart from that, the only other evidence and information about purchasers of the Tokens introduced by the Commission was contained in nine completed questionnaires of individuals who self-identified as purchasers of Tokens during the Material Time, and email correspondence the Commission received from twenty-one additional individuals who also self-identified as purchasers of Tokens.

[80] Other than the above, the Commission introduced no evidence that confirmed the total number of purchasers of Tokens, how many each purchased, when they purchased them, or their identities.

## 4. ISSUES AND ANALYSIS

[81] The issues before us are as follows:

    a. Are the alleged breaches in relation to securities?

    b. Did the respondents engage in fraud contrary to s. 126(1)(b) of the *Act*?

    c. Did Hogg, Cryptobontix, Arbitrade Exchange, and Arbitrade Bermuda engage in the business of trading securities without registration contrary to s. 25(1) of the *Act*?

    d. Did Hogg, Cryptobontix, Arbitrade Exchange and Arbitrade Bermuda illegally distribute securities contrary to s. 53(1) of the *Act*?

    e. Should Hogg be deemed under s. 129.2 of the *Act* to have violated Ontario securities law for permitting, authorizing or acquiescing in the corporate respondents' breaches?

[82] Our analysis and conclusions on each of these issues is set out below.

## 4.1 Are the alleged breaches in relation to securities?

[83] All the Commission's allegations of breaches of the Act are predicated on the Commission first establishing that the alleged breaches were in relation to securities.

[84] The Commission submits that the Tokens are securities by virtue of being "investment contracts".[9] The Commission submits alternatively that if the Tokens are not investment contracts, they are securities by virtue of being "other evidence of indebtedness"[10] or "any document constituting evidence of title to or interest in the capital, assets, property, profits, earnings or royalties of any person or company".[11]

---

[9] *Act*, s 1(1), "security" para (n)
[10] *Act*, s 1(1), "security" para (e)
[11] *Act*, s 1(1), "security" para (b)

2024 ONCMT 15 (CanLII)

[85]   We find that the Tokens considered alone are not "investment contracts". However, we do find that the initial sale transactions of the Tokens to purchasers, considering all the surrounding circumstances of the sales, including how the Tokens were represented to prospective purchasers, are "investment contracts" and therefore securities under the Act.

[86]   As the Commission need only satisfy one definition of "security", we need not consider whether the other two categories of securities invoked by the Commission, namely "evidence of indebtedness" or "evidence of title or interest", are established on the facts.

## 4.1.2   "Security" must be interpreted broadly and purposively

[87]   The Act defines "security" to include 16 enumerated categories of instruments. The Commission principally relies on one of those categories, "investment contracts", to establish that this case involves securities.

[88]   In deciding whether an instrument is a security, we must give the term a broad and purposive meaning, given that the Act is remedial legislation intended to protect the investing public. The Act must be "read in the context of the economic realities to which it is addressed" and "[s]ubstance, not form, is the governing factor".[12] Investor protection is the "overarching lens" through which we should view the attributes of an alleged security.[13]

[89]   This Tribunal has previously noted that crypto assets, such as the Tokens in this case, are "unique and complex, extremely difficult to objectively value and subject to significant volatility" and that "few retail investors would have much, if any, experience with these complex and risky products".[14]

## 4.1.3   Is the "investment contract" test met in this case?

[90]   The *Act* provides that "any investment contract" is a security.[15] The term "investment contract" is not defined in the *Act*.

---

[12] *Pacific Coast Coin Exchange v Ontario Securities Commission*, [1978] 2 SCR 112 (***Pacific Coast Coin***) at 127; see also *VRK Forex & Investments Inc (Re)*, 2022 ONSEC 1 (***VRK***) at paras 22, 24, 33, aff'd 2023 ONSC 3895 (Div Ct) (***VRK Appeal***)

[13] *VRK* at para 24; *VRK Appeal* at para 15

[14] *Polo Digital Assets, Ltd (Re)*, 2022 ONCMT 32 at para 55 (***Polo***)

[15] *Act*, s 1(1), "security" para (n)

2024 ONCMT 15 (CanLII)

[91]   The Supreme Court of Canada's decision in *Pacific Coast Coin* considered two approaches to the interpretation of "investment contract" developed in two American cases: *Howey* and *Hawaii*.[16] The Supreme Court adopted a modified version of the *Howey* test (the **Common Enterprise Approach**) and also found that the *Hawaii* test (the **Risk Capital Approach**) applied in the circumstances.[17]

[92]   In *Pacific Coast Coin*, the Court held that any definition of investment contract must embody "a flexible rather than a static principle, one that is capable of adaptation to meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits."[18] The Court emphasized the role of policy and legislative choice over a buyer-beware approach or any recently formed judicial test that had outlived its usefulness.[19]

[93]   An investment contract may be a "contract, transaction or scheme".[20] Many investment contract cases in the securities context involve one or more written or oral common law contracts. The sales of Tokens in this case raise various factual issues that may be relevant to whether a common law contract was formed with each of the purchasers of Tokens, including that: a) the identities of some of the purchasers were not known, b) some representations about the Tokens changed over time and each purchaser may not have heard each representation, and c) the "obligations" of Crytobontix or Arbitrade Bermuda might be unclear.

[94]   We considered whether there must be a technically valid and enforceable written or oral common law contract in relation to each of the sale transactions for the Tokens for us to find that there is an "investment contract". We are satisfied that this is not necessary. By stating that "transactions" and "schemes" – and not just contracts—can qualify as investment contracts, the Supreme Court made this

---

[16] *Pacific Coast Coin* at 127-132, citing *SEC v W J Howey Co*, 328 US 293 (1946) (**Howey**) and *State of Hawaii, Commissioner of Securities v Hawaii Market Center, Inc*, 485 P 2d 105 (1971) (**Hawaii**)

[17] *Pacific Coast Coin* at 127-131

[18] *Pacific Coast Coin* at 127

[19] *Pacific Coast Coin* at 132

[20] See *Re Pacific Coast Coin Exchange of Canada Ltd et al v Ontario Securities Commission*, 1975 CanLII 686 (ONSC) (**Pacific Coin (Div Ct)**), citing Howey at 298-299

2024 ONCMT 15 (CanLII)

6

2024 ONCMT 15 (CanLII)

clear. US courts have taken a similar approach.[21] *Pacific Coast Coin* itself is an example where a representation in marketing materials external to the written contract (and even contrary to the written contract's express terms) was important to establishing the existence of an investment contract.[22] *Hawaii*'s emphasis on an offeree being induced to advance value to the enterprise by the offeror's "promises or representations" also confirms this point.[23]

[95]   On a separate note, we asked the Commission whether a security (including an investment contract) can exist when some or all the relevant facts are either untrue when they are represented to investors or the promises to investors do not materialize. We accept the Commission's submissions in this regard—namely that, consistent with the *Act*'s policy of protecting the investing public against securities fraud, analysis about the existence of a security must consider what is offered or promised to investors, and not what happens or materializes. For example, in this case, we considered the representations made to potential investors in relation to the gold bullion backing and cryptocurrency mining operations.

### 4.1.3.a   What is the "investment contract" in this case?

[96]   Before we turn to consider whether the Commission has established that the elements of an investment contract are met, we consider the issue of what the "investment contract" is in this case.

[97]   The Commission submits that the Tokens themselves are the investment contract, as opposed to the overall transaction or scheme for the offer and sale of the Tokens, including the representations made to investors, considered together.

[98]   In support of this submission, the Commission references this Tribunal's approval of a settlement in Coinlaunch Corp. (Re),[24] where the Tribunal found that two crypto tokens were securities on the basis that they were investment contracts.[25]

---

[21] *SEC v Terraform Labs Pte Ltd*, 2023 US Dist LEXIS 132046 at 33-34.
[22] *Pacific Coast Coin* at 125 and 129
[23] *Pacific Coast (Div Ct)*, citing *Hawaii*
[24] 2019 ONSEC 26 (**Coinlaunch**)
[25] *Coinlaunch* at paras 7-11

The Commission also notes that some US decisions conclude that particular crypto assets are securities on the basis that they are investment contracts.[26]

[99] The Commission submits that the Tokens are the investment contract here because they are a "smart contract", "contract", the equivalent of a "written document", "the embodiment of the contract", and also the "investment instrument" (analogous to a share certificate) by which investors' interests are made manifest. According to the Commission, the Tokens have "features and functions embedded within them" and the "terms" embedded in them are based on the representations made to investors that the Tokens could be exchanged for gold during the coupon redemption periods and the Tokens could be traded and sold to others.

[100] The Commission argues that the Tokens are therefore analogous to the commodity account agreement found to be a security in *Pacific Coast Coin*. That commodity account agreement was a written contract between each of the investors and Pacific Coast Coin. The subject of the commodity account agreement was bags of silver coins. The commodity account agreement included multiple terms governing the investment relationship between Pacific Coast Coin and the investors who were essentially investing in silver coins on margin and relying on Pacific Coast Coin to make a market for their investment when they wanted to close out their account.[27]

[101] The Commission also submits that because the Tokens are the things being traded, the application of an investor protection lens warrants a finding that that the Tokens themselves are the investment contract and therefore the securities, as otherwise there may be ramifications for secondary market purchasers. This case does not involve secondary market purchases, and the Commission did not substantiate its submission on this point, so while we do not exclude the possibility that the submission is correct, we cannot give effect to it.

[102] We are not satisfied that the Tokens can themselves be an investment contract.

---

[26] *SEC v LBRY, Inc* (2022), 639 F Supp 3d 211 (**LBRY**) at 220-221; *SEC v Terraform Labs Pte Ltd*, 2023 US Dist LEXIS 230518 (**Terraform**) at 42, 45-48; *United States SEC v Kik Interactive Inc* (2020), 492 F Supp 3d 169 at 177-178; *In the Matter of Munchee Inc*, 2017 SEC LEXIS 4005 (**Munchee**) at 2-3; *In re BitConnect Securities Litigation*, 2019 US Dist LEXIS 231976 at 27-28

[27] *Pacific Coast Coin* at 123-125

2024 ONCMT 15 (CanLII)

24

[103] Determining whether something is a security by virtue of being an investment contract depends on the relevant facts. The Tribunal's decision in *Coinlaunch* does not stand for the proposition that crypto tokens are always securities. Further, we give that decision little weight, because it was a settlement approval and nothing on the face of the decision indicates that the parties made submissions about whether a crypto token is itself the investment contract or whether it is simply the subject of an investment contract. Although the US cases cited by the Commission involve findings that the crypto assets in those cases were investment contracts and therefore securities, we note that once those decisions find that the elements of the *Howey* test for an investment contract are met, they contain little to no analysis as to why the crypto assets are themselves the securities.

[104] We were not convinced by the Commission's assertion that the Tokens here are a "smart contract", "contract", "equivalent of a written document", or that they have "terms" embedded within them. The Commission relied on a single line in the Cryptobontix White Paper indicating that the Tokens are "based on the Ethereum Smart Contract technology, otherwise known as ERC20 tokens". The Commission did not satisfactorily explain why this was significant. There was no evidence supporting these assertions of the Commission. In contrast to the commodity account agreement in *Pacific Coast Coin*, the Tokens, considered alone, do not incorporate or reflect what purchasers of the Tokens might reasonably expect from their investments. As we find below, purchasers' reasonable expectations, based upon the representations that were made to them in promotional materials, are an essential element of what we find to be the investment contract.

[105] We were also not satisfied that the Tokens here are an investment instrument like a share certificate. It was not established that there is anything inherent in them that gives investors any interest in Cryptobontix or a business.

[106] On this question of what is the "investment contract", we prefer the approach and analysis taken in the US decision in *SEC v. Ripple Labs, Inc.*,[28] namely that the subject of a "contract, transaction or scheme" can be a variety of tangible or

---

[28] 2023 US Dist LEXIS 120486 (SDNY July 13, 2023) (**Ripple**) at 22-24

2024 ONCMT 15 (CanLII)

intangible assets. The subject itself is not necessarily a security by virtue of being an investment contract. Although the Tokens are the subject of the transaction or scheme in this case, we find that the Tokens (like the bags of silver coins in *Pacific Coast Coin* and the citrus groves in *Howey*, involving contracts in which investors bought citrus groves and essentially leased them back to a service provider to harvest, pool and market the produce), in and of themselves, do not embody the elements of an investment contract.

[107] Instead, we find, as detailed below, that the investment contract (and therefore the security) here is the transaction or scheme for the offer and sale of the Tokens, including the economic reality of all the surrounding circumstances and, in particular, the representations made to investors (the **Cryptobontix Security**). Without those representations, there is no investment contract in this case.

[108] For avoidance of any doubt, our decision should not be taken to mean that in no circumstances can a crypto token ever be a security either by reason of it being an "investment contract" or satisfying another of the enumerated categories of instruments that are securities. Every case will depend on its facts. We also note that because there was no need for us to consider whether one of the alternate definitions of a security (i.e. "evidence of indebtedness" or "evidence of title or interest") was satisfied in this case by virtue of the Tokens being represented to be a "coupon" that could be exchanged for gold bullion, we have also not considered the corresponding question of whether the Tokens themselves might be a security had one of those alternate definitions of a security been satisfied.

### 4.1.3.b Application of the Common Enterprise Approach

[109] We now apply the Common Enterprise Approach to the transaction or scheme involving the sale of the Tokens. The Common Enterprise Approach provides that an investment contract is made up of four elements:

a.    an investment of money;

b.    with a view to a profit;

2024 ONCMT 15 (CanLII)

    c.    in a common enterprise where the success or failure of the enterprise is interwoven with, and dependent on, the efforts of persons other than the investors; and

    d.    the efforts made by those others significantly affect the success or failure of the enterprise.[29]

[110]   Below we find that the facts of this case satisfy the Common Enterprise Approach. Therefore, we need not also consider the Risk Capital Approach.

### 4.1.3.b.i    Investment of money

[111]   The Commission submits that the first element of the test (an investment of money) can be satisfied if there was a payment.[30] The Commission submits that because investors paid for the Tokens with cryptocurrencies, such as bitcoin, this element of the test is clearly satisfied.

[112]   We agree. The payment need not be in fiat currency. It can be in crypto assets. In at least two prior decisions, this Tribunal accepted that the payment or deposit of crypto assets can satisfy this element of the test.[31] In this case, the bitcoin (and other cryptocurrency or crypto assets) that purchasers used to buy the Tokens was valuable and readily convertible into fiat currency. The Commission confirmed that this case is restricted to the initial sales of Tokens by or on behalf of Cryptobontix. Thus, all the proceeds raised through Token sales were available for use by the enterprise (Cryptobontix and Arbitrade Bermuda). The economic reality was that the sale proceeds were available for use by the enterprise offering the Tokens.

### 4.1.3.b.ii    View to a profit

[113]   We must adopt a broad approach in deciding whether an investment of money is made "with a view to a profit". This element of the test has been interpreted to include "all types of economic return, financial benefit or gain."[32]

---

[29] *Pacific Coast Coin* at 128-130

[30] *Edward Furtak et al*, 2016 ONSEC 35 (**Furtak**) at para 78, aff'd *Furtak v Ontario (Securities Commission)*, 2018 ONSC 6616 (Div Ct); *Polo* at para 44

[31] *Mek Global Limited (Re)*, 2022 ONCMT 15 (**Mek Global**) at para 43; *Polo* at para 44

[32] See *Furtak* at para 82, citing *Kustom Design Financial Services Inc (Re)*, 2010 ABASC 179

27

[114] We agree with the Commission's submission that this element of the test is established where an investor shares in an enterprise's profits. We go further and find that this element of the test can also be established where an investor invests money with the reasonable expectation that they will share in an enterprise's profits.

[115] During the Material Time, the potential to profit from the Tokens was repeatedly represented to potential investors through various materials that were widely available. As a result, investors would have reasonably expected that they would share in the profits of Cryptobontix (or Arbitrade Bermuda) including: a) by virtue of the Tokens growing in value based on the promised gold bullion reserves and earnings from the cryptocurrency mining program "backing" the Tokens, and b) through Token-holders' ability to sell or swap the Tokens on trading platforms that support the Tokens.

[116] We considered whether the Commission needed to establish that each individual purchaser of the Tokens had that expectation. We concluded that the Commission need not do so. The Commission need only establish that given all the circumstances, investors would have reasonably had that expectation.

[117] In coming to that conclusion, we applied an investor protection lens, and placed emphasis on the representations and offers made in connection with the Tokens. Those were fundamental to defining the relevant transaction or scheme. We also emphasized the scope of publication of the representations and offers, rather than a search for each purchaser's precise motivation or expectation. This approach also addresses the reality that the sale of crypto assets, by its very nature, can make it difficult to identify individual purchasers.

[118] The SEC and US courts have taken a similar approach in cases involving crypto assets and the question of whether they are securities by virtue of being "investment contracts" under US securities law, including the *Howey* test. The decisions focus on what purchasers or potential purchasers "would reasonably believe or expect" or "would understand" based on statements made in white

2024 ONCMT 15 (CanLII)

papers, blog posts, social media, podcasts, interviews and other public statements.[33]

### 4.1.3.b.iii    "Common Enterprise" and "Efforts of Others"

[119] The third and fourth elements of the test are interwoven and frequently considered together.[34] We do so here.

[120] A common enterprise "exists when it is undertaken for the benefit of the supplier of capital (the investor) and of those who solicit the capital (the promoter)."[35] The third and fourth elements are satisfied where there is a common enterprise where the fortunes of the investor are interwoven with and dependent upon the efforts and success of those seeking the investment or of third parties.[36]

[121] These elements of the test are met in this case. The investors' role was limited to advancing money to the Cryptobontix or Arbitrade Bermuda enterprise. Based on the representations made to investors, they would reasonably have expected that the profitability of their investment depended upon the efforts of others to increase the value of the Tokens by:

a.    using investor funds to acquire and operate cryptocurrency mining equipment; and

b.    using the proceeds of cryptocurrency mining to:

  i.    acquire gold to "back" the Tokens;

  ii.    acquire and operate further cryptocurrency mining equipment and thereby generate additional returns; and

  iii.    buy back and "burn" Tokens.

### 4.2    Other Preliminary Matters

[122] Before moving to consider the alleged breaches of the *Act*, we address two additional matters:

---

[33] *Munchee* at paras 14-24; *LBRY* at 216-219; *Ripple* at 11-13 and 29-33; *Terraform* at 46.
[34] *Pacific Coast Coin* at 128-129; *Polo* at para 49
[35] *Pacific Coast Coin* at 129
[36] *Pacific Coast Coin* at 128-129

2024 ONCMT 15 (CanLII)

a. Cryptobontix's, Arbitrade Exchange's and Arbitrade Bermuda's the roles and involvement in the matters in issue; and

b. the basis for our jurisdiction over the respondents and, in particular, Arbitrade Bermuda.

### 4.2.1 The roles and involvement of Cryptobontix, Arbitrade Exchange and Arbitrade Bermuda

[123] There appears to have been a shift during the Material Time regarding the involvement and role of various entities in the "business" related to the promotion and sale of the Tokens and the related cryptocurrency mining and gold bullion backing activities.

[124] Initially, and into 2018, Arbitrade Exchange and Cryptobontix issued and sold the Tokens and used capital raised through the sale of the Tokens to develop their businesses. Arbitrade Exchange conducted marketing and advertising for the Cryptobontix business (as well as for Arbitrade Bermuda's business in anticipation of its acquisition of Cryptobontix or its assets) and Cryptobontix engaged a public relations firm to promote awareness of Cryptobontix. Braverman and Goldberg were also "consultants" to Arbitrade Exchange.

[125] Later, Hogg, along with others, incorporated Arbitrade Bermuda. The stated intention was that Arbitrade Bermuda would acquire Cryptobontix or its assets and maybe also the business of Arbitrade Exchange. Although there is no evidence that this happened, Arbitrade Bermuda nevertheless treated Cryptobontix and the Tokens as part of its business and represented this to be the case.

### 4.2.2 Jurisdiction

[126] Hogg, Cryptobontix, Arbitrade Exchange, TJL and Gables all reside in Ontario. As a result, the Tribunal has jurisdiction over them and their activities.

[127] The Commission submits that we have jurisdiction over Arbitrade Bermuda on multiple grounds:

a. Hogg, a resident of Ontario, was the directing mind of Arbitrade Bermuda and Arbitrade Bermuda was his alter ego. Hogg conducted some of his activities that breached Ontario securities laws through Arbitrade Bermuda;

30

2024 ONCMT 15 (CanLII)

    b.   Arbitrade Bermuda engaged in its Token-related promotional activities through Hogg in Ontario; and

    c.   Arbitrade Bermuda's Token-related promotional activities were widely targeted and available to Ontario residents.

[128]  We do not agree that Arbitrade Bermuda was Hogg's alter ego. However, we accept the other submissions, with the caveat that Hogg was one of several directing minds of Arbitrade Bermuda. We note that Hogg had power to control the board and represent the company, and he was responsible for the technical operations and marketing. Furthermore, several of the newsletters circulated on behalf of Arbitrade Bermuda are signed "Arbitrade Management" with a related address in Grand Bend, Ontario.

[129]  These factors provide a sufficient nexus for us to conclude that we have jurisdiction over Arbitrade Bermuda.

## 4.3   Did the respondents engage in a fraud contrary to s. 126.1(1)(b) of the *Act*?

[130]  The Commission submits that the respondents engaged in or participated in a course of conduct regarding the Tokens that they knew or ought to have known perpetrated a fraud, contrary to s. 126.1(1)(b) of the *Act*. The Commission alleges two frauds. The first relates to the acquisition of gold to back the Tokens and the audit of that gold. The second relates to the use of investor funds. We first address the law relating to fraud before turning to the two alleged frauds.

### 4.3.1 Law on fraud

[131]  The prohibition against fraud in the *Act* provides that a person or company shall not, either directly or indirectly, engage in a course of conduct relating to securities that the person or company knows or reasonably ought to know perpetrates a fraud on any person or company.[37]

---

[37] *Act*, s 126.1(1)(b)

[132] Fraud is not defined in the *Act*. The Tribunal relies on the test for fraud developed in the criminal context as set out by the Supreme Court of Canada in *R v Théroux*.[38] The elements for determining fraud are:

a.   a prohibited act and deprivation caused by that act (*actus reus*); and

b.   knowledge of the prohibited act and that the act could have as a consequence the deprivation of another (*mens rea*).[39]

### 4.3.1.a   *Actus reus*

[133] There are two elements to the *actus reus*:

a.   a prohibited or dishonest act, which can be an act of:

    i.     deceit;

    ii.    falsehood; or

    iii.   other fraudulent means; and

b.   deprivation, which includes detriment, prejudice, or risk of prejudice to the financial interests of the victim.[40]

[134] The *actus reus* is assessed objectively, except in limited circumstances not relevant in this proceeding.[41]

[135] The Supreme Court of Canada has stated that to prove deceit or falsehood, "all that need be determined is whether the accused, as a matter of fact, represented that a situation was of a certain character, when, in reality, it was not."[42]

[136] "Other fraudulent means" broadly encompasses all other means, beyond deceit or falsehood, that could be considered dishonest. The concept has, "at its heart, the wrongful use of something in which another person has an interest, in such a

---

[38] 1993 CanLII 134 (SCC) (**Théroux**)

[39] *Al-Tar Energy Corp (Re)*, 2010 ONSEC 11 (**Al-Tar**) at paras 215-217, citing *Théroux*; *Feng (Re)*, 2023 ONCMT 12 (**Feng**) at para 37; *First Global* at para 346

[40] *Al-Tar* at paras 215-217, citing *Théroux*; *Feng* at para 37; *First Global* at para 346

[41] *First Global* at para 346; *Feng* at para 38; *Théroux* at 15-16

[42] *Théroux* at 17

2024 ONCMT 15 (CanLII)

32

2024 ONCMT 15 (CanLII)

manner that the other's interest is extinguished or put at risk."[43] The types of conduct that have been found to constitute "other fraudulent means" include:

a.    the use of investors funds in an unauthorized manner;

b.    the use of corporate funds for personal purposes;

c.    non-disclosure of important facts;[44]

d.    exploiting the weakness of another;

e.    unauthorized diversion of funds; and

f.    unauthorized appropriation of funds or property.[45]

[137]  When determining if there was fraud, we need not find that the investors relied on the dishonest act. It is sufficient if the respondent undertook the dishonest act voluntarily, causing a deprivation.[46]

[138]  Proof of actual economic loss is not necessary to establish the "deprivation" portion of the *actus reus* of fraud. "Deprivation" is established by proof of:

a.    actual loss to a victim;

b.    prejudice to a victim's economic interests; or

c.    risk of prejudice to a victim's economic interests.[47]

[139]  A risk of prejudice may be established where investors are induced, by dishonest means, to purchase or hold an investment.[48] The "mere creation of a financial risk to another by a dishonest act is sufficient to establish deprivation."[49]

---

[43] *R v Zlatic*, 1993 CanLII 135 (SCC) (***Zlatic***); *Solar Income Fund Inc (Re)*, 2022 ONSEC 2 (**Solar Income Fund**) at 86

[44] *Money Gate* at para 223

[45] *Quadrexx et al (Re)*, 2017 ONSEC 3 (***Quadrexx***) at para 20, aff'd 2020 ONSC 4392 (Div Ct); *Théroux* at 16; *Zlatic* at 44

[46] *First Global* at para 371

[47] *Feng* at 39; *Théroux* at 15-16

[48] *First Global* at para 375; *Quadrexx* at para 21

[49] *Feng* at para 58

[140] The Tribunal has held in past decisions that where there is an unauthorized diversion of funds, investors are exposed to risks for which they did not bargain, which also causes a risk of prejudice to their economic interests.[50]

### 4.3.1.b  *Mens rea*

[141] To establish the *mens rea* of fraud there must be proof of knowledge, by the respondent:

a.    of the prohibited act; and

b.    that the prohibited act could have as a consequence deprivation of another (which may be knowledge that the other's economic interests are put at risk).[51]

[142] To establish knowledge of the act, it is sufficient to prove that the respondent knowingly undertook the prohibited act. It is not necessary to prove that the respondent knew the act was prohibited.[52]

[143] For example, for an alleged unauthorized diversion of funds, the Tribunal has found that knowledge will be established by proof that the respondent was aware of:

a.    the representations made; and

b.    the diversion of the funds contrary to the representations made.[53]

[144] Knowledge of the consequences can be inferred from the act itself.[54] Where a respondent tells a lie knowing that others will act on it, the inference of subjective knowledge that the property of another would be put at risk is clear.[55]

[145] A change in risk, even if not an increase in risk, may be sufficient to find fraud.[56]

---

[50] *First Global* at para 376; *Feng* at para 61

[51] *Théroux* at 19-20; *Feng* at para 64

[52] *First Global* at paras 386, 390; *Théroux* at 19-20; *Feng* at para 64

[53] *First Global* at para 391; *Feng* at paras 66-70

[54] *Théroux* at 18; *First Global* at para 820

[55] *Théroux* at 20-21

[56] *First Global* at para 421

2024 ONCMT 15 (CanLII)

[146]  Maintaining that one did not think that the acts were wrong, or that one hoped that deprivation would not occur is not a defence.[57]

[147]  *Mens rea* under s. 126.1(1)(b) of the *Act* can be established where a respondent knew or reasonably ought to have known that the impugned act, practice, or conduct perpetrated a fraud.[58] Where a respondent is a corporation, a fraud will have been committed under s. 126.1(1)(b) of the *Act* where its directing mind knew or ought reasonably to have known that the corporation perpetrated a fraud.[59]

## 4.3.2  Gold title and audit fraud

### 4.3.2.a   Overview

[148]  The Commission submits that during the Material Time, Hogg, Cryptobontix, Arbitrade Exchange, and Arbitrade Bermuda made, or caused to be made, false and misleading statements in promotional materials. The promotional materials said that the Tokens issued by Cryptobontix were backed by gold and that the existence of the gold had been verified through an audit.

[149]  For the reasons below, we find that Hogg, Cryptobontix, Arbitrade Exchange and Arbitrade Bermuda all knew, or ought to have known, that their representations were false or misleading and could cause deprivation to investors. These respondents failed to disclose the truth to investors. They acted fraudulently.

### 4.3.2.b   *Actus reus* – the prohibited act

[150]  The Commission submits that initial promotional materials about the gold bullion backing the Tokens included:

a.   postings by Hogg on the Bitcoin Talk Forum;

b.   the Cryptobontix White Paper issued by Cryptobontix and provided by Hogg to investors through Braverman and the Cryptobontix website;

c.   sponsored announcements coordinated by Hogg on Livecoin;

---

[57] *Théroux* at 19, 23-24; *Feng* at 65
[58] *First Global* at para 388
[59] *First Global* at para 347; *Feng* at para 64; *Solar Income Fund* at para 82

2024 ONCMT 15 (CanLII)

2024 ONCMT 15 (CanLII)

    d. press releases by Arbitrade Exchange and Cryptobontix; and

    e. email newsletters issued through the Cryptobontix and Arbitrade Exchange websites (which were controlled by Hogg).

[151] We find that these initial promotional materials focused on the features of the Tokens, including that gold bullion backing the Tokens would be a significant feature that would drive their value. The materials said that the Tokens would "create a store of wealth", that the "tokens have a floor price" and further, the "tokens will be redeemable into their physical precious metal forms."

[152] We also find that later promotional materials elaborated on the acquisition and audit of the gold. These materials included statements prepared or reviewed by Hogg and others at Arbitrade Bermuda and issued on behalf of Cryptobontix and Arbitrade Bermuda as well as statements attributable directly to Hogg at a press conference:

    a. an email newsletter issued through the Cryptobontix website controlled by Hogg on behalf of "Cryptobontix/Arbitrade" and "Arbitrade Management" and written on behalf of both Cryptobontix and Arbitrade Bermuda or the soon-to-be-incorporated Arbitrade Bermuda. The newsletter referenced an Asset Pledge Agreement entered between Arbitrade Bermuda and SION, touted as one of the only licensed gold traders on the Dubai gold exchange and the company that ultimately purchased Hogg's shares of Cryptobontix. The newsletter stated that the gold acquisition "is similar to that of a house purchase with a mortgage" and that "everyday, a certain amount of the bullion becomes wholly owned by the tokens";

    b. a June 2018 Arbitrade Bermuda press release and telephone press conference, July 2018 Arbitrade Bermuda newsletter, and November 2018 Arbitrade Bermuda press release announcing that Arbitrade Bermuda had secured the gold to back its tokens. Hogg stated at the press conference that in partnership with SION, Arbitrade Bermuda would be granted US $10 billion worth of physical gold. Hogg said that Arbitrade Bermuda was receiving title to the gold, agreements were in place and signed, and the gold would be held at Brinks; and

36

c.   a July 2018 Arbitrade Bermuda newsletter issued through the Cryptobontix website announcing the intended audit and a November 2018 Arbitrade Bermuda press release announcing the completed audit by an accounting firm verifying the existence of the gold. The December 2018 Arbitrade Bermuda email newsletter stated "finally, the company recently announced receiving full title and audit of gold bullion holdings stored at independent security facilities in the amount of 395,000 kgs with a current market value in excess of US $10 billion."

[153]  We find that Cryptobontix was not a party to any of the agreements referenced above to back the Tokens with gold bullion during the Material Time. There is no evidence that there was any gold backing the Tokens. This by itself is sufficient to establish fraud. However, we outline below other misrepresentations about the acquisition and auditing of gold.

[154]  In June 2018, Arbitrade Bermuda and SION entered into an Asset Pledge Agreement, which stated:

a.   SION arranged for sufficient bullion (US $3 billion) to be pledged to the Tokens as collateral;

b.   this collateral gold would be secured at a location agreed to by the parties with Arbitrade Bermuda to have title to the full US $10 billion of gold;

c.   a third party would maintain custody of the reserve gold, to be evidenced by a safe-keeping receipt;

d.   the agreement had an initial term of three years and was renewable for up to 15 years;

e.   Arbitrade Bermuda would purchase the gold over the 15-year period; and

f.   Arbitrade Bermuda would pay SION an annual fee of .125% of the bullion value, payable on a monthly basis.

[155]  In September 2018, the Asset Pledge Agreement was amended and restated to say that SION pledged a safe-keeping receipt (a document acknowledging that an agent is safe-keeping your assets), not the physical bullion. SION and Arbitrade Bermuda also entered into an Assignment Agreement. The agreement stated that SION would transfer its ownership rights in relation to the US $10

2024 ONCMT 15 (CanLII)

37

billion of gold, provided that Arbitrade Bermuda remained liable for the payment obligations under the terms of the Asset Pledge Agreement.

[156] The Commission submits and we find that:

a.   The Asset Pledge Agreement and Assignment Agreement did not pledge or transfer title in any physical gold. The agreements only pledged a safe-keeping receipt held in a vault at G4S (a security company).

b.   Arbitrade Bermuda never purchased any gold from SION. The payments made under the Asset Pledge Agreement were fee payments for the pledge only.

c.   SION did not own any gold that it purportedly pledged. A third party owned the gold. This fact is further supported by the facts and claims pleaded by Hogg in a lawsuit he commenced against SION and others.

d.   Hogg confirmed to the Commission that no audit of physical gold was performed. All the firms that Arbitrade Bermuda approached about conducting an audit were simply asked to confirm that G4S issued the safe-keeping receipt. The firm that was retained only confirmed the issuance of the safe-keeping receipt.

[157] As a result of these additional findings, we conclude that Arbitrade Bermuda's and Hogg's further representations about the gold acquisition were also false or misleading.

[158] We find that each of Hogg, Cryptobontix, Arbitrade Exchange and Arbitrade Bermuda made various false or misleading statements directly. We also find that where Cryptobontix and Arbitrade Exchange made various false or misleading statements, such statements are also attributable directly to Hogg because Hogg was the sole officer, director and shareholder of these companies during the Material Time and essentially acted through them. We also find that the Commission established that Hogg was either involved in preparing or approving Arbitrade Bermuda's false and misleading statements, or was aware in advance of each of Arbitrade Bermuda's false and misleading statements.

[159] Thus, we conclude that the Commission has established the first part of the *actus reus* component of the alleged gold and audit fraud as against each of

2024 ONCMT 15 (CanLII)

2024 ONCMT 15 (CanLII)

Hogg, Cryptobontix, Arbitrade Exchange and Arbitrade Bermuda. All of them made false or misleading statements to potential and existing investors about the Tokens being backed by gold or that the gold had been secured, stored and verified through a third-party audit. These false and misleading statements were falsehoods that satisfy the first component of the *actus reus* test articulated in *Théroux*.

### 4.3.2.c   *Actus reus* – deprivation

[160] Some investors contacted the Commission and said that they had lost money. We find that some investors were harmed.

[161] Additionally, some of these investors said they invested in the Tokens because they were told that the Tokens were backed by gold. The misrepresentations that the Tokens were backed by gold created a risk to investors' economic interests for which they did not bargain. The gold backing for the Tokens was one of the key elements touted to potential investors in the promotional materials for the Tokens.

### 4.3.2.d   *Mens rea*

[162] The Commission submits, and we find, that each of Hogg, Cryptobontix, Arbitrade Exchange and Arbitrade Bermuda:

a.   had subjective knowledge of various representations identified above regarding the acquisition of gold bullion to back the Tokens and the audit of that gold; and

b.   knew that those representations were false or misleading.

[163] As the sole director and officer of Cryptobontix and Arbitrade Exchange, Hogg was the directing mind of both companies. As a result, we can determine the *mens rea* of Cryptobontix and Arbitrade Exchange based on Hogg's *mens rea*.

[164] Similarly, we can determine Arbitrade Bermuda's *mens rea* based on Hogg's *mens rea*, as he was a directing mind of the company, as well as on the *mens rea* of the formally appointed directors of the company.

[165] Except for Hogg's posting on the Bitcoin Talk Forum and statements at the June 2018 Arbitrade Bermuda telephone press conference, none of the false or

misleading statements related to gold were directly attributed to Hogg. However, Hogg was aware of all of these statements. He was directly involved in their preparation, approval or dissemination. He:

a. controlled the account that posted promotional materials on the Bitcoin Talk Forum;

b. contributed to the drafting of the Cryptobontix White Paper and disseminated it to investors;

c. was involved in preparing and coordinating the Livecoin announcements;

d. controlled both the cryptobontix.com and arbitrade.io websites through which email newsletters were distributed to existing and potential investors, and was involved in sending the newsletters and in drafting or reviewing all the newsletters before they were sent; and

e. he drafted or received drafts of nearly all press releases issued by or on behalf of Cryptobontix, Arbitrade Exchange and Arbitrade Bermuda.

[166] Hogg, Cryptobontix and Arbitrade Exchange (through Hogg) and Arbitrade Bermuda were therefore also each aware of the following facts:

a. Cryptobontix was not a party to any agreement backing the Tokens with gold. Its knowledge can be inferred because Hogg knew there was no such agreement. Additionally, Hogg asked the owner of SION to sign new agreements for gold under the name of Cryptobontix like those signed with Arbitrade Bermuda;

b. the Asset Pledge Agreement and Assignment Agreement pertained to a document held in a vault at G4S, as opposed to physical gold. Arbitrade Bermuda as a party to the agreements would certainly have been aware. Hogg received a copy of the July Asset Pledge Agreement, and was copied on various other documents and on related correspondence that discussed holding a document (rather than physical gold) in a vault with G4S;

c. Arbitrade Bermuda did not purchase any gold from SION. Arbitrade Bermuda's knowledge can be inferred. Hogg was aware because he received the Arbitrade Memorandum from Arbitrade Bermuda that only

referred to fee payments and no gold purchases under the Asset Pledge
Agreement;

d.    SION did not own US $10 billion in gold bullion. There is no evidence of
      any due diligence performed on SION as a company that would have
      significant gold holdings. The Asset Pledge Agreement refers to SION
      *arranging* for sufficient bullion holdings, which suggests that at the time of
      the agreement SION did not own gold. Hogg had ongoing concerns about
      the existence of gold, as is evident from his communications with the
      principal of SION. The communications raised red flags about the
      existence of gold, but instead of addressing those red flags, Hogg
      continued to work with the principal of SION with the aim of convincing
      the public that the gold-related representations were true in order to raise
      more money through the sale of Tokens;

e.    the Asset Pledge Agreement and Assignment Agreement did not give full
      title to 395,000 kg of gold bullion. A Gold Memorandum of Understanding
      referred to "nominal title", Hogg described the Asset Pledge Agreement as
      providing Arbitrade Bermuda with "contractual title", Arbitrade Bermuda
      never treated the alleged entitlement to gold bullion as an asset, and
      Hogg conceded to the Commission that Arbitrade Bermuda never owned
      any amount of gold close to 395,000 kg; and

f.    the gold bullion purportedly pledged or assigned to Arbitrade Bermuda by
      SION was not verified or audited. Arbitrade Bermuda was aware of the
      limitations of the audit, including that the audit would not confirm the
      existence of any physical gold. Hogg knew that the verification was limited
      to the safe-keeping receipt at G4S.

[167]  We conclude that Hogg, Cryptobontix, Arbitrade Exchange and Arbitrade
Bermuda knew or ought to have known about each of the facts outlined above,
which rendered the various representations relating to gold ascribed to each of
them false or misleading. We also find that they knew that these false and
misleading representations could have as a consequence deprivation of another
by inducing investors to assume risk they did not bargain for. The Commission
has therefore established the *mens rea* component of the allegation that Hogg,

2024 ONCMT 15 (CanLII)

41

2024 ONCMT 15 (CanLII)

Cryptobontix, Arbitrade Exchange and Arbitrade Bermuda committed fraud related to the acquisition, storing and auditing of gold.

[168] The requisite *actus reus* and *mens rea* have been established. We therefore find that the respondents' false and misleading statements in relation to gold backing the Tokens amounted to fraud.

### 4.3.3  Misappropriation of investor funds fraud

### 4.3.3.a    Overview

[169] The Commission alleges that during the Material Time, Hogg, Cryptobontix, Arbitrade Exchange and Arbitrade Bermuda made or caused to be made false and misleading statements about the use of proceeds from the sale of the Tokens, when they knew that they had used a significant amount of investor funds for unrelated purposes.

[170] The Commission submits that investors were told their funds would be used to purchase cryptocurrency mining equipment to create growth in the value of the Tokens. Instead, Hogg, Cryptobontix, Arbitrade Exchange and Arbitrade Bermuda knew that investor funds were directed to unrelated purposes. Some investor funds were directed to or for the benefit of:

a. Hogg and his companies, TJL and Gables. The Commission submits that neither entity had a legitimate reason to receive or benefit from investor funds. In addition, the Commission submits both entities knew or ought reasonably to have known that by participating in a scheme of diverting investor funds for purposes unrelated to the Tokens they participated in a course of conduct that perpetrated a fraud on investors; and

b. Arbitrade Bermuda for its operations, including the purchase of a property. The Commission submits that Arbitrade Bermuda knew or ought reasonably to have known that by participating in a scheme that diverted investor funds for purposes unrelated to the Tokens it participated in a course of conduct that perpetrated a fraud on investors.

[171] For the reasons below, we find that Hogg, Cryptobontix, Arbitrade Exchange and Arbitrade Bermuda made false and misleading statements about the use of proceeds from the sale of Tokens. We also find that the respondents knowingly

42

diverted investor funds from the purposes represented to investors, and that the respondents knew or ought reasonably to have known that by doing so they could cause a deprivation to investors. The respondents therefore acted fraudulently.

### 4.3.3.a   *Actus reus* – the prohibited act

[172] We find that beginning as early as May 2017 a series of representations were made by Hogg and Cryptobontix to potential investors in the Tokens about the use of their funds. These representations were that investor funds would be under the control of Cryptobontix and would be used to acquire cryptocurrency mining equipment that would generate funds to acquire gold bullion and additional cryptocurrency mining equipment. These representations were repeated and made as follows:

a.   in the White Paper provided to investors by Hogg and through the Cryptobontix website;

b.   in a May 2017 Bitcoin Talk Forum hosted by Hogg on behalf of Cryptobontix;

c.   in Livecoin announcements in May and July of 2017 arranged by Hogg on behalf of Cryptobontix; and

d.   in a July 2017 PowerPoint presentation created by Hogg.

[173] In addition, later promotional materials disseminated by or on behalf of Hogg, Cryptobontix, Arbitrade Exchange and Arbitrade Bermuda provided updates on the acquisition and operation of cryptocurrency mining equipment. These later promotional materials include:

a.   email newsletters, disseminated through websites that Hogg controlled, issued on behalf of Cryptobontix, Cryptobontix and Arbitrade Exchange jointly, Arbitrate Bermuda, and Cryptobontix and Arbitrade Bermuda jointly;

b.   sponsored announcements on Livecoin coordinated by Hogg; and

c.   press releases of:

i.   Arbitrade Exchange which Hogg was involved in drafting or which Hogg received in advance of their dissemination; and

2024 ONCMT 15 (CanLII)

43

2024 ONCMT 15 (CanLII)

ii.     Arbitrade Bermuda provided by Hogg to other senior management of Arbitrade Bermuda or which Hogg received in advance of their dissemination.

[174] There is no evidence that potential and existing investors were told that their funds would be used for any other purpose. There are some instances of disclosure by or on behalf of Hogg, Cryptobontix, Arbitrade Exchange and Arbitrade Bermuda about the acquisition of other properties, but that disclosure does not mention that investor funds would be used to purchase those properties.

[175] The Commission submits and we find that contrary to these representations, significant amounts of investor funds were used not only for purchasing cryptocurrency mining equipment, but also for other purposes entirely unrelated to the acquisition or operation of mining equipment:

a.   out of the US $41,622,965.27 in "token sales proceeds" identified in the Arbitrade Memorandum, all or nearly all which was from the sale of Tokens:

i.     US $6,666,666.34 was used to pay fees that Arbitrade Bermuda owed to SION under the Asset Pledge Agreement; and

ii.     at least US $15,940,605.23 was used by Arbitrade Bermuda to make payments related to the operation of Arbitrade Bermuda (e.g. purchase of a building and art, directors' and officers' fees, travel, and business meals, etc.); and

b.   US $4,141,700 was used to acquire 3,400 S9 mining rigs, of which 3,300 mining rigs were transferred to Hogg by Cryptobontix on June 7, 2019; and

c.   an additional US $10,109,038 of investor funds from the sale of Tokens was transferred to or used for the benefit of Hogg and his companies TJL and Gables, in particular:

i.     US $7,008,023 was used for the purchase of real properties and related businesses in Grand Bend, Ontario by TJL and Gables;

ii.     US $2,010,015 was transferred to bank accounts at BMO and TD held by TJL and Gables; and

2024 ONCMT 15 (CanLII)

iii.　US $1,091,000 was transferred to third parties for the benefit of Hogg and TJL.

[176] The Commission has therefore established the first component of the *actus reus* of the alleged fraud. Hogg, Arbitrade Exchange, Cryptobontix and Arbitrade Bermuda made false and misleading statements to investors that their funds would be used to acquire and operate cryptocurrency mining equipment to enhance the value of the Tokens. In fact, some of the investor funds were provided to or for the benefit of Hogg, TJL, Gables and Arbitrade Bermuda and used for other purposes.

[177] Similarly, Hogg, Cryptobontix, Arbitrade Exchange and Arbitrade Bermuda failed to disclose that some of the investor funds were used to pay for Arbitrade Bermuda's expenses, and for Arbitrade Bermuda's acquisition of assets that were unrelated to the mining of cryptocurrencies.

[178] We also conclude, for the same reasons noted above, that where Cryptobontix and Arbitrade Exchange made various false or misleading statements, those statements are also attributable directly to Hogg and Hogg was either involved in preparing or approving Arbitrade Bermuda's false and misleading statements or was aware in advance of each of Arbitrade Bermuda's false and misleading statements. Further, we find that the unauthorized diversion of investor funds to or for the benefit of TJL and Gables is also attributable directly to Hogg who owned and controlled them.

[179] These false and misleading statements were falsehoods that satisfy the first component of the *actus reus* test articulated in *Théroux*. The unauthorized diversion of investor funds and property and the unauthorized use of investor funds was "other fraudulent means" that also satisfies the first component of the test.

**4.3.3.b　*Actus reus* – deprivation**

[180] The various representations made about use of investor funds provided to potential and existing investors, as discussed in more detail above, linked the growth in the value of the Tokens to the enterprise's cryptocurrency mining activities.

45

[181]   Hogg, Cryptobontix, Arbitrade Exchange, Arbitrade Bermuda, TJL and Gables knew or ought to have known that by using investor funds for their own use and diverting them for uses unrelated to buying cryptocurrency mining equipment, they were putting the economic interests of the Token investors at risk. Also, Hogg and Cryptobontix knew or ought to have known that by transferring ownership of a large portion of the mining equipment that had been purchased to Hogg, they were subjecting the investors to risks for which they had not bargained.

### 4.3.3.c   *Mens rea*

[182]   The respondents were all aware of the various representations that investor funds would be used to buy cryptocurrency mining equipment:

a.   Hogg was aware because he prepared and finalized the Cryptobontix White Paper and made it available to investors;

b.   Cryptobontix, Arbitrade Exchange, Arbitrade Bermuda, TJL and Gables were all aware through Hogg's knowledge as he was a directing mind of each entity;

c.   Cryptobontix was also aware as it made the representations including through the Cryptobontix White Paper that it released; and

d.   Arbitrade Bermuda was aware because individuals who later became directors and officers of Arbitrade Bermuda were provided with draft and final copies of the Cryptobontix White Paper by Hogg.

[183]   Further, each respondent knew that significant amounts of investor funds were used for purposes other than the acquisition of mining equipment as represented:

a.   Hogg and Arbitrade Bermuda were aware that investor funds were used for expenditures by or for Arbitrade Bermuda, including to maintain the Asset Pledge Agreement and to make other payments for Arbitrade Bermuda, including the purchase of an office building;

b.   Arbitrade Exchange and Cryptobontix were generally aware that investor funds were used to pay for expenditures by or for Arbitrade Bermuda,

46

2024 ONCMT 15 (CanLII)

given Hogg's knowledge and his status as a directing mind of those entities;

c.  Hogg, Cryptobontix and Arbitrade Bermuda were aware that ownership of crypto mining rigs purchased with investor funds was transferred to Hogg personally, because Cryptobontix issued a resolution to that effect which was signed by Hogg, and Hogg, Cryptobontix and Arbitrade Bermuda all signed an agreement authorizing the transfer;

d.  Arbitrade Exchange was aware of the transfer of the mining rigs to Hogg, given Hogg's knowledge and his status as the directing mind of Arbitrade Exchange;

e.  Hogg was aware that investor funds from the sale of the Tokens were used or transferred to or for the benefit of Hogg, TJL and Gables, because:

i.  Hogg directed Braverman to transfer funds to the lawyer taking care of Hogg's real estate transactions;

ii.  it can be inferred that Hogg was aware funds transferred to accounts at BMO and TD held by TJL and Gables were from Braverman because Hogg controlled the accounts, and the funds came from Rozgold, which Hogg knew was Braverman's company;

iii.  Hogg directed Braverman to make payments to third parties to benefit Hogg and TJL by giving Braverman the wire details and supporting documents indicating the payments were made at Hogg's direction; and

iv.  Hogg knew that the funds from Braverman or Rozgold came from the sale of the Tokens because:

-  Hogg knew that cryptocurrency from the sale of Tokens to investors was sent to the Rozgold account at Genesis that was controlled by Braverman and where it was converted into US dollars;

-  as far as Hogg knew, Braverman had no meaningful employment other than selling Tokens and Hogg could not

47

2024 ONCMT 15 (CanLII)

2024 ONCMT 15 (CanLII)

identify any other sources of funds in the Rozgold account other than from the sale of Tokens; and

- there was no other reason for Braverman to give Hogg or Hogg's companies money other than in relation to the Tokens.

f. TJL and Gables were aware that investor funds from the sale of Tokens were transferred to or used for the benefit of Hogg and themselves because of Hogg's knowledge and his role as the directing mind of these entities;

g. Cryptobontix and Arbitrade Exchange were aware that investor funds from the sale of Tokens were transferred to or used for the benefit of Hogg, TJL and Gables because of Hogg's knowledge and his role as the directing mind of those entities; and

h. Arbitrade Bermuda was aware that investor funds from the sale of Tokens were transferred to or used for the benefit of Hogg, TJL and Gables because of Hogg's knowledge and his role as a directing mind of Arbitrade Bermuda, and because of Braverman's knowledge as the sender of the funds and his role as the Executive VP and Chief Operations Officer of Arbitrade Bermuda.

[184] All of the respondents were also aware that the misuse of investor funds could cause deprivation. We therefore conclude that the Commission has established the *mens rea* component of the allegation that the respondents committed fraud in relation to a misuse of investor funds contrary to s. 126.1(1)(b) of the *Act*.

[185] As we have already concluded that the respondents engaged in conduct constituting falsehoods and "other fraudulent means" and exposed investors to risks other than what they had bargained for, thereby satisfying both components of the *actus reus* of the alleged fraud, we find that the Commission has established that the respondents committed fraud in relation to a misuse of investor funds contrary to s. 126.1(1)(b) of the *Act*.

2024 ONCMT 15 (CanLII)

### 4.4 Did Hogg, Cryptobontix, Arbitrade Exchange, and Arbitrade Bermuda engage in the business of trading securities without registration contrary to s. 25(1) of the *Act*?

[186] The Commission alleges that Hogg, Cryptobontix, Arbitrade Exchange and Arbitrade Bermuda engaged in the business of trading in securities without registration and without an exemption from registration, contrary to s. 25(1) of the *Act*. We agree.

### 4.4.1 Law

[187] Registration is a cornerstone of the *Act*. It is an important gate-keeping mechanism that protects investors and the capital markets by imposing obligations of proficiency, integrity, and solvency on those who seek to be in the business of trading in securities.[60]

[188] The *Act* requires those engaged in the business of trading to be registered.[61] The *Act* defines "trade" or "trading" to include:

a.      any sale or disposition of a security for valuable consideration, whether the terms of payment be on margin, installment or otherwise,

....

e.      any act, advertisement, solicitation, conduct or negotiation directly or indirectly in furtherance of any of the foregoing.[62]

[189] The Tribunal determines whether a person or company has engaged in the business of trading by looking at the events as a whole, in the circumstances in which they took place, while also assessing the impact on those towards whom the acts were directed.[63]

[190] The Tribunal has found a wide range of activities to constitute acts in furtherance of a trade, including distributing promotional materials concerning potential

---

[60] *Limelight Entertainment Inc et al*, 2008 ONSEC 4 (***Limelight***) at paras 135-136; *Meharchand (Re)* 2018 ONSEC 51 (***Meharchand***) at para 107

[61] *Act*, s 25(1)

[62] *Act*, s 1(1)

[63] *Sandy Winick et al*, 2013 ONSEC 31 (***Winick***) at para 98; *Money Gate* at para 160

2024 ONCMT 15 (CanLII)

investments.[64] Direct solicitation or direct contact with an investor is not required for an act to constitute an act in furtherance of a trade. Nor is it necessary for an actual trade to occur.[65]

[191] The requirement in s. 25 of the *Act* to be registered applies to anyone who engages in or holds themselves out as engaging in the business of trading.

[192] The Tribunal has consistently used the criteria set out in Companion Policy 31-103CP *Registration Requirements, Exemptions and Ongoing Registrant Obligations* to determine whether a person or company is engaged in the business of trading for the purposes of s. 25(1) of the *Act* (referred to as the "business trigger" test).[66]

[193] Those criteria include:

a. engaging in activities like a registrant, including stating in any way that the firm will buy or sell securities, or setting up a company to sell securities or promoting the sale of securities;

b. acting as a market maker;

c. carrying on the activity with repetition, regularity or continuity, whether or not that activity is the sole or even the primary endeavour;

d. receiving or expecting to receive compensation for carrying on the activity, regardless of the form of compensation; and

e. directly or indirectly soliciting securities transactions.[67]

### 4.4.2 Hogg, Cryptobontix, Arbitrade Exchange, and Arbitrade Bermuda traded securities

[194] The Commission submits that Hogg, Cryptobontix, Arbitrade Exchange and Arbitrade Bermuda traded securities during the Material Time. We agree:

---

[64] *Winick* at para 99
[65] *Winick* at para 101; *Momentas Corporation et al*, 2006 ONSEC 15 (**Momentas**) at para 78
[66] *Mek Global* at paras 70–72; *VRK* at paras 124-126
[67] Companion Policy 31-103CP *Registration Requirements, Exemptions and Ongoing Registrant Obligations*, s 1.3 "Factors in determining business purpose" (**CP 31-103**)

50

a. Hogg traded the Cryptobontix Securities (which, as explained above were the transaction or scheme for the offer and sale of the Tokens, including the economic reality of all of the surrounding circumstances and the representations made to investors) during the Material Time, given that he:

    i. was heavily involved in choosing and contacting Livecoin and C-CEX, the crypto asset trading platforms where the Tokens were sold;

    ii. retained Braverman and Goldberg to sell the Tokens;

    iii. provided training instructions to Goldberg (and through Goldberg to Braverman), including on setting up accounts on Livecoin and C-CEX for trading;

    iv. transferred blocks of Tokens from his master account to Goldberg and Braverman for them to sell them to investors;

    v. maintained an account on Livecoin which received bitcoin and other cryptocurrency from investors for the purchase of the Tokens;

    vi. released Tokens to investors upon confirmation of the investor funds;

    vii. sold Tokens directly to at least two investors and communicated with investors and potential investors on around 30 phone calls to explain "the technical side of things";

    viii. prepared and/or disseminated numerous related promotional materials; and

    ix. together with Braverman and Goldberg, hired a firm to prepare an analyst report on the Unity Ingot token with the intention that the report would be disseminated to potential investors and, to that end, provided the firm with materials;

b. Cryptobontix traded the Cryptobontix Securities during the Material Time, given that it:

    i. created the Tokens and deployed them on the blockchain;

    ii. sold the Tokens, through Hogg, Braverman and Goldberg; and

2024 ONCMT 15 (CanLII)

51

2024 ONCMT 15 (CanLII)

      iii.   disseminated, directly or indirectly, related promotional materials, including through announcements on Livecoin it paid for, email newsletters and a press release;

  c.  Arbitrade Exchange traded the Cryptobontix Securities during the Material Time, given that:

      i.   Arbitrade Exchange and Cryptobontix sold Tokens; and

      ii.   Arbitrade Exchange disseminated, directly or indirectly, related promotional materials, including a sponsored announcement on Livecoin, emails and press releases; and

  d.  Arbitrade Bermuda traded the Cryptobontix Securities during the Material Time, given that:

      i.   it received investor funds from the sale of the Tokens;

      ii.   two of its directors and officers kept track of how much was earned from the sale of the Tokens; and

      iii.   it disseminated, directly or indirectly, related promotional materials, including a sponsored announcement on Livecoin, email newsletters, press releases and a press conference.

### 4.4.3 Hogg, Cryptobontix, Arbitrade Exchange, and Arbitrade Bermuda engaged in the business of trading

[195] We have concluded that Hogg, Cryptobontix, Arbitrade Exchange and Arbitrade Bermuda traded in securities. We must now decide whether they engaged in the business of trading in securities. We conclude that they did, based on the factors in the business trigger test.

### 4.4.3.a   Engaging in activities like a registrant

[196] Like a registrant, Hogg, Cryptobontix, Arbitrade Exchange and Arbitrade Bermuda promoted the Cryptobontix Securities and solicited investors.

[197] The Cryptobontix White Paper stated that part of Cryptobontix's business would be managing the crypto mining equipment. However, the evidence shows that this responsibility was delegated to a third party and its principal. That third party's principal was in turn a consultant of Arbitrade Exchange and Arbitrade

Bermuda and worked with a director of Arbitrade Bermuda to oversee mining operations during the Material Time. Hogg, Cryptobontix's sole employee during the Material Time, was focused primarily on marketing and selling the Tokens.

[198] Arbitrade Exchange and Arbitrade Bermuda purported to have other lines of business such as mining and exchange. However, there is no evidence that either entity pursued those other businesses or that their directors, officers, and employees devoted any time to such businesses. In fact:

a. Arbitrade Exchange did not carry on any active business other than marketing and advertising primarily related to the Tokens;

b. by July 2019, Arbitrade Bermuda had no other assets than a building in Bermuda that it never occupied or used;

c. Arbitrade Bermuda had been winding down business since the second or third quarter of 2019; and

d. Braverman and Goldberg, who had significant roles with Arbitrade Bermuda, were primarily responsible for selling the Tokens during the Material Time.

[199] Because Cryptobontix was the issuer of the Cryptobontix Securities, there is no basis for concluding that Arbitrade Exchange's and Arbitrade Bermuda's trading activities were ancillary to the business of the issuer.

[200] We therefore conclude that Hogg, Cryptobontix, Arbitrade Exchange and Arbitrade Bermuda engaged in activities like those of a registrant.

### 4.4.3.b    Acting as a market maker

[201] Hogg retained Braverman and Goldberg to make the market for the Tokens. According to Hogg, Braverman made a market by putting supporting bids for Tokens into the market. Hogg was Cryptobontix's sole employee during the Material Time. Braverman and Goldberg were later also employed by Arbitrade Bermuda during the period when Arbitrade Bermuda was receiving proceeds from sales of the Tokens. We therefore conclude that Hogg, Cryptobontix and Arbitrade Bermuda engaged in market making activities.

2024 ONCMT 15 (CanLII)

### 4.4.3.c     Repetitive, regular, or continuous activity

[202] During the Material Time, Hogg, Cryptobontix, Arbitrade Exchange and Arbitrade Bermuda regularly and continuously promoted and solicited investments in the Cryptobontix Securities.

### 4.4.3.d     Receiving or expecting to receive compensation

[203] Hogg, Cryptobontix, Arbitrade Exchange and Arbitrade Bermuda received investor funds from the sale of the Tokens. While some of those funds were used to acquire cryptocurrency mining equipment, a significant amount of those funds were used by Hogg (and his companies TJL and Gables) and by Arbitrade Bermuda for unrelated purposes. Some of the investor funds were used by Cryptobontix and Arbitrade Exchange to develop their respective businesses. We conclude that this constitutes a form of compensation received by Hogg, Cryptobontix, Arbitrade Exchange and Arbitrade Bermuda from the sale of the Tokens.

### 4.4.3.e     Soliciting securities transactions

[204] Hogg, Cryptobontix, Arbitrade Exchange and Arbitrade Bermuda solicited securities transactions through the promotional materials described above.

### 4.4.4   Hogg, Cryptobontix, Arbitrade Exchange, and Arbitrade Bermuda were not registered

[205] None of Hogg, Cryptobontix, Arbitrade Exchange or Arbitrade Bermuda was registered to trade securities during the Material Time.

### 4.4.5   No exemptions were available

[206] The onus of establishing that an exemption from the registration requirement is available lies with the respondents. None of the respondents alleged to have breached s. 25(1) claimed any such exemption and there is no evidence before us to support a claim that an exemption was available. We therefore conclude that no exemption from the registration requirement was available to them.

### 4.4.6   Conclusion regarding s. 25(1) of the *Act*

[207] We conclude that Hogg, Cryptobontix, Arbitrade Exchange and Arbitrade Bermuda traded the Cryptobontix Securities and were engaged in the business of

2024 ONCMT 15 (CanLII)

54

2024 ONCMT 15 (CanLII)

trading the Cryptobontix Securities without being registered and without an exemption, in breach of s. 25(1) of the *Act*. In finding that Hogg breached s. 25(1) of the *Act*, we have also considered, and attributed to him personally, the breaches by Cryptobontix and Arbitrade Exchange through which companies Hogg was acting.

**4.5   Did Hogg, Cryptobontix, Arbitrade Exchange, and Arbitrade Bermuda illegally distribute securities contrary to s. 53(1) of the *Act*?**

[208]  The Commission submits that Hogg, Cryptobontix, Arbitrade Exchange and Arbitrade Bermuda distributed the Cryptobontix Securities without complying with the prospectus requirements, contrary to s.53(1) of the *Act*. We agree.

**4.5.1  Law**

[209]  No person or company may trade in a security, if the trade would be a distribution, without a preliminary prospectus and a prospectus being filed and receipts issued by the Commission.[68]

[210]  The prospectus requirement is another cornerstone of Ontario's securities regulatory regime. A prospectus ensures that investors have full, true, and plain disclosure of information to properly assess the risks of an investment and to make an informed decision.[69] The prospectus is therefore fundamental to the protection of investors rights.

[211]  "Distribution" is defined by the *Act* to include "a trade in securities of an issuer that have not been previously issued."[70] As discussed above, "trade" is defined to include "acts in furtherance of a trade". The Commission submits that, therefore, "distribution" includes "acts in furtherance of trade". We agree.

[212]  Each of Hogg, Cryptobontix, Arbitrade Exchange and Arbitrade Bermuda was actively engaged in promoting the Cryptobontix Securities and soliciting investors. They were also actively engaged in trading or acts in furtherance of trading. Counsel for Cryptobontix and Arbitrade Exchange confirmed to the Commission that the Tokens were sold by Cryptobontix and Arbitrade Exchange.

---

[68] *Act*, s 53(1)
[69] *Limelight* at para 139
[70] *Act*, s 1(1) "distribution"

Braverman and Goldberg were retained by Hogg to solicit and make a market in the Tokens. They later became employees of Arbitrade Bermuda and continued to sell the Tokens to raise money. Proceeds from the sale of Tokens went to the benefit of all of the respondents.

### 4.5.2  No prospectus was filed and no exemptions were available

[213]  Cryptobontix was the issuer of the Cryptobontix Securities. Cryptobontix did not file a prospectus, and there is no evidence of an exemption being available to Cryptobontix.

### 4.5.3  Conclusion regarding s. 53(1) of the *Act*

[214]  We conclude that Hogg, Cryptobontix, Arbitrade Exchange and Arbitrade Bermuda distributed the Cryptobontix Securities without a prospectus and without an exemption contrary to s. 53(1) of the *Act*. In finding that Hogg breached s. 53(1) of the *Act,* we have also considered, and attributed to him personally, the breaches by Cryptobontix and Arbitrade Exchange through which companies Hogg was acting.

### 4.6     Did Hogg permit, authorize or acquiesce in the corporate respondents' breaches?

[215]  The Commission alleges that Hogg, as a director or officer of Cryptobontix, Arbitrade Exchange, TJL and Gables and as a *de facto* director and officer of Arbitrade Bermuda, authorized, permitted, or acquiesced in the breaches of the *Act* by those entities and therefore should be deemed to have breached the *Act* under s. 129.2 in respect of each of the corporate respondents' breaches.

[216]  Section 129.2 of the *Act* provides that "if a company or a person other than an individual has not complied with Ontario securities law, a director or officer of the company or person who authorized, permitted or acquiesced in the non-compliance shall be deemed to have also not complied with Ontario securities law."

[217]  The *Act* defines "director" and "officer" to include, respectively, individuals performing or occupying a similar position to a director and individuals who

2024 ONCMT 15 (CanLII)

perform functions like those normally performed by an officer.[71] We concluded earlier that Hogg was a director and officer of Cryptobontix, Arbitrade Exchange, TJL and Gables, and a directing mind of Arbitrade Bermuda. Having regard to numerous factors that the Tribunal has previously identified as relevant to determine whether someone is a carrying on a function like that of a director or officer,[72] we also conclude that Hogg was a director and officer of Arbitrade Bermuda.

[218]  Recent Tribunal decisions have concluded that where an individual has been found directly liable for a breach of the *Act* it is not necessary to consider whether the individual is also "deemed liable" under s. 129.2 of the *Act*. The Commission submits that we should not take that approach. The Commission has alleged that Hogg is accountable under s.129.2 of the *Act* for the corporate respondents' breaches of the *Act*. The Commission submits that the principles of justification and transparency require us to address the allegation.

[219]  These recent Tribunal decisions appear to be applying, without directly referring to, the principle from *Kienapple v R*[73] or a similar concept. We asked the Commission for further written submissions about the application of *Kienapple* to Tribunal proceedings and about jurisprudence from other Canadian securities commissions regarding the application of provisions like s.129.2 of the *Act* in circumstances where a direct breach of securities laws by an individual has been found.

[220]  We conclude that because *Kienapple* is a criminal law decision, it is not binding on the Tribunal. However, the decision does provide useful guidance. Where the Tribunal finds that an individual acting through a corporation has directly breached Ontario securities law, we do not need to also deem the individual liable for a corporate breach.

[221]  We also conclude that:

2024 ONCMT 15 (CanLII)

---

[71] *Act*, s.1(1) "director" and "officer"
[72] *Winick* at para 120; *Momentas* at paras 100-102
[73] [1975] 1 SCR 729 (**Kienapple**)

57.

a. had we not found Hogg directly liable for the breaches of the *Act* by Cryptobontix, Arbitrade Exchange, TJL and Gables, we would have deemed him liable under s. 129.2 for those respondents' breaches; and

b. Hogg is deemed liable under s. 129.2 of the *Act* in respect of the breaches of the *Act* by Arbitrade Bermuda.

### 4.6.1 The principle in *Kienapple*

[222] The principle in *Kienapple* is a criminal law concept that prohibits multiple convictions for the same "cause, matter or delict".[74] The principle only applies when there is a sufficient factual and legal nexus between the offences in question. Even if the same act grounds multiple offences, the legal nexus requires that there be no additional and distinguishing element that goes to guilt.[75] The legal nexus will not be demonstrated if the offences target different societal interests or victims or prohibit different consequences.[76]

[223] The Commission submits that it is unsettled law whether *Kienapple* applies generally to Tribunal proceedings. We are not aware of any binding authority that the principle does apply. The Tribunal has discussed *Kienapple* on limited occasions with limited analysis.[77] The Commission submits that Tribunal proceedings are administrative rather than civil or criminal. The Tribunal has held that criminal principles are not necessarily applicable to administrative proceedings.[78]

[224] The Commission further submits that it would be preferable for us to reject *Kienapple* as being unsuited to s. 127 proceedings for several other reasons. Given our conclusion that *Kienapple* is not binding on the Tribunal it is not necessary for us to consider those submissions.

[225] *Kineapple* is a criminal case. The Court's reasons speak only to the criminal context and not to administrative proceedings. The Tribunal is an administrative

2024 ONCMT 15 (CanLII)

---

[74] *R v Prince* [1986] 2 SCR 480 (**Prince**) at paras 14-15, 17
[75] *Prince* at para 32
[76] *R v Kinnear* 2005 CanLII 212092 (ONCA) (**Kinnear**) at para 39
[77] *Coventree Inc. et al (Re)*, 2011 ONSEC 38 at paras 64-66; *Axcess Automation LLC et al (Re)*, 2012 ONSEC 34 at para 136; *Irwin Boock et al (Re)*, 2013 ONSEC 33 at apras 106-109; *Natural Beeworks Apiaries Inc (Re)*, 2019 ONSEC 23 at para 146
[78] *Bridging Finance Inc (Re)*, 2023 ONCMT 21 (**Bridging**) at paras 10, 14

and regulatory body, not a criminal or quasi-criminal body. There is nothing in the *Kineapple* decision that suggests the principle should apply in the administrative context.[79]

[226] We note that in *Carruthers v. College of Nurses of Ontario*[80] the Ontario Divisional Court held that *Kienapple* applies in disciplinary proceedings taken against members of a self-regulated profession and that there is "no reason in principle to permit the application of the doctrine in respect of "regulatory" offences under provincial law, yet deny it to members of self-regulated professions in the case of prosecutions for alleged misconduct."[81] However, in subsequent decisions involving appeals of findings of professional misconduct by the Law Society of Upper Canada, the Divisional Court has concluded that *Kienapple* does not apply.[82] In the context of the Law Society decisions, the Court states that the complaint about professional misconduct "was not in the form of an indictment and should not be approached in an overly technical manner". We do not take from these Divisional Court decisions that *Kienapple* must apply to Tribunal proceedings.

[227] A review of the relevant decisions of this Tribunal supports a conclusion that while *Kienapple* is not binding on the Tribunal, the Tribunal has found the guidance in that decision, namely the idea of not finding multiple breaches of laws based on the same facts and wrongdoing or not punishing someone twice for the same matter, useful where the circumstances warrant it. On occasion the Tribunal has, either with or without reference to *Kienapple*, applied the principle that having found a respondent directly liable for breaches of Ontario securities law there is no need to also consider whether they are also deemed to have breached the law under s. 129.2.[83] We think this is the correct approach.

---

[79] *Bridging* at paras 10, 14

[80] 1996 CanLII 11803 (ONSC) (**Carruthers**)

[81] *Carruthers* at para 87

[82] *Stevens v Law Society of Upper Canada*, 1979 CanLII 1749 (Div Ct), cited in *Law Society of Ontario v von Achten* (**Achten**), 2022 ONLSTH 117

[83] *Stinson (Re)*, 2023 ONCMT 26 at para 78; *Feng* at paras 72-73; *Mughal (Re)*, 2023 ONCMT 39 at paras 104-108.

2024 ONCMT 15 (CanLII)

### 4.6.1.a    Should Hogg be deemed to have breached the *Act* in respect of each of the corporate respondents' respective breaches of the *Act*?

[228]   We decline to find that Hogg is deemed to have breached the *Act* under s. 129.2 for TJL's and Gables's breaches of s. 126(1)(b). This is because our finding that Hogg directly breached s. 126(1)(b) is based upon, among other things, the very same misconduct that underlies the breaches by TJL and Gables. In this case, because Hogg was the sole shareholder and director of both TJL and Gables and these companies' knowledge and actions were entirely through Hogg, we have already attributed these companies' misconduct to Hogg as part of our finding of Hogg's direct breach.

[229]   Similarly, we decline to find that Hogg is deemed under s. 129.2 to have breached the *Act* because of each of Arbitrade Exchange's and Cryptobontix's breaches of the *Act*. Given Hogg's role with each of these companies, we consider that Hogg made the false and misleading statements and is responsible for the other misconduct ascribed to these companies and we have already found that these companies' knowledge of their fraud was based, in part, upon Hogg's knowledge (or *mens rea*). We also attributed Arbitrade Exchange's and Cryptobontix's misconduct underlying their breaches of s. 25 and s. 53 to Hogg in finding that Hogg breached those provisions.

[230]   We do, however, find that Hogg is deemed under s. 129.2 to have violated Ontario securities laws for permitting, authorizing or acquiescing in Arbitrade Bermuda's breaches of Ontario securities laws. Despite finding Hogg was significantly involved with Arbitrade Bermuda during the Material Time, we do not attribute the breaches by Arbitrade Bermuda directly to Hogg, and Hogg alone. Given our factual findings about Hogg's role with Arbitrade Bermuda, including his knowledge of and involvement in Arbitrade Bermuda's breaches of the *Act*, we find that he permitted, authorized and acquiesced in such breaches.

## 5.    CONCLUSION

[231]   For the above reasons, we conclude that:

a.    the transaction or scheme for the offer and sale of the Tokens, including the economic reality of all the surrounding circumstances and, in particular, the

2024 ONCMT 15 (CanLII)

representations made to investors constitute "investment contracts" and are therefore securities under the *Act*;

b.  Hogg, Cryptobontix, Arbitrade Exchange and Arbitrade Bermuda acted fraudulently by falsely representing to investors that the Tokens were backed by gold and that gold was acquired and confirmed through an audit, contrary to s. 126.1(1)(b) of the *Act*;

c.  the respondents acted fraudulently by misappropriating funds raised from the sale of Tokens for purposes other than those represented to investors, contrary to s. 126.1(1)(b) of the *Act*;

d.  Hogg, Cryptobontix, Arbitrade Exchange and Arbitrade Bermuda engaged in the business of trading in securities without registration and without an exemption from registration, contrary to s. 25(1) of the *Act*;

e.  Hogg, Cryptobontix, Arbitrade Exchange and Arbitrade Bermuda distributed the securities without complying with the prospectus requirements, contrary to s.53(1) of the *Act*; and

f.  Hogg is deemed under s. 129.2 of the *Act* to have not complied with Ontario securities law in relation to each of Arbitrade Bermuda's breaches of the *Act*.

[232]  We decline to deem Hogg liable under s. 129.2 for the breaches of the *Act* by Arbitrade Exchange, Cryptobontix, TJL and Gables due to our attribution to Hogg of such breaches in our finding that Hogg directly breached ss. 126.1(1)(b), 25(1), and 53(1) of the *Act*.

[233]  We therefore require that the parties contact the Registrar by 4:30 p.m. on July 2, 2024, to arrange an attendance, to schedule a hearing regarding sanctions and costs, and the delivery of materials in advance of that hearing. The attendance is to take place on a mutually convenient date that is fixed by the Governance & Tribunal Secretariat, and that is no later than July 19, 2024.

[234]  If the parties are unable to present a mutually convenient date to the Registrar, each party may submit to the Registrar, for consideration by a panel of the Tribunal, a one-page written submission regarding a date for the attendance. Any such submission shall be submitted by 4:30 p.m. on July 2, 2024.

2024 ONCMT 15 (CanLII)

Dated at Toronto this 14th day of June, 2024

*"Andrea Burke"*
_____
Andrea Burke

*"Sandra Blake"*                    *"M. Cecilia Williams"*
_____      _____
Sandra Blake                     M. Cecilia Williams

2024 ONCMT 15 (CanLII)

62

**Exhibit B – Capital Markets Tribunal,** *Hogg (Re)*, **2024 ONCMT 31 (Sanctions Decision)**



| Capital Markets Tribunal | Tribunal des marchés financiers | 22nd Floor 20 Queen Street West Toronto ON M5H 3S8 | 22e étage 20, rue Queen ouest Toronto ON M5H 3S8 |

Citation: *Hogg (Re)*, 2024 ONCMT 31
Date: 2024-12-19
File No. 2022-20

**IN THE MATTER OF
TROY RICHARD JAMES HOGG, CRYPTOBONTIX
INC., ARBITRADE EXCHANGE INC.,
ARBITRADE LTD., T.J.L. PROPERTY
MANAGEMENT INC. and GABLES HOLDINGS INC.**

**REASONS AND DECISION**

**(Subsection 127(1) and section 127.1 of the *Securities Act*, RSO 1990, c S.5)**

| | |
|---|---|
| **Adjudicators:** | Andrea Burke (chair of the panel) Sandra Blake M. Cecilia Williams |
| **Hearing:** | September 30, 2024 |
| **Appearances:** | Erin Hoult          For the Ontario Securities Commission Alvin Qian |

No one appearing for Troy Richard James Hogg, Cryptobontix Inc., Arbitrade Exchange Inc., Arbitrade Ltd., T.J.L. Property Management Inc. and Gables Holdings Inc.

# TABLE OF CONTENTS

1.    OVERVIEW ......................................................................................... 1

2.    BACKGROUND.................................................................................... 2

3.    ANALYSIS........................................................................................... 3

3.1    Introduction ............................................................................... 3

3.2    Hogg's emails ............................................................................ 5

3.3    Sanctioning factors.................................................................... 6

      3.3.1  Seriousness of the misconduct........................................ 6

      3.3.2  Respondents' level of activity ......................................... 6

      3.3.3  Violations were recurrent ............................................... 7

      3.3.4  Profit............. .............................................................. 7

      3.3.5  Specific and general deterrence ..................................... 8

      3.3.6  Remorse of the respondent ........................................... 8

      3.3.7  Financial consequences of sanctions .............................. 8

3.4    Administrative penalties............................................................. 8

3.5    Disgorgement........................................................................... 10

3.6    Market participation and director and officer prohibitions ..................14

3.7    Costs......................................................................................... 14

      3.7.1  Introduction................................................................. 14

      3.7.2  The costs sought are reasonable and proportionate in the circumstances ............................................................. 15

4.    CONCLUSION.................................................................................... 16

# REASONS AND DECISION

## 1.    OVERVIEW

[1]    In a decision on the merits dated June 14, 2024 (the **Merits Decision**),[1] the Capital Markets Tribunal found that Troy Richard James Hogg, Cryptobontix Inc., Arbitrade Exchange Inc., Arbitrade Ltd. (**Arbitrade Bermuda**), T.J.L Property Management Inc. (**TJL**), and Gables Holdings Inc., breached the *Securities Act* (the **Act**).[2] The Tribunal found that Hogg, Cryptobontix, Arbitrade Exchange and Arbitrade Bermuda breached the *Act* by fraudulently promoting and selling digital tokens (the **Tokens**) to investors around the world, and falsely representing to investors that the Tokens were backed by gold and that an audit had verified the existence of that gold. The respondents were also found to have misappropriated investor funds which were represented to investors as being used to purchase crypto asset mining equipment to increase the value of the Tokens. In making these findings, the Tribunal found that the transaction or scheme for the offer and sale of the Tokens constituted investment contracts and were therefore securities under the *Act*.

[2]    Hogg, Cryptobontix, Arbitrade Exchange and Arbitrade Bermuda also breached the *Act* through unregistered trading and an illegal distribution of securities. The Tribunal also found that Hogg was deemed under the *Act* to have not complied with Ontario securities law in relation to Arbitrade Bermuda's breaches.

[3]    As a result of the findings in the Merits Decision the Commission seeks the following sanctions and costs against the respondents:

a.    permanent prohibitions on their ability to participate in Ontario's capital markets;

b.    administrative penalties ranging between $750,000 and $2.5 million;

c.    disgorgement of US $51,732,003.27 in investor funds received and $2,036,973.61 in profit made using investor funds; and

---

[1] *Hogg (Re),* 2024 ONCMT 15
[2] RSO 1990, c S.5 (**Act**)

1

d. costs of $667,605.27.

[4] The respondents did not participate in the merits hearing. With the exception of Hogg's emails to the Tribunal addressed below, the respondents also did not participate in the sanctions and costs hearing.

[5] For the reasons set out below, we conclude that it is in the public interest to order:

a. permanent prohibitions on the respondents' ability to participate in Ontario's capital markets;

b. administrative penalties on a joint and several basis ranging from $500,000 to $2 million;

c. disgorgement by the respondents in varying amounts totalling US $51,732,003.27 in investor funds received; and

d. costs of $667,605.27.

[6] We decline to order disgorgement of amounts that the Commission characterizes as profit made using investor funds because the Commission did not establish the necessary causal link between these amounts and the contravention of the *Act*.

## 2. BACKGROUND

[7] The Merits Decision made the following findings of fact that are relevant to our decision on sanctions and costs:

a. Hogg was the sole director, officer, shareholder and directing mind of Cryptobontix, Arbitrade Exchange and TJL and the sole shareholder and a director of Gables during the material time. He was also a directing mind of Arbitrade Bermuda;

b. Hogg and the corporate respondents, with the exception of Arbitrade Bermuda which was incorporated in Bermuda, were Ontario residents and operated from Ontario;

c. Arbitrade Bermuda engaged in Token-related promotional activities through Hogg in Ontario and targeted Ontario residents, such that there

2

was a sufficient nexus to Ontario for the Tribunal to have jurisdiction over Arbitrade Bermuda;

d.     Hogg developed the Tokens and arranged to have Cryptobontix issue the Tokens;

e.     the Tokens were promoted and sold to investors around the world as representing a store of wealth (purportedly due to being backed by gold bullion) with a growth component (purportedly due to earnings related to cryptocurrency mining activities and growth in the investment in gold bullion);

f.     in total Hogg, Cryptobontix, Arbitrade Exchange and Arbitrade Bermuda raised over US $51 million from the sale of Tokens to investors;

g.     there was no gold bullion backing the Tokens; and

h.     of the over US $51 million raised from investors, US $36.858 million was misappropriated by the respondents.

## 3.    ANALYSIS

### 3.1   Introduction

[8]    The Tribunal may impose sanctions under s. 127(1) of the *Act* where it finds it to be in the public interest to do so. The Tribunal's exercise of that jurisdiction must be consistent with the purposes of the *Act*, which include protecting investors from unfair, improper and fraudulent practices, and fostering fair and efficient capital markets and confidence in the capital markets.[3]

[9]    The sanctions listed in s. 127(1) of the *Act* are protective and preventative and are intended to be exercised to prevent future harm to Ontario's capital markets.[4]

---

[3] *Act*, s 1.1

[4] *Committee for the Equal Treatment of Asbestos Minority Shareholders v Ontario (Securities Commission)*, 2001 SCC 37 at paras 42-43

3

[10]   Sanctions must be proportionate to a respondent's conduct in the circumstances of the case.[5] Determining the appropriate sanctions is a highly contextual exercise that is dependent on the facts and findings in the case.[6]

[11]   In previous decisions, the Tribunal has identified a non-exhaustive list of factors applicable to the determination of appropriate sanctions.[7] We have listed the factors that the Commission submits are applicable to this case, as well as some others as potentially relevant given matters raised by Hogg, which are:

a.   the seriousness of the misconduct;

b.   the respondents' level of activity in the marketplace, or in other words, the "size" of the contravention;

c.   whether the misconduct was isolated or recurrent;

d.   the profit made or loss avoided from the misconduct;

e.   the likely effect that any sanction would have on the respondent ("specific deterrence") as well as on others ("general deterrence");

f.   whether or not there has been a recognition of the improprieties by, and the remorse of, the respondent; and

g.   the financial pain that any sanction would reasonably cause to the respondent.

[12]   Before we turn to review the factors applicable to determining appropriate sanctions, we briefly address the weight to be given to two emails submitted to the Tribunal by Hogg for our consideration. The first was submitted one business day prior to the hearing (**First email**), and the second was submitted the day after the hearing (**Second email**).

---

[5] *First Global Data Ltd (Re)*, 2023 ONCMT 25 (**First Global**) at para 7.

[6] *Quadrexx Hedge Capital Management Ltd (Re)*, 2018 ONSEC 3 (**Quadrexx**) at para 20; *Paramount Equity Financial Corporation (Re)*, 2023 ONCMT 20 (**Paramount**) at para 12

[7] *York Rio Resources Inc et al*, 2014 ONSEC 9 (**York Rio**) at para 34; *Kitmitto (Re)*, 2023 ONCMT 4 at para 8

4

### 3.2   Hogg's emails

[13]   Hogg asks that the Tribunal consider his First email when making decisions on sanctions and costs. He asserts loss of reputation, remorse and financial difficulties. He alleges there were few Canadian or Ontario investors and that other unidentified individuals were involved who were not made respondents. He requests that we consider his ability to pay and his age in determining sanctions. Hogg cites a number of sanctions cases however, none are analogous to this case either because they do not involve fraud, they are settlement approvals, or they involve sanctions applied in an entirely different context by another body under different laws.

[14]   We heard submissions from the Commission and considered *Paramount* and *Stinson (Re)*,[8] both of which address the standard to be met for a reduction in sanctions based on a claim of impecuniosity. We agree that Hogg's bald statements about his financial difficulties are insufficient to meet the burden of demonstrating circumstances sufficient to reduce monetary sanctions. The email was scant on detail, uncorroborated, and unsworn. We give no weight to Hogg's submissions in the First email.

[15]   Although Hogg expresses remorse by stating that he is "so sorry for anyone hurt by the actions chosen", overall we give no weight to this expressed remorse. This is because we do not interpret his statements as accepting his own responsibility for harm caused. They instead express regret for having listened to and become involved with other unnamed bad actors.

[16]   Hogg did not attend the hearing. However, the day after the hearing he sent the Second email to the Tribunal, apparently in reply to the Commission's submissions at the hearing. Although we have read the Second email, we have not given it any weight. We did not invite Hogg to file the Second email, and it was delivered after the hearing and outside the established timetable for the delivery of evidence and submissions. The Second email contains extensive factual assertions that are unsworn and uncorroborated, and the Commission did not have the opportunity to respond to or test any of these factual assertions.

---

[8] 2023 ONCMT 50 at paras 66-67

[17]   We turn now to the relevant sanctioning factors.

## 3.3    Sanctioning factors

### 3.3.1 Seriousness of the misconduct

[18]   The Merits Decision found that the respondents violated numerous provisions of the *Act.*

[19]   We find the misconduct serious due to the nature and scale of the violations.

[20]   Fraud is one of the most egregious violations of the *Act*, causing direct harm to investors and undermining confidence in the capital markets.[9] The registration and prospectus requirements are cornerstones of Ontario securities law. Unregistered trading and illegal distributions undermine investor protection and the integrity of the capital markets.[10]

[21]   The Commission submits that this fraud is particularly egregious because in other frauds there may be an underlying business, while here there is not. As there is no gold backing the Tokens, the Tokens are worthless. The offering is a total sham, therefore having significant market impact.

[22]   The Commission further submits that while details of the total number of investors affected by the fraudulent and abusive conduct of the respondents are not available, there is little doubt that investor losses are likely significant.

[23]   We find that the exact quantum of investor losses cannot be ascertained as some investors may have sold their Tokens in the secondary market. However, we agree that investors suffered harm by relying on false representations regarding the attributes of the Tokens.

### 3.3.2 Respondents' level of activity

[24]   Hogg, Cryptobontix, Arbitrade Exchange and Arbitrade Bermuda raised over US $51 million from their promotion and sales of Tokens to investors. Most investor funds, at least US $36.858 million, were misappropriated by the respondents for

---

[9] *First Global* at para 18
[10] *Polo Digital Assets, Ltd (Re)*, 2022 ONCMT 32 at paras 71 and 84

purposes entirely unrelated to the acquisition or operation of cryptocurrency mining equipment, contrary to representations made to investors.

[25] The Commission alleges that in terms of scale, this is the largest crypto asset fraud the Tribunal has heard to date and among the largest fraud cases the Tribunal has adjudicated.

[26] We agree that the respondents' level of activity was high, resulting in significant amounts of funds raised from investors and a significant misappropriation of investor funds.

### 3.3.3 Violations were recurrent

[27] We find that the misconduct was recurrent.

[28] The misconduct of the respondents took place over the span of more than two years (May 2017 to June 2019).

[29] During this period, the Tokens were regularly and repeatedly promoted, and investors were solicited. The misrepresentations made to investors were repeated frequently through various channels of communication and advertisements.

[30] The misappropriation of investor funds by the respondents for their own purposes took place over many months through numerous transactions.

### 3.3.4 Profit

[31] This factor considers whether the respondents made a profit, or avoided a loss, because of their misconduct. A contravention will generally be worthy of greater sanctions when the contravening party benefits from the misconduct.[11]

[32] The Merits Decision found significant amounts of investor funds were used to benefit most of the respondents rather than to purchase cryptocurrency mining equipment, their stated purpose. US $36.858 million of investor funds went to paying operating expenses of Arbitrade Bermuda and fees owed by Arbitrade Bermuda, purchasing real estate, purchasing mining equipment that was

---

[11] *First Global* at para 26

transferred by Cryptobontix to Hogg, and personally benefitting Hogg, TJL and Gables.

[33]   As a result, we find that Hogg, Arbitrade Bermuda, TJL and Gables directly benefitted from their misconduct.

### 3.3.5  Specific and general deterrence

[34]   The Commission submits that given the size and scope of the fraud, significant sanctions are necessary to deter the respondents and other like-minded people from engaging in similar misconduct. We agree. We find that significant sanctions are warranted in this case.

[35]   While Hogg submits that the number of Canadians involved was an extremely small number and even fewer were from Ontario, the misconduct was perpetrated from and had direct ties to Ontario. We find that it is important that the sanctions imposed deter misconduct from originating in Ontario, including where its effects are felt outside Ontario.

### 3.3.6  Remorse of the respondent

[36]   For the reasons explained above, we give no weight to the remorse expressed by Hogg. This was not a factor in our decision.

### 3.3.7  Financial consequences of sanctions

[37]   For the reasons explained above, we have also given no weight to Hogg's bald assertions about his financial difficulties without any corroborating or sworn evidence.

### 3.4   Administrative penalties

[38]   The Commission is seeking an order that the respondents pay the following amounts in administrative penalties:

a.     Hogg: $2.5 million;

b.     Arbitrade Bermuda: $2 million;

c.     Cryptobontix: $1.5 million;

d.     Arbitrade Exchange: $1 million;

e.     Gables: $750,000; and

f.       TJL: $750,000.

[39]   The Commission submits that the penalties requested are proportionate to the gravity of the respondents' misconduct and to sanctions in past cases involving fraudulent conduct.

[40]   To support the quantum of penalties being sought, the Commission provides precedents of:

a.       significant frauds where the individual respondents received high administrative penalties;[12]

b.       other frauds involving less investor funds;[13] and

c.       frauds involving misappropriation.[14]

[41]   Many of these precedents also involve unregistered trading and illegal distributions, findings which increase the seriousness of the misconduct and thus increase the quantum of administrative penalties.

[42]   The general theme of the Commission's submissions is that this is the largest crypto asset fraud the Tribunal has heard, and it ranks among the highest value frauds that the Tribunal has ever adjudicated.

[43]   The Commission submits that the corporate respondents are separate legal entities, and it is appropriate that they be sanctioned based on the role they respectively played in the fraud. The Commission therefore seeks separate independent administrative penalties. The Commission submits that if we are inclined to order joint and several liability, the total amount of the penalties should be no less than the total amount of the administrative penalties sought.

[44]   We reject the approach suggested by the Commission. In this case, Hogg is not only the directing mind but also the sole shareholder of Arbitrade Exchange,

---

[12] *Sino-Forest Corporation (Re)*, 2018 ONSEC 37 (**Sino-Forest**); *Paramount*

[13] *York Rio*; *Global Energy Group Ltd (Re)*, 2013 ONSEC 44; *Money Gate Mortgage Investment Corporation (Re)*, 2021 ONSEC 10; *Hibbert (Re)*, 2012 ONSEC 33; *Quadrexx*; *First Global*; *Mughal Asset Management Corporation (Re)*, 2024 ONCMT 14 (**Mughal**); *International Strategic Investments et al*, 2015 ONSEC 8; *International Strategic Investments et al*, 2015 ONSEC 17; *Meharchand (Re)*, 2019 ONSEC 7; *Natural Bee Works Apiaries Inc (Re)*, 2019 ONSEC 31; *Miner Edge Inc (Re)*, 2021 ONSEC 31

[14] *Pogachar (Re)*, 2012 ONSEC 23; *Lewis (Re)*, 2012 ONSEC 5; *Feng (Re)*, 2023 ONCMT 43

9

Cryptobontix, Gables and TJL. The administrative penalty as against all of these corporations is effectively also being sought from the same source, Hogg. In this case, we are not prepared to inflate the effective administrative penalty against Hogg simply due to the number of corporate respondents involved. We have considered the relative roles of the various corporate respondents in the multiple contraventions of the *Act*. We therefore find that the respondents should pay the following amounts in administrative penalties:

a.    Arbitrade Bermuda: $2 million;

b.    Hogg and Cryptobontix: jointly and severally, $1 million;

c.    Hogg and Arbitrade Exchange: jointly and severally $500,000;

d.    Hogg and Gables: jointly and severally $500,000; and

e.    Hogg and TJL: jointly and severally $500,000.

[45]   These amounts take a global view of sanctions, reflecting the serious nature of the multiple breaches of the *Act* by Arbitrade Bermuda, Hogg, Cryptobontix and Arbitrade Exchange while addressing Hogg's role with the corporate respondents and also drawing a distinction based on our view of the relative role of each company. These amounts also take into consideration our disgorgement orders and the non-monetary sanctions that we order below.

**3.5    Disgorgement**

[46]   The Commission seeks the following disgorgement orders:

a.    Arbitrade Bermuda disgorge US $41,622,965.27, of which amount Hogg and Cryptobontix be jointly and severally liable to disgorge US $7,822,296.72;

b.    Hogg disgorge US $10,109,038, of which amount:

  i.    TJL be jointly and severally liable to disgorge US $5,637,259.39; and

  ii.   Gables be jointly and severally liable to disgorge US $4,345,737.14; and

c.    Hogg disgorge an additional $2,036,973.61 of which amount:

      i.     TJL be jointly and severally liable to disgorge $64,712.19; and

      ii.    Gables be jointly and severally liable to disgorge $1,972,261.42.

[47]    These disgorgement amounts include US $51,732,003.27 obtained from investors who purchased Tokens plus an additional $2,036,973.61 which the Commission submits represents the profit connected to the purchase and sale of real estate by TJL and Gables.

[48]    We first consider the amounts obtained from investors who purchased Tokens.

[49]    Subsection 127(1) of the *Act* permits the Tribunal to order disgorgement of any amounts obtained "as a result of the non-compliance" with Ontario securities law. The purpose of a disgorgement order is to restore confidence in the capital markets, ensure wrongdoers do not benefit from violations of Ontario securities law, and deter others from engaging in similar misconduct.[15]

[50]    We find that the US $51,732,003.27 obtained from investors who purchased Tokens is an amount obtained as a result of non-compliance with Ontario securities law. Of that amount, Arbitrade Bermuda received US $41,622,965.27. We therefore find that Arbitrade Bermuda must disgorge US $41,622,965.27.

[51]    Of the US $41,622,965.27, Hogg and Cryptobontix shall be jointly and severally liable to disgorge US $7,822,296.72. This represents the portion of these investor funds used to purchase cryptocurrency mining equipment owned by Cryptobontix and Hogg. We find that Hogg should be jointly and severally liable for this amount given that he is the sole shareholder, officer and director of Cryptobontix, and because, of this amount, US $4,141,700 worth of the equipment was transferred by Cryptobontix to Hogg.

[52]    We also find that US $10,109,038 of the US $51,732,003.27 represents the amount of investor funds transferred to or used for the benefit of Hogg and his companies, TJL and Gables, including investor funds that were used by TJL and Gables to purchase real estate.

[53]    We therefore find that Hogg must disgorge US $10,109,038, of which amount:

---

[15] *North American Financial Group Inc v Ontario Securities Commission*, 2018 ONSC 136 (Div Ct) at para 218; *Al-Tar Energy Corp et al*, 2011 ONSEC 1 at para 71

    a.    TJL shall be jointly and severally liable to disgorge US $5,637,259.39; and

    b.    Gables shall be jointly and severally liable to disgorge US $4,345,737.14.

[54]    We now consider the profit earned from the purchase and sale of real estate by TJL and Gables.

[55]    The Commission submits the term "amounts obtained" should not be limited to the investor funds that were received by the respondents from investors as a result of their contraventions of the *Act*, but may include any amount obtained as a result of their non-compliance. The Commission cites *Pushka v Ontario Securities Commission*[16] and *Limelight Entertainment Inc et al*[17] in urging us to consider ordering the disgorgement of the "total profit" received by Hogg and his companies, TJL and Gables, on the real estate transactions. The Commission calculates the "total profit" by subtracting the original purchase price of the properties (including acquisition fees) from the sale price, and then subtracting a further $12,500 representing deposits paid toward the purchase price that were not investor funds.

[56]    Disgorgement orders issued by the Tribunal typically involve the disgorgement of investor funds that have been received by respondents from investors as a result of their contraventions of the *Act*. However, we agree with the Commission that the Tribunal's ability to order disgorgement is not limited to funds received from investors but may include any amount obtained as a result of non-compliance with the *Act*.

[57]    Indeed, *Pushka* is an example where the Tribunal ordered disgorgement of funds that were not funds received from investors, but instead were fees earned on management contracts that were purchased with investor funds in breach of the respondents' fiduciary duties under the *Act*. We read s. 127(1) broadly and purposively, such that "amounts obtained" are not limited to amounts obtained from investors and may, in appropriate circumstances, encompass amounts obtained in other ways so long as the requisite causal link between the "amounts obtained" and the "non-compliance" is established. The analysis of causation to

---

[16] 2016 ONSC 3041 (Div Ct) (***Pushka***)
[17] 2008 ONSEC 28 (***Limelight***)

establish that the amounts obtained" are "as a result of" the non-compliance includes consideration of events that interrupt the chain of causation and principles of remoteness.[18]

[58] On the facts before us, we find that the Commission failed to establish a direct causal link between the contraventions of the *Act* and the "total profit" received on the sale of one property acquired by TJL and the sale of three properties acquired by Gables. Although we find that investor funds raised from the sale of Tokens were misappropriated and flowed directly into a lawyer's trust account to purchase real estate, the Commission did not establish that there actually was a gain or profit (*i.e.*, further "amounts obtained") that flowed from this use of investor funds. For example, the difference between the purchase and sale price for the properties may be attributed to improvements made to the properties in the intervening time between the purchase and sale, and the Commission did not rule out that this was the case or otherwise establish the requisite connection between the misuse of investor funds.

[59] We recognize that s. 127(1) authorizes a disgorgement order for gross amounts obtained, without a requirement to net out any related expenses.[19] If the Commission had established a direct causal link, we still need to know the costs related to the sale of the properties (commissions and other fees) as arguably these amounts may reduce the "amounts obtained". We could then exercise our discretion to order disgorgement. Whether the amounts sought to be disgorged are reasonably ascertainable is an important factor.[20]

[60] Therefore, we conclude that it is not appropriate to order disgorgement of the "total profits" realized from the sale of real estate. We also note that although the Commission's Statement of Allegations dated September 30, 2022 seeks disgorgement orders, the Commission did not make any allegations about profits allegedly earned by TJL and Gables through the sale of real estate. Although we have not decided the issue on this basis, and did not ask the Commission for submissions on this point, we do have concerns that the Statement of

---

[18] *Pushka* at para 254
[19] *Pushka* at para 253; *Limelight* at paras 49-54
[20] *Limelight* at para 52

13

Allegations may not provide sufficient notice of the Commission's intention to seek disgorgement of real estate profits.

### 3.6 Market participation and director and officer prohibitions

[61] The Commission seeks permanent trading, acquisition, and exemption bans, and registrant and promoter bans against the respondents. The Commission further seeks against Hogg a permanent director and officer ban with respect to all issuers and registrants.

[62] Participation in the capital markets is a privilege, not a right.[21] The Tribunal has repeatedly found that it is in the public interest to permanently deprive those who commit fraud of the privilege of participating in the capital markets.[22]

[63] We find that there are no mitigating circumstances here, and order permanent market participation bans against the respondents and director and officer bans against Hogg.

### 3.7 Costs

### 3.7.1 Introduction

[64] Section 127.1 of the *Act* authorizes the Tribunal to order a respondent to pay the costs of an investigation or a hearing if the Tribunal is satisfied that the person or company has not complied with Ontario securities law or has not acted in the public interest.

[65] The Commission seeks costs of $667.605.27, apportioned among the respondents as follows:

a. Hogg, Cryptobontix, Arbitrade Exchange and Arbitrade Bermuda: $534,084.22 jointly and severally; and

b. Hogg, TJL and Gables: $133,521.05 jointly and severally.

[66] A smaller amount is attributed to TJL and Gables because they were only involved in the misappropriation fraud which represents one of the four

---

[21] *Glen & Christine Erikson v OSC*, 2003 CanLII 2451 (Div Ct) at paras 55-56
[22] *First Global* at paras 213-214

14

substantive breaches (the others being the gold audit fraud, unregistered trading, and illegal distribution).

### 3.7.2 The costs sought are reasonable and proportionate in the circumstances

[67] The Commission submits that the costs are reasonable and proportionate in the circumstances. This matter involved the investigation and preparation for a hearing involving a complex multijurisdictional crypto fraud that spanned over two years. There was significant investigation and forensic accounting work done to trace the use of investor funds by the respondents in numerous transactions during the material time involving many real properties, financial institutions, and other intermediaries.

[68] The Commission cites numerous precedents to establish that the costs sought are reasonable and within the range of other cases of serious misconduct including fraud.[23]

[69] We question whether the costs claimed by the Commission actually represent a 38.4% discount, as it submits, to the total costs incurred in connection with the investigation and hearing in this matter. This is because some of the discounted costs incurred are likely not recoverable as they were incurred in connection with obtaining freeze orders in separate court proceedings, as well as acknowledged inefficiencies. However, we find that the costs sought are reasonable and have been proven satisfactorily. The Commission provided an affidavit regarding costs and disbursements, which shows costs of the investigation, pre-hearing activities and the merits hearing. The affidavit lists members of the Commission who participated in each phase, the hourly rates for their positions (which have been previously approved by the Tribunal), and the time spent by them. We also find that the costs sought are in line with precedent cases.

[70] We therefore order the respondents to pay the Commission's costs of the investigation and hearing in the amounts sought.

---

[23] *Cartu (Re)*, 2022 ONSEC 4; *Cartu (Re)*, 2022 ONCMT 21 at paras 36–40; *Pro-Financial Asset Management (Re)*, 2018 ONSEC 18 at paras 106-115; *Mughal*, at para 136; *Quadrexx* at paras 117, 120; *Money Gate Mortgage Investment Corporation (Re)*, 2021 ONSEC 10 at para 83; *Paramount* at para 125; *First Global* at para 256; *Sino-Forest* at paras 8, 205-206

## 4.   CONCLUSION

[71]   For the above reasons, we order that:

a.   pursuant to paragraph 2 of subsection 127(1) of the *Act*, trading in any securities or derivatives by the respondents shall cease permanently;

b.   pursuant to paragraph 2.1 of subsection 127(1) of the *Act*, the acquisition of any securities by the respondents is prohibited permanently;

c.   pursuant to paragraph 3 of subsection 127(1) of the *Act*, any exemptions contained in Ontario securities law do not apply to the respondents, permanently;

d.   pursuant to paragraphs 7 and 8.1 of subsection 127(1) of the *Act*, Hogg shall immediately resign any positions that he holds as a director or officer of an issuer or registrant;

e.   pursuant to paragraphs 8 and 8.2 of subsection 127(1) of the *Act*, Hogg is prohibited from becoming or acting as a director or officer of any issuer or registrant, permanently;

f.   pursuant to paragraph 8.5 of subsection 127(1) of the *Act*, the respondents are prohibited from becoming or acting as a registrant or as a promoter, permanently;

g.   pursuant to paragraph 9 of subsection 127(1) of the *Act*, administrative penalties shall be paid as follows:

i.   Arbitrade Bermuda, $2 million;

ii.   Hogg and Cryptobontix, jointly and severally, $1 million;

iii.   Hogg and Arbitrade Exchange, jointly and severally, $500,000;

iv.   Hogg and Gables, jointly and severally, $500,000; and

v.   Hogg and TJL, jointly and severally, $500,000;

h.   pursuant to paragraph 10 of subsection 127(1) of the *Act*:

i.   Arbitrade Bermuda shall disgorge to the Commission the amount of US $41,622,965.27, of which amount Hogg and Cryptobontix shall be jointly and severally liable to disgorge US $7,822,296.72; and

16

ii.   Hogg shall disgorge to the Commission an additional amount of US $10,109,038, of which amount:

- TJL shall be jointly and severally liable to disgorge US $5,637,259.39; and

- Gables shall be jointly and severally liable to disgorge US $4,345,737.14; and

i.   pursuant to section 127.1 of the *Act*:

i.   Hogg, Cryptobontix, Arbitrade Exchange and Arbitrade Bermuda shall pay costs to the Commission in the amount of $534,084.22, for which they shall be jointly and severally liable; and

ii.   Hogg, TJL and Gables shall pay costs to the Commission in the amount of $133,521.05, for which they shall be jointly and severally liable.

Dated at Toronto this 19th day of December, 2024

_____
*"Andrea Burke"*
Andrea Burke


_____                    _____
*"Sandra Blake"*                                        *"M. Cecilia Williams"*
Sandra Blake                                               M. Cecilia Williams

17

**Exhibit C – Divisional Court,** ***Hogg v. CEO of the OSC***, **2025 ONSC 6214**

**CITATION:** Hogg v. Chief Executive Officer, 2025 ONSC 6214
**DIVISIONAL COURT FILE NO.:** DC-25-00000079-0000
**DATE:** 20251107

## ONTARIO
## SUPERIOR COURT OF JUSTICE
## DIVISIONAL COURT

### N. Backhouse, S. Nakatsuru, O'Brien JJ.

BETWEEN: )
)
TROY RICHARD JAMES HOGG, ) *Kevin Richard and Leanne Gruppuso,*
ARBITRADE EXCHANGE INC., TJL ) Counsel for the Appellants
PROPERTY MANAGEMENT INC. and )
GABLES HOLDINGS INC. )
)
)
)
Appellants )
- and – )
)
CHIEF EXECUTIVE OFFICER OF THE ) *Erin Hoult and Alvin Qian,* Counsel for the
ONTARIO SECURITIES COMMISSION ) Respondent,
)
)
)
Respondent )
) **HEARD at Toronto:** September 10, 2025
)

### REASONS FOR DECISION

**S. Nakatsuru J.**

### A. **OVERVIEW**

[1]   Troy Richard James Hogg, and his companies, Arbitrade Exchange Inc., TJL Property Management, and Gable Holdings (collectively the "appellants"), promoted the sale of cryptocurrency tokens backed by precious metals, and raised over US $51 million from investors between May 2017 and June 2019. In reality, the tokens were not backed by precious metals, and investor money did not go where it was supposed to.

[2]   A panel of the Capital Markets Tribunal (the "Panel") found that the appellants committed two frauds contrary to the *Securities Act,* R.S.O. 1990, c.S. 5. Additionally, the Panel found that the sale of tokens, without a prospectus and registration amounted to further breaches of the *Securities Act.*[1] Among the remedies ordered, Mr. Hogg was held jointly and severally liable for a portion of the disgorgement of the lost funds.

---

[1] These findings have not been appealed.

[3] The appellants submit that the Panel made errors of law, denied them procedural fairness, made palpable and overriding errors with respect to the interpretation of evidence, and that the sanctions decision was demonstrably unfit. They submit that the decisions should be set aside.

[4] The respondent submits that the hearing was procedurally fair and no reviewable errors were made. They ask that this appeal be dismissed.

[5] For the following reasons, I would dismiss the appeal.

## B. FACTUAL BACKGROUND

[6] Mr. Hogg was a software engineer who developed the cryptocurrency token scheme at issue. He was the founder, sole officer and director of Cryptobontix, the company which issued the tokens. Mr. Hogg was also the sole director, officer and shareholder of Arbitrade Exchange, which promoted the cryptocurrency issued by Cryptobontix to raise market awareness.

[7] Arbitrade Ltd. ("Arbitrade Bermuda") was established by Mr. Hogg and others, to combine Cryptobontix and Arbitrade Exchange. Mr. Hogg indirectly owned 67% of Arbitrade Bermuda's shares through his personal holding companies. TJL and Gables are Mr. Hogg's holding companies.

[8] The concept Mr. Hogg developed was to create a cryptocurrency token backed by gold bullion (the "Tokens"). The appellants represented to the public that the funds generated from the sale of the Tokens on international trading platforms would be used to purchase cryptocurrency mining equipment. The profits earned from mining cryptocurrency would be used: to purchase gold bullion that would "back" the Tokens and create a guaranteed intrinsic "floor value" for each Token; to purchase additional crypto mining equipment to grow the mining operation; to buy back Tokens from sellers in the market; and to fund the crypto mining operation.

[9] Mr. Hogg engaged two individuals to sell the Tokens through crypto asset trading platforms (Livecoin and C-CEX). During the material time, Stephen Braverman and James Goldberg, two shareholders of Arbitrade Bermuda, were involved in selling Tokens through the international exchanges. Mr. Braverman was also Chief Operating Officer and Mr. Goldberg was assistant to the Chairman and Chief Operating Officer of Arbitrade Bermuda.

[10] More than 1.5 billion Tokens were sold. At least US $51.7 million was raised from investors via the Token sales. Arbitrade Bermuda received US $41.6 million of investor funds in 2018. Of that amount, US $7.8 million was used to purchase cryptocurrency mining equipment ultimately owned by Cryptobontix and/or Mr. Hogg. Mr. Hogg, TJL and Gables received the benefit of US $10.1 million. TJL and Gables did not promote or sell the Tokens.

[11] Mr. Hogg, Cryptobontix, Arbitrade Exchange and Arbitrade Bermuda promoted the Tokens and solicited investors. During the material time, they made promotional materials available to the public, which presented a consistent picture as to what purchasers could expect in connection with the Tokens. From the outset (i.e., May 2017), the promotional materials included representations that the Tokens were backed by cryptocurrency "mining". A percentage of Token sale proceeds would be used to buy cryptocurrency mining rigs (basically, computer equipment) and related infrastructure that would be used to mine cryptocurrencies and generate earnings.

[12] The earnings from the cryptocurrency mining were represented to be used as follows: 50% would be used to purchase physical gold bullion that would "back" the Tokens and create a guaranteed intrinsic "floor value" for each Token; 15% (later increased to 20%) would be reinvested into additional mining servers so the size of the cryptocurrency mining operations backing the

Tokens would continue to grow; 15% would be used to buy Tokens from sellers in the market (e.g., "buy back" and Token "burning" programs); and 20% (later decreased to 15%) would be used for operations, expansions and upkeep. The Tokens were consistently touted as a "store of wealth" (due to the gold bullion backing) with a "growth component" (due to cryptocurrency mining earnings and growth in investment in gold bullion).

[13]   In the Cryptobontix "White Paper" dated November 5, 2017, the Tokens were also represented as a "coupon" for the physical bullion backing them, such that "after year two", Token holders could exchange their Tokens for bullion.

[14]   The above representations were extensively and repeatedly made available to the public and to prospective purchasers of the Tokens, including via social media and online forum posts, email announcements and newsletters, PowerPoint presentations, the White Paper, a press conference, and an analyst report.

[15]   In 2019, the Ontario Securities Commission (the "Commission"), began investigating the appellants, Cryptobontix and Arbitrade Bermuda. The Commission conducted compelled interviews of Mr. Hogg. During the compelled interviews, counsel for Mr. Hogg confirmed that Mr. Hogg was taking and relying upon any and all testimonial protections available to him as a compelled witness, including the protections found in s. 9 of the *Evidence Act*, R.S.O. 1990, c. E.23.

[16]   Based on their investigation, the Commission brought allegations against the appellants, Cryptobontix, and Arbitrade Bermuda that they breached provisions of the *Securities Act*. The dates for the merits hearing were set in April 2023. The hearing was scheduled for 28 days beginning on November 21, 2023, and continuing into January 2024.

## C.  THE PROCEDURAL BACKGROUND

*The Adjournment Motion*

[17]   On October 20, 2023, the Panel approved a request for withdrawal brought by counsel for the appellants because Mr. Hogg's counsel had not been paid for quite some time. A week later, Mr. Hogg filed a notice that he intended to act on his own behalf and on behalf of the other appellants.

[18]   On October 30, 2023, the appellants sought to adjourn the merits hearing. The Panel considered each ground raised by the appellants separately and found that none of the grounds put forward constituted 'exceptional circumstances' requiring an adjournment, as outlined in Rule 29(1) of the Tribunal's Rules of Procedure and Forms.

[19]   At the motion for an adjournment, the appellants argued that considering the recent withdrawal of counsel, Mr. Hogg needed more time to prepare for the merits hearing.

[20]   The Panel determined that the recent withdrawal of counsel did not constitute exceptional circumstances because the withdrawal was reasonably foreseeable, and Mr. Hogg was uncertain whether he would be able to raise funds to retain new counsel. Counsel's withdrawal was reasonably foreseeable because they withdrew for non-payment of accounts dating back to January 2022. Additionally, counsel had communicated to Mr. Hogg that due to non-payment, they were only working on issues related to compelling the foreign witnesses to testify, and not on other matters related to the merits hearing.

[21]   The Panel further rejected Mr. Hogg's submission that he was unable to open the

Commission's electronic disclosure because of broken links. The Panel did not find this submission compelling because disclosure was received by the appellants on October 27, 2022, more than one year before the scheduled commencement of the merits hearing. Since then, other than an inquiry in November 2022, the appellants have not raised an issue about the Commission's disclosure.

[22]    The appellants submitted that they needed more time to compel witnesses in foreign jurisdictions. The Panel concluded that this factor did not constitute an exceptional circumstance because the appellants failed to act diligently in the preceding seven weeks since the Superior Court issued letters of request to compel the foreign witnesses. The Panel also emphasized that since the Commission would be presenting its case first, Mr. Hogg would still have two months to compel the foreign witnesses.

[23]    The appellants further argued that the Canadian proceedings should be stayed until the U.S. Securities Exchange Commission proceedings had concluded, because those proceedings would be critical to their defence. The Panel rejected this submission on the ground that the appellants never previously raised an issue with the timing between the US and Canadian proceedings. When the merits hearing dates were set in April 2023, the Securities Exchange Commission proceeding had already been scheduled to begin after the merits hearing.

[24]    The Panel rejected the appellants' argument that the adjournment should be granted because it would not result in any prejudice, on the basis that lack of prejudice does not meet or obviate the exceptional circumstances test. In any event, the Panel found there would be prejudice in the form of wasted time and resources.

### The Hearing

[25]    After the denial of the adjournment motion, the appellants chose not to participate in the merits proceeding. On the first day of the hearing, Mr. Hogg advised the Panel in writing that "under advisement from my attorneys" he would not be attending the hearing. Relying on Rule 21(3) of the Tribunal's Rules of Procedure and s. 7(1) of the *Statutory Powers Procedure Act*, R.S.O. 1990, c S.22, the Panel determined that where a party has been given notice of a proceeding and that party does not attend the hearing, the Panel may proceed without the party's participation and the party is not entitled to any further notice in the proceeding.

[26]    At the merits hearing, the Commission entered as an exhibit the transcript of Mr. Hogg's compelled interviews, but with redacted portions of the transcript including where Mr. Hogg, through his counsel, claimed the available protections. Additionally, the Commission did not inform the Panel that Mr. Hogg had taken the various protections available as a compelled witness.

## D.  THE MERITS DECISION OF THE PANEL

### A "Security" under the Securities Act

[27]    The Panel first addressed the issue of whether the conduct involved a "security" as defined in the *Securities Act*. The Commission submitted the Tokens were an "investment contract" amongst other defined categories.

[28]    The Panel rejected the Commission's argument that the Tokens themselves were investment contracts. Rather, the Panel found that the initial sale of Tokens, coupled with how the Tokens were represented to prospective purchasers, constituted an investment contract, and therefore a security under the *Securities Act*.

[29] Applying the common enterprise approach set out in *Pacific Coast Coin Exchange v. Ontario Securities Commission*, [1978] 2 S.C.R. 112, at p. 128, the Panel found that the Commission established the elements of an investment contract:

- *Investment of Money*: The Panel held that prospective purchasers made an investment of money when they paid for the Tokens with Bitcoin, which is readily convertible into fiat currency. The proceeds collected from the sale of Tokens were available to be used by the enterprise offering the Tokens.

- *View to a profit*: The Panel found that investors reasonably expected that they would share in the profits of Cryptobontix because the appellants made representations that the Tokens were "backed" by gold and the earnings from the cryptocurrency mining program, and that Token holders would be able to sell the Tokens on other trading platforms. The Panel held that the Commission only needed to establish, in the circumstances that investors would have reasonably had that expectation. The Commission did not need to establish that each individual purchaser had that expectation.

- *Common enterprise and efforts of others*: The Panel held that given the representations made to investors, they would have reasonably expected that the profitability of their investment in the Tokens depended upon the efforts of others. Namely, their investment would increase in profitability if the funds from the sale of Tokens were used to acquire and operate crypto mining equipment, and that the profits from crypto mining would be used to acquire gold to "back" the Tokens, to acquire and operate more cryptocurrency mining equipment to generate additional returns, and to buy back and "burn" Tokens.

*The Frauds*

[30] The main findings by the Panel were regarding the frauds. The Panel determined that the appellants perpetrated two fraudulent schemes: (i) the gold title and audit fraud; (ii) the misappropriation of investor funds.

[31] Regarding the gold title and audit fraud, the Panel found that Mr. Hogg, Cryptobontix, Arbitrade Exchange and Arbitrade Bermuda all knew, or ought to have known, that their representations in public newsletters and press releases were false or misleading and could cause deprivation to investors. These false and misleading representations included that: the gold bullion backing the Tokens would be a significant feature that would drive their value; the Tokens would "create a store of wealth"; the Tokens would have a floor price; the "tokens will be redeemable in their physical precious metal forms"; Arbitrade Bermuda had entered into an Asset Pledge Agreement with SION, a licensed gold trader on the Dubai gold exchange; Arbitrade Bermuda had secured the gold to back the Tokens (in partnership with SION, Arbitrade Bermuda would be granted US $10 billion worth of physical gold); and, Arbitrade Bermuda had received full title and audit of gold bullion holdings stored at independent security facilities in the amount of 395,000 kgs, with current market value more than US $10 billion.

[32] Contrary to these representations, the Panel found that: the agreements between Arbitrade Bermuda and SION did not pledge or transfer title to any gold, but only pledged a "safe-keeping receipt"; Arbitrade Bermuda never purchased any gold from SION; despite pledging gold, SION did not own any gold; no audit of physical gold was performed; and, there was no evidence that there was any gold backing the Tokens at the material time.

[33] In addition, the panel found that Mr. Hogg, Cryptobontix, Arbitrade Exchange and Arbitrade Bermuda made various false or misleading statements directly. The statements made by

Cryptobontix and Arbitrade Exchange were attributable to Mr. Hogg because he was the sole officer, director and shareholder of each company during the material time.

[34]  Regarding the misappropriation of investor funds fraud, the Panel found that Mr. Hogg, Cryptobontix, Arbitrade Exchange and Arbitrade Bermuda made false and misleading statements about the use of proceeds from the sale of Tokens. Further, they knowingly used the proceeds for purposes other than those that were represented to investors, and that they knew or ought reasonably to have known that by doing so they could cause a deprivation to investors. Therefore, the Panel concluded that the appellants acted fraudulently.

[35]  More specifically, in their promotional materials, the appellants stated that the proceeds from the sale of Tokens would be used to purchase cryptocurrency mining equipment that would generate funds, which would be used to purchase gold bullion and additional cryptocurrency mining equipment.

[36]  The Panel found that instead, significant amounts of the proceeds from the sale of Tokens were used for other purposes unrelated to the acquisition or operation of the mining equipment, and that investors were not told that their funds would be used for any other purpose. They concluded that of the US $51 million raised from investors, US $36.858 million was misappropriated by the appellants.

[37]  The Panel further concluded that the false or misleading statements made by Cryptobontix and Arbitrade Exchange were also attributable to Mr. Hogg.

### E.  THE SANCTIONS AND COSTS DECISION

[38]  Following the Merits Decision, in their assessment of the appropriate sanction, the Panel considered the seriousness of the misconduct, the appellants' level of activity, the recurrence of the violations, the profits garnered, specific and general deterrence, remorse of Mr. Hogg, and the financial consequences of sanctions.

[39]  The Panel found the misconduct to be serious due to the nature and scale of the violations.

[40]  The Panel concluded that the appellants' level of activity was high, and that they were able to raise significant amounts of money and misappropriated a significant portion of those funds raised.

[41]  Further, the violations were recurrent, in that the misconduct took place over the span of more than two years, and that Mr. Hogg, Arbitrade Bermuda, TJL and Gables directly benefited from their misconduct.

[42]  The Panel rejected Mr. Hogg's expressions of remorse because they interpreted his statements as not taking responsibility for the harm he caused. Rather his statements only expressed regret for having become involved with other bad actors.

[43]  Likewise, the Panel rejected what they described as "bald assertions" by Mr. Hogg about his financial difficulties.

[44]  The Panel ordered the following administrative penalties: (a) Arbitrade Bermuda: $2 million; (b) Mr. Hogg and Cryptobontix: jointly and severally, $1 million; (c) Mr. Hogg and Arbitrade Exchange: jointly and severally $500,000; (d) Mr. Hogg and Gables: jointly and severally $500,000; and (e) Mr. Hogg and TJL: jointly and severally $500,000.

[45] Further, the Panel ordered permanent market participation bans against the appellants, and a director and officer ban against Mr. Hogg.

[46] In addition, the Panel concluded that Arbitrade Bermuda should disgorge US $41,622,965.27, for which Mr. Hogg and Cryptobontix should be jointly and severally liable to disgorge US $7,822,296.72. Mr. Hogg was also to disgorge an additional US $10,109,038 of which amount, TJL was to be jointly and severally liable to disgorge US $5,637,259.39, and Gables to be jointly and severally liable to disgorge US $4,345,737.14.

[47] Pursuant to section 127.1 of the *Securities Act* the panel awarded the following costs: (a) Mr. Hogg, Cryptobontix, Arbitrade Exchange and Arbitrade Bermuda to pay costs to the Commission in the amount of $534,084.22, for which they were jointly and severally liable; and (b) Mr. Hogg, TJL and Gables to pay costs to the Commission in the amount of $133,521.05, for which they were jointly and severally liable.

## F. JURISDICTION AND STANDARD OF REVIEW

[48] Under s. 10 of the *Securities Act* this Court has jurisdiction to hear an appeal of a final decision of the Capital Markets Tribunal.

[49] Because this appeal is brought pursuant to a statutory appeal mechanism, appellate standards of review apply: *Canada (Minister of Citizenship and Immigration) v. Vavilov*, 2019 SCC 65, [2019] 4 S.C.R. 653, at para. 37.

[50] Questions of law are reviewable on a correctness standard. Questions of fact and questions of mixed fact and law are reviewable on a standard of palpable and overriding error: *Quadrexx Hedge Capital Management Ltd. v. Ontario Securities Commission*, 2020 ONSC 4392 (Div. Ct.), at paras. 77-78.

[51] Questions of procedural fairness are assessed on a standard of correctness: *Law Society of Saskatchewan v. Abrametz*, 2022 SCC 29, [2022] 2 S.C.R. 220, at para. 30.

## G. THE ISSUES ON APPEAL

[52] At the appeal hearing, the appellants[2] focused on what they characterized as the two key errors of law committed by the Panel. They are:

- The transcript of compelled interviews by investigators of the Commission were erroneously admitted by the Panel at the hearing because Mr. Hogg took the protection of s. 9 of the *Evidence Act*; and,

- The Panel erred in its determination that the crypto Tokens were a "security" under the *Securities Act.*

[53] The remaining issues left in writing are the following:

- The denial of the adjournment of the merits hearing was procedurally unfair;

- The Panel erred in finding the appellants committed fraud;

- The Panel erred in finding Mr. Hogg was a director and officer of Arbitrade Bermuda;

[2] To be clear, Cryptobontix and Arbitrade Bermuda have not appealed.

- The disgorgement sanction and costs order were unfit.

## H. ANALYSIS

### 1. The admission of the transcript of the interviews of Mr. Hogg

[54]    Before addressing the merits of this ground of appeal, the respondent objects to it being entertained at all on the basis that it is being raised for the first time on appeal: *Kaiman v. Graham*, 2009 ONCA 77, 245 O.A.C. 130, at para. 18.

[55]    I would exercise the court's discretion to hear this ground of appeal. Given their lack of participation in the hearing, the appellants were not present to offer any objection or argument to the admission of the transcript.  Moreover, the transcript had been edited to only those relevant portions the respondent was relying on at the hearing. The portion of the transcript where Mr. Hogg raised that he was taking the protection of s. 9 of the *Evidence Act* at his interview was redacted. Thus, the Panel was not aware of this potential admissibility issue. Finally, the respondent conceded that from their point of view, no further adjudicative facts are required to resolve the matter on appeal. In these circumstances, it is fair and just that the appellants be permitted to raise the issue on appeal.

[56]    Subsection 9(1) of Ontario's *Evidence Act* prevents a witness from refusing to answer questions by claiming the answer might incriminate them or establish liability in a civil proceeding. Subsection 9(2) states that such compelled answers cannot be used as evidence against the witness in any civil proceeding or in any proceeding under any Act of the Legislature.

[57]    The appellants submit that where a party subject to an investigative interview under the *Securities Act* claims the protection of s. 9 of the *Evidence Act*, the transcript from the examination cannot be relied upon in the subsequent administrative hearing before the Tribunal. This is in part because an investigation under Part VI is not a part of the Panel proceeding, even if that proceeding is commenced because of the investigation. In arguing this, the appellants rely heavily on a Capital Markets Tribunal decision, *Teknoscan Systems Inc. (Re)*, 2024 ONCMT 32, at para. 64.[3]

[58]    The appellants point out that it was open to the respondent to summons Mr. Hogg as a witness to the hearing if they required his evidence, but they chose not to do so.

[59]    I would not give effect to this ground of appeal.

[60]    I find that Mr. Hogg's reliance on s. 9 is not a bar to the use of his compelled interviews at the hearing because this regulatory proceeding under s. 127 of the *Securities Act* does not constitute a separate proceeding from the investigation in which the compelled interviews were taken. I conclude this for the following reasons.

[61]    First, the regulatory context of the *Securities Act* involves the protection of the public from unscrupulous market trading practices which justifies inquiries of a limited scope to empower the regulator to obtain evidence to regulate the securities industry: *British Columbia Securities Commission v. Branch*, [1995] 2 S.C.R. 3, at para. 35.

[62]    It is not contested that the predominant purpose of the compulsion of Mr. Hogg's evidence was to further this regulatory purpose. Thus the admissibility of his compelled testimony did not depend upon rules regarding residual evidentiary immunity under s. 7 of the *Canadian Charter of*

---

[3] This decision was released after the Panel heard the evidence of Mr. Hogg's compelled interviews.

*Rights and Freedoms: R. v. S.(R.J.)*, [1995] 1 S.C.R. 451, at pp. 558-564.

[63]   In keeping with that, no *Charter* issues are raised by the appellants on appeal.

[64]   Second, the jurisprudence does not support the appellant's position.

[65]   In *Todorov v. Ontario Securities Commission*, 2018 ONSC 4503, 142 O.R. (3d) 578, (Div. Ct.), this Court dealt with the very issue of the admissibility of a compelled interview under s. 13 of the *Securities Act* in a s. 127 proceeding. In that case, the appellants argued that the use of the s. 13 interview was contrary to the *Charter*. The Court rejected their submission and held that given this was an administrative proceeding, the admission and use of compelled testimony in the hearing against the appellants was permissible. The *Charter* did not apply. While likely *obiter dictum*, at para. 48, Thorburn J. (as she then was) succinctly disposed of any suggestion that s. 9 of the *Evidence Act* might preclude admission as well:

> In this case, compelled testimony is not prohibited by s. 9(2) of the Ontario *Evidence Act* nor did the Appellants ever claim the protection of s. 9(2) during their interviews (*Re Sextant Capital Management Inc. et al.*, 2011 ONSEC 15, 34 O.S.C.B. 5829, at para. 9.).

[66]   Noteworthy is the fact that Thorburn J. cited the very authority that the panel in *Teknoscan Systems Inc.* declined to follow.

[67]   In *Alberta (Securities Commission) v. Brost*, 2008 ABCA 326, 2 Alta. L.R. (5th) 102, at paras. 37-38, the court came to the same conclusion that s. 6 of the *Alberta Evidence Act*, R.S.A. 2000, c. A 18, a similar provision to s. 9 of the Ontario *Evidence Act*, did not affect the admissibility of compelled interviews under their securities legislation. At para. 37, the court found that the compelled interviews were "not used to incriminate…nor were they used in other proceedings". They "were used in the same regulatory proceeding in which they were obtained." Thus, the interviews were admissible.

[68]   The reasoning in *Brost* was adopted by this Court in *College of Physicians and Surgeons of Ontario v. Yazdanfar*, 2013 ONSC 6420, 317 O.A.C. 53, (Div. Ct.), at paras. 65-68. At Dr. Yazdanfar's discipline hearing over a failed liposuction operation, the College sought to introduce the transcripts of interviews conducted by a College investigator with Dr. Yazdanfar. Those interviews were deemed by the governing health professions legislation to have the protections found in s. 33 of the *Public Inquiries Act, 2009*, S.O. 2009, c. 33, Sched. 6, which are effectively the equivalent of s. 9 of the *Evidence Act*. In finding the transcripts admissible, Harvison-Young J. (as she then was) followed *Brost* and held that Dr. Yazdanfar's interviews formed a part of the same regulatory proceeding initiated with the same ultimate regulatory purpose, that is, the protection of the public. Accordingly, the restriction found in s. 33 on the use of answers given in other proceedings was not applicable.

[69]   In coming to this conclusion, Harvison-Young J. noted at para. 67 that "treating the Committee hearing as a separate or other proceeding would effectively undermine the purpose of the regulatory framework and the onerous obligation placed on self-regulating bodies to protect the public."

[70]   A similar observation can be made with regards to the circumstances presented in this case.

[71]   Third, *Teknoscan Systems Inc.* is obviously not binding. But nor is it persuasive.

[72]   *Teknoscan Systems Inc.* appears to stand alone in relation to other Capital Market Tribunal

decisions on this issue. For example, in *Sextant Capital Management Inc. et al.*, 2010 ONSEC 25, at paras. 2, 7-10, despite the subject having taken the protection of s. 9, the panel relying on *Brost*, found that the compelled testimony could be used in the same regulatory proceeding in which it was obtained because the investigative stage and the adjudicative stage were not separate proceedings, but rather stages in one proceeding. See also: *Agueci (Re)*, 2013 ONSEC 45, at paras. 123-124; *York Rio Resources Inc. et al.*, 2011 ONSEC 37, at paras. 67-76.

[73]    The panel in *Teknoscan Systems Inc.* (at paras. 61-66) declined to follow the rulings in *Sextant* and *Agueci* because of their view that these decisions were predicated on the erroneous premise that a Part VI investigation under the *Securities Act* was part of, or one and the same as, an administrative enforcement proceeding under s. 127 of the *Securities Act*. It was significant to that panel that a Part VI investigation by the Commission could ultimately result in various processes and remedies that could be sought by the respondent: an administrative proceeding under s. 127 of the *Securities Act*; an application under s. 128 of the *Securities Act* before the Superior Court of Justice for declaratory and other ancillary relief; a prosecution under the *Provincial Offences Act* in respect of one or more alleged breaches of s. 122 of the *Securities Act*; and the delivery of a privileged report to the Commission as provided for in s. 15 of the *Securities Act*. Thus, in their view, the *Securities Act* contained no support for the suggestion that an investigation under Part VI either initiated or was part of a subsequent administrative proceeding brought under s. 127.

[74]    Respectfully, the panel in *Teknoscan Systems Inc.* overemphasized the significance of the different remedies available to the Commission after the completion of a Part VI investigation. The various separate remedies that could arise from an investigation does not impart to them the character of separate proceedings for the purposes of s. 9. This interpretation is in keeping with the following comment set out in *Wilder v. Ontario Securities Commission* (2001), 53 O.R. (3d) 519, at para. 23, about the nature of the overall *Securities Act*:

> …the overwhelming message (of the scheme) is one of remedial variety and flexibility, rather than one that creates hived-off areas of remedial exclusivity. A court should be loath to prefer a rigidly narrow and literal interpretation over one that recognizes and reflects the purposes of the *Act*.

Regardless of any amendments to the *Securities Act* since *Wilder*, the force of that principle remains.

[75]    Finally, in coming to their decision, the panel in *Teknoscan* did not deal with any of the judicial cases above-mentioned, which, if not binding, certainly merited their careful attention.

### 2. The determination that the cryptocurrency was a security

[76]    The appellants submit that the Panel erred in finding that the sale of the Tokens together with the representations made to purchasers, were "investment contracts" and therefore securities under the *Securities Act*. They further argued that the Panel expressly took the approach undertaken in an American authority, *SEC v. Ripple Labs, Inc.*, 2023 US Dist LEXIS 120486 (SDNY July 13, 2023) at p. 22-24, but then declined to follow it, in finding that there was an investment contract. The appellants' position is that to satisfy a necessary part of the legal test for an investment contract, the purchasers would have to know that they were purchasing the Tokens from Cryptobontix. There was almost no evidence that the purchasers knew who they were buying the Tokens from.

[77]    I do not accept this submission for the following reasons.

[78]    To begin the analysis of this issue, this ground of appeal raises a question of mixed fact and law. Whether something is a security is a purposive, fact-driven inquiry: *VRK Forex & Investments*

*Inc. v. Ontario Securities Commission*, 2023 ONSC 3895 (Div. Ct.), at para. 7. No extricable error of law arises in the circumstances of this case.

[79]    Second, the Panel got the test right. They cited the leading authority of *Pacific Coast Coin Exchange* and analyzed the four elements of the common enterprise approach to the definition of an investment contract:

    (a). An investment of money;

    (b). With a view to profit;

    (c). In a common enterprise where the success or failure of the enterprise is interwoven with, and dependent on, the efforts of persons other than the investors; and

    (d). The efforts made by those others significantly affect the success or failure of the enterprise.

Moreover, they carefully applied the evidence to each element and determined they were met.

[80]    Third, while it is true the Panel said at one point in their reasons that they preferred the approach and analysis of *Ripple Labs*, the context of that portion of their reasons must be carefully scrutinized. The reference to *Ripple Labs* is found in the section headed "What is the "investment contract" in this case?". In that section, the Panel rejects the respondent's argument that the Tokens themselves were the investment contract, as opposed to the overall transaction or scheme for the offer and sale of the Tokens, including the representations made to investors, considered together.

[81]    They rejected the respondent's argument that a concurrent level Capital Markets Tribunal decision warranted the conclusion that cryptocurrency was always a security. Rather, the Panel held that such a determination depended on the facts of each individual case. The Panel found that the Tokens, considered alone, did not incorporate or reflect what the purchasers of the Tokens might reasonably expect from their investments. Thus, the purchasers' reasonable expectations, based upon the representations that were made to them in promotional materials, were an essential element of an investment contract. Moreover, the Panel found that the Tokens were not an investment instrument like a share certificate. After reasoning in this fashion, the Panel then stated the following passage relied upon by the appellants:

    On this question of what is the "investment contract", we prefer the approach and analysis taken in the US decision in *SEC v. Ripple Labs, Inc.*, namely that the subject of a "contract, transaction or scheme" can be a variety of tangible or intangible assets. The subject itself is not necessarily a security by virtue of being an investment contract. Although the Tokens are the subject of the transaction or scheme in this case, we find that the Tokens (like the bags of silver coins in *Pacific Coast Coin* and the citrus groves in *Howey*, involving contracts in which investors bought citrus groves and essentially leased them back to a service provider to harvest, pool and market the produce), in and of themselves, do not embody the elements of an investment contract.

[82]    In my opinion, in this passage, the Panel was not applying the law as set out in *Ripple Labs* as the appellants contend. They clearly applied the test in *Pacific Coast Coin Exchange*. Nor were they finding *Ripple Labs* judge's application of the American test to the facts in that case persuasive in their assessment of the evidence in the case at bar. The only principle the Panel adopted was a narrow one. That is, an investment contract can be about tangible assets or intangible assets, and

that a cryptocurrency is not *per se* always an investment contract. Additionally, the Panel never goes beyond such a limited reference to *Ripple Labs* when one reads the entire reasons.

[83]   Fourth, given this context, the appellants' submission that the Panel somehow erred by failing to properly apply *Ripple Labs* is misplaced. In *Ripple Labs*, the sale of some of the crypto tokens to certain buyers did not qualify as an investment contract because the company and the purchasers of the tokens did not know each other and the purchasers did not know that they were purchasing from the company. Therefore, the purchasers did not have a reasonable expectation of profit derived from the efforts of the company. Further, the court found that there was no evidence that the buyers who purchased the tokens on digital exchanges, could "parse through multiple documents and statements…which include statements (sometimes inconsistent) across many social media platforms."

[84]   In my view, any precedent set by *Ripple Labs* is very much confined to the facts before it. The Panel had different evidence to consider. It did not err in failing to reach a similar conclusion about the proof of a security in the case at bar as it was done in *Ripple Labs*.

[85]   Fifth, regardless of the application of *Ripple Labs*, the appellants still argue that to establish the third and perhaps fourth element of the test in the common enterprise approach, the respondent would need to provide evidence that demonstrates that the purchasers knew they were buying the tokens from the company. The appellants submit that the Panel did not undertake this required analysis and that there was almost no evidence presented at the merits hearing to satisfy this requirement.

[86]   I am not persuaded the Panel erred in this way.

[87]   I agree with the respondent that the definition of an investment contract must be determined purposively and broadly. Accordingly, the meaning of investment contract must embody "a flexible rather than a static principle, one that is capable of adaptation to meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits": *Pacific Coast Coin Exchange*, at p. 127.

[88]   The analysis conducted by the Panel was in keeping with this approach.

[89]   While the appellants point to various deficiencies or weaknesses in the evidence, these arguments are essentially directed at the weight of the evidence. Absent a palpable and overriding error, these findings are afforded deference: *Hydro-Quebec v. Matta*, 2020 SCC 37, [2020] 3 S.C.R. 595, at para. 33.

[90]   I do not see any palpable and overriding error.

[91]   Although the appellants argue to the contrary, the Panel made findings in relation to when and how the tokens were sold, outlined generally how the tokens were sold, the approximate number sold during the material time, and conducted a chronological review of the promotional materials to determine the reasonable expectations of the purchasers.[4] Moreover, the Panel was cognizant of the nature of the scheme when they correctly observed "the reality [is] that the sale of crypto assets, by its very nature, can make it difficult to identify individual purchasers".[5]

---

[4] Paragraph 65 of the Merits Decision states where the tokens were sold. Paragraphs 67-68 outline generally how the tokens were sold. Paragraph 74 outlines the approximate number of tokens sold between May 2017 and November 2018. Paragraphs 71-73 outline the representations made in a chronology.
[5] Paragraph 117.

[92]   Having dismissed the last ground of appeal focused on by the appellants, I turn to the grounds of appeal left mainly in writing.

### 3. The denial of the adjournment motion

[93]   The appellants submit that the Panel's refusal of the adjournment request was a breach of procedural fairness. The appellant argues in bringing the motion for an adjournment, Mr. Hogg's circumstances were exceptional because he had recently lost his counsel and did not have time to prepare his defense as a self-represented litigant. Additionally, Mr. Hogg submitted that he required more time to summon critical witnesses who were in foreign jurisdictions.

[94]   The Capital Market Tribunal's *Rules of Procedure* require a party to demonstrate "exceptional circumstances" to obtain an adjournment, consistent with the objective that proceedings be "conducted in a just, expeditious and cost-effective manner."

[95]   The Panel's discretionary power to permit or deny an adjournment is usually afforded deference, and the standard of review is akin to one of reasonableness: *Todorov,* at para 34.

[96]   I agree with the respondent's position that the appellants are essentially asking this Court to re-weigh the factors the Panel considered and to reach a different conclusion. That is not appropriate. The Panel balanced the various competing interests at play and reasonably concluded that the appellants had a reasonable opportunity to prepare their defence. The circumstances on which they relied as a basis for the adjournment were foreseeable and avoidable and did not constitute valid reasons for an adjournment.

[97]   For instance, the appellants' counsel withdrew due to non-payment of accounts but this state of affairs dated back 22 months before the adjournment motion. Moreover, Mr. Hogg knew prior counsel was not preparing for the hearing, other than working to compel the attendance of foreign witnesses, given the fee dispute. At the motion, Mr. Hogg offered no basis to suggest they would be in a position in the near future to afford to retain new counsel. Additionally, considering these circumstances, Mr. Hogg provided no acceptable explanation why he was not prepared to proceed without counsel. The Panel rejected Mr. Hogg's assertion he was having technical issues accessing the respondent's disclosure provided many months earlier.

[98]   Another example, regarding the pursuit of obtaining the attendance of foreign witnesses, judicial letters to facilitate that had been requested seven weeks earlier. The appellants had not been diligent in obtaining these witnesses' testimony. The information received from lawyers in the foreign jurisdiction was that it may take months to obtain the evidence and there was no certainty provided as to when it might come to fruition. In addition, the Panel observed that the schedule of the hearing dates, which were broken up between the Commission's case and the appellants' case, and spanning a length of time, afforded the appellants the opportunity to pursue the foreign witnesses, if they were so inclined. The appellants did not. They refused to participate in the hearing.

[99]   In the end, I would dismiss this ground of appeal. The Panel did not misdirect themselves nor is the decision so clearly wrong as to amount to an injustice: *Ontario Securities Commission v. Go-To Developments Inc,* 2022 ONCA 328, at para. 11, leave to appeal refused, [2022] S.C.C.A. No. 236; *Katebian v Ontario (Securities Commission)*, 2025 ONSC 3249 (Div. Ct.), at paras. 46-47, 61, leave to Ont. C.A. requested.

### 4. The finding the appellants committed fraud

[100] There is little merit to this ground of appeal. No palpable and overriding error has been demonstrated by the appellants in the Panel's determination of fraud.

[101] With respect to the fraud about gold bullion backing the Tokens, the Panel made no error. The Panel found that the representations were misleading. They found there was no gold acquired, no gold backing the Tokens, and no audit conducted confirming the acquirement of gold as the misleading representations stated. The Panel was aware at the beginning of the material time, the representations indicated only some form of interest in gold was backing the Tokens, but correctly found that these representations evolved over time. As well, the Panel did not err in concluding that there was no actual physical gold possessed contrary to the representations. The evidence that Arbitrade Bermuda had purchased gold impressions of Nelson Mandela's hands did not affect this conclusion. These items were not acquired by or for Cryptobontix, the Token issuer. Moreover, the press releases in which the acquisition was announced largely distinguishes it from the gold bullion that was to back the Tokens. There was no reason to believe the gold in such historically significant items would be melted down and redeemable against Tokens.

[102] Regarding the misrepresentations, the appellants argue that the Panel erred in concluding that there was no evidence that investors were told that their funds would be used for purposes other than acquiring crypto mining equipment. They point to the Cryptobontix's "White Paper" which disclosed that some of the funds from Token sales would be used for other purposes such as operations.

[103] In my view, this does not demonstrate a palpable or overriding error. The Panel found that significant amounts of investor funds were used not only for purchasing cryptocurrency mining equipment, but also for other purposes entirely unrelated to the acquisition or operation of mining equipment including about US $14 million out of Token sales of at least US $51 million provided to or for the benefit of Mr. Hogg, TJL, Gables and Arbitrade Bermuda which was then used for other purposes. As found by the Panel, it is not necessary that *all* investor funds must be misappropriated to establish fraud. Rather it is sufficient that a significant amount of investor funds was misappropriated contrary to representations to the investors.

## 5. The finding Mr. Hogg was the "directing mind" of Arbitrade Bermuda

[104] The appellants submit that the Panel misconstrued the evidence and erred in law in concluding that Mr. Hogg was a director and officer of Arbitrade Bermuda at the material time, by improperly conflating share ownership with being a directing mind of a company. The appellants highlight that Arbitrade Bermuda was governed by a Board of directors and had officers who ran the day-to-day operations.

[105] I would not give effect to this ground of appeal.

[106] No palpable and overriding error was made in the Panel's findings. Subsection 1(1) of the *Securities Act* defines "director" and "officer" to include any individual performing the functions of such positions, regardless of formal titles. In finding Mr. Hogg was a director and officer of Arbitrade Bermuda, the Panel applied well-established principles for determining whether someone is acting like a director or officer and found many of the factors present in this case. They did not solely focus on Mr. Hogg's share position with the company and conflate that with him being a directing mind.

[107] I further agree with the respondent's position that success on this ground of appeal would

have no material effect as Mr. Hogg was not held liable for the administrative penalty or disgorgement amounts, other than a portion ultimately obtained by him and/or Cryptobontix, ordered against Arbitrade Bermuda which is not an appellant.

### 6. Sanctions and costs

[108]  An appeal court will only interfere with a tribunal's sanctions and costs decision if they have made an error in principal or if the penalty is clearly unfit: *College of Physicians and Surgeons of Ontario v. Peirovy*, 2018 ONCA 420, 143 O.R. (3d) 596, at para. 38; *Kitmitto v. Ontario (Securities Commission)*, 2024 ONSC 1412 (Div. Ct.), at para. 170.

[109]  The appellants first argue that the Panel lacked securities jurisdiction to order disgorgement on amounts from alleged distributions outside of Ontario and Canada. They point out that in the merits decision the Panel noted that there were only two identified purchasers of tokens that were located within Canada.

[110]  The appellants also allege that the disgorgement order was excessive and unfair. It is submitted that the Panel overlooked the fact that the disgorgement order against Arbitrade Bermuda would have little deterrent effect on other involved parties, including the members of Arbitrade Bermuda's board. Additionally, the appellants submit that since Arbitrade Bermuda was not found to be Mr. Hogg's alter ego, a joint and several disgorgement order will have disproportionate and unfair monetary consequences for Mr. Hogg.

[111]  These arguments are unpersuasive.

[112]  I find no error in principle made by the Panel. I do not agree that the Panel erred by assuming jurisdiction over Token distributions outside of Ontario or that they failed to address this issue. Mr. Hogg, an Ontario resident, was the driving force behind the development of the Tokens at issue. He was found to be the directing mind, in addition to being the majority shareholder, of Arbitrade Bermuda which structured and ran the business related to the tokens. The Panel was well aware their power to order the appellants to disgorge to the Commission amounts obtained had to be a result of the non-compliance with Ontario securities law. The Panel was satisfied that the transactions, wherever they took place, had sufficient connection to Ontario. This finding was open to them to make on the evidence given the connection of the parties and their actions to Ontario.

[113]  I also disagree with the appellants' submission that the disgorgement order was excessive and unfair. The purpose of disgorgement is not to punish. Rather its purposes include ensuring public confidence in the markets is maintained and deterring non-compliance with securities law by removing the prospect of receiving and retaining moneys from noncompliance: s.127(1)10 of the *Securities Act*. The Panel looked at the underlying facts and circumstances of the case and determined that the sanctions imposed were proportional to the conduct of the parties.  Deference should be afforded to the Panel's discretionary decision: *Katebian*, at para. 103; *Aziz v. Ontario (Securities Commission, Chief Executive Officer)*, 2024 ONSC 4691 (Div. Ct.), at para. 84, leave to Ont. C.A granted.

[114]  Disgorgement may be ordered on a joint and several basis where there is sufficient direction and control between the entities: *Katebian*, at paras. 100-103, 105. As discussed above, the Panel did not err in making the factual finding that Mr. Hogg was performing the functions of an "officer" or "director". Consequently, the decision to make Mr. Hogg jointly and severally liable to the corporate entities was reasonable to ensure individuals are not sheltered from sanctions if they orchestrate misconduct through a corporation they direct and control: *Phillips v. Ontario Securities Commission*, 2016 ONSC 7901, 135 O.R. (3d) 771, (Div. Ct.), at para. 74; *Aziz*, at para. 94.

[115]  In terms of costs, the appellants submit that the costs awarded by the Panel in the sanctions decision included amounts that were not recoverable pursuant to the *Securities Act*. In the alternative, it is submitted that the Panel failed to determine what portion of the costs sought by the respondent included amounts that were not recoverable.

[116]  I agree with the respondent that in asserting the Panel awarded unrecoverable costs, the appellants misconstrue the decision.  In discussing the percentage difference between incurred and claimed costs (i.e., any 'discount'), the Panel simply observed that some incurred costs were likely not recoverable. Neither the costs claimed, nor ordered, included unrecoverable amounts.

[117]  I see no grounds to interfere with the costs decision.

### I.  **DISPOSITION**

[118]  The appeal is dismissed.

[119]  As agreed to by the parties, the appellants will pay the respondent $15,000 all-inclusive in costs.

_____
**The Honourable Justice Backhouse**

_____
**The Honourable Justice Nakatsuru**

_____
**The Honourable Justice O'Brien**

**Released:** November 7, 2025

**CITATION:** Hogg v. Chief Executive Officer, 2025 ONSC 6214
**DIVISIONAL COURT FILE NO.:** DC-25-00000079-0000
**DATE:** 20251107

### ONTARIO SUPERIOR COURT OF JUSTICE
### DIVISIONAL COURT

**N. Backhouse, S. Nakatsuru, O'Brien JJ.**

BETWEEN:

TROY RICHARD JAMES HOGG, ARBITRADE
EXCHANGE INC., TJL PROPERTY MANAGEMENT
INC. and GABLES HOLDINGS INC.

Applicant

– **and** –

CHIEF EXECUTIVE OFFICER OF THE ONTARIO
SECURITIES COMMISSION

Respondents

_____

**REASONS FOR DECISION**

_____

**Released:** November 7, 2025

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

SECURITIES AND EXCHANGE COMMISSION,
Plaintiff,

v.

ARBITRADE LTD.;
CRYPTOBONTIX INC.;
TROY R.J. HOGG;
JAMES L. GOLDBERG;
STEPHEN L. BRAVERMAN; and
MAX W. BARBER,
Defendants,

and

SION TRADING FZE,
Relief Defendant.

Case No. 22-cv-23171-DAMIAN/D'ANGELO

**JOINT NOTICE OF SUPPLEMENTAL AUTHORITIES**
(NO RELIEF REQUESTED)

Defendants Troy R.J. Hogg and James L. Goldberg, appearing pro se, respectfully submit this Joint Notice of Supplemental Authorities for the Court's consideration. This Notice does not seek relief, does not request modification of any prior ruling, and

presents no argument. It is submitted solely to notify the Court of legal authorities relevant to issues raised in the parties' filings and expected to arise at trial.

Under Eleventh Circuit practice and longstanding federal procedure, parties may submit authorities decided or identified after briefing, or otherwise pertinent to the Court's adjudication of legal issues.

## I. U.S. SUPREME COURT AND CIRCUIT AUTHORITIES ON EXTRATERRITORIALITY (MORRISON LINE)

**Morrison v. National Australia Bank Ltd., 561 U.S. 247 (2010)**
The U.S. Supreme Court held that Section 10(b) applies only to:
(1) transactions in securities listed on domestic exchanges, and
(2) domestic transactions in other securities.
The Court rejected theories permitting enforcement based solely on U.S.-based effects or conduct occurring after foreign transactions.

**Absolute Activist Value Master Fund Ltd. v. Ficeto, 677 F.3d 60 (2d Cir. 2012)**
A transaction is "domestic" only when irrevocable liability is incurred in the United States or title is transferred within the United States.

**Parkcentral Global Hub Ltd. v. Porsche Automobile Holdings SE, 763 F.3d 198 (2d Cir. 2014)**
Even if some domestic activity exists, Section 10(b) does not apply where the defendant's alleged misconduct is "predominantly foreign."

**Cavello Bay Reinsurance Ltd. v. Shubin Stein, 986 F.3d 161 (2d Cir. 2021)**
Reaffirmed Morrison; foreign transactions involving foreign issuers remain outside Section 10(b).

**SEC v. Benger, 934 F. Supp. 2d 1008 (N.D. Ill. 2013)**

*Benger* concluded that Dodd-Frank's amendments do not extend the SEC's authority to transactions lacking a U.S. nexus, holding that Morrison continues to bar SEC enforcement where the securities transactions themselves are foreign.
The decision expressly states that 929P(b) "did not overrule Morrison," and the SEC must still satisfy the traditional domestic-transaction test.

**SEC v. Traffic Monsoon, LLC, 884 F.3d 1270 (10th Cir. 2018)**

Although recognizing Dodd-Frank's text, the *Traffic Monsoon* court held that Morrison still applies to antifraud provisions, and the SEC must establish a domestic securities transaction under the *Absolute Activist* irrevocable-liability test.

Where transactions occur abroad or through foreign platforms, the SEC lacks jurisdiction, even after Dodd-Frank.

***Stoyas v. Toshiba Corp., 896 F.3d 933 (9th Cir. 2018)***

*Toshiba* reconfirmed that Morrison governs extraterritorial securities enforcement and that Dodd-Frank does not revive conduct-and-effects tests for private or SEC antifraud actions.

The decision also reaffirmed that a domestic transaction is required, regardless of issuer nationality or investor location.

These authorities are relevant to evaluating the legal framework governing digital-asset transactions executed on international trading platforms.

## II. U.S. AUTHORITIES ON THE HOWEY TEST AND TOKEN CLASSIFICATION

***SEC v. W.J. Howey Co., 328 U.S. 293 (1946)***
The test for an "investment contract" requires:
(1) an investment of money;
(2) in a common enterprise;
(3) with a reasonable expectation of profits;
(4) derived from the efforts of others.

***SEC v. Ripple Labs Inc., No. 20-cv-10832 (S.D.N.Y. 2023)***
The court held that the ***token itself is not a security***; only specific transactions involving promoter representations may constitute investment contracts. *Programmatic sales on exchanges did not meet Howey.*

***SEC v. Telegram Group Inc., 448 F. Supp. 3d 352 (S.D.N.Y. 2020)***
The court distinguished between the token and the surrounding contractual scheme. *The token alone was not a security.*

***In re LBRY, Inc., No. 1:21-cv-00260 (D.N.H. 2023)***
Post-judgment narrowing clarified that the court's finding applied to specific offering conduct, *not secondary-market token trading.*

***SEC v. Binance Holdings Ltd., No. 1:23-cv-01599 (D.D.C. 2023–2024)***
The court applied Howey's transaction-specific analysis, emphasizing the need for evidence of reliance and promoter-led expectation of profit.

***SEC v. Kik Interactive Inc., 492 F. Supp. 3d 169 (S.D.N.Y. 2020)***

Kik reinforces that liability under Howey depends on the specific offering conduct, not the token itself.

***In re Bibox Group Holdings Ltd., 534 F. Supp. 3d 326 (S.D.N.Y. 2021)***

Held that purchasers of one token lack standing to sue over the sale of different tokens, reinforcing that each crypto asset must be evaluated transaction-by-transaction, not categorically.

***Audet v. Fraser, 2022 WL 1912866 (2d Cir. June 3, 2022)***

The Second Circuit held a jury could reasonably conclude that certain digital assets were **not** securities because the purchasers did not rely on managerial efforts.

This supports the principle that generalized token theories fail without **specific transaction-level evidence**

These authorities address the legal distinction between a digital token and the transactions or representations that may form an investment contract.

## III. AUTHORITIES ON STATEMENT ATTRIBUTION AND "MAKER" LIABILITY

***Janus Capital Group, Inc. v. First Derivative Traders, 564 U.S. 135 (2011)***
The Supreme Court held that the "maker" of a statement under Rule 10b-5(b) is the person with **ultimate authority** over the statement's content and dissemination.

***SEC v. Rio Tinto plc, 41 F.4th 47 (2d Cir. 2022)***
Emphasized Janus limitations; scheme liability cannot be used to circumvent the requirement that misstatements be attributed to the defendant.

These authorities are relevant to determining who has legal responsibility for corporate statements under U.S. securities law.

## IV. AUTHORITIES ON COMPELLED TESTIMONY AND INDEPENDENT-SOURCE RULES

***Kastigar v. United States, 406 U.S. 441 (1972)***
Compelled testimony cannot be used directly or indirectly by the government unless the government proves an *independent, legitimate source for each fact.*

***Murphy v. Waterfront Comm'n, 378 U.S. 52 (1964)***
Prohibits use of compelled statements or their derivatives in federal proceedings.

***Garrity v. New Jersey, 385 U.S. 493 (1967)***
Statements obtained under threat of penalties constitute compelled testimony.

**SEC v. Fife, 2021 WL 5998525 (N.D. Ill. Dec. 20, 2021)**
The SEC may not rely on testimony compelled by another sovereign unless it demonstrates independent sourcing.

**United States v. North, 910 F.2d 843 (D.C. Cir. 1990)**

North holds that the government may not use compelled testimony either directly or indirectly, and that even subtle or subconscious exposure to compelled statements taints subsequent investigative steps and prosecutorial decisions.
The court emphasized that derivative use includes any influence on witness testimony, evidentiary development, or government strategy, requiring strict proof of a wholly independent source.

**United States v. Hubbell, 530 U.S. 27 (2000)**

A constitutional violation occurs when the compelled information leads the government to evidence it otherwise would not have obtained.

**United States v. Harris, 973 F.2d 333 (4th Cir. 1992)**

Harris makes clear that once a defendant establishes compelled testimony was given, the government bears the affirmative burden to demonstrate that every piece of evidence it seeks to use is derived from an independent, legitimate source.
A mere assertion of non-use is insufficient; the government must produce concrete evidence showing its investigation was not shaped by the compelled statements.

**Gilbert v. California, 388 U.S. 263 (1967)**

Gilbert affirms that evidence obtained through exploitation of compelled or unlawfully obtained statements is inadmissible, even in non-criminal proceedings.
The Court emphasized that derivative evidence must be excluded where the government's acquisition of it was facilitated by improperly compelled testimony.

**United States v. Slough, 641 F.3d 544 (D.C. Cir. 2011)**

Slough holds that derivative use extends to witnesses whose memories, testimony, or understanding of events may have been influenced, even unintentionally, by exposure to compelled statements.
The government must prove that each witness, investigative lead, and evidentiary decision was untainted, meaning wholly uninfluenced by compelled testimony.

These authorities relate to issues identified in the Ontario Divisional Court's discussion of compelled testimony and transcript redaction.

## V. INTERNATIONAL COMITY DOCTRINE

### *Hilton v. Guyot, 159 U.S. 113 (1895)*

Defines comity as the respect federal courts give to foreign adjudications involving the same parties, subject matter, and facts, where consistent with U.S. public policy.

### *Ungaro-Benages v. Dresdner Bank AG, 379 F.3d 1227 (11th Cir. 2004)*

The Eleventh Circuit affirmed comity as a basis for considering foreign decisions where parallel issues were litigated abroad.

### *Turner Entertainment Co. v. Degeto Film GmbH, 25 F.3d 1512 (11th Cir. 1994)*

Recognizes judicial efficiency and fairness as comity considerations.

**Societe Nationale Industrielle Aerospatiale v. U.S. Dist. Court**, 482 U.S. 522 (1987)
Reaffirmed that federal courts may consider foreign adjudications and procedures when addressing cross-border legal disputes.

These authorities concern how U.S. courts consider foreign adjudicative facts and foreign-law determinations consistent with the FRE 201(b) and Rule 44.1 Notices previously filed.


## VI. FLORIDA GOVERNANCE AUTHORITIES

### *Fla. Stat. § 607.0801(1)*

The business and affairs of a corporation are managed by or under the direction of its board of directors.

### *Fla. Stat. § 607.0801(2)*

All corporate powers shall be exercised by or under the authority of the board of directors of the corporation.

### *Fla. Stat. § 607.0841 (Officers' authority)*

Officers only have the authority delegated to them by the board.

### *In re Southeast Banking Corp., 69 F.3d 1539 (11th Cir. 1995)*

The Eleventh Circuit confirmed that **corporate control lies with directors and officers**, not with shareholders or investors.
The court emphasized that fiduciary and managerial authority flows from the board, not from equity ownership.

### *Citizens Nat'l Bank of St. Petersburg v. Peters, 175 So. 2d 54 (Fla. 2d DCA 1965)*

The court held that management authority rests in the board of directors, and shareholders do not possess operational control over the corporation's decisions. This decision affirms the statutory principle that governance authority is separate from ownership.

## VII. PURPOSE OF THIS NOTICE

This Notice:

- provides authorities relevant to issues already raised;
- is not a request for relief;
- is not a motion;
- and does not seek reconsideration.

Defendants reserve all rights to rely on these authorities in trial briefing, evidentiary objections, and motions made at the appropriate time, including motions pursuant to Federal Rule of Civil Procedure 50(a).

Dated: December 3rd, 2025

Respectfully,

James L. Goldberg

Pro Se Defendant

515 NW 120th St, Miami, FL 33168

james_goldberg@msn.com | (305) 785-6900

Troy R. J. Hogg

Pro Se Defendant

72859 Sunridge Crescent

Dashwood, Ontario, Canada

troyhogg2020@protonmail.com | (519) 330-6570

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 3 day of December, 2025, a true and correct copy of the foregoing,

1. **Joint Notice of Foreign Adjudicative Facts Pursuant to Fed. R. Evid. 201(b)(2);**

2. **Joint Notice of Additional Foreign-Law Authorities Pursuant to Fed. R. Civ. P. 44.1;** and

3. **Joint Notice of Supplemental Authorities.**

was served via email upon all pro se Defendants and via email upon counsel for Plaintiff and counsel for Defendant Stephen L. Braverman, as follows:

Max W. Barber, Pro Se

Emails: maximas24@me.com; 23blackbee@gmail.com

Counsel for Plaintiff — Securities and Exchange Commission

Alice K. Sum, Esq.

Securities and Exchange Commission

801 Brickell Avenue, Suite 1950

Miami, Florida 33131

Email: sumal@sec.gov

Served via email.

Counsel for Defendant Stephen L. Braverman

Russell Kerr, Esq.

Law Offices of Russell Kerr, P.A.

Email: rkerr@russellkerrlaw.com

Respectfully,

James L. Goldberg

Pro Se Defendant

515 NW 120th St, Miami, FL 33168

james_goldberg@msn.com | (305) 785-6900

Troy R. J. Hogg

Pro Se Defendant

72859 Sunridge Crescent

Dashwood, Ontario, Canada

troyhogg2020@protonmail.com | (519) 330-6570