**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA**

**Case No. 22-cv-23171-DAMIAN/D'ANGELO**

---

SECURITIES AND EXCHANGE COMMISSION,

      **Plaintiff,**

v.

ARBITRADE LTD.,
CRYPTOBONTIX INC.,
TROY R.J. HOGG,
JAMES L. GOLDBERG,
STEPHEN L. BRAVERMAN, and
MAX W. BARBER,

      **Defendants.**

---

### PLAINTIFF SECURITIES AND EXCHANGE COMMISSION'S RESPONSE IN OPPOSITION TO DEFENDANT MAX BARBER'S MOTION TO EXCLUDE TESTIMONY OF FAISAL AHMED AND "EXPERT REPORT"

Plaintiff Securities and Exchange Commission ("SEC") responds to Defendant Max Barber's Motion to Exclude Testimony of Faisal Ahmed and "Expert Report" ("Motion") [ECF No. 389] as follows:

### I.      INTRODUCTION

There is no basis to exclude the SEC's expert's testimony or Expert Report because Faisal Ahmed is qualified, his Expert Report and opinions are reliable, and they would be helpful to the jury. Barber's Motion injects multiple unsupported facts, contains mischaracterizations of the contents of the Report, the expert's experience, and the standards and practices in the gold industry. Barber's Motion also attempts to back-door *his own* "expert" opinion and arguments regarding standards in the gold bullion industry, *without Barber having disclosed his own expert*. Even

viewing Barber's arguments in the best light, he fundamentally misunderstands that cross-examination, presentation of contrary, admissible evidence (if any), and careful instruction on the burden of proof are the appropriate means of addressing expert testimony. Ultimately, objections to the purported inadequacies of expert evidence go to the weight of the evidence rather than its admissibility. Therefore, the Court should deny Barber's Motion in its entirety.

## II.     FACTUAL AND PROCEDURAL BACKGROUND

### A.  Relevant Procedural History

The SEC filed its Complaint on September 22, 2022 against Defendants Arbitrade Ltd. ("Arbitrade") and Cryptobontix Inc. ("Cryptobontix"), and their principals, Troy R.J. Hogg ("Hogg"), James L. Goldberg ("Goldberg"), and Stephen L. Braverman ("Braverman"), and a self-described international gold trader, Max W. Barber ("Barber"). *See* Complaint [ECF No. 1 at ¶¶ 1-2]. Arbitrade and Cryptobontix operated or planned to operate a variety of crypto asset related business ventures, including a crypto asset trading platform, a merchant payment platform, and a crypto asset mining operation. *Id*. at ¶ 18. The misconduct involved in this case centered on an Ethereum-based crypto asset that Arbitrade and Cryptobontix owned and controlled called "Dignity" or "DIG," which, during the relevant time, was traded exclusively on a Russia based crypto asset trading platform called "Livecoin." *Id*. at ¶ 17.

Between May 2018 and January 2019, Arbitrade and Cryptobontix, through Hogg, Goldberg, Braverman, and Barber made material misrepresentations and misleading statements to investors in a series of news and press releases and a press conference issued to the public. *Id*. at ¶ 3. Arbitrade and Cryptobontix, through Hogg, Goldberg, and Braverman, used the false and misleading releases and press conference to establish a market and generate demand for DIG on the Livecoin trading platform. *Id*. at ¶ 76. The releases falsely claimed, among other things, that

Arbitrade had acquired and received title to $10 billion in gold bullion through a purchase transaction with Barber and his company, SION Trading FZE ("SION"), and that the company intended to back each DIG token issued and sold to investors with $1.00 worth of this gold. *Id.* at ¶ 3. The releases also misrepresented that independent accounting firms had performed an "audit" of the gold and verified its existence. *Id.* Specifically, Arbitrade claimed to have "confirmed" a Safe Keeping Receipt ("SKR") of the gold through "direct confirmation from the independent secure vaulting company." *Id.* at ¶ 67. Arbitrade hired two accounting firms, Elliott Davis, LLC ("Elliott Davis") and BDO USA, LLP ("BDO") to confirm the issuance of/authenticate the SKR. *Id.* at ¶¶ 42-44. Arbitrade did not engage either firm to confirm the existence, location, ownership, or origin of the gold itself or to determine whether SION actually possessed real, much less transferable, ownership rights or title to gold bullion. *Id.*

On March 5, 2024, the SEC submitted the Expert Report ("Report") of Faisal Ahmed ("Ahmed") in support of this case. The Report is attached hereto as **Exhibit 1**. On March 11, 2025, the SEC served a supplement to Ahmed's Report, including an update on his Professional Experience since he issued his Report ("Addendum to Resume"), a "List of documents relied upon in the Expert Report outside of the defendants' documents" ("List of Documents"), and said documents. The Addendum to Resume and List of Documents are attached hereto as **Composite Exhibit 2**. On March 12, 2025, Defendants Hogg and Braverman conducted the deposition of Ahmed for more than five hours. The transcript of Ahmed's deposition conducted on March 12, 2025 is attached hereto as **Exhibit 3** ("Ahmed 3/12/25 Depo Tr."). On June 11, 2025, Defendants Barber and Goldberg conducted the continued deposition of Ahmed for approximately three hours. The transcript of Ahmed's deposition conducted on June 11, 2025 is attached hereto as **Exhibit 4**. ("Ahmed 6/11/25 Depo Tr.")

**B. Ahmed's Qualifications and Report**

*1. Ahmed's Qualifications*

As part of his Report, Ahmed detailed his qualifications and attached his Resume as Exhibit A, and Ahmed supplemented his Resume with experience since he issued his Report.  Exhibit 1 at pp. 3, 21-22; Exhibit 2.

Ahmed has over 25 years of experience in financial crime compliance, anti-money laundering, tax advisory and auditing.  In the past six years, he has extensively serviced the gold industry, advised clients on regulatory compliance, conducted compliance reviews and audits, led accounting and taxation assignments, and worked closely with regulators, such as the United Arab Emirates ("UAE") Ministry of Economy ("MoE"), Dubai Multi Commodities Center ("DMCC"), Dubai Chamber of Commerce, The Central Bank of UAE ("CBUAE"), Executive Office of Anti-Money Laundering and Countering the Financing of Terrorism, and Emirates Bullion Market Committee ('EBC"), to train and build the capacity of the various actors in the gold sector to strengthen compliance and internalize responsible business conduct. Ahmed is also an accredited auditor for the UAE Good Delivery Standards for the gold and precious metals sector governed by the EBC.  Ex. 1 at p. 3 and Comp. Ex. 2 at p. 1.

Ahmed is the Group Head of Compliance for one of the top UAE Good Delivery Gold and Precious Metals refineries in the UAE, SAM Precious Metals Fz-LLC.  In the past four years, he also led the team of compliance and financial accounting specialists at AKW Consultants to service several UAE based and international gold and precious metals sector refineries and trading companies including companies engaged in importing, exporting, refining, assaying, and mining of gold.  Finally, Ahmed leads a company named NOVA Information Technology LLC, which is engaged with a gold and precious metals refinery in the UAE to develop a robust end-to-end

4

management systems software to cover the entire supply chain, operations, and compliance elements pertaining to gold trading business.  *Id.*

Ahmed has planned, executed, and concluded more than eleven annual independent third-party reviews on behalf of the MoE for assessing the refinery's compliance with the MoE Due Diligence Regulations for Responsible Sourcing of Gold. Additionally, Ahmed leads a team of professionals specializing in site-based due diligence for responsible sourcing of gold. Under his guidance, the team has conducted several supply chain compliance and integrity reviews in Africa and Latin America covering mines, processing plants and refineries, which included both financial and non-financial due diligence engagements.  Comp. Ex. 2 at p. 1.

### 2.  *Ahmed's Report*

Ahmed's 20-page Report offers five primary opinions on the purported gold transaction and the verification of gold in this case, which he stated are based on his "experience in the gold sector conducting compliance, accounting, bookkeeping, process reviews, transaction and document monitoring, management systems design," and "in practice."  Ex. 1 at pp. 6, 7, 12, 19. They are:

1.  Defendants should have conducted the customer due diligence ("CDD")/know your customer ("KYC") checks on SION and its owner, verified the physical existence of gold, its weight and purity to determine its worth, and obtained information on where was it being vaulted.

2.  Defendants' hiring of two accounting firms, Elliott Davis and BDO, to verify the G4S SKR did not comport with the Standards and Rules. Defendants' failure to follow the standard procedures and the verification process is further highlighted by the fact that another firm Defendants attempted to hire, Bureau Veritas, a company that specializes in inspection and certification services, refused to accept the engagement when it became clear that Arbitrade wanted the firm to issue its opinion without conducting any physical examination of the gold.

3.  Vaulting service providers in Dubai generally avoid issuing SKRs.  Such requests are usually declined.  In this instance, it would be highly unusual

practice to vault an SKR because of the amount of gold—395 metric tons—involved in the transaction.  If an SKR is to be vaulted there are well defined procedures that were not followed in this case.

4. Other than the SKR as purported proof of Arbitrade's claim that it had acquired title to $10 billion worth of gold, there are no other gold industry accepted documentation that substantiate the existence of the gold.

5. Even if vaulting SKRs was an acceptable practice and Defendants only needed to verify the authenticity of the SKR, there are multiple inconsistencies and red flags that arose during the transaction and exist in the other transaction documents.

*Id.* at p. 7.

Ahmed's Report and List of Documents detail the standards and rules that govern the gold industry, including among others the UAE Gold Delivery Standard, London Bullion Market Association Standards, international auditing and accounting standards, and standards for verification and secure and safe vaulting of gold.  The Report also progresses through the facts and evidence in this case relevant to the purported gold acquisition and what Defendants did (or did not do) to conduct the transaction, which ultimately served as the basis for the misrepresentations identified in the SEC's Complaint.  Ahmed's Report also then applies his extensive experience and knowledge of the applicable standards and rules to the evidence in this case to support his five opinions in this case and his ultimate conclusion that the "process used by Defendants to verify the gold—by only verifying the SKR—did not comport with Standards and Rules of the gold industry.  Even if the process employed by Defendants to verify the SKR did comport with Standards and Rules of the gold industry, there were multiple inconsistencies and red flags that occurred during the transaction or were contained in the documentation, and the transaction documents do not support Arbitrade's claim that it acquired and received title to $10 billion in gold bullion." *Id.* at pp. 19-20.

### III. <u>ARGUMENT AND MEMORANDUM OF LAW</u>

**A.  *Daubert* Standards**

Federal Rule of Evidence 702 states:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Fed. R. Evid. 702.

Implementing Rule 702, *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993), requires district courts to ensure that any and all scientific testimony or evidence admitted is both relevant and reliable.  *See id.* at 589–90.  The *Daubert* analysis also applies to non-scientific expert testimony.  *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999).  Therefore, the Court must determine whether: (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable; and (3) the testimony will assist the trier of fact to understand the evidence or determine a fact in issue.  *City of Tuscaloosa v. Harcros Chems., Inc.*, 158 F.3d 548, 562 (11th Cir. 1998). (reversing district court's exclusion of portion of expert testimony).  The party seeking to admit the expert testimony bears the burden of laying the proper foundation for its admissibility by a preponderance of the evidence.  *Allison v. McGhan Medical Corp.*, 184 F.3d 1300, 1306 (11th Cir. 1999).

Although the Court must conduct a *Daubert* inquiry, *Daubert* itself stresses that the inquiry envisioned by Rule 702 "is a flexible one." *Maiz v. Varani*, 253 F.3d 641, 665 (11th Cir. 2001) (affirming district court admission of expert testimony).  "Many factors will bear on the inquiry,

7

and there is no definitive checklist or test." *Id.* Furthermore, Rule 702 generally favors the admission of expert testimony. *Daubert*, 509 U.S. at 588 (the general approach is one "of relaxing the traditional barriers to opinion testimony"); *Arcoren v. U.S.* 929 F.2d 1235, 1239 (8th Cir. 1991) ("Rule 702 is one of admissibility rather than exclusion" and affirming district court admission of expert testimony); *Miles v. Gen. Motors Corp.*, 262 F.3d 720, 724 (8th Cir. 2001) ("doubts regarding whether an expert's testimony will be useful should generally be resolved in favor of admissibility" and finding district court properly admitted expert testimony over *Daubert* challenge to qualifications and reliability); *SEC v. Johnson*, 525 F. Supp. 2d 70, 73 (D.D.C. 2007) (*Daubert* envisions a "limited gatekeeper role" for trial judges, admitting expert testimony over *Daubert* challenge).

Furthermore, "[a] district court's gatekeeper role under *Daubert* is not intended to supplant the adversary system or the role of the jury." *Maiz*, 253 F.3d at 666.  Rather, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means" of addressing expert testimony.  *Id.* The Eleventh Circuit has observed that "in most cases, objections to the inadequacies of [expert evidence] are more appropriately considered an objection going to the weight of the evidence rather than its admissibility." *Rosenfeld v. Oceania Cruises, Inc.*, 654 F.3d 1190, 1193 (11th Cir. 2011) (internal quotation marks omitted) (reversing district court ruling excluding expert testimony).

"[T]he trial judge must have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable." *Kumho*, 526 U.S. at 152. Whether to admit expert testimony is "left to the broad discretion of the district court." *Montgomery v. Aetna Cas. & Sur. Co.*, 898 F.2d 1537, 1541 (11th Cir. 1990).  In *United States v. Brown*, 415 F.3d 1257, 1268-69 (11th Cir. 2005), for example, the District Court admitted the

testimony of two government expert witnesses, even though some of the factors *Daubert* identifies to determine reliability of expert testimony were not present.  In affirming this decision, the *Brown* court noted that: "'whether *Daubert*'s specific factors are, or are not, reasonable measures of reliability in a particular case is a matter that the law grants the trial judge broad latitude to determine.'" *Id.* (*citing Kumho,* 526 U.S. at 153).  The *Brown c*ourt further stated that its "conclusion is consistent with the 'liberal thrust of the Federal Rules and their general approach of relaxing the traditional barriers to opinion testimony.'" 415 F.3d at 1268.

**B.  Ahmed's Report and Testimony Are Admissible under *Daubert***

*1.  Ahmed is Qualified Under Daubert*

The first question under *Daubert* is whether the proposed expert witness is qualified to testify competently regarding the matters he intends to address.  *City of Tuscaloosa*, 158 F.3d at 563.  An expert may be qualified "by knowledge, skill, experience, training, or education." Fed. R. Evid. 702. "Determining whether a witness is qualified to testify as an expert 'requires the trial court to examine the credentials of the proposed expert in light of the subject matter of the proposed testimony.'"  *Clena Invs., Inc. v. XL Specialty Ins. Co.*, 280 F.R.D. 653, 661 (S.D. Fla. 2012) (quoting *Jack v. GlaxoWellcome, Inc.*, 239 F. Supp. 2d 1308, 1314–16 (N.D. Ga. 2002)).  "This inquiry is not stringent, and so long as the expert is minimally qualified, objections to the level of the expert's expertise [go] to credibility and weight, not admissibility."  *Id.* (citations and internal quotation marks omitted).

Barber claims that Ahmed is not qualified and summarily portrays Ahmed as "perhaps a generalist in finance."  Motion at p. 7.  Barber's argument ignores the portions of the Report and Supplement that detail Ahmed's extensive experience in the gold industry.  In addition to over 25 years of experience in financial crime compliance, anti-money laundering, tax advisory and

auditing, Ahmed has –in the past six years—extensively serviced the gold industry, advised clients on regulatory compliance, conducted compliance reviews and audits, led accounting and taxation assignments, and worked closely with regulators, especially in the UAE, where the purported gold was being stored per the SKR.[1]  Ex. 1 at p. 3 and Comp. Ex. 2 at p. 1.

Ahmed is the Group Head of Compliance for AKW Consultants, one of the top UAE Good Delivery Gold and Precious Metals refineries in the UAE, and in the past four years, he also led the team of compliance and financial accounting specialists at AKW Consultants to service several UAE based and international gold and precious metals sector refineries and trading companies including companies engaged in importing, exporting, refining, assaying, and mining of gold. Ahmed has planned, executed, and concluded more than eleven annual independent third-party reviews on behalf of the MoE for assessing the refinery's compliance with the MoE Due Diligence Regulations for Responsible Sourcing of Gold. Additionally, Ahmed leads a team of professionals specialising in site-based due diligence for responsible sourcing of gold. *Id.*

Barber attempts to criticize the Report, claiming that it does not confirm the jurisdiction where the Report arises from, no "legal trade license" has been produced, and there is no "professional stamp or trade license stamp endorsing" the Report.  Yet Barber fails to explain from where these legal requirements arise, likely because there are no such requirements.  Furthermore, Barber never requested any such documentation in discovery even though the Report was produced on March 5, 2024.

Barber also claims, without any support, that Ahmed's "generalized expertise does not extend to the specialized interplay of LBMA, OECD, and ISA 501 in international gold

---

[1] The SKR is attached as **Exhibit 5**.

transactions."  He ignores pages 6-13 of the Report where Ahmed details his experience and the standards he applied:

> Based upon my experience in the gold industry, including conducting regulatory compliance reviews and audits, accounting and taxation assignments, and working with the Industry regulators such as MoE and DMCC in the UAE to provide specialist compliance training in gold sector compliance, I understand the standards and rules that apply to the sector and have firsthand knowledge of the existing practices related to record keeping, mining, processing, trading, assaying, refining, transportation, accounting, purchasing, transferring, and vaulting of gold. My experience also includes the necessary steps for identifying, assessing, and mitigating the risks associated with each of these processes and the documents and records that must be maintained to demonstrate compliance.  **I applied the standards, rules, and regulations (Standards and Rules, Section IV.D., infra) that are in use and applicable in the context of this case** to ascertain if Defendants' actions comported with the international standards and code of practices governing the gold sector.

(Emphasis added.)

Thus, there is no question that Ahmed is qualified to provide his opinions on the purported gold transaction in this case and whether Defendants' actions comported with standards and practices in the gold industry.

### 2.  Ahmed's Opinion is Reliable

The second question under *Daubert* is whether the expert's testimony is reliable.  An expert may "properly base his testimony on 'professional study or personal experience.'" *Maiz*, 253 F.3d at 669.  Further, "[a] district court may decide that nonscientific expert testimony is reliable based upon personal knowledge or experience." *Am. Gen. Life. Ins. Co. v. Schoenthal Family, LLC*, 555 F.3d 1331, 1338 (11th Cir. 2009); *see also National Indemnity Company of the South v. Discount Rock & Sand, Inc.*, Case No 21-10081-CIV-Graham, 2024 WL 1329378 at * 3 (S.D. Fla March 6, 2024) (denying motion to exclude expert because the expert's testimony was based on her "professional study or personal experience").  Experts relying on experience must explain "how

that experience is reliably applied to the facts.'" *United States v. Frazier*, 387 F.3d 1244, 1261 (11th Cir. 2004) (citations omitted).

Ahmed used his collective 25 years of experience in financial crime compliance, anti-money laundering, tax advisory and auditing, as well as six years of extensively servicing the gold industry, including advising clients on regulatory compliance and conducting compliance reviews and audits, to opine on whether the evidence in this case shows that Defendants did not comport with international standards and code of practices governing the gold sector and to reach his five primary opinions. Put simply, his experience conducting audits and compliance reviews in the gold industry for various stakeholders, including the UAE MoE and private clients, gives him the ability to specifically opine on Defendants' conduct with respect to the purported gold transaction. Ahmed's opinion is sound because it is based on his extensive experience and knowledge of the standards and practices in the gold industry, and he reviewed the transaction documents and other evidence related to the conduct at issue during the relevant time period.

Barber uses multiple pages of his Motion to criticize Ahmed's identification of red flags in the transaction, which comprises less than one page of Ahmed's Report on the fifth opinion offered. Barber injects his own unsubstantiated facts and analysis of why *he* believes a portion of Ahmed's fifth opinion is wrong or unsupported. Barber did not disclose a rebuttal expert or produce a rebuttal expert report. In effect, Barber attempts to back-door a rebuttal expert opinion – *his own* – regarding gold industry standards. But contrary to Barber's assertions, Ahmed's opinions are not *ipse dixit*. On the face of the Report, Ahmed states that his opinion is based on his extensive experience in the gold industry conducting audits and compliance reviews coupled with his understanding of the relevant standards. Ahmed's expertise is uniquely suited for this case because it resides at the intersection of his auditing and regulatory compliance experience, as well as his work leading the

12

team of compliance and financial accounting specialists at AKW Consultants to service several UAE based and international gold and precious metals sector refineries and trading companies including companies engaged in importing, exporting, refining, assaying, and mining of gold.

Even if this Court were to accept Barber's unsupported statements regarding vault size, the Affidavit of Mike Farhat, or the Memorandum of Understanding, these would be factual disagreements, at best, between Ahmed and Barber. Case law is clear that a *Daubert* motion is not the appropriate venue to decide factual disagreements among experts (not that Barber has disclosed one). That goes to the weight of the evidence and any doubts as to the usefulness of the testimony should "be resolved in favor of admissibility." *United States v. Finch*, 630 F.3d 1057, 1062 (8th Cir. 2011) (district court properly admitted expert testimony); *Hangarter v. Provident Life and Acc. Ins. Co.*, 373 F.3d 998, 1017 n. 14 (9th Cir. 2004) ("The factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility, and it is up to the opposing party to examine the factual basis for the opinion in cross-examination" and finding district court correctly allowed testimony of expert based on qualifications and experience); *Packard v. City of New York*, Case No. 15-cv-7130, 2020 WL 1479016 at *3 (S.D.N.Y March 25, 2020) ("Disputes as to the strength of [an expert's] credentials, faults in his . . . methodology, or lack of textual authority for his opinion, go to the weight, not the admissibility, of his testimony") (rejecting defendants' *Daubert* challenge to plaintiff's expert on qualification, reliability, and helpfulness grounds) (quoting *McCullock v. H.B. Fuller Co.*, 61 F.3d 1038, 1044 (2nd Cir. 1995) (affirming admission of expert testimony)); *United States v. Lawton*, 84 F. Supp. 3d 331, 339-40 (D. Vt. 2015) (denying defendants' motion *in limine* and noting that "the rejection of [expert testimony] is the exception rather than the rule"); *Synergetics v. Hurst*, 477 F.3d 949, 956 (8th Cir. 2007) ("mere disagreement with the assumptions and methodology used does not warrant exclusion of expert testimony" and holding district court

did not abuse discretion in admitting expert testimony on damages where expert was qualified and explained his methodology, and defendants were able to challenge the methodology on cross-examination).

a.   <u>The SEC Has Not Cherry-Picked Evidence</u>

First, Barber complains that the SEC and Ahmed have "cherry-picked" facts and data. As a threshold matter, there is no legal requirement for an expert to review every single document produced in litigation. To the extent that an opposing party believes that there is *admissible* evidence that an expert should have reviewed, the expert can be questioned about such evidence on cross-examination. Here, Barber repeats an unsupported claim that there were "substantial portions of discovery (e.g., 75,000 documents, amounting to 23 gigabytes)" that were purportedly not reviewed by the expert. Despite the SEC providing the Bates stamp ranges for his document productions (totaling no more than 9,000 pages) and repeatedly demanding via email that Barber provide evidence that he produced 75,000 documents during the investigation/litigation, Barber has never substantiated his claims.[2] And, Barber does not identify specifically what documents from the purported 75,000 document production that should have been reviewed by the expert.

Next, Barber complains that Ahmed should have considered the Affidavit of Michael Farhat from 2022.[3] Again, the SEC was not required to provide this Affidavit to its expert. The SEC maintains that the Affidavit was neither relevant nor admissible. The Affidavit vaguely references Mr. Farhat having "physically seen, touched and inspected the gold bullion assets of Dr Bokhem" and "viewed the transfer of Title personally" based on a meeting in "late July 2008 in Indonesia."

---

[2] Barber has repeatedly made these claims without substantiation to the Court, and the SEC has refuted them. [ECF No. 338 at p. 10]

[3] Barber fails to disclose to the Court that Mr. Farhat passed away in March 2024, was never deposed, and no testimony from Mr. Farhat will be presented at trial.

There is nothing connecting the statements in Mr. Farhat's Affidavit that he inspected gold bullion in 2008 with the purported 395,000 kg/$10 billion in gold bullion at issue in 2018. Even if the Affidavit or its contents were relevant and admissible—which they are not—the appropriate manner to address this is to cross-examine the expert, not exclude his testimony.

b.   The Expert Did Not Rely On Pleadings Without Independent Verification

Barber further misunderstands the Report by jumping to the conclusion that the expert accepted the contents of SEC's Complaint and Defendants' Answers and Affirmative Defenses as true for the purposes of his opinion. To the contrary, in the section "Basis for Opinion and Documents Reviewed," the expert included the SEC's Complaint and Defendants' Answers and Affirmative Defenses among other materials and documents that he reviewed. Ex. 1 at p. 4. There is nothing surprising or prejudicial about the SEC providing copies of the operative pleadings— including Defendants' Answers and Affirmative Defenses—so that the expert could understand the respective positions of the parties. There simply is no basis for Barber's claim that the expert failed to make independent factual validation, an issue that Barber could easily address on cross-examination.

c.   The Expert Reviewed the MOU and Many Other Documents and Relied On His Experience for His Opinion on Logistics and Vaulting

Barber's next assertion that the expert opinion is unreliable because the expert was not hired to interpret the Memorandum of Understanding (MOU) is similarly unsupported and a mischaracterization of how the expert reached his opinions. Among many other documents, Ahmed reviewed the MOU[4] and the Safekeeping Receipt (SKR). Ex. 1 at pp. 23-25. Ahmed also reviewed

---

[4] Barber's argument that the MOU provides for a "15-year plan where Arbitrade would purchase the gold over time" directly contradicts the November 5, 2018 press release where Arbitrade claims to have received title to 395,000 kgs of gold bullion.

the November 5, 2018, press release (attached hereto as **Exhibit 5**), which states that "Arbitrade Ltd. has received title of gold bullion store at an independent security facilities in the amount of 395,000 kgs with a current market value in excess of $10 Billion U.S."   One of Ahmed's opinions is that "Vaulting service providers in Dubai generally avoid issuing SKRs.  Such requests are usually declined.  In this instance, it would be highly unusual practice to vault an SKR because of the amount of gold—395 metric tons—involved in the transaction.  If an SKR is to be vaulted there are well defined procedures that were not followed in this case."  Ex. 1 at p. 7.  Ahmed's opinion describes how, for example, if 395,000 kg of gold is "stacked one on top of one another" it would require a vault that is 65 feet by 65 feet in dimension, but the floor would not be able to hold that weight.  Even though the specific mathematical calculation of the dimensions of such a vault was not spelled out, Barber can cross-examine the expert.  Regardless, the expert—based on his extensive experience—can say that the vaulting services in Dubai do not have the capacity to hold 395,000 kg of gold.

> d.  <u>The SEC Produced the Communications Involving BDO and SION, Which the Expert Listed in His Report</u>

Barber's next argument attempts a game of "gotcha" with the expert, claiming that the expert did not specifically identify the communication when "SION told BDO to drop its request for a video conference with the G4S employee" during the deposition.  The SEC produced all documents that it sent to Ahmed to Defendants, including two email chains involving BDO, and the Report specifically listed "Emails exchanged with BDO," so it is not a mystery which documents support this opinion.  There is nothing improper about the expert stating that he would "have to take time to look into all the emails I've reviewed," and Barber did not provide the expert with a break to do so.  Again, the appropriate treatment is for Barber to cross-examine the expert, not to exclude the expert.

e.  Barber Attempts to Back-Door a Rebuttal Expert Opinion

Despite not disclosing an expert or producing a rebuttal expert opinion, Barber attempts to substitute his own arguments and opinions in order to undermine the SEC's expert.  Barber's arguments regarding purported requirements under the London Bullion Market Association (LBMA), the Organization for Economic Cooperation and Development (OECD), and International Standards on Auditing (ISA), as well as the propriety of security protocols at G4S and the necessity of a video conference with G4S (Motion at pp. 11-17) are nothing more than a rebuttal expert opinion in disguise.  The issues raised by Barber—such as what is the acceptable commercial use of an SKR, how to apply the LBMA and OECD frameworks, whether a video call with G4S was necessary, and whether physical inspection is required under ISA standards—are all within the province of a properly disclosed expert report, not *Barber's* unsupported "expert" opinion.[5]  This Court should reject Barber's attempts to inject his own opinions of how the gold bullion industry does or should operate.

f.  The Purported Photographic Evidence Is Irrelevant

Barber criticizes the expert's position that the photographs and documents at Exhibits 6 and 7 to Barber's Motion were not relevant.  Motion at pp. 29-33.  The SEC produced these photographs to the expert, who included them in the list of "documents reviewed and relied upon" as part of "Max Barber Document Production."  Ex. 1 at pp. 23-24.  Regarding Exhibit 6, these are photographs of purported gold bullion produced by Barber reflecting dates in February 2021, which is well after the relevant period between 2018-2019.  Exhibit 7 contains unauthenticated photographs and documents that date back to 1966.  Setting aside that the SEC has moved to exclude

---

[5] The SEC filed an Omnibus Motion *in Limine* that sought, among other things, to exclude "expert" or improper lay opinion testimony from Barber.  [ECF No. 338]

these documents and they are likely inadmissible at trial, the appropriate way to address these documents is for Barber to cross-examine the expert, not to exclude the expert's testimony.

### 3. Ahmed's Testimony Will be Helpful to the Jury

The last question under *Daubert* is whether the expert's testimony will be helpful to the trier of fact.  Expert testimony must "assist[] the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue." *City of Tuscaloosa*, 158 F.3d at 563-64 (citations omitted).

Ahmed's testimony without doubt be helpful to the jury to understand the purported gold transaction, the standards and procedures in the gold industry that applied to the transaction, and whether Defendants' conduct comported with said standards and procedures.  Ahmed's Report extensively details standards and procedures in the gold industry that applied to the transaction, information that would not be in the common knowledge of lay people. *See, e.g., Highland Capital Management, L.P., v. Schneider*, 551 F. Supp. 2d 173, 182 (S.D.N.Y. 2008) (holding that an expert "may testify as to the customs and practices of the industry" because such testimony was "relevant to this case and may prove helpful to the jury").  Ahmed's Report offers specialized insight into the precious metals sector.  His testimony is both admissible and helpful to a jury that likely has never encountered a gold transaction purportedly taking place in the UAE at the size (395,000 kilograms or 870,826 pounds of gold) and value ($10 billion USD) in this case.  His testimony is helpful to understand the scale of the purported transaction, which is more than the gold reserves of the United Kingdom and the UAE *combined*.  Exhibit 1 at p. 13.  His testimony will also help the jury understand why Defendants' decision to audit only the SKR and not the physical gold fell well below the standards and practices in the gold industry, a failure that belies Defendants'

misrepresentations about acquiring title to $10 billion in gold bullion that was allegedly properly audited.

### a. The Expert's Opinion is Not Speculation and He Did Not Exceed the Scope of His Engagement or His Expertise

Barber accuses the expert of straying far beyond his expertise and the defined scope of work. This is patently incorrect and obvious on the face of the Report, which clearly explains the expert's experience, the extensive documents he reviewed, and the five (5) opinions he reached.  Each opinion is supported by the documents and materials the expert reviewed, his experience, and the standards relevant to the "record keeping, mining, processing, trading, assaying, refining, transportation, accounting, purchasing, transferring, and vaulting of gold." Ex. 1 at p. 6.  There is no dispute that the SEC did not hire the expert to conduct a forensic investigation regarding the existence of the 395,000 kg of gold bullion.  Instead, the SEC retained the expert to explain the standards in the gold bullion industry and whether Defendants' actions comported with them. Nowhere in the Report does Ahmed state or imply that he assumed that the SKR was fraudulent or the gold did not exist.  Thus, there is no "analytical gap between the data and the conclusion."

### b. Barber Mischaracterizes the Expert's Methodology

Again, Barber has not disclosed an expert and cannot attempt an end-around.  His argument that the expert's methodology of conducting new audits based on LBMA standards is irrelevant because the "assets in question are LBMA registered and hallmarked" can only be advanced through a rebuttal expert opinion.  First, whether the purported gold bullion was already properly verified is certainly a disputed fact.  The only purported evidence of the gold bullion allegedly being LBMA registered and hallmarked are unauthenticated and inadmissible documents and photographs from 1966.    Second, whether relying on a purported LBMA registration from 1966 instead of conducting a physical audit for the 2018 transaction complies with gold industry

standards is within the purview of an expert, not Barber's own opinion. Criticism of the factual basis for an expert's opinion is not grounds for exclusion under *Daubert. Rosenfeld*, 654 F.3d at 1193 (objections to the inadequacies of expert evidence go to the weight of the evidence rather than its admissibility). To be excluded, an expert's testimony must be so "fundamentally unsupported" that it cannot assist the fact-finder. *Finch*, 630 F.3d at 1062. Ultimately, these are arguments that can be pursued at trial by cross-examining Ahmed, to the extent the evidence underlying the argument are admissible. *Hangarter*, 373 F.3d 998 at 1017 n.14.

   c. <u>The SEC Is Not Attempting to Bootstrap Its Expert's Opinion to the Fraud Allegations</u>

Barber fundamentally misunderstands the SEC's "fraud" claim, or he is mischaracterizing it to fit his narrative. Among other things, the SEC has alleged that Defendants made materially false and misleading statements in news releases regarding the acquisition and audits of the gold or aided and abetted the misrepresentations. The SEC's expert will explain how a gold bullion acquisition is supposed to be conducted and why Defendants' actions did not comport with these standards. Whether the "gold transaction was a sham" is not within the scope of the expert's opinion and testimony, and Barber is manufacturing an issue that does not exist.

As such, Ahmed's testimony satisfies the third *Daubert* prong, and Barber's request to exclude Ahmed's Report and testimony should be denied.

## IV.   <u>CONCLUSION</u>

For all of the foregoing reasons, there is no justification for excluding or limiting any of Ahmed's opinions, his Report, or his testimony at trial. The Court should deny Barber's Motion in its entirety.

December 9, 2025

Respectfully submitted,

/s/Alice Sum
Alice Sum, Esq.
Senior Trial Counsel
Florida Bar No. 354510
801 Brickell Avenue, Suite 1950
Miami, Florida 33131
Phone: (305) 416-6293
Email: sumal@sec.gov

*Attorneys for Plaintiff*
SECURITIES AND EXCHANGE COMMISSION

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of the foregoing was served this 9th day of December 2025, on counsel for Stephen Braverman via CMECF and all parties in the manner denoted below.

Troy R.J. Hogg, *pro se*
E-mail: troyhogg2020@protonmail.com

James L. Goldberg, *pro se*
E-mail: james_goldberg@msn.com

Max W. Barber, *pro se*
Email: maximas24@me.com; 23blackbee@gmail.com

/s/Alice Sum
Alice Sum