

EXHIBIT

1

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO.: 22-cv-23171-BLOOM/Torres**

**SECURITIES AND EXCHANGE COMMISSION,**

      **Plaintiff,**

**v.**

**ARBITRADE LTD.,**
**CRYPTOBONTIX INC.,**
**TROY R.J. HOGG,**
**JAMES L. GOLDBERG,**
**STEPHEN L. BRAVERMAN, and**
**MAX W. BARBER,**

      **Defendants.**

# EXPERT REPORT OF FAISAL AHMED ON BEHALF OF SECURITIES AND EXCHANGE COMMISSION

**Prepared by:**
**Faisal Ahmed**
**Date: March 05, 2024**

# EXPERT REPORT OF FAISAL AHMED

## Table of Contents

I.    Qualifications ..................................................................................................................3

II.   Engagement ....................................................................................................................4

III.  Basis for Opinion and Documents Reviewed...............................................................4

IV.   Opinion ...........................................................................................................................5

    A.   SEC's Complaint .........................................................................................................5

    B.   Defendants' Answers and Affirmative Defenses .........................................................6

    C.   Executive Summary......................................................................................................6

    D.   Standards and Rules .....................................................................................................8

        1.   In the Gold Industry...............................................................................................8

        a.   UAE Good Delivery Standard...............................................................................8

        b.   London Bullion Market Association Standards .....................................................9

        c.   OECD Due Diligence Guidance for Responsible Supply Chains of Minerals from
Conflict-Affected and High-Risk Areas ......................................................................10

        2.   International Auditing and Accounting Standards .................................................10

        a.   International Accounting Standard 16 of the IFRS ...............................................11

        b.   International Standard on Auditing 501 Audit Evidence .....................................11

        3.   Standards for Verification and Secure and Safe Vaulting of Gold.......................12

    E.   Findings .......................................................................................................................13

        1.   Defendants' Attempted Verification Of The SKR Did Not Comport With Standards
And Rules .....................................................................................................................14

        2.   Even If Verification Of The SKR Comported With Standards And Rules, There Were
Inconsistencies And Red Flags, And The Transaction Documents Do Not Support
Arbitrade's Claim That It Had Acquired And Received Title To $10 Billion In  Gold
Bullion .........................................................................................................................16

V.    CONCLUSION .............................................................................................................19

Attachment A: Résumé........................................................................................................21

Attachment B: Documents reviewed and relied upon ........................................................23

# EXPERT REPORT OF FAISAL AHMED

## I.      Qualifications

My experience and qualifications are set forth in the attached Resume (*See* **"Attachment A").** Overall, I have over 24 years of experience in financial crime compliance, anti-money laundering, tax advisory and auditing. In the past five (5) years, I have extensively serviced the gold industry, advised clients on regulatory compliance, conducted compliance reviews and audits, led accounting and taxation assignments, and worked closely with the regulators, such as the United Arab Emirates ("UAE") Ministry of Economy ("MoE"), Dubai Multi Commodities Center ("DMCC"), Dubai Chamber of Commerce, The Central Bank of UAE ("CBUAE"), Executive Office of Anti-Money Laundering and Countering the Financing of Terrorism, and Emirates Bullion Market Committee ('EBC'), to train and build the capacity of the various actors in the gold sector to strengthen compliance and internalize responsible business conduct. I am also an accredited auditor for the UAE Good Delivery Standards for the gold and precious metals sector governed by the EBC.

I act as the Group Head of Compliance for one of the top UAE Good Delivery Gold and Precious Metals refineries in the UAE, SAM Precious Metals Fz-LLC. In the past three (3) years, I have also led the team of compliance and financial accounting specialists at AKW Consultants to service several UAE based and international gold and precious metals sector refineries and trading companies including companies engaged in importing, exporting, refining, assaying, and mining of gold.

I lead a company named, NOVA Information Technology LLC, which is engaged with a gold and precious metals refinery in the UAE to develop a robust end-to-end management systems software to cover the entire supply chain, operations, and compliance elements pertaining to gold trading business.

In the past five (5) years, I have not testified as an expert at trial. I have authored articles in the past ten (10) years.

## EXPERT REPORT OF FAISAL AHMED

II.  <u>**Engagement**</u>

I was engaged by the Securities and Exchange Commission ("SEC") Miami Regional Office, to be an expert witness in this case. Specifically, I have been asked to render an opinion on whether the actions of Defendants Arbitrade Ltd. ("Arbitrade") and Cryptobontix Inc. ("Cryptobontix"), and their principals, Troy R. J. Hogg ("Hogg"), James L. Goldberg ("Goldberg"), and Stephen L. Braverman ("Braverman"), related to Arbitrade purportedly acquiring and receiving title to $10 billion in gold bullion, through a purchase transaction with Defendant Max W. Barber ("Barber") and his company, Relief Defendant SION Trading FZE ("SION"), comported with the international standards and code of practices governing the gold sector.

Within rendering such an opinion, I was asked to examine the transaction documents related to the case and provide/explain the necessary processes that must be adhered to while dealing in gold bullion that is widely acceptable in the industry and satisfies the legal and regulatory requirements governing the sector. I have been asked to explain the standard industry procedures in the gold sector, and if any rules of standardization exist. I have also been asked to explain if the conduct of the Defendants comported with the international standards and code of practices governing the gold sector. Finally, I have been asked to explain the process that should have been undertaken to verify the physical existence of 395 metric tons of gold.

My compensation for this case is at the rate of $1,000 per hour and is not contingent on the outcome of the case.

III.  <u>**Basis for Opinion and Documents Reviewed**</u>

The observations and opinions expressed in this report are based upon my extensive experience in the accounting, taxation, audit, and compliance engagements conducted in the UAE and global gold and precious metals sector, the standards and rules applicable in the gold industry, my understanding of the facts of the case, and my review of the SEC's Complaint for Injunctive and Other Relief ("Complaint") against the Defendants, Defendants' Answers and Affirmative

# EXPERT REPORT OF FAISAL AHMED

Defenses,[1] certain documents and communications, relevant statutory requirements, and market intelligence (*See* **Attachment B**).

## IV.   <u>Opinion</u>

### A.   **The SEC's Complaint**

The SEC has alleged, in part:

- Arbitrade, Cryptobontix, Hogg, Goldberg, Braverman, and Barber perpetrated a crypto asset pump-and-dump scheme.

- Arbitrade and Cryptobontix, through Hogg, Goldberg, Braverman, and Barber, made material misrepresentations and omissions to investors while they were offering and selling DIG tokens in a series of news and press releases issued to the public and a press conference.  They also participated in a scheme to defraud.  Among other things, the releases falsely claimed that Arbitrade had acquired and received title to $10 billion in gold bullion and intended to back each DIG token issued and sold to investors with $1.00 worth of this gold.  Arbitrade claimed to have acquired the gold through a purchase transaction with Barber and his company, SION.  The Defendants also misrepresented that independent accounting firms had performed an "audit" of the gold and verified its existence.  The gold acquisition transaction with Barber and SION was a sham.

- Arbitrade, Cryptobontix, Hogg, and Goldberg violated Sections 5(a) and (c) of the Securities Act [15 U.S.C. § 77e(a) and (c)];

- Hogg and Goldberg violated Sections 17(a)(1), (2), and (3) of the Securities Act [15 U.S.C. § 77q(a)(1), (2), and (3)]; and

- Arbitrade, Cryptobontix, Hogg, and Goldberg violated Section 10(b) [15 U.S.C. § 78(j)(b)], and Rules 10b-5(a), (b), and (c) [17 C.F.R. § 240.10b-5(a), (b), and (c)] of the Exchange Act.

- Hogg is liable as a control person under Section 20(a) of the Exchange Act [15 U.S.C. § 78t(a)] for Cryptobontix's violations of Section 10(b) [15 U.S.C. § 78(j)(b)], and Rules 10b-5(a), (b), and (c) [17 C.F.R. § 240.10b-5(a), (b), and (c)] of the Exchange Act.

---

[1] Defendants Arbitrade and Cryptobontix, and Relief Defendant SION, did not make an appearance, did not answer the Complaint, and were defaulted by the Court.

# EXPERT REPORT OF FAISAL AHMED

- Hogg and Goldberg are liable as control persons under Section 20(a) of the Exchange Act [15 U.S.C. § 78t(a)] for Arbitrade's violations of Section 10(b) [15 U.S.C. § 78(j)(b)], and Rules 10b-5(a), (b), and (c) [17 C.F.R. § 240.10b-5(a), (b), and (c)] of the Exchange Act.

- Braverman and Barber aided and abetted violations by Arbitrade, Cryptobontix, Hogg, and Goldberg of Section 10(b) [15 U.S.C. § 78(j)(b)], and Rules 10b-5(a), (b), and (c) [17 C.F.R. § 240.10b-5(a), (b), and (c)] of the Exchange Act.

- Relief Defendant SION, a company that Barber controlled, received proceeds of Defendants' securities violations without any legitimate entitlement to the funds.

## B.    Defendants' Answers and Affirmative Defenses

The individual Defendants deny all substantive allegations against them. They further raise numerous affirmative defenses, which are legal defenses beyond the scope of my expertise and not the subject of this Report.

## C.    Executive Summary

In forming my opinion, I have used my experience in the gold sector conducting compliance, accounting, bookkeeping, process reviews, transaction and document monitoring, management systems design, and reviewed the transaction documents and other materials related to the case listed in **Exhibit B** to evaluate the allegations set out in the SEC's Complaint. In addition, I performed extensive desktop searches and literature review of the information available in the public domain. Based upon my experience in the gold industry, including conducting regulatory compliance reviews and audits, accounting and taxation assignments, and working with the Industry regulators such as MoE and DMCC in the UAE to provide specialist compliance training in gold sector compliance, I understand the standards and rules that apply to the sector and have firsthand knowledge of the existing practices related to record keeping, mining, processing, trading, assaying, refining, transportation, accounting, purchasing, transferring, and vaulting of gold. My experience also includes the necessary steps for identifying, assessing, and mitigating the risks associated with each of these processes and the documents and records that must be maintained to demonstrate compliance. I applied the standards, rules, and regulations (Standards

## EXPERT REPORT OF FAISAL AHMED

and Rules, Section IV.D., infra) that are in use and applicable in the context of this case to ascertain if Defendants' actions comported with the international standards and code of practices governing the gold sector.

Based on the nature of the transaction and the amount of gold to be acquired, the Defendants should have followed certain standard procedures and rules. They failed to do so at every level and ignored red flags.

Based on my experience and my review of the materials listed in **Exhibit B**, I have formed the following opinions:

1.      Defendants should have conducted the customer due diligence ("CDD")/know your customer ("KYC") checks on SION and its owner, verified the physical existence of gold, its weight and purity to determine its worth, and obtained information on where was it being vaulted.

2.      Defendants' hiring of two accounting firms, Elliott Davis and BDO, to verify the G4S Safe Keeping Receipt ("SKR") did not comport with the Standards and Rules. Defendants' failure to follow the standard procedures and the verification process is further highlighted by the fact that another firm Defendants attempted to hire, Bureau Veritas, a company that specializes in inspection and certification services, refused to accept the engagement when it became clear that Arbitrade wanted the firm to issue its opinion without conducting any physical examination of the gold.

3.      Vaulting service providers in Dubai generally avoid issuing SKRs. Such requests are usually declined. In this instance, it would be highly unusual practice to vault an SKR because of the amount of gold—395 metric tons—involved in the transaction. If an SKR is to be vaulted there are well defined procedures that were not followed in this case.

4.      Other than the SKR as purported proof of Arbitrade's claim that it had acquired title to $10 billion worth of gold, there are no other gold industry accepted documentation that substantiate the existence of the gold.

5.      Even if vaulting SKRs was an acceptable practice and Defendants only needed to verify the authenticity of the SKR, there are multiple inconsistencies and red flags that arose during the transaction and exist in the other transaction documents.

# EXPERT REPORT OF FAISAL AHMED

### D. Standards and Rules

#### 1. In the Gold Industry

There are internationally accepted standards and rules that the gold industry follows collectively, regulations and statutes that transcend international borders that can be applied to the sector in conjunction with country specific statutory requirements, and regulators with transborder authority and jurisdiction. In addition, there are standards and regulators such as The London Bullion Market Association ("LBMA"), The Organization for Economic Co-operation and Development ("OECD"), UAE Good Delivery Standards ('UAEGD"), International Financial Reporting Standards ("IFRS"), International Accounting Standards Board ("IASB"), the UAE MoE, DMCC, Dubai Chamber of Commerce, CBUAE, Executive Office of Anti-Money Laundering and Countering the Financing of Terrorism, and EBC that govern the principles around accounting, record keeping, compliance, and verifications to be carried out in the gold industry. A brief description of some of the relevant instruments and about the regulators will help in understanding the Defendants' actions and omissions while operating and transacting in the context of this case. Finally, in the UAE, there are certain standards and rules that it follows to govern the gold sector and prevent financial crimes.

##### a. UAE Good Delivery Standard

UAE Good Delivery (UAEGD) is a current standard that provides a framework for the gold sector, in line with international best practices. During 2018 and 2019, the time during which the transactions in this case occurred, an earlier version of the UAEGD Standard, named Dubai Good Delivery Standards (DGDS), governed the gold sector. The DGDS and UAEGD are substantially similar (collectively the "Standard"). The Standard covers quality and technical specifications of refineries and gold production facilities in the UAE. The Standard strengthens UAE's position as a global gold, jewelry, and bullion trade hub, enhances the competitiveness of the products from UAE gold refineries and gold sector participants, and facilitates the access of UAE refineries and other UAE gold sector participants to global markets by adopting best international practices and strengthening governance and regulation of the UAE gold sector.

## EXPERT REPORT OF FAISAL AHMED

Although this Standard governs the UAE gold refineries and their supply chain processes for compliance with the OECD Guidelines[2], the procedures also apply to the gold trading companies as a market practice in the UAE.

The Standard is operated by the Executive Office – UAE Bullion Market Committee, which is chaired by the Ministry of Economy of the UAE. The Emirates Bullion Committee raises awareness about the importance of the UAEGD and encourages all relevant stakeholders to meet these standards. The UAE Bullion Market Committee works with all stakeholders across the value chain in the gold sector.

*See* https://ugd.gov.ae/.

### b.  *London Bullion Market Association Standards*

The London Bullion Market Association ("LBMA") Standards consist of three parts:

- <u>Good Delivery:</u> "We set the stringent Good Delivery standards, trusted around the world, that enable the global trade in gold and silver bars."

- <u>Global Precious Metals Code:</u> "The Global Precious Metals Code revised in December 2022 sets out the standards and best practice expected from market participants in the global precious metals market."

- <u>Responsible Sourcing:</u> "The Responsible Sourcing Program ensures the continuous improvement of Responsible Sourcing business practices and reassure clients that all of the metal sourced from LBMA Good Delivery Refiners is free from threat financing."

  "The Program follows the five-step due diligence framework set out in the OECD Guidance and requires Good Delivery List (GDL) refiners to demonstrate their

---

[2] The Organization for Economic Co-operation and Development is an intergovernmental organization with 38 member countries, founded in 1961 to stimulate economic progress and world trade. Together with governments, policy makers and citizens, OECD works on establishing evidence-based international standards and finding solutions to a range of social, economic, and environmental challenges. From improving economic performance and creating jobs to fostering strong education and fighting international tax evasion, OECD provides a unique forum and knowledge hub for data and analysis, exchange of experiences, best-practice sharing, and advice on public policies and international standard-setting.

## EXPERT REPORT OF FAISAL AHMED

efforts to combat money laundering, terrorist financing and human rights abuses, and respect the environment globally."

"The Responsible Gold Guidance (RGG) is based on the OECD Due Diligence Guidance as well as Swiss and US KYC, Anti-Money Laundering and Combatting Terrorist Financing regulations. Since January 2012, gold Good Delivery refiners have undergone annual audits against the LBMA's Gold Guidance." The LBMA RGG that was applicable in 2018 was further enhanced in Version 9 issued in November 2021 and states that "the overarching requirement of the RGG is that all Refiners must be aware of, and comply with, the laws, rules and regulations applicable to them and the precious metals market in each jurisdiction in which they do business (Applicable Laws). This guidance does not provide a legal defense to a violation of any Applicable Laws. It is expected that all parties directly involved in the gold supply chain, including upstream producers, comply with all Applicable Laws."

*See* https://www.lbma.org.uk/market-standards.

c.  *OECD Due Diligence Guidance for Responsible Supply Chains of Minerals from Conflict-Affected and High-Risk Areas*

The OECD Due Diligence Guidance ("OECD Guidance") provides detailed recommendations to help companies respect human rights and avoid contributing to conflict through their mineral purchasing decisions and practices. The OECD Guidance is for use by any company potentially sourcing minerals or metals from conflict-affected and high-risk areas. The OECD Guidance is global in scope and applies to all mineral supply chains. The Guidance is referenced in a range of international declarations, regulations, and initiatives, specifically, in the Five-Step Framework for Risk-Based Due Diligence in the Mineral Supply Chain.

*See* https://www.oecd.org/.

### 2.  International Auditing and Accounting Standards

Additionally, there are international auditing and accounting standards concerning establishing the existence of any asset, which would include gold, at the time of acquisition or at financial accounting period end.

# EXPERT REPORT OF FAISAL AHMED

### a.  *International Accounting Standard 16 of the IFRS*

In April 2001, the International Accounting Standards Board (Board) adopted IAS 16 Property, Plant and Equipment. Property, plant, and equipment are tangible items that: (a) are held for use in the production or supply of goods or services, for rental to others, or for administrative purposes; and (b) are expected to be used during more than one period.

According to IAS 16, the section on "Disclosure" to be made in the financial statements for each class of property, plant, and equipment, it is stated in Clause 74 (a) – "the existence and amounts of restrictions on title, and property, plant and equipment pledged as security for liabilities".

### b.  *International Standard on Auditing 501*

The International Standard on Auditing 501, Audit Evidence – Specific Considerations for Selected Items,[3] provides in Clause 3 that the objective of the auditor is to obtain sufficient appropriate audit evidence regarding the:

1.  Existence and condition of inventory;
2.  Completeness of litigation and claims involving the entity; and
3.  Presentation and disclosure of segment information in accordance with the applicable financial reporting framework.

If inventory is material to the financial statements, Clause 4 provides that the auditor shall obtain sufficient appropriate audit evidence regarding the existence and condition of inventory by:

1.  Attendance at physical inventory counting, unless impracticable, to: (Ref: Para. A1– A3);
    a.  Evaluate management's instructions and procedures for recording and controlling the results of the entity's physical inventory counting; (Ref: Para. A4)
    b.  Observe the performance of management's count procedures;(Ref: Para. A5)
    c.  Inspect the inventory; and (Ref: Para. A6)
    d.  Perform test counts; and (Ref: Para. A7–A8)

---

[3] Effective for audits of financial statements for periods beginning on or after December 15, 2009.

# EXPERT REPORT OF FAISAL AHMED

2. Performing audit procedures over the entity's final inventory records to determine whether they accurately reflect actual inventory count results; and

3. Presentation and disclosure of segment information in accordance with the applicable financial reporting framework.

### 3. Standards for Verification and Secure and Safe Vaulting of Gold

Based on my experience and in practice, vaulting service providers (a company that would be hired to carry, transport, or store an asset) in the UAE generally avoid issuing SKRs, especially for significant amounts of precious metals, and such requests are usually declined. In the very limited circumstances where an SKR is to be vaulted, there are well-defined procedures, including detailed due diligence and verification procedures.

Thus, the accepted practice, especially for precious metals, is for the actual asset to be verified through a detailed process and then vaulted. Service providers, such as Brinks, Transguard, or G4S International adhere to international standards and procedures for vaulting precious metals and have well-defined processes to keep the assets of their customers safe and secure and ensure their services are of the highest quality. By following these standards and procedures the security provider also protects and mitigates all inherent risks. Among other things the service providers for vaulting precious metals apply the following standards of care:

- Approvals are required from higher authorities of the service provider prior to receiving the physical asset of high value.

- Clearance from the compliance function of the service provider is essential before accepting the asset.

- The gold bars are checked to ascertain if they meet the 'Good Delivery' standards. Gold is tested by one or more of the methods of combination of the cupellation, ICP machines, advanced X-ray fluorescence spectrometers (XRF), SPARK spectrometers, and other methods to achieve the highest accuracy in testing gold. The purity and weight of gold is established when such methods are used by a refinery.

- Record the ownership, purity, weight of the bars in storage and maintain the supporting documents.

# EXPERT REPORT OF FAISAL AHMED

- Acquire suitable level of insurance to cover the metals that they hold. In case of G4S International, the insurance must be obtained from Llyod's of London.

- In addition, provisions are there for customers to perform regular audits of the vaulting facility and the asset that the service providers hold on their behalf. The charge for vaulting and the insurance cover is directly related to the liability they are holding.

- In the limited situations where an SKR is requested to be issued, proper due diligence must be conducted to verify its authenticity.

### E. Findings

As a starting point, the amount of gold identified in the SKR—395 metric tons or approximately 870,826 pounds—that is at the center of the transaction that Arbitrade was purportedly acquiring title to from SION, which SION allegedly acquired from an individual, was significant by any measure. In comparison, the amount of gold reserves by country[4] through December 2023 is as follows: the United States had 8,133 metric tons, China had 2,235 metric tons, Switzerland had 1,040 metric tons, the United Kingdom had 310 metric tons, and the UAE had 73.63 metric tons. Thus, the amount of gold allegedly involved in the transaction was more than the current gold reserves of the United Kingdom and the UAE combined.

Vaulting service providers in Dubai generally avoid issuing SKRs. Such requests are usually declined. In this instance, it would have been a highly unusual practice to vault an SKR because of the amount of gold—395 metric tons—involved in the transaction. If an SKR is to be vaulted, there are well-defined procedures that were not followed in this case.

Based on the nature of the transaction and the significant amount of gold to be acquired, Defendants' limited actions to verify the gold failed to comply with all gold industry standards. The Defendants should have followed detailed due diligence and verification procedures. In accordance with the UAEGD, OECD and LBMA guidelines, the Defendants should have

---

[4] *See* summary of gold reserves by country as of December 2023 at https://tradingeconomics.com/country-list/gold-reserves.

## EXPERT REPORT OF FAISAL AHMED

conducted CDD/KYC checks on SION and its owner, verified the physical existence of gold, its weight and purity to determine its worth, and obtained information on where was it being vaulted.

The verification process followed by the two accounting firms engaged by the Defendants should have been more detailed. Neither process included physical verification of the gold. In the case of BDO, it was limited to the SKR validation and telephonic interview with the process owner who purportedly issued and signed the SKR. A video call with the process owner who issued and signed the SKR was denied, and no checks were conducted to ascertain if the person who signed the SKR was authorized to do so on behalf of G4S Cash Services LLC ("G4S Cash"). In the case of Elliott Davis, it was limited to determining if the SKR existed and the Assignment Agreement between Arbitrade and SION was in order.

1.  **Defendants' Attempted Verification Of The SKR Did Not Comport With Standards And Rules**

There is no evidence to suggest that a physical verification of gold was conducted by Arbitrade or an appointed auditor on behalf of Arbitrade either at the time of entering the Gold Procurement, Vaulting, Trading, and Sales dated November 28, 2018 ("Contract") with SION or later. The Auditing and Accounting standards are applicable here because it specifies the requirements in terms of establishing the physical existence of the underlying assets. The reason the above Standards and Rules becomes crucial is because Arbitrade referenced the Contract in a press release to show that it purportedly obtained title to 395 metric tons of gold to back the DIG token. In the absence of following the basic principle of physical verification, Defendants failed to comply with the requirements of these Standards and Rules, and as a result, incorrectly relied on an attempted verification of the SKR for its belief that it held title to 395 metric tons of gold.

In fact, vaulting service providers in Dubai generally avoid issuing SKRs and such requests are usually declined because they would not comport with the above Standards and Rules. In this instance, it would be highly unusual practice to vault an SKR because of the amount of gold—395 metric tons—involved in the transaction. Further, in the unlikely event that an SKR—not the gold itself—is to be vaulted, there are well-defined procedures that were not followed in this case.

## EXPERT REPORT OF FAISAL AHMED

There were glaring deficiencies in the transaction documents and that arose during the course of the transaction:

First, in the SKR prepared by G4S Cash in Dubai, it states that it has "vaulted the below package under the account of SION." The "Package detail" mentions "Original Certificate of Guarantee No BC R.R. 07045". The BDO report purportedly confirmed this after interviewing the process owner who issued and signed the SKR, Mr. Peter Walters, Managing Director G4S Cash. The BDO Report further states: "The document was placed within an envelope inside a tamper-proof bag with a unique security seal number." There is no mention of whether it was a telephonic or video interview with Mr. Walters in the BDO Report. BDO stated in the Report that it was unable to confirm the employment of Walters: "Due to strict HR and security policies, BDO was unable to confirm employment with G4S UAE." Barber testified that he arranged for a direct communication between "G4S" and the audit firm[5].

Second, the independent accounting firms were directed or not allowed to perform certain procedures by SION. Defendants ignored the red flag presented when SION told BDO to drop its request for a video conference with the G4S employee whose signature purportedly appears on the Safe Keeping Receipt. Arbitrade also acquiesced to SION's requirement that Arbitrade should have no direct communications with G4S personnel. This highlights that the scope of the verification conducted by the auditors was limited, and it was not established and confirmed that the person the auditors interviewed was Mr. Walters.

Third, Arbitrade specifically avoided complying with the above-noted Standards. Bureau Veritas—a company that specializes in inspection and certification services—when contacted to provide an opinion about the existence of the gold that Arbitrade purportedly acquired title from SION, refused to accept the engagement when it became clear that Arbitrade wanted the firm to issue its opinion without conducting any physical examination of the gold. In the email dated 23 October 2018 Stephan Braverman wrote to Joseph Chapman of Bureau Veritas: "We have an SKR that has already been audited by 3 accounting firms. I really wanted to discuss with you what the options are. The bullion is significant in several security facilities in Dubai. Counting bars I believe is overkill." Joe Chapman responded by email on 30 October 2018 to Braverman: "The request for

---

[5] Deposition Transcript of Max Barber on May 6, 2021, at p. 71.

## EXPERT REPORT OF FAISAL AHMED

verification without physical validation of metals cannot be provided." Indeed, auditors are trained on techniques to conduct physical verification of assets. There are several methods used to verify large volume of inventory and assets, including sampling techniques. The denial of the permission to carry out physical verification of the gold is a further red flag and raises a question on the processes that were compromised by Defendants' actions.

> **2.      Even If Verification Of The SKR Comported With Standards And Rules, There Were Inconsistencies And Red Flags, And The Transaction Documents Do Not Support Arbitrade's Claim That It Had Acquired And Received Title To $10 Billion In Gold Bullion**

Other than the SKR as purported proof of Arbitrade's claim that it had acquired title to $10 billion worth of gold, there are no other gold industry accepted documentation that substantiate the existence of the gold. Even if vaulting SKRs was an acceptable practice and Defendants only needed to verify the authenticity of the SKR, there are numerous inconsistencies, failures, and red flags that arose during the course of the transaction and are self-evident in the transaction documents.  Had a proper authentication process been employed by Defendants pursuant to the Standards and Rules, it would have revealed the following problems and inconsistencies:

- In Dubai, G4S UAE operates under two licenses – G4S Cash and G4S International. Currently, both these licenses have been acquired by Brinks. G4S Cash, which is the listed as the entity Safekeeping the Original Certificate of Guarantee for 395 metric tons of gold does not render such a service. It provides cash related services to banks and ATMs and not the services related to transport and vaulting of precious metals. All vault related services are provided by G4S International pertaining to transport and vaulting of precious metals, artwork, and other valuable assets for which processes are defined.

- If 395 metric tons of gold or the SKR was to be vaulted the following procedures will have to be followed:

  1. Obtaining approvals from higher authorities within G4S International.

  2. Checking the authenticity of the SKR.

## EXPERT REPORT OF FAISAL AHMED

3. Obtaining information on purity of the gold, specifically the report on fire assay performed by an independent third-party assayer, like a refinery.

4. Clearance from the compliance function of the service provider is essential before accepting the gold.

5. Obtaining insurance from Llyod's of London. The charge for vaulting and the insurance coverage is directly related to the liability that is being held.

6. Historically, the maximum insurance coverage provided by Llyod's of London was worth USD 1.25 billion. The Arbitrade acquisition was represented as worth USD 10 billion.

7. There should be receipt of payment made to G4S for providing the vaulting service

There is no evidence of any of these procedures being followed in this transaction. For vaulting 395 metric tons of gold, a detailed verification process including records of ownership, purity, and weight of the bars must be checked to ascertain if the standards are met. Without these documents and physical verification, it cannot be determined if the asset being vaulted is gold and not iron.

- It is near to impossible to ship 395 metric tons of gold because of the following reasons:

  1. Transportation by land is ruled out from Switzerland to the UAE, if the 395 metric tons of gold was vaulted there.

  2. Due to security concerns and exposure of the asset at sea for a considerable time, transportation by water is not possible. No service provider and insurance company would take that risk.

  3. The only other option left is to transport by flight, but this too is near to impossible considering the number of flights that would be required to move this quantity due to the flowing reasons:

     a. Commercial flights can only ship 1 to 2 metric tons of gold at a time.

     b. Chartered flights can only ship 10 to 20 metric tons of gold at a time.

  4. If 395 metric tons of gold was shipped by air it would most likely be all over the news, but there was no such reporting.

## EXPERT REPORT OF FAISAL AHMED

- It is difficult to vault 395 metric tons of gold at a place even if the gold bars are stacked on top of one another.  It would require a vault that is 65 feet X 65 feet in dimension, but the floor will not be able to hold that weight. The biggest vault in the Middle East is at the Almas Towers in Dubai, operated by Brinks. The other approved vault services providers in Dubai include G4S International, Transguard, Ferrari, Timas, and Loomis. None of them have the capacity to hold 395 metric tons of gold.

- Any reliance upon photographs of the purported gold, which were used in the news/press releases and certain emails, and the video produced by Barber with a slip dated February 03, 2021, was improper, and they are otherwise insufficient evidence to confirm the existence of gold. Also, in my experience working with gold sector companies in the UAE and designing their policies, procedures, and processes, I have not witnessed instances where the logistics and vaulting service providers would allow taking photographs and videos inside the vault area. These areas are highly secured rooms with Closed Circuit Television ("CCTV") cameras and any form of camera or mobile phone access is restricted. Further, as noted supra, there are specific procedures that Defendants failed to follow to verify the gold, and using photographs is not a reliable method.

- There are no bank transactions, KYC/CDD documents, refining and vaulting receipts to support Arbitrade's alleged title to the gold. Arbitrade never received any information on the origin of the gold, the identity of the seller, or its storage location from SION. It is only mentioned in the Contract that SION shall purchase the gold from "Gold Resource Corporation" using its own finances / assets.

- The documents from the Union Bank of Switzerland (UBS) (collectively, the "Original Master Certificates") reflect that these SKRs changed hands thrice before Arbitrade purportedly acquired and received title to $10 billion in gold bullion. None of Original Master Certificates provide information on where the physical asset, 395 metric tons of gold, was vaulted to back Arbitrade's claim of acquiring and receiving the title to $10 billion in gold bullion. There is also no document that indicates the compensation, or any other benefit Mr. Ronggolawe received after signing the Deed of Assignment.

**EXPERT REPORT OF FAISAL AHMED**

Notably, Clause 2 of the Bailment Agreement between Dr. Bokhem and SION clearly sets out the Compensation, Payment, and Security terms. Thus, it is not clear as to why Mr. Ronggolawe assigned, ceded, and transferred all his powers and rights related to the ownership of gold bullions (22,198,000 kgs) to Mr. Bokhem, raising doubt about the genuineness of the documents backing the existence of 395 metric tons of gold before it purportedly reached the G4S vault in Dubai.

- There are two Safe Keeping Receipts effective 26 July 2018 in the documents. In one of the SKR the value is not declared but in the other one the value has been declared as USD 16,100,000,000.00. The letterhead used by G4S appear to be different, with a watermark and without it, and the signature of Mr. Walters and its placements with respect to the stamp and the font of the trade license number appears to be different in these SKRs, raising a question on the authenticity of the SKR.

- The only document in which Arbitrade is mentioned is the 2018 Year End Statement issued to SION Trading FZE Arbitrade dated 20 December 2018.

- There are no other documents other than the G4S SKR and Assignment Agreement as a proof to Arbitrade's claim that it had acquired title to $10 billion worth of gold. There is no declaration from Arbitrade to G4S confirming the ownership of gold as per standard procedures. The G4S Cash SKR and G4S SION Assignment Agreement are not sufficient documentation to demonstrate that the prescribed standards applicable to the gold sector for acquiring/receiving and vaulting were followed and complied with considering the quantity of gold and its worth.

## V.   <u>CONCLUSION</u>

I reach this opinion based on my experience and with the information currently available to me.  The process used by Defendants to verify the gold—by only verifying the SKR—did not comport with Standards and Rules of the gold industry. Even if the process employed by Defendants to verify the SKR did comport with Standards and Rules of the gold industry, there were multiple inconsistencies and red flags that occurred during the transaction or were contained

## EXPERT REPORT OF FAISAL AHMED

in the documentation, and the transaction documents do not support Arbitrade's claim that it acquired and received title to $10 billion in gold bullion.

I reserve the right to supplement, augment and/or revise this opinion if additional information becomes available to me during the course of this matter's litigation.

Prepared by:                                                Dated: March 5, 2024

_____

Faisal Ahmed

# EXPERT REPORT OF FAISAL AHMED

### Attachment A: Résumé

Faisal Ahmed
Managing Partner & CEO
AKW Consultants
Dubai, United Arab Emirates
faisal.ahmed@akwconsultants.com

## SUMMARY

Faisal Ahmed is a qualified Chartered Accountant with 24+ years of global experience specializing in Financial Crime Compliance, Anti-Money Laundering, Tax Advisory and Auditing.  He started his career with 6+ years at KPMG followed by 8+ years at PwC London and gathered 3+ years of industry experience with HSBC Middle East and London office as a Director and Global Head for Client Due Diligence for AML.

## PROFESSIONAL EXPERIENCE

Since early 2016, he has been running his consulting practice in the UAE, initially in partnership with a Kuwaiti based firm, and established AKW Tax Reclaim Accounting and Consultancy and AKW Consultants in early 2018.

Since 2018, Faisal has served a large number of UAE and GCC based clients providing specialist AML Compliance, Risk Management, Tax Advisory, Business Consulting, Financial Crime Consulting, and Accounting services. Faisal is an accredited Trainer with the London Institute of Banking and Finance and UAE Good Delivery Auditor. He runs a team of 70+ specialists based in the UAE who focus on delivering client projects around the services offered by AKW Consultants.

In the past five (5) years, Faisal and his team have serviced the gold industry, advising clients on regulatory compliance, conducted several compliance reviews, and worked closely with the regulators to train and build the capacity of the various actors in the gold sector to strengthen compliance and internalize responsible business conduct. Faisal is an accredited auditor for the UAE Good Delivery Standards for the Gold and Precious Metals Sector governed by the Emirates Bullion Community.

Since 2021, Faisal took up the role of the Group Head of Compliance for one of the top UAE Good Delivery Gold and Precious Metals Refinery in the UAE, SAM Precious Metals. In the past three (3) years, Faisal has developed a specialized team of Gold & Precious Metals sector experts who have served more than forty (40) gold sector trading and refining companies across the UAE and globally. In the gold and precious metals sector, Faisal and his team has led engagements related to developing and designing AML/CFT Compliance Framework, provide AML Compliance Consultancy and Outsourced Compliance Officer roles, fronted inspections and reviews conducted by the UAE Ministry of Economy, FATF and DMCC Gold & Precious Metals Sector regulatory

# EXPERT REPORT OF FAISAL AHMED

body. His team has also been engaged on financial accounting, statutory and internal audit, tax compliances including VAT and Corporate Tax implementation, legal and forensic advisory, responsible business and supply chain reviews including site visit of gold trading companies and gold mining sites in Africa and Latin America.

In 2022, Faisal took over a UAE based software development company, NOVA Information Technology LLC, which is engaged with a gold and precious metals refinery in the UAE to develop a robust end to end management systems software to cover the entire supply chain, operations and compliance elements pertaining to gold trading business.

Faisal attended the 2022 US-MENA Private Sector conference at the Federal Reserve Bank of New York (NYFED) in New York City on 12 October 2022, as a panelist, discussing the importance of PPP, Country level National Risk Assessments & MER, & adoption of UBO standards for the Financial Services Sector and the Gold & Precious Metals sector. Faisal represented SAM Precious Metals Fz-LLC at this conference along with his colleague from AKW Consultants, Mr. Sadi Ahmad, who is the Global Compliance Officer of SAM Precious Metals Fz-LLC.

Faisal's specialist gold sector consulting team reviews thousands of transactions related documents related to the gold trading and is well experienced in the regulatory and standard document requirements for business in this sector.

## **EDUCATION**

Faisal earned his Bachelor of Commerce in Commerce and Accountancy, with honours, from the Shri Ram College of Commerce, India, in 2000.  He qualified as a Chartered Accountant in 2003 from The Institute of Chartered Accountants of India. Faisal holds a Certificate in Business Management, General Administration and Management from the American University in Dubai.

## EXPERT REPORT OF FAISAL AHMED

### Attachment B: Documents reviewed and relied upon

- SEC's Complaint [DE 1]

- Defendants' Answers and Affirmative Defenses [DE 82, 83, 84, and 85]

- Gold Procurement, Vaulting, Trading, and Sales dated November 28, 2018 [Contract Number SION-ABR.16-402403]

- Email from Cryptobontix to Steve Braverman dated May 24, 2018 [Exhibit 28]

- Email from Cryptobontix to Steve Braverman dated July 05, 2018 [Exhibit 30]

- Agreement between SION and Bokhem [Exhibit 70]

- Arbitrade Press Release dated January 08, 2019

- Arbitrade Press Release dated January 09, 2019

- Arbitrade Press Release dated November 05, 2018

- Asset Pledge Agreement dated July 03, 2018

- BDO USA Master Service Agreement and Report

- Blog Post UBS Goes Down

- Bokhem Documents from T. Hogg

- Elliott Davis Report

- Emails between Stephen Braverman and Bureau Veritas

- G4S Safe Keeping Receipt [Exhibit 13]

- G4S Safe Keeping Receipt [Exhibit 14]

- G4S 2018 Year End Statement [Exhibit 57]

- Email date June 14, 2018 from Larry Meyer to John MacNeil

- Max Barber Document Production

## EXPERT REPORT OF FAISAL AHMED

- MOU between SION and Arbitrade dated 28 June 2018

- Market Value Appraisal by James D. Rasmussen, Geologist

- SEC-BRV 023386

- SEC-BRV 023387

- Email dated August 14, 2018 from David Sagal to Ronald Simmons

- Email dated August 08, 2018 from Humam Khadim to SION

- SION Arbitrade Assignment Agreement

- SION G4S Agreement

- SION G4S Agreement [Exhibit 61]

- UBS Gold Documents

- Video Produced by Max Barber

- UAE Good Delivery Standard

- LBMA Standard

- OECD Due Diligence Guidance for Responsible Supply Chains of Minerals from Conflict-Affected and High-Risk Areas

- The Ministry of Economy (MoE) UAE – Due Diligence Guidance for Responsible Supply Chain of Minerals

- Decree Law No. (20) of 2018 on Anti-Money Laundering and Combating the Financing of Terrorism and Illegal Organizations, the United Arab Emirates

- Cabinet Decision No. 10 of 2019 on the Implementing Regulation of Decree Law No. (20) of 2018, the United Arab Emirates

- LBMA Best Practice Guidelines Used by "Loco London" Vaults Opening a new vault for the storage of precious metals

## EXPERT REPORT OF FAISAL AHMED

- Data on of gold reserves by country as of December 2023, https://tradingeconomics.com/country-list/gold-reserves

- Transcripts of Deposition of Max Barber taken on May 6, 2021 and May 26, 2021

- Emails exchanged with BDO

- Securities Act of 1933, the United States of America

- Securities Exchange Act of 1934, the United States of America

- Securities and Exchange Commission's website