**EXHIBIT**

**3**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
-------------------------------------------X
SECURITIES AND EXCHANGE COMMISSION,

                              PLAINTIFF,

        -against-            Index No.:
                22-cv-2317-DAMIAN/D'Angelo

ARBITRADE LTD., CRYPTOBONTIX INC., TROY R.J.
HOGG, JAMES L. GOLDBERG, STEPHEN L.
BRAVERMAN and MAX W. BARBER,

                              DEFENDANTS.
-------------------------------------------X

                    DATE: March 12, 2025
                    TIME: 1:00 P.M.


        EXPERT DEPOSITION of FAISAL AHMED,
held via videoconference, before Rivka Trop,
a Notary Public of the State of New York.




            Magna Legal Services
              866-624-6221
              www.MagnaLS.com



Page 2

```
 1
 2    A P P E A R A N C E S:
 3
 4    SECURITIES AND EXCHANGE COMMISSION
          Attorneys for the Plaintiff
 5        SECURITIES AND EXCHANGE COMMISSION
          801 Brickell Avenue, Suite 1950
 6        Miami, Florida 33131
          BY: ALICE SUM, ESQ.
 7            ALEXANDER CHARAP, ESQ.
 8
 9    DAWN M. RAPOPORT, ESQ.
          Attorneys for the Defendant
10        JAMES L. GOLDBERG
          1314 East Las Olas Blvd #121
11        Fort Lauderdale, Florida 33301
          BY: DAWN M. RAPOPORT, ESQ.
12
13    SCHLAM STONE & DOLAN LLP
          Attorneys for the Defendant
14        Troy R.J. Hogg
          26 Broadway
15        New York, New York 10004
          BY: TOM KISSANE, ESQ.
16            ANNA PARK, ESQ.
17
      ALSO PRESENT:
18        TROY HOGG
19        STEVEN BRAVERMAN, pro se Defendant
20        MAX W. BARBER, pro se Defendant
21        JAMES GOLDBERG
22                *      *      *
23
24
25
```



```
 1                    F. AHMED
 2   F A I S A L   A H M E D, called as a
 3   witness, having been first duly sworn by a
 4   Notary Public of the State of New York, was
 5   examined and testified as follows:
 6   EXAMINATION BY
 7   MR. KISSANE:
 8       Q.    Please state your name for the
 9   record.
10       A.    Faisal Ahmed.
11       Q.    Where do you reside?
12       A.    Dubai.  Villa 1, Street 9, Springs
13   One, Dubai.
14       Q.    Good day, Mr. Ahmed.  My name is
15   Tom Kissane.  I'm an attorney for Troy Hogg,
16   one of the co-defendants in this case.
17            I'm going to be asking you some
18   questions today for purposes of creating a
19   written record of your testimony.  Because
20   that's our purpose, I'm going to ask that
21   you let me finish each of my questions even
22   if you know what it is going to be before
23   you undertake to answer it, okay?
24       A.    Yes.
25            MS. SUM:  Tom, I'm sorry.  I had
```



```
 1                    F. AHMED
 2     wanted to get on the record before.  Do
 3     you want me to go ahead and do that?
 4          MR. KISSANE:  Go ahead.
 5          MS. SUM:  Thank you.  My apologies
 6     for interrupting.
 7          I wanted to confirm with all of
 8     the four defendants that they will be
 9     paying for Mr. Ahmed's time to appear
10     for a deposition.  Please confirm on
11     the record.
12          MR. KISSANE:  Confirmed as to the
13     time taken for our questioning,
14     confirmed.
15          MR. BRAVERMAN:  Confirmed for the
16     time that I take, yes, thank you.
17     Steve Braverman.
18          MR. BARBER:  This is Max Barber.
19     Confirmed for the time that I take in
20     questioning.
21          MS. RAPOPORT:  This is Dawn
22     Rapoport on behalf of Jamie Goldberg
23     and we confirm as well.
24          I also wanted to quickly make an
25     objection and reservation based on the
```



```
 1                    F. AHMED
 2      SEC's late production last night of the
 3      authorities that Mr. Ahmed is relying
 4      on and reserve for questioning later,
 5      if necessary.
 6          MR. KISSANE:  On behalf of Troy
 7      Hogg, we join in that objection.
 8          MS. SUM:  On behalf of the SEC,
 9      those are the materials that were
10      referenced.  They are not new materials
11      with respect to his expert report.
12          MR. BARBER:  On behalf of Max
13      Barber, pro se, join and also reserve
14      the right to additional questioning
15      that might arise from this deposition
16      today.
17          MR. BRAVERMAN:  This is Steve
18      Braverman.  I reserve my rights as
19      well.  Thank you.
20      Q.   Okay.  Returning to where we left
21   off about the back and forth between us,
22   Mr. Ahmed, for the same reason I ask that
23   you let me finish my questions before you
24   answer, I also ask that you be sure to give
25   your answers verbally, rather than by
```



Page 6

```
 1                     F. AHMED
 2    gesture so that we have a complete record
 3    that the court reporter can take down, okay?
 4         A.   Yes.
 5         Q.   Are you represented by counsel for
 6    purposes of today's deposition?
 7         A.   Yes.
 8         Q.   And who is representing you?
 9         A.   So I'm representing myself as the
10    expert and I have Alice Sum here from the
11    SEC.
12         Q.   And it's your understanding that
13    she is your counsel, your attorney for
14    purposes of today's session?
15         A.   Yes.
16              MS. SUM:  Tom, I need to clarify
17         that.  The SEC has hired him as a
18         witness.  We are not personal counsel
19         to Mr. Ahmed or to his firm.
20              MR. KISSANE:  Just so we have a
21         clear record, are you representing him
22         for purposes of today's session
23         generally or in some limited sense or
24         not at all?
25              MS. SUM:  Generally speaking, we
```



Page 7

                        F. AHMED
1
2       don't represent as lawyers for any
3       expert.  He's appearing as the SEC's
4       expert.  I'm entitled to comment as
5       needed, if there's an objection, that
6       will certainly be preserved.  But it is
7       not an attorney/client relationship in
8       the traditional sense.  He's the
9       expert.  He doesn't have independent
10      counsel here today.
11          MR. KISSANE:  So you're preserving
12      your right to make objections, but if I
13      understand your representation
14      correctly, you're not representing him
15      as his counsel for today's purposes?
16          MS. SUM:  That is correct.
17          MR. KISSANE:  Okay, very good.
18      Q.   Do you understand that, Mr. Ahmed?
19      A.   Yes, I do understand, yes.
20      Q.   Have you ever sat for a deposition
21  before, given sworn testimony before a court
22  reporter, whether in person or remotely like
23  today?
24      A.   No.
25          MR. KISSANE:  I'm going to ask to



Page 8

```
 1                    F. AHMED
 2         display a document that we're going to
 3         mark as Exhibit 1 for purposes of
 4         today's deposition.  It's a copy of
 5         your expert report dated March 5, 2024.
 6              (Whereupon, an expert report was
 7         marked Ahmed Exhibit 1 for
 8         identification as of this date.)
 9         Q.   And we can scroll through this as
10    necessary.  I'll represent to you that it's
11    a 25-page document beginning with the page
12    you see.  And with the final two pages
13    consisting, I guess, the final three pages
14    consisting of something called attachment B,
15    documents reviewed and relied upon.
16              I'd ask if you would instruct us
17    how much of this we ought to show you to get
18    you comfortable answering the question of
19    whether you recognize this as your report?
20         A.   Yes, this is my report.  I
21    recognize this.  This is mine.
22         Q.   Now, in your report, and I'm going
23    to make references to it, if you'd like me
24    to turn you to the portion that I'm
25    referring to, we can easily do that.  But in
```



Page 9

                              F. AHMED

1

2    some cases it may not be necessary.  So let

3    me know if you want to do that.

4              I'm referring now to your report,

5    where you say that you had not testified as

6    an expert at trial in the past five years.

7    Have you testified as an expert in any other

8    capacity in the past five years, in other

9    words, apart from a trial?

10        A.    No.

11        Q.    And have you testified as an

12   expert at trial at any point, including

13   beyond the past five years?

14        A.    No.

15        Q.    Is it fair then to say that you

16   have never testified as an expert before

17   today?

18        A.    Yes, I have not testified.

19        Q.    And apart from testimony, have you

20   served as an expert in any litigation apart

21   from the one that we're here on today?

22        A.    So in my experience when I was

23   working with PricewaterhouseCoopers and

24   KPMG, I was part of the forensic advisory

25   services and we were providing litigation



Page 10

```
 1                    F. AHMED
 2   support.  So I have assisted the experts on
 3   similar matters producing expert reports.
 4   Personally I have not testified as an
 5   expert.
 6        Q.   Apart from testimony, you
 7   mentioned preparing reports.  Apart from
 8   assisting the preparation of reports, have
 9   you issued a report in your own name in
10   connection with any litigation?
11        A.   No.
12        Q.   By your own name, I mean, whether
13   individually or as part of a corporate
14   affiliation, but you are the expert, were
15   you identified as the expert in any report?
16        A.   No.
17        Q.   And your report here also states
18   that you authored articles in the past ten
19   years; right?
20        A.   Yes.
21        Q.   And how many articles have you
22   authorized in the last ten years?
23        A.   So there are a number of articles
24   which have been published in, in the gold
25   sector, primarily gold sector, in the recent
```



Page 11

```
1                    F. AHMED
2    past, in the last four years.  There are a
3    number of articles that I have written about
4    the challenges in the precious metal sector.
5              In the past I have written
6    articles on anti-crisis corruption once I
7    was with PricewaterhouseCoopers in London.
8    I have written articles on off-shoring
9    techniques.  So there are articles that I
10   have written over the last ten years.  Off
11   the top of my head I don't remember how
12   many, but there are a number of articles in
13   the recent past.
14        Q.   And you mentioned the articles
15   that you published.  Was that a publication
16   you named that they've appeared in?  Can I
17   ask you to clarify so that I understand
18   correctly?  Did you say gold sector?
19        A.   Yes.  So there are articles that I
20   have written in a magazine which is New
21   Journals.  There are articles that I've
22   written in Gulf News newspaper, there are
23   articles which was produced like a white
24   paper that I've written.  So these are the
25   type of articles that I've written.
```



Page 12

                    F. AHMED

1

2        Q.    Could you list for me all of the

3   publications in which you've published an

4   article in the past ten years, all the ones

5   you can recall?

6        A.    So Gulf News which is the

7   newspaper, there are articles that I've

8   written, new Journals magazine where my

9   article has been published.  These are the

10  two on the top of my head which I remember

11  where there are more than one articles in

12  New Journals that I've written.

13       Q.    Is there more than one in Gulf

14  also?

15       A.    Yes, there was -- there's articles

16  on Gulf News also, yes.

17       Q.    Can you identify for me, to the

18  best of your recollection, the subject and

19  date of each of the articles that you

20  published in Gulf News?

21       A.    I don't remember the date.  The

22  subject has been on corporate tax which

23  included the accounting standards

24  requirement in the UE.  Especially after

25  2018 there has been a massive requirement in



Page 13

```
 1                    F. AHMED
 2   terms of the documentation.  So I've written
 3   articles around that.
 4             In New Journals it has been around
 5   the gold sector, the requirements, the
 6   Anti-Money Laundering Law which has been
 7   enforced in the UE -- the Anti-Money
 8   Laundering, AML, and counter-financing of
 9   terrorism.  So I've written articles on that
10   subject, what the Ministry of Economy in the
11   UE has been doing in the last five or six
12   years, especially in the precious metal
13   sector.
14        Q.   And are you able to give any
15   reasonable estimate of the number of
16   articles you published in New Journal
17   magazine?
18        A.   New Journals, I believe there are
19   at least three before, but three is what I
20   can remember.
21        Q.   And what was the most recent?
22        A.   It would be less than six months
23   old.
24        Q.   And the questioning to this point
25   has been limited to the past ten years.
```



```
 1                     F. AHMED
 2   Have you written articles that were
 3   published more than ten years ago?
 4        A.   Not articles, but I was -- I was
 5   project managing the global economic Price
 6   survey, which is a survey which was
 7   published in 2009 and 2011 by
 8   PricewaterhouseCoopers.  I was globally
 9   managing it.  The content of that report was
10   written by me where we captured -- in 2009
11   the key theme was on the back of the
12   downturn, the global economic Price survey
13   on the back of the economic downturn.  In
14   2011 we focused on the cybercrime, the team.
15   It was a survey so I've written the report.
16              Around in 2010 there was the U.K.
17   Anti-Bribery Corruption Act of 2010 which
18   came into effect.  And I did -- I wrote a
19   white paper on responding to the Bribery Act
20   with respect to Emerging Markets, so which
21   included collaboration between the U.K.
22   president, U.K. China.  So that's a white
23   paper which was issued under
24   PricewaterhouseCooper, but I authored these
25   reports.
```



Page 15

                        F. AHMED

1

2       Q.   When you say you authored these

3   reports, they were issued by

4   PricewaterhouseCooper, were you identified

5   as the author on the report that was

6   published?

7       A.   Yes.  The report is published,

8   yes, it is available.  It should be

9   available online.  And I'm named as a

10  project manager of that.  And I completed

11  all the data, I documented the summaries, so

12  I wrote the report, of course.  It went

13  under the name of PricewaterhouseCooper's

14  report, not my personal report.

15      Q.   But you were the author in each of

16  these instances; is that correct?

17      A.   Yes.

18      Q.   We can put down your report for

19  the moment.

20          MR. KISSANE:  I'm going to ask if

21          we can pull up what I'm going to have

22          marked as Exhibit 2 for today's

23          session.  It's a copy of the Arbitrade

24          bylaws dated June 26 of 2018.

25               (Whereupon, Arbitrade bylaws dated



Page 16

```
 1                    F. AHMED
 2        June 26, 2018 were marked Ahmed Exhibit
 3        2 for identification as of this date.)
 4        Q.   I will start with a question.  Did
 5   you review the Arbitrade Bylaws in preparing
 6   your expert report?
 7        A.   The bylaws of Arbitrade, if I can
 8   see the document.  Because I have in my file
 9   the list of documents.  Can I see what
10   exactly --
11        Q.   Yes.  So we can scroll through it
12   as much as you would like.  Obviously if I
13   ask you about portions, we'll direct you to
14   those.
15        A.   Yes.
16        Q.   But my first question is whether
17   you reviewed the Arbitrade Bylaws in
18   preparing your report?  That's not
19   necessarily specific to this document,
20   although this is the Arbitrade Bylaws, but
21   before we get into the document specific
22   questions, do you recall if you reviewed any
23   iteration of the bylaws of Arbitrade in
24   connection with the preparation of your
25   report?
```



Page 17

                        F. AHMED
1
2         A.    I just read the first page.  I'm
3     not able to recollect.  But if you can
4     scroll down and show me the document, the
5     bylaws.
6              MS. SUM:  Tom, do you have a Bates
7         label for this?
8              MR. KISSANE:  I don't.  I see it's
9         not at hand.
10             I'm going to ask that we go off
11        the record for a second.
12             (Whereupon, an off-the-record
13        discussion was held.)
14             MS. SUM:  I'm going to put the
15        SEC's objection on the record that
16        Exhibit 2 does not bear a Bates stamp
17        number.  I've requested that
18        Mr. Kissane provide it.  The basis for
19        the objection is we just want to know
20        who the producing party is of Exhibit
21        2.  Thank you.
22             MR. KISSANE:  Very good.
23        Q.    So my question is, I guess you're
24     looking at the document, feel free to
25     continue to do so, my initial question is



Page 18

1                        F. AHMED
2    whether you recall whether or not you
3    reviewed any version of the Arbitrade Bylaws
4    in preparing your expert report?
5         A.    No, I don't recall, you know,
6    reviewing this document.
7         Q.    This document or any version of
8    the bylaws?
9         A.    Not any version of the bylaws.
10        Q.    So I'm going to ask that we
11   turn -- this document doesn't have page
12   numbers, but it has paragraph numbers, so
13   I'm going to ask that we turn to paragraph
14   51, and I direct your attention to that
15   portion that reads, "Powers of the Board of
16   Directors," and then 51.1 says, "The Board
17   shall determine the general policy of the
18   company including the scope of its
19   activities and operations and is also
20   responsible for ensuring that management of
21   the company conduct, the day-to-day
22   operations and management of the company and
23   its subsidiaries (where relevant) in
24   accordance with the policy and strategic
25   direction given by the board."



Page 19

```
 1                    F. AHMED
 2          Then I'm going to ask if we can
 3  turn to paragraph 56, and I direct your
 4  attention to 56.1 under Duties of Officers.
 5  It says, "The officers shall have such
 6  powers and perform such duties in the
 7  management, business and affairs of the
 8  company as may be delegated to them by the
 9  board from time to time."
10          Now, my question is, at the time
11  you prepared your report, were you aware
12  that the management of the company was
13  reserved to the officers and directors by
14  the bylaws?
15          MS. SUM:  Objection to the extent
16       that it requires the witness to reach a
17       legal conclusion based on the language
18       from Exhibit 2.
19          MR. KISSANE:  I'll rephrase the
20       question.
21          Q.   At the time that you prepared your
22  expert report, did you have any view,
23  regardless of what that view might have
24  been, as to whether the management of
25  Arbitrade was reserved to its directors and
```



Page 20

1                     F. AHMED

2    officers?

3          MS. SUM:  Still same objection,

4          requiring an understanding of what

5          legal requirements there were with

6          respect to the company and its board

7          and the other employees.

8          Q.   All right, you can answer the

9    question, unless -- well, actually you can

10   answer the question?

11         A.   No.  As mentioned, that's a legal

12   opinion.  It's outside the limit of my

13   expert report.

14         Q.   So you had no view either way as

15   to whether the management of the company was

16   reserved to the directors and officers at

17   the time you drafted your report?

18         MS. SUM:  Same objection.

19         Requires legal conclusion.

20         MR. KISSANE:  Asking him whether

21         he had a view doesn't require a legal

22         conclusion.  It's a factual matter.  He

23         either had a view or he didn't.

24         MS. SUM:  I'll allow him to answer

25         whether he had a view.



Page 21

1                    F. AHMED

2          Faisal, just so you know, counsel

3      may assert objections.  So unless I

4      instruct you not to answer, you do have

5      to answer questions being posed by

6      Mr. Kissane.

7      A.    Sure.  What I've gone through is

8  the complaint for injunction of relief and

9  of jury trial and the previous documents

10 listed in my exhibits and based on that, and

11 then there are a number of emails, so which,

12 you know, in my view there had been control

13 over the management in the specific area

14 where I had provided my expert report where

15 there were directions given by the

16 individuals, the management members.

17          I cannot comment on the -- I

18 cannot comment on the legal aspect based on

19 these bylaws.  But what I can see is there

20 were emails which were shared with me, there

21 were certain directions specific to the

22 expert report that I prepared.  I have gone

23 through those emails and the complaint.

24 Q.    At the time you prepared your

25 report, did you have any understanding as to



Page 22

```
 1                    F. AHMED
 2   whether Mr. Hogg was a director or officer
 3   of Arbitrade at the relevant times?
 4        A.   Yes.
 5        Q.   What was your understanding in
 6   that regard?
 7        A.   That he was the senior management
 8   team members.  It's mentioned in the
 9   complaint.
10        Q.   Well, let me focus on that then.
11   What was the basis of your understanding
12   that Mr. Hogg was the director of Arbitrade?
13             MS. SUM:  Objection.  I don't
14        think that was your question or you're
15        talking about other positions, so.
16             MR. KISSANE:  I asked director or
17        officer.  I'm going to pursue them
18        separately.
19        Q.   So let's start with director.  Was
20   it your understanding that Mr. Hogg was a
21   director of Arbitrade?
22        A.   Just can you clarify your
23   question.  You said director and officer,
24   what do you mean by the two?
25        Q.   I'll restate it and let's just
```



1                    F. AHMED

2    start with this question alone.

3         A.   Yes.

4         Q.   At the time you prepared your

5    report, did you understand or did you have

6    the understanding that Mr. Hogg had been a

7    director of Arbitrade during the period you

8    were considering?

9         A.   Yes.

10        Q.   And what was the basis of that

11   understanding?

12        A.   The documents which is mentioned

13   in my exhibits which I reviewed.

14        Q.   Did you see any document that to

15   your understanding stated that Mr. Hogg was

16   a director of Arbitrade?

17        A.   As in a legal document confirming

18   his position, no.

19        Q.   Whatever it is that you're saying

20   you relied on is what I'm trying to get at.

21        A.   So no, in terms of his

22   directorship, there's no document which was

23   provided to me.  But from his position as a

24   director, so his official appointment.

25        Q.   So what, if anything, did you rely



Page 24

1                    F. AHMED

2    upon in concluding that he was a director?

3         A.    To the complaint and the exchange

4    of emails which was shared as exhibits.

5    These are the documents that I have

6    reviewed.

7         Q.    Did you see anything in the

8    complaint that said that Mr. Hogg was the

9    director of Arbitrade?

10        A.    The exact position, I'd have to go

11   back to the complaint and have a look at it.

12        Q.    As we sit here, you don't recall

13   having seen that in the complaint; is that

14   right?

15        A.    No.  I said I have to go back to

16   his specific position, what was his

17   designation.  I'd have to go back and see

18   what was his exact designation in the

19   document, whether a director, officer,

20   managing director.  I mean, it could be any

21   position.  I need to go back and have a look

22   at it.  Or if you have it, you can actually

23   specifically show me where it's coming from,

24   the question.

25        Q.    As we sit here, do you recall



Page 25

```
 1                      F. AHMED
 2   having seen anything in the complaint
 3   stating that Mr. Hogg was a director of
 4   Arbitrade?
 5        A.   I've seen that he was holding a
 6   position of, you know, senior management
 7   position.  What was his designation?  I
 8   don't recall.  I would have to go back and
 9   have a look at that.
10            What I can see is that in the
11   defendants and the relief defendant's
12   section of the complaint it is specified
13   that Mr. Hogg was the founder, owner and
14   sole officer and director of Cryptobontix,
15   and I remember a title, as an officer or
16   director of Arbitrade.  So that's what is
17   mentioned.  In terms of what was his
18   position, in the complaint it says that Hogg
19   was an undisclosed control person of the
20   company and he was assigned to overall
21   control for Arbitrade and was executor or
22   the owner of the company.
23            So as for page 4 of the complaint
24   it defines in the defendants and relief
25   defendant section that "Mr. Hogg is a
```



Page 26

```
 1                    F. AHMED
 2  resident of Ontario, Canada.  Hogg is the
 3  founder, owner and sole officer and director
 4  of Cryptobontix.  Although Hogg never had a
 5  title as an officer or director of
 6  Arbitrade, Hogg was an undisclosed control
 7  person of the company.  He exercised overall
 8  control over Arbitrade and was the
 9  60 percent owner of the company."
10            This is what I received.
11            Now, my area of expertise did not
12  require me to actually validate that
13  information with any supporting documents.
14  This is the document that I relied on in
15  terms of his position.
16       Q.   Very good.  And having reviewed
17  that, does that clarify your understanding
18  that at the time you prepared your report,
19  you knew that Mr. Hogg was not a director of
20  Arbitrade?
21            MS. SUM:  Objection.  That
22       misstates his testimony.
23       Q.   Now, you just read from the
24  complaint saying that Mr. Hogg did not hold
25  a position on the board of Arbitrade.
```



Page 27

                              F. AHMED

1

2              And then you said that a complaint

3    also says he is some sort of undisclosed

4    control person.  I'm going to break that

5    down into its component parts.

6              When you prepared your report, you

7    understood that Mr. Hogg was not a director

8    of Arbitrade; right?

9         A.   Yes.  But there were emails and

10   there are emails between Mr. Hogg and the

11   management.  So as I said, in terms of your

12   question was whether I've relied on any

13   document, whether he was a director or not,

14   there was no document which supported his

15   position in that document.  I relied on the

16   complaint and the exhibits which were shared

17   with.

18        Q.   And the complaint, as we just

19   discussed, says that he was not a director,

20   and we'll talk about the emails in a minute.

21             But let's first talk about the

22   other thing you referred to from the

23   complaint saying that Mr. Hogg was an

24   undisclosed control person.

25             Do you have any understanding as



1                      F. AHMED

2    to whether undisclosed control person is a

3    legal term?

4         A.    That's a legal question.  So, you

5    know.

6         Q.    Well, do you have an understanding

7    of what undisclosed control person means,

8    other than as a legal term?

9         A.    Which means he has control, he has

10   control over the operations or decision

11   making in that company.

12        Q.    Did you form any view in preparing

13   your report as to whether Mr. Hogg was an

14   undisclosed control person of Arbitrade?

15            MS. SUM:  Objection.  Requires the

16        witness to provide any kind of legal

17        conclusion.  And he has already

18        testified that that's not his area of

19        expertise.

20            MR. KISSANE:  It only requires him

21        to say whether he had any view as to

22        whether Mr. Hogg was an undisclosed

23        control person other than as a legal

24        term.  He may have had such a view or

25        may not.  I just want to know which it



Page 29

1                          F. AHMED

2          is.

3          A.   Once again, this requires legal

4    expertise.  I did not -- my expert report,

5    the scope of work was not to provide legal

6    opinion.  So I would reserve my rights on

7    providing a view on this.

8          Q.   Can you tell me, what, if

9    anything, you saw in emails that caused you

10   to believe, if you did, that Mr. Hogg was a

11   director of Arbitrade?

12         A.   There were email exchanges, there

13   were email which was forwarded.  I didn't

14   see any emails which said he was a director

15   of Arbitrade.

16         Q.   And did you see anything in the

17   emails or otherwise concerning the question

18   of whether Mr. Hogg was an officer of

19   Arbitrade?

20         A.   No, I didn't see anything.

21         Q.   I'm going to ask you the same

22   questions as to Mr. Goldberg.  At the time

23   you prepared your report, did you have any

24   understanding as to whether Mr. Goldberg was

25   a director of Arbitrade?



Page 30

                    F. AHMED

1

2      A.   As I mentioned, again, my scope of

3   work did not require me to actually validate

4   their positions.  So whether they were a

5   director or an officer, they were the

6   defendants in the complaint, their role has

7   been already defined in that section,

8   defendants and relief defendant, and that's

9   the information that I had.

10      Q.   So your answer as to Mr. Goldberg

11   on the subject of officer and director

12   status would be the same as they were for

13   Mr. Hogg; is that correct?

14          MS. SUM:  Objection to form.  You

15      can answer, Mr. Ahmed.

16      A.   Yes.  So it clearly says he

17   exercised significant control over

18   day-to-day affairs of Arbitrade.  Now, that

19   is not for me to prove in my expert report.

20   That's a legal point.  But the complaint

21   which was shared with me clearly stated that

22   he exercised significant control over the

23   day-to-day affairs.  So this question about

24   whether he was a director or an officer is

25   not relevant to my expert testimony.



Page 31

```
 1                    F. AHMED
 2      Q.    Now, elsewhere in your report, you
 3  say, "The SEC has alleged in part that
 4  Arbitrade, Cryptobontix, Hogg, Goldberg,
 5  Braverman and Barber perpetrated a crypto
 6  asset pump and dump scheme."
 7             So that refers to a crypto asset.
 8  What experience, if any, do you have with
 9  crypto currency?
10      A.    So in 2021 the first crypto OTC,
11  over-the-counter company was set up in Dubai
12  by the Commodities Center, the SEC.  And I
13  wrote the AML policies and procedures for
14  that company.  We were awarded by the SEC
15  and the company providing the compliance
16  support.  And then we supported the
17  compliance for -- as compliance consultants
18  for this crypto company for a period of time
19  after we prepared the anti-money laundering
20  framework.
21      Q.    When you say, "we," who are you
22  referring to?
23      A.    Me and my firm.  So I lead this
24  firm with a few consultants.  And we were
25  hired by the company to actually write the
```



```
 1                    F. AHMED
 2   AML policies.  And we worked on the
 3   compliance aspect.  So we are aware about
 4   the crypto companies.  It's been our client.
 5       Q.   And at the time you were
 6   approached for that assignment you described
 7   in 2021, what experience, if any, did you
 8   have with crypto currency up to that point?
 9       A.   So again, since 2018 and '19,
10   there has been crypto business which is in
11   the UE.  So we engaged in a number of
12   meetings with clients of potential people
13   who are mining crypto here.  And I have
14   participated in my capacity as an adviser to
15   a number of clients on these discussions.
16            Also the Virtual Aspect Regulatory
17   Authority, the VARA regulations, which are
18   coming here.  So we do research.  So we,
19   when I say we, myself, myself, I lead the
20   firm, we are specializing in AML and we are
21   working in a number of industries.  I work
22   in financial institutions on implementing
23   anti-money laundering and counter-financing
24   of terrorism.  I work in the designated
25   non-financial businesses and professions,
```



Page 33

                              F. AHMED
1
2    which include precious metal sector, real
3    estate sector, insurance companies, lawyers
4    and accountants and also in the crypto
5    currency space.  So we have a dedicated team
6    which is looking at the crypto assets and
7    trying to get regulations within the crypto
8    industry.
9         Q.   Do you regard yourself as an
10   expert concerning crypto currency?
11        A.   I regard myself as an expert on
12   anti-money laundering and compliance in the
13   precious metal sector.
14             On the crypto sector, it's still
15   evolving.  We are still working.  As I said,
16   we were the first crypto OTC company which
17   was set up in the UE.  We were hired because
18   of our expertise in this to prepare the AML
19   framework and to act as compliance
20   consultants.
21        Q.   To focus on my questions, to fill
22   in what you said or drawing on other
23   resources you may have in mind, do you or do
24   you not regard yourself as an expert
25   concerning crypto currency?



Page 34

1                    F. AHMED

2        A.    When you say, "An expert

3    concerning crypto currency," can you

4    elaborate what you mean by an expert?  We

5    are consultants in the crypto currency, in

6    the compliances in crypto currency and we

7    are working with clients on this.

8              When you say, "an expert," what do

9    you mean?  I have not testified as an expert

10   for a crypto company.

11       Q.    Well, my question is whether you

12   regard yourself as an expert.  So I can't

13   tell you what definition you might apply in

14   making that judgment.

15       A.    All I can say is we are

16   consultants with compliance expertise

17   catering to the crypto industry.

18       Q.    But I believe you said you've

19   never offered testimony as an expert

20   regarding crypto currency; right?

21       A.    Yes, I'm sorry, yes.

22       Q.    Elsewhere in your report you

23   write, "The SEC has alleged in part that

24   Arbitrade and Cryptobontix through Hogg,

25   Goldberg, Braverman and Barber made material



Page 35

```
 1                      F. AHMED
 2   misrepresentations and omissions to
 3   investors while they were offering and
 4   selling DIG tokens in a series of news and
 5   press releases issued to the public and a
 6   press conference.  They also participated in
 7   a scheme to defraud."
 8            The text continues, but I want to
 9   focus your attention on that to ask this
10   question.  What experience, if any, do you
11   have with the U.S. Securities Laws?
12        A.   When you say, "The U.S. Securities
13   Laws," what specific laws on the U.S.
14   securities?
15        Q.   Well, let's start with them as a
16   whole and then we can get more specific if
17   and as appropriate.
18            What experience do you have, if
19   any, with the U.S. Securities Laws?
20        A.   That's a legal --
21            MS. SUM:  Actually, let me go
22        ahead and insert an objection here.
23        This expert has not been retained as an
24        expert in U.S. Securities Laws.  So I'm
25        going to object to a line of question
```



Page 36

```
                    F. AHMED
 1
 2      that goes into -- what he does or
 3      doesn't know about it is not the
 4      subject of this expert report.  It's
 5      very clearly defined what the scope is
 6      and it does not include U.S. Securities
 7      Laws.
 8          But Mr. Ahmed, you can answer the
 9      question, if it doesn't require any
10      legal expertise to answer it.
11  Q.    Do you have any experience with
12  the U.S. Securities Laws?
13  A.    No.  Again, as the expert in the
14  scope of work that I have produced, my
15  expert report, I'm not an expert in U.S.
16  securities.  That was not the requirement.
17  Q.    In the course of the review you
18  did in connection with your report, did you
19  see any evidence that Mr. Hogg had
20  participated in a crypto asset pump and dump
21  scheme?
22          MS. SUM:  Objection, calls for
23      legal conclusion.  And the expert was
24      not retained for that purpose as noted
25      in his report.
```



                        F. AHMED

1

2      Q.   In drafting your report, was it

3   your intention to reflect a conclusion as to

4   what you had described in here as the SEC's

5   allegation that Mr. Hogg had perpetrated or

6   participated in a crypto asset pump and dump

7   scheme?

8      A.   So in my conclusion is mentioned

9   in my expert report it was a specific

10   defined scope of work.  I was not required

11   to opine on the legal aspect of their role

12   and responsibilities.  I was -- I

13   specifically focused on the scope of work

14   which was provided in my expert report.

15      Q.   So it was not your attention in

16   your report to convey an opinion as to

17   whether Mr. Hogg had participated in a

18   crypto asset pump and dump scheme; is that

19   right?

20      A.   So as a legal opinion, no, I would

21   not provide a legal opinion.

22      Q.   Well, putting aside whether it's

23   characterized as a legal opinion, did you

24   intend for your report to convey an opinion

25   as to whether or not Mr. Hogg had



Page 38

1                    F. AHMED

2    participated in a crypto asset pump and dump

3    scheme?

4         A.    That was not the reason of my

5    report.

6         Q.    Do you recall seeing any evidence

7    in the course of preparing your report that

8    you believe supported an argument that

9    Mr. Hogg had participated in a crypto asset

10   pump and dump scheme?

11            MS. SUM:   Objection.   The witness

12        has testified repeatedly.   This is not

13        within the scope of his expert report.

14        It's not providing any legal

15        conclusions as to the section.

16            Tom, it says in this sub part of

17        his report, "The SEC has alleged in

18        part the listing of the allegation."

19            MR. KISSANE:   And I'm asking him

20        whether he saw any evidence that in his

21        view supported that allegation that

22        Mr. Hogg had participated in a crypto

23        asset pump and dump scheme.

24            He can answer yes, he can answer

25        no, he can answer that he can't say,



Page 39

1                    F. AHMED

2      but it's a simple question.

3      A.    That's outside the scope of my

4  work.  So you see, whether the -- it's a

5  legal point.  So I was not required to opine

6  or have my view on whether they participated

7  in the pump and dump scheme.  All I mention

8  in my report is that this is what the SEC

9  has alleged with the company.

10     Q.    Right, but I'm asking a different

11 question and that is whether in the course

12 of reviewing documents and preparing your

13 report, you saw anything that you regarded

14 as evidence supporting the allegation that

15 Mr. Hogg had participated in a crypto asset

16 pump and dump scheme?  Either you did or you

17 didn't.

18         MS. SUM:  Same objection, based on

19     the scope of his expert report.

20     A.    It's outside the scope of my work.

21     Q.    The question has nothing to do

22 with the scope of your work.  The question

23 has to do with whether you did or didn't see

24 documents that you believe supported the

25 allegation that Mr. Hogg participated in a



Page 40

```
                        F. AHMED
 1
 2   crypto asset pump and dump scheme.  If you
 3   say you did or didn't, the significance of
 4   that answer can be argued elsewhere.
 5            But the question of whether it's
 6   within the scope of your work is irrelevant
 7   to the question.  So I'm going to restate
 8   it.
 9            Did you or did you not in
10   connection with preparing your report see
11   any evidence that you believe supported an
12   allegation that Mr. Hogg participated in a
13   crypto asset pump and dump scheme?
14            MS. SUM:  I'm asserting the same
15        objection.
16            Tom, this is like asking him if
17        there's evidence, PC evidence whether
18        the sky is green.  This is not part of
19        the scope of his expert report.
20            MR. KISSANE:  Well, I think the
21        sky is as green as the allegation is
22        accurate.  But I'm not looking to argue
23        the merits of anything, obviously, with
24        you Alice here.  I just want to get him
25        to answer the very narrow question.
```



Page 41

```
 1                    F. AHMED
 2            And you know, you made your
 3       objection, and we'll see where it goes.
 4       But I still think he owes me an answer
 5       as to whether or not in the course of
 6       preparing his report he saw evidence
 7       that he regarded as supporting the
 8       allegation that Mr. Hogg participated
 9       in a crypto asset pump and dump scheme.
10            MS. SUM:  Same objection.
11            Mr. Ahmed, you can answer the
12       question, if it doesn't require you to
13       reach any kind of legal conclusion.
14       A.   Yes.  I mean, I'm repeating
15  myself.  I've said it previously.  I was not
16  required as part of my scope to form an
17  opinion or look at evidences on this
18  allegation.  So on the specific allegation
19  which you're talking about, it's beyond the
20  scope of my work.
21       Q.   So I'm trying to minimize the
22  redundancy here.  I'll rephrase the question
23  this way.
24            Accepting that you have said that
25  it was beyond the scope of your work,
```



Page 42

```
 1                         F. AHMED
 2    regardless of whether it was within or
 3    beyond the scope of your work, did you see
 4    any evidence during the preparation of your
 5    report that you regarded as supporting the
 6    allegation that Mr. Hogg participated in a
 7    crypto asset pump and dump scheme?
 8              MS. SUM:  Objection, to the extent
 9         that it calls the witness to provide
10         any kind of legal conclusion regarding
11         the allegation.
12              You can answer it, Mr. Ahmed, if
13         it doesn't require you to reach a legal
14         conclusion.
15         Q.   Please answer.
16         A.   Yes, you know, again, what I have
17    mentioned in my report is the SEC's
18    complaint, where the SEC has alleged my
19    responsibility or my scope did not require
20    me to investigate into whether these
21    allegations -- what was the evidence around
22    these allegations about pump and dump
23    scheme.  So I did not investigate.  That was
24    not the scope of work.  So if you ask me,
25    you know, you're asking me this question,
```



Page 43

                        F. AHMED

1    what I put down is the SEC's complaint, the

2    alleged complaint.  That was not my area of

3    expertise or my agreement or my scope to

4    actually investigate what the complaint SEC

5    is valid and to validate the evidence.

6        Q.   Okay.  I'm going to ask you the

7    same question and hopefully we can deal with

8    it more briefly.  I'll just ask the

9    question.

10           In the course of preparing your

11   report, did you see any evidence that you

12   regarded as establishing that Mr. Hogg had

13   made material misrepresentations to

14   investors?

15           MS. SUM:  The same objection to

16       the extent that the witness is required

17       to make a legal conclusion.

18           If you can answer without

19       providing any kind of legal conclusion,

20       you can do so.

21       A.   I mean, I can't provide a legal

22   opinion here.  I have looked at the

23   complaint, the SEC's complaint and we have

24   taken it from there.



Page 44

1                         F. AHMED

2        Q.    So did you or did you not see any

3    evidence that you regarded as supporting a

4    contention that Mr. Hogg had made material

5    misrepresentations to actual or potential

6    investors?

7             MS. SUM:   Objection, calls for a

8        legal conclusion.   You can go ahead.

9        A.    Just that I kept saying this, that

10   that requires a legal opinion, that's a

11   legal conclusion.   It was not my scope.   So

12   I can't comment on this.

13       Q.    I disagree that it requires a

14   legal conclusion, because the question is

15   simply whether you saw any evidence that you

16   believed supported that contention.   I'm not

17   at this point asking you about the ultimate

18   contention.

19            So did you or didn't you see

20   evidence going to that subject?

21            MS. SUM:   Same objection regarding

22       the legal conclusion.   You're asking a

23       witness who is an expert within the

24       gold industry and AML about what

25       material misrepresentations, et cetera,



Page 45

```
1                    F. AHMED

2         are.

3              Mr. Ahmed, if you can answer

4         without touching on any kind of legal

5         conclusion, you may answer.

6         A.    It's the same answer.  This is

7    beyond my expertise or scope of work.

8         Q.    And therefore you formed no

9    conclusion on the subject; right?

10        A.    It's a legal opinion.  So

11   whether -- to establish the evidence of

12   whether there is material misrepresentation

13   or not is a legal matter which I'm not

14   commenting on the legal matter.

15        Q.    So therefore you formed no opinion

16   on the subject in your report; right?

17        A.    On the legal matter, you know, on

18   the legal opinion.

19        Q.    You described it as a legal

20   opinion.  I've described it as the question

21   of whether Mr. Hogg made material

22   misrepresentations.

23              So if you're saying that you

24   didn't form an opinion on that subject, we

25   can move on.  But if you're qualifying that
```



Page 46

1                    F. AHMED

2    by saying that you didn't make an opinion

3    only as to the legal opinion, then I want to

4    pursue what else you had in mind where you

5    may have formed such an opinion.

6              So let's try to clarify that.

7         A.   So let me explain.  There are

8    press releases about Arbitrade announcing

9    shipments, Arbitrade announces that they are

10   secure, which is, you know, the U.S. dollar,

11   10 billion in gold backed up by documents.

12   Now it is not my opinion to validate whether

13   it leads to misrepresentation or not.  My

14   scope was clear on the process, the

15   standards which were required to be met to

16   validate that this was (unintelligible)

17   gold.  So I wouldn't comment on whether

18   those evidences satisfied the complaint or

19   the alleged complaint by SEC.  That's a

20   legal matter.

21        Q.   In the course of preparing your

22   report, you mentioned press releases.  Did

23   you see evidence of Mr. Hogg's participation

24   in the writing or distribution of press

25   releases related to the gold?



1               F. AHMED

2         A.    Which particular press release?

3    If you can refer me to the specific document

4    then I can, you know -- well, I can then

5    answer your question.

6         Q.    I don't know that there is any

7    such document.  I'm asking whether you do.

8              MS. SUM:  Objection.

9              Okay, Tom, you're asking a

10             question, and you're turning it to --

11             you're asking for clarification and now

12             you're taking the rug out from under

13             him.  If you want him to testify

14             regarding a specific press release, put

15             it up and ask him whatever question you

16             want.

17             MR. KISSANE:  If I wanted him to

18             testify to a specific press release, I

19             would do that.  But what I want him to

20             testify to is whether or not he saw any

21             evidence of Mr. Hogg's participation in

22             the writing or distribution of press

23             releases related to the gold.  It's a

24             yes or no question, if he knows or he

25             can say that he doesn't know.



Page 48

1                           F. AHMED

2               MS. SUM:  If you know the answer

3          to the question, Mr. Ahmed, you can

4          answer it.

5          A.   No, there are several emails.  Now

6     if I go back into my file, you know, I look

7     at those emails, I can't even remember --

8     there was a email which was from Troy Hogg

9     to Larry Mere dated June 14, 2018.  Again,

10    there is a discussion about the gold, there

11    is discussion about the gold bullion, et

12    cetera.  So again, if there is a specific

13    email, there are emails where he's copied or

14    he's sending email.  If you want to show me

15    the email, I can tell you what I relied on

16    from that particular email.  But you have to

17    show me that particular exhibit.

18         Q.   So I understand, you're saying

19    there were emails concerning the gold

20    bullion, but that wasn't my question?

21         A.   Yes.

22         Q.   My question was whether you were

23    aware of any evidence of Mr. Hogg's

24    participation in the writing or distribution

25    of press releases related to the gold?



Page 49

                          F. AHMED
1
2            MS. SUM:  Same objection.  The
3        scope of the expert's work and his
4        report is not as to the specific line
5        of questioning you're asking.  He said
6        very clearly multiple times now what
7        the scope of his expert report is and
8        it's plain in the report in black and
9        white.
10           MR. KISSANE:  I don't see how that
11       in any way prevents him from answering
12       the question.  It's a yes or no
13       question, and whatever the reasons for
14       either answer might be could be
15       explored elsewhere.
16      Q.   I'm simply asking whether as we
17   sit here today, he recalls whether he saw
18   any evidence of Mr. Hogg's participation in
19   the writing or distribution of press
20   releases related to the gold?
21      A.   Again, that's a legal point, what
22   was his participation.  If you see, my
23   expert report is clearly on the standards
24   which should have been followed.  It's not
25   on who was participating in those, in



Page 50

1                    F. AHMED
2   distribution of the release.  I haven't
3   commented anywhere in my report on the
4   distribution of the reports and provided an
5   expert opinion on that.
6        Q.    Well, do you remember whether you
7   saw any evidence of Mr. Hogg's participation
8   in the writing or distribution of press
9   releases related to the gold?  It's a yes or
10  no question, either you remember or you
11  don't, and either it's one or the other.
12       A.    The point is whether, you know,
13  whether his participation is a question for
14  -- it's a legal point.  Because it is not
15  for my expert report.  So it doesn't matter
16  if I remember or there were emails.  There
17  are emails.  Whether he participated or he
18  did not participate is for the legal team.
19  It was beyond the scope of my work to --
20       Q.    If you're saying that it's beyond
21  the scope of your work and therefore you
22  didn't see such materials, so that's an
23  answer to my question.
24            But whether or not it's within the
25  scope of your work, my question is a very



Page 51

                        F. AHMED
1
2   narrow one, and I don't see that it turns on
3   the scope of your work, except to the extent
4   you might wish to refer to that in
5   explaining why you didn't see such evidence.
6           But I'm asking mainly whether you
7   saw evidence going to the subject of
8   Mr. Hogg's participation in the writing or
9   distribution of press releases related to
10  the gold?  And I think it's a question that
11  fairly emits a yes or no answer.
12      A.   I have seen emails related to the
13  gold which was backing the tokens.  I have
14  seen the emails about the gold, particularly
15  the gold which was backing the tokens.  But
16  specifically whether he authorized or he
17  sent any email or any instruction for the
18  press release is not something that I was
19  looking for.  That was not in my scope to
20  actually validate that whether he
21  participated or did not participate.  That
22  is for the legal counsel to validate.
23      Q.   With respect to the participation
24  or distribution of writing or distribution
25  of press releases, will your answer be any



Page 52

```
 1                    F. AHMED
 2   different as to Mr. Goldberg than it has
 3   been as to Mr. Hogg?
 4        A.    Same answer.
 5        Q.    Would your answer be the same for
 6   Mr. Goldberg as it has been for Mr. Hogg
 7   with respect to the question of material
 8   misrepresentation?
 9        A.    Yes, it will be the same answer.
10   It's a legal thing.
11        Q.    The portion of your report refers
12   to a DIG token issued by Arbitrade.  Are you
13   familiar with the DIG token?  Do you know
14   what that is?
15        A.    Yes, the D-I-G?
16        Q.    Yes.
17        A.    It's mentioned in the complaint,
18   yes.
19        Q.    In the course of preparing your
20   report, did you see any evidence concerning
21   the question of whether Mr. Hogg was
22   involved in offering the DIG token to the
23   public?
24             MS. SUM:  Objection to the extent
25        that the question calls for a legal
```



Page 53

F. AHMED

1
2    conclusion.  And this is also outside
3    the scope of Mr. Ahmed's report.
4    Q.   You can answer.
5    A.   Yes, so it's outside of the scope
6    of my work and it requires legal counsel.
7    It's a legal question.
8    Q.   Again, I think we've sort of been
9    over this, but I think we can put aside the
10   scope of your report for a second, because
11   it's a matter of a factual question.
12           Did you or did you not see any
13   evidence in the course of preparing your
14   report concerning the subject of whether
15   Mr. Hogg did or did not offer the DIG token
16   to the public?
17           MS. SUM:  Same objection.
18   A.   It was outside the scope of my
19   work.
20   Q.   My question isn't whether it's
21   inside or outside the scope of your work.
22   My question is whether you saw any such
23   evidence?
24           MS. SUM:  Same objection.
25   Q.   You can answer.



Page 54

                         F. AHMED

1

2       A.    Yes, it's the same objection, I

3  would have because it is outside my scope.

4  I was specifically tasked, you know, to look

5  at whether the standards were followed, you

6  know, for the specific verification of gold.

7  Whether they participated or whether they

8  issued the DIG token was beyond my scope.

9  So I wouldn't be looking, I wouldn't be

10  commenting on that.

11       Q.    Well, I'm asking you to comment on

12  that, I'm asking you specifically to tell me

13  whether you saw any evidence that Mr. Hogg

14  was offering the DIG token to members of the

15  public?

16            MS. SUM:  I'm going to assert the

17        same objection, outside scope, calls

18        for a legal conclusion.

19            What's offering or not, you know

20        that that's within a legal decision.

21        He's not testified as to that.  That's

22        not his expertise.

23            MR. KISSANE:  He can answer the

24        question of whether or not he saw such

25        material.



Page 55

```
1                    F. AHMED
2        A.    That's not my expertise.  So if
3   you look at it, you know, I keep saying I
4   have the complaint and I have the relevant
5   documents which are related to the complaint
6   which I have mentioned in my expert report.
7   So if there's a specific document or part of
8   the report that you want to question me,
9   yes, I'm happy to answer that.  But this is
10  a legal point I wouldn't want to comment on,
11  whether there was any evidence or not.
12       Q.    If I understand correctly, you are
13  not prepared to answer the question of
14  whether you saw any evidence that concerned
15  the question of whether or not Mr. Hogg had
16  offered the DIG asset or the DIG coin to
17  members of the investing public?  You're not
18  going to answer that; is that correct?
19       A.    No, I'm not saying I'm not going
20  to answer that.  What I'm saying here is
21  that this is not, what you're questioning me
22  is not in the scope of my work or my
23  expertise.  It's for the legal counsel.  But
24  why would I look at an evidence, why would I
25  look at an evidence?  You're asking me
```



Page 56

1                    F. AHMED

2    whether I looked at a particular evidence or

3    not, it's not relevant, because it is beyond

4    my scope of work.

5        Q.   Those are all questions you're

6    presenting that one might ask, but that's

7    not the question I'm asking right now.

8            The question simply is whether you

9    saw such materials?  And I still don't

10   understand if your answer is that you won't

11   answer or that you don't recall seeing any

12   such materials?  I just would like to

13   clarify so we can move on.

14           MS. SUM:  I'm objecting to any

15       further questions along these lines.

16       Tom, he's tried to answer you as best

17       as he can saying repeatedly it's not

18       within the scope, okay, it calls for a

19       legal conclusion.

20           He's not here as a securities

21       expert or nor was he actually retained

22       as a crypto currency expert, although

23       he apparently has extensive experience

24       with crypto currency.  So we're

25       spending a lot of time on this.  This



Page 57

                              F. AHMED

1
2       deposition is going to take far longer

3       than five and a half hours if you're

4       going to spend this much time asking

5       questions about information that's

6       outside the scope of his retention.

7              MR. KISSANE:  Well, I believe my

8       questions are proper.  I can't control

9       the time.  I think the witness is

10      answering, is participating in the

11      process and I'm hopeful that we'll be

12      able to move forward.

13             This is really related to the

14      disagreement we had earlier.  The

15      questions there came out I think a

16      little clearer than they are here.

17             So I'm going to try to close a

18      loop on it, but I don't think we've

19      gotten there yet, so I have to re-ask.

20      Q.   Putting aside whatever the scope

21   of your assignment was, putting aside the

22   question of what is or isn't a legal

23   conclusion, did you in the course of

24   preparing your report see any evidence

25   concerning the question of whether Mr. Hogg



Page 58

```
 1                      F. AHMED
 2   offered the Dignity token to members of the
 3   investing public?
 4            MS. SUM:  Asserting the same
 5        objection.  Whether there's an offering
 6        calls for a legal conclusion.
 7        A.   It's the same thing.  I was not
 8   required to investigate this particular
 9   aspect.
10        Q.   I'm not asking if you were
11   required to investigate it.  I'm asking if
12   you saw any evidence going to that subject?
13        A.   It was outside the scope of --
14            MS. SUM:  Same objection.  You're
15        asking whether he saw evidence of an
16        offering, okay.  What an offering is is
17        absolutely outside the scope of his
18        expertise, requires knowledge regarding
19        U.S. Securities Law which clearly his
20        expert report does not include any
21        conclusions to that effect.
22            MR. KISSANE:  Well, I think it's
23        for the witness to say whether he saw
24        any evidence that he viewed going to
25        the question of whether Mr. Hogg
```



Page 59

```
 1                    F. AHMED
 2      participated in an offering of the DIG
 3      token.  He could say that he did see,
 4      or didn't see, or he didn't recall, or
 5      he could say whatever he wants.  But
 6      you keep going back to the scope of his
 7      retention.  The question isn't about
 8      the scope of his retention.  The
 9      question is about what he did or didn't
10      see.
11           MS. SUM:  Okay.  I'm going to
12      again object.  You're asking him if he
13      saw evidence of Mr. Hogg making an
14      offering, okay.  The issue of whether
15      there was evidence affording offering
16      calls for a legal conclusion.  He is
17      not an expert in U.S. Securities Laws
18      as to what qualifies as an offering.
19      So I'm going to again object.  To the
20      extent that Mr. Ahmed is able to answer
21      that question without providing any
22      legal expertise or relying or forming
23      an expert opinion on legal matters, he
24      can answer.  But if he can't, I will
25      tell Mr. Ahmed, then you're not able to
```



Page 60

```
1                    F. AHMED
2      answer.
3      Q.    All right.   So I'll re-ask the
4  question in this way.   In the course of
5  preparing your report, did you see any
6  evidence that you regarded as going to the
7  subject, putting aside whatever effect on
8  that subject it might have, of whether
9  Mr. Hogg had participated in offering the
10  DIG token to members of the investing
11  public?
12          MS. SUM:   The exact same objection
13      that I just asserted.
14      Q.    And I'd ask that you answer the
15  question?
16      A.    Yes.   So again, you're asking me
17  to actually state whether I saw any evidence
18  of offering of the DIG tokens to the public.
19  Now, that's, again, beyond my expertise.
20  I'm not an expert in the U.S. securities
21  offering.   So I can't comment on that
22  particular aspect.   What would form as an
23  evidence, whether it was there or not there,
24  it was outside the scope of my work.   If we
25  focus on the areas that I have expertise on
```



Page 61

1                    F. AHMED

2    and what I have actually opined on, then

3    yes, I would be able to answer that

4    question.  But this is beyond my scope.

5        Q.    And if my questions in this regard

6    about the offering of the DIG tokens were

7    framed in terms of Mr. Goldberg rather than

8    Mr. Hogg, would your answers be the same?

9            MS. SUM:  Same objection.

10       A.    Yes, yes.

11       Q.    So if we can go back to your

12   report, Exhibit 1, and as we turn to page 7,

13   looking at paragraph 1 you say, "Defendants

14   should have conducted the Customer Due

15   Diligence (CDD)/Know Your Customer (KYC)

16   checks on SION and its owner, verified the

17   physical existence of gold, its weight and

18   purity to determine its worth and obtained

19   information on where it was being vaulted."

20           Do you see that language?

21       A.    Yes.

22       Q.    Which defendants are you referring

23   to here?

24       A.    Arbitrade.  Because if you look at

25   Arbitrade, they should have conducted the



Page 62

```
 1                    F. AHMED
 2  checks on SION, right, and verified the
 3  physical existence of gold, because the
 4  agreement was between Arbitrade and SION.
 5      Q.   Do you agree that what you're
 6  describing as the language that I read is
 7  not something that Mr. Hogg was responsible
 8  for doing?
 9          MS. SUM:  Objection, form.
10      A.   Yes, what was his role and
11  responsibilities within the companies,
12  again, it's beyond my scope.  So I'm not
13  validating what he was required to do in the
14  company or not.  He is one of the defendants
15  and clearly this should have been done by
16  Arbitrade or the officers, you know, the
17  defendants from Arbitrade who represented
18  Arbitrade.
19      Q.   But your statement here that
20  defendants should have, in the language I
21  read --
22      A.   Yes.
23      Q.   -- when you wrote that and as we
24  sit here today, you were not intending that
25  as an affirmative opinion that Mr. Hogg
```



Page 63

1                         F. AHMED

2    himself had the obligation to do the things

3    you're describing, isn't that right?

4              MS. SUM:  Objection, form.

5         A.   He is one of the defendants that

6    he should have -- it's been said that the

7    officers are personally liable to actually

8    do this.  So he should have conducted due

9    diligence.

10        Q.   So in your opinion in saying, when

11   I asked you about this language, you said

12   the obligation is Arbitrade, so now I'm

13   trying to drill down on that.

14             It sounds like you're saying that

15   Mr. Hogg had that obligation.  When you say

16   that you include him among the defendants

17   who have this obligation, what is your basis

18   for determining that he has that

19   responsibility?

20        A.   So it's the defendants, all the

21   defendants, they should have conducted the

22   due diligence procedures, right.  So it is

23   the defendants.  What responsibilities they

24   have is, again, that was not validated in my

25   report, what they were required to do as per



Page 64

                              F. AHMED

1

2      the, you know, the evidence, whether they

3      were the director or the officer, we have

4      answered this question and we're coming back

5      to the same thing.  What was his position

6      within the company, to establish that is

7      beyond the scope of my work.  What I'm

8      saying is the defendants on this case, as

9      they are defined in the complaint, should

10     have conducted this due diligence.

11         Q.   Right.  And you phrase it in those

12     terms about the defendants, but my interest

13     is in clarifying which defendants you're

14     talking about, as to this and other

15     assertions.

16              So you have said, if I understand

17     you correctly, that you believe Mr. Hogg is

18     among the defendants who should have

19     conducted the customer due diligence and

20     know your customer checks?

21         A.   Yes.

22         Q.   And my question to you is what you

23     rely upon in determining that Mr. Hogg had

24     that obligation, because you've made the

25     representation now that you're saying he had



Page 65

1                    F. AHMED

2     the obligation, so I'm asking how you got to

3     that conclusion?

4          A.   So it's in the complaint.  You see

5     the SEC complaint, the defendants and the

6     relief defendant, it clearly defines the

7     defendants there.

8          Q.   Did you rely on anything other

9     than the complaint in coming to that

10    conclusion?

11         A.   No, it's the complaint, because it

12    was, again, beyond my scope to actually

13    establish what was their role within the

14    company.

15         Q.   And if I asked you these questions

16    about the CDD and the KYC with respect to

17    Mr. Goldberg rather than Mr. Hogg, would

18    your answers be the same?

19         A.   Yes.

20         Q.   So what do you contend defendants

21    should have done in order to meet the

22    obligation that you've described in the

23    language that we read?

24         A.   So the checks that should have

25    been performed, you know, as part of the due



Page 66

1                    F. AHMED

2    diligence process, when they are entered

3    into the agreement with SION.  So looking

4    at, you know, the AML, the anti-money

5    laundering and the counter-financing of

6    terrorism regulations require steps to be

7    followed, you know, the customer due

8    diligence that needs to be established,

9    right.  The source of funds, the source of

10   wealth, that needs to be established.  The

11   documents, the physical documents that

12   should have been there, you know, the

13   storage documents, the purchase documents,

14   the working documents, the physical

15   existence of gold, that should have been

16   established.  This is all part of the due

17   diligence process which clearly should have

18   been conducted.

19        Q.   And the opinion that you conveyed

20   in your report when you say defendants had

21   these responsibilities, did you as to each

22   of the obligations you just described, is it

23   your intention to say that all defendants

24   had each of those obligations or did you

25   make any attempt to distinguish among the



Page 67

```
 1                    F. AHMED
 2  defendants or is that simply not part of
 3  what you considering?
 4      A.   No.  See, the officers, the people
 5  who are responsible, the officers, we call
 6  them management, whatever you call them,
 7  they are responsible.  They are liable to
 8  actually ensure that these procedures are
 9  followed.  So they should have been
10  individually or collectively, I mean, as a
11  group or individually, they should have
12  performed these due diligence procedures
13  when they entered into this agreement.
14      Q.   Who, if anyone, apart from the
15  officers have you concluded was responsible
16  for doing that?
17          MS. SUM:  Objection to the extent
18      that it calls for a legal conclusion.
19          MR. KISSANE:  I'll rephrase it.
20      Q.   Who, if anyone, other than the
21  officers are you offering your opinion ought
22  to have taken the steps you just described?
23          MS. SUM:  Still calls for a legal
24      conclusion.
25          MR. KISSANE:  It goes entirely to
```



Page 68

1                    F. AHMED

2       his opinion.

3       A.   So at the end of the day the

4  defendants who are named here are, you know,

5  are responsible for running the company.

6  They are the ones who were responsible.  The

7  senior management is responsible, you know,

8  to get the due diligence conducted and done.

9  Again, who within the company would be

10 tasked to do it is a legal opinion.  So who

11 they would delegate or not delegate or do it

12 themselves or have a compliance officer

13 doing it, that's the legal part.  But at the

14 end of the day the people who are leading

15 the organization are ultimately responsible.

16          MS. SUM:  Tom, let me know when

17       there's a natural break for a bathroom

18       break.

19          MR. KISSANE:  Sure, we can take

20       one very shortly.

21       Q.   So this brings us back to the

22 subject we covered earlier.  I'd like to

23 return to it briefly.

24          I'm asking you who among the

25 defendants you believe had the



Page 69

1                          F. AHMED

2     responsibilities you've described, and I've

3     heard you say at one point the officers and

4     other point senior management.  But you also

5     said that in your opinion, when you say that

6     defendants should have done the CDD, the

7     KYC, does that include Mr. Hogg?  So I just

8     want to make sure I have a clear

9     understanding of whether you say that

10    Mr. Hogg is included among the defendants

11    having that obligation, because you have

12    formed an opinion that he was an officer or

13    a director or senior management of

14    Arbitrade, or whether you have not formed an

15    opinion on that subject?

16         A.   So once again, that's the legal

17    point.  But when I said, it's not just the

18    officer, the senior management or the

19    director, it's people having control.  So

20    whoever has control over the operations of

21    that company are actually responsible.  So

22    in the complaint, the SEC complaint it is

23    mentioned that he had control over the

24    entity, and that is why he is one of the

25    defendants.



Page 70

1                          F. AHMED

2          Q.    Now, since you've disclaimed any

3     legal opinion, what authority do you rely on

4     in saying that defendants had the

5     obligations you're describing with respect

6     to the CDD or the KYC?

7          A.    Can you repeat the question, sir?

8          Q.    Yes.  I'm trying to clarify,

9     you're saying the defendants have this

10    responsibility, and you seem to be including

11    Mr. Hogg among those defendants, but you've

12    disclaimed giving a legal opinion.  So I'm

13    asking, since you are excluding legal

14    authority, on what authority do you rely in

15    concluding that defendants had the

16    obligations that you described here?

17         A.    You see, once again whether they

18    were the officers or directors or senior

19    management or had the control is beyond my

20    scope of work.  That's the legal element.

21    It's a legal opinion that's established

22    alone.

23              Mr. Hogg is a defendant who had

24    control over the company as per the

25    complaint of the SEC, and they had control



```
 1                    F. AHMED
 2  over the entity and their operations,
 3  clearly they should have performed the due
 4  diligence as I have just mentioned.
 5       Q.   Just so I understand, are you
 6  saying that you put Mr. Hogg among those
 7  bearing these responsibilities that we're
 8  talking about because you have accepted the
 9  SEC's allegation that he was a control
10  person, not that you've made an independent
11  finding that he's responsible for these
12  things, but rather that you come to that
13  conclusion, come to that opinion applying
14  the assumption that he was a control person,
15  is that what you're saying or do you have an
16  independent factual contention that you're
17  opining it on?
18       A.   No, he was part of the
19  discussions, you know, on the email
20  exchanges and the discussion on whether
21  auditors and accounting firm, the physical
22  verification of the gold.  And why would he
23  participate if he did not have the control
24  or if he was not a decision maker.  So it's
25  not just purely based on the SEC's complaint
```



Page 72

1                    F. AHMED

2    allegation, but seeing the evidences which

3    were there that he participated in those

4    discussions.

5       Q.   So with that I take it you're

6    saying is not a legal conclusion, because

7    you've disclaimed legal conclusions, so you

8    are saying that you included in your opinion

9    as a factual matter that Mr. Hogg was a

10   control person; is that right?

11      A.   Again, that's a legal point,

12   whether he was a controller or not a

13   controller, right.  The defendant, you know,

14   he was party to whether it was the

15   appointment of an expert or discussions

16   around the accounting firms, why would you

17   actually participate in that?  So he

18   participated in that.  So when I'm saying,

19   the defendant, the people who are

20   responsible, if they are the officers or the

21   controllers in the company and they had the

22   authority, then they should have actually

23   conducted the right level of due diligence.

24      Q.   So I'm coming to the conclusion to

25   form the opinion and I think you have said



Page 73

                              F. AHMED

1
2   you did, that Mr. Hogg was among those
3   having that responsibility, I'd like to
4   clarify whether you had done that by forming
5   an independent opinion that he was a person
6   in control of the company or whether you had
7   done that by applying the assumption that
8   the SEC is correct in saying that?
9        A.    See, establishing the fact whether
10  he was in control of the company was beyond
11  the scope of my work.  So I wouldn't be
12  validating the information that yes, he
13  was -- he was, you know, controlling the
14  company.  But he is one of the defendants in
15  the SEC's complaint, which is said in the
16  complaint that he is, that he has the
17  control over Arbitrade.  Arbitrade went into
18  the contract with SION and Arbitrade and its
19  officers or the people who were controlling
20  it should have conducted the due diligence
21  as I mentioned in my report.
22       Q.    And if my questions on this
23  subject of the CDD and KYC in the matters
24  we're discussing just now, if I were to ask
25  the same questions with respect to



Page 74

                          F. AHMED
1
2    Mr. Goldberg that I'd asked with respect to
3    Mr. Hogg, would your answers be the same?
4         A.   Yes, it would be the same.
5              MR. KISSANE:  Alice, this is as
6         good a time as any to take a break.
7              THE WITNESS:  Yes, please.
8              MS. SUM:  Five minutes?
9              THE WITNESS:  Yes.
10             MR. KISSANE:  I'd like to take a
11        little more than that.  Can we resume
12        at 3:00 New York time?
13             MS. SUM:  Yes, very good.
14             MR. KISSANE:  Thank you.
15             (Whereupon, a short recess was
16        taken.)
17        Q.   I'm going to ask if we can turn to
18   page 4.  You may already be on the report.
19             I'm going to ask you to look at
20   the portion of page 4 of your report, which
21   is Exhibit 1, and the second line of page 4
22   I'm going to read a fairly lengthy portion
23   of text.  It says, "Specifically, I have
24   been asked to render an opinion on whether
25   the actions of the defendants Arbitrade and



Page 75

1                    F. AHMED

2    Cryptobontix, Inc. and their principals Troy

3    Hogg, James Goldberg, Stephen Braverman

4    related to Arbitrade purportedly acquiring

5    and receiving title to $10 billion in gold

6    bullion through a purchase transaction with

7    defendant Max Barber and his company

8    believed Defendant SION Trading, FZE

9    comported with the international standards

10   and code of practices governing the gold

11   sector."  And a little further down you say,

12   "I was asked to examine the transaction

13   documents related to the case and

14   provide/explain the necessary processes that

15   must be adhered to while dealing in gold

16   bullion that is widely accepted in the

17   industry and satisfies the legal and

18   regulatory requirements governing the

19   sector."

20            Do you recognize those words as

21   your own?

22       A.   Yes.

23       Q.   And under the standards and rules

24   identified in your expert report you list

25   several copied and pasted guidelines for the



Page 76

1                        F. AHMED

2      gold industry and the SEC yesterday produced

3      a series of documents that it described as

4      the authorities on which your report relied.

5              Do any of the materials that you

6      have relied on in forming your opinion as to

7      the subject of the propriety in the manner

8      in which the $10 billion in gold bullion

9      comported or didn't comport with the

10     standards you're describing, did any of

11     those materials you relied on speak to the

12     obligations of a buyer of gold?

13         A.    Yes.

14         Q.    Which do?

15         A.    So the first thing is about as a

16     process, the due diligence that the buyer

17     should perform on the seller and the asset

18     which they are buying.  So buyer has the

19     obligation to look at, you know, the EMN

20     requirement, the customer due diligence

21     requirement, the social part, this is all

22     required.  Also the responsibility sourcing

23     guidelines talk about, you know, where it

24     was sourced from, the gold.  The accounting

25     and auditing standards talk about physical



Page 77

                         F. AHMED
1
2    verification, the process.

3              I have listed it down in my

4    report.

5         Q.   Would you be able to -- and we can

6    direct the screen as you'd like.

7              Can you point me to the portion of

8    your report that discusses the source of

9    obligations for a buyer as opposed to a

10   seller of gold?

11        A.   The buyer as opposed to the

12   seller.  So I have listed down the, you

13   know, you see on page 10, 11, you know,

14   there are various regulations that have been

15   listed down.  The buyer is responsible to

16   conduct the customer due diligence.  So as

17   per the AML regulations, they are required

18   to conduct the customer due diligence.  And

19   as part of the due diligence there are

20   several steps that needs to be performed.

21              So for example, the buyer, the

22   movement of the gold, the evidence that the

23   gold existed, the commercial invoice or the

24   packing list, the airway bill.  You know,

25   there are a number of documents which are



Page 78

```
 1                    F. AHMED
 2   required to be validated by the buyer when
 3   they are actually buying gold from a seller.
 4        Q.   So could you point me specifically
 5   to the pages you're describing to which of
 6   the referenced standards contain the
 7   obligations you're describing on behalf of
 8   the buyer?
 9        A.   So if you go to page 8 of the
10   report, where the standards and rules I have
11   listed down.
12             You can scroll on the screen,
13   please, on page 8 if you see it talks about
14   in the gold industry the various regulations
15   that needs to be complied with.  And if you
16   look on page 10 which talks about the
17   responsible gold guidelines, the U.S. KYC,
18   anti-money laundering and combating
19   terrorism financing regulations.  And since
20   January 2012, the Good Delivery in the
21   finance have undergone annual audits and the
22   LBMA gold guidelines.  It talks about
23   several laws and regulations with the link
24   which are there.  And when you go into the
25   regulations there are obligations on the
```



Page 79

```
 1                    F. AHMED
 2   buyer to actually perform these checks,
 3   validations on the due diligence.
 4        Q.   Okay.  So let's take these one at
 5   a time, and I'll ask if I'm overlooking any
 6   of those sources that you are relying on as
 7   to the buyer's obligation, that you let me
 8   know that.  But we see one thing I see that
 9   you're discussing is the UAE Good Delivery?
10        A.   Yes.
11        Q.   You said to provide the framework
12   for the gold standard?
13        A.   Yes.
14        Q.   And is that among the sources that
15   your offering an opinion creates obligations
16   or offers guidance to buyers of gold?
17        A.   Yes, the UAE Good Delivery and
18   previously the passage used to be call Dubai
19   Good Delivery that had obligations on the
20   buyers.  So buyers and sellers, both the
21   obligations are there for both, both
22   parties.  The anti-money laundering
23   regulations also require, they have the
24   obligations for buyers and the sellers.
25        Q.   So as to the UAE Good Delivery,
```



Page 80

1                          F. AHMED

2    how if at all have the obligations on buyers

3    changed since 2018?

4          A.    So it hasn't changed.  It is --

5    it's evolving.  The regulations are becoming

6    more and more stricter, right.  But it was

7    there in 2018 as well.  So a buyer would --

8    I mean, there are two elements here.  One is

9    as a buyer you need to do the due diligence

10   which is if you go back to my report, the

11   page we were there before this, page number

12   7 where I clearly state on page number 7,

13   okay, the defendants here, if you can scroll

14   up on the screen, please, page 7, if you see

15   point number 1 here is the defendants here,

16   the defendants would be the buyers, right.

17   So you're referring to the buyers and SION

18   is the seller in this arrangement.  So they

19   should have conducted the customer due

20   diligence.

21              Now this is required by the AML

22   regulations, this is required by the Dubai

23   Good Delivery requirement.  So the LBMA

24   requirements or the OECD guidelines and

25   terms of responsible sourcing.  So there is



```
 1                    F. AHMED
 2   an obligation on the buyer to conduct due
 3   diligence on the seller as well as the goods
 4   of the seller, so which is where you verify
 5   the physical existence of goods, what is the
 6   weight, the purity of the gold, what is the
 7   value, the market value.  And then you
 8   validate it with evidences of documents
 9   which support all this.
10          So in terms of, as I mentioned,
11   what about the shipment, where did that gold
12   come from, what was the source from where
13   the origin of that particular gold.  So all
14   those documents are part of your KYC or your
15   due diligence procedures to be followed by
16   the buyer before they accept and on-board
17   that supplier or that seller.
18          And this is an obligation by the
19   UE AML requirements, right, as well as all
20   the other regulations that I've mentioned.
21   It talks about the onus on the buyer to
22   perform these checks.
23      Q.   And who, let me make sure, I'm
24   going to ask, you have done this, I'm going
25   to ask if you would again, to name so I can
```



Page 82

1                    F. AHMED

2    write down and the record will clearly

3    reflect each of the authorities that we're

4    talking about right now.  I have several

5    names here.  I'd just like to make sure I

6    have your listing of the complete roster of

7    the names.

8         A.   So I have listed it down in my

9    report but if, you know, broadly you want me

10   to specifically talk about the regulations

11   within this industry, the precious metal

12   industry, number 1 is the AML regulations.

13   Number 2 is the Good Delivery regulations

14   and Good Delivery can be the LBMA, the

15   London Bullion Market Authority.  You know,

16   when you're dealing with LBMA refiners or

17   LBMA bars, or it could be Dubai Good

18   Delivery which is now called UAE Good

19   Delivery.  And then you have the OECD's

20   guidelines which describes the responsible

21   sourcing of, you know, of precious metals.

22   So these are --

23        Q.   I'm sorry to interrupt, but I

24   missed your third statement.  Between the

25   Good Delivery and what was the other one you



Page 83

```
 1                    F. AHMED
 2   mentioned?
 3        A.   OECD guidelines which are there.
 4             So if you look at the various
 5   regulations which revolve around the sector,
 6   I'll repeat myself, the sector has to comply
 7   with AML regulations, the anti-money
 8   laundering and the counter-financing of
 9   terrorism.  That applies -- it's the
10   regulation which exists in the U.S., the
11   regulation that exist in the UE which
12   requires due diligence to be performed by
13   the buyer on the seller and the proceeds on
14   the goods which they are buying, the source
15   of wealth, the identity and all the
16   documentation, the transaction documentation
17   to satisfy that this was, you know, how was
18   it all sourced.  So that's AML regulations.
19             Number 2, so UE, just on the AML
20   aspect, UE is part of the Financial Action
21   Task Force, the FATF.  So to the Financial
22   Action Task Force.  So the U.S. entities are
23   regulated by the FATF and so are the UE
24   entities.  So you must comply with the
25   anti-money laundering regulations, number 1.
```



Page 84

1                       F. AHMED

2               Number two, you have the precious

3       metal specific regulators body or

4       attestations which requires you to follow

5       the due diligence procedures.  One of them

6       is the London Bullion Market Association,

7       LBMA, standards.  Number 2 is the Dubai Good

8       Delivery which is now called UAE Good

9       Delivery.  Number 3 is the OECD Organization

10      for Economic Co-operation and Development,

11      OECD guidelines which are there for precious

12      metals, responsible sourcing of precious

13      metals.

14               So within all these regulations it

15      specifically requires the buyers and the

16      sellers to perform the due diligence

17      procedures.

18          Q.    So in part of your opinion that

19      Arbitrade -- well, you say defendants.

20          A.    Yes.

21          Q.    I'm going to phrase it for our

22      purposes as Arbitrade, as the buyer, part of

23      your opinion is that Arbitrade was obliged

24      to meet certain requirements of the AML

25      regulations; is that right?



Page 85

```
 1                    F. AHMED
 2       A.   Yes, that's right.
 3       Q.   And are you saying that that
 4   obligation is one that you understand arose
 5   under U.S. law?
 6       A.   The AML regulations are under U.S.
 7   law as well.  So UAE, if I talk specifically
 8   about the UAE, it is a member of the
 9   Financial Action Task Force, the FATF
10   actually the guidelines have to be followed.
11   So under the AML regulations, whether it is
12   UAE AML regulations or the U.S. AML
13   regulations, Arbitrade, the defendants, were
14   required to perform the due diligence on the
15   seller or on the supplier.
16            And the supplier at SION which was
17   domicile in the UAE was obliged to meet with
18   the AML regulations to satisfy the buyer.
19   So they are on boarding the buyer, the buyer
20   is on boarding the seller.  So both parties
21   were equally responsible to actually satisfy
22   the requirements of AML and regulations and
23   conduct the due diligence.
24       Q.   Now, you are not forming a legal
25   opinion as to legal matters in your report,
```



Page 86

                              F. AHMED

1

2    right?

3         A.    Around the defendants, who were

4    the defendants and what was their role and

5    responsibility, yes, I'm not forming an

6    opinion on what was their role within

7    Arbitrade.

8         Q.    But are you forming a legal

9    opinion as to what their obligations were

10   under applicable law?

11        A.    As an expert, I am, yes, in terms

12   of within the applicable law, what were the

13   responsibilities of Arbitrade, of the

14   defendants.

15        Q.    So can you help me understand

16   which portion of your report identifies the

17   provision of law that obliges Arbitrade to

18   comply by the AML regulations?

19        A.    So, you know, I have specifically

20   mentioned the various -- if you look at page

21   8 where I have in the gold industry I've

22   listed down and I've listed down the

23   executive office of Anti-money Laundering

24   and Counter-Financing of Terrorism.  So if

25   you see, these are the industry regulations



Page 87

```
 1                    F. AHMED
 2   which are all mentioned on page 8.
 3        Q.   Right, and which of these
 4   constitute the provision that you rely on in
 5   concluding that there was a legal obligation
 6   for Arbitrade to meet the standards you're
 7   discussing?
 8        A.   So according to the Good Delivery
 9   standards as well as according to the
10   anti-money laundering standards.  So it's an
11   obligation to actually conduct the due
12   diligence.
13        Q.   The Good Delivery regulation
14   you're referring to, is that different than
15   the Good Delivery standards?
16        A.   No, it's the same.
17        Q.   And that's a UAE thing; right?
18        A.   Yes.  There is the LBMA.  If you
19   have LBMA, if you're dealing with LBMA parts
20   or you have the UAE Good Delivery or the
21   Dubai Good Delivery, yes.
22        Q.   Where in your report does it say
23   what provision of law subjects Arbitrade to
24   the standards of the UAE Good Delivery
25   regulation?
```



Page 88

```
 1                    F. AHMED
 2        A.   So Arbitrade would be a
 3   counter-party to the transaction which is
 4   happening in Dubai, in UE, right.  So
 5   Arbitrade would follow the anti-money
 6   laundering regulations of the FATF.  So I've
 7   mentioned the executive office of the
 8   anti-money laundering and counter-financing
 9   of Terrorism.  That's not restricted to the
10   UAE alone, it's global, and FATF -- so
11   Arbitrade and SION would both need to comply
12   the AML regulations.
13        Q.   Understanding that's your legal
14   conclusion, is there somewhere in this
15   report where you cite the authority for that
16   conclusion or is it your position that
17   conclusion follows from the standards
18   themselves?  I just want to understand how
19   you close the loop on that.
20        A.   So, if you look at the -- I'm
21   sorry, can you repeat your question once
22   again?
23        Q.   Yes.  I understand you're saying
24   that you offered the opinion that Arbitrade
25   is obliged to comply with various standards.
```



1                       F. AHMED

2          A.    Yes.

3          Q.    And I'm just asking if there's a

4     portion of your report that cites the

5     authority that creates that obligation for

6     Arbitrade or whether it's your opinion that

7     the obligation arises from the standards

8     themselves?  Is there a way you close the

9     loop to get from the standards to

10    Arbitrade's obligation or are you saying it

11    arises from the standards themselves without

12    need of a further connection?

13         A.    Yes.  So if you look at, you know,

14    all the list of the defendants where I have

15    provided all the list on the regulations,

16    the documents reviewed and relied upon and

17    I've mentioned the various regulations and

18    the cabinet decisions, right.  So, if

19    anybody is dealing with the UE, the whole

20    sector has to comply with these regulations

21    and Arbitrade itself would need to comply

22    with the AML regulations in the U.S.  So

23    based on my experience, and my, you know, as

24    an expert, you know, Arbitrade should have

25    conducted the customer due diligence.  They



Page 90

1                        F. AHMED
2    are dealing in a precious metals sector.
3    They were, you know, going to buy the gold
4    and they had an agreement.  So they should
5    have conducted the proper customer due
6    diligence.
7              If you want me to list out what
8    the customer due diligence would be or the
9    kinds of documents they should have, I would
10   be glad to state that.
11             MR. KISSANE:  I'm sorry, may I ask
12        the reporter to read back the last
13        sentence of that answer.
14             (Whereupon, the record was read by
15        the reporter.)
16   Q.    Okay, I will ask you to do that.
17   A.    Sorry?
18   Q.    I'll take you up on that offer.
19   A.    Okay.  So if you see, as a buyer
20   the first step is they need to actually
21   conduct a due diligence on the supplier,
22   right, and the products of that supplier.
23   So in this case SION would be the supplier,
24   the product would be gold which was there.
25             So first thing is the identity,



Page 91

```
 1                    F. AHMED
 2   the verification, identification and
 3   verification that should have been done, you
 4   know.  So in terms of all the legal
 5   documents of SION, their office, their
 6   possession of that gold, the financial
 7   statements, validating that the gold existed
 8   on their financial -- if they owned the
 9   gold, if they had the title to the gold,
10   then whether the physical verification was
11   conducted of that gold, what about the
12   audited report on this.
13            In terms of the source of funds or
14   the wealth to which this gold was procured,
15   it's a mandated requirement of the due
16   diligence, the purchase documents, the
17   storage, the vaulting documents, the
18   insurance, whether it was done by the
19   supplier or whether the vaulting authority
20   or the party which was storing the gold, the
21   insurance policy which was there.  What
22   about the movement of that gold, how did it
23   land in Dubai, or wherever the vault was, so
24   how did it come, what about the commercial
25   invoice, the custom document.  Because no
```



Page 92

                            F. AHMED

1

2    gold can come into the UE without having a

3    custom clearance.  So the custom documents,

4    the origin documents that it was originating

5    from, so the export bill or typically the

6    airway bill or the exit document from the

7    country from where it was transported into

8    the UE, the packing list which list down all

9    the CD number of that gold, the origin of

10   that gold, the weight, the purity of the

11   gold, the delivery note, you know.  There is

12   in and out document, so the metal receipt is

13   what we call it in the industry.  So where

14   the gold is handed over from one party to

15   the other party, whether the logistics

16   company to the supplier or from the supplier

17   to the vault.  So these documentation is

18   part of the due diligence process to be

19   followed.

20              And again, then comes the fact

21   that once you enter into that agreement, if

22   validation of the physical existence of

23   gold.  So prior to entering into a

24   relationship with a supplier of gold, all

25   these documentation, all the due diligence



Page 93

                          F. AHMED

1
2    should have been conducted by the buyer.
3    This is a practice that everybody in the
4    gold industry, they following this.  All the
5    transaction documents, these are, you know,
6    these are mandatory documents, whether it's
7    an international buyer or a local buyer here
8    in the UE.
9              So this would then establish the
10   due diligence requirements under the AML
11   regulations or any of the Good Delivery
12   regulations.
13             So again, I can keep on and then
14   go on on listing.  But these are the
15   typical, the level of duty.  Then the
16   screening that has to be performed for
17   sanctions, the screening for politically
18   exposed person, these are mandated on the
19   AML.  Gold sectors falls under the
20   designated non-financial businesses which is
21   regulated by AML regulations.
22             So if Arbitrade was going to be
23   with a gold trading company in the UE, this
24   level of due diligence is required under the
25   AML law to be conducted.



Page 94

1                    F. AHMED
2        Q.    You've expressed the opinion, as I
3    understand it, that not only Arbitrade had
4    those obligations, but other defendants as
5    well, including Mr. Hogg and Mr. Goldberg.
6            We discussed the responsibility of
7    Mr. Hogg and Mr. Goldberg for obligations of
8    Arbitrade earlier today before the break.
9            Apart from what you said then, is
10   there any other basis included in your
11   opinion as to why Mr. Hogg or Mr. Goldberg
12   would have responsibility for performing the
13   obligations you've attributed to them along
14   with Arbitrade as buyer?
15       A.    Going to point number 2 on my
16   report is, which is about the appointment of
17   independent accounting firms.  And where we
18   see the exchange of communication about
19   appointing independent accounting firms, so
20   what was the purpose of appointing these
21   firms?  It was the physical validation.  So
22   anybody -- if Arbitrade wanted to validate
23   the existence of the gold, there is a
24   certain level of due diligence or a certain
25   physical verification, or physical existence



Page 95

```
 1                    F. AHMED
 2  of gold that needs to be established by a
 3  third party.
 4      Q.   Okay, I don't mean to interrupt
 5  you but that's a little different than where
 6  I was going.
 7           We'll come to the auditing issue.
 8           But my question, my question for
 9  now is whether you have any basis for
10  offering the opinion that Mr. Hogg and
11  Mr. Goldberg had responsibility for meeting
12  the standards that you said applied to
13  Arbitrade with respect to the acquisition of
14  the gold, apart from the reasons you gave in
15  your testimony earlier today, when we talked
16  about the question of their responsibility
17  for Arbitrade's obligations in a different
18  context?
19      A.   They are the same reasons, same
20  reasons.
21      Q.   Moving then to the accounting
22  firms at page 7 of your report in paragraph
23  2, you say, "Defendants hiring of two
24  accounting firms, Elliot Davis and BDO to
25  verify the G4S safekeeping receipt did not
```



Page 96

1                   F. AHMED
2    comport with the standards and rules."
3            I take it that here too, you
4    include Mr. Hogg and Mr. Goldberg among the
5    defendants who were obliged to comport with
6    those standards; is that right?
7        A.    Yes, as defendants, yes.
8        Q.    And apart from what you described
9    earlier, is there any other basis for which
10   you relied in concluding that Mr. Hogg and
11   Mr. Goldberg had that obligation?
12       A.    They were in communications.  So,
13   I mentioned this earlier as well.  So, you
14   know, instructions or participating, yes, so
15   that's in my mindset means the same.
16       Q.    Okay.  Do you have any opinion as
17   to whether auditing firms had an obligation
18   to disclose a client hiring them to audit
19   gold what the standard practices are?
20       A.    If the auditing firm has an
21   obligation to disclose, what?
22       Q.    Yes, the standards of practice
23   that you're describing that you say
24   defendant failed to meet with respect to the
25   auditing, do you have an opinion as to



Page 97

```
 1                    F. AHMED
 2   whether the auditing firm has an obligation
 3   to disclose those standards and practices to
 4   the client who retains them?
 5        A.   Yes.  Well, you know, the client
 6   has the right to ask them what standards
 7   they're referring to in the report.  So if
 8   you see the report in the approach that the
 9   auditing accounting firm, you know, uses for
10   the approach, they mention that what
11   standards or what obligations they are
12   referring to.
13        Q.   Do you understand that the
14   accounting firms involved here disclose the
15   standards to Arbitrade?
16        A.   So here it was a limited -- it was
17   agreed upon procedure.  So if you look at
18   the report from the auditing firm, so
19   whether the report from BDO, it is clearly
20   mentioned it's an agreed upon procedure.  So
21   I'm asking them to, as a client, what the
22   client has done, I've asked them to do what
23   they want to do as an agreed upon procedure.
24              So if you look at it, they were
25   asked only to verify the SKR which is a
```



Page 98

1                    F. AHMED

2      piece of paper that yes the SKR existed,

3      that's what they have confirmed in the

4      report.  They are not confirming the

5      physical existence of gold.

6              MR. KISSANE:  I'm going to ask to

7          pull up what we'll mark as Exhibit 3.

8          And I'll ask if you have seen this

9          document before.

10             (Whereupon, the Elliot Davis

11         report was marked Ahmed Exhibit 3 for

12         identification as of this date.)

13     A.   If you scroll up, is this the

14     Elliot Davis report?  It just said

15     Arbitrade, Limited.

16     Q.   It is Elliot Davis.  You'll see on

17     the next page?

18     A.   Yes, yes, yes, I have seen this,

19     yes.

20     Q.   And are you able to tell me if the

21     standards that you're describing in your

22     report that you say Arbitrade failed to meet

23     are identified in this document?

24     A.   So if you see, this is -- I'm

25     saying, this is an agreed upon procedures



Page 99

```
 1                      F. AHMED
 2   report.  If you look at the scope of work on
 3   this report, it's clearly to confirm whether
 4   that document, which is called the Safe
 5   Keeping Receipt, or the SKR, whether that
 6   existed or not, it is not to be relied on as
 7   a confirmation or report confirming the
 8   existence of gold.
 9        Q.   My question is much narrower than
10   that.  My question is whether you're able to
11   identify anything in this report that
12   identifies to Arbitrade the various
13   standards that your report says Arbitrade
14   ought to have comported with?
15        A.   Yes.  So if you see in this
16   report, again, if you see it's independent
17   accountant's report.  So where they have
18   mentioned what they have actually performed.
19   So they have to assist clearly in the first
20   paragraph the address which is there for the
21   board of directors, it says, "To assist in
22   determining the existence of a Safe Keeping
23   Receipt held by G4S Dubai."
24             So the steps that they've
25   performed -- if you look at accounting and
```



Page 100

                          F. AHMED

1
2   auditing standards, I've mentioned them in
3   my report, there are standards of how do we
4   actually -- what are the steps to be
5   followed for physical existence.  So
6   verification steps.
7        Q.   I'm sorry to interrupt you but I
8   don't want to weigh your answer with having
9   to go back.
10       A.   Yes.
11       Q.   Can you direct us to the portion
12  of this exhibit you're referring to?
13       A.    It's here, it's on the screen.  So
14  if you see what it says is on the third
15  sentence after 2018 it says "Is to assist in
16  determining the existence of a Safe Keeping
17  Receipt held by G4S."
18            That was the scope of this report,
19  to determine the existence, right.
20            So in the accounting and auditing
21  standards and I have listed down the
22  accounting and auditing standards about how
23  do you go about validating the existence of
24  a particular document.
25            So if you go to the procedures and



Page 101

1                        F. AHMED

2    findings, the first things it says, they are

3    confirming the existence of a document.  So

4    they received a copy of the Safe Keeping

5    Receipt.  This is point 1A from Ricky

6    Sanders.

7              So it's the fact that they're

8    mentioning what are the sequence of the

9    steps of what was followed.

10        Q.   If I understand your report and

11   your opinion, you were of the opinion that

12   Arbitrade was obliged to do many things

13   beyond determining the existence of the Safe

14   Keeping Receipt, right?

15        A.   Yes, absolutely.

16        Q.   And this scope of responsibility

17   also says, "Our procedures also assist

18   Arbitrade in determining if title to the

19   gold is identified in the assignment

20   agreement which vests in SION pursuant to

21   the Safe Keeping Receipt has been assigned

22   to Arbitrade."

23              You see that, right?

24        A.   I'm sorry, where are you reading?

25   Which paragraph?



Page 102

1                         F. AHMED

2         Q.    About halfway down the first

3    paragraph it says, "Our procedures will also

4    assist Arbitrade?"

5         A.    In the first paragraph?

6         Q.    Yes.

7         A.    "Our procedures will also assist

8    Arbitrade in determining if title to the

9    gold is identified in the assignment

10   agreement which vests in SION pursuant to

11   the Safe Keeping Receipt has been assigned

12   to Arbitrade."

13        Q.    So that was also part of the

14   assignment; right?

15        A.    Yes, it's basically -- again, it's

16   only to the extent pursuant to the Safe

17   Keeping Receipt.  It's not the existence of

18   the gold, attaching to the gold.  It's

19   purely the Safe Keeping Receipt.

20        Q.    And the assignment of title;

21   right?

22        A.    Of the Safe Keeping Receipt, yes.

23        Q.    Well, it says, in determining if

24   title to the gold which vests in SION

25   pursuant to the Safe Keeping Receipt, that's



Page 103

                    F. AHMED
1
2    what is to be determined has been assigned
3    to Arbitrade; right?
4        A.   If you go to the next page where
5    it details the assignment agreement
6    provisions, what are they actually
7    confirming if we go onto the next page, page
8    number 2 of this report.
9        Q.   Page 2?
10       A.   Yes, which is the next page of
11   this exhibit.  So point number 2 here,
12   Assignment Agreement Provisions.  So it
13   says, "Obtain a copy of the assignment
14   agreement."  So on October 3, 2018 we
15   received a copy of the assignment agreement
16   between SION and Arbitrade.  It nowhere
17   talks about the title of gold or the
18   validation of gold.
19            The next point, point number B
20   here, October 8, 2018, we read, "The
21   assignment agreement between SION and
22   Arbitrade and noted it's properly executed
23   by our signatures."  That's what it says
24   there at the top.
25            If you go on to the next page,



Page 104

                            F. AHMED

1
2    page number 3, which is now type point
3    number C here on the top, read, "The
4    assignment agreement and affirm that there
5    are provisions in the agreement whereby SION
6    assigns Arbitrade."
7            So on October 8, 2018 we read the
8    assignment agreement and determine that the
9    agreement contains the following paragraphs
10   to the ownership, rights and title to the
11   gold.
12           So they are confirming the
13   agreement.  If you look at this report as an
14   expert or, you know, or even as, you know,
15   what is the scope of work that expert does,
16   what they're saying here is they are just
17   confirming that this paragraph exists in the
18   agreement.  Where does it say that they are
19   confirming the title to the gold?
20       Q.   But you agree, do you not, that
21   the statement of the scope of the work at
22   the beginning includes the sentence that our
23   procedures will also assist Arbitrade in
24   determining the title to the gold which
25   vests in SION pursuant to the SKR has been



1                          F. AHMED

2      assigned, saying -- well, the title has been

3      assigned.  That's part of what they say

4      they're going to do; right?

5           A.   This is, if you see the last

6      paragraph, this agreed upon procedure

7      engagement was conducted in accordance with

8      attestations standards established by the

9      American Institute of the CPA, Certified

10     Public Accountants.  We were not engaged to

11     and did not conduct an examination or

12     review.  The objective of which would be the

13     expression of an opinion or conclusion on

14     determining the existence of the Safe

15     Keeping Receipt as included in the above

16     procedure.

17               So accordingly, we do not express

18     such an opinion or conclusion.  As we have

19     performed additional procedures, other

20     matters might have come to our attention.

21     They are clearly limiting the scope that we

22     have looked at an agreement and we are

23     hereby confirming that in this agreement it

24     states there is a paragraph about assignment

25     and assumption.  That's all.  If you read



Page 106

                         F. AHMED
1
2    this report.
3         Q.    I'll direct you to one portion of
4    the agreement that says you need to confirm
5    that it states that they will do certain
6    things and then you're pointing me to other
7    provisions, but I'd like to stay focused on
8    mine for now.
9         A.    Yes, but just before we do that, I
10   want to highlight this, this point C, number
11   1.  That is the paragraph which they are
12   confirming that yes, this paragraphs exist
13   in the agreement, that's it.  And if you see
14   below that, they are clearly disclaiming
15   that we are not doing -- there's no other
16   procedures, no other validation or
17   examination we have performed.  So it's
18   basically -- let's look at this way.  If
19   there is an agreement, I'll ask Elliot
20   Davis, can you confirm that this paragraph
21   is mentioned in this agreement.  And all
22   they are confirming, yes, there is an
23   agreement signed by these parties and this
24   paragraph exists in this agreement.  That's
25   it.  That's what this report states.



Page 107

```
 1                    F. AHMED
 2    Nothing more than that.
 3         Q.    Okay.  I'd like to turn you back
 4    now to the language that was used to frame
 5    my question.
 6              At the first paragraph it says
 7    beginning our procedures were also, I just
 8    want to confirm that you recognize that that
 9    language says that they will assist
10    Arbitrade in determining its title to the
11    gold which vests in SION pursuant to the SKR
12    has been assigned to Arbitrade.  You see
13    that language; right?
14         A.    Sorry, Mr. Tom, there is something
15    in the brackets as well.  If you read that,
16    then that specifies how identified in the
17    assignment agreement.
18         Q.    Right.
19         A.    They are not confirming the title
20    to the gold, as identified in the assignment
21    agreement.  So they are making it very clear
22    that what they are confirming is the
23    existence of an agreement, that's it.  And
24    they are also later on in the report,
25    they've highlighted specific sections,
```



```
 1                      F. AHMED
 2   which, the specific paragraph.  So start
 3   reading it without the bracket there.  If
 4   you read it in the title to the gold as
 5   assigned in the assignment agreement which
 6   rests with SION.  That's the most important
 7   part to look at, yes.
 8        Q.   Just so I understand, you're
 9   saying that if we read the language in
10   determining if title to the gold as
11   identified in the assignment agreement has
12   been assigned to Arbitrade, you're reading
13   the parenthetical as identified in the
14   assignment agreement means that they are not
15   going to assist Arbitrade in determining if
16   title to the gold has been assigned to
17   Arbitrade; is that right?
18        A.   Yes, that's right.  So if you see
19   the last page which is on the screen right
20   now, the last paragraph, it clearly
21   mentioned that.  They are only in accordance
22   to the attestation standards which means
23   they are not engaged to conduct any
24   examination or review.
25        Q.   But it doesn't say anything about
```



Page 109

```
 1                        F. AHMED
 2   title in that paragraph?
 3        A.    What is it that they are
 4   confirming the assignment agreement.  So if
 5   you see, paragraph C here on October 8,
 6   2018, we read the assignment agreement and
 7   determined that the agreement contained the
 8   following paragraph.  And the first, which
 9   is where, the title, if you see this
10   paragraph, where the third line of that
11   paragraph says, "All of the assignments will
12   ship rights and titles in the gold which
13   vests in the assigning --
14             So in the beginning of the report
15   they are clearly mentioning that as per the
16   assignment agreement.  So all they are
17   saying is there is an agreement and this
18   agreement has a paragraph which talks about
19   assignment and assumption and we are
20   confirming that this agreement exist.
21   That's what they are telling in this report.
22        Q.    All right.  Well, we didn't make
23   our own readings about the language about
24   title.  But I'd like return to the question,
25   I've asked you initially about the Elliot
```



Page 110

1                          F. AHMED

2    Davis report where it identifies the

3    standards that Arbitrade was obliged to

4    comport with and that you've identified in

5    your report, you pointed out that it states

6    limitations to its scope.  But my question

7    is different than that.  Does this report

8    anywhere identify the standards that your

9    report says that Arbitrade ought to have

10   complied with?

11        A.   Again, this is an agreed upon

12   procedure.

13        Q.   I didn't say agreed upon

14   procedure.  To be clear, my question is --

15             MS. SUM:  Stop for a second.  Tom,

16        let the witness finish testifying.  He

17        is trying to finish answering the

18        question asked.

19             MR. KISSANE:  He's going to answer

20        the same way he did before and I'd like

21        to try to be more efficient than that.

22        Q.   Sir, you can answer however you

23   like.  I just ask that you allow me to give

24   a clarification and then you can answer how

25   you like.  I'm not going to try to control



Page 111

1                      F. AHMED

2   your answer.  But what I do want to do is

3   try to be clear.  I'm not looking to revisit

4   whatever limitations are in this report.

5   I'm asking a very narrow question as to

6   whether, not why, but whether the Elliot

7   David report identifies the standards that

8   your report says Arbitrade ought to have

9   complied with?

10          MS. SUM:  Objection.  Asked and

11       answered.  He answered your question

12       earlier.

13          Q.   Well, then I missed it.  So I

14   guess is it yes or no, does it or does it

15   not identify those standards?

16          A.   So once again let me just, you

17   know, repeat my answer.  These are agreed

18   upon procedures.  If you see the screen

19   right now, it says, "In accordance with

20   attestation standards established by the

21   American Institute of Certified Public

22   Accountants."  So these standards, the

23   process, the agreed upon procedures are

24   followed based on.  So, I mentioned in

25   regards to auditing and accounting



Page 112

1                          F. AHMED

2     standards, you know.  So if they are asking

3     Elliot Davis to confirm that the existence

4     of an agreement and whether this particular

5     paragraph exists in that agreement, they

6     have done that.

7          Q.   All right, let me try to simplify

8     the question.

9               Can you please point me to each

10    portion of the Elliot Davis report that

11    identifies the standards that your report

12    says Arbitrade ought to have complied with?

13    Just scroll through it and you can point me

14    to those portions.

15         A.   Sorry, Tom, but you see, Elliot

16    Davis was not appointed to conduct the due

17    diligence.  So why would Elliot Davis in

18    their report mention all the obligations of

19    Arbitrade?  That was not the assignment.  If

20    we look at clearly on page 1, it says there

21    are two things, assist in determining the

22    existence of SKR and number 2, assist in

23    determining the title to the gold as

24    identified in the agreement.  That's it.

25    These were the two tasks given to them and



Page 113

1                    F. AHMED

2      that is what they have mentioned that they

3      have identified the Safe Keeping Receipt,

4      that's point number 1 and point number 2,

5      they are clearly mentioning, point number

6      2C, they have mentioned that yes, we have

7      reviewed the agreement and there is a

8      paragraph about the title being transferred

9      and we are confirming that.  And we are

10     confirming that based on the CPA standards

11     on attestation.

12              Why would it list anything else,

13     any other regulations when they were not

14     tasked to do so by Arbitrade?

15          Q.   You're asking a why question.

16          A.   What I'm trying to say is, Elliot

17     Davis was tasked with clearly two things,

18     right.  Those two things are mentioned in

19     the very beginning of their report.  And in

20     doing so, if they are not required to

21     conduct a due diligence or a physical

22     verification of gold or comply with the Good

23     Delivery standards or the OECD standards or

24     the international accounting standards of

25     physical existence, then why would they



Page 114

```
 1                      F. AHMED
 2   mention it in their report?  They wouldn't
 3   mention it.  And what they have done is
 4   clearly they have followed the attestation
 5   requirements which they mentioned on the
 6   last page of their report that we have
 7   complied with the attestation standards of
 8   the certified public accountants, the CPAs.
 9              If they were, if they were tasked
10   to conduct a due diligence, if they were
11   tasked to conduct a physical examination of
12   the gold, they would have listed all the
13   standards that I have mentioned, whatever
14   they would have relied on.  But because they
15   were not tasked to do that.
16       Q.   Does your opinion include anything
17   on the subject of whether the seller of
18   bullion has an obligation to advise a buyer
19   of the applicable standards that are
20   described in your report?
21       A.   No.  So both parties are
22   independent.  So in my report it clearly
23   mentions the dependence which includes the
24   supplier.  The supplier equally has same
25   responsibilities.  Both parties are
```



Page 115

1                       F. AHMED
2   responsible to comply with the regulations,
3   but they're independent.  We can't say, you
4   know, no, the laws don't say that, no, the
5   supplier is obligated to inform the buyer.
6   No.  The buyer has to ensure that they are
7   in compliance on their own.  They should not
8   just rely on the supplier informing them
9   about the regulations.  Both parties need to
10  follow the regulatory compliances.
11       Q.   Are you aware whether anyone from
12  SION, G4S or Barber or anyone on the
13  seller's side, had any discussion with
14  anyone from Arbitrade regarding what you
15  described as the standards applicable to
16  both of them?
17       A.   There were discussions on the
18  physical verification of gold.  So, you
19  know, the past email exchange which was
20  there, right, which was -- which I've seen,
21  right.
22            There was also an email to KPMG
23  which was written.  So there were
24  discussions with the auditors.  There were
25  conversations on emails between the parties,



```
 1                      F. AHMED
 2   the defendants around, you know, how do we
 3   physically verify or what does this SKR mean
 4   or the third party auditors to be appointed.
 5            But to answer your question, the
 6   supplier is not obligated to inform the
 7   buyer that you need to satisfy these
 8   regulatory requirements.  The supplier
 9   should be following their own regulatory
10   requirements and as part of that process
11   they should have sent in a counsel before,
12   asked the relevant KYC questions to the
13   buyer also, get the information which is
14   required to conduct the due diligence which
15   I mentioned earlier.
16        Q.   Right, but my question here wasn't
17   whether the seller had that obligation.  My
18   question was whether putting aside the
19   question of obligation, whether the seller
20   had identified to Arbitrade the standards
21   that you say applied to both of them, and
22   you've referred to some communications but
23   it wasn't clear to me if you were saying
24   that those communications included that
25   disclosure.
```



Page 117

```
 1                      F. AHMED
 2           So even though I've asked it
 3    before, with that background I'm going to
 4    ask the question again, putting aside any
 5    question of obligation, are you aware of
 6    whether or not the seller, anyone on the
 7    seller's side communicated to Arbitrade the
 8    standards that your report says apply to
 9    both of them in connection with the gold
10    transaction?
11        A.   Again, outside the scope of my
12    work, why would I investigate whether the
13    supplier had actually advised the buyer on
14    what procedures or what standards to be
15    followed?  It's outside the scope of my
16    work.
17        Q.   Are you aware from the materials
18    you've reviewed in preparing your report and
19    retained Elliot Davis?
20        A.   I would have to look at the Davis
21    report and see who engaged them.  I'd have
22    to go back and check.
23           I mean, if you have the document,
24    you can show it to me.
25        Q.   Well, I'll ask you the same
```



```
 1                    F. AHMED
 2  question just for consolidation as to BDO.
 3       A.   Okay, so BDO?
 4       Q.   Yes.
 5       A.   So the report of the BDO?
 6       Q.   Who in Arbitrade engaged them?
 7       A.   I would need to check that.  You
 8  know, again in terms of who engaged them.
 9       Q.   Do you have an affirmative opinion
10  as to either BDO or Elliot Davis that it was
11  Troy Hogg who engaged them?
12       A.   As I said, I would have to go back
13  and check.  You asked me who engaged them.
14  I have to look at the engagement letter, who
15  signed that engagement letter and who was
16  copied on the email.  So if that question
17  would have come in advance I would have gone
18  and pulled out that document.  So the BDO
19  report is there, but who engaged them, I
20  would have to look into those documents.
21            So again, you know, in terms of
22  who engaged them will come back to the same
23  question about Arbitrade.  Arbitrade was --
24  the report was issued to Arbitrade, so the
25  Elliot Davis report, as you see, right, the
```



Page 119

```
 1                    F. AHMED
 2   report.  Now who engaged them is a question
 3   that I did not investigate, that was not my
 4   scope.  But I can check and confirm to you
 5   if there is, you know, who it was addressed
 6   to.
 7          So if you see it was addressed,
 8   the BDO report was addressed to
 9   Mr. Schutzman, I have the report.  Now I
10   have to go back and check the emails, who
11   were copied on the emails and who approved
12   this.
13       Q.   Apart from whatever review of
14   documentation might show, do you have any
15   independent knowledge as we sit here today
16   suggesting that it was Troy Hogg who
17   retained either Elliot Davis or BDO?
18       A.   The report has been addressed to
19   Arbitrade, right.  Both the reports are
20   addressed to Arbitrade.  In the BDO report
21   it does mention there Schutzman.  In the
22   Elliot Davis report it does not address to
23   any individual person, right.  I would need
24   to go back and look at the communication and
25   see where Mr. Hogg was copied or provided
```



Page 120

```
 1                    F. AHMED
 2   any approval on the email.  That is
 3   something which I'll have to go back and
 4   check.
 5             Again, that is not -- that -- what
 6   we are trying to establish is how was
 7   Mr. Hogg involved, you're asking me.  That's
 8   a legal question, whether he was -- whether
 9   he was the defendant or not, whether he was
10   the officer or not, it comes back to the
11   same question which you asked me before,
12   which I said it's a legal counsel question.
13   From my perspective, there was a report
14   which was issued by BDO to Arbitrade, right,
15   and there was a report issued by Elliot
16   Davis to Arbitrade.  And I said in the
17   beginning that the defendants from the SEC
18   complaint, the alleged people who were
19   responsible and had control over Arbitrade,
20   are the people defined as defendants in my
21   report.
22             MR. KISSANE:  Respectfully, I'm
23        going to move to strike that response,
24        because it evades my question entirely.
25        Q.   And I ask you to listen when I ask
```



Page 121

                        F. AHMED

1
2   the question again and try to focus on it
3   narrowly.
4           What I was trying to ask you was,
5   whether apart from whatever any review of
6   documents might later show, whether you had
7   any independent knowledge as we sit here
8   today concerning whether either Elliot Davis
9   or BDO was retained by Mr. Hogg on behalf of
10  Arbitrade?
11      A.   Again, that was not in my scope of
12  work to validate that whether Mr. Hogg
13  retained BDO or Elliot Davis.  So I won't be
14  able to comment on this.
15      Q.   Would your answer be any different
16  if the question were Mr. Goldberg?
17      A.   The same.
18      Q.   Do you recall seeing the signed
19  engagement agreements with each of those
20  firms?
21      A.   With BDO, yes.  With Elliot Davis,
22  this report.  The defendant accountant
23  support with BDO, there is the -- there is
24  the engagement letter, the proposed
25  statement of work, which is the proposed one



Page 122

```
 1                     F. AHMED
 2  which is about the anti-money laundering
 3  which was not, I don't see any report on
 4  that whether that was done or not.  But
 5  clearly it talks about the due diligence.
 6  So as you were asking me, BDO, they did
 7  submit a statement of work.  This is if you
 8  want to refer to the BDO report which is
 9  there, along with that there is the proposed
10  statement of work which they were proposing
11  to do in terms of the AMLs and sanction
12  work, which is the due diligence we are
13  talking about.
14           But I don't see any work that was
15  assigned to them on that.
16       Q.   And as we sit here today, do you
17  have any knowledge, independent of what
18  later review of documents might reveal as to
19  whether the proposals from those firms or
20  any instructions provided to them were via
21  emails that included Mr. Hogg?
22       A.   Again, that was not what I was
23  investigating or validating whether Mr. Hogg
24  was providing any instructions to them.
25       Q.   And would your answer be any
```



Page 123

```
 1                    F. AHMED
 2   different with respect to Mr. Goldberg?
 3        A.   The same.
 4             MR. KISSANE:  I'd ask to call up,
 5        I'm going to put up for display what's
 6        going to be marked as Exhibit 4 for
 7        today's purposes.
 8             (Whereupon, an agreement between
 9        SION and Arbitrade was marked Ahmed
10        Exhibit 4 for identification as of this
11        date.)
12        Q.   I ask if you have ever seen this
13   document before, you know, instruct us how
14   to scroll through it, if that's appropriate
15   to help you answer the question.
16        A.   Yes, I have seen this document.
17        Q.   And this is entitled Gold
18   Procurement, vaulting, Trading and Sales,
19   the agreement between SION and Arbitrade,
20   right?
21        A.   Yes, that's right, yes.
22        Q.   And if you would go to the end of
23   the document.
24             Do you see here who signed the
25   document on behalf of Arbitrade?
```



Page 124

```
 1                    F. AHMED
 2        A.    Yes, it is Mr. Schutzman.
 3        Q.    And Barber signed on behalf of
 4   SION?
 5        A.    Yes.
 6        Q.    Did you have any occasion to
 7   investigate the metadata for this document
 8   in order to determine who had written the
 9   agreement or participated in its authorship?
10        A.    It's beyond the scope of my work.
11             MR. KISSANE:  Close that please
12        and call up the next one.
13             (Whereupon, a memorandum of
14        understanding between SION and
15        Arbitrade was marked Ahmed Exhibit 5
16        for identification as of this date.)
17        Q.    I'm going to ask you the same
18   question, whether you recognize this
19   document?
20        A.    Yes.  Yes, I do recognize this
21   document.
22        Q.    So this is a Memorandum of
23   Understanding between SION and Arbitrade
24   concerning evidencing title and $10 billion
25   of gold?
```



Page 125

1                          F. AHMED

2          A.    Yes.

3          Q.    Looking at the end of this, can

4    you see who signed this on behalf of

5    Arbitrade?

6          A.    Yes, that's Len Schutzman.

7          Q.    And signed by Mr. Barber on behalf

8    of SION; right?

9          A.    Yes.

10         Q.    As to this document as I asked on

11   the last one, do you have any occasion to

12   review the metadata to determine who had

13   written or participated in the authorship of

14   the document?

15         A.    No.  It's beyond the scope of my

16   work.  Yeah.  This document is, if you see

17   Barber 002.  There is a document which is

18   Barber 003.  There is an email from Troy

19   Hogg to Chris Eaton from KPMG which includes

20   Mr. Goldberg as well as Mr. Barber as well.

21   And it talks about when he's stating that,

22   "Good day, Chris.  My name is Troy Hogg and

23   I am from Arbitrade, Limited."  It talks

24   about the news in the country, and KPMG, and

25   it also talks about in terms of the Safe



1              F. AHMED

2 Keeping Receipt, you know, and both

3 Arbitrade board of directors along with SION

4 would like to see this. Now, if you've seen

5 that email, that I've seen that, so I was

6 mentioning to you the email since you've

7 shown me this document. The next document

8 in the back after this, where there is an

9 email from Troy Hogg and it talks about

10 these issues in his capacity. Again, beyond

11 my legal distinctment. Since you asked me

12 the question, there is the email where he's

13 talking about all the issues relating to

14 Arbitrade and stating that all the partners

15 and board of directors have approved this.

16          MR. KISSANE: I'm going to move to

17      strike everything you just said. And

18      just so you understand why I'm doing

19      that, the way this process works is

20      you're here to answer my questions,

21      anyone else who might have questions

22      for you and answer those when they have

23      those answers.

24          If you are unresponsive to my

25      question, I'm entitled to make a motion



Page 127

```
                        F. AHMED
1
2        to strike that the court can ultimately
3        resolve.  So I'll ask that you not
4        volunteer information for me but focus
5        on answering my questions going
6        forward.
7             MS. SUM:  Just one second.
8             Tom, you did ask a question
9        earlier, Mr. Ahmed is providing an
10       answer to the question that you asked
11       earlier.  So there is no basis for your
12       motion to strike.  Please, Mr. Ahmed.
13            MR. KISSANE:  Well, to the extent
14       that it is entered as responsive, I
15       will determine that for making any
16       motion and proceed accordingly.
17            THE WITNESS:  Mr. Tom, you just
18       asked me --
19            MS. SUM:  I'm sorry.
20            THE WITNESS:  I'm sorry.
21            MS. RAPOPORT:  I'd like to
22       interrupt here really quickly.  I don't
23       know what you're talking about either.
24       Either can it be read back in the
25       record or can you talk about what
```



Page 128

1                          F. AHMED

2          you're referring to Mr. Ahmed, because

3          I'm not following that this was

4          something related to another question.

5              THE WITNESS:  So the question that

6          Mr. Tom just asked me is about any

7          email with Troy Hogg, around the SKR or

8          the BDO or the Elliot Davis report.  So

9          I'm referring to a document, so I'm

10         answering your question, Mr. Tom.  It's

11         titled in the back at 54003.  It's an

12         email dated July 26, 2018 that went

13         from Mr. Troy Hogg to a number of

14         people and it's addressed to Chris

15         Eaton from KPMG.  I mentioned this

16         before also in my testimony, there was

17         an email.  So that is the email if you

18         see, where you're asking where did I

19         see that Mr. Troy was engaged in

20         discussions.

21              I kept saying that he was engaged

22         in discussions in email.  So there is

23         an email which I'm answering your

24         question.

25         Q.   Okay.  Well, the record will



```
1                    F. AHMED
2    enable us all to make our own judgment?
3        A.   I want to actually -- because you
4    asked me the question, if we can pull up
5    that email, you asked me about auditing.  It
6    talks about specifically Mr. Troy Hogg
7    requesting Chris Eaton from KPMG to retain
8    them to conduct audits in order to verify
9    transactions with the proper and correct
10   forum that we believed should be.  You asked
11   me the question if I have seen anything
12   where Mr. Troy Hogg was engaged with
13   auditors like BDO or Elliot Davis or KPMG.
14   I'm referring to the email where he did, he
15   was requesting KPMG to conduct the audit.
16   Can we see that email?
17       Q.   I submit the responsive answer to
18   my question would have been yes.  And then
19   we could have seen where I went with it.
20   But I do not believe the information you're
21   giving is responsive to my question and I do
22   not wish to convert this into a process
23   whereby you mark exhibits for questioning.
24       A.   Sorry, Mr. Tom.  You had asked me
25   if I recall, just now, right.  When you
```



Page 130

```
 1                    F. AHMED
 2  talked about BDO and Elliot Davis report,
 3  that is the time when I, I says it is there,
 4  the emails, that I need to go into the
 5  document.  So this is not the question
 6  before the break.  This is the question that
 7  you asked me right now.  And I'm referring
 8  you to a document which I would like to
 9  include here which talks about --
10      Q.   Sir.
11      A.   You asked me about the auditing
12  standards.
13      Q.   You don't include documents --
14           MR. BRAVERMAN:  This is Steve
15      Braverman.
16           I'm going to object to this as
17      well.  Mr. Ahmed, you are not the
18      attorney, you are not here to prove
19      anything.  You are just here to answer
20      their questions.  And you know, I
21      object to this.  You shouldn't be
22      bringing anything up unless it's asked
23      specifically.  And I'm putting an
24      objection in.
25           He told us earlier that he's not a
```



Page 131

```
 1                     F. AHMED
 2     lawyer and that he doesn't answer any
 3     law questions.  Now he's acting as a
 4     lawyer trying to show that he's proving
 5     --
 6         MS. SUM:  Mr. Braverman, put your
 7     objection on the record, let me
 8     respond.
 9         To be absolutely clear, Tom has
10     chosen to conduct this deposition in a
11     manner where he asks general questions
12     of the expert as if he's supposed to
13     pull out of thin air an answer without
14     being able to refer to documents.  And
15     while Mr. Ahmed is answering the most
16     recent question from Tom, he's
17     providing the reference to the
18     documents that Tom could have very
19     easily brought up on the screen and
20     shown it to him rather than having him
21     trying to remember, okay.
22         MS. RAPOPORT:  No, no, no.
23         MS. SUM:  You all may not like the
24     order in which this information is
25     coming out.
```



Page 132

```
 1                     F. AHMED
 2          MS. RAPOPORT:  You are not his
 3      attorney.
 4          MR. BRAVERMAN:  It doesn't matter.
 5      I can assert whatever objection.  And
 6      if you all want to make objections, I
 7      can certainly respond on the record.
 8          MR. KISSANE:  Well, I'm going to
 9      proceed with my questioning.
10          So I'm going to turn to page 15.
11      Actually, I'll ask if we can bring back
12      up the report, Exhibit 1, your report,
13      and at page 15.
14      Q.   You say, about the middle of the
15  page, beginning of the paragraph, it says,
16  "Second, the independent accounting firms
17  were directed or not allowed to perform
18  certain procedures by SION."
19          Do you know if that direction was
20  from SION, not from Arbitrade; right?
21      A.   No.  Sorry.  Independent
22  accounting firms were directed or not
23  allowed to perform certain procedures,
24  certain procedures by SION.
25          Yes, the existence of the -- it's
```



Page 133

1                          F. AHMED

2    not about the instruction of the report to

3    BDO, no.  It's basically there are physical

4    inventory records that SION should have

5    maintained.  So it's not about instructing

6    the auditors.

7         Q.   Wait, you say here, "The

8    independent accounting firms were directed

9    or not allowed to perform certain procedures

10   by SION?"

11        A.   The next sentence -- yeah, but

12   then the next sentence says that "defendants

13   ignored the red flag presented when SION

14   told BDO to drop its request for a

15   videoconference."

16             So SION had told BDO to drop the

17   request for a videoconference.  That is what

18   I'm referring to.  So SION was not, you

19   know, instructing.  The defendants ignored

20   here.  When I say defendants, Arbitrade and

21   all the parties involved, they ignored the

22   red flags.  When SION dropped the request

23   for videoconference.

24        Q.   Well, let me understand.  Are you

25   now saying that your report is mistaken when



Page 134

```
 1                    F. AHMED
 2   it says --
 3        A.   No, it's not mistaken.
 4        Q.   Sir, sir, you got to let me finish
 5   the question.
 6             Are you now saying that you meant
 7   to write this differently rather than to say
 8   as it does now, that the independent
 9   accounting firms were directed or not
10   allowed to perform certain procedures by
11   SION, it says SION not Arbitrade.  Are you
12   now saying that that's not correct?
13        A.   It is absolutely correct, okay.
14   SION is one of the defendants.  So see, the
15   defendant accounting firms were directed and
16   not allowed to perform certain procedures by
17   SION.  If you read the next sentence in
18   conjunction with this sentence, you'll
19   understand what SION did not allow --
20        Q.   Sir, the question, we'll get to
21   what you're raising, but you're --
22        A.   You have to hear my answer.
23             MS. SUM:  Objection.  Tom, you
24        cannot stop a witness from completing
25        his answer.
```



Page 135

```
1                      F. AHMED
2        A.   So we should not be reading this
3   sentence out of context, Mr. Tom, read both
4   sentences together.  Let me then read it out
5   to you.
6             "Second, the defendant accounting
7   firm were directed or not allowed to perform
8   certain procedures by SION.  Defendants
9   ignored the red flag presented when SION
10  told BDO to drop its request for a
11  videoconference call."
12            So the request for a
13  videoconference call was dropped at the
14  request of SION.  That was the particular
15  step, you know, the procedure that SION did
16  not allow the independent accounting firms.
17  Let's not read it as independent accounting
18  firms were hired by SION.  I did not say
19  that.  It doesn't read that way.
20       Q.   I don't know where that's coming
21  from, my question is very narrow.  And I
22  believe you answered it.  You also answered
23  my next question which was not responsive to
24  the last one, but that's okay.
25            I wanted to proceed to the
```



Page 136

```
1                    F. AHMED
2    language you're talking about.  You talk
3    about defendants ignored the red flag
4    presented.
5             We've talked on several occasions
6    earlier about your use of defendants as a
7    collective term and whether it extends to
8    Mr. Hogg and Mr. Goldberg.  I guess what I'd
9    like to ask you here, when you say that
10   "defendants ignored the red flag," do you
11   have any basis for attributing that action
12   of ignoring the red flag to include Mr. Hogg
13   apart from the answers you gave earlier
14   about other questions on why they should be
15   included with Arbitrade as to various
16   statements that you had made?
17        A.   So once again, as I said, I am not
18   a legal counsel to establish his
19   responsibilities.  But I told you that there
20   are emails which clearly show, which I have
21   seen and I have actually highlighted just a
22   few minutes ago which you're not accepting
23   as the email from Troy Hogg which is to KPMG
24   which talks, you know, about conducting
25   audits in order to verify transactions.  It
```



1                    F. AHMED

2    talks about the acquisition to confirm the

3    gold bullion acquisition from SION trading.

4    It also confirms about the board of

5    directors of Arbitrade and partners along

6    with SION would like to see this done in

7    order to verify our actions publicly for

8    each step of the process.  So that email, it

9    clearly shows where Troy Hogg had actually

10   instructed.  So you asked me that question

11   so I'm referring you back to that email.

12            Again, in my scope of work, it was

13   not -- my scope of work did not require me

14   to establish the evidence that yes, what

15   were the responsibilities of Mr. Hogg.  But

16   the email I have referred, I told you there

17   was emails and this is the email I'm

18   referring to 26 of July 2018.

19        Q.   If I understand you correctly

20   you're saying that that email is an example

21   of evidence that you believe, apart from

22   whatever we discussed on the subject

23   earlier, you want me to know that you think

24   that supports the inclusion of Mr. Hogg

25   among the defendants who you say ignored the



Page 138

1                          F. AHMED
2    red flag presented when SION told BDO to
3    drop its request for a videoconference;
4    right?
5         A.   See, whether that email proves it
6    or not is a legal question, Tom.  You asked
7    me this question in different ways before
8    the break.  And what you wanted me, what you
9    were asking me is did I see any emails.  I
10   said there were emails, I would have to see
11   or remember or recall the email.  But it is
12   outside my agreement to establish his
13   position in Arbitrade.  Now, referring you
14   to the email, I cannot make derivations or
15   derive anything from that email which is a
16   legal counsel matter, right.  All I can say
17   is that there is instructions on audit,
18   there is instructions on the bullion
19   acquisition, right, on that email and there
20   is communication with auditor, KPMG.  That's
21   all I can say which is a fact.
22        Q.   Okay.  Well, you brought it up not
23   me, so that's the only reason I'm asking you
24   to clarify whether you are making, offering
25   the opinion that that document is relevant



Page 139

                        F. AHMED
1
2  to your contention that Mr. Hogg is among
3  the defendants who ignored the red flag
4  presented, as stated at page 15 of your
5  report.  I think you've answered that.
6          So I'm going to ask you whether
7  your answer would be the same if the
8  question were presented with respect to
9  Mr. Goldberg rather than Mr. Hogg?
10     A.   I'm sorry, what you just mentioned
11  that you understand my answer.  Can you just
12  clarify?  What did you think as my answer,
13  please?
14     Q.   Well, you gave your answer, and if
15  you think the record is unclear, I would ask
16  you to give me your answer.  I prefer not to
17  get into my characterization.
18          But the question was whether the
19  email that you're talking about is something
20  you're identifying as supporting the
21  contention in your report that Mr. Hogg
22  should be included among the defendants who
23  you say ignored the red flag presented when
24  SION told BDO to drop its request for a
25  videoconference?



Page 140

1                    F. AHMED

2          A.    That's why I wanted to clarify

3    this point.  I did not anywhere refer that

4    email to the point on this report about, you

5    know, BDO.  That email has nothing to do

6    with BDO.  That email is an email from

7    Mr. Hogg to KPMG.  This is a completely

8    different point.  Defendants is Arbitrade.

9    There was a red flag when somebody stopped.

10   So when SION dropped the request for a

11   videoconference that was a red flag for the

12   defendants.  The defendants include Mr. Troy

13   Hogg, Mr. Braverman, the defendants listed

14   in the SEC's complaint.  So just to keep it

15   on record clear, I'm not referring that

16   email has anything to do with the BDO

17   dropping or the red flags, no.

18         Q.    So let me re-ask the question

19   which I had thought you had mentioned in

20   that email in response to, maybe you did,

21   maybe you didn't, but I want to ask a

22   question again.  And you can make a fresh

23   judgment as to whether that email should be

24   part of the response or not.

25              The question as I recall asking it



Page 141

```
 1                    F. AHMED
 2   was whether apart from the reasons you gave
 3   in earlier testimony about other questions
 4   around the subject of whether Mr. Hogg or
 5   Mr. Goldberg should be included in the term
 6   defendants, as to other parts of your
 7   report, whether there is anything beyond
 8   that that you rely upon in saying that
 9   Mr. Hogg or Mr. Goldberg should be included
10   among defendants for purposes of this
11   statement at page 15, that defendants
12   ignored the red flag presented when SION
13   told BDO to drop its request for a
14   videoconference.  Is there anything, whether
15   it's that email or otherwise, beyond what
16   you've said earlier that goes to that
17   subject in your view?
18        A.   If we can actually break down this
19   question, I'm confused.  I'm not clear.
20             So very clearly by not allowing a
21   videoconference is a red flag and the
22   defendants ignored it.  That's my statement
23   here.  So that's it.  So that's the
24   statement.
25        Q.   But you see, it's also part of
```



Page 142

1                       F. AHMED

2  your report that the defendants failed to

3  perform an obligation by ignoring it; right?

4  Isn't that part of what you're saying?

5       A.   Yes, the defendants ignored the

6  red flag, right to drop, right, yes.  And as

7  a result of if, they failed to, yes.  So

8  you're saying that there was an obligation,

9  if that request was dropped, then the

10 defendants should have actually, you know,

11 taken it as a red flag and taken additional

12 steps to validate that information.

13      Q.   What I'm getting at with this

14 question is whether there is anything apart

15 from what we've covered earlier on other

16 examples of where I've asked you if Mr. Hogg

17 or Mr. Goldberg was among the defendants who

18 you said failed to perform certain

19 obligations, whether it was a specific

20 requests to ignoring the red flag here, is

21 there anything else you relied on in

22 concluding that Mr. Hogg and Mr. Goldberg

23 should be included among the defendants who

24 ought to have done something that they

25 failed to do when SION told BDO to drop its



Page 143

1                        F. AHMED

2    request for a videoconference?  It's a

3    little bit of a dense question, my

4    apologies, I can rephrase it if you'd like,

5    but if you understand it, please give me an

6    answer?

7         A.   But yes, let's go through the

8    question.  So when clearly they said we

9    would want to do a physical verification and

10   there were email exchanges about, you know

11   et cetera, but we'll come to that later on.

12   On the BDO part it is clear, what I mention,

13   that this is a red flag that should have

14   been further investigated or further steps

15   should have taken place.

16        Q.   And why do you say that either

17   Hogg or Goldberg had an obligation to do

18   something in response to that red flag?

19        A.   Well, once again I said

20   defendants.  So we are going back to the

21   same question again.  Establishing whether

22   they were officers or directors or the

23   controller of the company or participating

24   in various decision making process as per

25   the email that I just quoted dated in



Page 144

```
 1                    F. AHMED
 2   July 28 is a legal counsel matter.  That's
 3   not something for me to opine on that
 4   whether they had the control or not.
 5            But they are named as defendants
 6   in the allegations.  I mentioned to you what
 7   I have seen is the email where they are
 8   participating in these discussions whether
 9   with auditors or between company officials,
10   directors.
11        Q.   Can we go to page 15?
12             MS. SUM:  Tom, can I ask you
13        about --
14             THE WITNESS:  Can we take a break?
15             MS. SUM:  I was just about to ask
16        you if we can take a break.
17             MR. KISSANE:  Yes, I'm sorry.
18             MS. SUM:  It sounds like both he
19        and I were asking for a break at the
20        same time, so.
21             MR. KISSANE:  Yes, that's fine.
22        Actually, can we go off the record.
23             MS. SUM:  Sure.
24             (Whereupon, an off-the-record
25        discussion was held.)
```



Page 145

```
1                    F. AHMED

2            (Whereupon, a short recess was

3      taken.)

4        Q.   I have pulled back up what is

5  marked for today's purposes as Exhibit 5,

6  despite the tab on the upper right, it says

7  Exhibit 3 from prior use.  I'm going to ask

8  if we can display page 2 of that document

9  just to clarify something from earlier.

10           I believe in our earlier

11 discussion I may have said or maybe you did,

12 I don't recall, that this was signed by

13 Mr.Schutzman and I just want to point out

14 for the record that as the document reveals,

15 Mr. Schutzman's name is crossed out on this

16 document and the name Lawrence Meyer is

17 written in beneath it and it appears to be

18 Mr. Meyer's signature that appears above it.

19       A.   Yes.

20       Q.   That's the question I'm asking

21 you, and you're welcome if you have

22 something responsive to that to say so, but

23 I just wanted to clarify?

24       A.   No, that's fine.  I can see that,

25 correct.  So under the name printed is Len
```



Page 146

```
 1                    F. AHMED
 2  Schutzman but than Lawrence Meyer is cutout
 3  and the signature actually is -- I don't
 4  know the signature, but it says Lawrence
 5  Meyer.
 6           So this again, Lawrence Meyer is
 7  the one whose signature.  So do you have a
 8  question on this or?
 9      Q.   No, I wanted to clarify.  I think
10  left the record suggesting otherwise.  I
11  just wanted to clarify that it was Mr. Meyer
12  who signed it.
13           So I'll ask then if we can put
14  that document down and go back to
15  Mr. Ahmed's report.
16      A.   Just going back on the document.
17  So what was the question, Mr. Tom, you had
18  on that particular document?  You showed
19  that document just to clarify that it's
20  signed by one of the other person and not by
21  Schutzman?
22      Q.   That's correct.
23      A.   So there was no question on
24  Mr. Hogg on this?
25      Q.   That's correct.
```



Page 147

```
 1                      F. AHMED
 2            I had no further questioning on
 3    the document.  I just sought to clarify the
 4    signature.
 5            Okay.  So if we can turn to page
 6    15 of the report, please.
 7            I'm directing your attention to
 8    page 15 of your report, and towards the
 9    bottom of which you state that the email
10    dated the 23rd of October 2018 Stephen
11    Braverman wrote to Joseph Chapman of Bureau
12    Veritas, "We have an SKR that has already
13    been audited by three accounting firms.  I
14    really wanted to discuss with you what the
15    options are.  The bullion is significant in
16    several security facilities in Dubai.
17    Counting bars I believe is overkill."
18            Do you know what Mr. Braverman's
19    role, if any, was at Arbitrade as of
20    October 23, 2018?
21       A.    I believe he was the Chief
22    Operating Officer.  That's what -- that's
23    what his role has been defined, you know, he
24    was -- he would be responsible for the
25    operations as the Chief Operating Officer.
```



Page 148

```
 1                    F. AHMED
 2  So there is Exhibit 13 which talks about the
 3  roles of various individuals, the board of
 4  directors and two principal consultants and
 5  which is where he was defined as seeing some
 6  of the other emails as well.
 7       Q.   Are you referring to the white
 8  paper?
 9       A.   I'm referring to -- so if you see,
10  there is -- there is an email, it's Exhibit
11  13.  It's basically an email that came from
12  Cryptobontix.
13       Q.   Well, I'll approach the issue this
14  way.
15       A.   So it is addressed to Mr. Steve
16  Braverman, since you asked me that question,
17  it's addressed to him.  And it lists down,
18  you know, about Arbitrade team.  So you have
19  that document, if you can pull it up, we can
20  just go through that to answer your question
21  on his role.
22       Q.   We're going to proceed in the
23  normal course whereby I put up the documents
24  and ask you the questions.
25            You have every right to call my
```



Page 149

```
 1                    F. AHMED
 2  attention to the fact that you have
 3  something in mind and I'd like to ask you
 4  about it in the following, to the following
 5  extent.
 6            Do you know how you came to the
 7  conclusion that Mr. Braverman was the Chief
 8  Operating Officer?  And if it includes by
 9  reference to that document, feel free to say
10  so.  If it includes other things, feel free
11  to say that.
12       A.   Yes, I mean, if you look at again,
13  if you see, there is the defendant in the
14  complaint by SEC.  It says Braverman is --
15  on page number 5, Is a resident Newbury
16  Park, California.  Braverman was held out as
17  a Chief Operating Officer of Arbitrade from
18  September 1988 through June 2018.  Braverman
19  was a registered representative associated
20  with registered broker dealer.
21            So that's a document where Chief
22  Operating Officer of Arbitrade comes from.
23            In addition to that, if you look
24  at the email dated 7/5/2018, I'm presuming
25  that's 5th of July 2018, email from
```



Page 150

```
 1                      F. AHMED
 2   Cryptobontix to Steve Braverman and on that
 3   email it's a long email which talks about
 4   the roles and responsibilities including
 5   Mr. Troy Hogg's role.
 6            And what I understand is Mr. Troy
 7   Hogg was the owner of Cryptobontix as well.
 8   So apparently the email is coming from his
 9   company.
10            And that email actually defines
11   that, if I can, there are four aspects that
12   the company is building currently.  That is
13   operational management, the support teams,
14   the compliance teams and the board of
15   advisors.  Steve Braverman who was tenanted
16   with operating the trading desk and Knight
17   Securities with other investment houses for
18   many years will oversee the build out of the
19   Bermuda operations located at Victoria Hall
20   which is Arbitrade's new seven-story office
21   tower.
22            This paragraph is just below where
23   Troy Hogg's role has been defined, that Troy
24   was the visionary, designer of everything at
25   Arbitrade, from the all-in-one merchant
```



Page 151

                        F. AHMED

1

2    binding platform to the bullion backed

3    tokens to RBP and mining structure.

4              So after this paragraph, clearly,

5    it talks about Steve Braverman.

6              So these are the two sources that

7    I have, you know, that I can recall.  I can

8    look at, you know, again, other emails.  If

9    there was a footer on the email defining his

10   position.  But these are the two documents

11   which at the top of my head are here

12   defining his role as an operating officer of

13   somebody who was responsible for the

14   operations.

15        Q.   So do I understand you to be

16   saying that you relied upon the statement in

17   the email you've identified saying that

18   Mr. Braverman would oversee build-out of the

19   Victoria Hall operations as one of the

20   reasons you concluded that he was Chief

21   Operating Officer?

22        A.   No.  What I mentioned was in the

23   complaint, the SEC's complaint on the

24   defendants, Braverman's role has been

25   defined as the Chief Operating Officer of



```
 1                    F. AHMED
 2    Arbitrade.
 3              You asked me another question,
 4    that was there any other documents where his
 5    role was being defined and that is where I
 6    referred you to the email from Cryptobontix
 7    to Steve Braverman where it talks about his
 8    operating responsibilities.
 9         Q.    Okay.
10         A.    And then there are many other
11    emails, including the one that, the Bureau
12    Veritas one where he is engaging and he's
13    answering.  So if you ask me the specific
14    question, where did the term Chief Operating
15    Officer came from, it came from the
16    complaint document.  But where else?  He has
17    been mentioned, you know, if I recall from
18    the documents, that email which I just
19    mentioned talks about his role.
20         Q.    And to your recollection, did any
21    of the other emails that you commenced
22    identify Mr. Braverman as Chief Operating
23    Officer?
24         A.    I will have to look into those
25    emails.  You're asking me a question.  There
```



Page 153

```
1                        F. AHMED
2    are a number of emails that we've reviewed
3    but I will have to look into that, whether
4    any other emails.  These are the two that on
5    the top of my head, when you ask me the
6    question, I can pull it out and I can see
7    two sources.  I will have to see, because he
8    was copied on a number of emails, I'll have
9    to look at whether his position was defined
10   in any of those emails.
11       Q.   Do you recall seeing an email from
12   anyone at Arbitrade other than Mr. Braverman
13   raising the question or offering the view
14   that counting the bars would be overkill, in
15   words or in substance?
16       A.   So, that statement is here on the
17   email.
18            So that is a statement in the
19   email which you just mentioned, counting
20   bars, I believe is an overkill.  There is an
21   email which is sent from, from his iPhone
22   that says Steve Braverman's email ID.
23       Q.   Right.  So my question was apart
24   from that email, do you recall or do you
25   know whether you saw any other emails in
```


MAGNA
LEGAL SERVICES

Page 154

```
 1                     F. AHMED
 2  which anyone from Arbitrade expressed the
 3  view in words or substance that counting the
 4  bars would be overkill?
 5      A.   The term counting the bars would
 6  be overkill came in that email from Steve
 7  Braverman.  That's where the statement, yes,
 8  the statement is on his email.  No one else
 9  has mentioned in their emails anywhere, that
10  it would be an overkill.
11          MR. BRAVERMAN:  I'd like to object
12      to one thing.  Everybody keeps on
13      saying that I was the Chief Operating
14      Officer of Arbitrade.  And that is
15      just, you know, untrue.  I was at one
16      point asked to be the chief operating
17      officer of Arbitrade exchange in
18      Bermuda which I accepted and it was
19      never made official and I never
20      officially held that position.  There
21      was no exchange --
22          MS. RAPOPORT:  Steve.
23          MR. BRAVERMAN:  It never came
24      about and it needs to be on the record.
25      Thank you.
```



Page 155

1                        F. AHMED
2              MS. RAPOPORT:  You are not
3         testifying.
4              MS. SUM:  You are not testifying.
5         If you want to start pointing facts
6         into the record, then we can certainly
7         put in a number of other documents that
8         we're going to prove your statement to
9         be untrue but I don't know that's the
10        road you want to go down, so let's try
11        avoid those type of objections.
12             MR. KISSANE:  I think when you
13        review the transcript you'll see
14        everybody was not saying what you
15        attributed to everybody, but with that
16        said I think we should move on.
17        Q.   I ask now if we can turn to page
18   16 of your report and I direct your
19   attention to the last portion appearing
20   before number item 2 where you say, "Denial
21   of the permission to carry out physical
22   verification of the gold is a further red
23   flag and raises a question on the processes
24   that were compromised by defendants
25   actions."



Page 156

```
 1                    F. AHMED
 2           Can you tell me who it was that
 3  denied permission to carry out physical
 4  verification of the gold?
 5      A.   I'm sorry who was -- so you can
 6  see the physical verification that was
 7  requested in the email from Bureau Veritas,
 8  right.  So the email has -- there's an email
 9  from Joe Chapman which went to, again,
10  Mr. Braverman.  "I have raised your request
11  with the management director of Bureau
12  Veritas.  Unfortunately, at this time we are
13  not able to engage with as we are not an
14  accounting firm, a request for verification
15  without physical validation of metals cannot
16  be provided."
17           So clearly, Bureau Veritas refused
18  to do the assignment unless the physical
19  verification of the metals, the physical
20  verification would be conducted.
21      Q.   So you refer to the denial of the
22  permission to carry out physical
23  verification of the gold.  My question is
24  whether you can tell me who it was that
25  denied that permission?
```



Page 157

```
 1                      F. AHMED
 2        A.   So if you see, the email from
 3   Mr. Braverman which is the one we were
 4   referring to which says, "We have an SKR
 5   that has already audited.  I really wanted
 6   to discuss with you what the options are.
 7   The bullion is significant in several
 8   security facilities in Dubai.  Counting bars
 9   I believe is overkill.  I guess let's speak
10   about it when we meet."
11             So clearly was, you know, in that
12   email, saying that it is an overkill not to
13   perform the physical verification.
14        Q.   If you can answer this question,
15   the same question, I'm asking if you're able
16   to answer it as a yes or no answer, and if
17   you can't, then let me know that.
18             So I'm asking you again, are you
19   able to say who it was that denied
20   permission to carry out physical
21   verification of the gold as referred to at
22   page 16 of your report?
23             MS. SUM:  Objection, asked and
24        answered.  You can answer, Mr. Ahmed.
25        Q.   The question is whether you can
```



Page 158

```
 1                    F. AHMED
 2  answer that yes or no, whether you are able
 3  to say who it was?
 4       A.   So the denial of the permission to
 5  carry out the physical verification --
 6       Q.   You can't answer the question yes
 7  or no; is that correct?
 8       A.   No, let me answer your question.
 9  So I think you're asking --
10       Q.   The question was, let me clarify
11  my question and then you can determine if
12  you're answering it.
13            My question was whether you're
14  able to state as a yes or no in answer to
15  the question of who denied the permission to
16  carry out physical verification of the gold
17  as referred to at page 16 of your report?
18  Either yes you can answer that as a yes or
19  no question or you can't.  That's all I'm
20  asking.
21       A.   So all I can say is that the email
22  from Mr. Braverman which says, "Counting
23  bars I believe is an overkill" and then the
24  chain of email goes up where Joe Chapman
25  from Bureau Veritas has declined the
```



Page 159

1                         F. AHMED
2    engagement.  This is addressed to -- you
3    know, this particular email declining the
4    assignment saying without physical
5    validation, you know, their request for
6    verification cannot be provided.
7               That's the email.  Now whether
8    anyone else denied, you know, denied the
9    permission et cetera, I'm not aware.
10              So what I have seen is this email
11   which says, look, it's not possible for you
12   to conduct or it's an overkill to count the
13   bars and on the back of that, then the
14   Bureau Veritas has said that we would not
15   proceed with this engagement.
16              MR. KISSANE:  All right, I'm going
17         to move to strike the response and note
18         for the record I believe the answer
19         will confirm that the witness was not
20         able to answer the question yes or no.
21              THE WITNESS:  I did answer the
22         question, Tom.
23              MR. KISSANE:  There is no point in
24         arguing.  If I bring a motion to
25         strike, everyone will make arguments on



Page 160

```
 1                    F. AHMED
 2      the record.  I'm not looking to get
 3      engaged in an argument with you over
 4      it.  I don't think it will be
 5      productive to discuss it further.  But
 6      if you have something that you think is
 7      responsive to my question, I'm not
 8      going to stop you from saying it, but I
 9      prefer to avoid redundancy.
10      A.    But just to clarify, not argue,
11 what you are saying, you're asking me who
12 denied the permission, right.  I --
13      Q.    I'm sorry.  My actual question is
14 whether you could say yes or no to the
15 question of whether you could identify that
16 person.
17           So it's a very narrow question.
18 It didn't get to who that person was.  It
19 was just whether you can identify the person
20 yes or no, and you gave an extended answer
21 which I think reflects --
22      A.    Yes, because Tom, it cannot be a
23 yes or a no.  What I'm saying is there is an
24 email -- you can't stop me from answering.
25 Let me answer.
```



Page 161

```
 1                        F. AHMED
 2            MS. SUM:  I'm going to just
 3       interject here.  I appreciate both what
 4       people have to say what they said.  I
 5       think to make the most of the time that
 6       we have available, we really should
 7       just proceed with the next question.
 8       Q.   Mr. Ahmed, I'm happy to leave it
 9  where it stands.  I think our positions are
10  both on the record.
11       A.   Yes, that's fine.
12       Q.   You nowhere in your report make an
13  affirmative contention that it was Mr. Hogg
14  who denied permission to carry out physical
15  verification of the gold, do you?
16       A.   I'm sorry, can you show me where
17  in the report I have written that?
18       Q.   Well, my question was that you do
19  not anywhere in your report take an
20  affirmative position that it was Mr. Hogg
21  who denied permission to carry out physical
22  verification of the gold.
23            Under the premise of my question
24  there would be nothing in the report.
25            I'm asking you is it not true that
```



Page 162

```
 1                    F. AHMED
 2   you do not take a position in your report
 3   that it was Mr. Hogg who denied permission
 4   to carry out the physical verification of
 5   the gold?
 6            MS. SUM:  Objection, form.
 7            Tom, can you just ask it in a
 8        simple way.  I think you're confusing
 9        the witness, please.
10        Q.   All right, I'll try to be clearer.
11            Do you contend anywhere in your
12   report that it was Mr. Hogg who denied
13   permission to carry out physical
14   verification of the gold?
15        A.   I haven't put any names in the
16   report, no.  So I'm -- I don't recall its
17   name.  I said the denial of the permission,
18   which is on the back of this email from
19   Mr. Braverman was probably a red flag for
20   the defendants.
21        Q.   And your answer would be the same
22   as to Mr. Goldberg; right?
23        A.   Yes.
24        Q.   I'm going to ask if we could go
25   back to page 7 of the report.
```



Page 163

```
 1                    F. AHMED
 2          You say, "Defendants failure to
 3   follow the standard procedures and the
 4   verification process is further highlighted
 5   by the fact that another firm defendants
 6   attempted to hire, Bureau Veritas, a company
 7   that specializes in inspection and
 8   verification services, refused to accept the
 9   engagement when it became clear that
10   Arbitrade wanted the firm to issue its
11   opinion without conducting any physical
12   examination of the gold?"
13       A.   Yes.
14       Q.   Can you identify who it was that
15   attempted to hire Bureau Veritas for that
16   purpose?
17       A.   Again, you know, in terms of the
18   inspections, you know, the engagement letter
19   or you're talking about the emails.  So the
20   email exchange is with Mr. Steve Braverman
21   from Arbitrade.  So that is where the email
22   exchange is between him and Joe Chapman of
23   Bureau Veritas.
24       Q.   I'm asking if we can turn to page
25   18 of the report, please.  And if you look
```



Page 164

                            F. AHMED
1
2    at the fourth bullet point, there is some
3    text that ends "there is no document that
4    indicates the compensation or any other
5    benefit Mr. Ronggolawe received after
6    signing the deed of assignment."
7             Do you see that at the bottom of
8    the page?
9        A.   Yes.
10       Q.   Did you make any attempt to locate
11   documentation indicating the compensation or
12   any other benefit that Mr. Ronggolawe may
13   have received after signing the deed of
14   assignment?
15       A.   There is no document, that's what
16   I'm saying.  Other than the deed of
17   assignment there is no document which
18   includes compensation or any other benefit
19   received.
20            So again, questioning goes back to
21   my due diligence process.  What was the
22   source?  How was it procured?  What was the
23   compensation given, right.  So that due
24   diligence, the first point that I made on
25   page 7, defendant should have conducted a



Page 165

                        F. AHMED

1

2  thorough due diligence.  And previously I

3  explained what that due diligence, it would

4  require the buyer to actually confirm that

5  the -- how has the gold been procured, so

6  whether any compensation was paid against

7  it.  So there is no document other than the

8  deed of assignment.  There is nothing else

9  to confirm that.

10     Q.   Okay.  So I was taking, I was

11  taking your text to mean that you were

12  saying there is no document in the materials

13  that you had reviewed indicating

14  Mr. Ronggolawe's compensation or other

15  benefit.

16          Should I understand what you're

17  now saying to be that you're saying that

18  there is no document in the universe

19  concerning that subject or are you just

20  saying no document that you reviewed?

21     A.   How can I say if there is no

22  document in the universe.  I mean, this is

23  something what ever has been produced to us,

24  there is no document, right.  So whether, if

25  a document has not been disclosed, you know,



Page 166

```
 1                    F. AHMED
 2   then I wouldn't have -- I cannot say that.
 3            But my question here is that there
 4   is no document that indicates any
 5   compensation or, you know, like payment
 6   invoice or any -- how was this, the gold or
 7   this deed of assignment?  What was the
 8   compensation?  What was -- so there's
 9   nothing, no document that was produced to
10   us.
11       Q.   Having clarified that, my
12   misunderstanding that you're saying no
13   document that you had reviewed concerned
14   that subject, I'm going to repeat my earlier
15   question, which was whether you made any
16   attempt to determine whether there was
17   documentation that may not have been
18   provided to you concerning the subject of
19   any compensation or other benefit received
20   by Mr. Ronggolawe after signing the deed of
21   assignment?
22       A.   So my scope of work was clearly on
23   reviewing the transaction and documents, and
24   the documents which have been disclosed on
25   the case, which I received from the SEC.  It
```



Page 167

1                    F. AHMED

2    was not a forensic investigation where I

3    would have gone and investigated on my own

4    to find out if there is a document that

5    existed in the universe.  So it's clearly

6    restricted to the transactional documents,

7    and the evidence, the exhibits which were

8    produced to us.

9         Q.   Do you know if the SEC had made

10   any efforts to determine whether such

11   document existed?

12        A.   That's for the SEC to answer.  So

13   clearly we were, you know, we produced the

14   report, we asked for if there is any

15   documents, which, because this is -- if we

16   are not provided, there is no document which

17   we asked for this document, even if we ask

18   for this document, in our records, it is not

19   there.  It's not produced.  So I'm not

20   aware, and I can't comment on whether it was

21   produced to SEC and not shared with us or,

22   you know, if not shared with SEC at all.  So

23   I can't comment on that.

24             MR. KISSANE:  I know we broke

25        pretty recently, but I believe I may be



Page 168

```
 1                      F. AHMED
 2    done.  So I'm going to ask that we just
 3    take five minutes so I can review my
 4    notes and confirm that.
 5         MS. SUM:  Okay.  Who's up next,
 6    since we've got about an hour or so.
 7    Dawn?
 8         MS. RAPOPORT:  I have about two
 9    hours at this point now.  I have gone
10    through everything, I have about two
11    hours.  So I would suggest that Steve
12    and Max, since they said they have a
13    collective about an hour, and I can go
14    another day.
15         MS. SUM:  Okay.  Mr. Braverman,
16    Mr. Barber, who's up next?
17         MR. BARBER:  This is Mr. Barber.
18    You know with the other questions that
19    have been raised I'm going to need a
20    bit more time.  I'm going to need at
21    least an hour, an hour and a half.
22         MS. SUM:  Someone can start and
23    then we just continue.  I mean we have
24    already set aside this time for the
25    expert.
```



Page 169

```
 1                    F. AHMED
 2          MR. BRAVERMAN:  Do you want to go,
 3     because I have added probably a dozen
 4     more questions as well.
 5          MR. BARBER:  I'll go ahead and
 6     turn the floor over to you if you're
 7     not opposed to it, Steve.
 8          MR. BRAVERMAN:  After we get back,
 9     five minutes, I'll go.
10          I do have one question to ask,
11     Mr. Kissane.  You know, if I need to
12     show the report from the expert, can
13     you guys put it on the screen, because
14     I have absolutely no clue on how to do
15     it.
16          MS. SUM:  I mean, for what it's
17     worth, Mr. Ahmed does have a copy of
18     his report in front of him.
19          MR. BRAVERMAN:  Okay.
20          MS. SUM:  Mr. Braverman, if you're
21     fin, with that.  I suspect all of us
22     have a copy.  If I'm mistaken about
23     that, then, you know.  But you're
24     welcome to point him to whatever page
25     or paragraph, however you would like to
```



Page 170

```
 1                    F. AHMED
 2      guide him.
 3           MR. BRAVERMAN:  Okay.
 4           MR. KISSANE:  Can we go off the
 5      record then for a second.
 6           (Whereupon, an off-the-record
 7      discussion was held.)
 8           MR. KISSANE:  Let's go back on the
 9      record before I make any statement.
10           I've confirmed that I'm done with
11      my questions for today.
12           So I will leave it to the
13      discussion that had begun as to who
14      will go next.
15           MR. BRAVERMAN:  Okay.  I just need
16      about five minutes to get my questions
17      ready.  So if we can just take five
18      minutes.
19           MS. SUM:  We will reconvene at
20      5:30.
21           MR. BRAVERMAN:  Thank you.
22           (Whereupon, a short recess was
23      taken.)
24      EXAMINATION BY
25      MR. BRAVERMAN:
```



```
 1                    F. AHMED
 2     Q.   Mr. Ahmed, my name is Steve
 3  Braverman.  So I just want to be clear, that
 4  any of these questions I am going to be
 5  talking about myself and you.  But I just
 6  wanted to make it clear that I am a pro se
 7  defendant, not an attorney.
 8          My first question is, how much
 9  time, approximately, did it take to prepare
10  your report in round numbers?
11     A.   The total time that I spent total
12  was 75 hours in terms of researching,
13  reviewing the documents, preparation and
14  finalization of the expert report.
15     Q.   Seventy-five hours.  And you were
16  paid $1,000 an hour.  So you can work
17  backwards from your bill if that helps.
18     A.   Yes, that's right.  So that's the
19  charge out rate which I've given because SEC
20  is a government entity, we give a discount
21  on the charge out rate to SEC.
22     Q.   If I can provide you with some
23  information that you hadn't seen and it was
24  counter to all the information that you had
25  been presented, would you be willing to
```



Page 172

```
 1                        F. AHMED
 2   change your mind as it relates to me?
 3             MS. SUM:  Objection to form.  You
 4         can answer.
 5         A.   You want to show me some documents
 6   which were not produced to me?
 7         Q.   Correct.  If I were to show you
 8   documents that weren't produced yet by the
 9   SEC?
10         A.   From a legal perspective I want to
11   ask SEC if that's okay.
12             MS. SUM:  I'm sorry.
13         Mr. Braverman can show you documents,
14         whatever exhibits he wants to.
15         Q.   I'm just asking theoretical, if I
16   had documents that were not shown to you by
17   the SEC, right, that would change -- would
18   you be willing to change your mind as it
19   relates to me if it shows something that is
20   counter to the information that you were
21   presented?
22             MS. SUM:  Objection to the
23         hypothetical.
24         A.   Yes.  I have to look at it.  If
25   you want to show any documents to me, I'm
```



Page 173

```
 1                      F. AHMED
 2    happy to see those documents and then
 3    accordingly answer.
 4         Q.   Okay.  In reviewing your report
 5    and other related documents, the primary and
 6    apparent link to Braverman, his involvement
 7    in the dialogue with Bureau Veritas
 8    regarding the verification of the gold
 9    specifically regarding the counting of the
10    gold bars being overkill and in your report
11    you feel that serves as a specific instance
12    where he is directly associated with the
13    alleged misrepresentation and avoidance of
14    verifying gold to the full extent that
15    industry standards would suggest.  Is that
16    correct or is there other specific instances
17    that show Braverman is aiding and abetting?
18              MS. SUM:  Objection to form.  You
19         can answer.
20         A.   Well, if you're asking about the
21    Bureau Veritas, yes, I refer to that
22    particular email of yours, yes, correct.
23         Q.   Mr. Ahmed, in your report, you
24    list your professional background and
25    degrees.  You state that you are a qualified
```



Page 174

```
 1                    F. AHMED
 2  chartered accountant with 24 years of global
 3  experience specializing in financial crime
 4  compliance and some money laundering tax
 5  advisory and auditing.
 6            Would you agree that your formal
 7  education and degrees are primary in
 8  accounting and financial compliance, not
 9  metallurgy, mining or physical gold
10  verification?
11            MS. SUM:  Objection, form.  You
12       can answer.
13       A.   Yes, I'm not a minor, no.  But I
14  specialize, you know, your qualification is
15  one thing.  But then you -- industry
16  specialization, so I have been specializing
17  in the gold, precious metal sector in terms
18  of compliance, documentation, audits,
19  accounting, transactional documents,
20  reviews, both for refineries and trading
21  companies across the globe.
22       Q.   Do you have any degrees in
23  geology, chemistry, engineering, material
24  science which would directly relate to the
25  physical properties and storage of gold?
```



Page 175

```
 1                       F. AHMED
 2              MS. SUM:  Objection, form.  You
 3       can answer.
 4         A.    So, I'm not a geologist or a
 5  chemist from a qualification perspective.
 6  But I conduct audits on behalf of the
 7  ministry of economy for refineries, gold
 8  refineries in UE.  I've conducted -- I've
 9  mentioned in the addendum to my experience
10  as well in the last one year.  I have a
11  number of refineries that we have reviewed
12  as a process.  So RJC, the Royal Jewellery
13  Council of London; RTC, Certificate of
14  Practice; COC which is Chain of Custody, UA
15  Good Delivery, Responsible Sourcing
16  Regulations which requires us to validate
17  and review the physical inspection of gold
18  in terms of where it comes, the end-to-end
19  process, from mine to market.
20              So it's my experience in this
21  field conducting these reviews.  My
22  qualification is accounting, as I've
23  mentioned in my expert report.
24         Q.   Okay.  In your report you
25  acknowledge using online sources for
```



Page 176

1                       F. AHMED

2    research and performed extensive desktop

3    searches and literature review of the

4    information available in the public domain.

5              Would you agree that gathering

6    information from the Internet is an

7    acceptable method for verifying details?

8         A.   What is acceptable sources.  So

9    for example, the EMN regulations, the Good

10   Delivery regulations these are acceptable

11   sources which we rely on.  It's not a Google

12   search or a Wikipedia or something we are

13   looking at.  It's relevant websites of the

14   entities involved and acceptable sources.

15   That's what I refer to when we talk about

16   desktop research.

17        Q.   How long did it take you to

18   prepare your expert opinion, you said 75

19   hours?

20        A.   Yes, total, yes.

21        Q.   Do you follow a document process

22   for preparing this expert opinion such as an

23   ISO standard methodology or was this based

24   on your own ad hoc approach?

25              MS. SUM:  Objection, form.  You



```
 1                    F. AHMED
 2      can answer.
 3      A.   Yes, so we follow the process.  We
 4  follow the -- when we look at the, you know,
 5  the responsible sourcing or the gold sector
 6  refinery audits, ISAE 3000 auditing
 7  standards.  As an accountant we follow the
 8  International Accounting Standards, the
 9  verification process, the physical telemetry
10  requirements which are in the International
11  Financial Reporting Standards and the
12  International Auditing Standards.  So with
13  we follow these and I have mentioned some of
14  these in my report as well which are
15  relevant to the matter.
16      Q.   Did you ever personally perform
17  the physical verification of gold?
18      A.   Sorry?
19      Q.   Have you personally ever performed
20  the physical verification of gold?
21      A.   Yes.  I'm also, if you see my
22  profile, I am acting as the group head of
23  compliance and legal for one of the top UE
24  gold refineries and precious metals.  In my
25  capacity we actually engage auditors, both
```



Page 178

                          F. AHMED
1
2    financial auditors as well as the specific
3    industry, gold industry, you know
4    accreditation auditors.  So I have practic
5    auditors from RJV as I mentioned during
6    counsel for the COP, Certificate of
7    Practice, for the Chain of Custody.  I've
8    engaged with auditors who provided
9    accreditation for UE Good Delivery and I'm
10   also myself an auditor, a UA Good Delivery
11   auditor which requires you to have these
12   skills in terms of physical verification.
13   And we've conducted reviews.  I'm also a
14   trainer with the DMCC to the Dubai Multi
15   Commodities Center, DMCC which is where the
16   gold policy team presides.  And I train on
17   precious metals sector when it comes to mine
18   to market in terms of refining, in terms of
19   identification of gold.  We have conducted
20   more than, you know, I can't recall off the
21   top of my head, but 100 plus inspections for
22   the Ministry of Economy for precious metal
23   sector.  I have clients which are trading
24   companies in the UE as well as globally in
25   the precious metal sector.



Page 179

                              F. AHMED
1
2        Q.   Wow, Arbitrade should have hired
3    you to do the audit.
4             In your report you suggest that
5    storing 395 metric tons of gold would be
6    difficult due to space constraints.
7             Are you familiar with how gold is
8    physically stacked in a vault?
9        A.   Yes, I am.
10       Q.   How high can gold bars be safely
11   stacked?
12       A.   Say again?
13       Q.   How high can gold bars be safely
14   stacked?
15       A.   If you look at the 395 metric ton,
16   so you're talking about 395,000-kilo bars to
17   be stacked.  So either you can have kilo bar
18   you can have the large bars, you know, the
19   25KG bars,right.  What we've seen in the
20   documentation, these are kilo bars.  So
21   there would be a physical count of
22   395,000-kilo bars that would have been
23   stacked in a single vault, in a particular
24   vault.
25       Q.   Is there an internationally



Page 180

```
 1                     F. AHMED
 2   recognized stacking limit for gold in vaults
 3   that you're aware of?
 4        A.    In terms of stacking limit, no.  I
 5   haven't seen any, you know, stacking limit.
 6            But you know, when you're talking
 7   about how high, just think about it,
 8   395,000-kilo bars.  If your question is can
 9   it be stacked one on top of the other, no.
10   You can put it in lots, you know, 100, 200,
11   what you've seen in refineries, vaults and
12   trading vaults or trading companies or where
13   the physical inventory of goldvault is kept,
14   these are stacked.  You know, you can have
15   100 bars, you can have it in 50 bars,
16   whichever way it is stacked.
17            But it's a large volume.  What I
18   mentioned in my report is that that amount
19   of gold, that quantity of gold or 395 metric
20   tons which is equivalent to 87,000 plus
21   pounds of gold which would equate to
22   395,000-kilo bars would not be -- you know,
23   it's not practical to store it in one
24   storage area.  In Dubai, in my experience
25   in terms of breaks or G4S or Transcard or
```



Page 181

```
 1                     F. AHMED
 2   any of those logistic companies, they don't
 3   have a single vault which will store
 4   395,000-kilo bars.
 5       Q.   In any of the documentation that
 6   you saw that the SEC provided, did it say
 7   that SION or Arbitrade stored all of the
 8   gold in one particular vault, all 395 metric
 9   tons?
10       A.   Well, I mean, if you see the SKR
11   which was produced, it says in one location.
12   But I understand that, I've also gone
13   through, you know, the answers subsequently
14   that apparently now it has been told that it
15   was stored in different locations, different
16   places, right.
17            But if you look at it, you know,
18   it says in Dubai, in a single container.
19       Q.   Okay.
20            So since you brought it up, what
21   is an SKR?
22       A.   Well, in my experience it's the
23   Safe Keeping Receipt.  I haven't come across
24   a document like this.  SKR, I mean, this
25   document is basically it -- the document
```



Page 182

```
1                     F. AHMED
2    which was given to us, the G4S, SKR is
3    stating that, you know, they're confirming
4    that they are holding a document, that's it.
5    They are vaulting a piece of paper.
6         Q.   Okay.  Okay.
7         A.   Let me finish.  So it is not
8    confirming that it holds gold.  If you look
9    at the agreement, the contract of G4S which
10   clearly states that they are only
11   confirming, right, in the form of a Safe
12   Keeping Receipt that they are holding a
13   piece of paper which is the SKR.  G4S
14   agreement doesn't talk about holding gold
15   anywhere.  And that is why that particular
16   agreement --
17        Q.   Thank you.
18        A.   The cost is 1500 per month for
19   storing a piece of paper.  That's not the
20   cost for vaulting 395 metric tons of gold.
21   Again if you see the liability limit, their
22   vault is lira 2 million, right, which is
23   they liability they put in case they lose
24   that piece of paper.  That's all that G4S is
25   confirming on SKR specifically.
```



Page 183

                         F. AHMED

1
2        Q.   Okay.  Okay.  What does a SKR
3    represent?
4        A.   It's a Safe Keeping Receipt,
5    according to the definition.
6        Q.   Of what?
7        A.   It's a Safe Keeping Receipt of
8    that particular document.
9        Q.   It's a document that represents a
10   document?
11       A.   Yes.
12            MS. SUM:  Wait, let him -- wait,
13         the two of you are talking over each
14         other.  So Mr. Braverman, please let
15         him finish before you start a new
16         question.
17       A.   If I can direct you to the G4S
18   agreement, the agreement, and you see the
19   schedule, one of their agreement from G4S,
20   someone can pull it up or I can just talk.
21            So if you see the services in
22   clause two, point number B of schedule 1 of
23   G4S agreement, G4S will provide vaulting
24   services for the customer where a sensitive
25   document will be stored in the G4S cash



Page 184

                        F. AHMED

1
2    receiving centers vault.  It doesn't say
3    storing gold.  It's basically that they will
4    store a sensitive document, right.  The
5    document will be seen by the customer prior
6    to hand over to G4S staff, G4S will ensure
7    that the document is never to be accessed by
8    anyone including G4S staff unless otherwise
9    instructed by the customer, nor G4S will not
10   ensure what the document represents in
11   value, in anyway or be liable for what the
12   document represents in value in anyway.  So
13   clearly the agreement, the schedule 1
14   clearly states that whatever is mentioned in
15   that document, they are not confirming that.
16   G4S will also provide when required delivery
17   service of the document to the customer
18   provided the following information is shared
19   48 hours in advance.
20           Now, this is clearly the schedule
21   1 of the agreement with G4S.  Then
22   subsequently G4S has been requested to
23   confirm with the Safe Keeping Receipt, that
24   yes, they are keeping this particular
25   document.  They have no where mentioned that



Page 185

```
 1                      F. AHMED
 2   they have validated anything or that they
 3   are holding gold.  They are only holding a
 4   sensitive document.
 5       Q.   But what does the sensitive
 6   document represent?  What does an SKR
 7   represent?
 8       A.   That's what I'm saying the SKR.
 9       Q.   The SKR that they're holding, what
10   does it represent?
11       A.   It is said to contain.  So if you
12   look at the SKR -- let me, the SKR, if you
13   see the Safe Keeping Receipt, which is
14   issued, the Exhibit 9, and if you see what
15   it says is "We G4S Cash Services, LLC
16   herewith irrevocably confirm that we look
17   into our safety being the depositor as goods
18   as stated said to contain and secure
19   conditions with seal number so and so."
20           So that's what it is.  It's purely
21   saying you are telling me that there is gold
22   and I am just confirming that on an SKR.  So
23   the SKR does not, it is not a reflection of,
24   you know, that yes, it confirms that there
25   is gold.  It's a confirmation of what the
```



Page 186

1                         F. AHMED

2    person, the custodian or whoever has

3    requested has said that this document.

4              It's like an envelope.  I put my

5    will in that envelope or I could put a blank

6    piece of paper in the envelope, I seal it, I

7    give it to the vaulting services company and

8    I say here is my will.  It's said to contain

9    my will.  Although it's just a blank piece

10   of paper.  They are not validating that,

11   they are not insuring that.  All they're

12   saying is I'm issuing you a Safe Keeping

13   Receipt saying that yes you have kept a

14   document which is said to contain this

15   information.

16        Q.   Okay.

17             And what is G4S specifically?

18        A.   So it's a logistics and vaulting

19   company.  So G4S, there are two entities,

20   G4S Cash Services and G4S International,

21   right, and G4S has been taken over by Brinks

22   now.  So back in 2018 it was G4S Cash and

23   G4S International.

24        Q.   Right.

25             And do you think that G4S would



1                         F. AHMED

2      create an SKR without, you know, full

3      authority and acknowledgment of the

4      existence and ownership of the gold?

5          A.   Yes, because it is not a practice.

6      You know, this is in my experience working

7      with -- as I mentioned, we have reviewed and

8      audited 12 refineries in the UE.  I'm also

9      acting as the overhead for compliance and

10     for some precious metals.  We work with a

11     number of gold trading companies.  I haven't

12     come across SKRs in my experience as a

13     validation or G4S or Brinks or Transcard or

14     any of these companies.  They don't issue

15     these documents.

16              Now, clearly even if I have to

17     rely on this document, what it says is that

18     it is at the request of the customer, I'm

19     producing a document which says yes, you

20     have kept a document which is said to

21     contain the asset.

22          Q.   Right, but when G4S was asked to

23     create this SKR by SION, weren't there tons

24     of documentation sent to both G4S and

25     anybody involved in the management and



Page 188

```
 1                    F. AHMED
 2   Arbitrade to show that the gold was real and
 3   that the SKR represented all of that gold?
 4          MS. SUM:  Objection, form.  You
 5      can answer.
 6      A.   So the SKR doesn't represent the
 7   existence of gold.  The physical existence
 8   of gold is represented by way of physical
 9   verification report.  The invert, so the
10   transport documents.  So whenever gold is
11   handed over to G4S or any logistics company,
12   there is the delivery note.  There is the
13   shipment, there are insurance documents.
14   There is in and out documents into the
15   vaults, and based on that periodically if it
16   is stored for a period of time, then
17   periodically at a minimum, on an annual
18   basis, a physical verification is done,
19   because that is how it would be reflected on
20   the company, whoever owns that gold on that
21   balance sheet, as their asset.  None of
22   these documents have been produced.
23          So SKR alone does not actually
24   reflect or confirm the existence of gold.
25      Q.   Okay.  So if that is the case,
```



Page 189

1                        F. AHMED

2    let's just, you know, let's just go into a

3    different direction for a second.

4              The executives, owners, control

5    persons, board members of Arbitrade who

6    received all of the documentation from SION,

7    from G4S, from BDO, from Elliot Davis,

8    right, I would argue that they, including

9    myself, were layman when it came to the

10   world of gold and how things were supposed

11   to go.  At the same time I would argue that

12   our gold partner, Mr. Barber and SION, is an

13   expert and he's got a serious background and

14   I would also say, you know, that in your

15   testimony before you said that nobody did

16   any due diligence on Max, I would argue that

17   there was a ton of due diligence done.  But

18   my question is with all the due diligence

19   that was done and all the documentation that

20   was received and all of the people that were

21   hired meaning BDO and Elliot Davis and

22   Bureau Veritas, none of them brought up any

23   red flags that you have brought up to us.

24   So that is the case.  If they didn't bring

25   up the red flags to us, how would we as



Page 190

```
 1                    F. AHMED
 2  laymen know that there was any issues at
 3  all, if any, with regard to this particular
 4  gold and need this particular SKR?
 5          MS. SUM:  Objection.  Wait, wait,
 6      wait, wait.  Objection, form.  Assumes
 7      facts not in evidence.
 8      Mischaracterizes the evidence.  There
 9      is multiple objections I'll leave it at
10      that.
11          MR. BRAVERMAN:  There is a ton of
12      evidence.
13          MS. SUM:  To the extent that
14      you're able to answer the question,
15      Mr. Ahmed, you may attempt to do so.
16      A.   Yes.  So I won't comment on the
17  ton of evidence that you mentioned, so leave
18  that aside.
19          But, you know, there are a few
20  questions, you know, that you've raised.  So
21  let me answer one by one.
22          Number 1, is you don't need to be
23  an expert to count your assets.
24          So let's assume as an example, if
25  I'm buying cars, I need to see or if I have
```



Page 191

```
1                      F. AHMED
2    stock in my inventory, it could be anything,
3    you don't need to be an expert.  A layman if
4    I'm buying something I would want to
5    physically see it.
6               If I'm taking over a company or
7    I'm engaging with a company that is selling
8    me mobile phones, I would want a stock
9    record.  So the due diligence is one is the
10   regulatory requirement but second is common
11   sense, right.  I wouldn't rely on a piece of
12   paper which categorically says said to
13   contain and something SKR which is, you
14   know, vaulted with a G4S company which is a
15   logistics company and I would believe that
16   yes, we gave 395 metric tons.  If it was me,
17   you know, if you ask me personally, as an
18   expert, as a common man I would jump on a
19   plane and go physically verify the gold
20   myself.
21              So I don't accept the fact that
22   everybody at Arbitrade, including yourself
23   was a layman and would not know the
24   procedure.  So if you are buying, if you are
25   buying grossly, we count it, we check it.
```



Page 192

1                    F. AHMED

2    So here we are talking about basic check

3    that needed to be performed and not relying

4    on just an SKR, number 1.

5            Number 2, you've talked about the

6    two audit firms, the Elliot Davis and BDO.

7    Again, please look at the scope of work.

8    It's an agreed upon procedure.  Were they

9    asked to physically verify the gold?  No.

10   They were asked only to validate the

11   existence of a document.  And that's what

12   they have done, and they have mentioned it.

13   And they have also put the limitations in

14   their report that we were not asked to do

15   anything over and above this, so we are not

16   confirming anything else.  But just the

17   existence of a piece of paper.

18           And then we come to about physical

19   verification.  How people would have known,

20   this is where the third form which was

21   reached out, Bureau Veritas, they did

22   mention and they refused to accept the

23   engagement, they declined the engagement,

24   because, you know, they clearly said without

25   a physical verification, the validation, we



Page 193

```
 1                    F. AHMED
 2   cannot proceed.  So there were enough red
 3   flags for a common man to actually identify
 4   that, yes, something needs to be done and we
 5   can't just rely on a piece of paper for gold
 6   worth $10 billion.
 7            MR. BRAVERMAN:  Tom, can you X out
 8       of sharing.  I'm going to try and share
 9       some documents.  Hopefully I can make
10       it happen.
11            I'm going to have to just reserve
12       my rights and the next time we meet,
13       I'll come back with the documents
14       ready, all right.
15            So I'm done for now.
16            (Whereupon, an off-the-record
17       discussion was held.)
18       Q.   Are you seeing what I just sent?
19       A.   Yes.
20       Q.   Mr. Ahmed, can you see that on
21   your screen?
22       A.   Yes, I can, yes.
23       Q.   So this is an email on
24   10/26/2018 from me to Bureau Veritas, to
25   Joshua Husvar -- well, inspector@.com, same,
```



Page 194

1                          F. AHMED
2     they're a division of Bureau Veritas, he's
3     of the managers there.  This, I believe, is
4     after your email that you mentioned earlier
5     in your testimony about when Bureau Veritas,
6     when Arbitrade and myself were speaking to
7     Bureau Veritas in order to do an audit;
8     correct?
9              MS. SUM:  Objection.  Two things.
10         First, this document does not look the
11         native or original email.  It looks
12         like it's a cut and paste.  And I don't
13         see that there's a Bates stamp on it.
14         But even accepting that, I object to
15         the form of the question.  You're
16         testifying about the contents of it.
17         If you want to ask him a question, ask
18         him a question about it.
19              MR. BRAVERMAN:  Yes, I don't have
20         the Bates stamp, the one in front of me
21         but I can get it to you afterwards.
22         Q.   But this email is from me to
23     Joshua at Bureau Veritas saying "Josh, I'd
24     like introduce you to our CEO Len Schutzman
25     and my associate James Goldberg.  They will



Page 195

```
 1                    F. AHMED
 2   be handling the relationship moving forward.
 3   Thanks for your help.  I'm always available
 4   if you need my assistance as well."
 5            Do you agree that that is what it
 6   says it is, that I passed the buck to the
 7   CEO of the company and to my associate James
 8   Goldberg on who is going to handle the
 9   relationship?
10            MS. SUM:  Objection to form.
11        A.   Yes, but if you see this is dated
12   October 26, right?
13        Q.   Yes.
14        A.   And your email which talks about
15   counting bars as being an overkill is dated
16   October 23, so.
17        Q.   So three days later I introduced
18   them to the other people, because -- did you
19   actually ever see this email?  Do you
20   recognize this email?
21        A.   Yes, yes.
22        Q.   They did show it to you?
23        A.   No, this document which you are,
24   you know, which you just sent it on, hold on
25   a second -- this is, I'm talking about the
```



Page 196

```
 1                     F. AHMED
 2  email from Bureau Veritas, the October 23.
 3  This email I don't recall.
 4       Q.   You don't recall.  So this was
 5  left out in the documents that were sent to
 6  you by the SEC?  You didn't see this?
 7            MS. SUM:  Objection to form.
 8       A.   I would have to check the emails
 9  again, because, yes.
10       Q.   So here is --
11            MS. SUM:  Let him finish,
12       Mr. Braverman.  Let him finish.  And
13       you're scrolling back and forth.  It's
14       hard to.
15            MR. BRAVERMAN:  Okay.
16       A.   You're asking me about this email.
17  I don't recall.  But I'd have to check all
18  the emails.  The ones that I'm referring to
19  were the ones where you mentioned to Bureau
20  Veritas that it is overkill.  And after that
21  you come back, you and Chapman, there is a
22  chain of emails where he comes back and says
23  that particular email is addressed to you on
24  October 30, where he is saying that your
25  request for verification without physical
```



Page 197

```
 1                    F. AHMED
 2  validation of metals cannot be provided.  So
 3  that's not going to anybody else who you
 4  mentioned here in your email, neither to Len
 5  Schutzman, nor to James Goldberg, it's going
 6  to you.
 7      Q.   Understood.  Understood.
 8           But you're saying you never saw
 9  this particular email?
10           MS. SUM:  Objection, asked and
11           answered.
12      Q.   Okay.  So I'll scroll down to the
13  next exhibit, which is a text message from
14  January 7, 2019.  It is from me to Joe
15  Chapman over at Bureau Veritas and it says,
16  "Joe, do you have a moment to speak?  It
17  appears we are ready to do a full audit?"
18  And he responds, "Give me a minute.  In a
19  meeting."
20           And then I sent him,  "The
21  Arbitrade conference line, tomorrow
22  1:00 p.m. will send an email as well."
23           Did you see this document?  Did
24  the SEC send you this document at any point
25  in time, have you seen it, do you recognize
```



Page 198

```
 1                    F. AHMED
 2  it?
 3           MS. SUM:  Objection to the form.
 4           Wait, please.  Objection to form.
 5       Mr. Braverman, can you scroll down, I
 6       don't see where the Bates number is
 7       again for this.
 8           MR. BRAVERMAN:  Once again, I
 9       don't think I have a Bates number on
10       any of this, but I will get it to you
11       right afterwards.
12           MS. SUM:  Okay.  Just objection to
13       you generally testifying.  But
14       Mr. Ahmed, you can answer the question.
15       A.   Yes, these text messages.  No, I
16  don't recall seeing these text messages.
17       Q.   Okay.
18           Here is another email that's
19  confirming that we're having a call with
20  Bureau Veritas on January 8, 2019.  Did you
21  see this email?
22           MS. SUM:  Objection.  Same one
23       with respect to lack of Bates number.
24       A.   You have to give me the reference
25  or the exhibit numbers for me to actually
```



Page 199

```
 1                      F. AHMED
 2  look into the exhibits to see this email.
 3      Q.   Understood, I will get them for
 4  you.
 5      A.   Yes, please if you can, then I'll
 6  be able to.
 7      Q.   This was also a highlight from an
 8  email sent by Joe Chapman that BV is to
 9  witness the check weighing of an agreed
10  percentage of bars.  And this particular
11  document dated February 6, 2019 from Bureau
12  Veritas.  Did you see this document?
13          MS. SUM:  Same objection as to the
14      document, lacking a Bates and then at
15      least allow him to see the balance of
16      the document before he answers the
17      question.
18          MR. BRAVERMAN:  I'll explain what
19      the document is.
20      Q.   This is actually a scope of work
21  contract with Bureau Veritas with Arbitrade
22  to go and audit at lease a percentage of the
23  gold.
24          Has this document ever been shown
25  to you by the SEC?
```



Page 200

1                     F. AHMED

2           MS. SUM:  Same objection.  You

3      have to let the witness look at the

4      document, Mr. Braverman.  That's all.

5      Just scroll through the balance of it,

6      please.

7      A.   I do recall, but I need the

8  exhibit numbers or you know, the details to

9  have a look at this.

10     Q.   So, but this is a document from

11 February, I believe, 16.  So I'll get you

12 the number, but you do recall seeing it or

13 you don't recall seeing it?

14     A.   This is -- this is going too fast,

15 sorry.  It's a proposal.  It's a proposal

16 from Bureau Veritas.

17     Q.   Right, on February 16 of 2019.  So

18 three plus months after that email that the

19 SEC said that --

20     A.   I'm sorry, if I can get the

21 exhibit numbers, I will get --

22     Q.   Understood, I will get them for

23 you?

24          MS. SUM:  Okay, same objection,

25      regarding this document.  If you want



Page 201

```
 1                    F. AHMED
 2      the witness to look at it, please
 3      scroll a little bit slower so that he
 4      can attempt to answer your question.
 5           MR. BRAVERMAN:  Okay, well he's
 6      answered.  He's saying he doesn't know
 7      until he sees the exhibit numbers so
 8      I'll have to get the exhibit number.
 9           THE WITNESS:  Yes, yes.
10           MR. BRAVERMAN:  All right, then I
11      have no further questions.  I will get
12      you the exhibit numbers and I guess
13      next time we get on call you can
14      respond?
15           MS. SUM:  Are you concluding your
16      questioning or are you saying that
17      you're going to continue questioning.
18           MR. BRAVERMAN:  I'm concluding my
19      questioning, but I reserve my rights to
20      get an answer on the last few questions
21      about these documents when I show the
22      Bates numbers.
23           MS. SUM:  You're not concluding
24      your question, Mr. Braverman.  So
25      you're leaving it open so you're going
```



Page 202

                              F. AHMED

1
2      to resume when we start the next time.
3           MR. BRAVERMAN:  Okay, perfect.
4      Thank you.
5           MS. SUM:  I think at this point we
6      could go off the record.
7           (Whereupon, an off-the-record
8      discussion was held.)
9           MS. SUM:  Mr. Ahmed, we're done
10     with you for the purposes of the
11     deposition.  I think we need to sort
12     out a date.  I can separately email you
13     once I get everyone to agree on some
14     options for you.
15          (Continued on next page.)
16
17
18
19
20
21
22
23
24
25



Page 203

1                        F. AHMED

2            THE WITNESS:  Sure.  Thank you

3      very much.

4            THE COURT REPORTER:  Would you

5      like a copy of the transcript?

6            MS. SUM:  The SEC will order.  We

7      are going to order a rough, but I need

8      my paralegal to email you.

9            (Whereupon, at 6:15 p.m.,  the

10     Examination of this witness was

11     concluded.)

12

13                 ∘       ∘       ∘       ∘

14

15

16

17

18

19

20

21

22

23

24

25



Page 204

1                         F. AHMED

2              D E C L A R A T I O N

3

4        I hereby certify that having been first

5   duly sworn to testify to the truth, I gave

6   the above testimony.

7

8        I FURTHER CERTIFY that the foregoing

9   transcript is a true and correct transcript

10  of the testimony given by me at the time and

11  place specified hereinbefore.

12

13

14

                 _____

15               FAISAL AHMED

16

17

18  Subscribed and sworn to before me

19  this _____ day of _____ 20___.

20

21

        _____

22      NOTARY PUBLIC

23

24

25



Page 205

```
 1                      F. AHMED
 2                   I N D E X
 3
 4   EXAMINATION BY                        PAGE
 5     MR. KISSANE                          3
       MR. BRAVERMAN                       171
 6                 E X H I B I T S
 7
 8   AHMED EXHIBITS
 9
10   EXHIBIT          EXHIBIT
11   LETTER           DESCRIPTION       PAGE
12
13   1                Expert report        8
14   2                Arbitrade bylaws dated  16
                      June 26, 2018
15
     3                Elliot Davis report    98
16
     4                Agreement between SION 23.
17                    and Arbitrade
18   5                Memorandum of         124
                      understanding between
19                    SION and Arbitrade
20
21
22
23
24
25
```



Page 206

```
 1                    F. AHMED
 2          C E R T I F I C A T E
 3
 4   STATE OF NEW YORK        )
                               :  SS.:
 5   COUNTY OF QUEENS         )
 6
 7       I, RIVKA TROP, a Notary Public for and
 8   within the State of New York, do hereby
 9   certify:
10       That the witness whose examination is
11   hereinbefore set forth was duly sworn and
12   that such examination is a true record of
13   the testimony given by that witness.
14       I further certify that I am not related
15   to any of the parties to this action by
16   blood or by marriage and that I am in no way
17   interested in the outcome of this matter.
18       IN WITNESS WHEREOF, I have hereunto set
19   my hand this 12th day of March, 2025.
20
21
22
         _____
23              RIVKA TROP
24
25
```



# Magna
## Key Contacts

**Schedule a Deposition:**
Scheduling@MagnaLS.com | 866-624-6221

**Order a Transcript:**
CustomerService@MagnaLS.com | 866-624-6221

**General Billing Inquiries:**
ARTeam@MagnaLS.com | 866-624-6221

**Scheduling Operations Manager:**
Patricia Gondor (E: PGondor@MagnaLS.com | C: 215-221-9566)

**Customer Care:**
Cari Hartley (E: CHartley@MagnaLS.com | C: 843-814-0841)

**Director of Production Services:**
Ron Hickman (E:RHickman@MagnaLS.com | C: 215-982-0810)

**National Director of Discovery Support Services:**
Carmella Mazza (E: CMazza@MagnaLS.com | C: 856-495-1920)

**Billing Manager:**
Maria Capetola (E: MCapetola@MagnaLS.com | C: 215-292-9603)

**Director of Sales Operations:**
Kristina Moukina (E: KMoukina@MagnaLS.com | C: 215-796-5028)



MAGNA
LEGAL SERVICES

## A

**abetting**
173:17

**able**
13:14 17:3 57:12
59:20,25 61:3 77:5
98:20 99:10 121:14
131:14 156:13
157:15,19 158:2,14
159:20 190:14
199:6

**absolutely**
58:17 101:15 131:9
134:13 169:14

**accept**
81:16 163:8 191:21
192:22

**acceptable**
176:7,8,10,14

**accepted**
71:8 75:16 154:18

**accepting**
41:24 136:22 194:14

**accessed**
184:7

**accountant**
121:22 174:2 177:7

**accountant's**
99:17

**accountants**
33:4 105:10 111:22
114:8

**accounting**
12:23 71:21 72:16
76:24 94:17,19
95:21,24 97:9,14
99:25 100:20,22
111:25 113:24
132:16,22 133:8
134:9,15 135:6,16
135:17 147:13
156:14 174:8,19
175:22 177:8

**accreditation**
178:4,9

**accurate**
40:22

**acknowledge**
175:25

**acknowledgment**
187:3

**acquiring**
75:4

**acquisition**
95:13 137:2,3 138:19

**act**
14:17,19 33:19

**acting**
131:3 177:22 187:9

**action**
83:20,22 85:9 136:11
206:15

**actions**
74:25 137:7 155:25

**activities**
18:19

**actual**
44:5 160:13

**ad**
176:24

**added**
169:3

**addendum**
175:9

**addition**
149:23

**additional**
5:14 105:19 142:11

**address**
99:20 119:22

**addressed**
119:5,7,8,18,20
128:14 148:15,17
159:2 196:23

**adhered**
75:15

**advance**
118:17 184:19

**advise**
114:18

**advised**

**accurate** (col 2 continues)
117:13

**adviser**
32:14

**advisors**
150:15

**advisory**
9:24 174:5

**affairs**
19:7 30:18,23

**affiliation**
10:14

**affirm**
104:4

**affirmative**
62:25 118:9 161:13
161:20

**affording**
59:15

**against-**
1:5

**ago**
14:3 136:22

**agree**
62:5 104:20 174:6
176:5 195:5 202:13

**agreed**
97:17,20,23 98:25
105:6 110:11,13
111:17,23 192:8
199:9

**agreement**
43:4 62:4 66:3 67:13
90:4 92:21 101:20
102:10 103:5,12,14
103:15,21 104:4,5,8
104:9,13,18 105:22
105:23 106:4,13,19
106:21,23,24
107:17,21,23 108:5
108:11,14 109:4,6,7
109:16,17,18,20
112:4,5,24 113:7
123:8,19 124:9
138:12 182:9,14,16
183:18,18,19,23
184:13,21 205:16

**agreements**
121:19

**ahead**
4:3,4 35:22 44:8
169:5

**Ahmed**
1:15 3:1,10,14 4:1
5:1,3,22 6:1,19 7:1
7:18 8:1,7 9:1 10:1
11:1 12:1 13:1 14:1
15:1 16:1,2 17:1
18:1 19:1 20:1 21:1
22:1 23:1 24:1 25:1
26:1 27:1 28:1 29:1
30:1,15 31:1 32:1
33:1 34:1 35:1 36:1
36:8 37:1 38:1 39:1
40:1 41:1,11 42:1
42:12 43:1 44:1
45:1,3 46:1 47:1
48:1,3 49:1 50:1
51:1 52:1 53:1 54:1
55:1 56:1 57:1 58:1
59:1,20,25 60:1
61:1 62:1 63:1 64:1
65:1 66:1 67:1 68:1
69:1 70:1 71:1 72:1
73:1 74:1 75:1 76:1
77:1 78:1 79:1 80:1
81:1 82:1 83:1 84:1
85:1 86:1 87:1 88:1
89:1 90:1 91:1 92:1
93:1 94:1 95:1 96:1
97:1 98:1,11 99:1
100:1 101:1 102:1
103:1 104:1 105:1
106:1 107:1 108:1
109:1 110:1 111:1
112:1 113:1 114:1
115:1 116:1 117:1
118:1 119:1 120:1
121:1 122:1 123:1,9
124:1,15 125:1
126:1 127:1,9,12
128:1,2 129:1 130:1
130:17 131:1,15



132:1 133:1 134:1
135:1 136:1 137:1
138:1 139:1 140:1
141:1 142:1 143:1
144:1 145:1 146:1
147:1 148:1 149:1
150:1 151:1 152:1
153:1 154:1 155:1
156:1 157:1,24
158:1 159:1 160:1
161:1,8 162:1 163:1
164:1 165:1 166:1
167:1 168:1 169:1
169:17 170:1 171:1
171:2 172:1 173:1
173:23 174:1 175:1
176:1 177:1 178:1
179:1 180:1 181:1
182:1 183:1 184:1
185:1 186:1 187:1
188:1 189:1 190:1
190:15 191:1 192:1
193:1,20 194:1
195:1 196:1 197:1
198:1,14 199:1
200:1 201:1 202:1,9
203:1 204:1,15
205:1,8 206:1
**Ahmed's**
4:9 53:3 146:15
**aiding**
173:17
**air**
131:13
**airway**
77:24 92:6
**ALEXANDER**
2:7
**Alice**
2:6 6:10 40:24 74:5
**all-in-one**
150:25
**allegation**
37:5 38:18,21 39:14
39:25 40:12,21 41:8
41:18,18 42:6,11

71:9 72:2
**allegations**
42:21,22 144:6
**alleged**
31:3 34:23 38:17
39:9 42:18 43:3
46:19 120:18
173:13
**allow**
20:24 110:23 134:19
135:16 199:15
**allowed**
132:17,23 133:9
134:10,16 135:7
**allowing**
141:20
**American**
105:9 111:21
**AML**
13:8 31:13 32:2,20
33:18 44:24 66:4
77:17 80:21 81:19
82:12 83:7,18,19
84:24 85:6,11,12,12
85:18,22 86:18
88:12 89:22 93:10
93:19,21,25
**AMLs**
122:11
**amount**
180:18
**ANNA**
2:16
**announces**
46:9
**announcing**
46:8
**annual**
78:21 188:17
**answer**
3:23 5:24 20:8,10,24
21:4,5 30:10,15
36:8,10 38:24,24,25
40:4,25 41:4,11
42:12,15 43:19 45:3
45:5,6 47:5 48:2,4

49:14 50:23 51:11
51:25 52:4,5,9 53:4
53:25 54:23 55:9,13
55:18,20 56:10,11
56:16 59:20,24 60:2
60:14 61:3 90:13
100:8 110:19,22,24
111:2,17 116:5
121:15 122:25
123:15 126:20,22
127:10 129:17
130:19 131:2,13
134:22,25 139:7,11
139:12,14,16 143:6
148:20 157:14,16
157:16,24 158:2,6,8
158:14,18 159:18
159:20,21 160:20
160:25 162:21
167:12 172:4 173:3
173:19 174:12
175:3 177:2 188:5
190:14,21 198:14
201:4,20
**answered**
64:4 111:11,11
135:22,22 139:5
157:24 197:11
201:6
**answering**
8:18 49:11 57:10
110:17 127:5
128:10,23 131:15
152:13 158:12
160:24
**answers**
5:25 61:8 65:18 74:3
126:23 136:13
181:13 199:16
**Anti-Bribery**
14:17
**anti-crisis**
11:6
**anti-money**
13:6,7 31:19 32:23
33:12 66:4 78:18

79:22 83:7,25 86:23
87:10 88:5,8 122:2
**anybody**
89:19 94:22 187:25
197:3
**anyway**
184:11,12
**apart**
9:9,19,20 10:6,7
67:14 94:9 95:14
96:8 119:13 121:5
136:13 137:21
141:2 142:14
153:23
**apologies**
4:5 143:4
**apparent**
173:6
**apparently**
56:23 150:8 181:14
**appear**
4:9
**appeared**
11:16
**appearing**
7:3 155:19
**appears**
145:17,18 197:17
**applicable**
86:10,12 114:19
115:15
**applied**
95:12 116:21
**applies**
83:9
**apply**
34:13 117:8
**applying**
71:13 73:7
**appointed**
112:16 116:4
**appointing**
94:19,20
**appointment**
23:24 72:15 94:16
**appreciate**



161:3
**approach**
97:8,10 148:13
176:24
**approached**
32:6
**appropriate**
35:17 123:14
**approval**
120:2
**approved**
119:11 126:15
**approximately**
171:9
**Arbitrade**
1:7 15:23,25 16:5,7
16:17,20,23 18:3
19:25 22:3,12,21
23:7,16 24:9 25:4
25:16,21 26:6,8,20
26:25 27:8 28:14
29:11,15,19,25
30:18 31:4 34:24
46:8,9 52:12 61:24
61:25 62:4,16,17,18
63:12 69:14 73:17
73:17,18 74:25 75:4
84:19,22,23 85:13
86:7,13,17 87:6,23
88:2,5,11,24 89:6
89:21,24 93:22 94:3
94:8,14,22 95:13
97:15 98:15,22
99:12,13 101:12,18
101:22 102:4,8,12
103:3,16,22 104:6
104:23 107:10,12
108:12,15,17 110:3
110:9 111:8 112:12
112:19 113:14
115:14 116:20
117:7 118:6,23,23
118:24 119:19,20
120:14,16,19
121:10 123:9,19,25
124:15,23 125:5,23

126:3,14 132:20
133:20 134:11
136:15 137:5
138:13 140:8
147:19 148:18
149:17,22 150:25
152:2 153:12 154:2
154:14,17 163:10
163:21 179:2 181:7
188:2 189:5 191:22
194:6 197:21
199:21 205:14,17
205:19
**Arbitrade's**
89:10 95:17 150:20
**area**
21:13 26:11 28:18
43:3 180:24
**areas**
60:25
**argue**
40:22 160:10 189:8
189:11,16
**argued**
40:4
**arguing**
159:24
**argument**
38:8 160:3
**arguments**
159:25
**arises**
89:7,11
**arose**
85:4
**arrangement**
80:18
**article**
12:4,9
**articles**
10:18,21,23 11:3,6,8
11:9,12,14,19,21,23
11:25 12:7,11,15,19
13:3,9,16 14:2,4
**aside**
37:22 53:9 57:20,21

60:7 116:18 117:4
168:24 190:18
**asked**
22:16 63:11 65:15
74:2,24 75:12 97:22
97:25 109:25
110:18 111:10
116:12 117:2
118:13 120:11
125:10 126:11
127:10,18 128:6
129:4,5,10,24 130:7
130:11,22 137:10
138:6 142:16
148:16 152:3
154:16 157:23
167:14,17 187:22
192:9,10,14 197:10
**asking**
3:17 20:20 38:19
39:10 40:16 42:25
44:17,22 47:7,9,11
49:5,16 51:6 54:11
54:12 55:25 56:7
57:4 58:10,11,15
59:12 60:16 65:2
68:24 70:13 89:3
97:21 111:5 112:2
113:15 120:7 122:6
128:18 138:9,23
140:25 144:19
145:20 152:25
157:15,18 158:9,20
160:11 161:25
163:24 172:15
173:20 196:16
**asks**
131:11
**aspect**
21:18 32:3,16 37:11
58:9 60:22 83:20
**aspects**
150:11
**assert**
21:3 54:16 132:5
**asserted**

60:13
**asserting**
40:14 58:4
**assertions**
64:15
**asset**
31:6,7 36:20 37:6,18
38:2,9,23 39:15
40:2,13 41:9 42:7
55:16 76:17 187:21
188:21
**assets**
33:6 190:23
**assigned**
25:20 101:21 102:11
103:2 105:2,3
107:12 108:5,12,16
122:15
**assigning**
109:13
**assignment**
32:6 57:21 101:19
102:9,14,20 103:5
103:12,13,15,21
104:4,8 105:24
107:17,20 108:5,11
108:14 109:4,6,16
109:19 112:19
156:18 159:4 164:6
164:14,17 165:8
166:7,21
**assignments**
109:11
**assigns**
104:6
**assist**
99:19,21 100:15
101:17 102:4,7
104:23 107:9
108:15 112:21,22
**assistance**
195:4
**assisted**
10:2
**assisting**
10:8



**associate**
194:25 195:7
**associated**
149:19 173:12
**Association**
84:6
**assume**
190:24
**Assumes**
190:6
**assumption**
71:14 73:7 105:25
    109:19
**attaching**
102:18
**attachment**
8:14
**attempt**
66:25 164:10 166:16
    190:15 201:4
**attempted**
163:6,15
**attention**
18:14 19:4 35:9
    37:15 105:20 147:7
    149:2 155:19
**attestation**
108:22 111:20
    113:11 114:4,7
**attestations**
84:4 105:8
**attorney**
3:15 6:13 130:18
    132:3 171:7
**attorney/client**
7:7
**Attorneys**
2:4,9,13
**attributed**
94:13 155:15
**attributing**
136:11
**audit**
96:18 129:15 138:17
    179:3 192:6 194:7
    197:17 199:22

**audited**
91:12 147:13 157:5
    187:8
**auditing**
76:25 95:7 96:17,20
    96:25 97:2,9,18
    100:2,20,22 111:25
    129:5 130:11 174:5
    177:6,12
**auditor**
138:20 178:10,11
**auditors**
71:21 115:24 116:4
    129:13 133:6 144:9
    177:25 178:2,4,5,8
**audits**
78:21 129:8 136:25
    174:18 175:6 177:6
**author**
15:5,15
**authored**
10:18 14:24 15:2
**authorities**
5:3 76:4 82:3
**authority**
32:17 70:3,14,14
    72:22 82:15 88:15
    89:5 91:19 187:3
**authorized**
10:22 51:16
**authorship**
124:9 125:13
**available**
15:8,9 161:6 176:4
    195:3
**Avenue**
2:5
**avoid**
155:11 160:9
**avoidance**
173:13
**awarded**
31:14
**aware**
19:11 32:3 48:23
    115:11 117:5,17

159:9 167:20 180:3

---
**B**
---

**B**
8:14 103:19 183:22
    205:6
**back**
5:21 14:11,13 24:11
    24:15,17,21 25:8
    48:6 59:6 61:11
    64:4 68:21 80:10
    90:12 100:9 107:3
    117:22 118:12,22
    119:10,24 120:3,10
    126:8 127:24
    128:11 132:11
    137:11 143:20
    145:4 146:14,16
    159:13 162:18,25
    164:20 169:8 170:8
    186:22 193:13
    196:13,21,22
**backed**
46:11 151:2
**background**
117:3 173:24 189:13
**backing**
51:13,15
**backwards**
171:17
**balance**
188:21 199:15 200:5
**bar**
179:17
**Barber**
1:8 2:20 4:18,18 5:12
    5:13 31:5 34:25
    75:7 115:12 124:3
    125:7,17,18,20
    168:16,17,17 169:5
    189:12
**bars**
82:17 147:17 153:14
    153:20 154:4,5
    157:8 158:23
    159:13 173:10

**179:**10,13,16,18,20
    179:22 180:8,15,15
    180:22 181:4
    195:15 199:10
**bars,right**
179:19
**based**
4:25 19:17 21:10,18
    39:18 71:25 89:23
    111:24 113:10
    176:23 188:15
**basic**
192:2
**basically**
102:15 106:18 133:3
    148:11 181:25
    184:3
**basis**
17:18 22:11 23:10
    63:17 94:10 95:9
    96:9 127:11 136:11
    188:18
**Bates**
17:6,16 194:13,20
    198:6,9,23 199:14
    201:22
**bathroom**
68:17
**BDO**
95:24 97:19 118:2,3
    118:5,10,18 119:8
    119:17,20 120:14
    121:9,13,21,23
    122:6,8 128:8
    129:13 130:2 133:3
    133:14,16 135:10
    138:2 139:24 140:5
    140:6,16 141:13
    142:25 143:12
    189:7,21 192:6
**bear**
17:16
**bearing**
71:7
**becoming**
80:5



**beginning**
8:11 104:22 107:7
  109:14 113:19
  120:17 132:15
**begun**
170:13
**behalf**
4:22 5:6,8,12 78:7
  121:9 123:25 124:3
  125:4,7 175:6
**believe**
13:18 29:10 34:18
  38:8 39:24 40:11
  57:7 64:17 68:25
  129:20 135:22
  137:21 145:10
  147:17,21 153:20
  157:9 158:23
  159:18 167:25
  191:15 194:3
  200:11
**believed**
44:16 75:8 129:10
**beneath**
145:17
**benefit**
164:5,12,18 165:15
  166:19
**Bermuda**
150:19 154:18
**best**
12:18 56:16
**beyond**
9:13 41:19,25 42:3
  45:7 50:19,20 54:8
  56:3 60:19 61:4
  62:12 64:7 65:12
  70:19 73:10 101:13
  124:10 125:15
  126:10 141:7,15
**bill**
77:24 92:5,6 171:17
**billion**
46:11 75:5 76:8
  124:24 193:6
**binding**

151:2
**bit**
143:3 168:20 201:3
**black**
49:8
**blank**
186:5,9
**blood**
206:16
**Blvd**
2:10
**board**
18:15,16,25 19:9
  20:6 26:25 99:21
  126:3,15 137:4
  148:3 150:14 189:5
**boarding**
85:19,20
**body**
84:3
**bottom**
147:9 164:7
**bracket**
108:3
**brackets**
107:15
**Braverman**
1:8 2:19 4:15,17 5:17
  5:18 31:5 34:25
  75:3 130:14,15
  131:6 132:4 140:13
  147:11 148:16
  149:7,14,16,18
  150:2,15 151:5,18
  152:7,22 153:12
  154:7,11,23 156:10
  157:3 158:22
  162:19 163:20
  168:15 169:2,8,19
  169:20 170:3,15,21
  170:25 171:3
  172:13 173:6,17
  183:14 190:11
  193:7 194:19
  196:12,15 198:5,8
  199:18 200:4 201:5

201:10,18,24 202:3
  205:5
**Braverman's**
147:18 151:24
  153:22
**break**
27:4 68:17,18 74:6
  94:8 130:6 138:8
  141:18 144:14,16
  144:19
**breaks**
180:25
**Bribery**
14:19
**Brickell**
2:5
**briefly**
43:9 68:23
**bring**
132:11 159:24
  189:24
**bringing**
130:22
**brings**
68:21
**Brinks**
186:21 187:13
**broadly**
82:9
**Broadway**
2:14
**broke**
167:24
**broker**
149:20
**brought**
131:19 138:22
  181:20 189:22,23
**buck**
195:6
**build**
150:18
**build-out**
151:18
**building**
150:12

**bullet**
164:2
**bullion**
48:11,20 75:6,16
  76:8 82:15 84:6
  114:18 137:3
  138:18 147:15
  151:2 157:7
**Bureau**
147:11 152:11 156:7
  156:11,17 158:25
  159:14 163:6,15,23
  173:7,21 189:22
  192:21 193:24
  194:2,5,7,23 196:2
  196:19 197:15
  198:20 199:11,21
  200:16
**business**
19:7 32:10
**businesses**
32:25 93:20
**buy**
90:3
**buyer**
76:12,16,18 77:9,11
  77:15,21 78:2,8
  79:2 80:7,9 81:2,16
  81:21 83:13 84:22
  85:18,19,19 90:19
  93:2,7,7 94:14
  114:18 115:5,6
  116:7,13 117:13
  165:4
**buyer's**
79:7
**buyers**
79:16,20,20,24 80:2
  80:16,17 84:15
**buying**
76:18 78:3 83:14
  190:25 191:4,24,25
**BV**
199:8
**bylaws**
15:24,25 16:5,7,17



16:20,23 17:5 18:3
18:8,9 19:14 21:19
205:14

**C**

**C**
2:2 104:3 106:10
109:5 204:2 206:2,2
**cabinet**
89:18
**California**
149:16
**call**
67:5,6 79:18 92:13
123:4 124:12
135:11,13 148:25
198:19 201:13
**called**
3:2 8:14 82:18 84:8
99:4
**calls**
36:22 42:9 44:7
52:25 54:17 56:18
58:6 59:16 67:18,23
**Canada**
26:2
**capacity**
9:8 32:14 126:10
177:25
**captured**
14:10
**carry**
155:21 156:3,22
157:20 158:5,16
161:14,21 162:4,13
**cars**
190:25
**case**
3:16 64:8 75:13
90:23 166:25
182:23 188:25
189:24
**cases**
9:2
**cash**
183:25 185:15

186:20,22
**categorically**
191:12
**catering**
34:17
**caused**
29:9
**CD**
92:9
**CDD**
65:16 69:6 70:6
73:23
**CDD)/Know**
61:15
**Center**
31:12 178:15
**centers**
184:2
**CEO**
194:24 195:7
**certain**
21:21 84:24 94:24,24
106:5 132:18,23,24
133:9 134:10,16
135:8 142:18
**certainly**
7:6 132:7 155:6
**Certificate**
175:13 178:6
**certified**
105:9 111:21 114:8
**certify**
204:4,8 206:9,14
**cetera**
44:25 48:12 143:11
159:9
**chain**
158:24 175:14 178:7
196:22
**challenges**
11:4
**change**
172:2,17,18
**changed**
80:3,4
**Chapman**

147:11 156:9 158:24
163:22 196:21
197:15 199:8
**characterization**
139:17
**characterized**
37:23
**CHARAP**
2:7
**charge**
171:19,21
**chartered**
174:2
**check**
117:22 118:7,13
119:4,10 120:4
191:25 192:2 196:8
196:17 199:9
**checks**
61:16 62:2 64:20
65:24 79:2 81:22
**chemist**
175:5
**chemistry**
174:23
**chief**
147:21,25 149:7,17
149:21 151:20,25
152:14,22 154:13
154:16
**China**
14:22
**chosen**
131:10
**Chris**
125:19,22 128:14
129:7
**cite**
88:15
**cites**
89:4
**clarification**
47:11 110:24
**clarified**
166:11
**clarify**

6:16 11:17 22:22
26:17 46:6 56:13
70:8 73:4 138:24
139:12 140:2 145:9
145:23 146:9,11,19
147:3 158:10
160:10
**clarifying**
64:13
**clause**
183:22
**clear**
6:21 46:14 69:8
107:21 110:14
111:3 116:23 131:9
140:15 141:19
143:12 163:9 171:3
171:6
**clearance**
92:3
**clearer**
57:16 162:10
**clearly**
30:16,21 36:5 49:6
49:23 58:19 62:15
65:6 66:17 71:3
80:12 82:2 97:19
99:3,19 105:21
106:14 108:20
109:15 112:20
113:5,17 114:4,22
122:5 136:20 137:9
141:20 143:8 151:4
156:17 157:11
166:22 167:5,13
182:10 184:13,14
184:20 187:16
192:24
**client**
32:4 96:18 97:4,5,21
97:22
**clients**
32:12,15 34:7 178:23
**close**
57:17 88:19 89:8
124:11



clue
169:14
co-defendants
3:16
Co-operation
84:10
COC
175:14
code
75:10
coin
55:16
collaboration
14:21
collective
136:7 168:13
collectively
67:10
com
193:25
combating
78:18
come
71:12,13 81:12 91:24
92:2 95:7 105:20
118:17,22 143:11
181:23 187:12
192:18 193:13
196:21
comes
92:20 120:10 149:22
175:18 178:17
196:22
comfortable
8:18
coming
24:23 32:18 64:4
65:9 72:24 131:25
135:20 150:8
commenced
152:21
comment
7:4 21:17,18 44:12
46:17 54:11 55:10
60:21 121:14
167:20,23 190:16

commented
50:3
commenting
45:14 54:10
commercial
77:23 91:24
COMMISSION
1:3 2:4,5
Commodities
31:12 178:15
common
191:10,18 193:3
communicated
117:7
communication
94:18 119:24 138:20
communications
96:12 116:22,24
companies
32:4 33:3 62:11
174:21 178:24
180:12 181:2
187:11,14
company
18:18,21,22 19:8,12
20:6,15 25:20,22
26:7,9 28:11 31:11
31:14,15,18,25
33:16 34:10 39:9
62:14 64:6 65:14
68:5,9 69:21 70:24
72:21 73:6,10,14
75:7 92:16 93:23
143:23 144:9 150:9
150:12 163:6 186:7
186:19 188:11,20
191:6,7,14,15 195:7
compensation
164:4,11,18,23 165:6
165:14 166:5,8,19
complaint
21:8,23 22:9 24:3,8
24:11,13 25:2,12,18
25:23 26:24 27:2,16
27:18,23 30:6,20
42:18 43:2,3,5,24

43:24 46:18,19
52:17 55:4,5 64:9
65:4,5,9,11 69:22
69:22 70:25 71:25
73:15,16 120:18
140:14 149:14
151:23,23 152:16
complete
6:2 82:6
completed
15:10
completely
140:7
completing
134:24
compliance
31:15,17,17 32:3
33:12,19 34:16
68:12 115:7 150:14
174:4,8,18 177:23
187:9
compliances
34:6 115:10
complied
78:15 110:10 111:9
112:12 114:7
comply
83:6,24 86:18 88:11
88:25 89:20,21
113:22 115:2
component
27:5
comport
76:9 96:2,5 110:4
comported
75:9 76:9 99:14
compromised
155:24
concerned
55:14 166:13
concerning
29:17 33:10,25 34:3
48:19 52:20 53:14
57:25 121:8 124:24
165:19 166:18
concluded

67:15 151:20 203:11
concluding
24:2 70:15 87:5
96:10 142:22
201:15,18,23
conclusion
19:17 20:19,22 28:17
36:23 37:3,8 41:13
42:10,14 43:18,20
44:8,11,14,22 45:5
45:9 53:2 54:18
56:19 57:23 58:6
59:16 65:3,10 67:18
67:24 71:13 72:6,24
88:14,16,17 105:13
105:18 149:7
conclusions
38:15 58:21 72:7
conditions
185:19
conduct
18:21 77:16,18 81:2
85:23 87:11 90:21
105:11 108:23
112:16 113:21
114:10,11 116:14
129:8,15 131:10
159:12 175:6
conducted
61:14,25 63:8,21
64:10,19 66:18 68:8
72:23 73:20 80:19
89:25 90:5 91:11
93:2,25 105:7
156:20 164:25
175:8 178:13,19
conducting
136:24 163:11
175:21
conference
35:6 197:21
confirm
4:7,10,23 99:3 106:4
106:20 107:8 112:3
119:4 137:2 159:19
165:4,9 168:4



184:23 185:16
188:24
**confirmation**
99:7 185:25
**confirmed**
4:12,14,15,19 98:3
170:10
**confirming**
23:17 98:4 99:7
101:3 103:7 104:12
104:17,19 105:23
106:12,22 107:19
107:22 109:4,20
113:9,10 182:3,8,11
182:25 184:15
185:22 192:16
198:19
**confirms**
137:4 185:24
**confused**
141:19
**confusing**
162:8
**conjunction**
134:18
**connection**
10:10 16:24 36:18
40:10 89:12 117:9
**considering**
23:8 67:3
**consisting**
8:13,14
**consolidation**
118:2
**constitute**
87:4
**constraints**
179:6
**consultants**
31:17,24 33:20 34:5
34:16 148:4
**contain**
78:6 185:11,18 186:8
186:14 187:21
191:13
**contained**

109:7
**container**
181:18
**contains**
104:9
**contend**
65:20 162:11
**content**
14:9
**contention**
44:4,16,18 71:16
139:2,21 161:13
**contents**
194:16
**context**
95:18 135:3
**continue**
17:25 168:23 201:17
**Continued**
202:15
**continues**
35:8
**contract**
73:18 182:9 199:21
**control**
21:12 25:19,21 26:6
26:8 27:4,24 28:2,7
28:9,10,14,23 30:17
30:22 57:8 69:19,20
69:23 70:19,24,25
71:9,14,23 72:10
73:6,10,17 110:25
120:19 144:4 189:4
**controller**
72:12,13 143:23
**controllers**
72:21
**controlling**
73:13,19
**conversations**
115:25
**convert**
129:22
**convey**
37:16,24
**conveyed**

66:19
**COP**
178:6
**copied**
48:13 75:25 118:16
119:11,25 153:8
**copy**
8:4 15:23 101:4
103:13,15 169:17
169:22 203:5
**corporate**
10:13 12:22
**correct**
7:16 15:16 30:13
55:18 73:8 129:9
134:12,13 145:25
146:22,25 158:7
172:7 173:16,22
194:8 204:9
**correctly**
7:14 11:18 55:12
64:17 137:19
**corruption**
11:6 14:17
**cost**
182:18,20
**Council**
175:13
**counsel**
6:5,13,18 7:10,15
21:2 51:22 53:6
55:23 116:11
120:12 136:18
138:16 144:2 178:6
**count**
159:12 179:21
190:23 191:25
**counter**
171:24 172:20
**counter-financing**
13:8 32:23 66:5 83:8
86:24 88:8
**counter-party**
88:3
**counting**
147:17 153:14,19

154:3,5 157:8
158:22 173:9
195:15
**country**
92:7 125:24
**COUNTY**
206:5
**course**
15:12 36:17 38:7
39:11 41:5 43:11
46:21 52:19 53:13
57:23 60:4 148:23
**court**
1:2 6:3 7:21 127:2
203:4
**covered**
68:22 142:15
**CPA**
105:9 113:10
**CPAs**
114:8
**create**
187:2,23
**creates**
79:15 89:5
**creating**
3:18
**crime**
174:3
**crossed**
145:15
**crypto**
31:5,7,9,10,18 32:4,8
32:10,13 33:4,6,7
33:10,14,16,25 34:3
34:5,6,10,17,20
36:20 37:6,18 38:2
38:9,22 39:15 40:2
40:13 41:9 42:7
56:22,24
**Cryptobontix**
1:7 25:14 26:4 31:4
34:24 75:2 148:12
150:2,7 152:6
**currency**
31:9 32:8 33:5,10,25



34:3,5,6,20 56:22
56:24
**currently**
150:12
**custodian**
186:2
**Custody**
175:14 178:7
**custom**
91:25 92:3,3
**customer**
61:14,15 64:19,20
66:7 76:20 77:16,18
80:19 89:25 90:5,8
183:24 184:5,9,17
187:18
**cut**
194:12
**cutout**
146:2
**cybercrime**
14:14

---

**D**

**D**
3:2 204:2 205:2
**D-I-G**
52:15
**data**
15:11
**date**
1:12 8:8 12:19,21
16:3 98:12 123:11
124:16 202:12
**dated**
8:5 15:24,25 48:9
128:12 143:25
147:10 149:24
195:11,15 199:11
205:14
**David**
111:7
**Davis**
95:24 98:10,14,16
106:20 110:2 112:3
112:10,16,17

113:17 117:19,20
118:10,25 119:17
119:22 120:16
121:8,13,21 128:8
129:13 130:2 189:7
189:21 192:6
205:15
**Dawn**
2:9,11 4:21 168:7
**day**
3:14 68:3,14 125:22
168:14 204:19
206:19
**day-to-day**
18:21 30:18,23
**days**
195:17
**deal**
43:8
**dealer**
149:20
**dealing**
75:15 82:16 87:19
89:19 90:2
**decision**
28:10 54:20 71:24
143:24
**decisions**
89:18
**declined**
158:25 192:23
**declining**
159:3
**dedicated**
33:5
**deed**
164:6,13,16 165:8
166:7,20
**defendant**
2:9,13,19,20 25:25
30:8 65:6 70:23
72:13,19 75:7,8
96:24 120:9 121:22
134:15 135:6
149:13 164:25
171:7

**defendant's**
25:11
**defendants**
1:9 4:8 25:11,24 30:6
30:8 61:13,22 62:14
62:17,20 63:5,16,20
63:21,23 64:8,12,13
64:18 65:5,7,20
66:20,23 67:2 68:4
68:25 69:6,10,25
70:4,9,11,15 73:14
74:25 80:13,15,16
84:19 85:13 86:3,4
86:14 89:14 94:4
95:23 96:5,7 116:2
120:17,20 133:12
133:19,20 134:14
135:8 136:3,6,10
137:25 139:3,22
140:8,12,12,13
141:6,10,11,22
142:2,5,10,17,23
143:20 144:5
151:24 155:24
162:20 163:2,5
**defined**
30:7 36:5 37:10 64:9
120:20 147:23
148:5 150:23
151:25 152:5 153:9
**defines**
25:24 65:6 150:10
**defining**
151:9,12
**definition**
34:13 183:5
**defraud**
35:7
**degrees**
173:25 174:7,22
**delegate**
68:11,11
**delegated**
19:8
**delivery**
78:20 79:9,17,19,25

80:23 82:13,14,18
82:19,25 84:8,9
87:8,13,15,20,21,24
92:11 93:11 113:23
175:15 176:10
178:9,10 184:16
188:12
**denial**
155:20 156:21 158:4
162:17
**denied**
156:3,25 157:19
158:15 159:8,8
160:12 161:14,21
162:3,12
**dense**
143:3
**dependence**
114:23
**deposition**
1:15 4:10 5:15 6:6
7:20 8:4 57:2
131:10 202:11
**depositor**
185:17
**derivations**
138:14
**derive**
138:15
**described**
32:6 37:4 45:19,20
65:22 66:22 67:22
69:2 70:16 76:3
96:8 114:20 115:15
**describes**
82:20
**describing**
62:6 63:3 70:5 76:10
78:5,7 96:23 98:21
**DESCRIPTION**
205:11
**designated**
32:24 93:20
**designation**
24:17,18 25:7
**designer**



150:24
**desk**
150:16
**desktop**
176:2,16
**despite**
145:6
**details**
103:5 176:7 200:8
**determine**
18:17 61:18 100:19
104:8 124:8 125:12
127:15 158:11
166:16 167:10
**determined**
103:2 109:7
**determining**
63:18 64:23 99:22
100:16 101:13,18
102:8,23 104:24
105:14 107:10
108:10,15 112:21
112:23
**Development**
84:10
**dialogue**
173:7
**different**
39:10 52:2 87:14
95:5,17 110:7
121:15 123:2 138:7
140:8 181:15,15
189:3
**differently**
134:7
**difficult**
179:6
**DIG**
35:4 52:12,13,22
53:15 54:8,14 55:16
55:16 59:2 60:10,18
61:6
**Dignity**
58:2
**diligence**
61:15 63:9,22 64:10

64:19 66:2,8,17
67:12 68:8 71:4
72:23 73:20 76:16
76:20 77:16,18,19
79:3 80:9,20 81:3
81:15 83:12 84:5,16
85:14,23 87:12
89:25 90:6,8,21
91:16 92:18,25
93:10,24 94:24
112:17 113:21
114:10 116:14
122:5,12 164:21,24
165:2,3 189:16,17
189:18 191:9
**direct**
16:13 18:14 19:3
77:6 100:11 106:3
155:18 183:17
**directed**
132:17,22 133:8
134:9,15 135:7
**directing**
147:7
**direction**
18:25 132:19 189:3
**directions**
21:15,21
**directly**
173:12 174:24
**director**
22:2,12,16,19,21,23
23:7,16,24 24:2,9
24:19,20 25:3,14,16
26:3,5,19 27:7,13
27:19 29:11,14,25
30:5,11,24 64:3
69:13,19 156:11
**directors**
18:16 19:13,25 20:16
70:18 99:21 126:3
126:15 137:5
143:22 144:10
148:4
**directorship**
23:22

**disagree**
44:13
**disagreement**
57:14
**disclaimed**
70:2,12 72:7
**disclaiming**
106:14
**disclose**
96:18,21 97:3,14
**disclosed**
165:25 166:24
**disclosure**
116:25
**discount**
171:20
**discuss**
147:14 157:6 160:5
**discussed**
27:19 94:6 137:22
**discusses**
77:8
**discussing**
73:24 79:9 87:7
**discussion**
17:13 48:10,11 71:20
115:13 144:25
145:11 170:7,13
193:17 202:8
**discussions**
32:15 71:19 72:4,15
115:17,24 128:20
128:22 144:8
**display**
8:2 123:5 145:8
**distinctment**
126:11
**distinguish**
66:25
**distribution**
46:24 47:22 48:24
49:19 50:2,4,8 51:9
51:24,24
**DISTRICT**
1:2,2
**division**

194:2
**DMCC**
178:14,15
**document**
8:2,11 16:8,19,21
17:4,24 18:6,7,11
23:14,17,22 24:19
26:14 27:13,14,15
47:3,7 55:7 91:25
92:6,12 98:9,23
99:4 100:24 101:3
117:23 118:18
123:13,16,23,25
124:7,19,21 125:10
125:14,16,17 126:7
126:7 128:9 130:5,8
138:25 145:8,14,16
146:14,16,18,19
147:3 148:19 149:9
149:21 152:16
164:3,15,17 165:7
165:12,18,20,22,24
165:25 166:4,9,13
167:4,11,16,17,18
176:21 181:24,25
181:25 182:4 183:8
183:9,10,25 184:4,5
184:7,10,12,15,17
184:25 185:4,6
186:3,14 187:17,19
187:20 192:11
194:10 195:23
197:23,24 199:11
199:12,14,16,19,24
200:4,10,25
**documentation**
13:2 83:16,16 92:17
92:25 119:14
164:11 166:17
174:18 179:20
181:5 187:24 189:6
189:19
**documented**
15:11
**documents**
8:15 16:9 21:9 23:12



24:5 26:13 39:12,24
46:11 55:5 66:11,11
66:13,13,14 75:13
76:3 77:25 81:8,14
89:16 90:9 91:5,16
91:17 92:3,4 93:5,6
118:20 121:6
122:18 130:13
131:14,18 148:23
151:10 152:4,18
155:7 166:23,24
167:6,15 171:13
172:5,8,13,16,25
173:2,5 174:19
187:15 188:10,13
188:14,22 193:9,13
196:5 201:21

**doing**
13:11 62:8 67:16
68:13 106:15
113:20 126:18

**DOLAN**
2:13

**dollar**
46:10

**domain**
176:4

**domicile**
85:17

**downturn**
14:12,13

**dozen**
169:3

**drafted**
20:17

**drafting**
37:2

**drawing**
33:22

**drill**
63:13

**drop**
133:14,16 135:10
138:3 139:24
141:13 142:6,25

**dropped**

133:22 135:13
140:10 142:9

**dropping**
140:17

**Dubai**
3:12,13 31:11 79:18
80:22 82:17 84:7
87:21 88:4 91:23
99:23 147:16 157:8
178:14 180:24
181:18

**due**
61:14 63:8,22 64:10
64:19 65:25 66:7,16
67:12 68:8 71:3
72:23 73:20 76:16
76:20 77:16,18,19
79:3 80:9,19 81:2
81:15 83:12 84:5,16
85:14,23 87:11
89:25 90:5,8,21
91:15 92:18,25
93:10,24 94:24
112:16 113:21
114:10 116:14
122:5,12 164:21,23
165:2,3 179:6
189:16,17,18 191:9

**duly**
3:3 204:5 206:11

**dump**
31:6 36:20 37:6,18
38:2,10,23 39:7,16
40:2,13 41:9 42:7
42:22

**duties**
19:4,6

**duty**
93:15

_____
**E**
_____

**E**
2:2,2 3:2 204:2 205:2
205:6 206:2,2

**earlier**
57:14 68:22 94:8

95:15 96:9,13
111:12 116:15
127:9,11 130:25
136:6,13 137:23
141:3,16 142:15
145:9,10 166:14
194:4

**easily**
8:25 131:19

**East**
2:10

**Eaton**
125:19 128:15 129:7

**economic**
14:5,12,13 84:10

**economy**
13:10 175:7 178:22

**education**
174:7

**effect**
14:18 58:21 60:7

**efficient**
110:21

**efforts**
167:10

**either**
20:14,23 39:16 49:14
50:10,11 118:10
119:17 121:8
127:23,24 143:16
158:18 179:17

**elaborate**
34:4

**element**
70:20

**elements**
80:8

**Elliot**
95:24 98:10,14,16
106:19 109:25
111:6 112:3,10,15
112:17 113:16
117:19 118:10,25
119:17,22 120:15
121:8,13,21 128:8
129:13 130:2 189:7

189:21 192:6
205:15

**email**
29:12,13 48:8,13,14
48:15,16 51:17
71:19 115:19,22
118:16 120:2
125:18 126:5,6,9,12
128:7,12,17,17,22
128:23 129:5,14,16
136:23 137:8,11,16
137:17,20 138:5,11
138:14,15,19
139:19 140:4,5,6,6
140:16,20,23
141:15 143:10,25
144:7 147:9 148:10
148:11 149:24,25
150:3,3,8,10 151:9
151:17 152:6,18
153:11,17,19,21,22
153:24 154:6,8
156:7,8,8 157:2,12
158:21,24 159:3,7
159:10 160:24
162:18 163:20,21
173:22 193:23
194:4,11,22 195:14
195:19,20 196:2,3
196:16,23 197:4,9
197:22 198:18,21
199:2,8 200:18
202:12 203:8

**emails**
21:11,20,23 24:4
27:9,10,20 29:9,14
29:17 48:5,7,13,19
50:16,17 51:12,14
115:25 119:10,11
122:21 130:4
136:20 137:17
138:9,10 148:6
151:8 152:11,21,25
153:2,4,8,10,25
154:9 163:19 196:8
196:18,22



**Emerging**
14:20
**emits**
51:11
**EMN**
76:19 176:9
**employees**
20:7
**enable**
129:2
**end-to-end**
175:18
**ends**
164:3
**enforced**
13:7
**engage**
156:13 177:25
**engaged**
32:11 105:10 108:23
    117:21 118:6,8,11
    118:13,19,22 119:2
    128:19,21 129:12
    160:3 178:8
**engagement**
105:7 118:14,15
    121:19,24 159:2,15
    163:9,18 192:23,23
**engaging**
152:12 191:7
**engineering**
174:23
**ensure**
67:8 115:6 184:6,10
**ensuring**
18:20
**enter**
92:21
**entered**
66:2 67:13 127:14
**entering**
92:23
**entirely**
67:25 120:24
**entities**
83:22,24 176:14

186:19
**entitled**
7:4 123:17 126:25
**entity**
69:24 71:2 171:20
**envelope**
186:4,5,6
**equally**
85:21 114:24
**equate**
180:21
**equivalent**
180:20
**especially**
12:24 13:12
**ESQ**
2:6,7,9,11,15,16
**establish**
45:11 64:6 65:13
    93:9 120:6 136:18
    137:14 138:12
**established**
66:8,10,16 70:21
    95:2 105:8 111:20
**establishing**
43:13 73:9 143:21
**estate**
33:3
**estimate**
13:15
**et**
44:25 48:11 143:11
    159:9
**evades**
120:24
**everybody**
93:3 154:12 155:14
    155:15 191:22
**evidence**
36:19 38:6,20 39:14
    40:11,17,17 41:6
    42:4,21 43:6,12
    44:3,15,20 45:11
    46:23 47:21 48:23
    49:18 50:7 51:5,7
    52:20 53:13,23

54:13 55:11,14,24
55:25 56:2 57:24
58:12,15,24 59:13
59:15 60:6,17,23
64:2 77:22 137:14
    137:21 167:7 190:7
    190:8,12,17
**evidences**
41:17 46:18 72:2
    81:8
**evidencing**
124:24
**evolving**
33:15 80:5
**exact**
24:10,18 60:12
**exactly**
16:10
**examination**
3:6 105:11 106:17
    108:24 114:11
    163:12 170:24
    203:10 205:4
    206:10,12
**examine**
75:12
**examined**
3:5
**example**
77:21 137:20 176:9
    190:24
**examples**
142:16
**exchange**
1:3 2:4,5 24:3 94:18
    115:19 154:17,21
    163:20,22
**exchanges**
29:12 71:20 143:10
**excluding**
70:13
**executed**
103:22
**executive**
86:23 88:7
**executives**

189:4
**executor**
25:21
**exercised**
26:7 30:17,22
**exhibit**
8:3,7 15:22 16:2
    17:16,20 19:18
    48:17 61:12 74:21
    98:7,11 100:12
    103:11 123:6,10
    124:15 132:12
    145:5,7 148:2,10
    185:14 197:13
    198:25 200:8,21
    201:7,8,12 205:10
    205:10
**exhibits**
21:10 23:13 24:4
    27:16 129:23 167:7
    172:14 199:2 205:8
**exist**
83:11 106:12 109:20
**existed**
77:23 91:7 98:2 99:6
    167:5,11
**existence**
61:17 62:3 66:15
    81:5 92:22 94:23,25
    98:5 99:8,22 100:5
    100:16,19,23 101:3
    101:13 102:17
    105:14 107:23
    112:3,22 113:25
    132:25 187:4 188:7
    188:7,24 192:11,17
**exists**
83:10 104:17 106:24
    112:5
**exit**
92:6
**experience**
9:22 31:8 32:7 35:10
    35:18 36:11 56:23
    89:23 174:3 175:9
    175:20 180:24



181:22 187:6,12
**expert**
1:15 5:11 6:10 7:3,4
7:9 8:5,6 9:6,7,12
9:16,20 10:3,5,14
10:15 16:6 18:4
19:22 20:13 21:14
21:22 29:4 30:19,25
33:10,11,24 34:2,4
34:8,9,12,19 35:23
35:24 36:4,13,15,15
36:23 37:9,14 38:13
39:19 40:19 44:23
49:7,23 50:5,15
55:6 56:21,22 58:20
59:17,23 60:20
72:15 75:24 86:11
89:24 104:14,15
131:12 168:25
169:12 171:14
175:23 176:18,22
189:13 190:23
191:3,18 205:13
**expert's**
49:3
**expertise**
26:11 28:19 29:4
33:18 34:16 36:10
43:4 45:7 54:22
55:2,23 58:18 59:22
60:19,25
**experts**
10:2
**explain**
46:7 199:18
**explained**
165:3
**explaining**
51:5
**explored**
49:15
**export**
92:5
**exposed**
93:18
**express**

105:17
**expressed**
94:2 154:2
**expression**
105:13
**extended**
160:20
**extends**
136:7
**extensive**
56:23 176:2
**extent**
19:15 42:8 43:17
51:3 52:24 59:20
67:17 102:16
127:13 149:5
173:14 190:13

---

## F

**F**
3:1,2 4:1 5:1 6:1 7:1
8:1 9:1 10:1 11:1
12:1 13:1 14:1 15:1
16:1 17:1 18:1 19:1
20:1 21:1 22:1 23:1
24:1 25:1 26:1 27:1
28:1 29:1 30:1 31:1
32:1 33:1 34:1 35:1
36:1 37:1 38:1 39:1
40:1 41:1 42:1 43:1
44:1 45:1 46:1 47:1
48:1 49:1 50:1 51:1
52:1 53:1 54:1 55:1
56:1 57:1 58:1 59:1
60:1 61:1 62:1 63:1
64:1 65:1 66:1 67:1
68:1 69:1 70:1 71:1
72:1 73:1 74:1 75:1
76:1 77:1 78:1 79:1
80:1 81:1 82:1 83:1
84:1 85:1 86:1 87:1
88:1 89:1 90:1 91:1
92:1 93:1 94:1 95:1
96:1 97:1 98:1 99:1
100:1 101:1 102:1
103:1 104:1 105:1

106:1 107:1 108:1
109:1 110:1 111:1
112:1 113:1 114:1
115:1 116:1 117:1
118:1 119:1 120:1
121:1 122:1 123:1
124:1 125:1 126:1
127:1 128:1 129:1
130:1 131:1 132:1
133:1 134:1 135:1
136:1 137:1 138:1
139:1 140:1 141:1
142:1 143:1 144:1
145:1 146:1 147:1
148:1 149:1 150:1
151:1 152:1 153:1
154:1 155:1 156:1
157:1 158:1 159:1
160:1 161:1 162:1
163:1 164:1 165:1
166:1 167:1 168:1
169:1 170:1 171:1
172:1 173:1 174:1
175:1 176:1 177:1
178:1 179:1 180:1
181:1 182:1 183:1
184:1 185:1 186:1
187:1 188:1 189:1
190:1 191:1 192:1
193:1 194:1 195:1
196:1 197:1 198:1
199:1 200:1 201:1
202:1 203:1 204:1
205:1 206:1,2
**facilities**
147:16 157:8
**fact**
73:9 92:20 101:7
138:21 149:2 163:5
191:21
**facts**
155:5 190:7
**factual**
20:22 53:11 71:16
72:9
**failed**

96:24 98:22 142:2,7
142:18,25
**failure**
163:2
**fair**
9:15
**fairly**
51:11 74:22
**Faisal**
1:15 3:10 21:2
204:15
**falls**
93:19
**familiar**
52:13 179:7
**far**
57:2
**fast**
200:14
**FATF**
83:21,23 85:9 88:6
88:10
**February**
199:11 200:11,17
**feel**
17:24 149:9,10
173:11
**field**
175:21
**file**
16:8 48:6
**fill**
33:21
**fin**
169:21
**final**
8:12,13
**finalization**
171:14
**finance**
78:21
**financial**
32:22 83:20,21 85:9
91:6,8 174:3,8
177:11 178:2
**financing**



78:19
**find**
167:4
**finding**
71:11
**findings**
101:2
**fine**
144:21 145:24
161:11
**finish**
3:21 5:23 110:16,17
134:4 182:7 183:15
196:11,12
**firm**
6:19 31:23,24 32:20
71:21 96:20 97:2,9
97:18 135:7 156:14
163:5,10
**firms**
72:16 94:17,19,21
95:22,24 96:17
97:14 121:20
122:19 132:16,22
133:8 134:9,15
135:16,18 147:13
192:6
**first**
3:3 16:16 17:2 27:21
31:10 33:16 76:15
90:20,25 99:19
101:2 102:2,5 107:6
109:8 164:24 171:8
194:10 204:4
**five**
9:6,8,13 13:11 57:3
74:8 168:3 169:9
170:16,17
**flag**
133:13 135:9 136:3
136:10,12 138:2
139:3,23 140:9,11
141:12,21 142:6,11
142:20 143:13,18
155:23 162:19
**flags**

133:22 140:17
189:23,25 193:3
**floor**
169:6
**Florida**
1:2 2:6,11
**focus**
22:10 33:21 35:9
60:25 121:2 127:4
**focused**
14:14 37:13 106:7
**follow**
84:4 88:5 115:10
163:3 176:21 177:3
177:4,7,13
**followed**
49:24 54:5 66:7 67:9
81:15 85:10 92:19
100:5 101:9 111:24
114:4 117:15
**following**
93:4 104:9 109:8
116:9 128:3 149:4,4
184:18
**follows**
3:5 88:17
**footer**
151:9
**Force**
83:21,22 85:9
**foregoing**
204:8
**forensic**
9:24 167:2
**form**
28:12 30:14 41:16
45:24 60:22 62:9
63:4 72:25 162:6
172:3 173:18
174:11 175:2
176:25 182:11
188:4 190:6 192:20
194:15 195:10
196:7 198:3,4
**formal**
174:6

formed
45:8,15 46:5 69:12
69:14
**forming**
59:22 73:4 76:6
85:24 86:5,8
**Fort**
2:11
**forth**
5:21 196:13 206:11
**forum**
129:10
**forward**
57:12 127:6 195:2
**forwarded**
29:13
**founder**
25:13 26:3
**four**
4:8 11:2 150:11
**fourth**
164:2
**frame**
107:4
**framed**
61:7
**framework**
31:20 33:19 79:11
**free**
17:24 149:9,10
**fresh**
140:22
**front**
169:18 194:20
**full**
173:14 187:2 197:17
**funds**
66:9 91:13
**further**
56:15 75:11 89:12
143:14,14 147:2
155:22 160:5 163:4
201:11 204:8
206:14
**FZE**
75:8

**G**

**G4S**
95:25 99:23 100:17
115:12 180:25
182:2,9,13,24
183:17,19,23,23,25
184:6,6,8,9,16,21
184:22 185:15
186:17,19,20,20,21
186:22,23,25
187:13,22,24
188:11 189:7
191:14
**gathering**
176:5
**general**
18:17 131:11
**generally**
6:23,25 198:13
**geologist**
175:4
**geology**
174:23
**gesture**
6:2
**getting**
142:13
**give**
5:24 13:14 110:23
139:16 143:5
171:20 186:7
197:18 198:24
**given**
7:21 18:25 21:15
112:25 164:23
171:19 182:2
204:10 206:13
**giving**
70:12 129:21
**glad**
90:10
**global**
14:5,12 88:10 174:2
**globally**
14:8 178:24



globe
174:21
go
4:3,4 17:10 24:10,15
24:17,21 25:8 35:21
44:8 48:6 61:11
78:9,24 80:10 93:14
100:9,23,25 103:4,7
103:25 117:22
118:12 119:10,24
120:3 123:22 130:4
143:7 144:11,22
146:14 148:20
155:10 162:24
168:13 169:2,5,9
170:4,8,14 189:2,11
191:19 199:22
202:6
goes
36:2 41:3 67:25
141:16 158:24
164:20
going
3:17,20,22 7:25 8:2
8:22 15:20,21 17:10
17:14 18:10,13 19:2
22:17 27:4 29:21
35:25 40:7 43:7
44:20 51:7 54:16
55:18,19 57:2,4,17
58:12,24 59:6,11,19
60:6 74:17,19,22
81:24,24 84:21 90:3
93:22 94:15 95:6
98:6 105:4 108:15
110:19,25 117:3
120:23 123:5,6
124:17 126:16
127:5 130:16 132:8
132:10 139:6
143:20 145:7
146:16 148:22
155:8 159:16 160:8
161:2 162:24
166:14 168:2,19,20
171:4 193:8,11

195:8 197:3,5
200:14 201:17,25
203:7
gold
10:24,25 11:18 13:5
44:24 46:11,17,25
47:23 48:10,11,19
48:25 49:20 50:9
51:10,13,14,15 54:6
61:17 62:3 66:15
71:22 75:5,10,15
76:2,8,12,24 77:10
77:22,23 78:3,14,17
78:22 79:12,16 81:6
81:11,13 86:21 90:3
90:24 91:6,7,9,9,11
91:14,20,22 92:2,9
92:10,11,14,23,24
93:4,19,23 94:23
95:2,14 96:19 98:5
99:8 101:19 102:9
102:18,18,24
103:17,18 104:11
104:19,24 107:11
107:20 108:4,10,16
109:12 112:23
113:22 114:12
115:18 117:9
123:17 124:25
137:3 155:22 156:4
156:23 157:21
158:16 161:15,22
162:5,14 163:12
165:5 166:6 173:8
173:10,14 174:9,17
174:25 175:7,17
177:5,17,20,24
178:3,16,19 179:5,7
179:10,13 180:2,19
180:19,21 181:8
182:8,14,20 184:3
185:3,21,25 187:4
187:11 188:2,3,7,8
188:10,20,24
189:10,12 190:4
191:19 192:9 193:5

199:23
Goldberg
1:8 2:10,21 4:22
29:22,24 30:10 31:4
34:25 52:2,6 61:7
65:17 74:2 75:3
94:5,7,11 95:11
96:4,11 121:16
123:2 125:20 136:8
139:9 141:5,9
142:17,22 143:17
162:22 194:25
195:8 197:5
goldvault
180:13
good
3:14 7:17 17:22
26:16 74:6,13 78:20
79:9,17,19,25 80:23
82:13,14,17,18,25
84:7,8 87:8,13,15
87:20,21,24 93:11
113:22 125:22
175:15 176:9 178:9
178:10
goods
81:3,5 83:14 185:17
Google
176:11
gotten
57:19
governing
75:10,18
government
171:20
green
40:18,21
grossly
191:25
group
67:11 177:22
guess
8:13 17:23 111:14
136:8 157:9 201:12
guidance
79:16

guide
170:2
guidelines
75:25 76:23 78:17,22
80:24 82:20 83:3
84:11 85:10
Gulf
11:22 12:6,13,16,20
guys
169:13

**H**

H
3:2 205:6
half
57:3 168:21
halfway
102:2
Hall
150:19 151:19
hand
17:9 184:6 206:19
handed
92:14 188:11
handle
195:8
handling
195:2
happen
193:10
happening
88:4
happy
55:9 161:8 173:2
hard
196:14
head
11:11 12:10 151:11
153:5 177:22
178:21
hear
134:22
heard
69:3
held
1:16 17:13 99:23



100:17 144:25
149:16 154:20
170:7 193:17 202:8
**help**
86:15 123:15 195:3
**helps**
171:17
**hereinbefore**
204:11 206:11
**hereunto**
206:18
**herewith**
185:16
**high**
179:10,13 180:7
**highlight**
106:10 199:7
**highlighted**
107:25 136:21 163:4
**hire**
163:6,15
**hired**
6:17 31:25 33:17
135:18 179:2
189:21
**hiring**
95:23 96:18
**hoc**
176:24
**Hogg**
1:8 2:14,18 3:15 5:7
22:2,12,20 23:6,15
24:8 25:3,13,18,25
26:2,4,6,19,24 27:7
27:10,23 28:13,22
29:10,18 30:13 31:4
34:24 36:19 37:5,17
37:25 38:9,22 39:15
39:25 40:12 41:8
42:6 43:13 44:4
45:21 48:8 52:3,6
52:21 53:15 54:13
55:15 57:25 58:25
59:13 60:9 61:8
62:7,25 63:15 64:17
64:23 65:17 69:7,10

70:11,23 71:6 72:9
73:2 74:3 75:3 94:5
94:7,11 95:10 96:4
96:10 118:11
119:16,25 120:7
121:9,12 122:21,23
125:19,22 126:9
128:7,13 129:6,12
136:8,12,23 137:9
137:15,24 139:2,9
139:21 140:7,13
141:4,9 142:16,22
143:17 146:24
150:7 161:13,20
162:3,12
**Hogg's**
46:23 47:21 48:23
49:18 50:7 51:8
150:5,23
**hold**
26:24 195:24
**holding**
25:5 182:4,12,14
185:3,3,9
**holds**
182:8
**hopeful**
57:11
**hopefully**
43:8 193:9
**hour**
168:6,13,21,21
171:16
**hours**
57:3 168:9,11 171:12
171:15 176:19
184:19
**houses**
150:17
**Husvar**
193:25
**hypothetical**
172:23

——————————

**I**

**ID**

153:22
**identification**
8:8 16:3 91:2 98:12
123:10 124:16
178:19
**identified**
10:15 15:4 75:24
98:23 101:19 102:9
107:16,20 108:11
108:13 110:4
112:24 113:3
116:20 151:17
**identifies**
86:16 99:12 110:2
111:7 112:11
**identify**
12:17 99:11 110:8
111:15 152:22
160:15,19 163:14
193:3
**identifying**
139:20
**identity**
83:15 90:25
**ignored**
133:13,19,21 135:9
136:3,10 137:25
139:3,23 141:12,22
142:5
**ignoring**
136:12 142:3,20
**implementing**
32:22
**important**
108:6
**include**
33:2 36:6 58:20
63:16 69:7 96:4
114:16 130:9,13
136:12 140:12
**included**
12:23 14:21 69:10
72:8 94:10 105:15
116:24 122:21
136:15 139:22
141:5,9 142:23

**includes**
104:22 114:23
125:19 149:8,10
164:18
**including**
9:12 18:18 70:10
94:5 150:4 152:11
184:8 189:8 191:22
**inclusion**
137:24
**independent**
7:9 71:10,16 73:5
94:17,19 99:16
114:22 115:3
119:15 121:7
122:17 132:16,21
133:8 134:8 135:16
135:17
**Index**
1:5
**indicates**
164:4 166:4
**indicating**
164:11 165:13
**individual**
119:23
**individually**
10:13 67:10,11
**individuals**
21:16 148:3
**industries**
32:21
**industry**
33:8 34:17 44:24
75:17 76:2 78:14
82:11,12 86:21,25
92:13 93:4 173:15
174:15 178:3,3
**inform**
115:5 116:6
**information**
26:13 30:9 57:5
61:19 73:12 116:13
127:4 129:20
131:24 142:12
171:23,24 172:20



176:4,6 184:18
186:15
**informing**
115:8
**initial**
17:25
**initially**
109:25
**injunction**
21:8
**insert**
35:22
**inside**
53:21
**inspection**
163:7 175:17
**inspections**
163:18 178:21
**inspector**
193:25
**instance**
173:11
**instances**
15:16 173:16
**Institute**
105:9 111:21
**institutions**
32:22
**instruct**
8:16 21:4 123:13
**instructed**
137:10 184:9
**instructing**
133:5,19
**instruction**
51:17 133:2
**instructions**
96:14 122:20,24
138:17,18
**insurance**
33:3 91:18,21 188:13
**insuring**
186:11
**intend**
37:24
**intending**

62:24
**intention**
37:3 66:23
**interest**
64:12
**interested**
206:17
**interject**
161:3
**international**
75:9 93:7 113:24
177:8,10,12 186:20
186:23
**internationally**
179:25
**Internet**
176:6
**interrupt**
82:23 95:4 100:7
127:22
**interrupting**
4:6
**introduce**
194:24
**introduced**
195:17
**inventory**
133:4 180:13 191:2
**invert**
188:9
**investigate**
42:20,23 43:5 58:8
58:11 117:12 119:3
124:7
**investigated**
143:14 167:3
**investigating**
122:23
**investigation**
167:2
**investing**
55:17 58:3 60:10
**investment**
150:17
**investors**
35:3 43:15 44:6

**invoice**
77:23 91:25 166:6
**involved**
52:22 97:14 120:7
133:21 176:14
187:25
**involvement**
173:6
**iPhone**
153:21
**irrelevant**
40:6
**irrevocably**
185:16
**ISAE**
177:6
**ISO**
176:23
**issue**
59:14 95:7 148:13
163:10 187:14
**issued**
10:9 14:23 15:3 35:5
52:12 54:8 118:24
120:14,15 185:14
**issues**
126:10,13 190:2
**issuing**
186:12
**item**
155:20
**iteration**
16:23

**J**

**James**
1:8 2:10,21 75:3
194:25 195:7 197:5
**Jamie**
4:22
**January**
78:20 197:14 198:20
**Jewellery**
175:12
**Joe**
156:9 158:24 163:22

197:14,16 199:8
**join**
5:7,13
**Joseph**
147:11
**Josh**
194:23
**Joshua**
193:25 194:23
**Journal**
13:16
**Journals**
11:21 12:8,12 13:4
13:18
**judgment**
34:14 129:2 140:23
**July**
128:12 137:18 144:2
149:25
**jump**
191:18
**June**
15:24 16:2 48:9
149:18 205:14
**jury**
21:9

**K**

**keep**
55:3 59:6 93:13
140:14
**keeping**
99:5,22 100:16 101:4
101:14,21 102:11
102:17,19,22,25
105:15 113:3 126:2
181:23 182:12
183:4,7 184:23,24
185:13 186:12
**keeps**
154:12
**kept**
44:9 128:21 180:13
186:13 187:20
**key**
14:11



**kilo**
179:17,20
**kind**
28:16 41:13 42:10
43:20 45:4
**kinds**
90:9
**Kissane**
2:15 3:7,15 4:4,12
5:6 6:20 7:11,17,25
15:20 17:8,18,22
19:19 20:20 21:6
22:16 28:20 38:19
40:20 47:17 49:10
54:23 57:7 58:22
67:19,25 68:19 74:5
74:10,14 90:11 98:6
110:19 120:22
123:4 124:11
126:16 127:13
132:8 144:17,21
155:12 159:16,23
167:24 169:11
170:4,8 205:5
**knew**
26:19
**Knight**
150:16
**know**
3:22 9:3 17:19 18:5
21:2,12 25:6 28:5
28:25 36:3 41:2
42:16,25 45:17
46:10 47:4,6,25
48:2,6 50:12 52:13
54:4,6,19 55:3
62:16 64:2,20 65:25
66:4,7,12 68:4,7,16
71:19 72:13 73:13
76:19,23 77:13,13
77:24 79:8 82:9,15
82:21 83:17 86:19
89:13,23,24 90:3
91:4 92:11 93:5
96:14 97:5,9 104:14
104:14 111:17

112:2 115:4,19
116:2 118:8,21
119:5 123:13 126:2
127:23 130:20
132:19 133:19
135:15,20 136:24
137:23 140:5
142:10 143:10
146:4 147:18,23
148:18 149:6 151:7
151:8 152:17
153:25 154:15
155:9 157:11,17
159:3,5,8 163:17,18
165:25 166:5 167:9
167:13,22,24
168:18 169:11,23
174:14 177:4 178:3
178:20 179:18
180:5,6,10,14,22
181:13,17 182:3
185:24 187:2,6
189:2,14 190:2,19
190:20 191:14,17
191:23 192:24
195:24 200:8 201:6
**knowledge**
58:18 119:15 121:7
122:17
**known**
192:19
**knows**
47:24
**KPMG**
9:24 115:22 125:19
125:24 128:15
129:7,13,15 136:23
138:20 140:7
**KYC**
61:15 65:16 69:7
70:6 73:23 78:17
81:14 116:12

——————————
**L**
——————————
**L**
1:8,8 2:10 3:2 204:2

**label**
17:7
**lack**
198:23
**lacking**
199:14
**land**
91:23
**language**
19:17 61:20 62:6,20
63:11 65:23 107:4,9
107:13 108:9
109:23 136:2
**large**
179:18 180:17
**Larry**
48:9
**Las**
2:10
**late**
5:2
**Lauderdale**
2:11
**laundering**
13:6,8 31:19 32:23
33:12 66:5 78:18
79:22 83:8,25 86:23
87:10 88:6,8 122:2
174:4
**law**
13:6 58:19 85:5,7
86:10,12,17 87:23
93:25 131:3
**Lawrence**
145:16 146:2,4,6
**laws**
35:11,13,13,19,24
36:7,12 59:17 78:23
115:4
**lawyer**
131:2,4
**lawyers**
7:2 33:3
**layman**
189:9 191:3,23
**laymen**

190:2
**LBMA**
78:22 80:23 82:14,16
82:17 84:7 87:18,19
87:19
**lead**
31:23 32:19
**leading**
68:14
**leads**
46:13
**lease**
199:22
**leave**
161:8 170:12 190:9
190:17
**leaving**
201:25
**left**
5:20 146:10 196:5
**legal**
1:23 19:17 20:5,11
20:19,21 21:18
23:17 28:3,4,8,16
28:23 29:3,5 30:20
35:20 36:10,23
37:11,20,21,23
38:14 39:5 41:13
42:10,13 43:18,20
43:22 44:8,10,11,14
44:22 45:4,10,13,14
45:17,18,19 46:3,20
49:21 50:14,18
51:22 52:10,25 53:6
53:7 54:18,20 55:10
55:23 56:19 57:22
58:6 59:16,22,23
67:18,23 68:10,13
69:16 70:3,12,13,20
70:21 72:6,7,11
75:17 85:24,25 86:8
87:5 88:13 91:4
120:8,12 126:11
136:18 138:6,16
144:2 172:10
177:23



Len
125:6 145:25 194:24
  197:4
lengthy
74:22
let's
22:19,25 27:21 35:15
  46:6 79:4 106:18
  135:17 143:7
  155:10 157:9 170:8
  189:2,2 190:24
letter
118:14,15 121:24
  163:18 205:11
level
72:23 93:15,24 94:24
liability
182:21,23
liable
63:7 67:7 184:11
limit
20:12 180:2,4,5
  182:21
limitations
110:6 111:4 192:13
limited
6:23 13:25 97:16
  98:15 125:23
limiting
105:21
line
35:25 49:4 74:21
  109:10 197:21
lines
56:15
link
78:23 173:6
lira
182:22
list
12:2 16:9 75:24
  77:24 89:14,15 90:7
  92:8,8 113:12
  173:24
listed
21:10 77:3,12,15

78:11 82:8 86:22,22
  100:21 114:12
  140:13
listen
120:25
listing
38:18 82:6 93:14
lists
148:17
literature
176:3
litigation
9:20,25 10:10
little
57:16 74:11 75:11
  95:5 143:3 201:3
LLC
185:15
LLP
2:13
local
93:7
locate
164:10
located
150:19
location
181:11
locations
181:15
logistic
181:2
logistics
92:15 186:18 188:11
  191:15
London
11:7 82:15 84:6
  175:13
long
150:3 176:17
longer
57:2
look
24:11,21 25:9 41:17
  48:6 54:4 55:3,24
  55:25 61:24 74:19

76:19 78:16 83:4
  86:20 88:20 89:13
  97:17,24 99:2,25
  104:13 106:18
  108:7 112:20
  117:20 118:14,20
  119:24 149:12,23
  151:8 152:24 153:3
  153:9 159:11
  163:25 172:24
  177:4 179:15
  181:17 182:8
  185:12,16 192:7
  194:10 199:2 200:3
  200:9 201:2
looked
43:23 56:2 105:22
looking
17:24 33:6 40:22
  51:19 54:9 61:13
  66:3 111:3 125:3
  160:2 176:13
looks
194:11
loop
57:18 88:19 89:9
lose
182:23
lot
56:25
lots
180:10

_____
        M
_____
M
2:9,11 3:2
magazine
11:20 12:8 13:17
Magna
1:23
maintained
133:5
maker
71:24
making
28:11 34:14 59:13

107:21 127:15
  138:24 143:24
man
191:18 193:3
management
18:20,22 19:7,12,24
  20:15 21:13,16 22:7
  25:6 27:11 67:6
  68:7 69:4,13,18
  70:19 150:13
  156:11 187:25
manager
15:10
managers
194:3
managing
14:5,9 24:20
mandated
91:15 93:18
mandatory
93:6
manner
76:7 131:11
March
1:12 8:5 206:19
mark
8:3 98:7 129:23
marked
8:7 15:22 16:2 98:11
  123:6,9 124:15
  145:5
market
81:7 82:15 84:6
  175:19 178:18
Markets
14:20
marriage
206:16
massive
12:25
material
34:25 43:14 44:4,25
  45:12,21 52:7 54:25
  174:23
materials
5:9,10 50:22 56:9,12



76:5,11 117:17
165:12
**matter**
20:22 45:13,14,17
46:20 50:15 53:11
72:9 132:4 138:16
144:2 177:15
206:17
**matters**
10:3 59:23 73:23
85:25 105:20
**Max**
1:8 2:20 4:18 5:12
75:7 168:12 189:16
**mean**
10:12 22:24 24:20
34:4,9 41:14 43:22
67:10 80:8 95:4
116:3 117:23
149:12 165:11,22
168:23 169:16
181:10,24
**meaning**
189:21
**means**
28:7,9 96:15 108:14
108:22
**meant**
134:6
**meet**
65:21 84:24 85:17
87:6 96:24 98:22
157:10 193:12
**meeting**
95:11 197:19
**meetings**
32:12
**member**
85:8
**members**
21:16 22:8 54:14
55:17 58:2 60:10
189:5
**memorandum**
124:13,22 205:18
**mention**

39:7 97:10 112:18
114:2,3 119:21
143:12 192:22
**mentioned**
10:7 11:14 20:11
22:8 23:12 25:17
30:2 37:8 42:17
46:22 52:17 55:6
69:23 71:4 73:21
81:10,20 83:2 86:20
87:2 88:7 89:17
96:13 97:20 99:18
100:2 106:21
108:21 111:24
113:2,6,18 114:5,13
116:15 128:15
139:10 140:19
144:6 151:22
152:17,19 153:19
154:9 175:9,23
177:13 178:5
180:18 184:14,25
187:7 190:17
192:12 194:4
196:19 197:4
**mentioning**
101:8 109:15 113:5
126:6
**mentions**
114:23
**merchant**
150:25
**Mere**
48:9
**merits**
40:23
**message**
197:13
**messages**
198:15,16
**met**
46:15
**metadata**
124:7 125:12
**metal**
11:4 13:12 33:2,13

82:11 84:3 92:12
174:17 178:22,25
**metallurgy**
174:9
**metals**
82:21 84:12,13 90:2
156:15,19 177:24
178:17 187:10
197:2
**method**
176:7
**methodology**
176:23
**metric**
179:5,15 180:19
181:8 182:20
191:16
**Meyer**
145:16 146:2,5,6,11
**Meyer's**
145:18
**Miami**
2:6
**middle**
132:14
**million**
182:22
**mind**
33:23 46:4 149:3
172:2,18
**mindset**
96:15
**mine**
8:21 106:8 175:19
178:17
**minimize**
41:21
**minimum**
188:17
**mining**
32:13 151:3 174:9
**ministry**
13:10 175:7 178:22
**minor**
174:13
**minute**

27:20 197:18
**minutes**
74:8 136:22 168:3
169:9 170:16,18
**Mischaracterizes**
190:8
**misrepresentation**
45:12 46:13 52:8
173:13
**misrepresentations**
35:2 43:14 44:5,25
45:22
**missed**
82:24 111:13
**misstates**
26:22
**mistaken**
133:25 134:3 169:22
**misunderstanding**
166:12
**mobile**
191:8
**moment**
15:19 197:16
**money**
174:4
**month**
182:18
**months**
13:22 200:18
**motion**
126:25 127:12,16
159:24
**move**
45:25 56:13 57:12
120:23 126:16
155:16 159:17
**movement**
77:22 91:22
**moving**
95:21 195:2
**Mr.Schutzman**
145:13
**Multi**
178:14
**multiple**



49:6 190:9

---

**N**

**N**
2:2 204:2 205:2
**name**
3:8,14 10:9,12 15:13
  81:25 125:22
  145:15,16,25
  162:17 171:2
**named**
11:16 15:9 68:4
  144:5
**names**
82:5,7 162:15
**narrow**
40:25 51:2 111:5
  135:21 160:17
**narrower**
99:9
**narrowly**
121:3
**native**
194:11
**natural**
68:17
**necessarily**
16:19
**necessary**
5:5 8:10 9:2 75:14
**need**
6:16 24:21 80:9
  88:11 89:12,21
  90:20 106:4 115:9
  116:7 118:7 119:23
  130:4 168:19,20
  169:11 170:15
  190:4,22,25 191:3
  195:4 200:7 202:11
  203:7
**needed**
7:5 192:3
**needs**
66:8,10 77:20 78:15
  95:2 154:24 193:4
**neither**

197:4
**never**
9:16 26:4 34:19
  154:19,19,23 184:7
  197:8
**new**
1:17 2:15,15 3:4 5:10
  11:20 12:8,12 13:4
  13:16,18 74:12
  150:20 183:15
  206:4,8
**Newbury**
149:15
**news**
11:22 12:6,16,20
  35:4 125:24
**newspaper**
11:22 12:7
**night**
5:2
**non-financial**
32:25 93:20
**normal**
148:23
**Notary**
1:17 3:4 204:22
  206:7
**note**
92:11 159:17 188:12
**noted**
36:24 103:22
**notes**
168:4
**number**
10:23 11:3,12 13:15
  17:17 21:11 32:11
  32:15,21 77:25
  80:11,12,15 82:12
  82:13 83:19,25 84:2
  84:7,9 92:9 94:15
  103:8,11,19 104:2,3
  106:10 112:22
  113:4,4,5 128:13
  149:15 153:2,8
  155:7,20 175:11
  183:22 185:19

187:11 190:22
  192:4,5 198:6,9,23
  200:12 201:8
**numbers**
18:12,12 171:10
  198:25 200:8,21
  201:7,12,22

---

**O**

**O**
204:2
**object**
35:25 59:12,19
  130:16,21 154:11
  194:14
**objecting**
56:14
**objection**
4:25 5:7 7:5 17:15,19
  19:15 20:3,18 22:13
  26:21 28:15 30:14
  35:22 36:22 38:11
  39:18 40:15 41:3,10
  42:8 43:16 44:7,21
  47:8 49:2 52:24
  53:17,24 54:2,17
  58:5,14 60:12 61:9
  62:9 63:4 67:17
  111:10 130:24
  131:7 132:5 134:23
  157:23 162:6 172:3
  172:22 173:18
  174:11 175:2
  176:25 188:4 190:5
  190:6 194:9 195:10
  196:7 197:10 198:3
  198:4,12,22 199:13
  200:2,24
**objections**
7:12 21:3 132:6
  155:11 190:9
**objective**
105:12
**obligated**
115:5 116:6
**obligation**

63:2,12,15,17 64:24
  65:2,22 69:11 76:19
  79:7 81:2,18 85:4
  87:5,11 89:5,7,10
  96:11,17,21 97:2
  114:18 116:17,19
  117:5 142:3,8
  143:17
**obligations**
66:22,24 70:5,16
  76:12 77:9 78:7,25
  79:15,19,21,24 80:2
  86:9 94:4,7,13
  95:17 97:11 112:18
  142:19
**obliged**
84:23 85:17 88:25
  96:5 101:12 110:3
**obliges**
86:17
**Obtain**
103:13
**obtained**
61:18
**obviously**
16:12 40:23
**occasion**
124:6 125:11
**occasions**
136:5
**October**
103:14,20 104:7
  109:5 147:10,20
  195:12,16 196:2,24
**OECD**
80:24 83:3 84:9,11
  113:23
**OECD's**
82:19
**off-shoring**
11:8
**off-the-record**
17:12 144:24 170:6
  193:16 202:7
**offer**
53:15 90:18



**offered**
34:19 55:16 58:2
88:24
**offering**
35:3 52:22 54:14,19
58:5,16,16 59:2,14
59:15,18 60:9,18,21
61:6 67:21 79:15
95:10 138:24
153:13
**offers**
79:16
**office**
86:23 88:7 91:5
150:20
**officer**
22:2,17,23 24:19
25:14,15 26:3,5
29:18 30:5,11,24
64:3 68:12 69:12,18
120:10 147:22,25
149:8,17,22 151:12
151:21,25 152:15
152:23 154:14,17
**officers**
19:4,5,13 20:2,16
62:16 63:7 67:4,5
67:15,21 69:3 70:18
72:20 73:19 143:22
**official**
23:24 154:19
**officially**
154:20
**officials**
144:9
**okay**
3:23 5:20 6:3 7:17
43:7 47:9 56:18
58:16 59:11,14 79:4
80:13 90:16,19 95:4
96:16 107:3 118:3
128:25 131:21
134:13 135:24
138:22 147:5 152:9
165:10 168:5,15
169:19 170:3,15

**offered**
172:11 173:4
175:24 181:19
182:6,6 183:2,2
186:16 188:25
196:15 197:12
198:12,17 200:24
201:5 202:3
**Olas**
2:10
**old**
13:23
**omissions**
35:2
**on-board**
81:16
**once**
11:6 29:3 69:16
70:17 88:21 92:21
111:16 136:17
143:19 198:8
202:13
**ones**
12:4 68:6 196:18,19
**online**
15:9 175:25
**Ontario**
26:2
**onus**
81:21
**open**
201:25
**operating**
147:22,25 149:8,17
149:22 150:16
151:12,21,25 152:8
152:14,22 154:13
154:16
**operational**
150:13
**operations**
18:19,22 28:10 69:20
71:2 147:25 150:19
151:14,19
**opine**
37:11 39:5 144:3
**opined**

61:2
**opining**
71:17
**opinion**
20:12 29:6 37:16,20
37:21,23,24 41:17
43:23 44:10 45:10
45:15,18,20,24 46:2
46:3,5,12 50:5
59:23 62:25 63:10
66:19 67:21 68:2,10
69:5,12,15 70:3,12
70:21 71:13 72:8,25
73:5 74:24 76:6
79:15 84:18,23
85:25 86:6,9 88:24
89:6 94:2,11 95:10
96:16,25 101:11,11
105:13,18 114:16
118:9 138:25
163:11 176:18,22
**opposed**
77:9,11 169:7
**options**
147:15 157:6 202:14
**order**
65:21 124:8 129:8
131:24 136:25
137:7 194:7 203:6,7
**organization**
68:15 84:9
**origin**
81:13 92:4,9
**original**
194:11
**originating**
92:4
**OTC**
31:10 33:16
**ought**
8:17 67:21 99:14
110:9 111:8 112:12
142:24
**outcome**
206:17
**outside**

20:12 39:3,20 53:2,5
53:18,21 54:3,17
57:6 58:13,17 60:24
117:11,15 138:12
**over-the-counter**
31:11
**overall**
25:20 26:7
**overhead**
187:9
**overkill**
147:17 153:14,20
154:4,6,10 157:9,12
158:23 159:12
173:10 195:15
196:20
**overlooking**
79:5
**oversee**
150:18 151:18
**owes**
41:4
**owned**
91:8
**owner**
25:13,22 26:3,9
61:16 150:7
**owners**
189:4
**ownership**
104:10 187:4
**owns**
188:20

---

**P**

**P**
2:2,2
**p.m**
1:13 197:22 203:9
**packing**
77:24 92:8
**page**
8:11 17:2 18:11
25:23 61:12 74:18
74:20,21 77:13 78:9
78:13,16 80:11,11



80:12,14 86:20 87:2
95:22 98:17 103:4,7
103:7,9,10,25 104:2
108:19 112:20
114:6 132:10,13,15
139:4 141:11
144:11 145:8 147:5
147:8 149:15
155:17 157:22
158:17 162:25
163:24 164:8,25
169:24 202:15
205:4,11
**pages**
8:12,13 78:5
**paid**
165:6 171:16
**paper**
11:24 14:19,23 98:2
148:8 182:5,13,19
182:24 186:6,10
191:12 192:17
193:5
**paragraph**
18:12,13 19:3 61:13
95:22 99:20 101:25
102:3,5 104:17
105:6,24 106:11,20
106:24 107:6 108:2
108:20 109:2,5,8,10
109:11,18 112:5
113:8 132:15
150:22 151:4
169:25
**paragraphs**
104:9 106:12
**paralegal**
203:8
**parenthetical**
108:13
**Park**
2:16 149:16
**part**
9:24 10:13 31:3
34:23 38:16,18
40:18 41:16 55:7

65:25 66:16 67:2
68:13 71:18 76:21
77:19 81:14 83:20
84:18,22 92:18
102:13 105:3 108:7
116:10 140:24
141:25 142:4
143:12
**participate**
50:18 51:21 71:23
72:17
**participated**
32:14 35:6 36:20
37:6,17 38:2,9,22
39:6,15,25 40:12
41:8 42:6 50:17
51:21 54:7 59:2
60:9 72:3,18 124:9
125:13
**participating**
49:25 57:10 96:14
143:23 144:8
**participation**
46:23 47:21 48:24
49:18,22 50:7,13
51:8,23
**particular**
47:2 48:16,17 56:2
58:8 60:22 81:13
100:24 112:4
135:14 146:18
159:3 173:22
179:23 181:8
182:15 183:8
184:24 190:3,4
196:23 197:9
199:10
**particularly**
51:14
**parties**
79:22 85:20 106:23
114:21,25 115:9,25
133:21 206:15
**partner**
189:12
**partners**

126:14 137:5
**parts**
27:5 87:19 141:6
**party**
17:20 72:14 91:20
92:14,15 95:3 116:4
**passage**
79:18
**passed**
195:6
**paste**
194:12
**pasted**
75:25
**paying**
4:9
**payment**
166:5
**PC**
40:17
**people**
32:12 67:4 68:14
69:19 72:19 73:19
120:18,20 128:14
161:4 189:20
192:19 195:18
**percent**
26:9
**percentage**
199:10,22
**perfect**
202:3
**perform**
19:6 76:17 79:2
81:22 84:16 85:14
132:17,23 133:9
134:10,16 135:7
142:3,18 157:13
177:16
**performed**
65:25 67:12 71:3
77:20 83:12 93:16
99:18,25 105:19
106:17 176:2
177:19 192:3
**performing**

94:12
**period**
23:7 31:18 188:16
**periodically**
188:15,17
**permission**
155:21 156:3,22,25
157:20 158:4,15
159:9 160:12
161:14,21 162:3,13
162:17
**perpetrated**
31:5 37:5
**person**
7:22 25:19 26:7 27:4
27:24 28:2,7,14,23
71:10,14 72:10 73:5
93:18 119:23
146:20 160:16,18
160:19 186:2
**personal**
6:18 15:14
**personally**
10:4 63:7 177:16,19
191:17
**persons**
189:5
**perspective**
120:13 172:10 175:5
**phones**
191:8
**phrase**
64:11 84:21
**physical**
61:17 62:3 66:11,14
71:21 76:25 81:5
91:10 92:22 94:21
94:25,25 98:5 100:5
113:21,25 114:11
115:18 133:3 143:9
155:21 156:3,6,15
156:18,19,22
157:13,20 158:5,16
159:4 161:14,21
162:4,13 163:11
174:9,25 175:17



177:9,17,20 178:12
179:21 180:13
188:7,8,18 192:18
192:25 196:25
**physically**
116:3 179:8 191:5,19
192:9
**piece**
98:2 182:5,13,19,24
186:6,9 191:11
192:17 193:5
**place**
143:15 204:11
**places**
181:16
**plain**
49:8
**Plaintiff**
1:4 2:4
**plane**
191:19
**platform**
151:2
**please**
3:8 4:10 42:15 74:7
78:13 80:14 112:9
124:11 127:12
139:13 143:5 147:6
162:9 163:25
183:14 192:7 198:4
199:5 200:6 201:2
**plus**
178:21 180:20
200:18
**point**
9:12 13:24 30:20
32:8 39:5 44:17
49:21 50:12,14
55:10 69:3,4,17
72:11 77:7 78:4
80:15 94:15 101:5
103:11,19,19 104:2
106:10 112:9,13
113:4,4,5 140:3,4,8
145:13 154:16
159:23 164:2,24

168:9 169:24
183:22 197:24
202:5
**pointed**
110:5
**pointing**
106:6 155:5
**policies**
31:13 32:2
**policy**
18:17,24 91:21
178:16
**politically**
93:17
**portion**
8:24 18:15 52:11
74:20,22 77:7 86:16
89:4 100:11 106:3
112:10 155:19
**portions**
16:13 112:14
**posed**
21:5
**position**
23:18,23 24:10,16,21
25:6,7,18 26:15,25
27:15 64:5 88:16
138:13 151:10
153:9 154:20
161:20 162:2
**positions**
22:15 30:4 161:9
**possession**
91:6
**possible**
159:11
**potential**
32:12 44:5
**pounds**
180:21
**powers**
18:15 19:6
**practic**
178:4
**practical**
180:23

**practice**
93:3 96:22 175:14
178:7 187:5
**practices**
75:10 96:19 97:3
**precious**
11:4 13:12 33:2,13
82:11,21 84:2,11,12
90:2 174:17 177:24
178:17,22,25
187:10
**prefer**
139:16 160:9
**premise**
161:23
**preparation**
10:8 16:24 42:4
171:13
**prepare**
33:18 171:9 176:18
**prepared**
19:11,21 21:22,24
23:4 26:18 27:6
29:23 31:19 55:13
**preparing**
10:7 16:5,18 18:4
28:12 38:7 39:12
40:10 41:6 43:11
46:21 52:19 53:13
57:24 60:5 117:18
176:22
**PRESENT**
2:17
**presented**
133:13 135:9 136:4
138:2 139:4,8,23
141:12 171:25
172:21
**presenting**
56:6
**preserved**
7:6
**preserving**
7:11
**president**
14:22

**presides**
178:16
**press**
35:5,6 46:8,22,24
47:2,14,18,22 48:25
49:19 50:8 51:9,18
51:25
**presuming**
149:24
**pretty**
167:25
**prevents**
49:11
**previous**
21:9
**previously**
41:15 79:18 165:2
**Price**
14:5,12
**PricewaterhouseC...**
14:24 15:4
**PricewaterhouseC...**
15:13
**PricewaterhouseC...**
9:23 11:7 14:8
**primarily**
10:25
**primary**
173:5 174:7
**principal**
148:4
**principals**
75:2
**printed**
145:25
**prior**
92:23 145:7 184:5
**pro**
2:19,20 5:13 171:6
**probably**
162:19 169:3
**procedure**
97:17,20,23 105:6,16
110:12,14 135:15
191:24 192:8
**procedures**



31:13 63:22 67:8,12
81:15 84:5,17 98:25
100:25 101:17
102:3,7 104:23
105:19 106:16
107:7 111:18,23
117:14 132:18,23
132:24 133:9
134:10,16 135:8
163:3
**proceed**
127:16 132:9 135:25
148:22 159:15
161:7 193:2
**proceeds**
83:13
**process**
46:14 57:11 66:2,17
76:16 77:2 92:18
111:23 116:10
126:19 129:22
137:8 143:24 163:4
164:21 175:12,19
176:21 177:3,9
**processes**
75:14 155:23
**procured**
91:14 164:22 165:5
**Procurement**
123:18
**produced**
11:23 36:14 76:2
165:23 166:9 167:8
167:13,19,21 172:6
172:8 181:11
188:22
**producing**
10:3 17:20 187:19
**product**
90:24
**production**
5:2
**productive**
160:5
**products**
90:22

**professional**
173:24
**professions**
32:25
**profile**
177:22
**project**
14:5 15:10
**proper**
57:8 90:5 129:9
**properly**
103:22
**properties**
174:25
**proposal**
200:15,15
**proposals**
122:19
**proposed**
121:24,25 122:9
**proposing**
122:10
**propriety**
76:7
**prove**
30:19 130:18 155:8
**proves**
138:5
**provide**
17:18 28:16 29:5
37:21 42:9 43:22
79:11 171:22
183:23 184:16
**provide/explain**
75:14
**provided**
21:14 23:23 37:14
50:4 89:15 119:25
122:20 156:16
159:6 166:18
167:16 178:8 181:6
184:18 197:2
**providing**
9:25 29:7 31:15
38:14 43:20 59:21
122:24 127:9

131:17
**proving**
131:4
**provision**
86:17 87:4,23
**provisions**
103:6,12 104:5 106:7
**public**
1:17 3:4 35:5 52:23
53:16 54:15 55:17
58:3 60:11,18
105:10 111:21
114:8 176:4 204:22
206:7
**publication**
11:15
**publications**
12:3
**publicly**
137:7
**published**
10:24 11:15 12:3,9
12:20 13:16 14:3,7
15:6,7
**pull**
15:21 98:7 129:4
131:13 148:19
153:6 183:20
**pulled**
118:18 145:4
**pump**
31:6 36:20 37:6,18
38:2,10,23 39:7,16
40:2,13 41:9 42:7
42:22
**purchase**
66:13 75:6 91:16
**purely**
71:25 102:19 185:20
**purity**
61:18 81:6 92:10
**purportedly**
75:4
**purpose**
3:20 36:24 94:20
163:16

**purposes**
3:18 6:6,14,22 7:15
8:3 84:22 123:7
141:10 145:5
202:10
**pursuant**
101:20 102:10,16,25
104:25 107:11
**pursue**
22:17 46:4
**put**
15:18 17:14 43:2
47:14 53:9 71:6
123:5 131:6 146:13
148:23 155:7
162:15 169:13
180:10 182:23
186:4,5 192:13
**putting**
37:22 57:20,21 60:7
116:18 117:4
130:23

**Q**

**qualification**
174:14 175:5,22
**qualified**
173:25
**qualifies**
59:18
**qualifying**
45:25
**quantity**
180:19
**QUEENS**
206:5
**question**
8:18 16:4,16 17:23
17:25 19:10,20 20:9
20:10 22:14,23 23:2
24:24 27:12 28:4
29:17 30:23 34:11
35:10,25 36:9 39:2
39:11,21,22 40:5,7
40:25 41:12,22
42:25 43:8,10 44:14



45:20 47:5,10,15,24
48:3,20,22 49:12,13
50:10,13,23,25
51:10 52:7,21,25
53:7,11,20,22 54:24
55:8,13,15 56:7,8
57:22,25 58:25 59:7
59:9,21 60:4,15
61:4 64:4,22 70:7
88:21 95:8,8,16
99:9,10 107:5
109:24 110:6,14,18
111:5,11 112:8
113:15 116:5,16,18
116:19 117:4,5
118:2,16,23 119:2
120:8,11,12,24
121:2,16 123:15
124:18 126:12,25
127:8,10 128:4,5,10
128:24 129:4,11,18
129:21 130:5,6
131:16 134:5,20
135:21,23 137:10
138:6,7 139:8,18
140:18,22,25
141:19 142:14
143:3,8,21 145:20
146:8,17,23 148:16
148:20 152:3,14,25
153:6,13,23 155:23
156:23 157:14,15
157:25 158:6,8,10
158:11,13,15,19
159:20,22 160:7,13
160:15,17 161:7,18
161:23 166:3,15
169:10 171:8 180:8
183:16 189:18
190:14 194:15,17
194:18 198:14
199:17 201:4,24
**questioning**
4:13,20 5:4,14 13:24
49:5 55:21 129:23
132:9 147:2 164:20

201:16,17,19
**questions**
3:18,21 5:23 16:22
21:5 29:22 33:21
56:5,15 57:5,8,15
61:5 65:15 73:22,25
116:12 126:20,21
127:5 130:20 131:3
131:11 136:14
141:3 148:24
168:18 169:4
170:11,16 171:4
190:20 201:11,20
**quickly**
4:24 127:22
**quoted**
143:25

―――――――――――――
## R
**R**
2:2 204:2 206:2
**R.J**
1:7 2:14
**raised**
156:10 168:19
190:20
**raises**
155:23
**raising**
134:21 153:13
**Rapoport**
2:9,11 4:21,22
127:21 131:22
132:2 154:22 155:2
168:8
**rate**
171:19,21
**RBP**
151:3
**re-ask**
57:19 60:3 140:18
**reach**
19:16 41:13 42:13
**reached**
192:21
**read**

17:2 26:23 62:6,21
65:23 74:22 90:12
90:14 103:20 104:3
104:7 105:25
107:15 108:4,9
109:6 127:24
134:17 135:3,4,17
135:19
**reading**
101:24 108:3,12
135:2
**readings**
109:23
**reads**
18:15
**ready**
170:17 193:14
197:17
**real**
33:2 188:2
**really**
57:13 127:22 147:14
157:5 161:6
**reason**
5:22 38:4 138:23
**reasonable**
13:15
**reasons**
49:13 95:14,19,20
141:2 151:20
**recall**
12:5 16:22 18:2,5
24:12,25 25:8 38:6
56:11 59:4 121:18
129:25 138:11
140:25 145:12
151:7 152:17
153:11,24 162:16
178:20 196:3,4,17
198:16 200:7,12,13
**recalls**
49:17
**receipt**
92:12 95:25 99:5,23
100:17 101:5,14,21
102:11,17,19,22,25

105:15 113:3 126:2
181:23 182:12
183:4,7 184:23
185:13 186:13
**received**
26:10 101:4 103:15
164:5,13,19 166:19
166:25 189:6,20
**receiving**
75:5 184:2
**recess**
74:15 145:2 170:22
**recognize**
8:19,21 75:20 107:8
124:18,20 195:20
197:25
**recognized**
180:2
**recollect**
17:3
**recollection**
12:18 152:20
**reconvene**
170:19
**record**
3:9,19 4:2,11 6:2,21
17:11,15 82:2 90:14
127:25 128:25
131:7 132:7 139:15
140:15 144:22
145:14 146:10
154:24 155:6
159:18 160:2
161:10 170:5,9
191:9 202:6 206:12
**records**
133:4 167:18
**red**
133:13,22 135:9
136:3,10,12 138:2
139:3,23 140:9,11
140:17 141:12,21
142:6,11,20 143:13
143:18 155:22
162:19 189:23,25
193:2



**redundancy**
41:22 160:9
**refer**
47:3 51:4 122:8
    131:14 140:3
    156:21 173:21
    176:15
**reference**
131:17 149:9 198:24
**referenced**
5:10 78:6
**references**
8:23
**referred**
27:22 116:22 137:16
    152:6 157:21
    158:17
**referring**
8:25 9:4 31:22 61:22
    80:17 87:14 97:7,12
    100:12 128:2,9
    129:14 130:7
    133:18 137:11,18
    138:13 140:15
    148:7,9 157:4
    196:18
**refers**
31:7 52:11
**refineries**
174:20 175:7,8,11
    177:24 180:11
    187:8
**refiners**
82:16
**refinery**
177:6
**refining**
178:18
**reflect**
37:3 82:3 188:24
**reflected**
188:19
**reflection**
185:23
**reflects**
160:21

**refused**
156:17 163:8 192:22
**regard**
22:6 33:9,11,24
    34:12 61:5 190:3
**regarded**
39:13 41:7 42:5
    43:13 44:3 60:6
**regarding**
34:20 42:10 44:21
    47:14 58:18 115:14
    173:8,9 200:25
**regardless**
19:23 42:2
**regards**
111:25
**registered**
149:19,20
**regulated**
83:23 93:21
**regulation**
83:10,11 87:13,25
**regulations**
32:17 33:7 66:6
    77:14,17 78:14,19
    78:23,25 79:23 80:5
    80:22 81:20 82:10
    82:12,13 83:5,7,18
    83:25 84:14,25 85:6
    85:11,12,13,18,22
    86:18,25 88:6,12
    89:15,17,20,22
    93:11,12,21 113:13
    115:2,9 175:16
    176:9,10
**regulators**
84:3
**regulatory**
32:16 75:18 115:10
    116:8,9 191:10
**relate**
174:24
**related**
46:25 47:23 48:25
    49:20 50:9 51:9,12
    55:5 57:13 75:4,13

128:4 173:5 206:14
**relates**
172:2,19
**relating**
126:13
**relationship**
7:7 92:24 195:2,9
**release**
47:2,14,18 50:2
    51:18
**releases**
35:5 46:8,22,25
    47:23 48:25 49:20
    50:9 51:9,25
**relevant**
18:23 22:3 30:25
    55:4 56:3 116:12
    138:25 176:13
    177:15
**relied**
8:15 23:20 26:14
    27:12,15 48:15 76:4
    76:6,11 89:16 96:10
    99:6 114:14 142:21
    151:16
**relief**
21:8 25:11,24 30:8
    65:6
**rely**
23:25 64:23 65:8
    70:3,14 87:4 115:8
    141:8 176:11
    187:17 191:11
    193:5
**relying**
5:3 59:22 79:6 192:3
**remember**
11:11 12:10,21 13:20
    25:15 48:7 50:6,10
    50:16 131:21
    138:11
**remotely**
7:22
**render**
74:24
**repeat**

70:7 83:6 88:21
    111:17 166:14
**repeatedly**
38:12 56:17
**repeating**
41:14
**rephrase**
19:19 41:22 67:19
    143:4
**report**
5:11 8:5,6,19,20,22
    9:4 10:9,15,17 14:9
    14:15 15:5,7,12,14
    15:14,18 16:6,18,25
    18:4 19:11,22 20:13
    20:17 21:14,22,25
    23:5 26:18 27:6
    28:13 29:4,23 30:19
    31:2 34:22 36:4,15
    36:18,25 37:2,9,14
    37:16,24 38:5,7,13
    38:17 39:8,13,19
    40:10,19 41:6 42:5
    42:17 43:12 45:16
    46:22 49:4,7,8,23
    50:3,15 52:11,20
    53:3,10,14 55:6,8
    57:24 58:20 60:5
    61:12 63:25 66:20
    73:21 74:18,20
    75:24 76:4 77:4,8
    78:10 80:10 82:9
    85:25 86:16 87:22
    88:15 89:4 91:12
    94:16 95:22 97:7,8
    97:18,19 98:4,11,14
    98:22 99:2,3,7,11
    99:13,16,17 100:3
    100:18 101:10
    103:8 104:13 106:2
    106:25 107:24
    109:14,21 110:2,5,7
    110:9 111:4,7,8
    112:10,11,18
    113:19 114:2,6,20
    114:22 117:8,18,21



118:5,19,24,25
119:2,8,9,18,20,22
120:13,15,21
121:22 122:3,8
128:8 130:2 132:12
132:12 133:2,25
139:5,21 140:4
141:7 142:2 146:15
147:6,8 155:18
157:22 158:17
161:12,17,19,24
162:2,12,16,25
163:25 167:14
169:12,18 171:10
171:14 173:4,10,23
175:23,24 177:14
179:4 180:18 188:9
192:14 205:13,15
**reporter**
6:3 7:22 90:12,15
203:4
**Reporting**
177:11
**reports**
10:3,7,8 14:25 15:3
50:4 119:19
**represent**
7:2 8:10 183:3 185:6
185:7,10 188:6
**representation**
7:13 64:25
**representative**
149:19
**represented**
6:5 62:17 188:3,8
**representing**
6:8,9,21 7:14
**represents**
183:9 184:10,12
**request**
133:14,17,22 135:10
135:12,14 138:3
139:24 140:10
141:13 142:9 143:2
156:10,14 159:5
187:18 196:25

**requested**
17:17 156:7 184:22
186:3
**requesting**
129:7,15
**requests**
142:20
**require**
20:21 26:12 30:3
36:9 41:12 42:13,19
66:6 79:23 137:13
165:4
**required**
37:10 39:5 41:16
43:17 46:15 58:8,11
62:13 63:25 76:22
77:17 78:2 80:21,22
85:14 93:24 113:20
116:14 184:16
**requirement**
12:24,25 36:16 76:20
76:21 80:23 91:15
191:10
**requirements**
13:5 20:5 75:18
80:24 81:19 84:24
85:22 93:10 114:5
116:8,10 177:10
**requires**
19:16 20:19 28:15,20
29:3 44:10,13 53:6
58:18 83:12 84:4,15
175:16 178:11
**requiring**
20:4
**research**
32:18 176:2,16
**researching**
171:12
**reservation**
4:25
**reserve**
5:4,13,18 29:6
193:11 201:19
**reserved**
19:13,25 20:16

**reside**
3:11
**resident**
26:2 149:15
**resolve**
127:3
**resources**
33:23
**respect**
5:11 14:20 20:6
51:23 52:7 65:16
70:5 73:25 74:2
95:13 96:24 123:2
139:8 198:23
**Respectfully**
120:22
**respond**
131:8 132:7 201:14
**responding**
14:19
**responds**
197:18
**response**
120:23 140:20,24
143:18 159:17
**responsibilities**
37:12 62:11 63:23
66:21 69:2 71:7
86:13 114:25
136:19 137:15
150:4 152:8
**responsibility**
42:19 63:19 70:10
73:3 76:22 86:5
94:6,12 95:11,16
101:16
**responsible**
18:20 62:7 67:5,7,15
68:5,6,7,15 69:21
71:11 72:20 77:15
78:17 80:25 82:20
84:12 85:21 115:2
120:19 147:24
151:13 175:15
177:5
**responsive**

127:14 129:17,21
135:23 145:22
160:7
**restate**
22:25 40:7
**restricted**
88:9 167:6
**rests**
108:6
**result**
142:7
**resume**
74:11 202:2
**retain**
129:7
**retained**
35:23 36:24 56:21
117:19 119:17
121:9,13
**retains**
97:4
**retention**
57:6 59:7,8
**return**
68:23 109:24
**Returning**
5:20
**reveal**
122:18
**reveals**
145:14
**review**
16:5 36:17 105:12
108:24 119:13
121:5 122:18
125:12 155:13
168:3 175:17 176:3
**reviewed**
8:15 16:17,22 18:3
23:13 24:6 26:16
89:16 113:7 117:18
153:2 165:13,20
166:13 175:11
187:7
**reviewing**
18:6 39:12 166:23



171:13 173:4
**reviews**
174:20 175:21
178:13
**revisit**
111:3
**revolve**
83:5
**Ricky**
101:5
**right**
5:14 7:12 10:19 20:8
24:14 27:8 34:20
37:19 39:10 45:9,16
56:7 60:3 62:2 63:3
63:22 64:11 66:9
72:10,13,23 80:6,16
81:19 82:4 84:25
85:2 86:2 87:3,17
88:4 89:18 90:22
96:6 97:6 100:19
101:14,23 102:14
102:21 103:3 105:4
107:13,18 108:17
108:18,19 109:22
111:19 112:7
113:18 115:20,21
116:16 118:25
119:19,23 120:14
123:20,21 125:8
129:25 130:7
132:20 138:4,16,19
142:3,6,6 145:6
148:25 153:23
156:8 159:16
160:12 162:10,22
164:23 165:24
171:18 172:17
181:16 182:11,22
184:4 186:21,24
187:22 189:8
191:11 193:14
195:12 198:11
200:17 201:10
**rights**
5:18 29:6 104:10

109:12 193:12
201:19
**Rivka**
1:16 206:7,23
**RJC**
175:12
**RJV**
178:5
**road**
155:10
**role**
30:6 37:11 62:10
65:13 86:4,6 147:19
147:23 148:21
150:5,23 151:12,24
152:5,19
**roles**
148:3 150:4
**Ronggolawe**
164:5,12 166:20
**Ronggolawe's**
165:14
**roster**
82:6
**rough**
203:7
**round**
171:10
**Royal**
175:12
**RTC**
175:13
**rug**
47:12
**rules**
75:23 78:10 96:2
**running**
68:5

——————————
**S**
——————————
**S**
2:2 3:2 205:6
**Safe**
99:4,22 100:16 101:4
101:13,21 102:11
102:16,19,22,25

105:14 113:3
125:25 181:23
182:11 183:4,7
184:23 185:13
186:12
**safekeeping**
95:25
**safely**
179:10,13
**safety**
185:17
**Sales**
123:18
**sanction**
122:11
**sanctions**
93:17
**Sanders**
101:6
**sat**
7:20
**satisfied**
46:18
**satisfies**
75:17
**satisfy**
83:17 85:18,21 116:7
**saw**
29:9 38:20 39:13
41:6 44:15 47:20
49:17 50:7 51:7
53:22 54:13,24
55:14 56:9 58:12,15
58:23 59:13 60:17
153:25 181:6 197:8
**saying**
23:19 26:24 27:23
44:9 45:23 46:2
48:18 50:20 55:3,19
55:20 56:17 63:10
63:14 64:8,25 70:4
70:9 71:6,15 72:6,8
72:18 73:8 85:3
88:23 89:10 98:25
104:16 105:2 108:9
109:17 116:23

128:21 133:25
134:6,12 137:20
141:8 142:4,8
151:16,17 154:13
155:14 157:12
159:4 160:8,11,23
164:16 165:12,17
165:17,20 166:12
185:8,21 186:12,13
194:23 196:24
197:8 201:6,16
**says**
18:16 19:5 25:18
27:3,19 30:16 38:16
74:23 99:13,21
100:14,15 101:2,17
102:3,23 103:13,23
106:4 107:6,9
109:11 110:9 111:8
111:19 112:12,20
117:8 130:3 132:15
133:12 134:2,11
145:6 146:4 149:14
153:22 157:4
158:22 159:11
181:11,18 185:15
187:17,19 191:12
195:6 196:22
197:15
**schedule**
183:19,22 184:13,20
**scheme**
31:6 35:7 36:21 37:7
37:18 38:3,10,23
39:7,16 40:2,13
41:9 42:7,23
**SCHLAM**
2:13
**Schutzman**
119:9,21 124:2 125:6
146:2,21 194:24
197:5
**Schutzman's**
145:15
**science**
174:24



**scope**
18:18 29:5 30:2 36:5
36:14 37:10,13
38:13 39:3,19,20,22
40:6,19 41:16,20,25
42:3,19,24 43:4
44:11 45:7 46:14
49:3,7 50:19,21,25
51:3,19 53:3,5,10
53:18,21 54:3,8,17
55:22 56:4,18 57:6
57:20 58:13,17 59:6
59:8 60:24 61:4
62:12 64:7 65:12
70:20 73:11 99:2
100:18 101:16
104:15,21 105:21
110:6 117:11,15
119:4 121:11
124:10 125:15
137:12,13 166:22
192:7 199:20
**screen**
77:6 78:12 80:14
100:13 108:19
111:18 131:19
169:13 193:21
**screening**
93:16,17
**scroll**
8:9 16:11 17:4 78:12
80:13 98:13 112:13
123:14 197:12
198:5 200:5 201:3
**scrolling**
196:13
**se**
2:19,20 5:13 171:6
**seal**
185:19 186:6
**search**
176:12
**searches**
176:3
**SEC**
5:8 6:11,17 31:3,12

31:14 34:23 38:17
39:8 42:18 43:5
46:19 65:5 69:22
70:25 73:8 76:2
120:17 149:14
166:25 167:9,12,21
167:22 171:19,21
172:9,11,17 181:6
196:6 197:24
199:25 200:19
203:6
**SEC's**
5:2 7:3 17:15 37:4
42:17 43:2,24 71:9
71:25 73:15 140:14
151:23
**second**
17:11 53:10 74:21
110:15 127:7
132:16 135:6 170:5
189:3 191:10
195:25
**section**
25:12,25 30:7 38:15
**sections**
107:25
**sector**
10:25,25 11:4,18
13:5,13 33:2,3,13
33:14 75:11,19 83:5
83:6 89:20 90:2
174:17 177:5
178:17,23,25
**sectors**
93:19
**secure**
46:10 185:18
**securities**
1:3 2:4,5 35:11,12,14
35:19,24 36:6,12,16
56:20 58:19 59:17
60:20 150:17
**security**
147:16 157:8
**see**
8:12 16:8,9 17:8

21:19 23:14 24:7,17
25:10 29:14,16,20
36:19 39:4,23 40:10
41:3 42:3 43:12
44:2,19 46:23 49:10
49:22 50:22 51:2,5
52:20 53:12 57:24
59:3,4,10 60:5
61:20 65:4 67:4
70:17 73:9 77:13
78:13 79:8,8 80:14
86:25 90:19 94:18
97:8 98:16,24 99:15
99:16 100:14
101:23 105:5
106:13 107:12
108:18 109:5,9
111:18 112:15
117:21 118:25
119:7,25 122:3,14
123:24 125:4,16
126:4 128:18,19
129:16 134:14
137:6 138:5,9,10
141:25 145:24
148:9 149:13 153:6
153:7 155:13 156:6
157:2 164:7 173:2
177:21 181:10
182:21 183:18,21
185:13,14 190:25
191:5 193:20
194:13 195:11,19
196:6 197:23 198:6
198:21 199:2,12,15
**seeing**
38:6 56:11 72:2
121:18 148:5
153:11 193:18
198:16 200:12,13
**seen**
24:13 25:2,5 51:12
51:14 98:8,18
115:20 123:12,16
126:4,5 129:11,19
136:21 144:7

159:10 171:23
179:19 180:5,11
184:5 197:25
**sees**
201:7
**seller**
76:17 77:10,12 78:3
80:18 81:3,4,17
83:13 85:15,20
114:17 116:17,19
117:6
**seller's**
115:13 117:7
**sellers**
79:20,24 84:16
**selling**
35:4 191:7
**send**
197:22,24
**sending**
48:14
**senior**
22:7 25:6 68:7 69:4
69:13,18 70:18
**sense**
6:23 7:8 191:11
**sensitive**
183:24 184:4 185:4,5
**sent**
51:17 116:11 153:21
187:24 193:18
195:24 196:5
197:20 199:8
**sentence**
90:13 100:15 104:22
133:11,12 134:17
134:18 135:3
**sentences**
135:4
**separately**
22:18 202:12
**September**
149:18
**sequence**
101:8
**series**



35:4 76:3
**serious**
189:13
**served**
9:20
**serves**
173:11
**service**
184:17
**services**
1:23 9:25 163:8
  183:21,24 185:15
  186:7,20
**session**
6:14,22 15:23
**set**
31:11 33:17 168:24
  206:11,18
**seven-story**
150:20
**Seventy-five**
171:15
**share**
193:8
**shared**
21:20 24:4 27:16
  30:21 167:21,22
  184:18
**sharing**
193:8
**sheet**
188:21
**ship**
109:12
**shipment**
81:11 188:13
**shipments**
46:9
**short**
74:15 145:2 170:22
**shortly**
68:20
**show**
8:17 17:4 24:23
  48:14,17 117:24
  119:14 121:6 131:4

136:20 161:16
169:12 172:5,7,13
172:25 173:17
188:2 195:22
201:21
**showed**
146:18
**shown**
126:7 131:20 172:16
199:24
**shows**
137:9 172:19
**side**
115:13 117:7
**signature**
145:18 146:3,4,7
147:4
**signatures**
103:23
**signed**
106:23 118:15
  121:18 123:24
  124:3 125:4,7
  145:12 146:12,20
**significance**
40:3
**significant**
30:17,22 147:15
  157:7
**signing**
164:6,13 166:20
**similar**
10:3
**simple**
39:2 162:8
**simplify**
112:7
**simply**
44:15 49:16 56:8
  67:2
**single**
179:23 181:3,18
**SION**
61:16 62:2,4 66:3
  73:18 75:8 80:17
  85:16 88:11 90:23

91:5 101:20 102:10
102:24 103:16,21
104:5,25 107:11
108:6 115:12 123:9
123:19 124:4,14,23
125:8 126:3 132:18
132:20,24 133:4,10
133:13,16,18,22
134:11,11,14,17,19
135:8,9,14,15,18
137:3,6 138:2
139:24 140:10
141:12 142:25
181:7 187:23 189:6
189:12 205:16,19
**sir**
70:7 110:22 130:10
  134:4,4,20
**sit**
24:12,25 49:17 62:24
  119:15 121:7
  122:16
**six**
13:11,22
**skills**
178:12
**SKR**
97:25 98:2 99:5
  104:25 107:11
  112:22 116:3 128:7
  147:12 157:4
  181:10,21,24 182:2
  182:13,25 183:2
  185:6,8,9,12,12,22
  185:23 187:2,23
  188:3,6,23 190:4
  191:13 192:4
**SKRs**
187:12
**sky**
40:18,21
**slower**
201:3
**social**
76:21
**sole**

25:14 26:3
**somebody**
140:9 151:13
**sorry**
3:25 34:21 82:23
  88:21 90:11,17
  100:7 101:24
  107:14 112:15
  127:19,20 129:24
  132:21 139:10
  144:17 156:5
  160:13 161:16
  172:12 177:18
  200:15,20
**sort**
27:3 53:8 202:11
**sought**
147:3
**sounds**
63:14 144:18
**source**
66:9,9 77:8 81:12
  83:14 91:13 164:22
**sourced**
76:24 83:18
**sources**
79:6,14 151:6 153:7
  175:25 176:8,11,14
**sourcing**
76:22 80:25 82:21
  84:12 175:15 177:5
**SOUTHERN**
1:2
**space**
33:5 179:6
**speak**
76:11 157:9 197:16
**speaking**
6:25 194:6
**specialization**
174:16
**specialize**
174:14
**specializes**
163:7
**specializing**



32:20 174:3,16
**specific**
16:19,21 21:13,21
24:16 35:13,16 37:9
41:18 47:3,14,18
48:12 49:4 54:6
55:7 84:3 107:25
108:2 142:19
152:13 173:11,16
178:2
**specifically**
24:23 37:13 51:16
54:4,12 74:23 78:4
82:10 84:15 85:7
86:19 129:6 130:23
173:9 182:25
186:17
**specified**
25:12 204:11
**specifies**
107:16
**spend**
57:4
**spending**
56:25
**spent**
171:11
**Springs**
3:12
**SS**
206:4
**stacked**
179:8,11,14,17,23
180:9,14,16
**stacking**
180:2,4,5
**staff**
184:6,8
**stamp**
17:16 194:13,20
**standard**
79:12 96:19 163:3
176:23
**standards**
12:23 46:15 49:23
54:5 75:9,23 76:10

76:25 78:6,10 84:7
87:6,9,10,15,24
88:17,25 89:7,9,11
95:12 96:2,6,22
97:3,6,11,15 98:21
99:13 100:2,3,21,22
105:8 108:22 110:3
110:8 111:7,15,20
111:22 112:2,11
113:10,23,23,24
114:7,13,19 115:15
116:20 117:8,14
130:12 173:15
177:7,8,11,12
**stands**
161:9
**start**
16:4 22:19 23:2
35:15 108:2 155:5
168:22 183:15
202:2
**state**
1:17 3:4,8 60:17
80:12 90:10 147:9
158:14 173:25
206:4,8
**stated**
23:15 30:21 139:4
185:18
**statement**
62:19 82:24 104:21
121:25 122:7,10
141:11,22,24
151:16 153:16,18
154:7,8 155:8 170:9
**statements**
91:7 136:16
**states**
1:2 10:17 105:24
106:5,25 110:5
182:10 184:14
**stating**
25:3 125:21 126:14
182:3
**status**
30:12

**stay**
106:7
**step**
90:20 135:15 137:8
**Stephen**
1:8 75:3 147:10
**steps**
66:6 67:22 77:20
99:24 100:4,6 101:9
142:12 143:14
**Steve**
4:17 5:17 130:14
148:15 150:2,15
151:5 152:7 153:22
154:6,22 163:20
168:11 169:7 171:2
**STEVEN**
2:19
**stock**
191:2,8
**STONE**
2:13
**stop**
110:15 134:24 160:8
160:24
**stopped**
140:9
**storage**
66:13 91:17 174:25
180:24
**store**
180:23 181:3 184:4
**stored**
181:7,15 183:25
188:16
**storing**
91:20 179:5 182:19
184:3
**strategic**
18:24
**Street**
3:12
**stricter**
80:6
**strike**
120:23 126:17 127:2

127:12 159:17,25
**structure**
151:3
**sub**
38:16
**subject**
12:18,22 13:10 30:11
36:4 44:20 45:9,16
45:24 51:7 53:14
58:12 60:7,8 68:22
69:15 73:23 76:7
114:17 137:22
141:4,17 165:19
166:14,18
**subjects**
87:23
**submit**
122:7 129:17
**Subscribed**
204:18
**subsequently**
181:13 184:22
**subsidiaries**
18:23
**substance**
153:15 154:3
**suggest**
168:11 173:15 179:4
**suggesting**
119:16 146:10
**Suite**
2:5
**Sum**
2:6 3:25 4:5 5:8 6:10
6:16,25 7:16 17:6
17:14 19:15 20:3,18
20:24 22:13 26:21
28:15 30:14 35:21
36:22 38:11 39:18
40:14 41:10 42:8
43:16 44:7,21 47:8
48:2 49:2 52:24
53:17,24 54:16
56:14 58:4,14 59:11
60:12 61:9 62:9
63:4 67:17,23 68:16



74:8,13 110:15
111:10 127:7,19
131:6,23 134:23
144:12,15,18,23
155:4 157:23 161:2
162:6 168:5,15,22
169:16,20 170:19
172:3,12,22 173:18
174:11 175:2
176:25 183:12
188:4 190:5,13
194:9 195:10 196:7
196:11 197:10
198:3,12,22 199:13
200:2,24 201:15,23
202:5,9 203:6
**summaries**
15:11
**supplier**
81:17 85:15,16 90:21
90:22,23 91:19
92:16,16,24 114:24
114:24 115:5,8
116:6,8 117:13
**support**
10:2 31:16 81:9
121:23 150:13
**supported**
27:14 31:16 38:8,21
39:24 40:11 44:16
**supporting**
26:13 39:14 41:7
42:5 44:3 139:20
**supports**
137:24
**supposed**
131:12 189:10
**sure**
5:24 21:7 68:19 69:8
81:23 82:5 144:23
203:2
**survey**
14:6,6,12,15
**suspect**
169:21
**sworn**

3:3 7:21 204:5,18
206:11

**T**

**T**
204:2 205:6 206:2,2
**tab**
145:6
**take**
4:16,19 6:3 57:2
68:19 72:5 74:6,10
79:4 90:18 96:3
144:14,16 161:19
162:2 168:3 170:17
171:9 176:17
**taken**
4:13 43:25 67:22
74:16 142:11,11
143:15 145:3
170:23 186:21
**talk**
27:20,21 76:23,25
82:10 85:7 127:25
136:2 176:15
182:14 183:20
**talked**
95:15 130:2 136:5
192:5
**talking**
22:15 41:19 64:14
71:8 82:4 122:13
126:13 127:23
136:2 139:19
163:19 171:5
179:16 180:6
183:13 192:2
195:25
**talks**
78:13,16,22 81:21
103:17 109:18
122:5 125:21,23,25
126:9 129:6 130:9
136:24 137:2 148:2
150:3 151:5 152:7
152:19 195:14
**Task**

83:21,22 85:9
**tasked**
54:4 68:10 113:14,17
114:9,11,15
**tasks**
112:25
**tax**
12:22 174:4
**team**
14:14 22:8 33:5
50:18 148:18
178:16
**teams**
150:13,14
**techniques**
11:9
**telemetry**
177:9
**tell**
29:8 34:13 48:15
54:12 59:25 98:20
156:2,24
**telling**
109:21 185:21
**ten**
10:18,22 11:10 12:4
13:25 14:3
**tenanted**
150:15
**term**
28:3,8,24 136:7
141:5 152:14 154:5
**terms**
13:2 23:21 25:17
26:15 27:11 61:7
64:12 80:25 81:10
86:11 91:4,13 118:8
118:21 122:11
125:25 163:17
171:12 174:17
175:18 178:12,18
178:18 180:4,25
**terrorism**
13:9 32:24 66:6
78:19 83:9 86:24
88:9

**testified**
3:5 9:5,7,11,16,18
10:4 28:18 34:9
38:12 54:21
**testify**
47:13,18,20 204:5
**testifying**
110:16 155:3,4
194:16 198:13
**testimony**
3:19 7:21 9:19 10:6
26:22 30:25 34:19
95:15 128:16 141:3
189:15 194:5 204:6
204:10 206:13
**text**
35:8 74:23 164:3
165:11 197:13
198:15,16
**thank**
4:5,16 5:19 17:21
74:14 154:25
170:21 182:17
202:4 203:2
**Thanks**
195:3
**theme**
14:11
**theoretical**
172:15
**thin**
131:13
**thing**
27:22 52:10 58:7
64:5 76:15 79:8
87:17 90:25 154:12
174:15
**things**
63:2 71:12 101:2,12
106:6 112:21
113:17,18 149:10
189:10 194:9
**think**
22:14 40:20 41:4
51:10 53:8,9 57:9
57:15,18 58:22



72:25 137:23 139:5
139:12,15 146:9
155:12,16 158:9
160:4,6,21 161:5,9
162:8 180:7 186:25
198:9 202:5,11
**third**
82:24 95:3 100:14
109:10 116:4
192:20
**thorough**
165:2
**thought**
140:19
**three**
8:13 13:19,19 147:13
195:17 200:18
**time**
1:13 4:9,13,16,19
19:9,9,10,21 20:17
21:24 23:4 26:18
29:22 31:18 32:5
56:25 57:4,9 74:6
74:12 79:5 130:3
144:20 156:12
161:5 168:20,24
171:9,11 188:16
189:11 193:12
197:25 201:13
202:2 204:10
**times**
22:3 49:6
**title**
25:15 26:5 75:5 91:9
101:18 102:8,20,24
103:17 104:10,19
104:24 105:2
107:10,19 108:4,10
108:16 109:2,9,24
112:23 113:8
124:24
**titled**
128:11
**titles**
109:12
**today**

3:18 5:16 7:10,23
9:17,21 49:17 62:24
94:8 95:15 119:15
121:8 122:16
170:11
**today's**
6:6,14,22 7:15 8:4
15:22 123:7 145:5
**token**
52:12,13,22 53:15
54:8,14 58:2 59:3
60:10
**tokens**
35:4 51:13,15 60:18
61:6 151:3
**told**
130:25 133:14,16
135:10 136:19
137:16 138:2
139:24 141:13
142:25 181:14
**Tom**
2:15 3:15,25 6:16
17:6 38:16 40:16
47:9 56:16 68:16
107:14 110:15
112:15 127:8,17
128:6,10 129:24
131:9,16,18 134:23
135:3 138:6 144:12
146:17 159:22
160:22 162:7 193:7
**tomorrow**
197:21
**ton**
179:15 189:17
190:11,17
**tons**
179:5 180:20 181:9
182:20 187:23
191:16
**top**
11:11 12:10 103:24
104:3 151:11 153:5
177:23 178:21
180:9

**total**
171:11,11 176:20
**touching**
45:4
**tower**
150:21
**trading**
75:8 93:23 123:18
137:3 150:16
174:20 178:23
180:12,12 187:11
**traditional**
7:8
**train**
178:16
**trainer**
178:14
**transaction**
75:6,12 83:16 88:3
93:5 117:10 166:23
**transactional**
167:6 174:19
**transactions**
129:9 136:25
**Transcard**
180:25 187:13
**transcript**
155:13 203:5 204:9,9
**transferred**
113:8
**transport**
188:10
**transported**
92:7
**trial**
9:6,9,12 21:9
**tried**
56:16
**Trop**
1:16 206:7,23
**Troy**
1:7 2:14,18 3:15 5:6
48:8 75:2 118:11
119:16 125:18,22
126:9 128:7,13,19
129:6,12 136:23

137:9 140:12 150:5
150:6,23,23
**true**
161:25 204:9 206:12
**truth**
204:5
**try**
46:6 57:17 110:21,25
111:3 112:7 121:2
155:10 162:10
193:8
**trying**
23:20 33:7 41:21
63:13 70:8 110:17
113:16 120:6 121:4
131:4,21
**turn**
8:24 18:11,13 19:3
61:12 74:17 107:3
132:10 147:5
155:17 163:24
169:6
**turning**
47:10
**turns**
51:2
**two**
8:12 12:10 22:24
80:8 84:2 95:23
112:21,25 113:17
113:18 148:4 151:6
151:10 153:4,7
168:8,10 183:13,22
186:19 192:6 194:9
**type**
11:25 104:2 155:11
**typical**
93:15
**typically**
92:5

---

**U**

**U.K**
14:16,21,22
**U.S**
35:11,12,13,19,24



36:6,12,15 46:10
58:19 59:17 60:20
78:17 83:10,22 85:5
85:6,12 89:22
**UA**
175:14 178:10
**UAE**
79:9,17,25 82:18
84:8 85:7,8,12,17
87:17,20,24 88:10
**UE**
12:24 13:7,11 32:11
33:17 81:19 83:11
83:19,20,23 88:4
89:19 92:2,8 93:8
93:23 175:8 177:23
178:9,24 187:8
**ultimate**
44:17
**ultimately**
68:15 127:2
**unclear**
139:15
**undergone**
78:21
**understand**
7:13,18,19 11:17
23:5 48:18 55:12
56:10 64:16 71:5
85:4 86:15 88:18,23
94:3 97:13 101:10
108:8 126:18
133:24 134:19
137:19 139:11
143:5 150:6 151:15
165:16 181:12
**understanding**
6:12 20:4 21:25 22:5
22:11,20 23:6,11,15
26:17 27:25 28:6
29:24 69:9 88:13
124:14,23 205:18
**understood**
27:7 197:7,7 199:3
200:22
**undertake**

3:23
**undisclosed**
25:19 26:6 27:3,24
28:2,7,14,22
**Unfortunately**
156:12
**unintelligible**
46:16
**UNITED**
1:2
**universe**
165:18,22 167:5
**unresponsive**
126:24
**untrue**
154:15 155:9
**upper**
145:6
**use**
136:6 145:7
**uses**
97:9

--- **V** ---

**valid**
43:6
**validate**
26:12 30:3 43:6
46:12,16 51:20,22
81:8 94:22 121:12
142:12 175:16
192:10
**validated**
63:24 78:2 185:2
**validating**
62:13 73:12 91:7
100:23 122:23
186:10
**validation**
92:22 94:21 103:18
106:16 156:15
159:5 187:13
192:25 197:2
**validations**
79:3
**value**

81:7,7 184:11,12
**VARA**
32:17
**various**
77:14 78:14 83:4
86:20 88:25 89:17
99:12 136:15
143:24 148:3
**vault**
91:23 92:17 179:8,23
179:24 181:3,8
182:22 184:2
**vaulted**
61:19 191:14
**vaulting**
91:17,19 123:18
182:5,20 183:23
186:7,18
**vaults**
180:2,11,12 188:15
**verbally**
5:25
**verification**
54:6 71:22 77:2 91:2
91:3,10 94:25 100:6
113:22 115:18
143:9 155:22 156:4
156:6,14,19,20,23
157:13,21 158:5,16
159:6 161:15,22
162:4,14 163:4,8
173:8 174:10 177:9
177:17,20 178:12
188:9,18 192:19,25
196:25
**verified**
61:16 62:2
**verify**
81:4 95:25 97:25
116:3 129:8 136:25
137:7 191:19 192:9
**verifying**
173:14 176:7
**Veritas**
147:12 152:12 156:7
156:12,17 158:25

159:14 163:6,15,23
173:7,21 189:22
192:21 193:24
194:2,5,7,23 196:2
196:20 197:15
198:20 199:12,21
200:16
**version**
18:3,7,9
**vests**
101:20 102:10,24
104:25 107:11
109:13
**Victoria**
150:19 151:19
**videoconference**
1:16 133:15,17,23
135:11,13 138:3
139:25 140:11
141:14,21 143:2
**view**
19:22,23 20:14,21,23
20:25 21:12 28:12
28:21,24 29:7 38:21
39:6 141:17 153:13
154:3
**viewed**
58:24
**Villa**
3:12
**Virtual**
32:16
**visionary**
150:24
**volume**
180:17
**volunteer**
127:4

--- **W** ---

**W**
1:8 2:20
**wait**
133:7 183:12,12
190:5,5,6,6 198:4
**want**



4:3 9:3 17:19 28:25
35:8 40:24 46:3
47:13,16,19 48:14
55:8,10 69:8 82:9
88:18 90:7 97:23
100:8 106:10 107:8
111:2 122:8 129:3
132:6 137:23
140:21 143:9
145:13 155:5,10
169:2 171:3 172:5
172:10,25 191:4,8
194:17 200:25
**wanted**
4:2,7,24 47:17 94:22
135:25 138:8 140:2
145:23 146:9,11
147:14 157:5
163:10 171:6
**wants**
59:5 172:14
**wasn't**
48:20 116:16,23
**way**
20:14 41:23 49:11
60:4 89:8 106:18
110:20 126:19
135:19 148:14
162:8 180:16 188:8
206:16
**ways**
138:7
**we'll**
16:13 27:20 41:3
57:11 95:7 98:7
134:20 143:11
**we're**
8:2 9:21 56:24 64:4
71:7 73:24 82:3
148:22 155:8
198:19 202:9
**we've**
53:8 57:18 136:5
142:15 153:2 168:6
178:13 179:19
**wealth**

66:10 83:15 91:14
**websites**
176:13
**weigh**
100:8
**weighing**
199:9
**weight**
61:17 81:6 92:10
**welcome**
145:21 169:24
**went**
15:12 73:17 128:12
129:19 156:9
**weren't**
172:8 187:23
**WHEREOF**
206:18
**whichever**
180:16
**white**
11:23 14:19,22 49:9
148:7
**widely**
75:16
**Wikipedia**
176:12
**willing**
171:25 172:18
**wish**
51:4 129:22
**witness**
3:3 6:18 19:16 28:16
38:11 42:9 43:17
44:23 57:9 58:23
74:7,9 110:16
127:17,20 128:5
134:24 144:14
159:19,21 162:9
199:9 200:3 201:2,9
203:2,10 206:10,13
206:18
**words**
9:9 75:20 153:15
154:3
**work**

29:5 30:3 32:21,24
36:14 37:10,13 39:4
39:20,22 40:6 41:20
41:25 42:3,24 45:7
49:3 50:19,21,25
51:3 53:6,19,21
55:22 56:4 60:24
64:7 70:20 73:11
99:2 104:15,21
117:12,16 121:12
121:25 122:7,10,12
122:14 124:10
125:16 137:12,13
166:22 171:16
187:10 192:7
199:20
**worked**
32:2
**working**
9:23 32:21 33:15
34:7 66:14 187:6
**works**
126:19
**world**
189:10
**worth**
61:18 169:17 193:6
**wouldn't**
46:17 54:9,9 55:10
73:11 114:2 166:2
191:11
**Wow**
179:2
**write**
31:25 34:23 82:2
134:7
**writing**
46:24 47:22 48:24
49:19 50:8 51:8,24
**written**
3:19 11:3,5,8,10,20
11:22,24,25 12:8,12
13:2,9 14:2,10,15
115:23 124:8
125:13 145:17
161:17

**wrote**
14:18 15:12 31:13
62:23 147:11
**www.MagnaLS.com**
1:24

---
**X**
---
**X**
1:3,10 193:7 205:2,6

---
**Y**
---
**yeah**
125:16 133:11
**year**
175:10
**years**
9:6,8,13 10:19,22
11:2,10 12:4 13:12
13:25 14:3 150:18
174:2
**yesterday**
76:2
**York**
1:17 2:15,15 3:4
74:12 206:4,8

---
**Z**
---

---
**0**
---
**002**
125:17
**003**
125:18

---
**1**
---
**1**
3:12 8:3,7 61:12,13
74:21 80:15 82:12
83:25 106:11
112:20 113:4
132:12 183:22
184:13,21 190:22
192:4 205:13
**1,000**
171:16
**1:00**



1:13 197:22
**10**
46:11 75:5 76:8
77:13 78:16 124:24
193:6
**10/26/2018**
193:24
**100**
178:21 180:10,15
**10004**
2:15
**11**
77:13
**12**
1:12 187:8
**121**
2:10
**124**
205:18
**12th**
206:19
**13**
148:2,11
**1314**
2:10
**14**
48:9
**15**
132:10,13 139:4
141:11 144:11
147:6,8
**1500**
182:18
**16**
155:18 157:22
158:17 200:11,17
205:14
**171**
205:5
**18**
163:25
**19**
32:9
**1950**
2:5
**1988**

149:18
**1A**
101:5

**2**

**2**
15:22 16:3 17:16,21
19:18 82:13 83:19
84:7 94:15 95:23
103:8,9,11 112:22
113:4 145:8 155:20
182:22 192:5
205:14
**20**
204:19
**200**
180:10
**2009**
14:7,10
**2010**
14:16,17
**2011**
14:7,14
**2012**
78:20
**2018**
12:25 15:24 16:2
32:9 48:9 80:3,7
100:15 103:14,20
104:7 109:6 128:12
137:18 147:10,20
149:18,25 186:22
205:14
**2019**
197:14 198:20
199:11 200:17
**2021**
31:10 32:7
**2024**
8:5
**2025**
1:12 206:19
**22-cv-2317-DAMI...**
1:6
**23**
147:20 195:16 196:2

205:16
**23rd**
147:10
**24**
174:2
**25-page**
8:11
**25KG**
179:19
**26**
2:14 15:24 16:2
128:12 137:18
195:12 205:14
**28**
144:2
**2C**
113:6

**3**

**3**
84:9 98:7,11 103:14
104:2 145:7 205:5
205:15
**3:00**
74:12
**30**
196:24
**3000**
177:6
**33131**
2:6
**33301**
2:11
**395**
179:5,15 180:19
181:8 182:20
191:16
**395,000-kilo**
179:16,22 180:8,22
181:4

**4**

**4**
25:23 74:18,20,21
123:6,10 205:16
**48**

184:19

**5**

**5**
8:5 124:15 145:5
149:15 205:18
**5:30**
170:20
**50**
180:15
**51**
18:14
**51.1**
18:16
**54003**
128:11
**56**
19:3
**56.1**
19:4
**5th**
149:25

**6**

**6**
199:11
**6:15**
203:9
**60**
26:9

**7**

**7**
61:12 80:12,12,14
95:22 162:25
164:25 197:14
**7/5/2018**
149:24
**75**
171:12 176:18

**8**

**8**
78:9,13 86:21 87:2
103:20 104:7 109:5
198:20 205:13



**801**
 2:5
**866-624-6221**
 1:23
**87,000**
 180:20

---
                    **9**

**9**
 3:12 185:14
**98**
 205:15

