**EXHIBIT**

**4**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No.: 22-cv-23171-DAMIAN/D'ANGELO


SECURITIES AND EXCHANGE COMMISSION,

        Plaintiff,

v.

ARBITRADE, LTD.,
CRYPTOBONTIX, INC.,
TROY R.J. HOGG,
JAMES L. GOLDBERG,
STEPHEN L. BRAVERMAN and
MAX W. BARBER,

        Defendants.
_____/


Wednesday,
June 11, 2025


11:06 a.m. to 2:02 p.m.
Via Zoom


_____

DEPOSITION

OF

FAISAL AHMED
_____

APPEARANCES:


On behalf of the Plaintiff:

U.S. SECURITIES AND EXCHANGE COMMISSION
BY: ALICE SUM, ESQUIRE
801 Brickell Avenue
Suite 1950
Miami, Florida   33131
(305) 982-63000
sumal@sec.gov

On behalf of the Defendant:

MAX W. BARBER, PRO SE
1028 S 1900 E
Salt Lake City, Utah
(801) 518-1821
Maximas25@me.com

STEPHEN L. BRAVERMAN, PRO
Sbraverman22@gmail.com

JAMES GOLDBERG, PRO SE
James_Goldberg@msn.com

<u>I N D E X</u>

| <u>WITNESSES</u> | <u>Direct</u> | <u>Cross</u> | <u>Redirect</u> | <u>Recross</u> |
|---|---|---|---|---|
| <u>FAISAL AHMED</u> | | | | |
| (By Mr. Barber) | 4 | 104 | -- | -- |

| <u>EXHIBITS:</u> | <u>Marked</u> | <u>Received</u> |
|---|---|---|

```
1              P R O C E E D I N G S

2                                          (11:06 a.m.)

3   Whereupon,

4                    FAISAL AHMED,

5   previously having been duly sworn, was called as a witness

6   herein and was examined and testified as follows:

7           MR. BARBER: So this is Max Barber acting pro se. And

8       I'll be taking the deposition today.

9           MS. SUM: This is Alice Sum. I am counsel for

10      Plaintiff, Securities and Exchange Commission.

11          MR. BRAVERMAN: This is Steve Braverman, pro se.

12          MR. BARBER: Thank you. Again, thank you everyone for

13      your time, and especially Mr. Ahmed for joining so late. I

14      know the time difference is never fun, so I appreciate

15      your time and patience with us.

16          Before I begin, I just want to go over some basic

17      formalities to cover the correct points.

18          I know you've already stated your name for the

19      record.

20                    DIRECT EXAMINATION

21      BY MR. BARBER:

22   Q    Have you ever had your deposition taken before?

23   A    The one in March, the deposition on this case.

24   Q    Okay. Perfect.

25          Do you understand that you are now under oath, today,
```

1    and the testimony carries the same weight as if you were in a

2    Court of law?

3        A    Yes, I understand.

4        Q    So we must, for the court reporter, we need to make

5    sure we provide verbal answers, not a head nod. You've been

6    through it before, so I want to make sure that I record that

7    correctly, so I might interject just to say, yes, I don't want

8    to be rude, but just for the record --

9        A    Yes.

10       Q    -- to make sure that's correct.

11       A    That's fine. Yes.

12       Q    Also, I want to make sure that you understand any of

13   my questions clearly. If you don't understand a question, let

14   me know, and I'll be happy to rephrase it.

15            So if you answer a question yes, then I'll assume

16   that you understood it.

17       A    Okay. Yeah.

18       Q    Perfect.

19       A    Yeah.

20       Q    And then, if you need a break at any time, just let

21   me know and we'll take a quick break --

22       A    Sure.

23       Q    -- or what have you.

24            I might take a coffee break.

25       A    Yeah.

1    Q    So if you can begin, Mr. Ahmed, would you start with

2    your professional background, just a brief summary, and

3    describe your current employment.

4    A    So I've already stated that, in my previous

5    deposition, and it's there in my expert report. So if you see

6    last year, when the expert report was submitted, my

7    qualifications are already mentioned there.

8         But did you want me to repeat that? I mean, it's

9    already mentioned in that previous deposition, also I covered

10   it.

11   Q    Maybe what we'll do it we'll fast track for the time

12   allotment. Just give me an idea of your current employer, or if

13   you hold a company, you're a director, if you could give me you

14   qualifications on that as of today.

15   A    I'm the managing partner and CEO for AKW Consultants.

16   It's a group of companies based out of the UAE. And we

17   specialize in regulatory compliance work. So we specialize

18   particularly with a niche in the precious metals sector.

19        And I'm a named UAE Delivery Auditor, as well, so UAE

20   delivery, the standards which apply. And we've been working

21   extensively in this space since the regulations came into

22   effect for the designated month, and businesses, so the

23   precious metal sector. So we work with multiple refineries,

24   gold trading companies, in this region, and globally.

25   Q    Perfect. So would it be correct to say that that's

1    your full-time employer?

2         A    Yes.

3         Q    Okay. Now in your testimony, you've represented that

4    you've worked with Sam Gold.

5         A    Right.

6         Q    What is your interactions with Sam Gold, or your

7    employment with them?

8         A    So Sam Precious Metals is one of my clients. So as I

9    mentioned, I run a consulting firm. And I act as the group head

10   of Compliance for Sam Precious Metals.

11          The team, I lead the team at Sam Precious Metals. We

12   manage the entire Compliance for Sam Precious Metals. So we

13   work extensively with Sam Precious Metals. And in the last one

14   year, I have added this to my experience, the addendum that I

15   submitted, that we have been -- we have conducted audits of

16   several other refineries in the UAE.

17        Q    Okay.

18        A    So the responsibility of audits, yes.

19        Q    Okay, perfect.

20          So it would be correct to state that AKW Consultants

21   is where you have your work visa, residency visa, through that

22   company, not through Sam Precious Metals?

23        A    No.

24          AKW Consultants, yes.

25        Q    All right.

1    A    And we have an agreement with Sam Precious Metals,

2 ongoing, for almost four years now, yes.

3    Q    Okay, so for four years, you said.

4    A    Yes.

5         If you see in the, yes. We started engaging with

6 them, I don't recall the exact date, but in 2021. And since

7 then we've been working with them.

8         So the -- the Global Head of Compliance is one of my

9 directors who reports into me. The Compliance Team at Sam

10 Precious Metals, they report into me.

11    Q    Okay. Okay. Fair enough.

12        Going back to the beginning of your engagement with

13 this case, in particular, how did that come about with your

14 engagement, and contract, with the SEC to provide your expert

15 testimony?

16        About what time did you start working on your report

17 as an expert for the SEC?

18    A    So that was last year. Exact dates, again, I don't

19 Recall. I'd have to look at the contract when it was signed.

20 But I submitted my report, which is dated March the 5th of

21 2024.

22        So that's the date of my report. And prior to that we

23 engaged with -- with the SEC. The exact dates would be in the

24 engagement letter with the SEC.

25    Q    Okay, so the engagement, would that be the same as

1    what you referenced just a moment ago, a contract with the SEC?

2         A    Yes.

3         Q    Is that --

4         A    Yes.

5         Q    -- all in the same --

6         A    Yes.

7         Q    Okay.

8              MR. BARBER: And then just for the record, Alice, has

9         that been produced as far as part of your production?

10             MS. SUM: I don't believe there was a Request for

11        Production for the contract. But I don't have an issue

12        with providing a copy of the contract.

13             What I will represent to you is it looks a little bit

14        different than, I mean it's like a contract that's in like

15        a federal kind of standard form.

16             MR. BARBER: Okay.

17             MS. SUM: Versus like a letter engagement, which we

18        often see in private practice, et cetera.

19             MR. BARBER: Okay. That would be great. So if you

20        could provide that that would be fantastic, after this.

21             BY MR. BARBER:

22        Q    On that note, was that contract engagement for you

23   personally, or under AKW Consultants?

24        A    So me personally. But again, AKW Consultants is my

25   firm, so I own the company.

1     Q    Understood.

2     A    So I was one hundred percent owner. Yes.

3     Q    Okay. Okay, perfect.

4     A    I said there are several companies, AKW. Because of

5   jurisdictional requirements, not every activity, all activities

6   cannot come under one license. AKW Tax became Accounting and

7   Consultants. They could review consultants. They could review

8   accounts. They could review investments. So collectively, AKW

9   Consultants is the brand.

10    Q    Okay, and then is AKW, for jurisdictional purposes,

11  just referencing what you've disclosed there, is that, which

12  free zone is that under, in UAE, or is it a UAE free zone

13  company?

14    A    So we have AKW Consultants, LLC, which is the

15  mainland company. We have AKW Consultants, DMCC, which is a

16  DMCC company. We have AKW Consultants Accounts, which is a

17  mainland company. AKW Consultants -- AKW Tax became Accounting

18  and Consultants --

19    Q    Okay.

20    A    -- which is a mainland company.

21         So we've got, as I've mentioned, because you can't

22  have tax with -- with accounting, or consulting with. So that

23  is the reason. Plus, we needed multiple offices. So that is the

24  reason we have the free zone entity, because we have an office

25  in GLT, next to Almas Tower, so in Saba Tower. And then, which

11

1   is where I'm sitting at this point.

2           And then we have office in Business Bay, which is the

3   mainland. So that's how --

4       Q   Oh, yes. Business Bay is nice. I enjoyed my time in

5   Business Bay.

6           So it's fair to say that you have different

7   businesses with different trade license activities, and that's

8   why you have multiples in different areas, to facilitate the

9   different needs of your clients, and so forth.

10          Would it be correct to say that the general activity

11  of these licenses is consulting, or is it different from like

12  accounting and other formats?

13      A   So how we position ourselves is regulatory

14  compliance. If you say regulatory compliance on Anti-Money

15  Laundering and Counter-Financing of Terrorism, AMLCFT, we have

16  responsible sourcing on the precious metal sites, so meeting

17  the OACD Guidelines on responsible sourcing.

18      Q   Okay.

19      A   Conducting UAE Delivery Audits.

20          So the requirements, we've assisted clients with RJC,

21  the Responsible Jury Counsel. That court of practice, the chain

22  of custody, you know, the COP and the COC Accreditations.

23          We work on the other regulatory elements which have

24  been introduced in the UAE. So for example, the VAT Indirect

25  Taxes, which were introduced in 2018. The Economic Substance

1    Regulation, which came into effect in 2019. The UBO

2    Declaration, which came into effect in 2019 and 2020.

3         We've been working on the corporate tax, which is

4    also a regulatory requirement.

5         So we are basically a regulatory compliance firm. And

6    we -- we specialize in the precious metals sector. So our

7    specialization is in the precious metals sector working, as

8    I've mentioned, working with multiple refineries and trading

9    companies.

10   Q    Okay, so to dive into that part a bit more, can you

11   explain what your interactions are with, we'll use Sam Precious

12   Metals as an example, what your company's interaction is with

13   them as far as the precious metals is concerned. As far as the

14   import, the KYC, the AML, and so forth?

15   A    Well, as I said, regulatory compliance. So acting as

16   a Group Head of Compliance we look at all aspects of compliance

17   from meeting the AML Requirements, the Anti-Money Laundering

18   Requirements.

19        The, well, running the compliance function, which is,

20   you know, the onboarding of new customers, due diligences of

21   new counter-parties, suppliers, and buyers.

22        Transaction monitoring. So looking at all the

23   transactions, the shipments that come in.

24        So we validate, my team actually validates, from a

25   compliance prospective, all the documentation. So the standard

1    operating procedures.

2          We also assist with -- with mapping, in terms of the

3    financial accounting, in terms of, you know, now with the

4    corporate tax, as well.

5          They have Independent Financial Statement Auditors,

6    so the standards of the audit is conducted by a separate form,

7    but we have the in-house Finance and Compliance Team. Finance,

8    Compliance, and Legal.

9          So we look at all the elements in terms of the

10   compliances.

11   Q    Okay, so as far as hitting on the note of your team

12   will validate the documentation of the import, what does look

13   like, specifically?

14   A    So all the, for example, we conduct internal audit,

15   inherent risk assessments.

16         We -- we review all the transactional documents which

17   are there.

18         We look at shipments, how the, you know, the

19   shipments take place, to make sure that all the documentations,

20   the audits, the inventory, you know, the periodic reviews, the

21   inventory, which is the, to satisfy the external auditors, you

22   know, as far to -- to insure that the inventory is correctly

23   reported in the balance sheet.

24         So we gather the documentation. We look at -- we

25   conduct the inventory count alongside the external auditors on

1    a periodic basis.

2            We do the verification of the documentation, in terms

3    of the goods in transit, the shipments, the insurance. We look

4    at the insurance documentation.

5            The storage, you know. Particularly when -- and when

6    we are conducting the due diligence on the counter-parties, we

7    dig into much further detail, enhanced due diligence. Given

8    that, you know, gold and precious metal usually fall into the

9    high-risk sector.

10       Q    Right. Okay, so would it be fair to say that you also

11   interact with Dubai Customs, and Transguard, Donata, and so

12   forth, to validate shipments, and so forth?

13       A    Yes.

14           So we --- we engage with Brinks, Transguard, World

15   Ferrari, the logistics service providers, you don't typically

16   use in Dubai.

17           We engage with the relevant regulatory authorities,

18   whether it is the Gold Policy Team, like the DMCC, we

19   extensively engage with them.

20           We engage with the Almas Tower, you know, the team at

21   the storage. The vaults which are there -- at the DMCC Vault

22   which is there on Sheikh Zayed Road.

23           You know, for our clients, it could be Sam's counter-

24   party, or it could be other clients. We work with a number of

25   clients in the gold and precious metal sector. So there are

1    instances where we need to engage with various regulatory

2    bodies.

3              So Ministry of Economy with, you know, the other,

4    when you look at the -- the gold and previous metals desk, or

5    the EBC, the Emirates Bullion Committee. Which is there for the

6    UAE delivery.

7         Q    Okay, so I mean, it would be fair to say, from what

8    you're saying, you have a wide range of assets to go to,

9    government authorities to validate, and to check the relevant

10   sourcing, and metals that are being imported, would that be

11   correct?

12        A    Yes.

13             Yes, and we also as I mentioned, we also get

14   responsible sourcing. So we do the supply chain review. So we

15   also conduct site visits. So site-based due diligence, which is

16   part of enhanced due diligence from the sourcing countries.

17             So my team actually travels to the sourcing countries

18   in Africa and Latin America to validate the supply chain.

19        Q    Okay.

20        A    And we produce reports on behalf of our clients. The

21   reports get submitted to the -- to the Emirates Bullion

22   Committee of the Gold Policy. That's their DMCC, or even to the

23   OECD, at times.

24        Q    Oh, that's fantastic. So I would assume so you've

25   provided multiple reports like this with the SEC.

1          Is this the first time you provided a Precious Metals

2    Report, such as this, to the SEC, or have you provided

3    testimony before to the SEC?

4          MS. SUM: Objection, form.

5          THE WITNESS: Yes.

6          MS. SUM: You can answer.

7          THE WITNESS: No, I'm just saying, this is the first

8       testimony for the SEC. The first engagement with the SEC.

9          BY MR. BARBER:

10   Q    Okay, so this is your first engagement with the SEC.

11   Is it your first time providing expert testimony in a U. S.

12   jurisdiction venue?

13   A    Yes.

14   Q    Okay. When you were provided the documentation to

15   perform your work for the report, what documentation did you

16   rely upon?

17   A    So the documentation, I have listed the documentation

18   in my expert report. So there was, you know, several documents

19   which were provided to us, and I've listed, there is a list,

20   it's a long list of all the documents, as part of my expert

21   report, which we have relied upon.

22   Q    Okay. I think I --

23         MR. BARBER: Just for the record, I'm just going to

24      put a copy of your report, I'm going to share on-screen,

25      if I could figure out how to do that.

1         MS. SUM: If you want to, I believe I've asked the

2    witness to have the report in front of him, as well.

3    Because I know we have had some kind of like glitches

4    with, you know, lagging pages.

5         So it's up to you how you'd like to handle it. But

6    that was meant to help you, given some of the --

7         MR. BARBER: Thank you. No, I appreciate that, for

8    sure.

9         I think this might work. It might be easier just to

10   manage time, and being able to show it.

11        Okay, so I just sent a request to be able to share.

12        Perfect.

13        Let's see, I think it's -- Okay. I think I've got it

14   now.

15        Got it. Okay.

16        MS. SUM: We see your computer screen, not the report.

17        MR. BARBER: Perfect. Okay. Can you see the screen

18   here, with the exhibit?

19        MS. SUM: I can see it, but it's small.

20        I'd defer to the expert whether he can see it large

21   enough.

22        THE WITNESS: Yes, I can see it.

23        I can see it.

24        BY MR. BARBER:

25   Q    Okay, so this is what I have for your expert report.

1       A    MM-MMM.

2       Q    Prepared March 5, 2024.

3            Does that look accurate?

4       A    Yes.

5       Q    Okay, so this looks like a true and accurate copy to

6   you?

7       A    Yes.

8       Q    Okay, so we'll just go down to, so here is your

9   professional experience, as outlined, as you stated earlier.

10  Does that look accurate?

11      A    Yes.

12           That's the one which I used last year.

13           Now I also submitted an Addendum from additional

14  experience that we've gained in the last one year.

15      Q    And just --

16           MS. SUM: And that was produced to all of the

17      Defendants in the case, as well as additional documents

18      that the expert reviewed after the issuance of his report.

19           MR. BARBER: Understood.

20           BY MR. BARBER:

21      Q    So in just summary, could you summarize the

22  additional Addendum that you uploaded?

23           MR. BARBER: I'm sorry. I'll rephrase the question.

24           BY MR. BARBER:

25      Q    Would you summarize the Addendum of what that

1    included to be added to your experience?

2         A    So since March 2024, the 5th of March 2024 is when I

3    submitted this report. And since then, up until March of 2025,

4    so the several other projects, engagements that we've done,

5    I've added that to my experience.

6              So the Addendum was shared. If you can show the

7    Addendum to me, I can talk you through that.

8              So a number of Ministry of Economy led audits for our

9    reviews on responsible sourcing of gold for precious metal

10   refineries across the UAE. So I've highlighted that experience

11   in -- in my Addendum.

12        Q    Okay, so it would be fair to say that it's more the

13   experience you've had in the previous metals field with, as we

14   were talking earlier, with Sam Precious Metals, and a couple of

15   other clients you referenced?

16        A    Yes.

17             More clients and more regulations. And if you see,

18   UAE, there are stringent regulations which are being put in

19   place, or as a result of which several inspections, or audits,

20   or reviews, are taking place.

21             And where we, as a foreman, myself as an expert, have

22   supported, or assisted our clients, or conducted these reviews

23   on behalf of the Ministry of Economy, I have highlighted that

24   in the Addendum, just to add to the, you know, to the

25   experience.

1    Q    Okay, so with the Addendum added, of course, and it's

2   been produced, so we'll add it into, it's already on to the

3   record, but --

4    A    MM-MMM.

5    Q    -- with the Addendum, would you confirm that the

6   opinions in the report are complete and final?

7    A    Yes.

8    Q    Okay. Are there any other opinions you hold in the

9   matter that you would like to express, that aren't expressed in

10  the report?

11   A    Can you repeat the question, please?

12   Q    Yes. Sorry.

13       Is there any other opinions, or factors that you

14  would like to add into the report, that you have now, that you

15  haven't had a chance to add into the report?

16       MS. SUM: I'm going to just object. I mean, he was

17      deposed for five plus hours asking for explanations

18      regarding his opinion. So just want to note that.

19       THE WITNESS: Well, I'd stick to the, my opinion. To

20      my --

21       MR. BARBER: Okay.

22       THE WITNESS: My opinion remains the same, yes.

23       BY MR. BARBER:

24   Q    Okay. I just wanted to see if you wanted to add

25  anything to it, at this point in time, with the information

1    you've had. No problem.

2          So for each opinion that you've expressed in the

3    report, you would say that you believe that you've used the

4    correct methodology, and generally accepted practices in the

5    field, as I've read through the report, would you agree with

6    that?

7          A    Yes.

8          Q    Okay. Now, in composing the report, as we've

9    mentioned earlier, we're talking about the documentation you

10   relied upon, and I believe that's here. So documents reviewed

11   and relied upon.

12          MR. BARBER: And I'll just list them out for the

13       record.

14          The SEC's Complaint.

15          Defendants' Answers and Affirmations.

16          Gold Procurement Vaulting Trading, Consolidated

17       November 28, 2018. Contract signed under Arbitrade.

18          Email to Cryptobontix May 24th, and then July 5th.

19          Agreement between SION and Bokhem.

20          Arbitrade Press Releases, January 8th, 9th, November

21       5th.

22          And then we have the Asset Pledge Agreement, the 3rd

23       of July.

24          Then we have BDO U. S. Master Service Agreement.

25          Blog Post UBS goes down.

1           Nope, sorry.

2           Emails between Braverman and Bureau of Veritas.

3           G4S Safekeeping receipt.

4           Exhibit 13, 14, G4S 2018 Year-End Statement 57, Email

5      date June 14, 2018 from Larry Meyer's.

6           Max Barber Document Production, MOU, between SION and

7      Arbitrade, dated 18th of June 2018.

8           Market Value by Geologist James D. Rasmussen.

9           SEC Production labeled BRV023386 and 87.

10          Email from David Segal, August 14, 2018.

11          Email from Hummam Khadim from SION, August 8, 2018.

12          SION Arbitrade Assignment Agreement.

13          SION G4S Agreement.

14          SION G4S Agreement, Exhibit 6.

15          UBS Gold Documents.

16          Video produced by Max Barber.

17          UAE Good Delivery Standard.

18          LBMA Standard.

19          OECD Due Diligence Guidance of Responsible Supply

20     Chain for Minerals from Conflict Effected in High-Risk

21     Areas.

22          The Ministry of Economy Due Diligence Guidance and

23     Responsibilities Supply Chain Minerals.

24          Decree of Lot Number 20 of 2018 of Anti-Money

25     Laundering from the United Arab Emirates.

1          The Cabinet Decision Number 10, 2019, of the UAE.

2          LBMA Best Practice Guideline.

3          And data on gold reserves by country as of December

4     2023.

5          Transcripts of depositions taken of Max Barber taken

6     May 6, 2021, and May 26, 2021.

7          Email exchange with BDO.

8          Securities Act of 1933.

9          Securities Exchange Act of 1934.

10         And the Securities Exchange Commissions website.

11         Does that all read accurate, and do you confirm with

12    that?

13    A    Yes.

14         MS. SUM: Objection to the question, only to the

15    extent that the SEC provided to the Defendants all of the

16    documents that were sent and relied upon by the expert.

17         MR. BARBER: Noted.

18         BY MR. BARBER:

19    Q    So in the review of all these documents, and you said

20    your engagement started roughly around 2023, with the SEC for

21    the report?

22         Was it correct that you referenced your engagement

23    with the SEC started around 2023?

24    A    Yeah, the -- yeah, exact date I'll have to look at,

25    but the contract date, yes.

1    Q    When you're reviewing these documents, and making

2    your report, did you review the production named Max Barber

3    Production that we read earlier, and the production that

4    consisted of 75,000 documents, and roughly 23 gigabytes of

5    data?

6         MS. SUM: Objection, mischaracterizes the record. The

7         SEC objects to your representation. And dispute that you,

8         in fact, produced 75,000 documents either during the

9         investigation or during the course of this case.

10        BY MR. BARBER:

11   Q    Go ahead and answer.

12   A    I've mentioned it's in my report, what I have

13   reviewed. And as the relevant information which I received,

14   I've already documented that.

15        THE WITNESS: So Alice, in terms of how many

16        documents, and how many gigabytes, it's not a question for

17        me to answer.

18        BY MR. BARBER:

19   Q    Understood.

20        So it would be fair to say that you were given full

21   access, and complete access, to the data that's represented in

22   the report?

23   A    The documents that have been, the relevant documents

24   that have been shared with us, we've reviewed those documents.

25   Q    Okay, and you've had full access to review those

1   documents, obviously, because it's in your report, is that

2   correct?

3        A    Yes, the --

4             MS. SUM: Objection, just form.

5             You can answer.

6             THE WITNESS: Yes, so I'm saying that documents were

7        sent to us. So, and all the documents which were sent to

8        us, we've reviewed them.

9             BY MR. BARBER:

10       Q    Okay. Perfect.

11            So I just want to bring your attention to Exhibit 2.

12            Have you seen this document before, Mr. Ahmed? This

13   is the MOU --

14       A    Yes.

15       Q    -- between SION Trading FZE and Arbitrade?

16       A    Yes, I have seen this document.

17            Yes.

18       Q    Okay. Now going back a bit, we were referencing the

19   jurisdiction, and the different free zone set-ups that you

20   have. Did you do any due diligence on SION Trading FZE and its

21   incorporation being a valid free zone entity in Russalcama

22   [sic].

23            MS. SUM: Objection, form.

24            BY MR. BARBER:

25       Q    Go ahead and answer.

 1      A    Yes, so due diligence on SION is not the scope of

 2  work. So if you look at a scope very clearly, in terms of,

 3  you're asking if, the question you're asking is whether we

 4  conducted a due diligence on SION Trading FZE?

 5      Q    That's correct. In your report.

 6      A    No.

 7           So that was not the scope of work to conduct a KYC or

 8  customer due diligence on SION Trading.

 9      Q    Okay, so that wasn't in your scope of work of your

10  engagement or, slash, contract, that we discussed earlier?

11      A    Correct.

12           Yes --

13           MS. SUM: Objection to the characterization of the

14      contract. It's just hiring of the firm.

15           THE WITNESS: Yes.

16           MR. BARBER: Understood.

17           BY MR. BARBER:

18      Q    But you are familiar with the free trade zone

19  Russalcama, or referred to as RAC?

20      A    Yes.

21      Q    Okay. In your professional opinion, expert opinion,

22  is RAC a suitable jurisdiction, or free zone, for precious

23  metal trading?

24           MS. SUM: Objection, outside the scope of the expert's

25      report.

1          BY MR. BARBER:

2     Q    Go ahead and answer. I saw a head not, but I just

3     want to get a yes or no.

4     A    As I said, I'm aware of RAC free zone, so Russalcama

5     Free Zone, it is one of the free zones.

6          Whether it is appropriate, or not appropriate, is

7     beyond my scope of work, to judge and comment.

8     Q    Understood.

9          So did you have the, this being not in your scope of

10    work, I'm assuming that you didn't review the Trade License of

11    SION Trading FZE, or its --

12         MS. SUM: Objection, form.

13         BY MR. BARBER:

14    A    So as I said whether the RAC Free Zone, I mean, as I

15    understand your question, it's about whether gold operating

16    companies would be working out of RAC zone, or whether it

17    should be working or it should not working, is beyond the

18    scope. That's not part of my report.

19         RAC, all I can say is, yes, I'm aware of RAC Free

20    Zone. There are multiple companies which are listed in the RAC

21    Free Zone, with different activities. And the precious metals

22    trading activity is offered by RAC Free Zone.

23         So very well SION Trading would have procured this

24    activity, and operating out of RAC Free Zone.

25    Q    Okay. No worries. I know that you have a good

1  relationship with DNCC, so I won't put you in a corner, saying

2  one's better than the other. But that's okay. I understand

3  that's not in your scope --

4       A    Yes.

5            Yes.

6       Q    -- and I'm not going to make reliance on your opinion

7  on where to establish a company, and hold you responsible. No

8  worries.

9            My main point of the question is, were you able to

10 review the trade license that was provided in the discovery, in

11 view of the report that you provided?

12           MS. SUM: Objection. Form and mischaracterization of

13      the purported production by Mr. Barber.

14           MR. BARBER: I'll rephrase the question.

15           BY MR. BARBER:

16      Q    Have you viewed or seen the trade license for SION

17 Trading FZE?

18      A    I have to look at the documents. They were separate

19 documents. I'd have to go back and -- if you have the document,

20 if you can show it to me, yes, I can -- I can check. But I have

21 my file of all the documents, all the exhibits, so I'll have to

22 go back and check.

23      Q    Okay. No worries. I'll come back to that, and I'll

24 bring the trade license, and we can address that in just a

25 little bit.

 1          So with the trade license, and being active at the

 2    time of the contract, and so forth, on the grounds that it's an

 3    active compliant with the UAE, as far as a free trade zone

 4    company with the activities of precious metals, which we'll

 5    confirm later, after you can see the document, on that basis,

 6    what further due diligence did you take, or undertake, to

 7    validate SION Trading FZE in that capacity?

 8          MS. SUM: Objection. Form and the predicate that's in

 9       that question is vague and confusing.

10          You can answer if you understand it.

11          THE WITNESS: Yes, so I would repeat the same answer.

12       I was not engaged to actually conduct a due diligence on

13       SION Trading FZE. The scope of work was not to actually

14       conduct a due diligence.

15          Now, as you would be aware, conducting a due

16       diligence on a particular company requires certain steps

17       to be followed, right? So the, on SION Trading FZE,

18       conducting the due diligence on that particular entity,

19       and its activities, and whether it has the right

20       activities to perform the gold trading, et cetera, was

21       beyond the scope.

22          I mean I, if I would have, you know, even if I've

23       seen the trade license I wouldn't comment on that, because

24       that's beyond the scope of my expert report.

25          BY MR. BARBER:

1      Q     Understood.

2            So just bringing your attention to the Memorandum of

3  Understanding that's on screen now, on Section Two, collateral

4  will be provided, slash, secured, to Dubai Gold Exchange, or

5  such other location approved by both parties, for Arbitrade, in

6  the amount of $10 Billion in physical assets.

7            And I just want to point out on Four, the initial

8  term of the agreement will be for three years, with four

9  renewable terms of three years, each  for a total term of 15

10 years, with renewal terms and automatic, unless other party

11 gives written notice not to go forward with it.

12           So I just wanted to bring the attention to that, if

13 that was in view of your report as far as this contract being a

14 supply contract to Arbitrade. But furthermore, in Section Six,

15 Arbitrade agrees, you can see it goes to, the gold is for

16 Arbitrade Bermuda, just to make the distinction between the

17 contracted parties and the purpose of the supply contract.

18           Do you see that there?

19           MS. SUM: Objection. Form, compound.

20           If you want to ask him --

21           MR. BARBER: Sorry. Let me rephrase. It's a really

22      long question.

23           I'll rephrase it.

24           BY MR. BARBER:

25      Q     So in reviewing the MOU, do you agree that this is

1    the supply over a term of 15 years, with rules and extensions,

2    per Section Four?

3              MS. SUM: Objection, form.

4              THE WITNESS: Sorry. Is that a question to me?

5              MR. BARBER: Yes, that is a question for you.

6              THE WITNESS: If you can just, again, repeat the

7         question, please?

8              MR. BARBER: Certainly.

9              BY MR. BARBER:

10        Q    So in Section Four of the MOU, do you see where it

11   says, the Agreement will be for a term of three years, each for

12   a total term of 15 years. And then the renewal terms are

13   automatic, unless either party gives 30 days' notice that they

14   do not intend to renew?

15        A    If you look at the, again, the engagement of my

16   expert report, it's not to actually validate the clauses of

17   this contract, and whether it was a -- so if you look at the

18   scope of work, if you refer to the, to my expert report on page

19   four, where it talks about the engagement, it's clearly, you

20   know, to look at whether the standard procedures were being

21   followed, were followed, or not.

22             What does this contract mean, whether the -- that was

23   beyond my scope.

24             So I would again go back to, you know, to highlight

25   the scope of work, where I was asked to examine the transaction

1   documents related to the case, and provide and explain the

2   necessary processes that must be adhered to, while dealing in

3   gold bullion.

4          That is widely acceptable in the industry, and

5   satisfies the legal and regulatory requirements commanding the

6   sector. So --

7     Q    Understood.

8     A    -- what I'm asked to do is to explain the standard

9   industry procedures in the gold sector. And if any rules of

10  standardization exist.

11         I have also been asked to explain if the conduct of

12  the Defendants comported with the International Standards and

13  Code of Practices commanding the gold sector.

14         So typically, which has to do with the physical

15  existence of gold and what, whether there were any red flags --

16    Q    So, yes, I'm not going to ask you to interpret a

17  legal document by any means.

18         I just want to put on the record if, let me just do

19  this. Could you read --

20    A    I think that I have seen this document, just to

21  answer your question, your first question, yes, I have gone

22  through this document. In terms of the contractual agreement,

23  it was beyond my scope, so I won't be able to comment, in terms

24  of what was the contractual agreement between the two parties

25  on this Memorandum of Understanding.

1       Q    Okay, but the document that you see here now, in

2   order to simplify my question, I'm sorry I'm making it more

3   complicated than it needs to be, under Number Six it says,

4   Arbitrade agrees to, and then, B, it says, purchase $10 Billion

5   of its bullion requirements from SION within the term of 15

6   years.

7            Is that accurately stated there?

8            MS. SUM: Objection, form.

9            But the document speaks for itself.

10            THE WITNESS: I mean, it's written on the document.

11            BY MR. BARBER:

12       Q    Okay.

13       A    I -- What it interprets is not, is beyond my scope --

14       Q    Okay.

15       A    -- to comment on.

16       Q    Fair enough. We'll move on from there.

17            Let me go to the next.

18            So this is Exhibit 3. Let me know if, have you seen

19   this document before?

20       A    Do you see the document number, or if I can just have

21   a look at this.

22            This is the affidavit?

23       Q    Yes.

24       A    Is there the reference number, the exhibit -- is this

25   the Exhibit 3 on the --

1      Q    All right, so this is Exhibit 3 for the production

2   for today. But let me give you the Bates stamp there.

3           While I'm looking-up the Bates stamp, go ahead and

4   read over, then I'll give you that reference.

5           MS. SUM: Mr. Barber, the SEC is willing to stipulate

6       that the Affidavit of Mr. Fahat from 2022 was not provided

7       to the expert. So we can shortcut this.

8           MR. BARBER: Oh, so you did not provide this to the

9       expert?

10          MS. SUM: Correct. This is an Affidavit of a person

11      who executed in 2022, so no.

12          MR. BARBER: Okay.

13          BY MR. BARBER:

14      Q    If this was provided to you, Mr. Ahmed, would this

15   fall in your scope of work?

16      A    No, it wouldn't change, I mean, I'd have to read

17   through this, I haven't seen this document before, but this is

18   dated 2022. If you see --

19      Q    Yes.

20      A    We are talking about the --- the advertisement which

21   were made in 2018, right? And then there are the red flags

22   which were in 2018, and you know, the 2019. So physical

23   verification of the gold. So this wouldn't change my opinion.

24      Q    Okay. No problem.

25          So on to the verification.

1          You stated that red flags, and going to BDO, you

2    made, in the report you made a statement that, Max Barber said

3    drop the video conference with BDO and G4S. Is that a true

4    statement, or an accurate statement?

5         A    Can you show me where is it? If you show me the

6    document, then I'll be able to comment.

7         Q    Let me move over the --- Okay. Here we go.

8              So on page 15 of your report, there's a

9    second -- the independent accounting firms were directed, or

10   not allowed to perform certain procedures by SION. Defendants

11   ignored the red flag presented when SION told BDO to drop its

12   request for a video conference with the G4S employee, whose

13   signature purportedly appears on the Safekeeping receipt.

14        A    Yes.

15             Yes, that's what the report --

16        Q    So --

17        A    This is --

18        Q    That is accurate?

19        A    Yes.

20        Q    Okay. What documentation did you rely upon to come to

21   that conclusion in your report?

22        A    I'd have to -- I'll have to look at the document,

23   the --

24        Q    So you're looking for that --

25        A    There's an email, yes, for the -- if you have the

1    particular email --

2        Q    Okay.

3        A    -- it states, I'm just trying to search for that

4    particular email. You'll have to give me a few moments to --

5        Q    Oh, I think I have the email.

6        A    You have the email?

7        Q    I'll pull it up next, but from the report --

8        A    Yes.

9        Q    -- it would be interpreted as, you know, SION is not

10   wanting a video conference to validate the gold, as requested

11   by BDO. Is that the context of the video?

12       A    You show me the email, it'll be -- if you have the

13   email, if you can --

14       Q    Yes.

15       A    -- put it up on the screen, then we can -- I can just

16   answer your question.

17       Q    Sure. So --

18            MS. SUM: Objection.

19            I mean, to the extent that there was an embedded

20       question there before him asking for the email, I object

21       to the form of the prior question.

22            MR. BARBER: So I would just state, the interpretation

23       of the report has a narrative that is a red flag from

24       SION, which inflects that BDO to drop its request for a

25       video conference with G4S employees.

1      That basically implies that SION is saying we don't

2  want any video conference with G4S to show gold. So that's

3  what the implication is.

4      But we go down to the --

5      MS. SUM: I mean, you're not testifying. But I mean,

6  show him the email and he can answer specific questions.

7      MR. BARBER: Yes.

8      BY MR. BARBER:

9  Q    So I mean, more particularly, it's not so much in

10  your report, Mr. Ahmed, but it's in the SEC's Complaint as far

11  as obstruction of video validation of the gold holdings, was

12  purported by SION. And so that's the circumstances in which the

13  question is being arisen.

14      So this is Exhibit 5, and it has a Bates stamp of

15  JAG002357.

16  A    MM-MMM.

17  Q    And this is, and this isn't even, I'll throw myself,

18  September 26, 2018, 9:17 p.m., to BDO, Deepak. And where it

19  says, hi, Deepak, let me know a time you and your boss can have

20  a chat tomorrow, thanks, Max.

21      Oh, let me go back-up. Sorry.

22      And Deepak responds back, Max, as part of our

23  research we did see Peter's picture on the website requesting

24  we set-up a video conference to validate the person that I

25  spoke to on the phone is the Peter Walters pictured on the

1  website. Since Peter cannot provide a copy of his government I.

2  D., he can hold it up on a webcam so we can complete our agreed

3  upon procedure.

4          Do you see that there?

5      A    Yeah, it's there. I can see it on the screen.

6      Q    So would that change your terminology in the report

7  as far as a red flag, as it's relating to validating employees

8  identification, work identification?

9      A    Yeah, but then it's -- then it's another --

10          MS. SUM: Objection, form.

11          THE WITNESS: Yeah. But this is -- this is, any

12          Language that's coming from video to your cell, requesting

13          for a video conference or a video call.

14          BY MR. BARBER:

15      Q    Yes, so this document was provided by, I think this

16  is from BDO directly, because it's not my Bates stamp, but you

17  do see it's then -- but you'd agree that the body of the email

18  is requesting validation of an employee's government I. D.?

19      A    This email is from BDO to yourself. I'm looking for

20  the email, which is clearly where, you know, which is your

21  email which, to drop the video conference.

22      Q    Okay, so that's the conference there. So I will state

23  that there is not an email from me that is requesting them to

24  drop any video conference.

25          MS. SUM: All right. Objection.

1        You're not here to testify Mr. Barber. Ask your

2    question --

3        MR. BARBER: No. Understood.

4        I just wanted to ascertain what documents the expert

5    has had to perform his work to conclude the report. I'm

6    not trying to say it's, I'm just trying to define what

7    documents have been reviewed, or what he did.

8        THE WITNESS: Yes, so I have found the document on my

9    laptop. So it's, I think, FL042144. So I think the Bates

10   stamp which you have is a different one. This is the

11   reason, it's BDO Arbitrade 000048. Which is the email.

12       MS. SUM: Can you give the date, Mr. Ahmed?

13       THE WITNESS: Yes. Sorry. So the date, 27th of

14   September 2018. Email from Max Barber to Deepak Chaudhry.

15       That's the chain of email we are talking about. So

16   this is an excerpt that we've seen here. Please take note

17   of this email to serve as a formal written notice. As part

18   of the research we did see the pictures. I'm requesting to

19   set-up a video conference to validate that the person that

20   I spoke to on the phone is Peter Walters's picture.

21       So that's what video is requesting you, if I'm

22   reading, I'm going back into the emails.

23       BY MR. BARBER:

24   Q    Yes.

25   A    And yeah, so there is an email clearly on, dated 26th

1  of September 2018, where Deepak Chaudhry has wrote that, we

2  received a response from Patrick [sic] Walters. For security

3  and confidential purpose, I have removed any references.

4      We are trying to validate Peter Walters's

5  affiliation. Peter is unable to provide a copy of his

6  government I. D. to validate his identification. We cannot

7  provide an assertion of authenticity without the requested

8  identification, as there is no proof that Peter was for G4S,

9  and that he is who he is. And he is who he is.

10      That enough, that's a red flag. So if you see that,

11  the following agreed upon procedures between Arbitrade and BDO

12  are required to validate the SPR.

13      So if you see that sentence itself is that where BDO,

14  Deepak, is stating that they cannot provide an assertion of

15  authenticity without the requested identification, as there is

16  no proof that Peter works for G4S, and that he is who he is.

17      That's a red flag. So if you see the report --

18    Q   Understood.

19    A   Got you.

20    Q   Okay, so but as far as the email communications,

21  there is not an email from me, Max Barber, stating, drop the

22  video call?

23    A   I'd have to go into all the emails. So I mean,

24  clearly -- That email is coming to SION, so there was a red

25  flag which was there.

1      Q     Right, but for the record, there's not an email from

2   Max Barber, or SION, that says, drop the video call, that

3   you --

4            MS. SUM: Objection, form.

5            BY MR. BARBER:

6      Q     Go ahead and answer.

7      A     Yeah, so as I said, the email from Max Barber, I have

8   to see the documents again. What I've quoted to you is the

9   email that's come from BDO saying it's insufficient. That email

10  has come to, you know, and, you know, that's the email chain

11  which you are showing to me. But clearly, what I've mentioned

12  in my report here, which you were just reading, is that the red

13  flags were presented when SION told BDO to drop its request.

14           So there is, I will look into it, you know, any other

15  email. But I'll have to take time to look into all the emails

16  that I've reviewed.

17     Q     Certainly.

18     A     Yeah.

19           MR. BARBER: So I'll just state for the record that

20        the communication and evidence, and discovery that we've

21        reviewed, there is no such email.

22           BY MR. BARBER:

23     Q     Now, going to the email from Peter Walters directly

24  to Deepak at BDO, that is referenced on September 26, 2018,

25  8:12 a.m., and has a Bates stamp JAG0002360, it states, dear

1   Mr. Deepak, further to our recent correspondence regarding the

2   storage of items for SION Trading FZE, please note the

3   following. G4S confirms number has been issued to SION Trading

4   FZE, and is in good standing under the account of SION Trading

5   FZE.

6           Attached to this email is a copy of the Safekeeping

7   receipt Number for your reference.

8           And then highlighted in green here, due to security

9   reasons, and company policy, your other requests are not

10  permitted. And then on the other side it goes to the video of

11  the government I. D. card on CCTV. Do you see that there?

12          MS. SUM: Objection to the question.

13          You started with your testimony and argument in this

14      case, and then it runs into you reading the email. So

15      Mr. Barber, I --

16          MR. BARBER: I'll rephrase.

17          MS. SUM: Yes.

18          BY MR. BARBER:

19  Q    What I read in the email, is that correct, and can

20  you view that on your screen?

21  A    What you're – what you're showing me, that's what you

22  read, which is on the -- on the email, yes.

23  Q    Oh, okay. And then as far as my statement, it's a

24  statement, not you're confirming or denying that there is not

25  an email from SION Trading FZE, or its representative, asking

```
 1        anyone to drop the video call?
 2               MS. SUM: Objection, form.
 3               MR. BARBER: Okay.
 4               THE WITNESS: As I said, you're asking me to pull out
 5           an email which confirms that. I'd have to go back into the
 6           records and see.
 7               I mean --
 8               BY MR. BARBER:
 9        Q    Very well.
10        A    Yeah.
11        Q    But nowhere is there -- So in a practical sense, the
12    practical question, if you're working for Sam Precious Metals,
13    is it in their corporate policy to allow a video call inside of
14    the vault, or inside of the premises?
15        A    There are photographs as part of -- so there are two
16    things here.
17               If we talk about due diligence processes, face-to-
18    face verification of who you're talking to, it's part of the
19    due diligence, the process. It's basic on the EMM [sic]
20    Regulations, you know, the face-to-face.
21               You're talking about high-risk sectors. Even in
22    normal due diligence, a face-to-face. Even banks do that, you
23    know. Customer face-to-face is a mandate, it's a requirement.
24    You can't just rely on somebody else, the other side of the
25    phone.
```

44

```
 1              So here we are talking about a face-to-face

 2   verification of the person who we are -- we are engaging with.

 3              When it comes to, when you're talking about

 4   photographs of gold and what the entire process of from the

 5   time the --

 6        Q    Well not so much photograph, but a live video.

 7              MS. SUM: Wait, wait. Let the witness finish his

 8        answer.

 9              THE WITNESS: Yes, so --

10              BY MR. BARBER:

11        Q    But he did go to a live video, not photos?

12        A    Yeah.

13        Q    I agree with your thoughts.

14              MS. SUM: Mr. Barber, don't interrupt the witness. Let

15        him finish his answer.

16              MR. BARBER: My apologies.

17              THE WITNESS: So if you see the email, which I read,

18        which was the one before this, from Deepak, it clearly

19        says that he's unable to establish the identity.

20              I mean, again, in my words, I'm saying the words are

21        authentication of the person to establish that it's the

22        same person who he is talking to. He cannot establish

23        that.

24              That is not to do with video conferencing on the

25        vault. It's to do with the face-to-face verification of an
```

1    individual who you're talking to, right? So that's what it

2    refers to.

3         Whereas the question you're asking me is whether a

4    live video footage of a vault can be produced.

5         That's a completely separate question. I mean, the

6    email chain that we were looking at, and the red flag we

7    are talking about, is where it has been highlighted by BDO

8    that we are not sure of the identity of the person we are

9    talking to, right? Until the time you don't have a video

10   call, and we can see the government issued I. D., that

11   this person is the person who he claims to be.

12        Which is part of a due diligence sort of, you know, a

13   standard process.

14        BY MR. BARBER:

15   Q    Understood.

16   A    Right?

17        Whereas your other question is completely different.

18   It's whether we should do video coverage of a vault is not part

19   of my report. It's, you know, I'm happy to talk about the

20   entire process, but that's beyond the scope.

21        So if you look at it as a process in the refinery,

22   every stage, when the gold comes in, and you're aware of Dubai

23   there are serial approvals, you know, required, which is

24   connected to Dubai Police. You have cameras, you have, you

25   know, the security levels are very high.

1    So everything from the time the gold enters into a

2    refinery, or a trader's vault, or you know, any the vault, it

3    is recorded. And it can be produced --

4    Q    Yes.

5    A    -- to the Dubai Police, right?

6    It is - it is all accessible, so you can't do any

7    tampering. So if there is -- This is to avoid any kind of

8    dispute. Because you're actually exchanging a valuable

9    commodity.

10    So gold with cash or transfers are made into metal.

11    So every stage of the movement of gold in Dubai,

12    when it enters is recorded. You know when it comes to the CCTV

13    cameras which are present, right?

14    So having access to that, yes. I mean, the

15    authorities have access. The vault owners or the storage,

16    whether it's a refinery, or a vault in a trading company, or

17    Brinks, they have access to those CCTV camera footage which

18    shows that the physical gold exists, or how it is moved. What

19    has come in, what has gone out.

20    Even the type of gold is actually photographed, you

21    know, at the time that the XRF machine is used. At the very

22    first stage, when it enters.

23    So it is, it's a very structured process which is

24    followed.

25    Q    Okay. No, understood, and agreed. More specifically,

1    my question as (unintelligible) would be, having CCTV, and

2    having Dubai Police, UAE Police, give you the rights to have

3    the vaulting facility, and to have the CCTV, would you agree,

4    or disagree, that it is not allowed by a Dubai Police to have

5    unauthorized video equipment, other than the CCTV, in those

6    high areas.

7            MS. SUM: Objection to form.

8            THE WITNESS: I cannot comment on that. That's,

9        again, beyond my expert, this thing, what Dubai Police

10       will allow, or not allow.

11           BY MR. BARBER:

12       Q    Okay.

13       A    But as a question, when you raise the question

14   whether video graphic of gold in a vault is done, or not done,

15   the answer, and again, I'm not --

16       Q    CCTV is done.

17       A    I'm not required to answer because that's beyond,

18   again, the scope of -- but based on my extensive experience

19   working with multiple refineries, with trading companies, which

20   hold physical gold in their vaults, looking at Almas Tower and

21   other, you know, with Brinks and others engaging with them.

22           I'm aware of the process which is followed where

23   video footage of the gold in the chain is kept as a record,

24   it's part of the process. So --

25       Q    Understood.

1        A      -- again, whether Dubai Police would allow, but

2    again, if you see the question in this chain of email is not

3    about physically showing the video of the gold being present --

4        Q      Right.

5        A      -- it's about validating the identity of the

6    individual.

7               So having a video call, so that I'm able to see the

8    person, to confirm the identity. And then just the way I

9    started this deposition today, when I was asked by the court

10   recorder to actually show my I. D. --

11       Q      Yes.

12       A      -- and who I am, to prove that I'm the person.

13              And that's what the video is questioning. Which  is

14   the red flag that --

15       Q      I think we both agree that the substance is not the

16   video of the gold, but the video confirmation of an I. D., and

17   of a person.

18       A      Yes.

19       Q      Which is not in the scope. Okay.

20              So I'll move on from that. I know we're not here to

21   discuss Dubai Police law and so forth, so --

22       A      Yes.

23       Q      -- I'll move on.

24              So this is confirmation of the discovery production

25   that was sent, the 75,000 documents from my previous counsel,

1   Nelson Boxer, Tuesday, April 28, 2020, 9:42 p.m., which

2   confirms the documentation that was provided, 23 gigabytes of

3   data, and so forth from Nelson Boxer to the SEC.

4          Is it your testimony today that you have not viewed

5   that amount of documentation and data, to your knowledge, as of

6   today?

7          MS. SUM: Objection to the question.

8          The characterization that you've actually produced,

9      or your prior has produced 75,000 documents is inaccurate.

10          Separately, SEC has emailed you, Mr. Barber.

11          If, in fact, you have 23 gigabytes of data that you

12      believe has been produced, then turn it over to the SEC,

13      okay?

14          But asking --

15          MR. BARBER: So --

16          MS. SUM: -- the witness --

17          MR. BARBER: -- you tasked that that's an inaccurate

18      statement by the SEC, but I will furnish that

19      documentation, because it's uploaded per the data

20      encryption that the SEC requires. That's done through a

21      third-party provider.

22          But that's not for here, for that to be held.

23          MS. SUM: And I sent you an email showing the

24      production, and all you did was send back these emails

25      claiming that 75,000 documents were transmitted. And it's

1    not correct.

2         But placing this issue before the witness in an email

3    from 2020 as between the SEC and your former counsel, this

4    is just irrelevant. We object to the question, and the

5    characterization.

6         MR. BARBER: I just want to establish what he has, and

7    has not, seen.

8         But I'll supplement that documentation since you

9    stated that you have not received that today.

10        MS. SUM: We told you repeatedly, Mr. Barber, that we

11   don't have it. And we've requested that you produce that

12   75,000 that you purport to have produced.

13        MR. BARBER: So I'll go ahead and go to the next

14   subject, because I don't think we're going to agree. So

15   we'll just agree to disagree, and continue to go forward.

16        BY MR. BARBER:

17   Q    So Exhibit 7, so have you seen this document before?

18        THE WITNESS: Could we just take a quick comfort

19   break? It's been more than an hour. You know, you need a

20   coffee also, as you mentioned. I'll just take a quick, you

21   know, comfort break, yes?

22        MR. BARBER: Yes. No problem whatsoever.

23        Does ten minutes sound okay?

24        THE WITNESS: Yes, ten minutes is perfect. Yes.

25        MR. BARBER: Okay. We'll go off the record now.

1          (Off the record.)

2                                    (12:29 p.m.)

3          MS. SUM: He just emailed saying he got confused on

4      the timing, and asked for the Zoom link to be sent.

5          I'm sending it to him right now. Just FYI.

6          MR. BARBER: Okay. No problem.

7          Well, we'll go ahead and get back on the record.

8          If Mr. Goldberg jumps on we'll admit him on, and

9      we'll continue on. I want to be respectful of Mr. Ahmed's

10     time and how late it is there.

11         Perfect.

12         Let me share my screen again, Mr. Ahmed.

13         But I want to put on the record, for Exhibit 3, which

14     was the Sworn Affidavit of Michael Fahat. That has Bates

15     stamp number BARBER019.

16         BY MR. BARBER:

17     Q    Okay, so let's see, so Exhibit 7, have you seen this

18 document before, Mr. Ahmed?

19         MS. SUM: I'm going to ask for clarification.

20         What's the Bates number on this, Mr. Barber?

21         MR. BARBER: So this is from Troy Hogg's production.

22     Bates number is BC9B20117.

23         MS. SUM: Wait. B what?

24         MR. BARBER: BC913007.

25         MS. SUM: I've never heard of a BC913007. Is that

 1     production in this case, or a different case?

 2          MR. BARBER: This case.

 3          Let me tell you exactly when.

 4          MS. SUM: B, as in boy, C, as in Charlie, 9, is the

 5     prefix?

 6          MR. BARBER: Yes. So it, I have to go back with that.

 7     Hold-on one second.

 8          MR. BRAVERMAN: And Alice, I believe these are the

 9     documents that Troy recently submitted.

10          MS. SUM: Wait. When you say "recently," what's

11     recently?

12          MR. BRAVERMAN: In his most recent submissions of

13     documents this past week.

14          MS. SUM: Okay. You mean court filings, or are you

15     talking about like production?

16          MR. BRAVERMAN: Yes, in the court filings he put these

17     documents in his exhibits.

18          MR. BARBER: Yes, so it's the link that he put in, and

19     that he filed to the Court the week of -- I'll supplement

20     it, but if you're not opposed, let's continue forward.

21          MS. SUM: All right, well I'll just preserve the

22     objection that these are late produced documents. I have

23     not seen something called BC9, as a prefix. And I'll

24     obviously reserve as we continue with your questioning, as

25     to the document.

53

1          MR. BARBER: Fair enough.

2          I've also submitted this document in my last

3     production.

4          MS. SUM: What's your last production? Provide the

5     date, and other information, so that we have the Bates

6     stamp numbers.

7          MR. BARBER: Well I'll supply that here, after we

8     continue on.

9          MS. SUM: So, but was this produced before or after

10     March 5, 2024?

11          MR. BARBER: Before March 5, 2024.

12          MS. SUM: Before?

13          MR. BARBER: Yes.

14          MS. SUM: I'm confused. Mr. Braverman just said that

15     this was produced by Mr. Hogg.

16          MR. BARBER: Yes, it's been produced multiple times,

17     so there's multiple numbers.

18          MS. SUM: So where are the numbers --

19          MR. BARBER: So I'll clarify the original submission

20     of it later on, if you're not opposed to that.

21          MS. SUM: Well, it does matter what the date is,

22     because a representation was made that it was produced

23     only recently by Mr. Hogg.

24          Are you saying that you produced it, Mr. Barber?

25          MR. BARBER: Yes.

1          MS. SUM: Okay.

2          MR. BARBER: I'm saying that I produced it also in

3     this --

4          MS. SUM: What is the Bates number for when you

5     produced the document?

6          MR. BARBER: Yes, I'll supplement that as we go on.

7          MS. SUM: Okay, well without having that information,

8     and if it's only recently been produced by Mr. Hogg, then

9     obviously the SEC maintains its objection as being late

10     produced.

11          MR. BARBER: Okay. Objection noted.

12          BY MR. BARBER:

13     Q    Okay. Mr. Ahmed, have you seen a document like this

14  before?

15     A    Yes, this is a --

16          MS. SUM: Objection, form.

17          THE WITNESS: Again, this is a Customs document. But

18     in this case, what's the Bates number? I'll have to look

19     at it. I don't recall seeing this document produced on

20     this case.

21          BY MR. BARBER:

22     Q    Oh, okay. So it's accurate to state that you haven't

23  seen this document produced in evidence before?

24          MS. SUM: Objection, form.

25          MR. BARBER: Okay.

1      BY MR. BARBER:

2      Q    Go ahead and answer.

3      A    Yes. See, you need to give me the reference number to

4  validate this. I don't recall, but I'll have to look at, if you

5  give me the reference number I can look into my file and see if

6  it was produced.

7      Q    Fair enough.

8           But at this moment, to your recollection as of now,

9  you don't recall seeing it before?

10     A    No.

11     Q    Okay, but you're familiar with the format of the

12  document being UAE Federal Customs, Dubai Customs, Bill of

13  Import? Is that the correct heading of the document?

14     A    Yes.

15          It's a copy for the consignee. Which is, you know,

16  from the Dubai Customs. One of the documents which accompany

17  when gold is imported into the country.

18     Q    So the consignee on this particular document, what

19  does it read on that document on your screen?

20     A    SION Trading FZE.

21     Q    And also as the Donata Cargo Accessor Code, and then

22  commercial regulation number, is there anything on this

23  document that would raise a red flag?

24     A    I'll have to see the document. I'd have to, you know,

25  and not on the screen, it has to be produced for me to assess

1    and validate this document.

2            But on the face of it, as I can see on the screen,

3    the information, which is redacted, as you asked me, I've read

4    it. The consignee here is showing as SION Trading FZE. And it's

5    a Customs document, yes.

6        Q    Okay, and in the gross weight at the bottom, in KGs,

7    what does the document say there?

8            MS. SUM: The SEC continues with its objection to this

9        document.

10           There's no evidence at all that this was even any

11       type of gold that's like the reference in this case.

12           And you should also point out to the witness, you're

13       now making it so that he can't see what the date is on the

14       document, so we continue with our objections.

15           BY MR. BARBER:

16       Q    So the date at the top is the 19th of January 2019.

17           But the gross weight at the bottom is 1,256.17

18   kilograms of gold bars. Then you have the HS code. Is that the

19   correct HS code for gold?

20           MS. SUM: Objection, form.

21           THE WITNESS: I have to check that. It's --

22           BY MR. BARBER:

23       Q    Okay, but back to our, the beginning of the

24   deposition, given the scope of your contracted work with the

25   SEC, if you had this document at your disposal, would this fit

1    into your scope of work in the expert report?

2    A    I mean --

3         MS. SUM: Object to form.

4         THE WITNESS: -- this -- this document which is dated

5    19th of January 2019, what you are presenting, I have

6    been, you know, I need to validate, verify, and review

7    this document.

8         It shows a consignment of gold which is coming into

9    SION on 19th of January 2019.

10        But it doesn't, again, change the opinion in my

11   report. If you look at my report, it talks about the

12   procedures that should have been followed by the

13   Defendants when it comes to the physical validation,

14   physical verification of the gold, to confirm that the

15   gold existed.

16        So this is just a document of a shipment, which is

17   produced.

18        So it doesn't affect the, you know, we are talking

19   about 395 metric tons of gold. Which was, yes, 395 metric

20   tons of gold, which were claimed to be vaulted in Dubai.

21        But this doesn't actually -- and if you see, his

22   doesn't establish -- What is the question? I mean if you

23   ask me the specific question.

24        BY MR. BARBER:

25   Q    Yes.

1      MR. BARBER: Let me rephrase and give a more exact

2   question.

3      BY MR. BARBER:

4   Q    So you mentioned in your scope of work from the SEC,

5   it didn't include validating that SION Trading FZE had a valid

6   trade license, or imported gold. So with that said, I'm just

7   confirming you previous statement that this would not be in

8   your original scope of work?

9      MS. SUM: Objection, form.

10      What is this? Are you talking about the document, or

11   are you talking about --

12      BY MR. BARBER:

13   Q    My question is, if you had this document earlier,

14   would this fit in your scope of work to validate?

15   A    No, not the standard procedures.

16      I mean, see, again, this document, if this was not

17   produced earlier, and right now you're producing, my report

18   specifically talks about the procedures that have been

19   followed.

20      So if you see for the gold inventory audit, you know,

21   and it talks about the gold inventory audit, in terms of the

22   documentation that should have been there, the proof which

23   reconciles to the 395 metric tons. But this is just a one-off

24   document which has been produced. It doesn't -- How does it

25   correlate to the 395 metric tons?

1    Q    So just on the basis --

2    A    So on 19th of January 2019.

3         So the representations were made in 2018, end of

4    2018, that we are housing.

5         So is this a subsequent shipment that SION has

6    produced? What are we trying to establish?

7    Q    Yes, so --

8    A    SION was trading --

9    Q    We're trying -- Yes, fair enough.

10   A    And imported.

11   Q    So what I'm just trying to establish is what you've,

12   you're aware of these documents in Dubai, and they're valid

13   documents from the UAE government that are issued as a standard

14   operating procedure for imports, is that correct?

15   A    It has to be validated.

16        MS. SUM: Form.

17        THE WITNESS: Once again, I'll have to check the HS

18        code, I'll have to check the different, if you see there

19        are several pieces of information which is mentioned here.

20        The manifest number, the gate pass.

21        So all those documents will be supported with this,

22        right?

23        BY MR. BARBER:

24   Q    Yes.

25        Correct.

1      A      So when we do our transaction monitoring, and let me

2   talk in general about, so when a shipment comes, it comes with

3   a docket of, you know, a number of documents. So there is the

4   export document which comes. The Bill of Lading, or the Airway

5   Bill, which is accompanied. This is a Customs document. Just a

6   stand-alone Customs document.

7           It has, you know, the insurance papers along with it.

8           You know, what about the transportation from the

9   airport, where it is going to.

10          So the consignee is SION Trading, but clearly, SION

11   Trading cannot. As you were aware, the gold will go from

12   Customs to a certain place. To a certain refinery for getting

13   it refined. If this is the story or if it is gold bars.

14   (Unintelligible) gold bars.

15          What is the type of, are these LBMA bars? Are these

16   priorly being stored at SION offices? Where is it going? So all

17   the logistics documents.

18          So if you look at the, you know, with this one piece

19   of document, it doesn't look at, so every shipment, if you see,

20   it has import export (unintelligible). It will have Proof of

21   Origin, Insurance Reports. Papers. Vault receipts.

22          So where this gold is being stored, you know, all

23   those documents produces a transaction document.

24          So if this document, as you are showing and

25   mentioning that 1,200 kilograms, which is 1.2 tons of gold,

1    came on 19th of January 2019, this consignment was part of

2    which shipment? What was, you know, was it part of the 395? Was

3    it something just of obsequent. Or is it just a stand-alone

4    document?

5          Just, this alone doesn't give, you know, enough --

6    Q    Right, but as far as -- as far as process and

7    procedure, you agree that this is the first step of

8    documentation of a shipment clearing in Dubai?

9          Without this document, it's illegal to purchase any

10   gold in UAE. Would you agree to that?

11   A    No, I would say --

12         MS. SUM: Objection, compound.

13         THE WITNESS: Yes, so let me break your question.

14         I mean, see, to purchase gold in Dubai you don't need

15   Customs. It could be local purchase, as well.

16         BY MR. BARBER:

17   Q    Correct.

18   A    So to purchase gold by a trading company, you can

19   purchase it, or within certain other documents, you know, with

20   origin and insurance, and other documents.

21         Now, when you're importing gold, you have a certain

22   set of documents which have to be, as part of the standard

23   practice, a certain set of documents have to accompany that

24   import of gold. Which includes export import documentation.

25         It includes, as I've mentioned, insurance papers.

1    Papers for the logistics. The carrier.

2         So if this is, I don't know which, it came on which

3    aircraft. So if it is Emirates --

4         Q    So Brinks level services?

5         A    Yeah.

6         So if Brinks, so the documents from Brinks would be

7    there, which would validate this information.

8         Then, the time and date, when it arrives into Dubai,

9    and from where -- where is it -- where's the destination of

10   this gold, right? So what is the -- And the movement. Because

11   it goes in the secured custodies. The security.

12        So all those documents, this could be -- this would

13   be one of the many documents which accompanies an import

14   shipment, which comes into Dubai.

15        Q    Right, and I agree fully with you.

16        So it's a part of multi-facet documents that, as you

17   outlined, you have your Airway bill from the airway carrier,

18   British Airways, if that was used. You've have Brinks Global

19   that would do the clearing for you, and delivery to your

20   destination.

21        A    Right.

22        Q    And so we would use, you know, Brinks Global or G4S

23   to facilitate the Customs clearance with Donada [sic], clear it

24   with Customs, pay the fees. We have our own Customs code to

25   clear it, et cetera, so we're not utilizing a refinery's

1    Customs clearance code. We have our own Customs clearance code

2    to import gold into the Middle East through UAE.

3            So then we would have the gold brought to our office,

4    you know, that's inside the gold souk behind RAC Bank. We do

5    our validation. Brinks comes and further collects it, bags it,

6    tags it.

7            We have a Collection Note, Delivery Note. It goes to

8    a refinery such as Sam's Precious Metals Refined.

9            And then from the refinement side we, you know,

10   either sell, or we get exchanged refined bars from Sam.

11           And then, at that point in time, we would have

12   Hallmark bars, that would then come with Hallmark Certificate

13   Numbers and so forth.

14           Is that a good explanation of the general process?

15           MS. SUM: Objection. That's basically you're

16       testifying, Mr. Barber. It's compound. Form. Multiple

17       issues with your question.

18           BY MR. BARBER:

19   Q    Would you agree that's a good summary of process?

20   A    Yeah.

21           I mean, you summarized the --

22           MS. SUM: Again --

23           THE WITNESS: You know, yes. That's the process. So

24       the entire, I mean, there could be some more steps added

25       to it, but yes, you kind of summarized it.

64

1      BY MR. BARBER:

2      Q    Just for --

3      A    Yes.

4      Q    Yes.

5      A    The process, you know, works.

6           Yes.

7           MR. BARBER: Just for time efficiency. I don't want to

8      drag you out here. I know it's late.

9           BY MR. BARBER:

10     Q    So with that said, my previous question was, with

11     that example said, and you'd have to go through the steps to

12     validate the additional documents, and so forth, is it your

13     understanding that this documentation, if it was provided to

14     you, would be a part of your scope of work with the SEC to

15     validate?

16     A    And so --

17          MS. SUM: Objection.

18          THE WITNESS: -- see, this would not be the scope.

19          But see if you again look at it, we are talking about

20     a quantity of gold that has been claimed to exist in

21     Dubai, stored in Dubai vaults.

22          And my opinion, in my report, was to assess whether

23     the standard procedures were followed. Whether to insure

24     the physical existence of this gold, the validation of

25     this gold.

1        So if you look at this document, it's purely one of

2    the shipment documents. Now if you see, again, this is

3    2019, which means imports, the VAT was in place from 2018.

4    So any imports that come in would have been recorded.

5        So I will validate it with the VAT Report, with

6    looking at the Customs Report.

7        So it would reflect on SION Trading that file on the

8    FTA, the Federal Tax Authority's database.

9        BY MR. BARBER:

10   Q    Right.

11   A    So again, due diligence and an investigation would

12   need to be done, whether, you know, this came in on 2019, all

13   the records.

14       But this alone would not -- would not -- it does not

15   kind of confirm anything to me, as of --

16   Q    It doesn't confirm the full picture?

17   A    Yeah.

18   Q    I'm with you.

19   A    The full picture.

20       And the 2018, if that quantum of gold already existed

21   in vaults in Dubai then, you know, this shipment is irrelevant,

22   because this is 2019. January of -- It's just an example how a

23   shipment would have come into SION Trading.

24   Q    Yes. I just wanted to establish the process, the

25   paperwork, which you've done a great job of doing. And then

1    establishing that this wasn't a part of your scope, which you

2    confirmed.

3           And then further, as you explained the VAT reference

4    on SION Trading was not confirmed either. Obviously, because it

5    wasn't in your scope.

6           MS. SUM: Object to the form. Compound.

7           THE WITNESS: See I'm --

8           BY MR. BARBER:

9    Q    Go ahead and answer.

10   A    -- defining the process here. So again, as an

11   example, the VAT validation.

12          So if we need to validate a shipment if, as a part of

13   our process if you are looking at the transactions review of

14   this particular transaction, we'd have to look at this

15   particular transaction.

16          But this has no relevance to my report, which talks

17   about, as I mentioned, 395 metric tons of gold housed or stored

18   in Dubai prior to this date of shipment.

19          This is just one shipment that may have come to SION

20   Trading in January of 2019.

21   Q    Got it.

22          Got it.

23          But as far as the scope of work, that would not be a

24   part of your scope of work with this document, nor checking the

25   VAT, or checking with West Alcama [sic] Free Zone to validate

1    SION Trading FZE as an entity, as we discussed previously.

2          So I'll go forward from that point on.

3          You know, utilizing the reference of Sam Precious

4    Metals, once the gold comes into Sam Precious Metals and it's

5    refined, and then sold to the client, what does that process

6    usually look like?

7    A    Sorry, what is that? Can you repeat the question?

8    Q    Yes. Sorry.

9          So once the gold comes into Sam Precious Metals, the

10   metals are refined, and then Sam Precious Metals puts that into

11   Hallmark bars.

12         Could you explain a little bit more about the

13   Hallmark, and why that's done, why a Hallmark is done in the

14   first place?

15         MS. SUM: Objection, form.

16         THE WITNESS: See again, why a Hallmark is done? I

17         mean, each refinery would -- would -- Sam, if I talk about

18         Sam, Sam is a UAE Good Delivery accredited refinery. It

19         has a sequence number on every bar that is produced. So

20         every bar which comes out of a refinery, like Sam

21         Refinery, or Emirates Gold, or Al Etihad, they are UAE

22         Good Delivery Code delivery freed refineries.

23         It has a unique reference number, right? They have

24         also here now, adopted anti-counterfeiting technology. But

25         again, you know, just a basic. It will have a serial

1    number. It would be packaged with, you know, reference

2    numbers, so you know that this bar has come out from

3    Sam's.

4        So, and the record of the right, you know, as say the

5    audit trail of that gold bar would be maintained with that

6    refinery. That's the whole idea of any LBMA refinery, or a

7    UAE good delivery accreditation.

8        The origin of gold would be recorded. That yes, this

9    gold came from this particular consignee, or this

10   particular exporter, or this location. We've refined it,

11   and it's been converted into.

12       And all that record is maintained as part of the, and

13   which is produced for several accreditations and various

14   audits.

15       So you know, for example, it is mandatory to produce

16   those records, to demonstrate to the auditors that, yes,

17   this is how the movement of gold has taken place. Had

18   brought it into the end product, which is then handed over

19   either to the consignee, if they are taking the metal

20   back. It can be a mezquita quito.

21       You're just refining in the refinery, or you're

22   selling it back to the refinery, or you're purchasing the

23   gold from the refinery.

24       BY MR. BARBER:

25   Q    Okay, and then usually when you purchase gold from

1    Sam Precious or Emirates Gold, or Al Etihad and you have your

2    bars, it comes with a little certificate with that Hallmark

3    number. Is that accurate with Sam's Precious Metal, as well?

4        A    Yes.

5            So you have a kilo bar. If it is one kilo it will

6    say, Sam logo would be there, one kilo. And it would also have

7    the, you know, it's 995, or triple nine, whatever the purity

8    levels are there, and then the serial number which would be

9    there.

10       Q    I think I saw in Sam's website, that's really cool,

11   you actually have where you can type in the bar number on the

12   website to pull-up the info. I thought that was really neat.

13           So with that said, moving forward, with your work

14   with Sam Gold, your side is on the compliance and on the

15   sourcing side. For the record, I take it you're not a

16   metallurgist or a chemist, and you don't perform finesses, is

17   that correct?

18       A    We don't --

19           MS. SUM: Objection, form.

20           THE WITNESS: So we don't perform finesses, no. But we

21       understand the process. So we validate the standard

22       operating process.

23           So when a refinery goes through the accreditation, we

24       front the audits. As I mentioned, we are the internal

25       auditors. So we give -- we front the UAE good delivery

1     auditor. We front the RJC auditors.

2          So we understand the whole process. How the finesses

3     and how it goes from XLF to, you know, the whole --

4          BY MR. BARBER:

5     Q    Yes.

6     A    How the sampling goes on, and when the samples are

7     kept, it's a graph of what period of time.

8          So the entire standard operating procedures, yes.

9     Q    All right, so when you review, that process has been

10    done. You don't perform that activity of finesse?

11    A    So we --

12         MS. SUM: Objection. Form and compound.

13         THE WITNESS: So we review, we prove, we recommend, we

14    discuss, we validate when it comes to, as an audit, right?

15    My role is as an auditor, right? A compliance auditor.

16         We don't -- we don't perform. I'm not a -- you know,

17    I'm not a refiner who's working. So the performance, or

18    the finessing is done by the technical engineers, or the

19    supervisors, the people who actually do the finessing.

20         BY MR. BARBER:

21    Q    So like a metallurgist or a chemist, or a lab

22    technician?

23    A    Yeah.

24    Q    I just want to establish, you're not saying you're a

25    lab technician, or  metallurgist, that's all I'm trying to

1    establish. Okay.

2         So going forward, back -- Well going forward on the

3    basis of the Hallmarks, we're talking about Hallmarks, I wanted

4    to make it to the next exhibit. So there's Peter. This is our

5    docket. You see that production. Let's stick to the fact on

6    here.

7         So here we have --

8         MS. SUM: What exhibit number are you marking this as?

9         MR. BARBER: This should -- Exhibit 10.

10        MS. SUM: Okay, so have you skipped 8 and 9 for now?

11        MR. BARBER: Oh, sorry. This is Exhibit 9.

12        It's side-by-side, so it's a little odd.

13        Yes, 8, I don't think it's really relevant. We've

14    already discussed that. I want to be mindful of time.

15        So this is Exhibit 9.

16        BY MR. BARBER:

17    Q    And so did you have a chance to review these

18    documents in your report?

19    A    Yes. And --

20        MS. SUM: And what's the, just, is this the entire set

21    of documents that you've been produced, because you

22    probably clipped these together?

23        MR. BARBER: Yes, these have been --

24        MS. SUM: What's the --

25        MR. BARBER: Yes, this has been produced in the case

1    already. I'll provide the Bate stamps. But I just wanted

2    to blow it up so he could see it.

3

4         BY MR. BARBER:

5    Q    Here you have document --

6         MS. SUM: I'm familiar with that.

7         BY MR. BARBER:

8    Q    -- number 137-17.

9         MS. SUM: I'm familiar with it, Mr. Barber. I'm not

10   just beating that this has been produced.

11        MR. BARBER: Okay.

12        MS. SUM: It's just, I wanted to see if there was,

13   like what's the entire exhibit that you're showing him.

14   Because --

15        MR. BARBER: Okay.

16        MS. SUM: -- it was only one page, or two pages --

17        MR. BARBER: Got it.

18        Yeah.

19        MS. SUM: -- you know that we see on the screen.

20        So just show the witness.

21        MR. BARBER: Well there's a total of six pages. Two,

22   four, six.

23        BY MR. BARBER:

24   Q    And so just going back, I think you said you have

25   seen these documents, and relied upon them for your report, is

1    that correct?

2        A    These documents were produced, I recall, yes, seeing

3    these exhibits, these photographs.

4            There were photographs. I don't know which one, if

5    you -- we could just scroll through the photographs. But I've

6    seen some photographs which are here, yes.

7        Q    Okay, so I just want to bring your attention to,

8    we're talking about Hallmarks, and the Hallmark numbers, and

9    the geology of the gold all the way from the maker of the mark,

10   which in this case, like Sam Precious Metals would be UVS.

11           And so you have, on the right you have the serial

12   number, and then you have the bar numbers, which read from 2689

13   bar number to 3689. Which represent a thousand kgs in each bar

14   as one kg bar. And those are the, as referenced, Hallmark

15   numbers on each representative bar.

16           Is that how you --

17           MS. SUM: Objection -- Okay. You finish your

18       statement, then I'll object.

19           MR. BARBER: Go ahead, I'll let you object, and I'll

20       keep on going.

21           MS. SUM: Objection. Form, compound.

22           MR. BARBER: Okay.

23           MS. SUM: I mean, so I understand what you're saying.

24       You're trying to do, Mr. Barber, you're just confirming

25           that the witness sees what you're talking about on the

1    screen, but you're vetting like other questions in there.

2        So I suggest you either try to break it down, so I

3    don't have to object to form and compound.

4        MR. BARBER: Okay. I'll, for the interest of time, I

5    will make the questions short. And I'll just break it down

6    where he can answer yes or no, so I can -- I'll move

7    through this quicker, in the preservation of time here.

8        BY MR. BARBER:

9    Q    So, you have recognized these documents, and you had

10   them at your disposal at the time of generating your report, is

11   that correct?

12   A    Yeah. So, as I said, there are some photographs and

13   there's documents. So, this is a document which has--I've seen

14   some photographs of which has been produced, yes.

15   Q    Okay. To your expert review. Does this look in line

16   with documentation for hallmark numbers and bars?

17       MS. SUM: Objection form and it presumes authenticity.

18       BY MR. BARBER:

19   A    Again, I mean what's, what's the question? And again,

20   how is it relevant to my expert witness? So, I talked about,

21   you asked me about the process of hallmarking. So, there are

22   serial numbers which are mentioned on the bars.

23       You can validate it from the refineries that these serial

24   numbers, as you said that Sam has the technology where you can

25   go on their website and put the serial number and it'll give

1    you, you know, it'll confirm that. So, what is the question

2    when it comes to my expert report.

3        Q    Yeah, so I just wanted to know what efforts did you

4    take to validate these documents, if any?

5        A    So, these documents again if you see as process these

6    documents are they, they're not from the Dubai any refineries

7    or the vaults. These, the, the pictures-and again there are

8    pictures which are dated subsequent at 2021 as I recall.

9        I mean, I don't know. We just went through it. If we go

10   one by one, I can. The, the photographs were taken

11   subsequently. Some of the photos which are there. So, I mean it

12   does not a photograph. I mean we see as a process.

13       I mean anybody can click a picture with, with gold, right?

14   The question is which, what is the location? Which vault was is

15   it from? Where was it stored? Where are the documents? Right.

16       So, I can have, and you know, you, you've been in gold

17   trading. You see, you know there are people who will take

18   pictures of stacks of gold behind them and say hey, I have this

19   gold, you know, sitting. It's the, the, the scams which happen

20   all the time, right.

21       Q    Right?

22       A    So, so people will have this gold. I mean you see

23   people showing pictures of gold doesn't establish. Right. How

24   do you know firstly that it's gold from a picture, right. Or

25   it's not tungsten or copper, you know, right. Something which

1   is just coated in gold color. Right. So how do you validate

2   that? Right. Anybody can just imprint, you know, a Swiss

3   refinery with a serial number and the 999 purity on, on a piece

4   of metal, right. Which is not gold, and stack it here and say

5   this is, this is gold.

6       So, the, the point is, how do you establish that is

7   genuine gold is uniform, is where is it wanted? Right. What is

8   the location where what was the movement? How did it reach that

9   particular point? As you explained the entire process, if that

10  gold came from outside the country in unless until, and unless

11  it was not an LBMA bar, it would have come as a Doré or any

12  other bar. It would have been refined.

13      Because you as a consignee, when I see you, I mean whoever

14  is the consignee would want to check the purity of the bar. You

15  don't want to hold something as gold which is nothing but a

16  piece of iron or copper or tungsten, as I mentioned. So, you

17  would, that is the whole reason why the refining is conducted

18  here. And you have the assay report which gives you the purity

19  and that's where you have the bar.

20      So, this gold, what is the, the flow? If it came from

21  outside the country, which refinery it went to, if it was

22  refined, I mean, and then that refinery produced assay report,

23  those reports are then documented and then where is it stored?

24  So, the agreement with one of the service providers for

25  vaulting, where is it vaulted? What are the locations? And then

1    you validate that, yes, this is the gold which has the assay

2    report. And I can actually track that the gold moved from this

3    particular hallmarking center or a refinery to this particular

4    vault in absence purely a photograph. Having gold bars behind

5    me does not confirm the existence of gold.

6        Q    Understood. I also don't take a photograph as

7    existence. So, we agree there. But as far as what you did

8    personally when you saw these documents, just as the record,

9    what steps or actions did you take to validate or these

10   documents when you reviewed them for your report?

11       A    As I mentioned, the whole the process, there was lack

12   of documentation. You know, the process, which is what I've

13   highlighted in my, in my report, that the standard procedures

14   were not followed when it comes to physical verification.

15       So, if you look at, you know, when you talk about the

16   gold, how do you validate gold inventory? As an auditor, if I'm

17   doing an audit or as somebody who is into the gold trade, you

18   would gather the documents so the inventory records. So, when

19   this gold was purchased or sold or transferred.

20       So those documents, what about the shipping records, the

21   vein certificates, the invoices, the stock movement, where,

22   where when it came in and it goes out. There is a stock in and

23   stock out movement. What about who are the key staff involved?

24   Because this much quantity of gold cannot move, you know, in,

25   in in suitcases. You need --

1    Q    So --

2    A    Brinks or whichever. I mean Brinks Transguard.

3    Q    but --

4    A    Sorry, I just -- you asked question, so, I'll just

5    want to complete.

6         So, what was the security protocols followed for the

7    movement? How did it arrive, where it arrived? The first

8    question is these documents, the first step you would do is the

9    KYC or the CDD prior to the shipment, where it's coming from.

10   Then you would look at, okay, it's coming, it's going to this

11   particular vault. I have all the documentation.

12        So, with this piece of document which I'm seeing as you

13   know, redacted the certificate, it does not establish anything

14   in terms of, that's the existence of the gold was here in Dubai

15   and this, this gold. So, when we looked at this document we

16   started looking at what are the other documents. Where is the

17   entire flow or the chain or how the movement of gold happened.

18   But that does not exist or at least what I haven't seen.

19        So again, physical count of the gold inventory at the

20   storage location, verifying you know the, the. The balances as

21   you would know what was the different categories. So, the

22   purity of the gold. So again, all those steps which, which

23   needs to be followed as part of the process.

24        Q    With that said, sorry. So, with that said, so I

25   don't. Because we've gone through the process and I just want

1    to be conscious of time. But as far as these documents are

2    concerned, no action was taken to validate them because in your

3    view you didn't have the full package is what you're saying is

4    that correct?

5           MS. SUM: Objection. Form and mischaracterizes the

6        witness's testimony.

7           BY MR. BARBER:

8    Q    So let me rephrase the question to be more simpler.

9    So, these documents, were they in your scope of work to

10   validate?

11          MS. SUM: Objection.

12          BY MR. BARBER:

13   Q    Go ahead and answer this yes, or no?

14   A    So, validation of a document, as I mentioned is very

15   similar to the previous question where validation of that

16   custom document that goes into investigating whether this

17   document is authentic or not authentic. Right. That is out of

18   the scope of work.

19        So, if we refer back to the scope of work, what as a

20   process whether this document as I mentioned as a shipment, the

21   custom document which you showed earlier fits into the overall

22   world of a shipment transaction document if it is a shipment

23   that came in. Right.

24        Similarly, this is, what it shows is, it shows that there

25   were certain Swiss gold bars or, you know, whatever these gold

1   bars, which there is kind of an inventory list. Now, what does

2   it, what does this standalone document established. My role was

3   not to investigate whether this is a genuine document or a

4   fraudulent document or, you know, the validation of a document,

5   right. That is not in the scope.

6       Q    Right, that's not in the scope –

7       A    And then whether the procedures followed the industry

8   standards or not. Right. So, this alone, this document does not

9   satisfy the standards, the industry procedures.

10      Q    So, to summarize, what I'm hearing is your scope of

11  work wasn't to validate these documents?

12      A    We reviewed these documents. We looked at this, I

13  reviewed the documents. I looked at the pictures as well. But

14  again, validation –

15      Q    You didn't validate. It wasn't in the scope to

16  validate?

17      A    So, as I mentioned, a picture with, with a metal. It

18  was not my scope to validate whether it was actually gold or

19  whether it's just tungsten, which was—that's what is

20  validation, whether it is fake or real. That was beyond the

21  scope.

22      Q    Got it. Okay, perfect. Thank you for answering that.

23  And so, I'll just represent. These are more of the stock report

24  inventory, and this is the stamp to confirm with UBS in the

25  holding. So, but back to--and so, I just want to go back to

1  Exhibit 9, which is a photo of Peter Walters D4S with the

2  original documents.

3       So, as we're stating beforehand with the import of the

4  customs bill, Dubai bill of import. We also utilize, as you

5  mentioned, you have a secured logistic provider that takes care

6  of the insurance, movement, transfer, et cetera, et cetera. So,

7  what we're stating in our--in what we put forth is, this amount

8  of gold is being managed and all the origin genealogy of the

9  gold, just like with Sam Precious, is held and organized to

10 have that movement and stock movement.

11      Now, I know that's a statement. I'm not asking you to

12 answer that or not, but let me get to the actual questions

13 here. So, I'll go back.

14          MS. SUM: Mr. Barber, can you just confirm. Because

15      you said Exhibit 9 was, was the, the certificate and then

16      the -

17          MR. BARBER: Oh, sorry.

18          MS. SUM: So, I want to just make sure we've got it,

19      okay.

20          MR. BARBER: Yeah, exhibit eight is the photo with

21      Peter Walters and the original documents with the

22      genealogy to G4S to manage. Exhibit nine are the UBS

23      documents, which is the gold certificate of guarantee. And

24      then you have the inventory numbers, the bar numbers.

25          MS. SUM: That's fine. I just wanted to make sure.

1       Because you were referring to the Walters photo as 9.

2       That's why it just wasn't clear, that's all.

3            BY MR. BARBER:

4       Q    No, no problem. So that's it for the exhibit. But

5  I'll just move to the question. So, I'll just take off the

6  screen sharing. Okay, so back to the scope of work and with Sam

7  Precious Metals. Remind me again the name of your consulting

8  company again.

9       A    AKW Consultants. Yeah.

10      Q    Okay. Did AKW Consultants, did you guys receive a, a

11  non-conflict letter or approval from Sammy or from Sam Precious

12  Metals to make the report with the SEC?

13      A    Yes, because part of my team is as I said, we are

14  part of the team. So, they're fully aware we got clearance and

15  in my team is the general manager of Sam Precious Metals as

16  well. So, you know, the compliance head is director. So, the,

17  which I've you know, mentioned in terms of my team that assists

18  me. So -

19      Q    So, it'd be correct that you have a document signed

20  by Mr. Ayub to perform the SEC?

21      A    Yeah, he has already cleared. Alice, you can answer

22  this. Ayub's name is already mentioned. He went through the -

23            MS. SUM: Okay, what, what the SEC, will stipulate to

24       is that for the purposes of the contract with Mr. Ahmed

25       and AKW, he is not the sole, the sole timekeeper like the

1     individuals who are permitted to. To perform work have

2     been cleared and it includes Mr. Ayub.

3          MR. BARBER: Yes. So, I just wanted to make clear for

4     the record the representations and the history of the

5     Precious metals background from Sam and some others and

6     just confirming that the consulting company had the non-

7     conflict letter to perform these services. That's all.

8          So, moving on, this is another side question. As we

9     discussed in the MOU with Arbitrade, as I outlined, it was

10    a supply contract whereby over a period of 15 years the

11    gold would be supplied and it was intended to go to

12    Bermuda to be vaulted in the Hamilton Building.

13         Are you familiar with those statements that were in

14    the evidence that you reviewed to make your report?

15         MS. SUM: Objection. Form and compound.

16         BY MR. BARBER:

17    Q     Go ahead and answer?

18    A     So yes, I have reviewed the MOU which is the document

19    you showed previously. Yes, we've gone through the--as I

20    mentioned again, in terms of the business arrangements, the

21    clauses in that MOU is beyond the scope. But yeah, we've gone

22    through the MOU, you know, in terms of whatever is documented

23    in the MOU.

24    Q     Okay. In your review of all the documents provided,

25    were there any documents that you reviewed that were executed

1    or made in the personal capacity of Max Barber or on letterhead

2    of Max Barber personally?

3         A    Personal letterhead of Mx Barber--?

4         Q    Yes?

5         A    No, I mean I don't recall any personal letterhead of

6    Max Barber. There are emails, there are documents and again I

7    have listed, if you see in my report, all the documents that we

8    have reviewed are listed there. So, you know, if you go one by

9    one, you went through all the documents.

10        Q    So yeah, I just want to put on the record is from

11   what you recall. So, we talked about that email with G4S. Just

12   get back onto. So, in the report you reference logistically

13   it's impossible the moving and the vaulting of 395 metric tons

14   of gold was logistically impossible for Sion. Is that a correct

15   statement from your report?

16        A    Can you show the report which page--?

17        Q    Let me see if I can go back. So, it's on page 17. Oh,

18   let me show my screen here. Okay, so it is page 17 and it's

19   under 7. At this point here it is near to impossible to ship

20   395 metric tons of gold because of the following reasons?

21        A    Yes, this is a statement in the report. Yeah.

22        Q    Okay, so in your analysis, did you review the

23   logistical complexities of being able to ship the gold not only

24   to Dubai, but also to Bermuda?

25        A    To Dubai, the shipping of this gold coming into

1   Dubai, you know, what are the laws and the regulations. But

2   there are, again, if you, if you see in terms of what we are

3   saying is it's nearly impossible where it's practically not

4   possible. If you look at it, you know, in a, in the context of

5   commercial scale gold trade. I mean here we are talking about

6   commercial scale gold trade. We are not -

7        Q    Yeah, just to clarify because I, I think I know your

8   answer, so I'll just jump to it. In the context of the report,

9   your report is written as 395 metric tons shipped in one

10  shipment. Is that correct?

11       A    Or even if so again, how many shipments? That is the

12  question. If you see the transportation was there, how many

13  shipments took place? So if you look at it, a commercial

14  aircraft, which I've mentioned here, I've mentioned the, the

15  commercial flights, how much they can they take, you know, one

16  to two ton or a chartered flight, how much they can take and if

17  we add it up becomes a very large number of planes or chartered

18  planes which will be used to ship this quantity of gold into

19  Dubai.

20       So where are the records? I mean it's not, again in my

21  experience, I mean it's a huge quantity of gold coming into

22  Dubai. I mean this would have been a matter of, you know, high

23  security, you know, to bring this, this, this quantity of gold.

24  So again, as you can see it is, you know, near to impossible.

25  Practically, it is not.

1        I mean theoretically we can talk about what quantity of

2   total weight an aircraft can take. But the, the point is, it's

3   not about that. It's about how much they can carry. There are

4   various other elements to be looked at. You know, how much of

5   risk they can take, you know, how much of, how much of gold can

6   be insured, you know, the density, there are many factors. But

7   you know, coming to answer your question, yes, we looked at

8   these aspects.

9        Q    So, you looked at those aspects. But if under the

10  purview and perspective of shipping that amount of gold over a

11  period of 15 years, would that change your report?

12            MS. SUM: Objection. Form, vague question.

13            BY MR. BARBER:

14       Q    Do you think it's possible to ship 395 metric tons

15  over a period of 15 years?

16            MS. SUM: Objection. Speculation.

17            BY MR. BARBER:

18       A    I mean, again, that's a hypothetical question. I

19  mean, what we are trying to -

20       Q    That's logistically possible?

21       A    Yeah, I mean, look, I mean, what the point is, you

22  know, what I've tried to establish and try to review or, or try

23  to find within the documents, you know, when producing my

24  expert report is where was this 395 metric tons at that time?

25  Where was it? How do we confirm that, you know, it existed? And

1    there were processes which were followed, the standard

2    processes which were followed by to ensure that yes, it is

3    there in a certain world. That's the question.

4        It's not about in the next 15 years, whether it can be

5    moved out to somewhere else or where would it go. So, the point

6    is, again, at that time, where was the 395 metric tons, whether

7    it can be actually stored in a single vault? How did it come

8    into the country, how many vaults they were, which locations

9    they were there. So, the processes did not comport to the -

10       Q    Right. And to that end, to answer that question,

11   during the time of your report, you did not contact G4S to

12   confirm the gold or the logistical side of the gold, is that

13   correct?

14       A    Yeah. So, we see the mandate again was not to--again,

15   we had assigned the confidentiality so we would not reach out

16   to G4S and ask them for a statement. I mean, that's -

17       Q    So, you cited confidentiality, I'm sorry?

18       A    What I'm trying to say is your question is did we

19   contact G4S about--?

20       Q    To validate the documents in the report that SEC gave

21   you?

22       A    Again, not within the scope. The scope did not

23   require us to investigate. You see, there is a difference in

24   the investigation and providing an expert report on the

25   standard procedures, whether it was followed and was in line

1    with the industry practice.

2        So, if the scope is not investigation which would have,

3    you know, again, if it was investigation, that would require us

4    to go and talk to the vendors, validate what happened during

5    that time. So no, that was not the scope of work.

6            MS. SUM: Mr. Barber, so there is not--our experts

7        confidentiality agreements so that they don't share the

8        information about the cases and the documents you've

9        produced or other people produced to third parties. That,

10       I mean, just so that there's no, you know, mystery about

11       it.

12           BY MR. BARBER:

13       Q    Understood. But during the time of your report, you

14   had all the documentation that your availability to review and

15   to reach out and talk to. If that was in your scope of work?

16           MS. SUM: Objection form.

17           BY MR. BARBER:

18       A    That was not in the scope of work is what I'm saying.

19       Q    Yes. Okay, fair enough. I'm not going to keep

20   hounding on that one point. I apologize. I just want to make it

21   very clear. So let me just review my last little bit here. So,

22   you also reference on page 18 of your report, there are no bank

23   transactions, KYC documents, refining and vaulting receipts. Is

24   that an accurate reading of your report?

25       A    Which page 18--?

1    Q    Yeah, let me go to it. Yeah, there are no bank

2    transactions, KYC, CDD documents, refining and vaulting

3    receipts to support?

4    A    Yeah, this is, this is part of the report. What's the

5    question on this--?

6    Q    So, the question is, with that statement in the

7    report and with your previous statements of scope of work, you

8    were not given the scope of work to validate the documents that

9    we just reviewed of UBS, which are the hallmarking list, the

10   refining list, and then the vaulting receipts, such as the G4S,

11   vaulting receipt and SKR. So, with that said, is that an

12   accurate reading of your report with what we've just reviewed?

13          MS. SUM: Objection, form.

14          BY MR. BARBER:

15   A    When I say that the scope of work did not require us

16   to validate a document, which means that to investigate and

17   challenge the, whether it is a fake document or a genuine

18   document. Right. So that's, that's an investigation part, a

19   forensic review. Right, but when -

20   Q    That's not in the scope?

21   A    That's not in the scope. Right. So that is very

22   clear. So, whether it was to do with any custom documents or

23   any other documents or the--is whether this document is a true

24   document or an untrue document. That is what validation is when

25   it comes to looking at the process and the type of documents

1    that should have been there, the type of steps or the processes

2    that should have been followed in a normal transaction as a

3    standard practice, clearly, we did not see any documents or

4    there were no KYC, CDD documents, vaulting receipt.

5        We've talked about the whole process. You know, you've

6    summarized it very well in terms of what are the types of

7    documents that should exist. when it comes to gold trading or

8    import of gold or storage of gold in Dubai per se. Right. Or

9    anywhere in the world. But we're talking specifically about

10   Dubai. So those documents were not available.

11       And that's the point we're trying to make that. Which is a

12   lack in the entire process. So, the standard process. So, which

13   means these documents did not exist, I mean, even till date. I

14   mean, we don't know. Where were these vaults? Again, I keep

15   asking these questions and no, this is your deposition, so I'm

16   not asking the question, but I'm just trying to make a

17   statement that where are these vaults? Where are those

18   documents which confirm that they are in these vaults? Right.

19       What were the locations? What was the quantity in each? If

20   it was in multiple vaults, if it was in a single vault, then

21   which void actually housed that much? So those are the kind of

22   questions.

23           MR. BARBER: Okay, I'll answer your question to be

24       polite, but the majority of the gold is housed in

25       different vaults throughout Europe as well, which the

1   documents reflect where you have in Zurich, Cloten. And it

2   has, according to the stock report that are on each one of

3   these certificates that were provided.

4        But we're not here to determine the accuracy of that

5   or not, but I'll just report that this information was

6   provided for these exhibits. And this also has the

7   different vaults locations, Lugano, Zurich, Basel, et

8   cetera. And so, the suggestion would be, if I had a time

9   machine, is, and knowing that you're doing a report and

10  say, hey, give these guys a call.

11       They validate stock report, movement, history of

12  documents, chain of custody, packing slips, bag and tag.

13  The tag numbers are holding X amount of bars in each bag,

14  et cetera, et cetera, et cetera and so forth.

15       But I wanted to be polite, to answer the question,

16  but we're not going to be able to determine that here. But

17  that's the answer for you.

18       MR. AHMED: As you mentioned. In that case, the XPR

19  has no relevance -

20       MS. SUM: Objection. There's no pending question. I

21  appreciate that, Mr. Barber, you were responding to what

22  the witness said, but this is beside the point. Mr. Barber

23  is not here to testify. He's here to ask questions. And

24  for you, Mr. Ahmed, to answer them and not for you, Mr.

25  Ahmed, to ask questions of Mr. Barber.

```
 1         BY MR. BARBER:

 2         Q    But. So, I'll continue on in a short manner of. And

 3    I'll try to ask a question that isn't so loaded and that's just

 4    simple yes or no and try to get this wrapped up for you. I

 5    appreciate your time again and for spending it with us so late.

 6         So, to that, just to establish you were not commissioned

 7    to do an investigation. You were commissioned to oversee and

 8    confirm a protocol of industry standards. Is that a good

 9    summary of what we've been discussing?

10         MS. SUM: Form. You can answer.

11         BY MR. BARBER:

12    A    Yeah, it's, again, it's mentioned. The scope of work

13    is mentioned in my report. I've repeated it before as well. So,

14    what we were hired to specifically perform.

15    Q    And that would include this--all this will be a yes

16    or no. So, you did not perform or confirm Sion Trading FZE,

17    maintain corporate formalities such as corporate bank account

18    or commingling of funds with Mr. Barber personally. That was

19    not in your scope of work compound?

20         MS. SUM: Objection. Compound. You can answer.

21         BY MR. BARBER:

22    A    Just out of scope. Yeah. So, to check whether they

23    have bank accounts or whether the trade license is valid or

24    expired.

25    Q    Out of scope?
```

1       A    Out of scope.

2       Q    Okay, perfect. So, your analysis in the report is

3  heavily relied on the Dig Token. Were you also familiar with

4  the white paper and the Arbitcoin, and the Digcoin being

5  converted into the new Arbitcoin?

6           MS. SUM: Objection form, compound. You can answer if

7       you're able to answer.

8           MR. AHMED: I didn't. You know, I didn't get the -

9           BY MR. BARBER:

10      Q    I'll make a simpler one. Are you. Do you recall

11 reviewing documents from Arbitrade that referenced an Arbicoin,

12 A-R-B-I and D-I-G coin?

13      A    Yes, if you. If you have a question specifically, you

14 can refer me to a particular document, but yes, there are.

15 There are emails, there are documents which refer to DIG Coins

16 DIG token.

17      Q    Okay, we skip over that point. This is more of a

18 procedural side you reference in an email. You identified an

19 email from Mr. Braverman stating that counting bars, I believe,

20 is overkill. As a red flag?

21      A    Yes.

22      Q    Okay. In your view of the compliance and procedural

23 process, in view of it being a business activity, would you

24 think it'd be relevant to count and validate each bar as they

25 come in to be vaulted in Bermuda or to count and validate at

1    site?

2              MS. SUM: Objection. Form compound embedded legal

3         conclusion.

4              BY M MR. BARBER:

5         Q    I don't know how to ask that question any better.

6    I'll let you answer to the best of your ability?

7         A    What's the question again? Sorry, if you can repeat

8    it.

9         Q    Would you agree that compliance is fulfilled as long

10   as the bars are counted at a particular point in time and not

11   at this -- I'm saying economic, business reasons. Like

12   economically it's unfeasible to count the bars twice or three

13   times.

14        Let's count them when they're all going into the vault, as

15   an example. Would you agree that that timing can be placed as a

16   business economical side of it?

17             MS. SUM: Still. I maintain the same objections, but

18        you can try to answer it.

19             BY MR. BARBER:

20        A    If, I mean, I'm not understanding the question. See,

21   physical verification of an asset is a process. Right. Again,

22   how often it is done, at what intervals it is done. You know,

23   there are periodic reviews.

24        So where, if an asset comes on a balance sheet of a

25   company, you know, the auditors would, would do a physical

1    verification at period end. Right. So, at financial year end or

2    quarterly or half yearly, depending on the process. Right.

3    There are various methodologies which are adopted. Right. You

4    look at, there is if the volume is significant and not, you

5    know, you can't physically count every item.

6        And I'm not here talking about in this particular case,

7    but in general I'm talking in terms of, as a physical

8    verification process, then you, they adopt judgmental sample

9    process or a selective sampling process. You know, so there are

10   different types of judgmental samples or selective samples, or

11   you know, and based on that, you know, you then confirm, you

12   know, the likelihood and the occurrence, etc.

13       So there, there is a methodology which is adopted when it

14   comes to physical verification of assets. So again if, if we,

15   we also look at stock movements, so if the stock is in a

16   particular place, we've done a physical verification last year.

17   I wouldn't rely on it. I would look at the log.

18       Because in secured vaults or even in factories or assets,

19   I mean even you would have those logs of movements, you know,

20   what asset is going out, what asset is coming in and you would

21   reconcile that to ensure that the same quantity still exists.

22       So, there are multiple, you know, steps involved in the

23   gold inventory or any inventory calculation which, you know,

24   the auditors, whether these are, you know, financial statement

25   auditors who come, internal auditors who come, or any

1    accredited auditors for specific accreditation authorities

2    would come and do a physical verification.

3         I mean it can be even done for, on behalf of a client or a

4    supplier. I mean you, you get physical verification done, as I

5    mentioned in my deposition in March as well, is that, you know,

6    if I'm buying an asset, if I have, if I'm buying some assets or

7    let's say vehicles or cars, I'll have to go and physically

8    verify, you know, so and either I'll appoint a third party to

9    conduct the physical verification and then there are certain

10   steps which are followed by. So, it's not that you do physical

11   verification at one point and you don't do it at the other

12   point. It has to be, you know, structured.

13        Q    Congruent is kind of what I would agree with. You

14   would want to make sure it's congruent. And if I'm hearing you

15   correctly, you're saying there's multiple steps in that process

16   and there's also batch testing along that line of said process?

17        A    Yeah.

18        Q    Is that correct? Okay, moving forward from that, did

19   you see any evidence that you reviewed in making your report

20   that Max Barber or Sion Trading FZE had ultimate authority to

21   write or approve public statements that you reviewed?

22             MS. SUM: Objection, form.

23             BY MR. BARBER:

24        A    What's the question? Sorry, what public statement--?

25        Q    Did you see any documentation that said, for example,

1    Sion Trading FZE is the sole media source of publications for

2    Arbitrade or Max Barber? Did you see any of that in your

3    review?

4            MS. SUM: Objection. Form.

5            BY MR. BARBER:

6       A    If you show me a specific document or if you're

7    referring to something, I mean, I don't, as I mentioned, all

8    the list of documents I've reviewed is mentioned in my report,

9    so.

10      Q    But as you recall right now, can you recall any

11   specific document that was a red flag that jumped out at you?

12      A    Which is where what you're asking me let me, you

13   know, understand the question, what you're saying is if I have

14   reviewed any document where Max Barber, yourself, has actually

15   authorized any press releases.

16      Q    So specifically on the authority, the ultimate

17   authority to say on the sole ultimate authority for any

18   publications or releases going out?

19           MS. SUM: Objection, form.

20           BY MR. BARBER:

21      A    I don't recall. I have to go back and see that there

22   are people who are copied on emails. There are emails which are

23   authorizing, you know, the, the advertisements if you are

24   copied or whether you replied on an email chain. I'll have to

25   go back and see.

1    Q    Right, but there, as you can recall now, there's not

2    a document that says all publications go through Max Barber or

3    Sion that you can recall at this time.

4    A    Yeah, all publications go through Max Barber or Sion.

5    No, I recall that. If you were copied or you were on the email

6    chain and then. Yeah, I'll have to go back.

7    Q    Okay, let's see. Just a couple last little questions.

8    I think I've hit everything. Just let me have one more quick

9    look. Oh, was your contract with the SEC to perform these

10   services, was there any performance basis of compensation such

11   as you get more if you make the report longer, smaller, faster,

12   longer, etc.?

13   A    No.

14   Q    Perfect. And can you confirm the rate and the cost of

15   the report?

16        MR. AHMED: So, the, the rate, Alice, if you have, are

17        you happy for me to share the rate that we have?

18        MS. SUM: Yeah, absolutely.

19        BY MR. BARBER:

20   A    Thousand dollars an hour. U.S. dollars. Yes.

21   B    And what was the total hours spent on it or total

22   bill?

23        MS. SUM: Well, he's continuing to Bill for his time,

24        I mean. Yeah.

25        BY MR. BARBER:

1        Q     So, at the time of furnishing the report?

2        A     Yeah, yeah. Just about 75 hours, we have bill for the

3   report and then for further another 20 odd hours. So again, SEC

4   has the bill so they would be able to provide the details. This

5   excludes the deposition time that we have spent in the

6   preparation time for the recent deposition.

7        Q     Understood. Okay. So, we talked about the awareness

8   of the Dig coin and the Arbi coin, we covered that. Have you

9   ever worked with G4S logistics before in the past in a

10  professional capacity?

11       A     No, I have not worked like as an employee, you're

12  asking--?

13       Q     Or just interacted?

14       A     Interacted, Yes, I mean we interact, as I mentioned,

15  in my professional capacity. We work with, you know, last year

16  we have conducted, if not more. I don't recall the top my head,

17  but 12 or 14 refinery audits I have conducted of gold

18  refineries on behalf of Ministry of Economy. Right.

19       Maybe more now by now it may be 15. So not just Sam. Sam

20  is one of my clients. I'm working with 15 other refineries. I'm

21  working with refineries in Istanbul. I'm working with

22  refineries. So, we are working across the region as well.

23       And so, interaction with the service providers, of course,

24  in that professional capacity. Definitely, yes. Except these or

25  you know, even we participate  In various--I'm a speaker and a

1    trainer on various forums. So, at the gold conferences. So, you

2    know, now G4S doesn't exist as you know, part of Brinks. So

3    yes, I know people and brinks. I've interacted with people who

4    were in G4S at that time. I know them on a professional and

5    social basis. Yes.

6        Q    Okay. And so, I mean we've covered this already, but

7    following the normal document production, we reviewed that

8    already and as far as bill of import collection notes,

9    insurance, et cetera. So, I don't want to go down that road

10   again. But you're familiar with that paperwork through other

11   service providers like G4S?

12       A    Yes. And as you said that the SKR which I have

13   mentioned, I won't repeat it in my previous deposition as well,

14   is nothing but a safekeeping receipt. It's not a document which

15   confirms the existence of gold. It could. It's just that there

16   is a document which is stored. I've mentioned this previously.

17   So again, we've gone through the whole.

18       Q    Yeah, I mean, on the validation process again, your

19   job was. Well, sorry, your scope of work was not to

20   investigate. So, my further questions would fall into that

21   investigation box of, you know, contacting G4S. Contacting UBS

22   to validate the bar numbers, contacting the bank of

23   International Settlements or Dubai Central Bank or Abu Dhabi

24   Central Bank. That's not in your scope of work?

25       A    Yes.

1    Q    We've cleared that. Correct.

2    A    Yes. Contacting the third parties is not in the scope

3    of work.

4    Q    Okay. Okay, I think that concludes everything for me.

5    Just let me look at this last piece of paper here. The last

6    question would be as a general term, if I bought gold from, and

7    again, I don't like, I'm just pointing at SAM Gold there, but

8    we talked about it?

9    A    Yeah.

10    Q    If I bought 100 kilos from SAM Gold or SAM Precious

11    Metals. Excuse me, and I brought it into the US and then I sold

12    it to my friend, my friend could take that gold, call SAM

13    Precious Metals, confirm the certificate numbers and the bar

14    numbers and SAM would then validate that back to the new owner.

15    Is that a correct statement?

16         MS. SUM: Objection, form. You can answer.

17         BY MR. BARBER:

18    A    I mean different refineries have different processes,

19    but accredited bars, the whole idea is so that it's anti-

20    counterfeiting. So, you know, so when you have, you have a bar

21    which has, you know, you can have the QR codes.

22    Some refineries use, some refineries use a package on

23    minted coins or you know, the smaller Tola bars where you have

24    a package and it has a QR code, you can scan it, you can just

25    to ensure this digital fingerprint which is coming into

1   existence as well now.

2       So yeah, so again, yes, if you have a bar which is

3   hallmark by LBMA or a UAE good delivery refinery, you can go

4   back and validate that it's been produced by them.

5       Q    Okay. So, you would agree the statement confirming

6   with the maker is a correct process in dealing with hallmarked

7   bars?

8       A    See again, if it is in the same form, you melt the

9   bar and you, you know, produce the jewelry. They will not

10  confirm, you know, so it has to be in the same shape and form

11  and depends on how, what, what type of verification process is

12  being used by that particular refiner. So either have they

13  embedded a chip into that bar.

14      Do they have a package, which means it's on the seal, it's

15  not on the bar. So, once you open the seal, you can always

16  replace it. They are having a digital fingerprint of that bar

17  which means it's scanned with, with certain properties, the

18  metal properties on the surface based on which it picks up.

19      So, there are various mechanisms. Is. Yes. One of the ways

20  is when you have an accredited bar which has a certificate or a

21  barcode on it, you can go back and check with that particular

22  producer that it is genuinely it's a product which has been

23  produced by them. Or is it a counterfeit?

24      Q    Got it. You would advise go to the maker to see what

25  their procedure is. What counterfeits prevention. They've taken

1    place about a your said bar?

2        A    Yes.

3        Q    Is that accurate?

4        A    Yes.

5        Q    Okay. And then last question. Again, this goes into

6    investigation, which I sure already know the answer. But just

7    for the record, you also did not validate or contact U.S.

8    homeland Security for custom bill of entry or export from the

9    United States in your report?

10       A    No. As I said, no third parties or, you know, as the

11   scope was not forensic investigation. So, when you do a

12   forensic investigation, then you look at these elements and you

13   start contacting and you do your market research and your

14   intelligence, etc. And the due diligence. No. So that was not

15   the scope of work.

16           MR. BARBER: Understood. Well, I really appreciate

17       your time this evening. I know it's late for you. I know

18       that I tried to leave a little bit of time for the other

19       co-defendants to ask any questions. I'm happy to turn it

20       over now. If anybody has any other questions.

21           MS. SUM: Note the stop time for Mr. Barber's

22       questioning is 1:48 p.m.

23           MR. GOLDBERG: And that's Max. I've got one question.

24       And Mr. Court Reporter, this is James Goldberg, pro se. I

25       came in late. I had the times not corrected. Thank you.

1    So, Max, I got one question. That's it. I don't know if

2    Steve has questions, but I just have one.

3         MR. BRAVERMAN: Go ahead.

4                    CROSS EXAMINATION

5         BY MR. GOLDBERG:

6    Q    Mr. Ahmed, when the SEC asked you to give your expert

7    opinion on this matter, did they specify individuals who were

8    the target of their investigation related to the Gold deal?

9    A    Can you repeat that question? So, the target? Sorry.

10   Q    When the SEC asked you to give your expert opinion on

11   this matter, did they specify individuals who were the target

12   of their investigation related to the Gold deal?

13   A    Yeah. So, the SEC's complaint, if you see, was shared

14   with us. So, we've gone through that, but they did not. You

15   know. What do you mean by. I mean the scope. All the documents

16   that I have relied upon is mentioned in my report. I mean,

17   again, it's not an investigation.

18       So, we are not investigating anybody, any individual or

19   any particular. But we've gone through the documents. We've

20   gone through the complaint and all the relevant documents which

21   are mentioned in my report.

22   Q    Did they not mention Len Schutzman (phonetic) or

23   Larry Mayer to you at all?

24       MS. SUM: Objection. Form, compound.

25       BY MR. GOLDBERG:

1    Q    Did the SEC not mention Len Schutzman or Larry Mayer

2  to you?

3         MS. SUM: Same objection.

4         BY MR. GOLDBERG:

5    A    I've seen these names in the. In the documentation.

6  You're mentioning. Larry, what's the -

7    Q    Len Schutzman was the chairman of the board –

8    A    Who? The voice is--I'm not able to hear clearly.

9         MS. SUM: Mr. Goldberg, could you speak up? There's a

10        little bit of static.

11        BY MR. GOLDBERG:

12   Q    Sorry. Mr. Len Shutzman was the chairman of the

13 board, and I believe the president, Larry Mayer, I believe, was

14 the CFO?

15   A    Okay.

16   Q    Do you recognize those names? Did the SEC show, show

17 you who these people were in the company and their position?

18   A    Yes, I've seen the documents where the names have

19 come across. Yes. Len Shhutzman, you mentioned.

20   Q    Yes?

21   A    And Larry -

22   Q    Did you see the documents where Len Schutzman and

23 Larry Mayer signed off on the gold deals?

24        MS. SUM: Objection. Form, relevance.

25        BY MR. GOLDBERG:

1      A      You have to show me the documents. Which document are

2  you referring to--?

3      Q      I don't have those documents. But you don't recall

4  seeing documents from the SEC on who signed off on the actual

5  gold deal, Is that what you're saying?

6           MS. SUM: Objections, Scope, relevance.

7           BY MR. GOLDBERG:

8      A      Yeah. So, on page 23, 24 of my report in 25, all the

9  documents that I have reviewed are mentioned there. So, you

10 know, top of my head, you're asking me, which documents? If you

11 show me the documents, I can answer your question.

12     Q      Is it. Isn't it true that a person that signs an

13 agreement can be the person responsible by law?

14           MS. SUM: Objection. That calls for a legal conclusion

15           that's clearly outside the scope of Mr. Ahmed's expert

16           retention in this case.

17           MR. GOLDBERG: Well, with the next question, Alice,

18           isn't it. Wouldn't it be their responsibility to do the

19           ultimate due diligence before signing their names, the

20           people that signed off on the deal?

21           MS. SUM: Mr. Goldberg, I appreciate that you want to

22           ask questions, but if you listen to Mr. Ahmed's testimony,

23           he's very clear about what the scope was of his engagement

24           in this case and the scope of his expert report and

25           opinion. So, I'm objecting to any questions that request

Absolute Digital Inc. (305) 379-4741

1       him to opine on what legal obligations anybody that's

2       named as a defendant in this case had.

3               MR. AHMED: Alice, just reminder that I have a hard

4       stop at 10:00 p.m., my time.

5               MR. GOLDBERG: Okay, so I guess, Alice, Len Schutzman

6       or Larry Mayer, because they're not mentioned in the

7       complaint, that doesn't mean that he was shown who ran the

8       company, what a company, you know, who it consisted of. Or

9       did he just look at the complaint, what you guys showed

10      him, and, you know, let's go over the procedures.

11              MS. SUM: Mr. Goldberg, I'm not going to talk about

12      what the SEC's work product or internal deliberations.

13      Okay? But what I objected to is you asking questions that

14      were asked him for legal conclusions about obligations.

15      It's simply not within the scope of his expertise and it's

16      just not relevant.

17              BY MR. GOLDBERG:

18      Q    So let me rephrase, Mr. Ahmed, the name Len Schutzman

19      and Larry Mayer. Do you remember seeing documents on anything

20      that has to do with the gold deal from those two parties?

21      A    Once again, you have to give me the reference of

22      which exhibit are you talking about? I have already listed all

23      the documents, right.

24      Q    Well, just for example. I'm sorry, sir, that's part

25      of the question. I mean, have you seen documents on who signed

1    off on a gold deal that you were hired to investigate?

2         MR. BARBER: I'll just interject one real quick. I

3         think Jamie is referring to the MOU document. He was the

4         counter signatory on the MOU document. Is that what you're

5         asking Jamie?

6         MR. GOLDBERG: Yeah, it's one of the questions. Yes,

7         part of it.

8         MR. AHMED: Okay, so let me go back.

9         MS. SUM: Mr. Ahmed said that he recognized the names.

10        But if, if you want to spend time going through document

11        by document or asking him to specifically identify like

12        which documents he remembers seeing those names. I mean,

13        go ahead, you know.

14        BY MR. GOLDBER:

15   A    Yeah. See if--as Mr. Barber, you've mentioned that

16   MOU as a document. I have that I can see Len Schutzman. That's

17   why I said I've seen the name. It's there, one of the

18   signatories, if that is your question, that have I seen the

19   name. It is there. One of the signatures along with Max Barber

20   from Sion, Mr. Barberr. So that's. Yeah, that's the document. I

21   have seen that document. Yes.

22   Q    So, when you just go over, you know, your procedures

23   on how things were to be done, didn't you question any of these

24   other people that you know who they were signing off on

25   something and you know, you know, part of your process of your

1    discovery and how you do things within a report?

2          MS. SUM: Objection. He already testified, it is out

3       of his scope.

4          BY MR. GOLDBERG:

5    A    I've already mentioned it's outside the scope because

6    it was not investigative report on who's responsible for what.

7    So, I've clearly mentioned in my report the scope.

8    Q    So, you do or just said that you do remember seeing

9    names of Len Schutzman and Larry Mayer, signing off on both

10   documents?

11   A    Yes, I did not say that. I did not say that. I asked

12   you to specifically refer to a document and Mr. Barber then

13   refer to the MOU. So, I went back to the MOU on my file and I

14   can see the name Len Schutzman. There. So, if there is a

15   specific document you want to refer to, please highlight it

16   with the reference number and I can comment on it.

17         MR. GOLDBERG: No, that's it. Thank you.

18         MS. SUM: I'll note the stop time for Mr. Goldberg's

19      questions was 1:57.

20         MR. BARBER: Mr. Braverman, do you have any questions?

21         MR. BRAVERMAN: I do not have any questions.

22         BY MS. SUM:

23   Q    Okay. I have. All right, so I just have one follow up

24   question for you. Mr. Ahmed, you've testified as to the

25   documents that are identified as an exhibit to your expert

1    report.

2        I want to Clarify. After the March 5, 2024, issuance of

3    your report, did the SEC send you additional documents, such as

4    deposition transcripts and exhibits, et cetera, to those

5    depositions? I want to clarify that record on the other

6    materials?

7        A    Yes.

8        Q    Okay, so there are other materials that the SEC sent

9    to you after you issued the report, correct?

10       A    Correct. Yes.

11           MS. SUM: Okay. And I'll represent to the defendants

12           in this case that those documents have also, in addition

13           to the original ones that were transmitted to Mr. Ahmed,

14           were transmitted to the defendants.

15           MR. BARBER: Alice, would you be against providing a

16           comprehensive list of all the documents that Mr. Ahmed has

17           reviewed, given that.

18           M. SUM: I am not going to compile like a list, but we

19           have transmitted via Excelion (phonetic), all of the

20           documents that the SEC provided in total, meaning before

21           and after the report.

22           MR. BARBER: Okay, I'll take note of that and request

23           that later on in a different form. Does anybody else have

24           any other questions for Mr. Ahmed? Okay. Mr. Ahmed, I

25           really appreciated your time this evening. Thank you, sir.

1    I appreciate answering all these questions and in the

2    manner which they were given. Have a good evening.

3         MR. AHMED: Have a good evening. Thank you, everyone.

4         MS. SUM: Court reporter. Hi. The SEC does want to

5    order the transcript on an expedited basis. I'd like to

6    get your contact information so that my paralegal can

7    reach out to you for that expedited transcript.

8         I believe we've been ordering the rest of the

9    transcripts from other court reporters on a three-day

10   expedited basis. So just to give you the heads up. I

11   believe so. But what I'd like to do if I could, is connect

12   you. Could you pop your email address? Or I can give you.

13        That's perfect. Yes, I see it. Thank you. May I ask

14   you what time zone you're located in? Eastern. Okay,

15   perfect. I will send an email to you and my paralegal so

16   that you're connected and she can do whatever, fill out

17   whatever paperwork you need for the purposes of the

18   transcript.

19        MR. BARBER: Yes, yes, I'll email those over to you

20   and then also request a transcript as well.

21        MS. SUM: And then, Mr. Barber, you'll please upload

22   them via Excelion.

23        MR. BABRBER: You'll have to send me a link for

24   Excelion. I've actually never used it.

25        MS. SUM: Well, we'll send you a link, but you'll have

1          to open an account.

2              MR. BARBER: Yeah, no problem.

3              MS. SUM: Okay. All right. We don't have anything else

4          for you, so you don't need to stay on the call. I know

5          it's late your time, so thank you very much.

6              MR. AHMED: Thank you so much.

7              MS. SUM: Okay.

8              MR. BARBER: Thank you so much.

9              MS. SUM: Thank you. Bye.

10             MR. BARBER: Thank you, Alice. Have a good day. Thank

11         you, David. You too. Bye. Bye

12             (Whereupon, all formalities with regard to the

13         reading and signing of the deposition were reserved.)

14             (Whereupon, at 2:02 p.m., the proceedings were

15         concluded.)

REPORTER'S CERTIFICATE


         I, Joe Vargas, hereby certify that the

foregoing transcript consisting of 113 pages, inclusive,

is a complete, true, and accurate transcript of the testimony

indicated, held on Wednesday, June 11, 2025, via Zoom, in the

matter of Securities Exchange Commission v. Arbitrade, etc., et

al., Case Number 22-cv-2317.


         I further certify that this proceeding was reported

by Absolute Digital Inc., and that the foregoing transcript has

been prepared by me or under my direction.



                         Date: June 13, 2025


                         Joe Vargas,
                         Transcriptionist