SOUTHERN DISTRICT OF FLORIDA

CASE NO. 22-CV-23171-DAMIAN/D'ANGELO

SECURITIES AND EXCHANGE COMMISSION,

Plaintiff,

v.

ARBITRADE LTD., CRYPTOBONTIX INC.,

TROY R.J. HOGG, JAMES L. GOLDBERG,

STEPHEN L. BRAVERMAN, and MAX W. BARBER,

Defendants.

_____/

FILED BY _MCO_ D.C.

DEC 1 9 2025

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - MIAMI

**DEFENDANTS HOGG AND GOLDBERG'S SUPPLEMENTAL SANCTIONS MEMORANDUM**

**PROCEDURAL INTRODUCTION**

This Supplemental Sanctions Memorandum is submitted to complete and organize the sanctions record previously raised by Defendants Troy R.J. Hogg and James L. Goldberg and set for hearing on October 15, 2025. That hearing did not proceed because all proceedings were stayed during the federal government shutdown. As a result, Defendants were unable to present the consolidated evidentiary proffer and findings-style presentation prepared for the Court's review. This filing does not seek default relief, severance, reconsideration of prior rulings, or any new dispositive determination. Nor does it request the reopening of discovery or the introduction of

new evidence. It is submitted solely to complete and organize the existing sanctions record, relying exclusively on sworn deposition testimony and documentary exhibits already produced in discovery, and to present that record in a focused, findings-oriented format consistent with the Court's guidance regarding orderly adjudication.

The issues presented concern the integrity of the fact-finding process itself. Because they are record-based and turn on sworn testimony and documentary contradictions, the Court may, in its discretion, resolve the matters on the papers without resetting an evidentiary hearing. Defendants defer entirely to the Court as to whether further proceedings are necessary and submit this memorandum solely to facilitate review of the completed record following the stay.

## LEGAL STANDARD – INHERENT POWER AND FRAUD ON THE COURT

Federal courts possess inherent authority to protect the integrity of their proceedings. That authority includes the power to impose sanctions where a party has acted in bad faith, vexatiously, wantonly, or for oppressive reasons, including through the fabrication or laundering of evidence and the presentation of knowingly false or misleading testimony. *Chambers v. NASCO, Inc.*, 501 U.S. 32, 45–46 (1991).

Inherent-power sanctions are most justified where a litigant persists in misrepresentation after litigation has commenced, thereby corrupting the Court's ability to rely on the evidentiary record. The focus is not punishment, but preservation of the Court's truth-finding function.

## PART I – MAX W. BARBER

**EVIDENTIARY MISREPRESENTATIONS REGARDING GOLD AND SKRs**

**A. Contractual Impossibility of Title and Mutually Exclusive Litigation Positions**

The evidentiary record now establishes a closed and irreconcilable chain of governing documents that makes the transfer of present title to gold legally impossible, notwithstanding Barber's continued litigation reliance on Safe Keeping Receipts ("SKRs"). That chain consists of: (1) the Memorandum of Understanding ("MOU"); (2) the Asset Pledge Agreement; (3) the Assignment Agreement executed by SION Trading FZE; (4) the Bailment Agreement governing the underlying gold; and (5) The November 5th press release.

The Bailment Agreement expressly provides that title to the gold remains vested in the bailor at all times unless and until full payment and specified contractual conditions are satisfied. Barber repeatedly testified that under this structure there was "no payment, no title," and that Arbitrade never acquired ownership of the gold because it never paid for any quantity of bullion. (Barber Dep., May 26, 2021, Vol. II at 147:1–148:3; id. at 171:1–5; Ex. 70).

Despite that limitation, the Asset Pledge Agreement and subsequent Assignment Agreement purport to pledge or assign ownership rights derived from the SKRs themselves. The Assignment Agreement executed by SION expressly claims to assign "all ownership rights and title in relation to the Gold which are vested in the Assignor pursuant to the SKR." That assertion is facially impossible if, as the Bailment Agreement and Barber's sworn testimony confirm, no title ever vested in SION in the first instance. (Assignment Agreement executed by SION; Barber Dep., May 26, 2021, Vol. II at 206:20–207:8).

Barber's testimony confirms this contradiction. He admitted that provisions in draft agreements referencing "title" were inaccurate, that Arbitrade never acquired title absent payment, and that

any language suggesting present ownership was improper. (Barber Dep., May 26, 2021, Vol. II at 146:19–23; 147:1–5). Yet Barber continues to rely on the SKRs and related contractual instruments as proof of ownership in ongoing motion practice, including his December 16, 2025 reply supporting exclusion of expert testimony, where he argues that the MOU and related documents legitimize the transaction and that SKRs constitute valid evidentiary substitutes for physical verification.

These positions cannot be reconciled. Barber cannot simultaneously maintain that (a) title never transferred because payment conditions were unmet, and (b) SKRs and derivative assignments constitute proof of ownership. Persisting in these mutually exclusive factual theories during active litigation constitutes fraud on the Court, not a mere contractual dispute.

## B. Structural Impossibility of the Promised Gold Title

The operative transaction documents promised present title to physical gold. At the same time, Barber's bailment agreement with the gold owner expressly provided that title remained with the bailor and that neither SION Trading FZE nor any other party acquired title. This structural conflict made the promised transfer of title legally impossible.

Nevertheless, Barber presented Safe Keeping Receipts ("SKRs") as proof of ownership and custody. Each SKR expressly stated that the sealed package was "said to contain" gold, an explicit disclaimer that the custodian did not verify the contents. Despite that disclaimer, the SKRs listed specific quantities, certificate references, and declared values.

Because the custodian disclaimed verification of sealed contents, those particulars could only have been supplied by the depositor or its agent. Presenting such documents as independent

third-party proof while concealing their depositor-supplied nature **constitutes evidentiary misrepresentation**.

## C. Cancellation and Continued Reliance After Knowledge

The gold owner issued cancellation and cease-and-desist communications to Barber after non-payment. Those communications terminated any legal validity the SKRs might otherwise have claimed and occurred before Barber's continued reliance on the SKRs.

Despite this, Barber continued to rely on the SKRs in sworn testimony and filings, testifying that the transaction merely "fell apart later." That characterization is objectively false in light of the cancellation timeline. Continuing to present cancelled instruments as evidence after notice of cancellation constitutes knowing **misrepresentation to the Court**.

(Bokhem cancellation and cease-and-desist correspondence, Aug. 2018 (Exs 72,73); Barber Dep., Feb. 12, 2025 at 23:55–24:03; Asset Pledge Assignment dated Sept. 2018 (Ex. C)).

## D. False Testimony Beyond Personal Knowledge (Rule 602)

Barber testified that Troy Hogg controlled Arbitrade and that, if Hogg and board members disagreed, Hogg would prevail.

However, in sworn testimony taken before and after this litigation commenced, Barber admitted that he **did not conduct diligence on Hogg**, explaining that he had no need to do so because Hogg was **not the person he was dealing with**, and that **Len Schutzman and Larry Meyer** were the individuals he relied upon for governance

From **Barber, Max – Vol. I (May 6, 2021)**, during questioning about who he dealt with at Arbitrade:

Q: "Would it be fair to say that, especially say in 2018, the people that you had the most contact

with were Lynn and Larry Meyer?"

**A: "That's correct."**

*(Barber Dep., May 6, 2021, Vol. I, 37:2–5.)*

This is a **clear, unqualified admission** that:

- Len (referred to as "Lynn" in the transcript) and Larry Meyer were his **primary contacts**,

  not Troy Hogg.

Rule 602 (personal knowledge) impeachment.

From **Barber, Max – Vol. II (May 26, 2021)**, in the governance/control sequence you flagged:

Q: "If Troy and Len disagreed about direction, who would win?"

A: "Troy would win the argument."

*(Barber Dep., May 26, 2021, Vol. II, 248:20–249:3.)*

From **Barber, Max – Deposition (Feb. 12, 2025):**

Q: "Did you do due diligence on Mr. Hogg?"

A: "Mr. Hogg, I did not personally do due diligence on Mr. Hogg, because I was told that Mr.

Hogg was a part of, you know, setting it up, and then he was, you know, not going to be directly

involved. And really, Lynn and Larry were the main people on the board."

*(Barber Dep., Feb. 12, 2025, 42:24–49.)*

Those admissions are corroborated by contemporaneous documents:

- the **MOU was executed by Meyer,**

- the **Asset Pledge Agreement by Schutzman,** and

- custodial confirmations and communications were routed by email to **Schutzman**.

Barber never executed governance instruments with Hogg, never observed internal decision-making, and lacked first-hand knowledge of corporate control. Testifying about corporate control while simultaneously admitting the absence of personal knowledge constitutes **reckless testimony under oath** that had the effect of misrepresenting governance facts to the Court and undermining the reliability of the evidentiary record.

### E. Fabrication and Continued Litigation Reliance on SKRs

Barber denied under oath that he drafted or controlled the language of the Safe Keeping Receipts ("SKRs"), testifying that the documents were independently generated by the custodian. In the same deposition, however, Barber admitted that the SKR content was drafted by him in coordination with his assistant and that the SKRs were intended to "provide evidence" that the asset existed. (Barber Dep., May 6, 2021, Vol. I at 56:48–49; 90:44–52; 119:18–22.)

These admissions establish that the SKRs were depositor-authored documents bearing an express custodian disclaimer ("said to contain") and were not independent third-party confirmations. Presenting such documents as neutral proof of ownership constitutes fabrication and laundering of evidence that undermines the Court's fact-finding function.

Barber's misconduct did not end when the underlying transaction failed. After receiving express cancellation and cease-and-desist notices for non-payment, Barber continued to rely on the SKRs and testified that the transaction merely "fell apart later." He further admitted that Arbitrade made monthly payments for several months and that the default occurred in or around 2019. (Barber Dep., Feb. 12, 2025, 65:23–66:21.)

Despite this knowledge, Barber failed to disclose the cancellation to Arbitrade's board, continued accepting payments, and reaffirmed the legitimacy of the SKRs during this litigation, including in his December 16, 2025 motion practice. Persisting in reliance on depositor-authored, cancelled instruments during active litigation constitutes ongoing fraud on the Court, not a historical dispute.

### F. Misuse of Expert Testimony to Launder Disputed Facts

While denying authorship and control of SKRs under oath, Barber adopted litigation positions framed as **expert-based legitimacy** of the SKRs. The SEC's own expert explains that SKRs bearing "said to contain" disclaim verification, are highly unusual for transactions of this magnitude, and do not substantiate ownership or custody under industry standards *(Ahmed Report, pp. 15–18)*.

### PART II – STEPHEN L. BRAVERMAN

### EVIDENTIARY CONTRADICTIONS AND NARRATIVE LAUNDERING

### A. Executive Authority and Public-Facing Control Contradicted by Sworn Testimony

Braverman testified under oath that he exercised no control over Arbitrade and operated solely on a "need-to-know basis." (Braverman Dep., Apr. 17, 2025, 396:5–8; 406:17–18.) He further denied having any responsibility for public relations, stating that PR was "not my part of the company." (Braverman Dep., Feb. 4, 2025, 180:4–11.)

Those denials are irreconcilable with Braverman's own admissions and contemporaneous documentary record. In the same February 4 deposition, Braverman admitted that if he observed a content error in public communications, he "would have" raised it. (Id. at 77:20–22.) He later

admitted that he reviewed press releases issued under his name and signature and treated them as factually describing company operations. (Braverman Dep., Apr. 17, 2025, 429:8–19.)

Public documents corroborate this authority. Arbitrade and Cryptobontix whitepapers identified Braverman as a senior executive, including Chief Operating Officer, and were distributed to investors as authoritative descriptions of management. Braverman never objected to or disclaimed these designations.

Investor-facing communications further contradict Braverman's testimony. Emails addressing Arbitrade operations and DIG token matters consistently used Braverman's executive signature block and did not limit his role to any subsidiary. A November 5, 2018 Arbitrade Ltd. press release publicly designated Braverman as the contact for token holders and bore his executive signature block. (Ex. 4, Meyer_0009982–0009984.)

No contemporaneous communication advised investors that Braverman lacked authority or was acting only for a separate entity. His later sworn disclaimers are therefore inconsistent with his own public representations and directly bear on the credibility and reliability of his testimony.

## B. Fabrication and Laundering of SKRs

### 1. Braverman First Denied Supplying a Mock/Draft SKR to Barber

Braverman was asked directly whether he ever supplied a mock SKR to Max Barber for the purpose of obtaining a G4S receipt. He denied that conduct:

**Q.** "You never provided any mock safe keeping receipt that you submitted to Max Barber to obtain a safe keeping receipt from G4S; is that correct?"

**A.** "No, I don't recall anything like that."

*(Braverman Dep., Apr. 17, 2025, 403:22–404:4)*

This is not hedging about wording; it is a denial of the conduct itself ("don't recall anything like that").

## 2. In the Same Sequence, Braverman Recast the Conduct as a "Draft" and Admitted the Mechanism

Within the same exchange, Braverman shifted from denial to an affirmative admission that what was provided was "a draft" designed to dictate the form/content of an SKR:

"It would have been a draft of what we needed on that SKR."

*(Braverman Dep., Apr. 17, 2025, 404:7–8)*

He then justified the exact laundering mechanism, depositorgenerated draft, transmitted to another party, turned into an ostensible thirdparty document:

"Isn't that what people would do? They would put a draft together, send it to someone, and then it ultimately gets made."

*(Braverman Dep., Apr. 17, 2025, 404:10–13)*

This admission is the operative fact, Braverman describes depositor-authored drafting as the intended pathway to a "made" custodial receipt.

## 3. Braverman Also Admitted He Directed SKR Attribution Changes and That "G4S Complied"

Braverman further admitted he exercised control over how custodial documents would identify the pledgor/account attribution:

"That was part of our agreement. I told them that that has to change and Kaled agreed and G4S complied."

*(Braverman Dep., Apr. 17, 2025, 403:19–21)*

This is not passive receipt of a custodian's independent document. It is direction of content/attribution with stated compliance by the custodian.

**4. Exhibit 329 Is Contemporaneous Documentary Proof of Braverman's SKR Drafting - With Template Placeholders and "Said to Contain" Language**

The denial/admission sequence above is independently confirmed by documentary evidence. Exhibit 329 contains Braverman-generated SKR drafts and transmissions.

Braverman circulated an "SKR Draft" with an attachment titled "Draft SKR (1).docx":

"See attached." (re: "SKR Draft") (Ex. 329 at 5)

The attached draft is a template, not a custodian-authored receipt. It uses placeholder identifiers and is structured to appear as a thirdparty confirmation:

> "G4S Bahrain has vaulted the below package under Security Seal No # 4444444444 …";
> "Package details and said to contain …"; Under the account of: "Sion Trading FZE …";
> "Pledged Under: Dignity Gold LLC …"; "Authorized person: Mr. Stephen Braverman
> …". *(Ex. 329 at 4)*

This is the same evidentiary defect the Court has already seen in the Barber record, the "said to contain" formulation is an express disclaimer of verification, yet the template contains detailed custodial-style fields and values. Here, however, the problem is more direct, Braverman is not

merely benefiting from depositor-supplied content; he is drafting the SKR itself in template form.

**5. Why This Is Fraud-on-the-Court Conduct (Not Merely "Impeachment")**

Taken together, the record shows:

- A sworn denial of supplying a mock/draft SKR to Barber *(403:22–404:4);*

- A same-sequence admission that a draft specifying "what we needed on that SKR" was created and transmitted *(404:7–13);*

- An admission that Braverman directed custodial attribution changes and that "G4S complied" *(403:19–21);*

- Documentary proof that Braverman generated and circulated SKR templates containing placeholder seal numbers and "said to contain" language and naming himself as authorized person *(Ex. 329 at 4–5).*

This is not a credibility quibble. It is a record-supported showing that Braverman participated in creating and laundering purported custodial evidence in a manner that **cannot be** treated as independent third-party proof in a judicial proceeding.

**C. "No Evidence" Assertion Versus Contemporaneous Proof of Token Control**

**1. Braverman's Sworn "No Evidence" Assertion**

When confronted with the premise that he was "similarly situated" and had "the majority of the tokens and the sales," Braverman did not deny the conduct on the facts. He asserted the absence of proof:

**Q.** "I am just curious of your opinion of why you think the SEC didn't charge you the same as they charged James and I when you had clearly the majority of the tokens and the sales?"

**A.** "First of all, you have no evidence of any of that."

*(Braverman Dep., Apr. 17, 2025, Vol. 3, p. 447, lines 21–25).*

That testimony is now objectively impeachable as false because Exhibit 279 is evidence, and it is evidence sourced from contemporaneous communications and transactional notices.

## 2. Exhibit 279 — Contemporaneous Custody Confirmation + COO Signature Block

Exhibit 279 contains contemporaneous email evidence explicitly reflecting token custody for Braverman: "Totals you're holding for me. 15 million DIG and 250,000 of Namaste correct?" (Email dated 5/18/2019 9:13:31 PM) *(Ex. 279 at 1)*

Braverman replied confirming the custody statement: "yes"

with signature block:

"Stephen Braverman

Chief Operating Officer, Arbitrade"

(Email dated 5/18/2019 9:26:58 PM) *(Ex. 279 at 2)*

This is devastating for two independent reasons:

1. It is contemporaneous documentary proof of custody/beneficial control of large token quantities; and

2. it shows Braverman using the "Chief Operating Officer, Arbitrade" signature block in the same records he later seeks to characterize as outside his authority and control.

### 3. Exhibit 279 — Transactional "Funds Withdrawal" Notices Reflecting Liquidation at Scale

Exhibit 279 also contains transactional notifications evidencing liquidation activity, including high-volume withdrawals in the hundreds of millions of DIG tokens. For example:

"Outgoing payment notification" … "Outgoing payment 100000000 DIG …"

"Payment reference: Funds withdrawal" (Forwarded email dated June 19, 2019 10:26:47 AM)

*(Ex. 279 at 20)*

A sworn "no evidence" assertion cannot survive this kind of transactional record.

### 4. Additional Sworn Admissions Undermining the NonControl Narrative

Even aside from Exhibit 279, Braverman's sworn testimony confirms financial dominion inconsistent with denial: He admitted he owns and controls Rozgold:

**Q.** "Rozgold is a company that you own and control?"

**A.** "Yes."

*(Braverman Dep., Apr. 17, 2025, 365:13–15)*

- He admitted there was no rule or method for segregating personal vs. company funds in the Rozgold account:

"I don't know. There was no specific rule on how that was handled."

*(Braverman Dep., Apr. 17, 2025, 372:19–23)*

- He admitted owner draws included proceeds from "sale of DIG tokens":

"Profits from any number of business things that I did, including sale of DIG tokens."

*(Braverman Dep., Apr. 17, 2025, 381:3–6)*

### 5. Why This Is Sanctionable in the Inherent-Power Frame

This is not a dispute about percentage math. It is a dispute about truthfulness to the Courts.

Braverman's statement, "you have no evidence", is not advocacy. It is a factual representation about the record that is contradicted by Exhibit 279 and by his own admissions. Continuing to present the predicate of "no evidence / no possession / no control" in sworn testimony is conduct that undermines the reliability of the evidentiary record the Court must evaluate.

### REQUEST FOR RESOLUTION ON THE PAPERS

The sanctions issues presented in this Supplemental Sanctions Memorandum turn exclusively on sworn deposition testimony and documentary exhibits already in the record. No disputed issues of fact require credibility determinations based on live testimony, and no additional evidence is necessary for the Court to assess the internal contradictions, documentary inconsistencies, and ongoing reliance on invalidated evidentiary predicates identified herein.

Defendants therefore respectfully submit that these matters are appropriate for resolution on the papers. Proceeding without an evidentiary hearing will conserve judicial resources and avoid unnecessary duplication of proceedings, while fully preserving the Court's ability to impose any curative or evidentiary measures it deems warranted under its inherent authority.

Defendants defer entirely to the Court's discretion as to whether further proceedings are necessary and submit this request solely to facilitate orderly resolution of the completed sanctions record.

**CONCLUSION**

The completed record demonstrates persistent evidentiary misconduct by Max W. Barber and Stephen L. Braverman, including fabrication and laundering of documents, sworn misrepresentations, and continued reliance on invalidated instruments during active litigation. This conduct directly implicates the Court's inherent authority to protect the integrity of its fact-finding function.

Defendants respectfully submit this memorandum to complete and organize the sanctions record for the Court's consideration. Defendants do not presume to dictate the appropriate remedy and defer entirely to the Court's discretion as to whether, and to what extent, curative or evidentiary measures are warranted to preserve the integrity of these proceedings.

Dated: December 19th, 2025

Respectfully,

---

James L. Goldberg

Pro Se Defendant

515 NW 120th St, Miami, FL 33168

james_goldberg@msn.com | (305) 785-6900

---

Troy R. J. Hogg

Pro Se Defendant

72859 Sunridge Crescent

Dashwood, Ontario, Canada

troyhogg2020@protonmail.com | (519) 330-6570