UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.: 22-cv-23171-DAMIAN/D'ANGELO

SECURITIES AND EXCHANGE COMMISSION,

    Plaintiff,

v.

ARBITRADE LTD.,
CRYPTOBONTIX INC.,
TROY R.J. HOGG,
JAMES L. GOLDBERG,
STEPHEN L. BRAVERMAN, and
MAX W. BARBER,

    Defendants, and

SION TRADING FZE,

    Relief Defendant.

### DEFENDANT STEPHEN L. BRAVERMAN'S RESPONSE IN OPPOSITION TO SEC'S MOTION TO STRIKE

Defendant Stephen L. Braverman ("Braverman"), by and through undersigned counsel, respectfully submits this Response in Opposition to the Securities and Exchange Commission's Motion to Strike (ECF 552), and in support thereof states as follows:

**I. INTRODUCTION**

1. The SEC's Motion to Strike asks this Court to invoke its inherent authority to suppress two jurisdictionally based motions, Defendant Braverman's Motion for Judgment on the Pleadings and Motion to Dismiss for Lack of Subject-Matter Jurisdiction. Both motions

1

were filed in response to the Court's ruling at the hearing on the SEC's Motion for Leave to Amend its Complaint, at which time the Court initially granted the SEC leave to amend but, based on representations made by SEC counsel, ordered Count One to be struck from the Complaint. Braverman's motions raise non-waivable jurisdictional defects in the SEC's operative Complaint and further address the material change to the operative pleading resulting from the Court's decision to strike Count One. Moreover, the motions were filed as the Court expressly invited, upon a good-faith belief that such defects in the SEC's pleadings exist. Defendant Braverman respectfully submits that there is a sound and substantial good-faith basis for both motions, which warrant consideration and review on the merits by Court rather than suppression sought by the SEC.

2. Contrary to the SEC's assertions in its Motion to Strike, Braverman's motions were filed in good faith, were not intended to violate the Court's May 23, 2025 Order, and do not seek to relitigate issues already decided. While undersigned counsel was not present at that hearing on May 23, 2025, there was no intention to violate any order of the Court, and the undersigned and Defendant Braverman fully respect the Court's directives. Importantly, the Court's prior Order respectfully could not apply to motions raising non-waivable jurisdictional issues. The two motions arise directly from the SEC's decision to seek leave to amend its Complaint and from the Court's subsequent order striking Count One—the Complaint's sole statutory registration claim. Both motions address the legal consequences of those developments, including the resulting defects in subject-matter jurisdiction and the insufficiency of the remaining pleadings as they relate specifically to Defendant Braverman. Subject matter jurisdiction cannot be forfeited or waived. In

*Trusted Media Holdings,* the Court quoted *Arbaugh*, which held: "[s]ubject matter jurisdiction 'involves the court's power to hear a case' and therefore can never be forfeited or waived.' *Arbaugh v. Y & H Corp.*, 546 U.S. 500, 514, 126 S.Ct. 1235, 1244, 163 L.Ed.2d 1097 (2006); *In re Trusted Net Media Holdings, LLC*, 550 F.3d 1035, 1042 (11th Cir. 2008). Federal courts also have an independent obligation to examine their own jurisdiction at every stage of the litigation. *University of South Alabama v. American Tobacco Co.*, 168 F.3d 405, 410 (11th Cir. 1999).4.

3. In light of the foregoing, subject-matter jurisdiction can never be waived, can be raised at any time, and cannot be barred by a scheduling or case-management order. Accordingly, the SEC's request that the Court strike Braverman's Motion for Judgment on the Pleadings and Motion to Dismiss for Lack of Subject Matter Jurisdiction as "improper" is unsupported by law.

## II.     The SEC Placed Jurisdiction at Issue by Filing Its Motion for Leave to Amend its Complaint

4. The SEC filed its original Complaint on September 30, 2022 (ECF 1), asserting multiple causes of action, including violations of Sections 5(a) and 5(c) of the Securities Act of 1933 (unregistered offer and sale of securities), Sections 17(a)(1)–(3) of the Securities Act, Section 10(b) of the Securities Exchange Act of 1934, and related control-person and aiding-and-abetting counts.

5. On July 14, 2025, the SEC filed a Motion for Leave to File an Amended Complaint (ECF 415). The proposed Amended Complaint while maintaining most of the core factual allegations, eliminated Count One in its entirety thereby abandoning all claims under Sections 5(a) and 5(c) of the Securities Act.

6. At the September 25, 2025, hearing on the SEC's motion to amend, the SEC represented that the only intended change from the original Complaint was the voluntary dismissal of Count One, plus minor "scrivener's corrections." At that hearing, SEC counsel told the Court:

> "In an effort to streamline this case and to focus solely on the SEC's fraud claim… the SEC is seeking to voluntarily dismiss Count One… Prior to filing our motion for leave… the SEC sent a redline… which showed that the only thing that we had been changing… was simply dropping Count One and making a few scrivener's corrections." (Transcript of September 25, 2025 Hearing at 25–26.)

7. While the above representation was generally true, there was a significant change to paragraph 84, wherein the SEC revised paragraph 84 by striking the following portion of the sentence, in its proposed Amended Complaint as follows:

> 84.    DIG investors' role was limited to purchasing the DIG tokens through the Livecoin trading platform. Investors had no role in the business operations of Cryptobontix or Arbitrade and were entirely passive. Instead, investors relied solely on Arbitrade and Cryptobontix, and their management, to generate a profit for investors, namely an increase in the value of their DIG tokens. Investors' expectation of those profits came from, among other things, the representations that Arbitrade and Cryptobontix would obtain the promised gold to back the DIG tokens, and that investors would be able to redeem DIG tokens for gold**, of which the supply would be directly dependent on the extent to which revenues were generated to fund company gold purchases [emphasis added].** Investors would have also expected profits based on the success of Arbitrade's underlying business ventures, including mining of crypto assets and the creation of a crypto asset trading platform and merchant payment platform.

8. Although the Court ruled that the original Complaint remains the operative pleading, with only Count One stricken, the SEC nevertheless attempted to revise paragraph 84 in its proposed Amended Complaint by deleting the allegation that the value and supply of DIG tokens were "directly dependent on the extent to which revenues were generated to fund company gold purchases."

4

    That allegation was not clerical in nature. It articulated the sole concrete economic mechanism tying investor profits to post-sale managerial efforts. The SEC's unsuccessful effort to remove it confirms its substantive significance and underscores that paragraph 84 remains central to the SEC's original investment-contract theory.

9. The Magistrate Judge accepted the above representations of the SEC, stating:

> "I will strike Count One from the Complaint… the complaint that is on the docket is still the operative complaint… everything else will remain exactly the same." (Transcript of September 25, 2025 Hearing at 50–51.)

10. By the Court striking Count One of the SEC's Complaint for Violations of Sections 5(a) and (c) of the Securities Act at the hearing on the SEC's Motion for Leave to Amend its Complaint invited a review of the operative Complaint for the reasons set forth in detail below.

### III. THE COURT EXPRESSLY INVITED A GOOD-FAITH JURISDICTIONAL MOTION

11. At the status conference, the Court expressly invited undersigned counsel to file a motion based on subject matter jurisdiction in good faith as he became more familiar with the litigation. Braverman's motions were filed in direct response to that invitation and raise threshold jurisdictional and legal challenges based on the SEC's own pleadings. The SEC's Motion to Strike, by contrast, is premised on the assertion that nothing material has changed in the case and seeks to nullify Braverman's good-faith arguments rather than address them on the merits. That use of Rule 12(f) is inconsistent with the limited purpose of motions to strike and the Court's instruction below:

"If, as you become more familiar with the litigation, you have any concern that is based in good faith about the Court's subject matter jurisdiction over this action, you can raise the appropriate motion."

Braverman, through counsel, did exactly that.

12. The SEC now attempts to recharacterize the Court's instruction and to punish Braverman for following it. That position is untenable. A motion filed at the Court's invitation cannot plausibly be deemed sanctionable, abusive, or filed in bad faith.

### IV. THE COURT'S MAY 23, 2025 ORDER DOES NOT BAR JURISDICTIONAL MOTIONS.

13. The SEC's central argument, that Braverman violated the Court's May 23, 2025 Order limiting parties to one dispositive motion, is legally incorrect. Moreover, the Court makes no reference in its instruction above to the May 23, 2025 Order being potential bar in bringing a motion about the Court's subject matter jurisdiction. Nothing in Braverman's opposition to the SEC's Motion to Strike concedes the sufficiency of the original Complaint or waives any jurisdictional, constitutional, or merits-based challenges. To the contrary, the SEC's attempt to revise its core allegations reinforces why those challenges remain live and must be resolved through proper Rule 12 motions and/or summary judgment, not suppressed through a motion to strike.

### A. Subject-Matter Jurisdiction Motions Are Not Waivable or Time-Barred

13. Federal Rule of Civil Procedure 12(h)(3) provides:

"If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action."

14. The Supreme Court has made clear that subject-matter jurisdiction objections may be raised at any stage of litigation, by any party, or by the court sua sponte. *Arbaugh v. Y &*

*H Corp.*, 546 U.S. 500, 506–07 (2006). Additionally, subject matter jurisdiction must be resolved before merits or case-management concerns. *Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83, 94–95 (1998).

15. Case-management orders are claims-processing tools and cannot extinguish jurisdictional objections or override Rule 12(h)(3). Subject matter jurisdiction is an issue which can and must be raised by the court at any level of the proceeding. Fed.R.Civ.P. 12(h)(3); e.g., *City of Indianapolis v. Chase National Bank*, 314 U.S. 63, 69, 62 S.Ct. 15, 16, 86 L.Ed. 47 (1941) (<u>Eagerton v. Valuations, Inc.</u>, 698 F.2d 1115, 1118 (11th Cir. 1983)). Nor can it convert a jurisdictional challenge into a forbidden "extra dispositive motion."

   In sum, because subject-matter jurisdiction is nonwaivable, may be raised at any time, and must be resolved before merits or case-management considerations, the Court is required to determine whether the transactions alleged by the SEC fall within its jurisdiction. If the crypto asset transactions at issue do not constitute securities transactions under *Howey*, the Court lacks subject-matter jurisdiction and the SEC's claims must be dismissed pursuant to Rule 12(h)(3).

**B. The Motion for Judgment on the Pleadings Is Procedurally Proper**

16. Rule 12(c) expressly authorizes a motion for judgment on the pleadings after the pleadings are closed and before trial. Accordingly, the Motion for Judgment on the Pleadings was filed properly in a timely manner.

17. Defendant Braverman's Motion for Judgment on the Pleadings addresses pleading defects that arise because Count One, the sole registration claim, no longer exists. Said defects did not exist in their present form until Count One of SEC's Complaint was

stricken by the Court. That ruling materially altered the pleadings and closed them anew as to the remaining claims. Rule 12(c) expressly authorizes a motion for judgment on the pleadings after the pleadings are closed and before trial. Accordingly, the Motion for Judgment on the Pleadings was filed in a timely manner.

18. Moreover, the SEC's Motion to Strike is an effort to avoid judicial scrutiny on issue of jurisdiction and a vulnerable theory of liability. Rather than defend the revenue-dependent profit model alleged in paragraph 84 of the operative Complaint, the SEC attempted to delete that allegation altogether. When that effort failed, the SEC turned to a motion to strike to prevent Braverman from addressing its significance. Motions to strike are not a vehicle for insulating legally significant allegations from analysis or for accomplishing indirectly what a party could not obtain through amendment.

## V. THE SEC MISCHARACTERIZES THE EFFECT OF STRIKING COUNT ONE

19. The SEC repeatedly asserts that striking Count One "changed nothing." That assertion is untenable as a matter of law and ignores the central role Count One played in the structure of the original Complaint.

20. Count One was the only claim alleging an unregistered offer and sale of securities, the only count that expressly treated DIG as a "security," and the foundation upon which the SEC constructed its overarching "scheme" theory. It supplied the statutory anchor for the case and framed the remaining allegations.

21. Courts have held that claims arising out of Section 5 of the Securities Act, which do not require proof of fraud are not subject to Rule 9(b). See, *SEC v. Burnett Grey & Co.*, No. 92-55361, 1993 U.S. App. LEXIS 25453 (9th Cir. Sept, 24, 1993)(unpublished opinion). Accordingly, once Count One was struck, SEC was

8

required to plead fraud "with particularity". The operative Complaint with fraud-based claims became subject to the heightened pleading requirements of Rule 9(b) and aiding-and-abetting claims that are entirely derivative of a properly pleaded primary violation.

22. Rule 9(b) requires that the circumstances constituting fraud must be set forth "with particularity".  A complaint alleging fraudulent violations of section 10(b) and Rule 10b–5 must satisfy the particularity requirement of Rule 9(b). *See Decker v. Massey–Ferguson, Ltd.,* 681 F.2d 111, 114 (2d Cir.1982). Although Rule 9(b) provides that "[m]alice, intent, knowledge, and other condition of mind of a person may be averred generally," it is well established that a plaintiff must still "allege facts that give rise to a *strong inference of fraudulent intent.*" *Chill v. Gen. Elec. Co.,* 101 F.3d 263, 267 (2d Cir.1996) (emphasis in original) (quoting *Acito v. IMCERA Group, Inc.,* 47 F.3d 47, 52 (2d Cir.1995)) (*SEC v. Alexander*, 160 F.Supp.2d 642 (2001)).

23. Moreover, the SEC is required to plead scienter in all claims arising under Section 10(b) of the Securities Exchange Act of 1934. See *Aaron v. SEC*, 446 U.S. 680, 695 (1980). Here, fraud has not been plead with particularity as required by Rule 9(b) nor has scienter been plead by the SEC as required against Braverman. The elimination of the sole registration count, thus raised threshold questions regarding pleading sufficiency, jurisdiction, and the viability of secondary liability as to Braverman.

24. As the Supreme Court has made clear, secondary liability cannot exist in the absence of a viable primary violation. *Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.,* 511 U.S. 164, 177 (1994). Where the alleged primary violation is removed, the derivative claims cannot simply persist by assumption.

9

25. To establish aiding and abetting liability under Section 20(e), the SEC must allege three elements: "(1) the existence of a securities law violation by the primary (as opposed to the aiding and abetting) party; (2) knowledge of this violation on the part of the aider and abettor; and (3) substantial assistance by the aider and abettor in the achievement of the primary violation" (*Securities and Exchange Commission v. Sharp*, 626 F.Supp.3d 345 (2022)). Whether the remaining allegations independently support Exchange Act jurisdiction and sustain derivative aiding-and-abetting liability is therefore a serious and legitimate legal question. It is not frivolous, it is not abusive, and it is certainly not sanctionable.

## VI. THE SEC CANNOT USE A MOTION TO STRIKE AS A SUBSTITUTE FOR MERITS REVIEW

26. A motion to strike is a drastic and disfavored remedy, to be used sparingly and only in narrow circumstances. *Augustus v. Board of Public Instruction*, 306 F.2d 862, 868 (5th Cir. 1962).

27. Rule 12(f) authorizes a court to strike pleadings only; it does not permit courts to strike motions, briefs, or memoranda. Motions are not pleadings under Rule 7(a), and courts therefore lack authority to strike them under Rule 12(f). *Zaidi v. Ehrlich*, 732 F.2d 1218, 1219–20 (5th Cir. 1984); *Canadian Overseas Ores Ltd. v. Compania de Acero del Pacifico S.A.*, 727 F.2d 274, 277 (2d Cir. 1984).

28. Recent authority confirms that the SEC's attempt to use a motion to strike as a substitute for merits review is improper. In *SEC v. Coinbase, Inc.*, No. 23-cv-4738 (KPF), 2025 WL ___ (S.D.N.Y. Jan. 7, 2025), the court rejected the SEC's effort to procedurally eliminate defenses by characterizing them as "immaterial" or "foreclosed." (A copy of the order is

attached to this Response as **Exhibit "A"**). The court emphasized that motions to strike are "narrow, disfavored remedies" and may not be used to resolve contested questions of law or to preemptively silence defenses the SEC believes will ultimately fail. *Id*. As the Coinbase court explained, disagreement with the merits of a defense "is not a basis for striking it," particularly where the defense implicates statutory interpretation, due process, or the scope of the SEC's authority. *Id*. The same holds for the SEC's Motion here.

29. Courts in this Circuit have consistently applied that principle, recognizing that a motion to strike cannot be used to dispose of or suppress dispositive motions. See *Harrison v. Belk*, Inc., 748 F. App'x 936, 940 (11th Cir. 2018) (noting that courts are not authorized to strike motions for summary judgment); *Silva v. Swift*, 333 F.R.D. 245, 248 (N.D. Fla. 2019).

30. Here, the SEC does not contend that Braverman's motions contain scandalous, impertinent, or improper material of the type contemplated by Rule 12(f). Instead, the SEC seeks to prevent judicial consideration of arguments it believes will ultimately fail. That is not a proper use of a motion to strike. Disagreement with a motion's merits must be addressed through substantive opposition, not procedural suppression—particularly where the motions raise jurisdictional and due-process concerns that the Court has an independent obligation to consider.

31. The Coinbase court addressed the litigation tactic employed here. In certifying its prior order for interlocutory appeal, the court recognized that the SEC sought to "short-circuit judicial consideration" of disputed legal questions by invoking procedural mechanisms rather than litigating the issues on the merits. *SEC v. Coinbase, Inc.*, 726 F. Supp. 3d 260,

282–84 (S.D.N.Y. 2024), certification granted, No. 23-cv-4738 (KPF) (S.D.N.Y. Jan. 7, 2025). The court rejected that approach, holding that where defenses raise non-frivolous questions concerning the application of *Howey*, statutory reach, or constitutional limitations, those issues must be resolved through dispositive motions or trial, not by striking them from the record. *Id*. The SEC's Motion to Strike Braverman's filings is an attempt to achieve indirectly what *Coinbase* did not allow.

32. If the SEC believes Braverman's arguments lack merit, the appropriate response is opposition on the merits, not suppression.

## VII. WHAT CONSTITUTES AN "INVESTMENT CONTRACT" IS AN EVOLVING QUESTION OF LAW

30. The legal definition of a security and more specifically, what constitutes an "investment contract" *under SEC v. W.J. Howey Co.* continues to evolve with respect to digital assets and has developed materially, since the filing of the Original Complaint. Recent federal decisions including *Ripple and Coinbase* have endeavored to address whether, and under what circumstances, crypto-asset transactions, particularly secondary-market transactions, may satisfy the *Howey* test.

31. As the court held in *SEC v. Ripple Labs Inc.*, 682 F. Supp. 3d 308, 324–30 (S.D.N.Y. 2023) the "investment contract" inquiry is transaction-specific and context-dependent, not an immutable characteristic of a digital asset itself. The Ripple court expressly rejected the SEC's theory that a token "is itself" a security, holding instead that "the proper inquiry is whether the *particular transaction* at issue constitutes an investment contract." This analytical framework confirms that the application of *Howey* to digital assets is not static, but instead evolves based on market structure, purchaser expectations,

and the economic realities of each category of transaction, particularly in secondary markets where issuers are absent and purchasers lack privity or reliance.

32. In Paragraph 19 of the SEC's Complaint, the SEC alleges: "All three billion DIG tokens created were owned and controlled by Hogg and Cryptobontix, who arranged for them to begin trading exclusively on a Russian domiciled crypto asset-trading platform called Livecoin around the end of 2017." The SEC further alleges in Paragraph 76 that: "The false and misleading news releases and conference calls served to create demand for DIG and had material impact on the price of DIG sales on the Livecoin trading platform," which, by the SEC's own admission, was located in Russia. In Paragraph 81, the SEC alleges: "Hogg and Goldberg exclusively handled all of these sales of DIG on Livecoin and generally sold DIG in exchange for Bitcoin." Finally, in Paragraph 84, the SEC alleges: "DIG investors' role was limited to purchasing the DIG tokens through the Livecoin Trading Platform."

33. Thus, under the SEC's own allegations, all DIG transactions at issue all occurred exclusively on the Livecoin trading platform, a foreign secondary-market platform based in Russia. Moreover, based upon the SEC's allegations in Paragraph 19 of its Complaint, all 3 billion tokens were owned and controlled by Hogg and Cryptobonix who arranged for the tokens to be sold on Livecoin. In paragraph 25 of the SEC's Complaint, the SEC's alleges in pertinent part that "Likewise, the initial coin offering that Arbitrade and Cryptobontix planned to carry out never occurred". There is no allegation tying the control or ownership of the 3 billion tokens sold on the Livecoin exchange to Arbitrade. Accordingly, the transactions as alleged by the SEC appear to be secondary-market sales

of DIG tokens on the Livecoin crypto trading platform, which tokens were owned and controlled by Hogg and Cryptobontix.

34. In paragraph 84 of the SEC' Complaint, the SEC alleges "Investors would have also expected profits based on the success of Arbitrade's underlying business ventures, including mining of crypto assets and the creation of a crypto asset trading platform and merchant payment platform." Here, the SEC alleges that Arbitrade was the purported "common enterprise" within the meaning of *Howey*; assuming arguendo that such allegation is true and a common enterprise existed, involving Arbitrade, the Complaint nevertheless does not allege any initial coin offering or any sale of tokens by Arbitrade.

35. In rejecting the SEC's attempt to collapse all transactions into a single investment-contract theory, the *Ripple* court held that secondary-market purchasers, who "did not know whether their payments went to Ripple or to some other seller", could not, as a matter of law, be said to have invested "in a common enterprise" with Ripple or reasonably expected profits from Ripple's entrepreneurial or managerial efforts. The court emphasized that where the issuer is not a counterparty, does not solicit the transaction, and does not receive the proceeds, the essential *Howey* elements fail. This reasoning also applies to this case, where Livecoin secondary-market transactions occurred independently of Arbitrade and entirely outside any issuer-driven capital-raising context.

36. Moreover, *Ripple* underscores that securities-law analysis must be grounded in the economic and geographic realities of the transaction itself, not the SEC's generalized theories. The Ripple court's refusal to extend investment-contract status to anonymous secondary-market trades, where purchasers lacked knowledge of the issuer and

transactions occurred through global digital-asset platforms, reflects an implicit recognition of the territorial limits of U.S. securities regulation. Under *Ripple's* reasoning, such transactions cannot be retroactively transformed into U.S. securities transactions by regulatory fiat.

37. In *SEC v. Coinbase, Inc., et al.*, No. 1:23-cv-4738 (KPF) (S.D.N.Y. Jan. 7, 2025), the court addressed whether secondary-market transactions of crypto-assets may constitute "investment contracts" under *Howey* as a matter of law. See *Coinbase* Decision at 21–23, 25. In certifying its prior order for interlocutory appeal, the *Coinbase* court expressly recognized conflicting authority within the Second Circuit on this precise issue.

38. Specifically, the Coinbase Decision identified the tension between *SEC v. Ripple Labs, Inc.,* 682 F. Supp. 3d 308, 324–30 (S.D.N.Y. 2023), which drew a distinction between primary sales to institutional investors and secondary-market sales to public buyers that did not satisfy *Howey*, and *SEC v. Terraform Labs Pte. Ltd.,* 684 F. Supp. 3d 170, 195–98 (S.D.N.Y. 2023), which declined to adopt *Ripple's* distinction. The Coinbase court further noted that its own prior order, now certified for appeal. "deepened the split" by adopting an analysis more consistent with Terraform.

39. The *Coinbase* Decision also recognized the opinion of Judge Jackson in *SEC v. Binance Holdings Ltd.,* No. 23 Civ. 1599 (ABJ), 2024 WL 3225974 (D.D.C. June 28, 2024), in which Judge Jackson stated that she was "inclined to agree with the approach" articulated in *Ripple*. See *Coinbase* Decision at 21–22.

40. This unsettled and rapidly developing legal landscape underscores why the SEC's assertion that striking Count One "changed nothing" is untenable. Once the sole

registration claim was removed, the remaining allegations concern only foreign, secondary-market transactions conducted on a non-U.S. platform. In that posture, whether the alleged transactions constitute "investment contracts" under *Howey*—and whether they fall within the Exchange Act's jurisdictional reach—can no longer be presumed. Those elements must be affirmatively established.

41. The *Ripple* decision further confirms that the application of *Howey* to digital assets, particularly secondary-market transactions, remains an unsettled and evolving area of law. The court's detailed, transaction-by-transaction analysis, and its rejection of the SEC's categorical approach, demonstrate that reasonable actors could not have had fair notice that foreign, anonymous secondary-market trades would be deemed securities transactions under U.S. law. This ongoing judicial debate forecloses the SEC's attempt to recast novel enforcement theories as settled doctrine.

42. In light of the acknowledged split among federal courts on whether secondary-market crypto transactions satisfy *Howey*, the sufficiency of the SEC's remaining claims and the existence of subject-matter jurisdiction present serious, good-faith legal questions. The SEC's attempt to dismiss those questions as settled, or to characterize motions raising them as improper, ignores both the Court's own order striking Count One and the evolving state of the law governing digital assets and whether they constitute a security under Howey.

## VIII. THERE IS NO PREJUDICE TO THE SEC

39. The SEC identifies no concrete or cognizable prejudice resulting from Braverman's motions. Discovery has closed. Summary-judgment briefing is already extensive. No trial date has been set. Addressing threshold jurisdictional and pleading issues at this stage

imposes no undue burden on the SEC and does not disrupt the procedural posture of the case.

40. By contrast, granting the SEC's Motion to Strike would substantially prejudice Braverman. It would improperly shield alleged jurisdictional defects from judicial review and foreclose individualized consideration of the claims asserted against him personally—issues that go to the Court's authority to adjudicate the case and to the fundamental fairness of the proceedings.

## IX.  CONCLUSION

Braverman's motions were filed in good faith, were invited by the Court, raise non-waivable issues of subject-matter jurisdiction that may be addressed at any stage of the proceedings, and comply fully with the Federal Rules of Civil Procedure and this Court's Local Rules.

Because the operative Complaint continues to rely on the revenue-dependent profit allegations set forth in paragraph 84, and because the SEC's Motion to Strike seeks to foreclose meaningful scrutiny of those allegations, the motion should be denied. Braverman is entitled to challenge the SEC's theory as pled, to identify the SEC's unsuccessful attempt to retreat from that theory, and to obtain judicial review through established procedural mechanisms—not through the extraordinary remedy of striking argument from the record.

For these reasons, the SEC's Motion to Strike should be denied in its entirety.

WHEREFORE, Defendant Stephen L. Braverman respectfully requests that the Court deny the SEC's Motion to Strike and grant such other and further relief as the Court deems just and proper.

**Request for Oral Argument**

Defendant Braverman respectfully requests oral argument pursuant to Local Rule 7.1(d). Given the significance of the relief sought and the factual and legal issues implicated, oral argument would assist the Court in resolving the matters presented.

Respectfully submitted on January 2, 2026.

> KERR LAW GROUP
> *Attorneys for Stephen L. Braverman*
> 1025 W. Indiantown Road, #102
> Jupiter, Florida 33458
> Telephone: (561) 571-0358
>
> /s/ Russell A. Kerr
> Russell Kerr, Esq., Bar #10206
> S. Mitchell Moran, Esq., Bar #113344
> RKerr@RussellKerrLaw.com
> SMitchellMoran@kerrlawgroup.com

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 2nd day of January, 2026, a true and correct copy of the foregoing was filed with the Court using CM/ECF to: Troy R.J. Hogg, Pro Se, troyhogg2020@protonmail.com, Max W. Barber, Pro Se, maximas24@me.com; 23blackbee@gmail.com, Counsel for Plaintiff- Securities and Exchange Commission, Alice K. Sum, Esq., Securities and Exchange Commission, sumal@sec.gov, and James L. Goldberg, Pro Se, james_goldberg@msn.com.

> /s/ Russell A. Kerr
> Rusell A. Kerr, Esq.