Case 1:22-cv-23171-MD   Document 564   Entered on FLSD Docket 05/29/2026   Page 1 of 183

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF FLORIDA

CASE NO. 22-cv-23171-DAMIAN/D'ANGELO

SECURITIES AND EXCHANGE COMMISSION,

Plaintiff,

v.

ARBITRADE LTD.,

CRYPTOBONTIX INC.,

TROY R.J. HOGG,

JAMES L. GOLDBERG,

STEPHEN L. BRAVERMAN, and

MAX W. BARBER,

Defendants.

_____/

**JOINT SUPPLEMENTAL NOTICE OF MATERIAL DISCLOSURE FACTS RELEVANT TO PLAINTIFF'S HOWEY THEORY, PURCHASER RELIANCE ALLEGATIONS, AND PENDING PROCEDURAL POSTURE**

Defendants Troy R.J. Hogg ("Hogg") and James L. Goldberg ("Goldberg"), proceeding pro se, respectfully submit this Joint Supplemental Notice of Material Disclosure Facts in light of (1)

Plaintiff's May 15, 2026 Second Supplemental Rule 26 Disclosures and (2) the SEC/CFTC Joint Interpretive Guidance issued March 17, 2026.

## I. INTRODUCTION

1. On May 15, 2026, Plaintiff disclosed approximately eighty-nine (89) pages of previously undisclosed communications (Ex. B) involving investor Jason Dolgy and Defendant Stephen Braverman.

2. Those communications were disclosed after the close of discovery, after dispositive briefing had concluded, and during the continued stayed posture of this case.

3. Plaintiff's March 17, 2026 SEC/CFTC Joint Interpretive Guidance (Ex. A) places significant emphasis upon:

    (a) purchaser reliance;

    (b) essential managerial efforts;

    (c) attribution of representations;

    (d) continuity of managerial control; and

    (e) the separation of investment-contract relationships from underlying digital assets following changes in managerial authority.

4. Plaintiff's newly disclosed communications raise material questions concerning those very issues and are directly relevant to Plaintiff's previously asserted Howey theory.

## II. PLAINTIFF'S OWN GUIDANCE RECOGNIZES THE SIGNIFICANCE OF MANAGERIAL SEPARATION

5. The SEC/CFTC Joint Interpretive Guidance states:

"When a purchaser of a non-security crypto asset that has been subject to an investment contract could no longer reasonably expect the issuer's representations or promises to engage in essential managerial efforts to remain connected to the non-security crypto asset, the non-security crypto asset separates from such representations or promises."

6. The guidance further provides that where purchaser expectations are no longer connected to those managerial efforts:

"the associated investment contract would cease to exist."

7. The guidance further explains that purchaser expectations depend upon the issuer's representations and promises to engage in continuing essential managerial efforts.

8. Plaintiff's own regulatory framework therefore places substantial importance upon:

   (a) who exercised managerial authority;

   (b) who communicated with investors;

   (c) whose efforts purchasers relied upon; and

   (d) whether material changes in operational control occurred.

## III. PLAINTIFF'S NEWLY DISCLOSED COMMUNICATIONS DOCUMENT A MATERIAL CHANGE IN OPERATIONAL AUTHORITY

9. Plaintiff's newly disclosed communications contain statements attributed to Defendant Stephen Braverman including:

"Listen when this was arbitrade i did not control the outcome. Now I do."

10. Plaintiff's disclosure further contains the statement:

"Unfortunately Troy Jamie and Len were unable to execute. Kent and I are not."

11. These statements are significant because they were produced and disclosed by Plaintiff and expressly distinguish:

(a) prior management;

(b) current management;

(c) operational authority; and

(d) execution responsibility.

12. Plaintiff's own disclosure therefore reflects a claimed transition of operational authority away from prior management and toward Defendant Braverman and Kent Swig.

13. Notably, the newly disclosed communications do not consist of communications between the investor and Defendants Hogg or Goldberg.

14. Rather, the communications primarily consist of statements made by Defendant Braverman concerning:

(a) operations;

(b) future plans;

(c) management decisions;

(d) token-related activities;

(e) exchange activity; and

(f) enterprise execution.

15. Defendants Hogg and Goldberg appear primarily as third parties being discussed by others rather than as active participants in the communications.

16. Plaintiff's own disclosure therefore raises substantial questions concerning:

(a) purchaser reliance;

(b) attribution of representations;

(c) managerial authority; and

(d) whose alleged efforts investors were actually relying upon during the relevant period.

## IV. PLAINTIFF'S NEW DISCLOSURE IS CONSISTENT WITH PREVIOUSLY NOTICED EVIDENCE OF MANAGERIAL TRANSITION

17. Plaintiff's newly disclosed communications are not isolated evidence. Rather, they are consistent with previously submitted and noticed exhibits already before the Court.

18. In Exhibit C, Arbitrade's Bermuda corporate counsel expressly advised that:

"Troy Hogg is not a director of Arbitrade Ltd. nor is he involved in the day to day running or any major management of the Company."

19. Exhibit C further confirms that Defendant Hogg possessed no signing authority on behalf of Arbitrade-related entities and was not involved in major management functions.

20. Thus, well before Plaintiff's newly disclosed 2026 communications, evidence existed demonstrating that operational governance and management authority had been transferred away from Defendant Hogg.

21. Similarly, Exhibit D, a November 2018 draft press release, reflects that communications concerning token holders were expressly assigned to Defendant Stephen Braverman. Specifically, the document states:

"Questions from Coin Holders are under the counsel of Stephen Braverman."

22. Exhibit D further reflects that the announcement itself was made by Arbitrade's Board of Directors and confirmed by Chairman and Chief Executive Officer Len Schutzman on behalf of the Board.

23. Accordingly, Plaintiff's newly disclosed communications showing Braverman serving as the investor-facing representative are consistent with previously noticed evidence assigning investor communications responsibilities to Braverman rather than Defendants Hogg or Goldberg.

24. Exhibit E further reflects that:

(a) SION Trading FZE was identified as Arbitrade's precious metals procurement agent;

(b) Max Barber was publicly quoted regarding the transaction;

(c) Leonard Schutzman was publicly quoted regarding the transaction;

(d) DIG tokens were associated with Arbitrade Ltd. who was controlled by a board of directors at the time; and

(e) Stephen Braverman was identified as Chief Operating Officer and investor contact.

25. Exhibit E also contains express disclaimers distancing Gold Resource Corporation from responsibility for statements concerning SION and related precious metals representations.

26. The allocation of communications authority reflected in Exhibit E is consistent with Plaintiff's newly disclosed communications showing investors communicating directly with Braverman regarding operations, token activity, exchange activity, and future enterprise plans.

27. Exhibit F, titled "Industry Veterans Launch Dignity Holdings, LLC," further reflects a public transition in which Dignity Holdings announced that it had acquired Cryptobontix and the associated DIG, NAM, HNR, and ORE token ecosystem, while identifying Defendant Braverman as the executive leading the newly formed structure.

28. That exhibit therefore reflects a publicly asserted transfer of operational authority and token-related management to actors other than Defendants Hogg and Goldberg.

29. Defendants additionally submit Exhibit G, a February 12, 2023 correspondence concerning the DIGG/DIGau framework, as supplemental evidence relevant to Plaintiff's purchaser-reliance and managerial-efforts theories. Exhibit G reflects that holders of the original DIG token were directed into a separate DIGG/DIGau structure involving Dignity Corp., Tritaurian Capital, accredited investor verification, KYC/AML procedures, Regulation BI disclosures, subscription agreements, and separate investor-facing offering materials.

30. The significance of this evidence is underscored by Plaintiff's March 17, 2026 SEC/CFTC interpretive guidance, which recognizes that purchaser expectations may become separated from prior managerial efforts and prior representations when later representations, managerial actors, and operational structures become the basis for investor expectations.

31. Exhibit G reflects a framework involving different entities, different offering materials, different compliance procedures, different investor-facing communications, and a proposed DIG-to-DIGG/DIGau replacement structure. Such evidence is consistent with the type of managerial and purchaser-reliance separation described in Plaintiff's March 2026 guidance.

32. When considered together with Plaintiff's newly disclosed communications and the previously noticed exhibits demonstrating Board governance, Braverman's investor-facing role, and later asserted acquisition of the token ecosystem, Exhibit G further reinforces the material relevance of continuity, attribution, purchaser reliance, and managerial-control questions under Plaintiff's own interpretive framework.

## V. RELEVANCE TO PLAINTIFF'S HOWEY THEORY

32. Plaintiff's Motion for Partial Summary Judgment was heavily premised upon the application of SEC v. W.J. Howey Co., 328 U.S. 293 (1946).

33. Plaintiff's March 2026 interpretive guidance places substantial emphasis upon purchaser reliance, continuing essential managerial efforts, attribution of representations, and changes in managerial authority.

34. Plaintiff's newly disclosed communications, when viewed together with the previously noticed exhibits referenced above, raise substantial questions concerning the continuity of the managerial-efforts theory previously advanced by Plaintiff.

35. Specifically, Plaintiff's own evidence reflects:

(a) Board governance and decision-making authority;

(b) investor-facing communications being assigned to Defendant Braverman;

(c) publicly asserted transfers of ownership and control;

(d) claimed operational authority by Defendant Braverman and later actors; and

(e) later investor-facing token structures involving different entities and regulatory frameworks.

36. These developments are directly relevant to:

    (a) purchaser reliance;

    (b) attribution of representations;

    (c) common enterprise analysis;

    (d) reliance upon the essential managerial efforts of others; and

    (e) continuity of any alleged investment-contract relationship.

37. Defendants do not contend that Plaintiff's March 2026 interpretive guidance automatically resolves the issues in this case.

38. However, the guidance materially refines the analysis of purchaser reliance, essential managerial efforts, attribution of representations, and separation of investment-contract relationships.

39. When considered together with Plaintiff's own May 2026 disclosures, these developments create substantial tension with aspects of Plaintiff's previously asserted Howey theory and pending dispositive arguments.

## VI. REQUEST FOR CONSIDERATION AT STATUS CONFERENCE

40. Because Plaintiff's newly disclosed evidence and intervening March 2026 guidance directly concern purchaser reliance, managerial efforts, attribution, and continuity of enterprise control, Defendants respectfully submit that these developments warrant consideration at the requested status conference.

41. Defendants further respectfully submit that the Court may wish to consider whether supplemental briefing or other procedural relief is appropriate in light of:

(a) Plaintiff's post-discovery disclosures;

(b) the continued stayed posture of this case;

(c) intervening regulatory developments; and

(d) the material relevance of these issues to Plaintiff's pending claims and dispositive theories.

WHEREFORE, Defendants Troy R.J. Hogg and James L. Goldberg respectfully submit this Supplemental Notice of Material Disclosure Facts and request such other and further relief as the Court deems just and proper.

DATED: May 29, 2026

Respectfully submitted,

Troy R.J. Hogg, Pro Se

James L. Goldberg, Pro Se

*Conformed to Federal Register version*

SECURITIES AND EXCHANGE COMMISSION

17 CFR Parts 231 and 241

[Release Nos. 33-11412; 34-105020; File No. S7-2026-09]

RIN 3235-AN56

COMMODITY FUTURES TRADING COMMISSION

17 CFR Part 1

RIN 3038-AF67

Application of the Federal Securities Laws to Certain Types of Crypto Assets and Certain

Transactions Involving Crypto Assets

AGENCY: Securities and Exchange Commission; Commodity Futures Trading Commission

ACTION: Final rule; interpretation; guidance

SUMMARY: The Securities and Exchange Commission ("Commission" or "SEC") issues

herein an interpretation regarding the application of the Federal securities laws to certain types of

crypto assets and certain transactions involving crypto assets. The references in this release to

"we" and "our" are to the Commission. The Commodity Futures Trading Commission ("CFTC")

provides herein guidance relating to that interpretation.

DATES: *Effective Date*: March 23, 2026.

ADDRESSES: Comments may be submitted by any of the following methods:

Electronic Comments:

- Use the Commission's internet comment form (https://www.sec.gov/comments/s7-
  2026-09/application-federal-securities-laws-certain-types-crypto-assets-certain-
  transactions-involving); or

- Send an email to rule-comments@sec.gov. Please include File Number S7-2026-09 on the subject line.

**Paper Comments:**

- Send paper comments to Vanessa A. Countryman, Secretary, Securities and Exchange Commission, 100 F Street NE, Washington, DC 20549-1090.

All submissions should refer to File Number S7-2026-09. This file number should be included on the subject line if email is used. To help the Commission process and review your comments more efficiently, please use only one method of submission. The Commission will post all comments on the Commission's website (https://www.sec.gov/comments/s7-2026-09/application-federal-securities-laws-certain-types-crypto-assets-certain-transactions-involving). Do not include personally identifiable information in submissions; you should submit only information that you wish to make available publicly. The Commission may redact in part or withhold entirely from publication submitted material that is obscene or subject to copyright protection.

**FOR FURTHER INFORMATION CONTACT:** SEC: Andrew Schoeffler, Office of Chief Counsel, at (202) 551-3500, Division of Corporation Finance, Securities and Exchange Commission, 100 F Street NE, Washington, DC 20549; CFTC: Mark Fajfar, Senior Assistant General Counsel, Office of the General Counsel, at (202) 418-6636, Commodity Futures Trading Commission, Three Lafayette Centre, 1155 21st Street, NW, Washington, DC 20581.

**SUPPLEMENTARY INFORMATION:**

**Table of Contents**

I.      INTRODUCTION .................................................................................................... 4

II.     DEFINITION OF "SECURITY" .......................................................................... 9

III.    CLASSIFICATION OF CRYPTO ASSETS ...................................................... 13

A.    **Digital Commodities** ................................................................................. 14

B.    **Digital Collectibles** ................................................................................. 16

C.    **Digital Tools** ............................................................................................ 20

D.    **Stablecoins** .............................................................................................. 21

E.    **Digital Securities** ..................................................................................... 23

IV.    **CRYPTO ASSETS THAT ARE SUBJECT TO AN INVESTMENT CONTRACT**.... 24

    A.    **How Crypto Assets Become Subject to an Investment Contract** ......................... 24

    B.    **Separation of a Non-Security Crypto Asset from the Issuer's Representations or Promises** .................................................................................................. 28

        1.    **Fulfillment of the Issuer's Representations or Promises** ........................... 29

        2.    **Failure to Satisfy Issuer's Representations or Promises** ......................... 31

        3.    **Application of the Interpretation** ..................................................... 33

V.    **FEDERAL SECURITIES LAWS STATUS OF THE CRYPTO ASSET ACTIVITIES KNOWN AS "PROTOCOL MINING" AND "PROTOCOL STAKING"** ................... 34

    A.    **Protocol Mining**....................................................................................... 35

        1.    **Protocol Mining Activities Generally**............................................... 35

        2.    **Covered Protocol Mining Activities** ................................................ 37

        3.    **Interpretation Regarding Protocol Mining Activities** ............................ 38

    B.    **Protocol Staking**...................................................................................... 40

        1.    **Protocol Staking Activities Generally** .............................................. 40

        2.    **Covered Protocol Staking Activities**................................................ 46

        3.    **Interpretation Regarding Protocol Staking Activities**............................ 47

        4.    **Interpretation Regarding Staking Receipt Tokens**................................. 52

VI.    **FEDERAL SECURITIES LAWS STATUS OF THE CRYPTO ASSET ACTIVITY KNOWN AS "WRAPPING"**................................................................................ 54

VII.    **APPLICATION OF THE *HOWEY* TEST TO CERTAIN CRYPTO ASSET DISSEMINATIONS KNOWN AS "AIRDROPS"** ......................................................... 58

    A.    **Airdrops Generally**.................................................................................. 58

    B.    **Covered Airdrops**.................................................................................... 59

    C.    **Interpretation Regarding Airdrops**.............................................................. 60

VIII.  **OTHER MATTERS**............................................................................................ 63

IX.    **COMMISSION ECONOMIC CONSIDERATIONS**........................................................ 63

3

## I.   INTRODUCTION

The Commission has engaged with crypto assets[1] for more than a decade.[2] In 2017, the Commission issued a report pursuant to section 21(a) of the Securities Exchange Act of 1934 (the "Exchange Act")[3] regarding offers and sales of crypto assets by an unincorporated organization named "The DAO."[4] The Commission, in The DAO Report, determined, among other things, that crypto assets issued by The DAO were offered and sold as investment contracts and, therefore, securities under section 2(a)(1) of the Securities Act of 1933 (the "Securities Act")[5] and section 3(a)(10) of the Exchange Act.[6] In making this determination, the Commission applied the "*Howey* test," which the U.S. Supreme Court (the "Supreme Court") has used to determine whether a contract, transaction, or scheme is an investment contract and therefore a security.[7] In the years following publication of The DAO Report, the Commission applied the

---

[1]   For purposes of this release: a "crypto asset" is any digital representation of value that is recorded on a cryptographically secured distributed ledger; a "crypto network" is a blockchain or similar distributed ledger technology network; and a "crypto application" is a software application running on a crypto network. We refer to crypto networks and crypto applications together in this release as "crypto systems." Further, for purposes of this release, "onchain" refers to transactions or data that are processed and recorded directly on a crypto network and "offchain" refers to transactions or data that are processed and recorded outside of a crypto network. The foregoing definition of "crypto asset" is identical to the definition of "Digital Asset" in section 2(6) of the Guiding and Establishing National Innovation for U.S. Stablecoins Act, Pub. L. No. 119-27, 139 Stat. 419 (2025) ("GENIUS Act").

[2]   For example, the first registration statement for the offer and sale of a crypto asset exchange-traded product was filed with the Commission in 2013. *See* Form S-1 Registration Statement filed with the Commission on July 1, 2013, available at https://www.sec.gov/Archives/edgar/data/1579346/000119312513279830/d562329ds1.htm.

[3]   15 U.S.C. 78a *et seq.*

[4]   *See Report of Investigation Pursuant to Section 21(a) of the Securities Exchange Act of 1934: The DAO*, Release No. 34-81207 (July 25, 2017) ("The DAO Report").

[5]   15 U.S.C. 77a *et seq.*

[6]   *See* The DAO Report at 11-15.

[7]   *See SEC v. W.J. Howey Co.*, 328 U.S. 293 (1946) ("*Howey*"). The *Howey* test defines an investment contract as a contract, transaction, or scheme involving (1) an investment of money, (2) in a common enterprise, (3) with an expectation of profits derived from the efforts of others. Courts have concluded that the "*Howey* test has three elements," including "a common enterprise." *SEC v. Barry*, 146 F.4th 1242, 1251 (9th Cir. 2025); *accord SEC v.*

4

*Howey* test, mostly in the context of enforcement actions, to determine whether crypto assets were offered and sold as investment contracts and therefore as securities. Some Commissioners and other commentators expressed concerns about the Commission's approach to crypto assets during this period. Some described that approach as "regulation by enforcement," stating that the Commission pursued enforcement actions against crypto asset issuers for alleged violations of the Federal securities laws rather than developing a tailored regulatory framework that accommodates crypto asset innovation and entrepreneurship.[8]

Applying the *Howey* test to crypto assets and transactions involving crypto assets can be challenging because of the varying degrees of control that persons or groups may have over crypto systems, the diversity of the types of crypto assets with varying characteristics, uses, and functionality, and the evolving nature of crypto assets and crypto systems. These unique attributes of crypto assets have prompted divergent views among market participants, financial regulators, and the courts over the application of the *Howey* test to crypto assets and transactions involving crypto assets, particularly with respect to secondary market transactions involving crypto assets. Accordingly, market participants have requested guidance from the Commission

---

*Scoville*, 913 F.3d 1204, 1220 (10th Cir. 2019) (the *Howey* test has been broken down into "three requirements," including a "common enterprise"). To the extent the Commission's opinion in *In re Barkate*, Release No. 34-49542, 2004 WL 762434, at *3 n.13 (Apr. 8, 2004), or other such prior statements by the Commission or its staff indicate that the Commission does not view commonality as a requirement for an "investment contract" under *Howey*, the Commission concludes and clarifies that, based on courts' post-*Barkate* decisions, the common enterprise element must be satisfied.

[8] *See, e.g.*, Commissioner Hester M. Peirce, *Outdated: Remarks before the Digital Assets at Duke Conference* (Jan. 20, 2023), available at https://www.sec.gov/newsroom/speeches-statements/peirce-remarks-duke-conference-012023#_ftn35; Commissioner Mark T. Uyeda, *Remarks at the "SEC Speaks" Conference 2022*, available at https://www.sec.gov/newsroom/speeches-statements/uyeda-speech-sec-speaks-090922; Commissioner Mark T. Uyeda, *Remarks at the "SEC Speaks" Conference 2025*, available at https://www.sec.gov/newsroom/speeches-statements/uyeda-remarks-sec-speaks-051925.

regarding the circumstances under which the Commission will characterize crypto assets as securities and transactions involving crypto assets as securities transactions.[9]

On January 21, 2025, Acting Chairman Mark T. Uyeda established the Crypto Task Force to help provide greater clarity on the application of the Federal securities laws to the crypto asset markets.[10] The Crypto Task Force's focus is to support, among other things, the Commission's efforts to draw clear regulatory lines, appropriately distinguish securities from non-securities, craft tailored disclosure frameworks, provide realistic paths to registration for crypto asset offerings and intermediaries subject to the Federal securities laws, and ensure that investors have the information necessary to make informed investment decisions.[11] To this end, the Crypto Task Force has hosted a series of roundtables, including a March 21, 2025 roundtable on security status titled, "How We Got Here and How We Get Out – Defining Security Status."[12] The Crypto Task Force also has requested and received written input from,[13] and held meetings with, members of the public.[14] To date, the Crypto Task Force has received over 300 written submissions from issuers, investors (both individual and institutional), law firms and legal

---

[9]   *See, e.g.,* Coinbase, Petition for Rulemaking – Digital Asset Securities Regulation (July 21, 2022), available at https://www.sec.gov/rules/petitions/2022/petn4-789.pdf; Letter from Robinhood Markets, Inc. (Mar. 13, 2025), available at https://www.sec.gov/files/ctf-input-robinhood-2025-03-13.pdf; Letter from Andreessen Horowitz (Mar. 13, 2025), available at https://api.a16zcrypto.com/wp-content/uploads/2025/03/a16z-Crypto-SEC-RFI-Questions-1-through-6-March-13-2025.pdf; Letter from Coinbase Global, Inc. (Mar. 19, 2025), available at https://www.sec.gov/files/ctf-input-grewal-2025-3-19.pdf; Letter from SIFMA and SIFMA AMG (May 9, 2025), available at https://www.sifma.org/wp-content/uploads/2025/05/SIFMA-SEC-Crypto-RFI-Initial-Response-May-2025.pdf.

[10]   *See* U.S. Securities and Exchange Commission, Crypto Task Force, available at https://www.sec.gov/about/crypto-task-force.

[11]   *Id.*

[12]   *See* U.S. Securities and Exchange Commission, Crypto Task Force Roundtables, available at https://www.sec.gov/about/crypto-task-force/crypto-task-force-roundtables.

[13]   *See* U.S. Securities and Exchange Commission, Crypto Task Force Written Input, available at https://www.sec.gov/about/crypto-task-force/crypto-task-force-written-input.

[14]   *See* U.S. Securities and Exchange Commission, Crypto Task Force Meetings, available at https://www.sec.gov/about/crypto-task-force/crypto-task-force-meetings.

professionals, audit and accounting professionals and firms, academics, professional and investor associations and organizations, investment companies and advisors, market intermediaries, service providers, network foundations, foreign entities, other crypto asset market participants, and other members of the public.[15]

In July 2025, the President's Working Group on Digital Asset Markets released a report titled, "Strengthening American Leadership in Digital Financial Technology" that, among other things, addresses the need for a taxonomy for crypto assets and sets forth a number of recommended regulatory reforms relating to the crypto asset markets.[16] In particular, the report recommended that the "SEC and CFTC should use their existing authorities to provide fulsome regulatory clarity that best keeps blockchain-based innovation within the United States."[17] In connection with the release of the report, Chairman Paul S. Atkins launched "Project Crypto," a Commission-wide initiative to modernize rules and regulations under the Federal securities laws in accordance with the President's Working Group's recommendations to enable America's financial markets to move onchain.[18] Among other things, Chairman Atkins directed the staff to "work to develop clear guidelines that market participants can use to determine whether a crypto asset is a security or subject to an investment contract."[19] On January 29, 2026, Chairman Atkins and CFTC Chairman Michael S. Selig announced that Project Crypto—previously an SEC-led

---

[15]  *See supra* note 13.

[16]  *See Strengthening American Leadership in Digital Financial Technology* (July 30, 2025) ("PWG Report"), available at https://www.whitehouse.gov/wp-content/uploads/2025/07/Digital-Assets-Report-EO14178.pdf.

[17]  *Id.* at 54.

[18]  *See* Chairman Paul S. Atkins, *American Leadership in the Digital Finance Revolution* (July 31, 2025), available at https://www.sec.gov/newsroom/speeches-statements/atkins-digital-finance-revolution-073125.

[19]  *Id.*

initiative—will proceed as a joint effort between the SEC and the CFTC to harmonize federal oversight of crypto asset markets.[20]

In light of the concerns raised about the Commission's approach to crypto assets before 2025, the regulatory developments beginning in 2025, and the public input provided to the Crypto Task Force, the Commission has determined to issue herein an interpretation of the definition of "security" as applied to crypto assets and transactions involving crypto assets as part of its efforts to provide greater clarity regarding the Commission's treatment of crypto assets under the Federal securities laws. We first discuss the definition of "security" under the Federal securities laws, including the term "investment contract." We then classify crypto assets into categories based on their characteristics, uses, and functions, and analyze each category under the definition of "security." We also address how a "non-security crypto asset"—which is a crypto asset that itself is not a security—may become subject to, and how it may cease to be subject to, an investment contract. Further, we discuss the Federal securities laws status of the crypto asset activities known as "protocol mining," "protocol staking," and "wrapping." Finally, we discuss the application of the *Howey* test to certain crypto asset disseminations known as "airdrops."

The interpretation in this release does not supersede or replace the *Howey* test, which is binding legal precedent. Rather, the interpretation conveys the Commission's views, informed by the extensive feedback the Commission and its staff have received to date on these topics (including from the Crypto Task Force's roundtables, written input, and meetings), regarding

---

[20] *See* Chairman Paul S. Atkins, Opening Remarks at Joint SEC-CFTC Harmonization Event – Project Crypto (Jan. 29, 2026), available at https://www.sec.gov/newsroom/speeches-statements/atkins-remarks-joint-sec-cftc-harmonization-event-project-crypto-012926; Chairman Michael S. Selig, *The Next Phase of Project Crypto: Unleashing Innovation for the New Frontier of Finance* (Jan. 29, 2026), available at https://www.cftc.gov/PressRoom/SpeechesTestimony/opaselig1.

8

how certain aspects of the *Howey* test apply to crypto assets and transactions involving crypto assets.[21] The Commission and its staff will administer the Federal securities laws consistent with the interpretation, including with respect to enforcement actions. The interpretation is the Commission's first step toward developing a clearer regulatory framework for the treatment of crypto assets under the Federal securities laws.[22]

Further, the CFTC provides herein guidance that the CFTC and its staff will administer the Commodity Exchange Act[23] consistent with the interpretation,[24] and that certain non-security crypto assets could meet the definition of "commodity" under the Commodity Exchange Act.[25]

The interpretation in this release is based on the Commission's current understanding of the crypto asset markets, including the typical transactional and structural features of these markets and the typical characteristics, uses, and functions of crypto assets. To help inform the Commission's ongoing consideration of the topics addressed in this release, we are soliciting public comment on the views set forth in the interpretation, including the descriptions of the crypto assets and crypto asset transactions contained herein. Based on the feedback received, the Commission may refine, revise, or expand upon the interpretation in order to provide further clarity regarding the Commission's treatment of crypto assets under the Federal securities laws.

## II. DEFINITION OF "SECURITY"

---

[21] The interpretation supersedes the Commission staff's *Framework for "Investment Contract" Analysis of Digital Assets* (Apr. 3, 2019), available at https://www.sec.gov/corpfin/framework-investment-contract-analysis-digital-assets.

[22] *See, e.g.*, U.S. Securities and Exchange Commission, *Spring 2025 Unified Agenda of Regulatory and Deregulatory Actions*, available at https://www.reginfo.gov/public/do/eAgendaMain?operation=OPERATION_GET_AGENCY_RULE_LIST&currentPub=true&agencyCode=&showStage=active&agencyCd=3235.

[23] 7 U.S.C. 1 *et seq.*

[24] Nothing in this release should be construed as altering the respective statutory authorities of the SEC or CFTC.

[25] *See infra* note 48.

In delineating the scope of the Federal securities laws, Congress "enacted a broad definition of 'security,' sufficient to encompass virtually any instrument that might be sold as an investment."[26] While the definition of "security" includes an enumerated list of "the commonly known documents traded for speculation or investment," including "stock," "bond," and "note," it also includes instruments "of a more variable character," such as "investment contract," "certificate of interest or participation in a profit-sharing agreement," and "any interest or instrument commonly known as a security."[27] In addition, the definition of "security" includes any "receipt for, guarantee of, or warrant or right to subscribe to or purchase" any of the financial instruments enumerated in the definition of "security."[28]

The Supreme Court has said that "[b]ecause securities transactions are economic in character Congress intended the application of these statutes to turn on the economic realities underlying a transaction, and not the name appended thereto."[29] The Supreme Court has reasoned that "in searching for the meaning and scope of the word 'security' . . ., form should be disregarded for substance and the emphasis should be on economic reality."[30] Nonetheless, the definition of "security" is not boundless: "Congress, in enacting the securities laws, did not intend to provide a broad federal remedy for all fraud."[31] While the securities laws cover "those instruments ordinarily and commonly considered to be securities in the commercial world," not every instrument is "the type of instrument that comes to mind when the term 'security' is used,"

---

[26] *SEC v. Edwards*, 540 U.S. 389, 393 (2004). The definition of "security" is "essentially identical in meaning" under section 2(a)(1) of the Securities Act (15 U.S.C. 77b(a)(1)) and section 3(a)(10) of the Exchange Act (15 U.S.C. 78c(a)(10)). *Id.* (citing *Reves v. Ernst & Young*, 494 U.S. 56, 61 n.1 (1990)).

[27] *Howey*, 328 U.S. at 297.

[28] 15 U.S.C. 77b(a)(1).

[29] *United Housing Foundation, Inc. v. Forman*, 421 U.S. 837, 849 (1975).

[30] *Id.*

[31] *Marine Bank v. Weaver*, 455 U.S. 551, 556 (1982).

10

and not every instrument falls within "the ordinary concept of a security."[32] Importantly, the Federal securities laws generally do not apply to items that are purchased for use or consumption,[33] whether they are physical or digital.

There is no universal test to determine whether an instrument is a security.[34] Instead, it must be analyzed to determine if it constitutes one of the financial instruments enumerated in the definition of "security." The financial instruments enumerated in the definition of "security" generally are not defined in statute or Commission rules,[35] but the Supreme Court and other Federal courts have interpreted many of them based on economic reality. For example, the Supreme Court has established tests for determining whether an instrument that is designated as a "note"[36] or "stock"[37] is a security for purposes of the Federal securities laws.

The definition of "security" is not limited to "obvious and commonplace" instruments.[38] In cases involving a "[n]ovel, uncommon, or irregular device," courts often evaluate whether the instrument is an "investment contract," a term that is not defined in statute or Commission

---

[32] *Id.* at 559.

[33] *Forman*, 421 U.S. at 852-53 ("[W]hen a purchaser is motivated by a desire to use or consume the item purchased—'to occupy the land or to develop it themselves,' as the Howey court put it, *ibid.*—the securities laws do not apply." (quoting *Howey*, 328 U.S. at 300)).

[34] Louis Loss (late), Joel Seligman & Troy Paredes, *Securities Regulation* 3.A.1 (6th and 7th eds., 2025 Cum. Supp. 2018-2023) ("Each type of financial instrument included in the statutory definition of security is susceptible to a separate analysis, employing separate analytical concepts. There is no universal or generic test of the term.").

[35] Certain financial instruments enumerated in the definition of "security" are defined in statute and Commission rules and regulations, such as "security future" and "security-based swap." *See, e.g.*, 15 U.S.C. 78c(a)(55) and (68).

[36] *See Reves*, 494 U.S. at 60–61 (holding that all notes are presumptively securities, with that presumption rebuttable where Reves's four-factor analysis indicates that the note was delivered in a commercial or consumer context and not in an investment context).

[37] *See Landreth Timber Co. v. Landreth*, 471 U.S. 681, 686 (1985) (holding that the characteristics typical of "stock" are "(i) the right to receive dividends contingent upon an apportionment of profits; (ii) negotiability; (iii) the ability to be pledged or hypothecated; (iv) the conferring of voting rights in proportion to the number of shares owned; and (v) the capacity to appreciate in value").

[38] *SEC v. C.M. Joiner Leasing Corp.*, 320 U.S. 344, 351 (1943).

11

rules.[39] The Commission and Federal courts typically have evaluated the security status of crypto assets and crypto asset transactions under an investment contract analysis.[40]

In *Howey*, the Supreme Court defined the term "investment contract" in a way that it intended to be "capable of adaptation to meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits."[41] Under *Howey*, the term "investment contract" means any contract, transaction, or scheme whereby a person invests money in a common enterprise and reasonably expects profits to be derived from the efforts of others.[42] This definition, known as the "*Howey* test,"[43] is intended to afford "the SEC and the courts sufficient flexibility to ensure that those who market investment contracts are not able to escape the coverage of the Federal securities laws by creating new instruments that would not be covered by a more determinate definition."[44] Since the Supreme Court decided *Howey* in 1946, Federal courts have applied the *Howey* test to a broad range of contracts, transactions, and schemes.[45]

---

[39] *Id.*

[40] *See, e.g.*, The DAO Report; *SEC v. Telegram Grp. Inc.*, 448 F. Supp. 3d 352 (S.D.N.Y. 2020).

[41] *Howey*, 328 U.S. at 299.

[42] *Id.* at 298-99. The *Howey* test's "efforts of others" requirement is satisfied when "the efforts made by those other than the investor are the undeniably significant ones, those essential managerial efforts which affect the failure or success of the enterprise." *See, e.g.*, *SEC v. v. Glenn W. Turner Enterprises, Inc.*, 474 F.2d 476, 482 (9th Cir. 1973). Federal courts also have stated that administrative and ministerial activities are not managerial efforts that satisfy *Howey's* "efforts of others" requirement. *See, e.g.*, *First Fin. Fed. Sav. & Loan v. E.F. Hutton Mortgage*, 834 F.2d 685 (8th Cir. 1987) (activities performed were merely administrative and ministerial in nature and therefore did not constitute the managerial efforts of others); *Union Planters National Bank of Memphis v. Commercial Credit Business Loans, Inc.*, 651 F.2d 1174 (6th Cir. 1981) (stating that administrative tasks and services are not managerial under *Howey*); *see also Donovan v. GMO-Z.com Tr. Co., Inc.*, 779 F. Supp. 3d 372, 388 (S.D.N.Y. 2025) ("Ministerial, technical, and clerical tasks often are 'necessary' for an investment scheme to operate and thereby generate a profit, but courts have long found such efforts to be insufficient under *Howey's* third prong."). In this release, we refer to managerial efforts that meet the *Howey* test's "efforts of others" requirement as "essential managerial efforts."

[43] *See supra* note 7.

[44] *Reves*, 494 U.S. at 63 n.2.

[45] As noted above, the definition of "security" also includes a "certificate of interest or participation in any profit-sharing agreement." The term "certificate of interest or participation in any profit-sharing agreement" does not

## III.   CLASSIFICATION OF CRYPTO ASSETS

Virtually any type of security, good, service, right, or interest can be represented in a digital format as a crypto asset. The developer of a crypto asset can determine the quantity of units of a crypto asset that will be generated, the parameters for distribution of the crypto asset, and the functionality (or lack thereof) of the crypto asset, among other things. The developer can generate crypto assets as fungible units or as non-fungible units (commonly known as "non-fungible tokens" or "NFTs").[46] As such, crypto assets encompass a broad range of instruments with varying characteristics, uses, and functions. For purposes of this release, we classify crypto assets into five categories based on their characteristics, uses, and functions: (i) digital commodities; (ii) digital collectibles; (iii) digital tools; (iv) stablecoins; and (v) digital securities.

Digital commodities, digital collectibles, and digital tools, each as further described below, are not themselves securities. However, as with any asset that is not a security, a non-security crypto asset can be offered and sold subject to an investment contract, which is a security.[47] Stablecoins, as further described below, are a broad category of crypto assets that may or may not be securities depending on their characteristics. Digital securities, as further described below, are securities. Given the variations in crypto assets and the constantly evolving nature of the crypto asset markets, including the underlying technology, there may be crypto assets that do

---

have a meaning broader than that of "investment contract." *See Int'l Brotherhood of Teamsters v. Daniel*, 439 U.S. 551, 558 n.11 (1979) (stating that a "certificate of interest … in any profit-sharing agreement" does not have "any broader meaning under the Securities Acts than an 'investment contract'"). Accordingly, a financial instrument that is not an investment contract cannot be a certificate of interest or participation in any profit-sharing agreement. It is possible, but not necessarily the case, that an instrument that is an "investment contract" could also be a "certificate of interest or participation in any profit-sharing agreement." *See, e.g., Tcherepnin v. Knight*, 389 U.S. 332, 336 (1967).

[46]   An NFT is a non-interchangeable crypto asset with a unique digital identifier. Because NFTs constitute unique crypto assets, they cannot be replicated. In contrast, fungible crypto assets are interchangeable, which means that they are identical and of equal value and substitutable for one another.

[47]   *See infra* section IV. The fact that a non-security crypto asset is subject to an investment contract does not transform the non-security crypto asset itself into a security.

13

not fall within any of these five categories, as well as crypto assets with hybrid characteristics that may fall within more than one category.

### A. Digital Commodities[48]

A digital commodity is a crypto asset that is intrinsically linked to and derives its value from the programmatic operation of a crypto system that is "functional,[49] as well as supply and demand dynamics, rather than from the expectation of profits from the essential managerial efforts of others.[50] A digital commodity does not have intrinsic economic properties or rights, such as generating a passive yield or conveying rights to future income, profits, or assets of a business enterprise or other entity, promisor, or obligor, but may have certain other rights (as discussed below). Examples of digital commodities include Aptos (APT); Avalanche (AVAX); Bitcoin (BTC); Bitcoin Cash (BCH); Cardano (ADA); Chainlink (LINK); Dogecoin (DOGE); Ether (ETH); Hedera (HBAR); Litecoin (LTC); Polkadot (DOT); Shiba Inu (SHIB); Solana (SOL); Stellar (XLM); Tezos (XTZ); and XRP (XRP).[51]

---

[48] For purposes of this release, we are using the term "commodity" in an economic and commercial sense (*i.e.*, assets that are fungible, have utility, and whose value is determined by supply and demand). However, any non-security crypto asset, other than a "payment stablecoin issued by a permitted payment stablecoin issuer," as such terms are defined in section 2 of the GENIUS Act, could meet the definition of "commodity" under the Commodity Exchange Act. *See* 7 U.S.C. 1a(9).

[49] For purposes of this release, a crypto system is "functional" if the system's native crypto asset can be used on the system in accordance with the programmatic utility of the system. The term "native" in the context of a crypto asset refers to a crypto asset generated for use on a particular crypto system.

[50] A digital commodity may be native to a crypto system that is decentralized. For purposes of this release, a crypto system is "decentralized" if the crypto system functions and operates autonomously with no person, entity, or group of persons or entities having operational, economic, or voting control of the crypto system.

[51] Based on our understanding of their characteristics, terms, and functions as of the date of this release, the Commission concludes that each of these crypto assets is a digital commodity because they are intrinsically linked to and derive their value from the programmatic operation of a crypto system that is functional, as well as supply and demand dynamics, rather than from the expectation of profits from the essential managerial efforts of others. As of the date of this release, each of these digital commodities underlies a futures contract that has been made available to trade on a designated contract market operating under the regulatory oversight of the CFTC. To be clear, it is not necessary that a crypto asset underlie such a futures contract to be a digital commodity; rather, the fact that these digital commodities underlie such a futures contract explains their selection as examples for this release. For example, based on their characteristics, terms, and functions as of the date of this release, Algorand (ALGO) and LBRY Credits (LBC), neither of which underlies such a futures contract, are digital commodities because they are intrinsically linked to and derive their value from the

A digital commodity is necessary to participate in or use certain aspects of an associated functional crypto system. The programmed purpose of a digital commodity is to facilitate and incentivize the validation, ordering, and confirmation of transactions on the associated functional crypto system, serve as a mechanism to maintain the functioning and/or security of the associated functional crypto system, and foster network effects.[52] Accordingly, a digital commodity is integral to the operation of the associated functional crypto system. For example, a digital commodity typically conveys to holders certain technical rights with respect to the associated functional crypto system, such as enabling holders to participate in the system's consensus mechanism by staking (or locking up) the system's native digital commodity.[53] A digital commodity also may convey to holders certain governance rights with respect to the associated functional crypto system. Such a "governance token" typically allows holders to vote on certain technical or governance matters, such as software upgrades and treasury expenditures. Further, a functional crypto system may require users to pay transaction (or "gas") fees in the system's native digital commodity. These gas fees—in addition to units of the digital commodity newly generated by the protocol—typically are used as an incentive mechanism to reward participation in and use of the associated functional crypto system.

A digital commodity itself, as described in this release, is not a security because it does not have the economic characteristics of a security. A digital commodity does not constitute any of the financial instruments enumerated in the definition of "security" because, among other things, it does not represent a digitized form of any such instruments, including an investment

---

programmatic operation of a crypto system that is functional, as well as supply and demand dynamics, rather than from the expectation of profits from the essential managerial efforts of others.

[52] For purposes of this release, "network effects" refers to the phenomenon where the value, use, and security of a crypto system increase as more users participate and interact with the crypto system.

[53] *See infra* section V for a more detailed explanation of "staking" and "consensus mechanism."

15

contract. Like commodities generally, a digital commodity has intrinsic value derived from the value of the goods and services that may be produced or accessed using that commodity, as well as from supply and demand dynamics. Users of a functional crypto system use the system's native digital commodity to interact with the system's features and functionalities. A functional crypto system incorporates economic mechanisms that reward voluntary cooperation and coordination among the system's users. Users are encouraged to participate in a functional crypto system based on its economic mechanism design, and developers are incentivized to build crypto applications for functional crypto systems that successfully attract users. A functional crypto system does not have a central party[54] that oversees participation or distributes rewards to users. As a result, the value of a digital commodity is intrinsically linked to the programmatic functioning of the associated functional crypto system. Therefore, given that a digital commodity is associated with a functional crypto system, a purchaser would not reasonably expect to profit based on the essential managerial efforts of others.

## B.      Digital Collectibles

A digital collectible is a crypto asset that is designed to be collected and/or used and may represent or convey rights to artwork, music, videos, trading cards, in-game items, or digital representations or references to internet memes, characters, current events, or trends, among other things. A digital collectible does not have intrinsic economic properties or rights, such as generating a passive yield or conveying rights to future income, profits, or assets of a business enterprise or other entity, promisor, or obligor. Examples of digital collectibles available in the markets today, based on our understanding of their characteristics, terms, and functions as of the

---

[54]  For purposes of this release, a "central party" is a person, entity, or group of persons or entities having operational, economic, or voting control of a crypto system.

16

date of this release, include CryptoPunks,[55] Chromie Squiggles,[56] Fan Tokens,[57] WIF,[58] and VCOIN.[59]

Like physical collectibles, digital collectibles do not provide holders with any legal rights or interest in or with respect to a business enterprise or other entity, promisor, or obligor associated with the creator of the digital collectible or otherwise.[60] Digital collectibles may provide holders with a limited license or other intellectual property rights, often pursuant to an end user agreement. For example, creators of unique artwork digital collectibles often provide holders with the right to display and commercialize the acquired artwork.[61] Social media platforms, video games, and other consumer applications sometimes incorporate digital collectibles to enhance the user experience and facilitate network effects. The developers of these applications often reward early users with digital collectibles or allow active users to earn digital

---

[55] *See* https://cryptopunks.app.

[56] *See* https://chromie-squiggles.com.

[57] *See* https://www.socios.com/fan-tokens. Fan Tokens have hybrid characteristics and could be classified as digital tools.

[58] *See* https://dogwifhat.us.

[59] *See* https://vcoin.imvu.com.

[60] Digital collectibles may be programmed to transmit automatically a portion of the sale price of the collectible to the creator as a royalty each time that it is resold or otherwise transferred. These royalties may provide the creator of the digital collectible with a long-term payment stream from the creator's work, even after the initial sale (*i.e.*, when subsequent sales or transfers of the digital collectible are solely between third parties). Royalties typically are based on a percentage of the transaction value each time a digital collectible is resold. The creator sets the percentage at the time the digital collectible is created, and the ongoing payments are automated. As such, whenever the digital collectible is resold, the amount of the royalties is automatically calculated and transferred to the creator. The digital collectible holder does not receive any share of the creator royalty, and the digital collectible holder has no rights or interest in or with respect to a business enterprise or other entity, promisor, or obligor associated with the creator. Accordingly, the existence of a creator royalty does not change a digital collectible into a security.

[61] Digital collectibles sometimes are issued as part of a digital collection (*i.e.*, a group of digital collectibles that share a common theme, style, or project). A digital collection typically follows a particular aesthetic theme and includes a wide variety of unique traits, which allows the creator of the digital collection to incorporate slight variations with varying degrees of rarity or scarcity throughout the collection. A digital collection is analogous to a series of artworks based on a single theme, such as Andy Warhol's "Campbell's Soup Cans" series containing 32 different paintings. The inclusion of a digital collectible in a digital collection does not change the digital collectible into a security.

collectibles by engaging with the application. These digital collectibles include badges, video game "skins," and rewards points.

Some digital collectibles have limited or no functionality. For example, a "meme coin" is a type of crypto asset inspired by internet memes, characters, current events, or trends for which the creator seeks to attract an enthusiastic online community to purchase the meme coin and engage in its trading.[62] Meme coins typically are acquired for artistic, entertainment, social, and cultural purposes, and their value is driven by supply and demand, rather than any essential managerial efforts of others. Nonetheless, meme coin holders may create uses for meme coins, such as by limiting access to a chatroom to meme coin holders or whitelisting meme coin holders for an airdrop.[63] Further, a crypto asset may be offered and sold initially as a meme coin that has no functionality within an associated functional crypto system (and no related representations or promises to create such functionality or crypto system) and that derives its value from the asset's artistic, entertainment, social, or cultural significance, but later become a digital commodity because it becomes functional within an associated functional crypto system.

A digital collectible itself, as described in this release, is not a security because it does not have the economic characteristics of a security.[64] A digital collectible does not constitute any of

---

[62]   The Division of Corporation Finance ("Corporation Finance") issued a statement addressing the characterization of meme coins under the definition of "security." *See* U.S. Securities and Exchange Commission, Division of Corporation Finance, *Staff Statement on Meme Coins* (Feb. 27, 2025), available at https://www.sec.gov/newsroom/speeches-statements/staff-statement-meme-coins. That statement and any other staff statement referenced in this release is not a rule, regulation, guidance, or statement of the Commission, and the Commission has neither approved nor disapproved its content. Staff statements have no legal force or effect: they do not alter or amend applicable law, and they create no new or additional obligations for any person. For the avoidance of doubt, the views expressed by the Commission in this release supersede any prior statements by the Commission or its staff on these topics.

[63]   For purposes of this release, "whitelisting" is the practice of explicitly allowing only pre-approved applications, users, email addresses, or IP addresses to access a crypto system or service. For a description of "airdrops," *see infra* section VII.

[64]   Digital collectibles are onchain analogues to physical collectibles, which generally have not been regulated as securities.

the financial instruments enumerated in the definition of "security" because, among other things, it does not represent a digitized form of any such instruments, including an investment contract. Digital collectibles generally have artistic, entertainment, social, or cultural value or utility. The purchase of a digital collectible is not an investment in any business enterprise or other entity, promisor, or obligor associated with the creator of the digital collectible.

Like a physical collectible, a digital collectible's value is not based on the expectation of profits from any essential managerial efforts of its creator following creation but rather on supply and demand, which in many cases depends on the subject matter, popularity, or scarcity of the digital collectible, as is the case with physical collectibles. For example, buying a digital collectible with the hope that its subject matter, popularity, or scarcity will increase its price is like buying a piece of art with the hope that market forces will create demand for the art and increase its price. While the value of a digital collectible may be impacted directly or indirectly by the activities or reputation of the creator—as may occur with respect to a physical collectible—the creator of a digital collectible typically does not make representations or promises to undertake essential managerial efforts from which a purchaser would reasonably expect to derive profits.[65]

However, as can be the case with physical collectibles,[66] the offer and sale of a digital collectible that either is fractionalized or otherwise enables individuals to acquire a fractional ownership interest of a single digital collectible, could constitute the offer or sale of a security

---

[65] If the creator of a digital collectible facilitates network effects, including through the use of a digital collectible, such activities do not constitute essential managerial efforts. *See infra* section IV.A.

[66] For example, fractionalized interests in artwork may in some circumstances be deemed securities even though the underlying artwork itself is not a security because interests in the fractional pool may constitute investment contracts.

because it may involve essential managerial efforts from which a purchaser would reasonably expect to derive profits and, therefore, may be offered and sold as an investment contract.[67]

### C.      Digital Tools

A digital tool is a crypto asset that performs a practical function, such as a membership, ticket, credential, title instrument, or identity badge. Digital tools are commonly issued for use in connection with crypto systems and are designed to perform practical functions within such systems. Digital tools often are non-transferrable or "soul-bound,"[68] and their value is derived from their practical functionality. Digital tools may be issued by a central party or autonomously in accordance with the programmatic functioning of a crypto system. A digital tool does not have intrinsic economic properties or rights, such as generating a passive yield or conveying rights to future income, profits, or assets of a business enterprise or other entity, promisor, or obligor. Examples of digital tools available in the markets today, based on our understanding of their characteristics, terms, and functions as of the date of this release, include Ethereum Name Service domain names[69] and CoinDesk's 'Microcosms' NFT Consensus Ticket.[70]

A digital tool itself, as described in this release, is not a security because it does not have the economic characteristics of a security.[71] A digital tool does not constitute any of the financial

---

[67]  In *Howey*, the Supreme Court held that offers and sales of individual parcels of a citrus grove, when paired with service contracts giving the offeror/seller exclusive rights to access and manage the land, and providing purchasers a share of the profits, were offers and sales of investment contracts, rather than just offers and sales of real estate. While selling the whole citrus grove to a single, active owner might have been a real estate sale, the subdivision of the citrus grove combined with centralized management of the parcels meant that purchasers depended on the seller's essential managerial efforts for profits.

[68]  Soul-bound digital tools are designed for permanent association with a specific digital identity and are intended to represent aspects of an individual's or entity's identity that typically are not transferable, such as academic degrees, professional certifications, memberships, or verifiable work history.

[69]  *See* https://ens.domains.

[70]  *See* https://www.coindesk.com/business/2024/01/31/coindesk-brings-back-microcosms-nft-consensus-ticket.

[71]  Digital tools are onchain analogues to physical utilities, which generally have not been regulated as securities.

instruments enumerated in the definition of "security" because, among other things, it does not represent a digitized form of such instruments, including an investment contract. Persons acquire digital tools for their functional utility and do not have any rights or interest in or with respect to a business enterprise or other entity, promisor, or obligor just as persons acquiring a museum membership do not expect to realize a profit from the essential managerial efforts of the museum's operators. The price at which the digital tool may be resold, if it may be resold at all, is based upon its functional utility rather than any expectation of profits from any essential managerial efforts of its developer. While the value of a digital tool may be impacted directly or indirectly by the activities of the developer, the creator of a digital tool typically does not make representations or promises to undertake any essential managerial efforts from which a purchaser would reasonably expect to derive profits.[72]

### D.    Stablecoins

A stablecoin is a crypto asset that is designed to maintain a stable value relative to a reference asset like the U.S. dollar.[73] In July 2025, Congress enacted the GENIUS Act, which creates a comprehensive regulatory framework for a specific type of stablecoin called a "payment stablecoin."[74] The GENIUS Act excludes from the definition of "security" any "payment stablecoin issued by a permitted payment stablecoin issuer," as such terms are defined in section 2 of the GENIUS Act.[75] A "payment stablecoin" is defined as a digital asset that is, or is designed to be, used as a means of payment or settlement, and the issuer of which generally is obligated to convert, redeem, or repurchase the digital asset for a fixed amount of monetary

---

[72]    If the creator of a digital tool facilitates network effects, including through the use of a digital tool, such activities do not constitute essential managerial efforts. *See infra* section IV.A.

[73]    *See* PWG Report.

[74]    *See supra* note 1.

[75]    *See* section 17 of the GENIUS Act.

value, and represents that it will maintain, or create the reasonable expectation that it will maintain, a stable value relative to the value of a fixed amount of monetary value.[76]

A "permitted payment stablecoin issuer" is defined as a person formed in the United States that is: (1) a subsidiary of an insured depository institution that has been approved to issue payment stablecoins under section 5 of the GENIUS Act; (2) a Federal qualified payment stablecoin issuer; or (3) a State qualified payment stablecoin issuer.[77] A permitted payment stablecoin issuer is prohibited under the GENIUS Act from paying any form of interest or yield to the permitted stablecoin holders (whether in cash, tokens, or other consideration) solely in connection with the holding, use, or retention of the payment stablecoin.[78] These crypto assets categorically will not be securities by operation of statute after the effective date of the GENIUS Act. Stablecoins other than payment stablecoins issued by a permitted payment stablecoin issuer may meet the definition of "security" depending on the facts and circumstances.

Prior to the enactment of the GENIUS Act, Corporation Finance issued a statement addressing the characterization of certain stablecoins—referred to therein as "Covered Stablecoins"—under the definition of "security."[79] Given that the GENIUS Act is not yet effective,[80] and to clarify the Commission's views on the application of the *Howey* test to

---

[76]   *See* section 2(22) of the GENIUS Act.

[77]   *See* section 2(23) of the GENIUS Act.

[78]   *See* section 4(a)(11) of the GENIUS Act.

[79]   *See* U.S. Securities and Exchange Commission, Division of Corporation Finance, *Staff Statement on Stablecoins* (Apr. 4, 2025), available at https://www.sec.gov/newsroom/speeches-statements/statement-stablecoins-040425 (the "Staff Stablecoin Statement"). The Staff Stablecoin Statement and any other staff statement referenced in this release is not a rule, regulation, guidance, or statement of the Commission, and the Commission has neither approved nor disapproved its content. Staff statements have no legal force or effect: they do not alter or amend applicable law, and they create no new or additional obligations for any person. For the avoidance of doubt, the views expressed by the Commission in this release supersede any prior statements by the Commission or its staff on these topics.

[80]   The GENIUS Act will become effective on the earlier of 18 months after its date of enactment (July 18, 2025) or the date that is 120 days after the date on which the primary Federal payment stablecoin regulators issue any final regulations implementing the GENIUS Act.

stablecoins, the Commission interprets that, for the reasons set forth in the Staff Stablecoin Statement, the offer and sale of Covered Stablecoins does not involve the offer and sale of securities within the meaning of section 2(a)(1) of the Securities Act or section 3(a)(10) of the Exchange Act.[81] Accordingly, persons involved in the process of issuing and redeeming Covered Stablecoins do not need to register those transactions with the Commission under the Securities Act or fall within one of the Securities Act's exemptions from registration. The foregoing interpretation does not address stablecoins other than Covered Stablecoins as described in the Staff Stablecoin Statement.

### E.    Digital Securities

A digital security (commonly known as a "tokenized" security) is a financial instrument enumerated in the definition "security" that is formatted as or represented by a crypto asset, where the record of ownership is maintained in whole or in part on or through one or more crypto networks.[82] There are a variety of models used to tokenize securities, but they may vary in terms of structure and the rights afforded to holders. As such, the rights of a holder of the crypto asset may be materially different from the rights of a holder of the underlying security, including economic and voting rights. Tokenized securities generally fall into two categories: (1) securities tokenized by or on behalf of the issuers of such securities; and (2) securities tokenized by third

---

[81]    Although not included in the statutory exclusion from the definition of "security" in section 17 of the GENIUS Act, payment stablecoins issued by a "foreign permitted stablecoin issuer" (as the term is defined in the GENIUS Act) registered with the Comptroller of the Currency will generally not meet the definition of "security," as such payment stablecoins will generally be considered "Covered Stablecoins." *See* section 18 of the GENIUS Act; Staff Stablecoin Statement.

[82]    Tokenization is the process of creating a digital representation of a tangible or intangible asset using blockchain or similar distributed ledger technology. *See* PWG Report. A non-security crypto asset that is subject to an investment contract is not a tokenized security. *See supra* note 47. Further, a stablecoin that meets the definition of "security" based on its particular facts and circumstances is a tokenized security. *See supra* section III.D.

parties unaffiliated with the issuers of such securities, which may involve the third party issuing a separate security that derives its value from or is otherwise linked to the subject security.

A security is a security regardless of whether it is issued, or otherwise represented, offchain or onchain. All devices and instruments that have the economic characteristics of a security are securities regardless of format or label. Many digital securities convey the same legal rights with respect to a business enterprise or other entity, promisor, or obligor as offchain securities. Some digital securities do not convey the same legal rights as offchain securities but instead entitle the holder to receive economic distributions from a central party that manages a business enterprise or other entity, promisor, or obligor on behalf of digital security holders. Purchasers of this latter type of digital security invest in a business enterprise or other entity, promisor, or obligor operated by a central party and look to the central party to earn such distributions. Further, digital securities may provide non-financial benefits to holders, similar to a digital commodity, digital collectible, or digital tool. A digital security does not fall outside of the definition of "security" merely because it provides such non-financial benefits.

## IV.   CRYPTO ASSETS THAT ARE SUBJECT TO AN INVESTMENT CONTRACT

### A.   How Crypto Assets Become Subject to an Investment Contract

How an issuer[83] markets and promotes a contract, transaction, or scheme is relevant to assessing whether the issuer is offering or selling an investment contract.[84] A non-security crypto asset becomes subject to an investment contract when an issuer offers it by inducing an investment of money in a common enterprise with representations or promises to undertake

---

[83]   For purposes of this release, references to an "issuer" include affiliates and agents of the issuer or a promoter.

[84]   For example, in finding that certain instruments issued by a housing cooperative were not "securities," the Supreme Court in *Forman* specifically noted that: "Nowhere does the [co-operative's Information] Bulletin seek to attract investors by the prospect of profits resulting from the efforts of the promoters or third parties. On the contrary, the Bulletin repeatedly emphasizes the 'nonprofit' nature of the endeavor." 421 U.S. at 854; *see also Joiner*, 320 U.S. at 352-53.

essential managerial efforts from which a purchaser would reasonably expect to derive profits.[85] A purchaser's reasonable profit expectations depend on the issuer's representations or promises to engage in such essential managerial efforts.[86] Absent such representations or promises being conveyed to purchasers,[87] it would not be reasonable for a purchaser to expect profits from the contract, transaction, or scheme.

Whether it would be reasonable for a purchaser to expect profits based on representations or promises to engage in essential managerial efforts depends on the specific facts and circumstances, taken as a whole, under which those representations and promises are made.[88] For example, the source of the representations or promises is relevant to a purchaser's reasonable expectations. Because the issuer establishes the essential managerial efforts that it intends to undertake, it would be reasonable for a purchaser to expect profits based on the explicit representations or promises to engage in essential managerial efforts made by or on behalf of the issuer and conveyed to purchasers. In contrast, it would not be reasonable for a purchaser to

---

[85]   Courts have similarly determined that other types of non-securities, such as real estate, have been offered and sold subject to investment contracts. *See, e.g., Howey*, 328 U.S. 293 (real estate); *Continental Marketing Corporation v. SEC*, 387 F.2d 466 (10th Cir. 1967), cert. denied, 391 U.S. 905 (1968) (beavers); *Miller v. Central Chinchilla Group, Inc.*, 494 F.2d 414 (8th Cir. 1974) (chinchillas); *Glen-Arden Commodities v. Costantino*, 493 F.2d 1027 (2nd Cir. 1974) (Scotch whisky warehouse receipts). The Commission expects that contracts for the purchase and delivery of a "payment stablecoin issued by a permitted payment stablecoin issuer" (as defined in the GENIUS Act) that do not involve a reasonable expectation of profit to be derived from the essential managerial efforts of others generally would not be considered to be offered and sold as investment contracts, regardless of when delivery occurs.

[86]   As the Supreme Court stated in *Howey* with respect to citrus groves subject to an investment contract, purchasers "have no desire to occupy the land or develop it themselves; they are attracted solely by the prospects of a return on their investment." *Howey*, 328 U.S. at 300. The purchasers' motivations were demonstrated by their granting the issuer exclusive rights to occupy and develop the land in exchange for a share in the profits resulting from that development.

[87]   For purposes of this release, references to a "purchaser" include prospective purchasers.

[88]   This release addresses the scope of representations or promises relevant to a reasonable expectation of profits under *Howey*, and is distinct from and does not delineate the scope of other provisions of the Federal securities laws, including the antifraud provisions (*e.g.,* 15 U.S.C. 77q, 78j), and disclosure obligations applicable to registration statements and periodic reports by reporting companies (*e.g.,* 15 U.S.C. 77g, 77aa, 78m).

25

expect profits based on representations or promises made by third parties,[89] such as unaffiliated proponents of the relevant crypto system or holders of the relevant crypto asset, unless the representations or promises are authorized by the issuer and conveyed to purchasers.[90] Moreover, the timing of the representations or promises is relevant to a purchaser's reasonable expectations.[91] Of necessity, in order to shape a purchaser's expectations, the representations or promises must be conveyed to the purchaser prior to or contemporaneously with the issuer's offer or sale to the purchaser. As such, the issuer's post-sale representations or promises would not convert the prior sale into an offer or sale of an investment contract.

Similarly, the manner in which the representations or promises are made is relevant to a purchaser's reasonable expectations. It is reasonable for a purchaser to expect profits based on representations or promises conveyed to purchasers in written or oral agreements, public communications through which the issuer has established a regular pattern of communicating (such as the issuer's website or official social media accounts), direct private communications between the issuer and purchasers, regulatory filings publicly available to purchasers, or documents clearly attributable to the issuer (such as a whitepaper).[92] Outside of such channels, the reasonableness of a purchaser's expectations of profit depends on whether the representations or promises are widely disseminated, the specific means by which the representations or promises are conveyed, and the issuer's established communication practices.

---

[89]  However, where the third party and the issuer collude to convey representations or promises, it would be reasonable for a purchaser to expect profits based on those explicit representations or promises.

[90]  *See, e.g.,* the definition of a "person acting on behalf of an issuer" in section 101(c) of Regulation FD (17 CFR 243.101(c)).

[91]  For additional discussion of the timing of representations or promises, *see infra* section IV.B.2.

[92]  For purposes of this release, "whitepaper" refers to a document that describes the technical aspects of a crypto asset project (*i.e.*, a crypto asset and the associated crypto system) along with other relevant details.

Further, representations or promises are more likely to create reasonable expectations of profit when they are explicit and unambiguous as to the essential managerial efforts to be undertaken by the issuer, contain sufficient details demonstrating the issuer's ability to implement the proposed project, and explain how the issuer's efforts will produce the profits that purchasers reasonably expect. Representations or promises by an issuer conveyed to purchasers to develop and achieve functionality for a non-security crypto asset and/or develop an associated crypto system together with a business plan containing detailed milestones, a timeline, information about personnel, sources of funding and other resources needed to meet those milestones, and an explanation of how holders of the non-security crypto asset will profit from those efforts, likely would reasonably create an expectation of profit because they speak directly to those essential managerial efforts that affect the failure or success of the project.[93] In contrast, representations or promises that are vague or contain no semblance of an actionable business plan, such as those lacking milestones, funding, or other plans for needed resources, likely would not create reasonable expectations of profit.

The issuer's representations or promises to engage in essential managerial efforts from which a purchaser would reasonably expect to derive profits, when combined with an investment of money in a common enterprise, creates an investment contract under the *Howey* test. As is the case with other non-security assets,[94] the fact that a non-security crypto asset is subject to an investment contract does not transform the non-security crypto asset itself into a security. For this reason, a non-security crypto asset that has been subject to an investment contract does not

---

[93] This discussion addresses one example, and the presence or absence of any single activity may not be outcome determinative when determining whether any particular contract, transaction, or scheme constitutes an investment contract.

[94] *See supra* note 85.

remain subject to the associated investment contract in secondary market transactions where purchasers would not reasonably expect such representations or promises to remain connected to the non-security crypto asset. If, on the other hand, purchasers would reasonably expect such representations or promises to remain connected to the non-security crypto asset, the non-security crypto asset would continue to be subject to the associated investment contract in secondary market transactions. Under such circumstances, secondary market offers and sales of such a non-security crypto asset would constitute securities transactions that must be registered under the Securities Act or conducted pursuant to an available exemption from registration. The associated investment contract will continue to be transferred to subsequent purchasers of the non-security crypto asset in secondary market transactions until the non-security crypto asset separates from the issuer's representations or promises, as discussed below.

**B.      Separation of a Non-Security Crypto Asset from the Issuer's Representations or Promises**

A non-security crypto asset that was offered and sold subject to an investment contract does not necessarily remain subject to the associated investment contract in perpetuity. A non-security crypto asset remains subject to the associated investment contract if purchasers continue to have a reasonable expectation of profits to be derived from the issuer's essential managerial efforts. For that to be so, purchasers must continue to reasonably expect the issuer's representations or promises to engage in essential managerial efforts to remain connected to the non-security crypto asset.

When a purchaser of a non-security crypto asset that has been subject to an investment contract could no longer reasonably expect the issuer's representations or promises to engage in essential managerial efforts to remain connected to the non-security crypto asset, the non-

28

security crypto asset separates from such representations or promises, and thereafter the non-security crypto asset is not subject to the Federal securities laws. This separation of the non-security crypto asset from the issuer's representations or promises to engage in essential managerial efforts may occur at any time after the offer of the associated investment contract, such as immediately upon delivery of the non-security crypto asset to purchasers or at a future date. As discussed below, we would not expect a non-security crypto asset to be subject to an investment contract when any of the following non-exclusive indicia of separation is present.

### 1.      Fulfillment of the Issuer's Representations or Promises

A non-security crypto asset that was offered and sold subject to an investment contract is no longer subject to the associated investment contract once the issuer has fulfilled its representations or promises to engage in essential managerial efforts, even if the issuer continues to provide efforts that are not essential managerial efforts with respect to the non-security crypto asset or an associated crypto system or other software project.[95] Because the issuer has fulfilled the essential managerial efforts it represented or promised it would undertake, purchasers no longer have any reasonable expectations of profits to be derived from those efforts. Such representations or promises to engage in essential managerial efforts could, for example, relate to developing certain functionalities or features for the non-security crypto asset or the associated crypto system or other software project, achieving certain software development milestones on a roadmap, or open-sourcing related computer code.[96] Upon the issuer's fulfillment of such

---

[95]   For examples of activities that the Commission does not view as ongoing essential managerial efforts, *see supra* section IV.A.

[96]   Whether an issuer fulfills its representations or promises to engage in essential managerial efforts depends on how the issuer defines or otherwise describes such efforts in marketing and promoting the investment contract. For example, if the issuer represents or promises to achieve decentralization of an associated crypto system, whether the issuer has achieved decentralization would be based on how the issuer defined or otherwise described decentralization, not a general market conception of what constitutes decentralization. Similarly, if the issuer represents or promises to achieve certain functionality for a crypto asset and its associated crypto

29

representations or promises, the issuer is no longer offering or selling an investment contract and the investment contract itself ceases to exist. Accordingly, the issuer's subsequent offers or sales of the non-security crypto asset would not constitute securities transactions unless the issuer creates a new investment contract to which the non-security crypto asset is subject.

To illustrate, a non-security crypto asset may be offered and sold subject to an investment contract in a primary offering for immediate delivery or delayed delivery. In an offering involving immediate delivery, such as through an "initial coin offering," the issuer agrees to deliver newly generated non-security crypto assets immediately to investors in exchange for their investment. In an offering involving delayed delivery, such as through a "simple agreement for future tokens," the issuer agrees to deliver non-security crypto assets that have not yet been generated to investors at a later date in exchange for their investment today. In either case, the sale of the non-security crypto assets occurs at the time of entry into the agreement with the investors (with settlement occurring either immediately or at a future date),[97] at which time the non-security crypto assets become subject to an investment contract regardless of when they are delivered.

Upon delivery, where a purchaser would not reasonably expect profit from the efforts of the issuer (such as where the issuer has publicly disclosed that it completed the essential managerial efforts it represented or promised it would undertake), the non-security crypto assets are no longer subject to the associated investment contract because a necessary element of an investment contract no longer exists. In contrast, upon delivery, where a purchaser would

---

network, whether the issuer has achieved functionality would be based on how the issuer defined or otherwise described functionality, not a general market conception of what constitutes functionality.

[97] *See Securities Offering Reform*, Release No. 33-8591 (July 19, 2005) [70 FR 44721, 44765 n.391 (Aug. 3, 2005)].

reasonably expect profits from the efforts of the issuer (such as where the issuer has continued providing essential managerial efforts in accordance with its representations or promises or has not publicly disclosed that it completed the essential managerial efforts it represented or promised it would undertake), the non-security crypto assets would continue to be subject to the associated investment contract.

### 2.      Failure to Satisfy Issuer's Representations or Promises

A non-security crypto asset that was offered and sold subject to an investment contract is no longer subject to an investment contract if a purchaser would not reasonably expect the issuer to be able to fulfill or to continue to engage in the essential managerial efforts it represented or promised it would undertake. There are several reasons why this could occur. For example, a sufficiently long period of time may have passed since the issuer's offer and sale of the investment contract and, during this time period, it has become clear to investors that the issuer has neither conducted the essential managerial efforts it represented or promised it would undertake nor indicated that it still intends to conduct such efforts. Similarly, the issuer may publicly announce that it will no longer perform the essential managerial efforts it represented or promised it would undertake (*e.g.*, where the issuer effectively "abandons" the development of a crypto system).[98]

Under these circumstances, a purchaser of the non-security crypto asset would not reasonably expect an issuer's past representations or promises to engage in essential managerial efforts to continue to remain connected to the non-security crypto asset. Accordingly, such purchaser would not reasonably expect the non-security crypto asset to be subject to the

---

[98]     A public announcement of non-performance should be widely disseminated to market participants and unambiguous in order for investors to no longer reasonably expect the issuer to perform the essential managerial efforts.

associated investment contract. An issuer that fails to perform or otherwise complete the essential managerial efforts it represented or promised it would undertake may face liabilities under the Federal securities laws for these failures, including under the anti-fraud provisions of the Federal securities laws.

To illustrate, a non-security crypto asset is offered and sold subject to an investment contract comprising the issuer's representations or promises to undertake certain essential managerial efforts in connection with the development of a crypto system. The offer and sale of that investment contract must be registered under the Securities Act or conducted pursuant to an exemption from registration. As the issuer endeavors to develop the crypto system, the issuer experiences difficulties that affect its ability to fulfill the essential managerial efforts it represented or promised to undertake, such as insufficient funding or other resources, poor system architecture, technical issues (e.g., scalability problems, smart contract flaws, or security vulnerabilities), competition, poor management, and market conditions. Based on these difficulties, the issuer decides that it is unable or unwilling to fulfill the essential managerial efforts it promised to undertake and abandons the development of the crypto system.

In such case, if the issuer publicly announces through a widely disseminated communication that it is abandoning the development of the crypto asset and will no longer perform the essential managerial efforts it represented or promised it would undertake when the investment contract was created, it would not be reasonable to expect the issuer's representations or promises to engage in such essential managerial efforts to remain connected to the non-security crypto asset. Accordingly, the non-security crypto asset would no longer be subject to the associated investment contract, and the associated investment contract would cease to exist. Nevertheless, the issuer would continue to be potentially liable for material misstatements or

32

omissions in connection with its failure to perform or otherwise complete the essential managerial efforts that it represented or promised that it would undertake.

### 3.      Application of the Interpretation

The interpretation above assumes that an investment contract has been created and does not address or otherwise affect the analysis regarding its creation under the *Howey* test. The interpretation only addresses certain circumstances under which a non-security crypto asset that is subject to an existing investment contract may separate from that investment contract and no longer be subject to that investment contract. Consequently, the interpretation only applies after an investment contract is created, even if the investment contract later ceases to exist because the issuer is unable or unwilling to complete the essential managerial efforts it represented or promised to undertake when the investment contract was created.

Similarly, the fact that a non-security crypto asset may separate from the associated investment contract at some time following its creation does not affect the application of the Federal securities laws with respect to that investment contract. For example, the offer and sale of a non-security crypto asset that is subject to an investment contract must be registered under the Securities Act or conducted pursuant to an available exemption. If the issuer fails to register the offering of that investment contract or conduct it pursuant to an available exemption, the issuer will violate the Securities Act and investors will have certain rights against the issuer under the Federal securities laws for this failure to register or use an applicable exemption, even if the non-security crypto asset subsequently separates from the associated investment contract and that investment contract ceases to exist. Moreover, if the issuer makes material misstatements or omissions in connection with the creation of the associated investment contract or at any time during the existence of that investment contract, the issuer may be subject to

liability under the anti-fraud provisions of the Federal securities laws for such conduct, even if the non-security crypto asset subsequently separates from the associated investment contract and that investment contract ceases to exist.

The interpretation in this section IV is intended to underscore the Commission's view that how an issuer markets and promotes a contract, transaction, or scheme impacts whether the issuer is offering or selling an investment contract. To the extent issuers make representations or promises about essential managerial efforts they plan to undertake, we encourage issuers to clearly and in sufficient detail outline those efforts, provide a timeline and milestones for completing those efforts, explain the resources needed to complete those efforts, and publicly disclose the completion of those efforts.

## V. FEDERAL SECURITIES LAWS STATUS OF THE CRYPTO ASSET ACTIVITIES KNOWN AS "PROTOCOL MINING" AND "PROTOCOL STAKING"

Crypto networks rely on cryptography and economic mechanism design to eliminate the need for designated trusted intermediaries to verify crypto network transactions and provide settlement assurances to users. The operation of each crypto network is governed by an underlying software protocol, consisting of computer code, which programmatically enforces certain rules, technical requirements, and reward distributions. Each protocol incorporates a "consensus mechanism," which is a method for enabling the distributed network of unrelated computers (known as "nodes") that maintain the peer-to-peer network to agree on the "state" (or authoritative record of network address ownership balances, transactions, smart contract code, and other data) of the network. Public, permissionless crypto networks allow anyone to participate in the crypto network's operation, including the validation of new transactions to the crypto network in accordance with the crypto network's consensus mechanism.

In the following discussion, we provide an interpretation regarding the application of the Federal securities laws to: (1) certain digital commodity activities known as "mining" on public, permissionless crypto networks that use proof-of-work ("PoW") as a consensus mechanism ("PoW Networks"); and (2) certain digital commodity activities known as "staking" on public, permissionless crypto networks that use proof-of-stake ("PoS") as a consensus mechanism ("PoS Networks"). In this release, we refer to mining digital commodities on PoW Networks as "Protocol Mining"[99] and staking digital commodities on PoS Networks as "Protocol Staking."[100]

### A. Protocol Mining

#### 1. Protocol Mining Activities Generally

PoW is a consensus mechanism that incentivizes transaction validation by rewarding participants, called "miners," who operate nodes adding computational resources to the PoW Network. PoW involves validating transactions on a PoW Network and adding them in blocks to the distributed ledger. The "work" in PoW is the computational resources that miners contribute

---

[99] Corporation Finance previously issued a statement addressing Protocol Mining. *See* U.S. Securities and Exchange Commission, Division of Corporation Finance, *Staff Statement on Certain Proof-of-Work Mining Activities* (Mar. 20, 2025), available at https://www.sec.gov/newsroom/speeches-statements/statement-certain-proof-work-mining-activities-032025. That statement and any other staff statement referenced in this release is not a rule, regulation, guidance, or statement of the Commission, and the Commission has neither approved nor disapproved its content. Staff statements have no legal force or effect: they do not alter or amend applicable law, and they create no new or additional obligations for any person. For the avoidance of doubt, the views expressed by the Commission in this release supersede any prior statements by the Commission or its staff on these topics.

[100] Corporation Finance previously issued two statements addressing Protocol Staking. *See* U.S. Securities and Exchange Commission, Division of Corporation Finance, *Staff Statement on Certain Protocol Staking Activities* (May 29, 2025), available at https://www.sec.gov/newsroom/speeches-statements/statement-certain-protocol-staking-activities-052925, and *Staff Statement on Certain Liquid Staking Activities* (Aug. 5, 2025), available at https://www.sec.gov/newsroom/speeches-statements/corpfin-certain-liquid-staking-activities-080525. That statement and any other staff statement referenced in this release is not a rule, regulation, guidance, or statement of the Commission, and the Commission has neither approved nor disapproved its content. Staff statements have no legal force or effect: they do not alter or amend applicable law, and they create no new or additional obligations for any person. For the avoidance of doubt, the views expressed by the Commission in this release supersede any prior statements by the Commission or its staff on these topics.

to validate transactions and add new blocks to the PoW Network. Miners do not have to own the PoW Network's digital commodity to validate transactions.

Miners use computers to solve complex mathematical equations in the form of cryptographic puzzles. Miners compete with their peers to solve these puzzles, and the first miner to solve a puzzle is charged with accepting batches of transactions from other nodes and validating (or proposing) new blocks of transactions to the PoW Network. In exchange for providing validation services, miners earn rewards in the form of newly generated digital commodities that are delivered under the terms of the PoW Network's software protocol.[101] In this way, PoW provides an incentive for miners to invest the resources necessary to add valid blocks to the PoW Network.

A miner providing validation services receives the reward only after the other nodes on the PoW Network verify, through the software protocol, that the solution is correct and valid. To this end, once a miner finds the correct solution, it broadcasts this information to other miners who can verify whether the miner properly solved the puzzle to receive the reward. Once verified, all miners then add the new block to their own copies of the PoW Network. PoW is designed to secure the PoW Network by requiring miners to spend considerable time and computational resources to authenticate transactions. When the validation process functions in this way, it not only makes it less likely that someone would seek to undermine a PoW Network but also makes it less likely that miners could include altered transactions, such as those enabling the "double spending" of digital commodities.[102]

---

[101] The protocol establishes rules on rewards. Miners cannot change the rewards they receive as the reward structure is predetermined by the protocol.

[102] Double spending involves the same crypto assets being sent to two recipients and can occur when ledger entries are altered.

In addition to self (or solo) mining, miners can join "mining pools," which allow miners to combine their computational resources to increase their chances of successfully validating transactions and mining new blocks on the PoW Network. There are several types of mining pools, each with differing methods of operation and reward distribution.[103] A pool operator typically is responsible for coordinating the miners' computational resources, maintaining the pool's mining hardware and software, overseeing the pool's security measures to protect against theft and cyberattacks, and ensuring that the miners are paid their rewards. In return, the pool operator charges a fee that is deducted from the rewards earned by the mining pool. Reward payouts vary among pools, although rewards often are distributed across the mining pool in proportion to the amount of computational resources that each miner contributes to the pool. Miners generally have no obligation to stay in a pool and can choose to leave a pool at any time.

### 2. Covered Protocol Mining Activities

The interpretation below pertains to the following Protocol Mining activities when such activities conform to the descriptions in this release ("Protocol Mining Activities" and each a "Protocol Mining Activity"): (1) mining digital commodities on a PoW Network; and (2) the roles of mining pools and pool operators involved in the Protocol Mining process, including their roles in connection with the earning and distribution of rewards. Only Protocol Mining Activities undertaken in connection with the following types of Protocol Mining are addressed in this release:

---

[103] For example, in a "pay-per-share" model, miners receive a payment for each valid share or block they contribute to the mining pool, regardless of whether the pool successfully mines a block; in a "peer-to-peer" model, the pool operator's role is decentralized among pool members; and in a "proportional" model, miners receive rewards proportional to the amount of work they contribute to successfully mine a block. There also may be hybrid pools that offer a combination of different operational and payout methods.

Self (or Solo) Mining, which involves a miner mining digital commodities using its own computational resources. The miner may work alone or together with others to operate a node and mine digital commodities.

Mining Pool, which involves miners combining their computational resources with other miners to increase their chances of successfully validating transactions and mining new blocks on the PoW Network. Reward payments may flow from the PoW Network directly to the miners or indirectly to them through the pool operator.

### 3. Interpretation Regarding Protocol Mining Activities

Protocol Mining Activities, in the manner and under the circumstances described in this release, do not involve the offer and sale of a security within the meaning of section 2(a)(1) of the Securities Act and section 3(a)(10) of the Exchange Act. Accordingly, participants in Protocol Mining Activities do not need to register transactions with the Commission under the Securities Act or fall within an available exemption from registration in connection with these Protocol Mining Activities.

As noted above,[104] a digital commodity itself does not constitute any of the financial instruments enumerated in the definition of "security." Accordingly, we conduct our analysis of certain transactions involving digital commodities in the context of Protocol Mining under the *Howey* test.

Self (or Solo) Mining. A miner's self (or solo) mining is not undertaken with a reasonable expectation of profits to be derived from the essential managerial efforts of others. Rather, a miner contributes its own computational resources, which secure the PoW Network and enable the miner to earn rewards issued by the PoW Network in accordance with its software protocol.

---

[104]  *See supra* section III.A.

To earn rewards, the miner's activities must comply with the rules of the PoW Network's software protocol. By adding its computational resources to the PoW Network, the miner merely is engaging in an administrative or ministerial activity to secure the PoW Network, validate transactions and add new blocks, and receive rewards. A miner's expectation to receive rewards is not derived from any third party's essential managerial efforts upon which the PoW Network's success depends. Instead, the expected financial incentive from the PoW Network's software protocol is derived from the administrative or ministerial act of Protocol Mining performed by the miner. As such, rewards are payments to the miner in exchange for services it provides to the PoW Network rather than profits derived from the essential managerial efforts of others.

Mining Pool. Likewise, when a miner combines its computational resources with other miners to increase their chances of successfully mining new blocks on the PoW Network, the miner has no expectation of profit derived from the essential managerial efforts of others. By adding its own computational resources to a mining pool, the miner merely is engaging in an administrative or ministerial activity to secure the PoW Network, validate transactions and add new blocks, and receive rewards. In addition, any expectation of profits that the miners have is not derived from the efforts of a third party, such as a pool operator. Even when participating in a mining pool, individual miners still perform the actual mining activity by contributing their computational power to solve the cryptographic puzzles for validation of new blocks.[105] Moreover, whether a miner self (or solo) mines or mines as a member of a mining pool does not alter the nature of Protocol Mining for purposes of the *Howey* test. In either case, Protocol Mining, as described in this release, remains an administrative or ministerial activity. Further, a

---

[105] This assumes miners receive a pro rata share of the rewards from the pool based on their contribution of computational power, rather than where non-miners can purchase interests in the pool, or miners can pay to receive greater than a pro rata share of the rewards from the pool based on their contribution of computational power.

pool operator's activities in operating the mining pool using the combined computational resources of participating miners are administrative or ministerial in nature. While some of the pool operator's activities may benefit the group of miners, any such efforts are not sufficient to constitute essential managerial efforts because miners are expecting the computational resources that they provide in conjunction with other members to the mining pool to earn profits.[106] To this end, a miner does not join a mining pool based on the ability to earn profits passively from the activities of the pool operator.

### B.    Protocol Staking

### 1.    Protocol Staking Activities Generally

PoS is a consensus mechanism used to prove that operators of nodes ("Node Operators") participating in the PoS Network have contributed value to the PoS Network that, in some cases, can be forfeited if they act dishonestly.[107] In a PoS Network, a Node Operator must stake the PoS Network's digital commodity to be selected programmatically by the PoS Network's software protocol to validate new blocks of data to, and update the state of, the PoS Network.[108] When selected, the Node Operator serves as a "Validator." In exchange for providing validation services, Validators earn rewards of two types: (1) newly generated digital commodities that are programmatically distributed to the Validator by the PoS Network in accordance with its

---

[106]  In contrast, where miners passively rely on the pool operator to provide the computational resources, the pool operator's activities constitute essential managerial efforts.

[107]  This release does not address "restaking," which is a process that allows digital commodities staked on their associated crypto network to be used on additional crypto systems. The specific staking activities covered by this release are discussed below in "Covered Protocol Staking Activities."

[108]  Validation is the process by which the Node Operator checks and confirms transactions effected on the crypto network.

40

software protocol; and (2) a percentage of the transaction fees, paid in digital commodities, by parties who are seeking to add their transactions to the PoS Network.[109]

In PoS Networks, Node Operators must commit or "stake" digital commodities to be eligible to validate and earn rewards, which typically is effected using a smart contract. When initially staked, digital commodities are subject to a "bonding period," which is a length of time set by the terms of the applicable PoS Network's software protocol after which the staked digital commodities become eligible to earn rewards. While staked, the digital commodities are locked up and cannot be transferred.[110] The Validator does not take possession or control of the staked digital commodities, which means that ownership and control of the staked digital commodities do not change.

Each PoS Network's software protocol contains the rules for operating and maintaining the PoS Network, including the method of selecting Validators among Node Operators. Some software protocols provide for random selection of Validators while others employ specific criteria for selecting Validators, such as the number of digital commodities staked by the Node Operators. Protocols also may contain rules intended to deter activities that are detrimental to the PoS Network's security and integrity, such as validating invalid blocks or double signing (which occurs when a Validator attempts to add the same transaction to the PoS Network multiple times, effectively spending the same crypto assets more than once).[111]

---

[109] While the protocol establishes rules on rewards, Node Operators generally are free to share rewards or impose fees for their services in ways that differ from those of the protocol. Some protocols permit a Node Operator to propose and receive a reward that differs from the protocol's standard reward.

[110] The minimum staking or lock-up period varies among PoS networks. Further, staked digital commodities typically are subject to an "unbonding period," which is a length of time set by the terms of the applicable PoS Network's software protocol after which digital commodities that are unstaked are unlocked and can be transferred.

[111] A Node Operator or Validator may have its staked digital commodities forfeited or "slashed" if it engages in such detrimental activities or fails to adhere to the PoS Network's technical requirements.

41

Rewards from Protocol Staking provide an economic incentive for participants to use their digital commodities to secure the PoS Network and ensure its continued operation. An increase in the amount of staked digital commodities can increase the security of PoS Networks and mitigate the risk of a hostile party gaining control of a majority of the total staked digital commodities, which would allow the party to manipulate the PoS Network by influencing the validation of transactions and potentially altering the PoS Network's transaction history.

Digital commodity owners ("Owners") can earn rewards by serving as a Node Operator and staking their own digital commodities. When self (or solo) staking, the Owner maintains ownership and control of its digital commodities and cryptographic private "keys" at all times.

Alternatively, Owners can participate in the PoS Network validation process without running their own nodes by using self-custodial staking directly with a third party. Owners grant their validation rights to a third-party Node Operator.[112] When using a third-party Node Operator, the Owner receives a portion of the rewards, with the Node Operator also earning a portion of the rewards for its services in validating transactions. When self-custodial staking directly with a third party, the Owner retains ownership and control of its digital commodities and its private keys.

In addition to self (or solo) staking and self-custodial staking directly with a third party, a third form of Protocol Staking is "custodial" staking, in which a third party (a "Custodian") takes custody of an Owner's digital commodities and facilitates staking them on behalf of the Owner. When Owners (in this context, "Depositors") deposit their digital commodities with a Custodian,

---

[112]  On certain PoS Networks, Owners can stake their digital commodities and receive validation rights that they can grant to a third party, thereby allowing the third party to use the staked digital commodities to verify transactions on the PoS Network on behalf of the Owners. For example, some PoS Networks may facilitate this by allowing an Owner to "delegate" its validation rights to a Node Operator. In this case, the Node Operator acts as a "Delegate" in the staking process. Other PoS Networks may use "Nominators" to whom an Owner may grant its validation rights to act on the Owner's behalf in selecting Validators.

the Custodian holds the deposited digital commodities in a cryptographic wallet that the Custodian controls. The Custodian stakes the digital commodities on the Depositor's behalf for an agreed-upon portion of any rewards, either using a node the Custodian operates or through a third-party Node Operator the Custodian selects. At all times during the staking process, the deposited digital commodities remain in the control of the Custodian, and the Depositor is intended to retain ownership of the digital commodities held by the Custodian.[113] Further, the deposited digital commodities: (1) are not used by the Custodian for operational or general business purposes; (2) are not lent, pledged, or rehypothecated for any reason; and (3) are held in a manner designed not to subject them to claims by third parties. To this end, the Custodian may not use the deposited digital commodities to engage in leverage, trading, speculation, or discretionary activities.

A fourth type of Protocol Staking is "Liquid Staking," whereby Depositors receive newly generated crypto assets ("Staking Receipt Tokens") that evidence Depositors' ownership of the deposited digital commodities and any rewards that accrue to the deposited digital commodities.[114] As part of Liquid Staking, Staking Receipt Tokens are issued to Depositors on a one-for-one basis to the amount of the deposited digital commodities.[115] Staking Receipt Tokens enable their holders to maintain liquidity without having to withdraw the deposited digital commodities from staking. For example, holders can use Staking Receipt Tokens as collateral or to participate in crypto applications, including those that can provide a return to the holder,

---

[113] The Custodian typically enters into an agreement with the Depositor, such as a user agreement or terms of service, providing that the Depositor retains ownership of the digital commodities.

[114] As discussed below, slashing losses are deducted from the staked digital commodities.

[115] While issued on a one-for-one basis, the Staking Receipt Token that is issued may not be a whole unit because at the time of deposit one whole unit of the deposited digital commodity may represent a fraction of one whole unit of the Staking Receipt Token.

43

although any such transactions are separate and independent of the Protocol Staking activities. Staking Receipt Tokens do not change any of the rights or obligations of the deposited digital commodities and are characterized as receipts for the deposited digital commodities. Depositors can redeem the Staking Receipt Tokens for the deposited digital commodities and any rewards that accrue to the deposited digital commodities,[116] subject to any applicable unbonding period.[117]

Persons can participate in Liquid Staking through protocol-based or third-party service providers (both referred to in this release as "Liquid Staking Providers"). The Liquid Staking Provider facilitates the staking of the deposited digital commodities on behalf of the Depositor. The Liquid Staking Provider holds the deposited digital commodities either in a cryptographic wallet that the Liquid Staking Provider controls or in a smart contract. The Liquid Staking Provider stakes the deposited digital commodities on behalf of the Depositor for an agreed-upon fee that reduces the amount of rewards that would otherwise accrue to the deposited digital commodities, either using a node the Liquid Staking Provider operates or through a third-party Node Operator the Liquid Staking Provider selects.[118] In the latter case, this selection is the Liquid Staking Provider's only decision in the staking process, and that decision may be automated. At all times during this Liquid Staking arrangement, the deposited digital commodities remain in the control of the Liquid Staking Provider and the Depositor (or any

---

[116] When redeemed, the Staking Receipt Tokens are "burned," which is a process through which the Staking Receipt Tokens are permanently removed from circulation.

[117] *See supra* note 110 for an explanation of "unbonding period."

[118] The amount of rewards that otherwise would accrue to the deposited digital commodities also would be reduced by any fees owed to a third-party Node Operator.

44

subsequent transferee of the Depositor's Staking Receipt Tokens) is intended to retain ownership of the deposited digital commodities.[119]

When using a protocol-based Liquid Staking Provider, Depositors deposit their digital commodities into a software protocol that holds the deposited digital commodities in a smart contract on behalf of the Depositors, stakes the deposited digital commodities on behalf of the Depositors, and issues Staking Receipt Tokens to the Depositors, all in a programmatic manner through self-executing computer code. The generating, issuing, and redeeming of the Staking Receipt Tokens is performed without the need for or reliance on a third-party intermediary.

When using a third-party Liquid Staking Provider, such as a Custodian, Depositors deposit their digital commodities with the third-party Liquid Staking Provider, who holds the deposited digital commodities in a cryptographic wallet on behalf of the Depositors, stakes the deposited digital commodities on behalf of the Depositors, and issues Staking Receipt Tokens to the Depositors. The generating, issuing, and redeeming of the Staking Receipt Tokens is performed by the third-party Liquid Staking Provider.

In a Liquid Staking arrangement, rewards accrue to, and slashing[120] losses are deducted from, the staked digital commodities. Rewards are deposited with the Liquid Staking Provider, and staked digital commodities are forfeited if there are slashing losses, in either case in a programmatic manner through self-executing computer code. There are two methods through which Staking Receipt Tokens reflect rewards and/or slashing losses. In the first method, the Staking Receipt Token itself evidences ownership of more digital commodities as and when rewards accrue and fewer digital commodities as and when slashing losses occur. This means

---

[119] The Liquid Staking Provider typically enters into an agreement with the Depositor, such as a user agreement or terms of service, providing that the Depositor retains ownership of the digital commodities.

[120] *See supra* note 111 for an explanation of "slashing."

45

that the ratio of one Staking Receipt Token to one digital commodity changes as rewards accrue and/or slashing losses occur. For example, as rewards accrue the ratio changes from one-to-one to one-to-more-than-one, with one Staking Receipt Token representing more than one digital commodity. In the second method, Staking Receipt Token holders receive additional Staking Receipt Tokens as and when rewards accrue and lose Staking Receipt Tokens as and when slashing losses occur. This means that the ratio of Staking Receipt Tokens to digital commodities always remains one-to-one. In either case, the Staking Receipt Tokens can be redeemed with the Liquid Staking Provider at any time for the deposited digital commodities, subject to any applicable unbonding period.

### 2.    Covered Protocol Staking Activities

The interpretation below pertains to the following Protocol Staking activities when such activities conform to the descriptions in this release ("Protocol Staking Activities" and each a "Protocol Staking Activity"): (1) staking digital commodities on a PoS Network; (2) the activities undertaken by third parties involved in the Protocol Staking process—including, but not limited to, third-party Node Operators, Validators, Custodians, Delegates, Nominators, and Liquid Staking Providers (collectively, "Service Providers")—including their roles in connection with the earning and distribution of rewards; (3) the activities undertaken by Liquid Staking Providers in connection with generating, issuing, and redeeming Staking Receipt Tokens; and (4) providing Ancillary Services (as defined below). Only Protocol Staking Activities undertaken in connection with the following types of Protocol Staking are addressed in this release:

Self (or Solo) Staking, which involves a Node Operator staking digital commodities it owns and controls using its own resources. The Node Operator may include one or more persons acting together to operate a node and stake their digital commodities.

46

Self-Custodial Staking Directly with a Third Party, which involves a Node Operator, under the terms of the PoS Network's protocol, being granted Owners' validation rights. Reward payments may flow from the PoS Network directly to the Owners or indirectly to them through the Node Operator.

Custodial Arrangement, which involves a Custodian staking on behalf of Depositors. For example, a crypto asset trading platform holding deposited digital commodities may stake such digital commodities on behalf of Depositors on a PoS Network that permits delegation on behalf of and with the consent of the Depositors. The Custodian will stake the deposited digital commodities using its own node or select a third-party Node Operator. In the latter case, this selection is the Custodian's only decision in the staking process.

Liquid Staking, which involves a Liquid Staking Provider staking on behalf of Depositors who receive a Staking Receipt Token that evidences their ownership of the deposited digital commodities and any rewards that accrue to the deposited digital commodities. The Liquid Staking Provider will stake the deposited digital commodities using its own node or select a third-party Node Operator. In the latter case, this selection is the Liquid Staking Provider's only decision in the Liquid Staking process.

### 3.      Interpretation Regarding Protocol Staking Activities

Protocol Staking Activities, in the manner and under the circumstances described in this release, do not involve the offer and sale of a security within the meaning of section 2(a)(1) of the Securities Act or section 3(a)(10) of the Exchange Act. Accordingly, participants in Protocol Staking Activities do not need to register transactions with the Commission under the Securities Act or fall within an exemption from registration in connection with these Protocol Staking Activities.

As noted above,[121] a digital commodity itself does not constitute any of the financial instruments enumerated in the definition of "security." Accordingly, we conduct our analysis of certain transactions involving digital commodities in the context of Protocol Staking under the *Howey* test.[122]

Self (or Solo) Staking. A Node Operator's self (or solo) staking is not undertaken with a reasonable expectation of profits to be derived from the essential managerial efforts of others. Rather, Node Operators contribute their own resources and stake their own digital commodities, thereby helping to secure the PoS Network and facilitating the PoS Network's operation through the validation of new blocks, which enables them to qualify for rewards issued by the PoS Network in accordance with its underlying software protocol. To earn rewards, the Node Operator's activities must comply with the rules of the PoS Network's software protocol. By staking its own digital commodities and engaging in Protocol Staking, the Node Operator is merely engaging in an administrative or ministerial activity to secure the PoS Network and facilitate its operation. A Node Operator's expectation to receive rewards is not derived from any third party's essential managerial efforts upon which the PoS Network's success depends. Instead, the expected financial incentive from the PoS Network's software protocol is derived solely from the administrative or ministerial act of Protocol Staking. As such, rewards are payments to the Node Operator in exchange for the services it provides to the PoS Network rather than profits derived from the essential managerial efforts of others.

---

[121] *See supra* section III.A.

[122] Protocol Staking generally and the "Protocol Staking Activities" defined in this release and upon which we express our view in this release do not involve notes or other evidences of indebtedness because at all times during the staking process the Owner or Depositor retains ownership of its digital commodities (either directly or through a Custodian or Liquid Staking Provider).

Self-Custodial Staking Directly with a Third Party. Likewise, where an Owner grants its validation rights to a Node Operator, the Owner has no expectation of profit derived from the essential managerial efforts of others. The Node Operator's service to the Owner is administrative or ministerial in nature and does not constitute essential managerial efforts for the reasons discussed above with respect to self (or solo) staking. Whether a Node Operator stakes its own digital commodities or is granted validation rights from Owners does not alter the nature of Protocol Staking for purposes of the *Howey* test. In either case, Protocol Staking remains an administrative or ministerial activity, and the expected financial incentive is derived solely from such activity and not the success of the PoS Network or some other third party. Further, the Node Operator does not guarantee or otherwise set or fix the amount of the rewards owed to Owners, although the Node Operator may subtract from such amount its fees (whether fixed or a percentage of such amount).

Custodial Arrangement. In a custodial arrangement, the Custodian (whether a Node Operator or not) does not provide essential managerial efforts to Depositors for whom it provides this service. These arrangements are like those discussed above where an Owner grants its validation rights to a third party but, in this instance, they also involve the Owner granting custody of its deposited digital commodities. The Custodian does not decide whether, when, or how much of a Depositor's digital commodities to stake. The Custodian acts as an agent in connection with staking the deposited digital commodities on behalf of the Depositor.[123] In addition, the Custodian's taking custody of the deposited digital commodities and in some cases selecting a Node Operator do not constitute essential managerial efforts because these activities

___

[123]   If a Custodian does select whether, when, or how much of a Depositor's digital commodities to stake, its activities are outside the scope of this release.

are administrative or ministerial in nature. Further, the Custodian does not guarantee or otherwise set or fix the amount of the rewards owed to Depositors, although the Custodian may subtract from such amount its fees (whether fixed or a percentage of such amount).[124]

Liquid Staking. In Liquid Staking, the Liquid Staking Provider (whether a Node Operator or not) does not provide essential managerial efforts to Depositors for whom it provides this service. These arrangements are like those discussed above with respect to a "Custodial Arrangement." The Liquid Staking Provider does not decide whether, when, or how much of a Depositor's digital commodities to stake and is acting as an agent in connection with staking the digital commodities on behalf of the Depositor.[125] In addition, the Liquid Staking Provider's taking custody of the deposited digital commodities and in some cases selecting a Node Operator does not constitute essential managerial efforts because these activities are administrative or ministerial in nature. Further, the Liquid Staking Provider does not guarantee or otherwise set the amount of the rewards owed to Depositors, although the Liquid Staking Provider may subtract from such amount its fees (whether fixed or a percentage of such amount).[126]

Ancillary Services. Service Providers may provide the services described below ("Ancillary Services") to Owners and Depositors in connection with Protocol Staking. Each of these Ancillary Services is merely administrative or ministerial in nature and does not involve essential managerial efforts. They are facets of a general activity—Protocol Staking—that itself does not constitute essential managerial efforts. Whether offered separately or as a group of

---

[124] If a Custodian does guarantee or otherwise set the amount of rewards owed to the Depositors, its activities are outside the scope of this release.

[125] If a Liquid Staking Provider does select whether, when, or how much of a Depositor's digital commodities to stake, its activities are outside the scope of this release.

[126] If a Liquid Staking Provider does guarantee or otherwise set the amount of rewards owed to the Depositors, its activities are outside the scope of this release.

50

services, the Service Provider does not provide essential managerial efforts if it provides any or all of these services.[127]

*Slashing Coverage*, where the Service Provider reimburses or indemnifies a staking customer against loss resulting from slashing. This protection is similar to that offered by service providers in many types of traditional commercial transactions.

*Early Unbonding*, where a Service Provider allows digital commodities to be returned to an Owner or Depositor before the end of the applicable unbonding period of a PoS Network's software protocol. This service merely shortens the applicable unbonding period as a convenience to the Owner or Depositor by reducing the burden of the unbonding period.

*Alternate Rewards Payment Schedules and Amounts*, where the Service Provider delivers earned rewards at a cadence and in an amount that differs from the set schedule of a PoS Network's software protocol and/or where the rewards are paid earlier or less frequently than a PoS Network's software protocol distributes them, provided the reward amounts are not fixed, guaranteed, or greater than those awarded by the PoS Network's software protocol. Similar to early unbonding, this is merely an optional convenience afforded to Owners and Depositors in connection with the administration of rewards allocation and delivery.

*Aggregation of Digital Commodities*, where the Service Provider offers the ability for Owners or Depositors to aggregate their digital commodities to meet any applicable staking minimum of a PoS Network's software protocol. This service is part of the validation process, which itself is administrative or ministerial in nature. Without more, aggregating the digital

---

[127] To the extent that Service Providers provide services not discussed below, their activities are outside the scope of this release.

commodities of Owners or Depositors to help enable staking is similarly administrative or ministerial in nature.

### 4.    Interpretation Regarding Staking Receipt Tokens

The offer and sale of a Staking Receipt Token that is a receipt for a non-security crypto asset that is not subject to an investment contract, in the manner and under the circumstances described in this release, does not involve the offer and sale of a security within the meaning of section 2(a)(1) of the Securities Act or section 3(a)(10) of the Exchange Act. Accordingly, persons involved in the process of generating, issuing, and redeeming a Staking Receipt Token that is a receipt for a non-security crypto asset that is not subject to an investment contract, in the manner and under the circumstances described in this release, as well as persons involved in secondary market offers and sales of such Staking Receipt Tokens, do not need to register those transactions with the Commission under the Securities Act or fall within an exemption from registration. In contrast, the offer or sale of a Staking Receipt Token that is a receipt for a digital security or a non-security crypto asset that is subject to an investment contract is an offer or sale of a security within the meaning of section 2(a)(1) of the Securities Act or section 3(a)(10) of the Exchange Act.

A Staking Receipt Token that is a receipt for a non-security crypto asset that is not subject to an investment contract does not constitute any of the common financial instruments enumerated in the definition of "security" because, among other things, it does not have the economic characteristics of a security. While Depositors are entitled to rewards accruing with respect to their deposited digital commodity, such a Staking Receipt Token itself does not generate rewards. Rather, rewards are generated from the underlying Protocol Staking Activities, which (as discussed above) do not involve securities transactions. Further, such a Staking

52

Receipt Token does not constitute any of the derivative financial instruments enumerated in the definition of "security."[128] Thus, such a Staking Receipt Token merely evidences the deposited digital commodity held with the Liquid Staking Provider to which the Depositor is entitled as the Owner. The definition of "security" specifically includes "receipt for" any security.[129] A Staking Receipt Token is a receipt, which is an instrument certifying that a stated amount of a digital commodity has been deposited with the Liquid Staking Provider issuing the receipt, because it evidences the holder's ownership of the deposited digital commodity.[130] Accordingly, a Staking Receipt Token that is a receipt for a non-security crypto asset that is not subject to an investment contract is not a receipt for a security. In contrast, a Staking Receipt Token that is a receipt for a digital security or non-security crypto asset that is subject to an investment contract is a security.

Consideration also must be given to whether a Staking Receipt Token that is a receipt for a non-security crypto asset that is not subject to an investment contract itself may be offered and sold subject to an investment contract. Such a Staking Receipt Token is not offered and sold subject to an investment contract because the parties involved in the process of generating, issuing, and redeeming such a Staking Receipt Token do not provide essential managerial efforts to holders of such a Staked Receipt Token and any economic benefits realized by holders of such

---

[128] Such a Staking Receipt Token does not constitute: (i) a "put, call, straddle, option, or privilege on any security" because it does not have a premium (*i.e.*, there is no price paid for the right to buy or sell an underlying asset), have optionality (*i.e.*, there is no ability to choose whether or not to purchase or sell the underlying asset), or transfer risk between the parties; (ii) a "security future" because it is not a contract of sale for future delivery of an asset; or (iii) a "security-based swap" because, among other reasons, it provides the holder with a beneficial ownership interest in the deposited digital commodity.

[129] While the financial instruments enumerated in the definition of "security" also include "certificate of deposit for a security," that term generally has been interpreted to refer to instruments issued by protective committees during corporate reorganizations. *See Marine Bank*, 455 U.S. at 557 n.5.

[130] *See supra* note 119.

a Staking Receipt Token are not derived from any such efforts.[131] That is, the value of such a Staking Receipt Token is derived from the value of the deposited digital commodity and not from the essential managerial efforts of the Liquid Staking Provider or any other third party involved in the process of generating, issuing, and redeeming such a Staking Receipt Token. Moreover, any rewards accruing with respect to the deposited digital commodity are realized from Protocol Staking Activities that, as discussed above, do not involve the offer and sale of a security within the meaning of section 2(a)(1) of the Securities Act or section 3(a)(10) of the Exchange Act.

## VI.   FEDERAL SECURITIES LAWS STATUS OF THE CRYPTO ASSET ACTIVITY KNOWN AS "WRAPPING"

In the following discussion, we provide an interpretation regarding the "wrapping" of crypto assets. The "wrapping" of crypto assets refer to the process through which a person deposits a crypto asset with a Custodian or cross-chain bridge[132] (the "Wrapped Token Provider") and in return the Wrapped Token Provider generates an equivalent amount of "Redeemable Wrapped Tokens"[133] on a one-for-one basis without directly or indirectly offering any return, yield, profit opportunity, or additional good or service. The Wrapped Token Provider holds the deposited crypto asset in a manner intended to ensure that, for the Redeemable Wrapped Tokens in circulation, there is an equivalent amount of the deposited crypto asset being

---

[131]   A holder of such a Staking Receipt Token may be able to use the Staking Receipt Token to generate additional returns. Where a Liquid Staking Provider provides the means by which such a Staking Receipt Token can be used to generate such returns, those activities are outside the scope of this release.

[132]   A "cross-chain bridge" programmatically generates and redeems Redeemable Wrapped Tokens (defined below) without the use of a Custodian. A cross-chain bridge consists of self-executing code that uses smart contracts to facilitate the interoperability between different crypto networks and token standards.

[133]   For purposes of this release, a "Redeemable Wrapped Token" is a crypto asset issued on a crypto network that represents either a crypto asset native to a different crypto network or a crypto asset based on a different token standard and that both (1) is backed one-for-one by the deposited crypto asset, and (2) can be redeemed on a fixed one-for-one basis for the deposited crypto asset, in which case the Redeemable Wrapped Token is burned (or destroyed) and thereby permanently removed from circulation.

held.[134] The Wrapped Token Provider holds the deposited crypto asset for the benefit of the Redeemable Wrapped Token holders and the deposited crypto asset effectively is "locked up" and cannot be transferred, lent, pledged, rehypothecated, or otherwise used for any reason. The holder of a Redeemable Wrapped Token—whether the original depositor of the crypto asset or a subsequent transferee—has the right to redeem the Redeemable Wrapped Token for the deposited crypto asset on a one-for-one basis. To redeem, the Redeemable Wrapped Token holder reverses the process described above: the holder sends the Redeemable Wrapped Tokens back to the Wrapped Token Provider, who burns (or destroys) the Redeemable Wrapped Tokens and releases the equivalent amount of the deposited crypto asset back to the holder on a one-for-one basis.

The offer or sale of a Redeemable Wrapped Token that is a receipt for a non-security crypto asset that is not subject to an investment contract, in the manner and under the circumstances described in this release, does not involve the offer and sale of a security within the meaning of section 2(a)(1) of the Securities Act or section 3(a)(10) of the Exchange Act. Accordingly, persons who participate in the offer or sale of a Redeemable Wrapped Token that is a receipt for a non-security crypto asset that is not subject to an investment contract, in the manner and under the circumstances described in this release, do not need to register their transactions with the Commission under the Securities Act or fall within an exemption from registration. In contrast, the offer or sale of a Redeemable Wrapped Token that is a receipt for a digital security or a non-security crypto asset that is subject to an investment contract is an offer

---

[134] A Custodian typically holds the deposited crypto assets in a cryptographic wallet that the Custodian controls. A cross-chain bridge holds the deposited crypto assets in a smart contract.

or sale of a security within the meaning of section 2(a)(1) of the Securities Act or section 3(a)(10) of the Exchange Act.

A Redeemable Wrapped Token that is a receipt for a non-security crypto asset that is not subject to an investment contract does not constitute any of the common financial instruments enumerated in the definition of "security" because, among other things, it does not have the economic characteristics of a security. Further, such a Redeemable Wrapped Token does not constitute any of the derivative financial instruments enumerated in the definition of "security."[135] Thus, such a Redeemable Wrapped Token merely evidences the deposited crypto asset held with the Wrapped Token Provider to which the Redeemable Wrapped Token holder is entitled. The definition of "security" specifically lists "receipt for" any security. A Redeemable Wrapped Token is a receipt, which is an instrument certifying that a stated amount of a crypto asset has been deposited with the Wrapped Token Provider issuing the receipt, because it evidences the holder's ownership of the deposited crypto asset and does not change any of the rights, obligations, or benefits of the deposited crypto asset.[136] Accordingly, a Redeemable Wrapped Token that is a receipt for a non-security crypto asset that is not subject to an investment contract is not a receipt for a security. In contrast, a Redeemable Wrapped Token that is a receipt for a digital security or non-security crypto asset that is subject to an investment contract is a security.

---

[135] Such a Redeemable Wrapped Token does not constitute: (i) a "put, call, straddle, option, or privilege on any security" because it does not have a premium (i.e., there is no price paid for the right to buy or sell an asset), have optionality (i.e., there is no ability to choose whether or not to purchase or sell an asset), or transfer risk between the parties; (ii) a "security future" because it is not a contract of sale for future delivery of an asset; or (iii) a "security-based swap" because, among other reasons, it provides the holder with a beneficial ownership interest in the deposited crypto assets.

[136] The Wrapped Token Provider typically issues Redeemable Wrapped Tokens together with a user agreement or terms of service providing that the holder retains ownership of the deposited crypto assets.

Consideration also must be given to whether a Redeemable Wrapped Token that is a receipt for a non-security crypto asset that is not subject to an investment contract itself may be offered and sold subject to an investment contract. The offer and sale of such a Redeemable Wrapped Token do not involve an investment in an enterprise and the parties involved in the wrapping process do not provide essential managerial efforts upon which any return would be derived. First, holders of such a Redeemable Wrapped Token are not making an investment in an enterprise. That is, their funds are neither pooled together to be deployed by promoters or other third parties for developing any enterprise, nor are their fortunes tied to the efforts of a promoter or other third party or shared with those of a promoter or other third party. As noted above, the Wrapped Token Provider holds the deposited crypto asset for the benefit of holders of such a Redeemable Wrapped Token, and the deposited crypto asset is locked up and cannot be transferred or otherwise used. Second, any economic benefits realized by holders of such a Redeemable Wrapped Token are not derived from the essential managerial efforts of others. That is, the value of such a Redeemable Wrapped Token is derived from the value of the deposited crypto asset and not from the efforts of any third party involved in the wrapping process. The wrapping process itself is an administrative or ministerial function typically used to facilitate or enhance the interoperability between different crypto networks and different token standards[137] by allowing a crypto asset to be represented and used in a crypto system with which it is not otherwise compatible.[138] In addition, there is no financial incentive derived from the wrapping

---

[137] A token standard comprises the specifications governing how a crypto asset functions in a crypto system. Such specifications address a wide range of functions including how the crypto asset is transferred, how transactions are approved, and how data is accessed.

[138] Crypto networks have different protocols and may not be interoperable, meaning that crypto assets originating from one crypto network may not be compatible with other crypto networks such that the crypto assets may not be able to be transferred to or otherwise used on such other crypto networks. A crypto asset also may not be able to be used in a crypto application if it is based on a token standard that is not compatible with the token standard(s) required for use in the crypto application.

57

process because a Redeemable Wrapped Token is redeemable for the deposited crypto asset only on a fixed, one-for-one basis without any additional financial incentive or benefit. Moreover, the activities of the parties involved in the wrapping process, including those of Wrapped Token Providers, are administrative or ministerial in nature and do not constitute essential managerial efforts.

## VII.   APPLICATION OF THE *HOWEY* TEST TO CERTAIN CRYPTO ASSET DISSEMINATIONS KNOWN AS "AIRDROPS"

In the following discussion, we provide an interpretation regarding the investment contract status of certain crypto asset disseminations known as "airdrops" for purposes of Section 2(a)(1) of the Securities Act. As discussed below, this interpretation addresses only airdrops of non-security crypto assets by issuers to recipients who do not provide the issuer with money, goods, services, or other consideration in exchange for the airdropped non-security crypto assets.

### A.   Airdrops Generally

An "airdrop" is a means for crypto asset issuers to disseminate their crypto assets in exchange for no or nominal consideration. The issuer, usually in the early stages of development of a crypto system, effectuates an airdrop by transferring its crypto asset to specific cryptographic wallets or other addresses. Issuers use airdrops for a variety of reasons, such as to generate interest in and expand ownership and use of their crypto assets, reward early users or loyalty of users of a crypto system, promote a software application, build a community, decentralize governance authority with respect to an open-source crypto system, or award high-scoring players of an associated video game. An increase in the ownership base of a crypto asset

can help grow and increase participation in the associated crypto system by more users, support decentralization of the crypto system, and facilitate network effects.

Issuers choose the recipients and all other terms of their airdrops. For example, an issuer could airdrop its crypto asset only to cryptographic wallets holding another specified crypto asset, with or without minimum ownership thresholds of that other crypto asset, or to cryptographic wallets of users of a particular trading platform that facilitates participation in the airdrop. Or an issuer may airdrop its crypto asset to selected crypto system users who meet specific criteria, such as holding a minimum amount of the crypto asset or based on their prior or current level of activity with the associated crypto system. Further, an issuer may airdrop its crypto asset in exchange for the recipient providing a service. That service could include, for example, a task aimed at raising awareness of the issuer's crypto asset and associated crypto system through various channels, such as following the issuer on social media, "retweeting" (or reposting) a post sent by the issuer, writing an article about the associated crypto system, referring another person to the associated crypto system, or fixing bugs in the associated crypto system's software.

## B.    Covered Airdrops

The interpretation below pertains to airdrops of non-security crypto assets to recipients who do not provide the issuer with money, goods, services, or other consideration in exchange for the airdropped non-security crypto asset.[139] The interpretation does not pertain to any airdrops of non-security crypto assets where the recipient provides the issuer with money, goods, services, or other consideration in exchange for the airdropped non-security crypto asset, such as

---

[139]    The non-security crypto assets disseminated in an airdrop may or may not be allocated to recipients on a *pro rata* basis.

where the recipient performs a service in exchange for the airdropped non-security crypto asset. The interpretation does, however, pertain to airdrops of non-security crypto assets in which the recipients have provided to the issuer money, goods, services, or other consideration where the consideration was not provided to the issuer in exchange for the airdropped non-security crypto assets. In other words, the recipient must not bargain for or choose to provide such consideration in exchange for the airdropped non-security crypto asset for the interpretation to apply. For example, where such consideration was provided to the issuer prior to the announcement[140] of the airdrop and the recipients are not required to provide any further consideration to the issuer after such announcement in order to obtain the airdropped non-security crypto asset, we would not view such consideration as being provided to the issuer in exchange for the airdropped non-security crypto asset.[141]

### C. Interpretation Regarding Airdrops[142]

Where an issuer conducts an airdrop of non-security crypto assets in the manner and under the circumstances described in this release, the non-security crypto asset does not become subject to an investment contract because the first element of the *Howey* test—requiring an

---

[140] This view does not foreclose general statements regarding the possibility of an airdrop so long as any such statements do not provide terms or conditions.

[141] If recipients would have to fulfill further conditions subsequent to the announcement of the airdrop, such as buying a specific crypto asset, buying a good or service (whether or not related to a crypto asset), or performing a specific task (whether or not related to a crypto asset), the interpretation would not pertain to such airdrop.

[142] The interpretation does not apply to or otherwise affect existing Commission or staff positions regarding employee compensation and benefit arrangements involving the issuance or award of securities.

investment of money[143]—is not met.[144] Recipients of the airdropped non-security crypto asset are not making an "investment of money" because they provide no money, goods, services, or other consideration to the issuer in exchange for the airdropped non-security crypto asset, and the issuer is not offering them the non-security crypto asset in exchange for any such consideration.[145] Accordingly, issuers conducting airdrops of non-security crypto assets in the manner and under the circumstances described in this release do not need to register those transactions with the Commission under the Securities Act or fall within one of the Securities Act's exemptions from registration.[146]

This interpretation would include the following scenarios where recipients do not provide consideration to the issuer in exchange for the airdropped non-security crypto asset:

---

[143]   The first element of the *Howey* test requires recipients to make an "investment of money." Federal courts have interpreted "money" for this purpose to not be limited to cash. *See, e.g., Uselton v. Comm. Lovelace Motor Freight, Inc.*, 940 F.2d 564, 574 (10th Cir. 1991) (stating that "in spite of *Howey's* reference to an 'investment of money,' it is well established that cash is not the only form of contribution or investment that will create an investment contract" and that "the 'investment' may take the form of 'goods and services,' or some other 'exchange of value.'") (citations omitted).

[144]   The interpretation in this section of the release only relates to the "investment-of-money" requirement of the *Howey* test. *See supra* note 7. The *Howey* test is a conjunctive test, meaning that if any of its three requirements is not met there is no "investment contract." *See, e.g., Revak v. SEC Realty Corp.*, 18 F.3d 81, 87 (2d Cir. 1994) ("The three elements of the *Howey* test must all be present for a [ ] contract [, transaction, or scheme] to constitute a security . . . .").

[145]   Applicable Federal case law since *Howey* explains that there is no investment of money where the recipient does not provide consideration for the acquired asset. *See SEC v. Sg Ltd.*, 265 F.3d 42, 47 (1st Cir. 2001) ("The determining factor [under the first prong of the *Howey* test] is whether an investor 'chose to give up a specific consideration in return for a separable financial interest with the characteristics of a security.'" (quoting *Int'l Bhd. of Teamsters v. Daniel*, 439 U.S. 551, 558 (1979)). "In every case [where courts have found an investment contract exists] the purchaser gave up some tangible and definable consideration in return for an interest that had substantially the characteristics of a security." *Int'l Bhd. of Teamsters v. Daniel* at 559.

[146]   Although the non-security crypto asset disseminated in the airdrop may not be subject to an investment contract, there may be an investment contract associated with the non-security crypto asset created in connection with other transactions involving the non-security crypto asset, whether prior to or after the airdrop. In such cases, the non-security crypto asset disseminated in the airdrop may become subject to that investment contract in a subsequent transaction, which would constitute a securities transaction, such as where the airdrop recipient sells the non-security crypto asset in a secondary market transaction. Any such transaction would have to be registered under the Securities Act or conducted pursuant to an available exemption from registration, such as the exemption in section 4(a)(1) of the Securities Act.

61

- An issuer airdrops its non-security crypto asset to persons who hold another specified crypto asset in their digital wallets, and the issuer does not announce the airdrop before the non-security crypto asset is disseminated.[147]

- An issuer creates a new crypto system that utilizes a non-security crypto asset. Prior to deploying the crypto system, the issuer deploys a testing environment version of the crypto system and interested users transact using such version during that phase of the crypto system's development. After the crypto system is fully functional and operational, the issuer announces that persons who used the testing environment version during a specific prior period would receive the non-security crypto asset in an airdrop for that prior engagement.[148]

- An issuer airdrops its non-security crypto asset free of charge to users of a related software application who satisfy certain eligibility criteria based upon such users' use of the application. Airdrop eligibility is solely based on the users' use of the application prior to the date of the airdrop, and the issuer does not announce the airdrop before the non-security crypto asset is disseminated.

This interpretation does not address airdrops of digital securities. This interpretation also does not address or otherwise alter our views of what does or does not constitute a "sale" under section 2(a)(3) of the Securities Act, which includes "every contract of sale or disposition of a security or interest in a security, for value," or section 3(a)(14) of the Exchange Act. Section

---

[147] The result here would be the same regardless of whether the issuer conducting the airdrop itself is the issuer of the other specified crypto asset and regardless of whether the other specified crypto asset itself is a security.

[148] If, however, the issuer announced the airdrop during the testing environment version phase to incentivize engagement during that phase of the crypto system's development and limited the airdrop to persons who use the testing environment version, then the interpretation would not pertain to such airdrop.

2(a)(3) of the Securities Act and section 3(a)(14) of the Exchange Act by their terms do not apply to airdrops of non-security crypto assets that are not subject to an investment contract.

## VIII.  OTHER MATTERS

Pursuant to the Congressional Review Act,[149] the Office of Management and Budget ("OMB") has designated the interpretation in this release as a "major rule," as defined by 5 U.S.C. 804(2). Notwithstanding such designation, the interpretation in this release may take effect immediately pursuant to 5 U.S.C. 808(2) because it is an interpretive rule and thus exempt from the Administrative Procedure Act's notice and comment requirements. The interpretation in this release is a significant regulatory action under section 3(f) of Executive Order 12866, as amended, and has been reviewed by OMB. The interpretation in this release concerns the Federal securities laws and the guidance included herein concerns the administration of the Commodity Exchange Act by the CFTC. No interference is intended with respect to any other legal regime, including the Federal tax laws under the Internal Revenue Code or the Bank Secrecy Act of 1970 and the Anti-Money Laundering Act of 2020, which are outside the scope of the interpretation in this release.

## IX.  COMMISSION ECONOMIC CONSIDERATIONS

The interpretation in this release is intended to advise the public on the Commission's views of the application of the Federal securities laws to certain types of crypto assets and certain transactions in crypto assets. The interpretation does not itself create any new legal obligations for issuers of, and investors in, digital securities and crypto asset-related securities (*i.e.*, when a crypto asset is subject to an investment contract). Nonetheless, we recognize that, to the extent the understanding and behavior of issuers and investors are currently not consistent with the

---

[149]  5 U.S.C. 801 *et seq.*

interpretation, the interpretation would have economic effects. We discuss the potential economic effects of the interpretation below, including the potential for improvements in efficiency, capital formation, and competition.

The interpretation may affect issuers of and investors in digital securities and crypto asset-related securities; creators and acquirers of non-security crypto assets; users of crypto systems; and financial intermediaries. The main effect of the interpretation will be to reduce uncertainty by finally providing clarity about the Commission's views on the application of the Federal securities laws to certain types of crypto assets and certain transactions in crypto assets. The impact of this clarification, however, is limited in certain respects. First, given the passage of the GENIUS Act, affected parties are already on notice that payment stablecoins issued by a permitted payment stablecoin issuer will be excluded from the statutory definition of "security" after the effective date of the GENIUS Act. Second, to the extent that affected parties are already acting consistently with the interpretation, the interpretation will have minimal economic impact.

By providing more clarity, the interpretation should reduce costs for issuers of digital securities and crypto asset-related securities, as well as other market participants and creators of non-security crypto assets by reducing the cost of legal advice to determine their obligations consistent with the Commission's views on the application of the Federal securities laws to crypto assets and transactions involving crypto assets. A reduction in costs could result in more issuers issuing, offering, and selling crypto assets securities and crypto asset-related securities. These effects could spur competition in the market for these securities and lead to increased entrepreneurship and innovation in this market, to the benefit of investors. The added clarity and associated reduction in costs from the interpretation could also spur more activity in the markets for non-security crypto assets, thus increasing competition among creators and among buyers. As

a result of these effects, the additional clarity that the interpretation provides could accelerate growth and innovation in blockchain or similar distributed ledger technology.

Further, to the extent that confusion about the Commission's views on the application of the Federal securities laws to certain crypto assets and certain transactions involving crypto assets has chilled activity in the crypto asset markets or encouraged crypto asset activity to shift outside of the United States, added clarity from the interpretation could reduce the perceived risk of engaging in the crypto asset markets and encourage more crypto asset activity in the United States.

It is possible that some issuers of digital securities and crypto asset-related securities may determine that they must change business practices as a result of the interpretation. To the extent that their past understandings and behavior were not consistent with the interpretation, they may incur costs of changing their practices, including potentially with respect to registration and exemption from registration of securities offerings under the Federal securities laws. Other potential issuers of digital securities or crypto asset-related securities may choose either to not undertake future issuances or to alter the form of their crypto asset issuances.

We also expect the interpretation to have some effects on current and potential investors in digital securities and crypto asset-related securities and acquirers of non-security crypto assets. Such investors and acquirers may change their investment behavior if their prior understanding of the application of the Federal securities laws to certain types of crypto assets or certain transactions in crypto assets differs from the interpretation. For instance, some individuals and entities may prefer to hold digital securities or crypto asset-related securities. Because the interpretation provides further clarification about when the Commission believes a crypto asset is itself a security or is subject to an investment contract, it should help inform these investors'

investment choices. In addition, clarifying the Commission's views on the application of the Federal securities laws to crypto assets and transactions involving crypto assets could lessen any related uncertainty-driven distortions that may have affected prices for digital securities and crypto asset-related securities, as well as non-security crypto assets, thereby enhancing pricing efficiency.

In sum, we expect the interpretation to enhance clarity for issuers and investors regarding the Commission's views on the application of the Federal securities laws to certain crypto assets and certain crypto asset transactions. For the reasons discussed above, this could: enhance pricing efficiency in digital securities, crypto asset-related securities, and non-security crypto assets; increase capital formation; and improve competition, which could facilitate innovation and entrepreneurship in the markets for crypto assets.

**Statutory Authority**

The interpretation in this release is being adopted pursuant to sections 2(a)(1) and 19 of the Securities Act and sections 3(a)(10) and 23 of the Exchange Act.

**List of Subjects in 17 CFR Parts 231 and 241**

Securities.

**Text of Amendments**

For the reasons set forth above, the Commission is amending title 17, chapter II of the Code of Federal Regulations as set forth below:

**PART 231 – INTERPRETATIVE RELEASES RELATING TO THE SECURITIES ACT OF 1933 AND GENERAL RULES AND REGULATIONS THEREUNDER**

1. The authority citation for part 231 continues to read as follows:

**Authority**: 15 U.S.C. 77a *et seq.*

2. Amend part 231 by adding an entry for Release No. 33-11412 at the end of the table to read as follows:

\* \* \* \* \* \* \*

| Subject | Release No. | Date | Fed. Reg. Vol. and page |
|---|---|---|---|
| \* \* \* \* \* \* \* | | | |
| Application of the Federal Securities Laws to Certain Types of Crypto Assets and Certain Transactions Involving Crypto Assets | 33-11412 | March 17, 2026 | 91 FR 13714. |

**PART 241 – INTERPRETATIVE RELEASES RELATING TO THE SECURITIES EXCHANGE ACT OF 1934 AND GENERAL RULES AND REGULATIONS THEREUNDER**

3. The authority citation for part 241 continues to read as follows:

**Authority**: 15 U.S.C. 78a *et seq.*

4. Amend part 241 by adding an entry for Release No. 34-105020 at the end of the table to read as follows:

\* \* \* \* \* \* \*

| Subject | Release No. | Date | Fed. Reg. Vol. and page |
|---|---|---|---|
| \* \* \* \* \* \* \* | | | |
| Application of the Federal Securities Laws to Certain Types of Crypto Assets and Certain Transactions Involving Crypto Assets | 34-105020 | March 17, 2026 | 91 FR 13714. |

By the Commission.

Dated: March 17, 2026.

**Vanessa A. Countryman**,

*Secretary*.



SEC-DolgyJ-E-0000001

**1:38**



Yes

**Stephen**

As what role

Founder and chief operating officer

Jdolgy@gmail.com

Ok haha that works



So obviously you're bullish on the project haha. I own a good amount of dig have some as a hold and swing it often

Excuse my ignorance Steve but isn't Troy founder ? I can't find your name as COO (apologies just doing due diligence when sending out btc)

Yes

If you look at the original whitepaper you will see me listed as a board member as well

\+

SEC-DolgyJ-E-0000002

1:38



**Stephen**

If you look at the original whitepaper you will see me listed as a board member as well

Jul 16, 2018 at 5:46 PM

> Tell Troy to stop tweeting he's killing the price! Haha

Lol ok

> Every tweet instant 20% Dump

Not gonna be relevant in a few days...

Whole new level coming

Hired new professional PR firm

> Telegram hates him

> Ok good haha

Fuck telegram...they are children...we will be on cover of WSJ and NY Times as well as CNBC and Bloomberg

Gonna be a top 20 crypto in a few weeks

> Nice nice. Unfortunately retail

+

SEC-DolgyJ-E-0000003

1:38



CNBC and Bloom **Stephen**

Gonna be a top 20 crypto in a few weeks

Nice nice. Unfortunately retail reacts heavily to his tweets

And when have you ever known retail to be right? They will be jumping back in at .50

Fomo forsure

What's the deadline to send the btc

Sooner the better but no particular deadline...but if news comes and it's trading much higher can only honor discount from mkt price at the time you send

That's fine selling some positions now

Ok

Jul 16, 2018 at 5:44 PM

Hey Steve positions sold transferring btc to my ledger to send

 at

SEC-DolgyJ-E-0000004



**1:39**

**Stephen**

Hey Steve positions sold transferring btc to my ledger to send

Great

This is a large % of my portfolio please follow through haha

Dig is 0.098 spot it here?

That's usd

0.0000147

Need a minute on a call

Ok

Hey Steve I'm annoyed haha look: "Please, note, that withdrawals in excess of 20000 USD (or an equivalent amount in any cryptocurrency), are processed manually during our regular working hours on weekdays. Our regular working hours: 10:00 – 20:00 (GMT+3). If you are seeing this message, it means our regular business day is over. "

Going to try and figure it out

Matt spread it out in 4 lots

SEC-DolgyJ-E-0000005

1:39



**Stephen** ⟩

Hey S... ...oyed here look-
"Please, note, that withdrawals in excess of 20000 USD (or an equivalent amount in any cryptocurrency), are processed manually during our regular working hours on weekdays. Our regular working hours: 10:00 – 20:00 (GMT+3). If you are seeing this message, it means our regular business day is over. "

Going to try and figure it out

Matt spread it out in 4 lots

Ok

Let you know soon

I can't cancel the withdrawal they open at 1am EST i will have to send then

Ok

No worries

Your locked in at the price

Ok thanks hopefully doesn't dump 🤞

+

SEC-DolgyJ-E-0000006



SEC-DolgyJ-E-0000007

1:39

**Stephen**

Yw

> Can i send more than 20btc or is that max

How much?

> (Sorry for all the questions)

> Apologies was on phone

> 25 btc

25 total? Or 25 more?

> Total

Jul 16, 2018 at 9:25 PM

> That ok steve? If not I'll send the agreed 20

That's fine

> Ok 25 it is

Ok

Jul 17, 2018 at 9:04 AM

> Hey Steve check your gmail please confirm

+

SEC-DolgyJ-E-0000008

**1:39**

**SB**

**Stephen**

Hey Steve check your gmail please confirm

Confirmed

My son is handling the dig for me. He is in LA he will be awake in an hour or so...will handle it then..please do the math for me and let me know how many dig to send...I will double check your numbers

It's all in the email

Cool ty

Jul 17, 2018 at 11:__ AM

Sent 10562

Please confirm when received will send the balance

Ok

Received

Cool

Fast

+

SEC-DolgyJ-E-0000009

1:39

**Stephen**

Cool

Fast

Lol

Haha ya

Sent 2,140,000

Didn't receive yet

Ok

I keep refreshing. Ether scan not in yet

Ok

It's in my pending

Ok did you send from livecoin? If so takes time

Yes

Received dig thank you steve

Cool

+

SEC-DolgyJ-E-0000010



**Stephen**

Cool

Jul 17, 2018 at 3:50 PM

Bitcoin pumps and dig moving we all win!

👻

Jul 20, 2018 at 7:40 PM

What's happening what a sell off

Was there an issue with the swap?

Not that I know of

I'm a buyer

I heard some people got 2-3x the tokens and are dumping

That's not true

As far as we can tel

Nobody I know got more than they are supposed to

And I know a lot of holders



SEC-DolgyJ-E-0000011

1:39



**Stephen**

Nobody I know got more than they are supposed to

And I know a lot of holders

Ethereum Accounts, Address and Contracts

This account got extra

3x

There's your dump

I'm sure there are others

I'm looking into it

Yes because I'm not part of dig team but I'm in crypto a long time, this could be crippling

Dignity (DIG) Token Tracker

And i don't mean to bother you or get you mad but Troy insulting people on twitter then deleting it but the account digsaw screen shotting it is bad too.

Aug 3, 2018 at 9:31 AM



+   essage

SEC-DolgyJ-E-0000012

1:39



**Stephen** 〉

Aug 3, 2018 at 9:31 AM

Hey Steve any good updates on DIG? Since we made the deal price has bled. Also, you said on the phone news was to be released soon. Hope all is well

Aug 3, 2018 at 2:34 PM

Price hasn't bled..it's down very small considering the Alt market has been crushed the last 3 months...that being said everything is going great on our end. We are focused, determined and prepared. The gold deal is being audited as I type...our first 5500 rigs are online. We are working on the ccex swap which has been hell because ccex refuses to cooperate. But we are on it. There are many moving parts and we are focused on the business. I have hired IR and PR and they are working on our strategy and timing of numerous releases. Sorry to say we are not concerned about the pigeons on social media...we are building a crypto empire...takes a few days you know? 😎

Aug 3, 2018 at 3:34 PM

Ya i hear ya just no one can sell cuz of lockout on livecoin plus no vol

+

SEC-DolgyJ-E-0000013

1:39

 you know?


**Stephen**

Aug 3, 2018

> Ya i hear ya just no one can sell cuz of lockout on livecoin plus no vol there. My friends and i have about 4m dig on livecoin right now, and i know they are getting antsy about delays. This is not a threat, just telling you how major bagholders feel hAha.

Tell them I will buy their coin at anytime

> What price

A penny below any current bid

But I'm telling you it's a mistake

I'll call you in a bit I'm on a CC

> I'm on vaca no calls only text

> Ok

Nice

Ok

> Haha no selling at anything less than 22 cents haha

 +

SEC-DolgyJ-E-0000014

1:39



**Stephen**

Ok

Haha no selling at anything less than 22 cents haha

Dude 22 cents is a mistake

This will be 3$ in the fall

Hhah no problem then buy them for $0.50 💀



"I'm a creative genius and I know you're not supposed to say that."

GIPHY via #images

Lol I may be dumb but I ain't stupid

Haha you just said $3....

Yes

You will 6x you're purchase ahha

And I am buying every day all day at .10

+

SEC-DolgyJ-E-0000015

1:39

**Stephen**

And I am buying every day all day at .10

Hopefully by fall cuz the opportunity cost of this is at all time high (in crypto not equities haha)

Meantime the alt coins are getting crushed

Btc is t

Isn't

You have saved tens of thousands a being in dig

Yeah ok

Ya alts with large vol being sold off true

For btc

For etf looming news

Looming

Yup

What do you think happens when

+ rc

SEC-DolgyJ-E-0000016



**1:40**

**Stephen**

Yup

What do you think happens when we prove dig is backed by 3bil in gold with no debt?

Then it will pump, bagholders will dump it, then it will re establish new highs

As a matter of fact can you introduce me to that medium guy...we have some news coming perhaps he would like to break it?

Yes

I will set it up

Ty

One is in Puerto Rico one in Germany

Ok

Give me your email i will have them email you

Sbraverman22@gmail.com

+

SEC-DolgyJ-E-0000017



**Stephen** ⟩

Sbraverman22@gmail.com

Aug 5, 2018 at 11:29 PM

> Sorry for late text (i think you said you're on Cali time) but tmrw i would like to facilitate a buy back with you. Thanks

How many coin?...it's a mistake bro... a big one...

> Talk tmrw we will figure out amount and price

Ok

I'm telling you this will be over 1$ before sept...

> When is news coming out? Been 3-4 weeks

Starts this week and your medium guys gonna be involved as well

You should be adding not selling

> Talk tmrw

Understand my motive...I make

+ ble

artificial intelligence company that

SEC-DolgyJ-E-0000018

**1:40**



**Stephen**

You should be adding not selling

> Talk tmrw

Understand my motive...I make people $$ that do more deals with me...I have a crypto fund and artificial intelligence company that need funding as well...all my guys make $$...just have to trust me

> No offence to you Steve or anyone in finance i don't trust any guarantees. Seen it before.
> You could be right, but don't like opportunity cost as of now. Plus i also need fiat regardless

> Not a knock on you or your character but i been in crypto a longggg time

> Text is impersonal, let's talk via a phone call tmrw

Ok

Aug 6  2018 at

Can you send me that stuff on Dan sweet

> BrokerCheck - Find a broker,

+   essage

SEC-DolgyJ-E-0000019

**1:40**



**Stephen**

Can you send me that stuff on Dan sweet

BrokerCheck - Find a broker, investment or financial advisor

Ty

Lol that's not our Dan Sweet...may be his son

Ok

Hold on

Our Dan worked for Cantor Fitz



+

SEC-DolgyJ-E-0000020

1:40

**‹** SB **Stephen ›** ▢◁



pbs.twimg.com

And is registered with a bd in North Carolina

Look at that picture

Yes that is him

Read timeline

Yes it's garbage...it had to do with his wife who was involved in real estate and she got sick with cancer and was unable to keep up with the business...it's all bullshit bro...Dan is as clean as a whistle...

+ ᵓk

SEC-DolgyJ-E-0000021

1:40



**Stephen**

Yes it's garbage...it had to do with his wife who was involved in real estate and she got sick with cancer and was unable to keep up with the business...it's all bullshit bro...Dan is as clean as a whistle...

Check him out on finra webste

He was Never in court...

It's all bullshit from these telegram morons

Ok ok

Stopped out made 1%

Sorry to hear that...it's a mistake

Ahhh haha wrong person

Lol

Ha

Good

Aug 2, 2018 at 12:00 PM

Just the beginning bro...audit being finished today   once the swap is

+  pl

SEC-DolgyJ-E-0000022



SEC-DolgyJ-E-0000023

1:40



**Stephen ›**

Worst exchange on earth

What is hitbtc?

No

Binance kraken bitfinex first

> You applied ?

Lol yes

> Holy shit

> Didn't know

This is all calculated bro

There is plan

Watch

The next few weeks will be huge

We have 3 announcements coming
your medium guys will get it as well

> Cool

> Thanks



SEC-DolgyJ-E-0000024

1:40

**Stephen**

You will hear about everything before hand

Just must complete the swap first

Fucking pain in the ass

But close

Tmrw swap deadline right ?

Dk exactly

The article on Arbitrade says it

Aug 13, 2018 at 6:00 PM

So been a week my man price still dead

It's coming

How much longer can you say that though lol

We have minimum of 3 announcements this week

Every week same thing ....

SEC-DolgyJ-E-0000025

**1:40**



announcements { **Stephen**

> Every week same thing ....

> Have you spoken to medium guys? They said no

I will when the release is ready

Aug 14, 2018 at 3:34PM

> Need news ASAP bleeding

> Breaking TA supports

It's coming just waiting for AMD marketing to approve it

> Approve what

The announcement of our purchase of 10,000 RX vega nanos

We have literally 7 announcements coming in the next 10 days....a couple of really big ones

Amd is the first

> AMD the chip company or marketing company

We have hired a professional PR

+ tc

SEC-DolgyJ-E-0000026



**Stephen ⟩**

We have hired a professional PR firm to handle

The chip company

Their marketing department needs to approve it

Which they will

Ok

It's all about to start

Perfect

Had to wait for the swap to be complete

And everyone should have their gift coins by tomorrow am

Ya saw that on livecoin. Instant dumping it lol

Aug 15, 2018 at 1:05 PM

Why would Troy tweet exchanges wants proof of gold that's instant dump



SEC-DolgyJ-E-0000027

**1:40**



**Stephen**

Why would Troy tweet exchanges wants proof of gold that's instant dump

Jason..look at it this way...Troy is The Donald Trump of Arbitrade....4.1% GDP jobless rate lowest in history...markets screaming....but his twitter account makes him look foolish sometimes....DIG is a winner and will be a big one...you know what we are doing and it's all happening....maybe not as quickly as people want but it's happening and DIg will be top 10 crypto this year...

Aug 22, 2018

Any news? The opportunity cost on this coin is nuts. I could have saved the BTC and made more trading Shitcoins. This isn't equities in crypto as you know always better opportunities for Xs. Even medium guys aren't happy. It's like I'm watching TENx coin here saying soon soon soon. What's the story here Steve patience gets less each day as i have been patient for over a month. It's always next week. This isnt me panic selling just want a true state of affairs

+

SEC-DolgyJ-E-0000028

1:40



**Stephen** ›

Aug 22, 2018 at 2:17 PM

Will call you shortly...

Aug 22, 2018 at 2:10 PM

Ronnie going after the #1 trader on twitter and blockchain gurus and devs retweeting Peter. https://twitter.com/PeterLBrandt/status/1032374281412337664

More and more

Ronnie is correct...Peter has not done an ounce of research on us...

He is a fool and will change his tune

Peter most respected trader around

Crypto community loves him

Turning into a hot mess between Ronnie and Troy

Whatever

Community grows your coin not Wall Street

If that's what you believe do as you wish



SEC-DolgyJ-E-0000029

1:40



**Stephen** ⟩
**Wall Street**

If that's what you believe do as you wish

Please when DiG is 3$ I don't wanna hear it

Every word of what I have told you is true and factual...period...anything else anyone else says has no clue what they are talking about....

How much $$ to we have to spend on equipment and people and licenses and buildings etc etc etc before you believe...it amazes me how short sited crypto traders are...the world does not know about us yet...but I assure you they will...what we are doing will change the world..you can go for the ride or tell the story in 10 years how you almost hit it big in something but Peter Brandt was a respected douche bag and I listened to him instead...

Aug 27, 2018 at 1:46PC

@Dreakkerino Binance wants millions of dollars to list a coin on their site. Do you really think there's larger benefits to being on this

+

SEC-DolgyJ-E-0000030

**1:40**



**Stephen**

@Dreakkerino Binance wants millions of dollars to list a coin on their site. Do you really think there's larger benefits to being on this exchange for that kind of money when we have several coins to list? We thought it would be better to build the co. I'd love to hear the feedback on this...

**Troy R. James**
twitter.com

And?

Denying binance?

You want to put up the 5mil? We will list today

We are talking to them

We are building a massive infrastructure

With licensing and buildings and tens of thousands of machines

Backed by giant companies with billions in gold

No

+

SEC-DolgyJ-E-0000031

**1:40**



**Stephen**

No

Binance kraken bitfinex first

You applied ?

Lol yes

You told me binance?

If
You are short sighted and don't see
that and think a listing on binance is
all that matters I apologize...yes at
the time I was told that and it's still
in talks and it still will happen but
we need to make all our
announcements first so we have
negotiating leverage...look at the
big picture bro..you want easy short
term gains I don't know what to
say...you want to invest in the next
aapl,goog,amzn at the ground floor
than you are in...it's simple

Aug 28, 2018 at 6:09 PM

We want to sell some dig OTC at
the 1400 SAT value you agreed
upon. Will you still honor this price?

Aug 29, 2018 at 12:56 PM

?

+

SEC-DolgyJ-E-0000032

1:41



**Stephen**

?

Aug 29, 2018 at 7

Hello?

So to answer you question I said 1400 sat when it was in line with the market. I do apologize if you misinterpreted. Jason you have been brought to me from Matt...I put him into this around .015 and he was not a believer either. When it went to .0025 he was panicked and crying and questioning...etc...I convinced him to add to his position...and with in weeks it went from .0025 to .28...you can do whatever you want but you really are not paying attention to what I have been telling you. This is real...I've written every check...nearly 50million dollars...of rigs and infrastructure etc. the gold is real.. and not debt...the world does not know about us...we have billionaires and princes coming on our advisory board. Dig will be above 1$. This year

If it's going to $1 as you say you should feel confident buying at 1400 no?



+

1:41





our advisory boar **Stephen** ›
above 1$. This year

> If it's going to $1 as you say you should feel confident buying at 1400 no?

> I will forward your answer to medium guys and let them know. Thank you

I spoke with Patrick last Thursday he said nothing about wanting to sell

> I speak to Patrick everyday he wants to sell some. I work with him on projects. We are over exposed. Alts are coming back and we want to buy some of them to diversify. We want to sell but cannot without tanking price regardless of the market maker bot being used. Also if Patrick sells market he will have to notify his followers as per his reputation

> And tell them why he did

> He is a man of too high standard to not be truthful

Sep 17, 2018

> 3 weeks no news

+

SEC-DolgyJ-E-0000034

1:41



**Stephen**

3 weeks no news

Sep 26, 2018 at 2:14PM

Better turn your market maker bot on. Coin is going to 0 live

Go look

8million dig Dubord

Dumped

It's a Livecoin glitch they are going to fix it and all these sellers gonna have to buy back

What's the glitch

Apparently all erc 20 tokens are being doubled when you transfer in and out

That's not good

Supply will increase

Omg Ronnie tweeted the issue

Gonna dump hard



+

SEC-DolgyJ-E-0000035



1:41

**Stephen**

> Gonna dump hard

> Idk how you're so calm

> This is gonna be exploited hard

> Ppl gonna send and withdraw repeat it

> I'm panicking

Because I am not concerned about the price of the coin right now

We have done everything we said

We have the gold

We have the servers we have the exchange we have the audits we will have he license any day...this is just a bump in the road

> Steven it's 2.5 cents. Was once thirty. And you know how many times ppl will rinse repeat this bug? The circulating supply could at minimum double

I've bought 5mil dig in the last 3 hours

+

SEC-DolgyJ-E-0000036

1:41

**SB**

**Stephen ⟩**

I've bought 5mil dig in the last 3 hours

Troy deleted his Twitter? What?

Oct 2 2018

Any updates you can give after this fiasco?

I listened to the conf cal

Yes...than you have all the updates I can discuss

When is trading open again

Either tomorrow or Thursday as far as I know...

Wait i just read you bought 5m dig. Did you withdraw? The blockchain shows a large wallet of 5m doubled their coins lol

No

Kk

Cmon bro...that's a silly

+ sti

SEC-DolgyJ-E-0000037

**1:41**



**Stephen**

Kk

Cmon bro...that's a silly question...I'm a buyer forever....you read the whitepaper...we are real. At the 5 yard line...

Livecoin got fucked eh

They are ok...it was really as bad as people think...

And the people who took advantage are gonna have issues in my opinion

Ya i figured. I also figured it came out of their wallet and not arbitrade

Issues? I'm in the telegram reading. It's a no kyc exchange

Not legal

But their accounts may stay frozen till they return the double coin they took

Just my opinion

Ya i read in telegram that's pretty

+

SEC-DolgyJ-E-0000038



1:41

**Stephen**

till they return the they took

Just my opinion

Ya i read in telegram that's pretty much all they can do

I don't have any real info about it

Sucks for them

I don't care about them

Doesn't affect us

I care about dog

Dig

Livecoin can disappear for all i care

The big picture is gonna be clear momentarily

Right

Just not yet lol

Well when are those new exchanges at least

Or are they waiting for audit

SEC-DolgyJ-E-0000039

1:41

**SB**

**Stephen**

Just not yet lol

> Well when are those new exchanges at least

> Or are they waiting for audit

Lol no comment

Can't talk about it bro

> All good

Took close to the end to mess things up

> Ok

All I can say is I believe it won't be down at these levels much longer or ever again

> Well it can go to $100000 no one can trade it haha

Partials just like btc

> No meaning it's not tradeable now

Oct 28, 2018 at 1:...

Is anything happening with this coin? Chart wise it's awful. And

An anchor in my portfolio

SEC-DolgyJ-E-0000040



All I can say is your patience will be rewarded...

In Miami for board meeting...

We are on the 2 yard line

Btw Ronnie has lost his mind

Lol

We knew that

His reputation hit hard haha

That will change when dig takes off

Vindication

Watch

See the messed up thing about all

SEC-DolgyJ-E-0000041



SEC-DolgyJ-E-0000042

1:41

**Stephen**

2018?

I'm going to Malta this week if that helps

Yes

Good hopefully before end November

Yes

News exchanges license and something bigger than both

When

It's all begun bro...I spoke with Patrick. He is sending questionnaire for Len and I. Giving him the first interview

Everything is in motion

I know binance and bittrex are in Malta...



SEC-DolgyJ-E-0000043

1:41



**Stephen**

Everything is in motion

I know binance and bittrex are in Malta...



GIPHY via #images

Lol what?



GIPHY via #images



SEC-DolgyJ-E-0000044



**SB**

Nt **Stephen** ⟩ M

Good new ex can't come soon enough i refuse to use livecoin for any reason

Nov 12, 2018 at 3:77 PM

If anyone has any additional information on $DIG and nefarious behavior, please forward it to me. Am going to be going public with concrete evidence of fraud to crypto media outlets and authorities in the coming week.

 **Thomas L. McLaughlin** 🦊
twitter.com

Ok he is setting himself up for a liable suit...

Perfect

Nefarious behavior like buying Victoria Hall for cash? Buying 10,000 AMD nanos for cash? Buying the building in Ontario for cash? For buying all the mining rigs we have? For the license we are about to be given in Bermuda? For the FACT that we have an SKR for 15.9 billion in Gold? Ooooohhh nefarious oooooohhhh that frightens me

SEC-DolgyJ-E-0000045

1:41

 **Stephen**

15.9 billion in Gold nefarious oooooohhhh that frightens me

The guy is just another putz trying to make a name for himself

We are going to contact him

It's possible he is working for the opposition government in Bermuda trying to make them look bad

Ha yes

One sec

LinkedIn him he hosts a bs masternode program in nyc and is 30 years old

**Bermuda highlighted by J. McLaughlin | The Royal Gazette:Bermuda News - Mo...**
royalgazette.com

Yeah it's the opposition party

Fucking politics

Crazy

Wait the tweet is a 30 year old kid

\+

SEC-DolgyJ-E-0000046

1:41



**Stephen**

Crazy

Wait the tweet is a 30 year old kid

Article says 65 years old

Yeah probably his son

Idk that's a bit of a stretch and that article is nothing of note

Nov 13, 2018 at 1:50PM

**Not all that glitters is gold | The Royal Gazette:Bermuda Opinion - Mobile**
royalgazette.com



Yeah yeah...watch

It's the opposition party trying to fuck with us...we got this...

Fucking politics in Bermuda bro...but it's all good...new exchanges coming more info on gold and a lot more

Guy trying to insinuate Len wasn't at Pepsi for 35 years as cfo and vice chairman..lol...he is also on the advisory board of J.P. Morgan ha

Nov 27, 2018 at 9:18 AM



SEC-DolgyJ-E-0000047

**1:42**



advisory board of **Stephen** ha

Nov 27, 2018 at 9:16 AM

So it's end November where's that exchange

Nov 27, 2018 at

?

Coming

And a lot more

Nov 28, 2018 at

I own 2 things bitcoin and dig. Dig demolishing my folio worse Than bitcoin

News is coming all I can say...give it another week and see

Meantime Patrick was supposed to interview Len and myself. Never sent questions and has been Mia.

Ronnie is a fool. He has been pressured by his subscribers to make us release news...we will not be pushed around by anyone. We are dealing with governments and public companies. We will release news when we are good and ready. We are building fortune 100

+ p

We have purchased two buildings

SEC-DolgyJ-E-0000048

1:42



sent questions ar **Stephen** lia.

Ronnie is a fool. He has been pressured by his subscribers to make us release news...we will not be pushed around by anyone. We are dealing with governments and public companies. We will release news when we are good and ready. We are building fortune 100 company in the crypto space. Just stick with the facts that we release. We have purchased two buildings valued at 10mil plus. We have 27 million dollars of mining servers. We are mining currently and are profitable. We have a stellar board. We HAVE an SKR for 15.9billion in gold. Those are facts.

Current btc state for mining can't b good

Is crypto dead?

Or are institutions buying everything up right now?

I know the factual answer...we are building something to last...

Dec 3, 2018 at 1:32 PM

What's the update

+ 'yt'

SEC-DolgyJ-E-0000049

1:42

**Stephen**

What's the update

Everything will be clear this week

Finally

Yes

Dec 6, 2018 at 10:23 AM

Losing 20% a week 👍

**₿0.00000233**

▼ -₿0.00000457 (-66.23%)

1M

Great chart

Dec 7, 2018 at 11:56 AM

Under a penny. The best

SEC-DolgyJ-E-0000050



**Stephen** )

Dec 8, 2018 at 12:11 PM

> This is going to 0

No it's not

> It is under a penny

The truth is the truth

We have the gold

> The truth means shit man get a new exchange or watch it disappear

Ronnie has published false information

We have 395000 kgs of gold...

It's not disappearing

> Buddy where's that new exchange

We will flip the switch after we fix this situation...

> What situation

This Ronnie bullshit



SEC-DolgyJ-E-0000051

1:42

**Stephen**

This Ronnie bullshit

Bro fuck him forget him just get a new exchange

It's coming

This is absurd

Agree

A full year of bullshit

But the thing is it's not bullshit

Every word I said is true

You Ronnie arbitrage, all bullshit. Nothing ever gets done

Every single one

We have the servers we have the gold we have the building we have the board we will have the licenses shortly the technology is real

Where's the exchange

Everyone harps on something...it's coming

then the exchanges will come

SEC-DolgyJ-E-0000052



**1:42**

**Stephen**

shortly the techni…

Where's the exchange

Everyone harps on something...it's coming...we have some announcements we must make first then the exchanges will come

You just told me end november. It's mid December

I know

"Announcements This week" is the line you always tell me

Never on time

I should have sold this scam at 7 cents

Loses 50% a week

Joke

When is the new exchange

That's all that matters now

That's how you show Ronnie it's true

+

SEC-DolgyJ-E-0000053



SEC-DolgyJ-E-0000054



SEC-DolgyJ-E-0000055

1:42

**SB**

**Stephen**

That's all anyone cares

Spelling mistakes on website? Come on

I'm about to report an ico i invested in to the SEC. this project might be next. Sick of it

Lol and now Ronnie is going to parliament floor. Train wreck

Ronnie will have egg on his face shortly...we are in court Friday...we have deals to be announced that will shed light on everything...you can report whatever you want to whomever you want....I know what we have and what we are doing..

Dec 14, 2018 at 6:30PM

I listened a bit today. We good or what. License on?

Yes

And more

Just watch the tape

Lol Ronnie referred to as the lunatic

+

SEC-DolgyJ-E-0000056



Just watch the ta **Stephen**

Lol Ronnie referred to as the lunatic

When it happens it's gonna happen fast

Have Patrick send the interview questions

He will have first shot

Ok

Dec 18, 2018

At all time low...

Not concerned

Lots coming next 3 days

And next week

Hold the line

When's the exchange

News first

Then exchanges

When exchange

SEC-DolgyJ-E-0000057

1:42



**Stephen**

News first

Then exchanges

> When exchange

> You said in November

> November 2019?

It was supposed to be...Ronnie fucked it up...but after we clarify and prove the gold and announce our 3 new board members will be back on other exchanges

We've already paid for them and programming is done

> You should put me and Patrick on the board after all the bullshit we been through

Patrick still hasn't contacted me

He should

Cause we are already speaking with Wall Street journal and New York Times to run stories on us

He can be first but tick tick

+

SEC-DolgyJ-E-0000058



**Stephen**

He can be first but tick tick

Tock

Dec 20, 2018 at 5:14PM

What was news today you said lots next 3 days

Did parliament pass daba act?

Dec 21, 2018 at 8:01PM

I read today the bullion won't be audited?!! Wtf

When previously you said you had gold at brinks?

Omg are you a fund manager? Why are you listening to twitter or telegram?

Just wait for the official news releases

The guy said he spoke to you directly

They will show all

And Ronnie says we are a scam

Anyone who believes that is

. oles

\+

SEC-DolgyJ-E-0000059



SEC-DolgyJ-E-0000060

**1:42**

**SB**

**Stephen**

Omg June? Man

Lol

Nah just hedgeing

Will be way before that

3 days excuse x 7 months that's 70 times I'll hear the excuse

I wish I could tell you

Lol

I listened to you over my instincts. Shoulda sold at 1400 sats

Dec 26 2018

Ronnie fbi now? Holy fuck this is a horror show

Hahaha..5 minutes of due diligence by the fbi they will tell him to fuck off

Is Ronnie at all preventing this project from going forward? be honest what's going on here



SEC-DolgyJ-E-0000061

1:43



**Stephen**

Is Ronnie at all preventing this project from going forward? be honest what's going on here

Not in the least

He just said in his tweet this case was sent to higher ups at fbi?

Oooooohhhh higher ups

You see the tweet?

Fuck fucking twitter and fuck Ronnie Moas he is a gnat



...ing I hopefully put the first nail in the DIG (Arbitrade) **coffin** with my meeting at the ... ...ar (Florida). Photo pasted here on my Twitter feed earlier. Luckily, it is only 30 miles (3 ...rs) away from where I live. I had to wait a couple of hours for the meeting. I don't know ...something to do with the government shut down or not. When I finally was received, I g ...th two agents. They were very upset ... one of them was actually angry. They said my y... ...escalated to a higher level with a sense of urgency (because of the amount of money that ...) They told me that they will bring me back in again. It is my understanding that the rin ...in a lot of trouble (on several fronts). I am **VERY** sorry about what happened. I will live ...st of my life. I am quite close with many of you and I had close friends who went **ALL** ...n't know what I can do to make this up to you all, other than to continue working 17 hou ...week (as I always do). It is very easy for people to take their frustration out on me witho ...**NY** understanding with regards to how hard and how seriously I take my responsibility ...I had five people here. today I have **one** person here assisting me. I have one assistant (...) go to Cyprus for a family emergency. Cyprus is 5,500 miles (8,800 kilometers) away fr ...t far from Greece). I felt that the stock market was **oversold** as it dropped 5,000 points s ...n early October. I called Alex up last night at 11pm (23:00) on Christmas Day in Cypri ...York   continued on next slide

We are a giant

Meaningless

What crime is he ensuing ?



SEC-DolgyJ-E-0000062

**1:43**

Meaningless

**Stephen**

> What crime is he ensuing ?

Exactly

> And please he will be first to dump on new exchange

> Which new exchange is all i care about

We are negotiating with OriginX to be our market maker and get us on several larger exchanges...we are also prepping the IcO which we expect to be the largest in history...specifically based on the institutions involved...

Len is working on his response to Patrick...you will understand soon

> Ok

Jan 2, 2019 at

> What's the update

Stop looking at social media...they are fools and create problems where there are none. We are moving forward every day. More so now that holidays are over. Breathe ad

+

Are you nuts? Add? You have to

SEC-DolgyJ-E-0000063

1:43

**Stephen**

What's the update

Stop looking at social media...they are fools and create problems where there are none. We are moving forward every day. More so now that holidays are over. Breathe and add in my opinion

Are you nuts? Add? You have to be sick

Ha...

Sick no...twisted maybe a little...but things are not what they appear to be bro....

So I've heard since July

Good things sometimes take time

You can buy millions for nothing down here...worth the risk

What happens if we are as real as I say we are? And Dig is over par in 2019?

Do you think with all the heat I'd still be this confident if I didn't know we are real?

+

SEC-DolgyJ-E-0000064

1:43



**Stephen**

2019?

Do you think with all the heat I'd still be this confident if I didn't know we are real?

I have a family bro...

I'm not going to jail

Never happen

We have the gold. We have the servers we have the building we have the technology bottom line...and we have a whole Lot more that hasn't been announced yet

We don't care about Ronnie or social media pressure..we care about Bermuda and our partners period.

When the time comes all will be clear and the patient ones will be rewarded

Jun 10, 2019 at 3:25PM

Any updates

I'm in miami with my mother...the only update I can tell you is I bought another 3mil dig this morning

+

SEC-DolgyJ-E-0000065

**1:44**



another 3mil dig ‹ **Stephen** ›

Jan 11, 2019 at 8:27 AM

**Arbitrade Ltd. Hamilton, Bermuda: Announces Gold Shipment Added to the Vaults** bitr

globenewswire.com

When new exchange

Realistically

Jan 19, 2019 at 12:10 PM

Exchange update?

Feb 1, 2019 at 8:41 AM



$DIG | Arbitrade - Game Changer

Dignity Token
0.02445 grams of gold bullion
Backing each Token
Current Price: $0.0098
Exchanges:

🐦 **Maarten ⇌ $DIG**
twitter.com

\+

SEC-DolgyJ-E-0000066

1:44



Exchanges:

**Stephen**

Maarten ⇌ $DIG
twitter.com

> Yobit? F me awful exchange nice vid tho

> Yobit has no volume. Far cry from binance

Feb 6, 2019 at 4:56 PM

> Can we get some price action here? Or real news?

Feb 8, 2019 at 1:08 AM

?

Feb 8, 2019 at 6:08 AM

> Did you leave company is that why no answer? https://www.gov.bm/registrar-of-companies-directory?field_company_name_value=arbi-trade&combine=&field_registration_number_value=
>
> You're not on here

Still with company

Not a director

COO

+   s!

SEC-DolgyJ-E-0000067

**1:44**



**Stephen**

COO

And shareholder

Feb 8, 2019 at 11:18 PM

> This thing ever gonna be worth anything? Over a year now

Feb 11, 2019 at 4:46 PM

> I'm selling my dig and telling everyone i know to as well. This has gone on far too long no updates no exchanges all bullshit

> Ronnie is a loser and idc if he's right or wrong this opportunity cost is criminal

You are welcome to do as you wish...personally I believe it's a mistake...but ok...I'll give you a heads up if something is imminent

> Over a year I've been asking you and you never deliver

> How long you been telling me exchanges

> And with this Ronnie bullshit this could be months in court no exchange will touch dig



SEC-DolgyJ-E-0000068



**Stephen ⟩**

Not gonna take months

Feb 12, 2019 at 10:44 AM

2 years no gold audit hahah what a scam

Feb 12, 2019 at 7:19 PM

Amazing how you keep this facade alive. I won't ever support Ronnie but at a certain point I'm not dumb, this is a scam

Dude it's not a facade or a scam and if you think that so be it...everything WE have announced publicly is true...you want to listen to twitter Trolls that's your prerogative

I don't listen to trolls i look at what you've said to me since w first started talking and how ZERO has happened. Not one thing

Unfortunately the BMA is being very strict with every detail of every thing we do...and because fucking Moas started his shit and that fucking overseas garbage article they go over everything with a fine tooth comb...we are more than just

\+

SEC-DolgyJ-E-0000069

**1:44**



**‹**   **Stephen ›**   **⬜️**

Unfortunately the BMA is being very strict with every detail of every thing we do...and because fucking Moas started his shit and that fucking overseas garbage article they go over everything with a fine tooth comb...we are more than just a bullion backed token..there's numerous divisions and protocols and paperwork for everything...you think your frustrated imagine how I feel

Mar 5, 2019 at 9:34 AM

**Why is the telegram being deleted**

Mar 6, 2019 at 6:46 PM

**Hit all time low today....**

Mar 7, 2019 at 2:43 PM

**Hello? What's going on here**

Don't panic

Things are not what they seem

**How can i not it's free falling**

Hold tight

**+**

SEC-DolgyJ-E-0000070



SEC-DolgyJ-E-0000071

**1:44**



**Stephen**

How long can this take 2 years now

Promise you things are moving
forward

Before June? Cuz I'll
Hold u to it

Mar 12, 2019 at 12:37 AM

I realize you're "waiting" but man
even a white paper is easy to
release. Ronnie going to jail don't
have to worry about him

Mar 17, 2019 at 9:33 AM

Buddy what's going on here
everyone i speak to is turning on
you guys including the whales i
know and other wall st ppl i know in
the coin

Mar 17, 2019 at 7:31 PM

?

Mar 17, 2019 at 7:41 PM

Is this going to zero?

Is the lowest it's ever been

What the fuck is going on

+   ssage

SEC-DolgyJ-E-0000072

1:44



**Stephen )**

is the lowest it's ever been

What the fuck is going on

I mean i figured you'd answer the guy who had messages of you guaranteeing a price

Mar 17, 2019 at 8:49 PM

Call me tomorrow. No texts. After 10am pst

Ok

Mar 18, 2019 at 5:15 PM

Need 10 mins

Ok I'll call u in 10

I'll be in traffic haha need someone to talk to

One more thing where's Len

Len is fine lol

He is still around

Oh ya and the mining? I heard you guys stopped? i can't believe i forgot to ask this. Doesn't Troy own

\+   essage

Not true

SEC-DolgyJ-E-0000073

1:44



**Stephen**

Len is fine lol

He is still around

Oh ya and the mining? I heard you guys stopped? i can't believe i forgot to ask this. Doesn't Troy own this?

Not true

Arbitrade owns the mining

And we are and have been up and running

Profitably I might add

Ok good

I should have said Len is I the bed next to Ruth Nader Ginsburg

Lol

Jeez lol

Lol

Mar 31 2019 at 11:07 AM

Buddy wtf none of what you said is

+

SEC-DolgyJ-E-0000074

**1:44**

Lol



**Stephen**

Mar 31, 2019 at 11:52 AM

Buddy wtf none of what you said is happening it's just melting away

Apr 5, 2019 at 5:56 PM

Keep breaking those all time lows

Apr 6, 2019 at 10:31 AM

Glad to see this will hit 0

Apr 6, 2019 at 12:06 PM

I'll bet you 50k it's a nickel before 0.

Apr 8, 2019 at 1:17 AM

ok you literally never meet any date you set. Ever. Everything pumping, dig losing value by the second. How much longer til the lights can't be turned on anymore

Apr 15, 2019 at 3:16 PM

So when is this moving

Apr 26, 2019 at 12:02 AM

@not_chamber @Taff80 @BlockchainPC @investBermuda At this time Arbitrade has not been licensed to issue an ICO or operate a digital asset business in Bermuda.

 **fintechbermuda**

+

SEC-DolgyJ-E-0000075

1:44



< **Stephen** )

~~So when is this moving~~

Apr 26, 2019 at 12:07 AM

@not_chamber @Taff80 @BlockchainPC @investBermuda At this time Arbitrade has not been licensed to issue an ICO or operate a digital asset business in Bermuda.

 **fintechbermuda**
twitter.com

Apr 29, 2019 at 12:13 PM

> So obv you guys aren't doing anything in Bermuda

Stop

You don't know what you are talking about

Of course we are

We are a Bermuda company

We own Victoria Hall

Seriously

> The Bermuda fintech said no. This isn't a troll it's an official user

They said we haven't gotten the

+

SEC-DolgyJ-E-0000076

1:44

**Stephen**

Seriously

The Bermuda fintech said no. This isn't a troll it's an official user

They said we haven't gotten the licenses yet

There is reason for that

I'll call you this afternoon

Apr 29 2019 at 7:06PM

Sorry been a busy day

Call me tomorrow morning.

9am pst

Jun 4, 2019 at 6:39PM

So how do you wanna send me that $50k?

?

You said June 1st it'd be $0.05 you would bet me 50k

Did we actually bet?

Show me

+

SEC-DolgyJ-E-0000077

1:44


**Stephen**

Show me

I will pay up if you booked it

Anyway today will be a good day

Progress has actually been made today

> You sold me a token at $0.14 promising it going to $1. It's worth under a penny. This thing is done time to shoot it

Ah ok

Did you book it

> 50k was 0 before a nickel i just read haha

Or did I offer it

I'll still do it if you say it's booked

I got time

Booked?

> I sent u 125,000$ for dig. It's worth $5000 now. What a scam

+

SEC-DolgyJ-E-0000078



**Stephen**

Booked?

I sent u 125,000$ for dig. It's worth $5000 now. What a scam

You will make $$

I won't ever get that back

The bullshit is almost over

At 14 cents i said guaranteed $1

U said*

Yes I still believe it

Once Troy Len and Jamie are out

You will see what happens

Who is coming in with me to take over

U ruined my crypto holdings. Just an FYI

Coulda put a down payment on a house. Now can't even buy a used civic

SEC-DolgyJ-E-0000079



1:45

**Stephen** ⟩

Coulda put a down payment on a house. Now can't even buy a used civic

Pretty criminal what you did to me tbh

Not criminal bro. I believed and still do. They just mismanaged everything. We are going to fix it.

Everything we said was true

We have the gold

The rigs

The building

Ruined my holdings, i won't ever recoup. So sad

Etc

How is that possible

I sent you 125k worth 5k now

Ok so at .14 you'll be even?

+

SEC-DolgyJ-E-0000080



**Stephen**

Ok so at ..i4 you'l

Yes

Ok

Hold it

You will be even

That's over 30x

Actually the opportunity cost of this is sickening. I can't believe i was played so bad

I bought your rigs. Wow

Or paid for your wife's designer clothes

Sad sad investment

Oh stop....I have my entire family and all my friends in this. Troy and Jamie fucked everything up. But I am taking over. And I've got billionaire partners.

So relax..it is going to work out

Over a year i heard this. Just sad

 I k·

SEC-DolgyJ-E-0000081



SEC-DolgyJ-E-0000082

**1:45**



**Stephen**

**Journalist inquiry about investment into Arbitrade/DIG**

Hello,

I heard from a source that you invested in Dignity Token via Stephen Braverman. I'm a journalist writing a story on the matter. Would you be willing to comment?

Mitchell

--
Editorial Manager
CryptoSlate
cryptoslate.com

**Writing:** author.mitchell-moos
**Telegram:** @mitchellmoos
**LinkedIn:** in/mitchellmoos
**Twitter:** @MitchellMoos

Who is this

Jul 30, 2019 at 12:23 PM

A guy that wants to interview me. From cryptoslate. He is going through our Pr firm Rubenstein. They will determine if we speak to them. You're certainly welcome to speak to him however you should probably wait till next week because your opinion will likely change.

You owe me $1000



SEC-DolgyJ-E-0000083



SEC-DolgyJ-E-0000084

**1:45**



**Stephen**

Jul 26, 2019

Sent

> Thanks will let you know when o receive

> Got it thanks buddy. Look forward to more dig news

Hope you are fully loaded now

> I am

> No more $ for dig

Will make back your loss 25x

> I hope

> I'm not interviewing with that guy

Good

Jan 5, 2020

> Buddy is this ever gonna move? You literally stole 150k from me and promised $1 dig. Jeez what a nightmare. Only needs 100x. No WP no gold. Man i lost a fortune

\+



Hey man I'm considering hiring a

SEC-DolgyJ-E-0000085

1:45



**Stephen ⟩**

Jan 7, 2020 at 11:42 AM

Hey man I'm considering hiring a lawyer, this is ridiculous

Jason you are welcome to do whatever you need to do. We are working. Things aren't what they seem. Stay off of social media they know nothing

How about the price

It's 9 sats man

I bought off you at 1400

-99.4%

150k in the toilet

Please tell me how I'm supposed to recoup any of this

Please

150k was a lot for me

The price today is irrelevant.we have not launched the new company yet.

+



SEC-DolgyJ-E-0000086

1:45

**SB**

**Stephen**

The price today is irrelevant.we have not launched the new company yet.

Man, this will never recoup my money

Ever

Whatever you say

I'm getting married in August, we wanted to buy a house, this ruined us

The trolls on twitter who cares, but you know me personally we spoke on phone, how can you live with thay

That

Listen when this was arbitrade i did not control the outcome. Now I do. It is taking longer than I want but it's not over by a long shot

I just don't see how you can sleep knowing what you did to me. And furthermore when you say this was arbitrade, that shows even more you lied to me when we originally spoke!

SEC-DolgyJ-E-0000087

1:45



**Stephen** >

I did not lie about anything

> Just not right Stephen, really set my family back

Not once

> Don't say you didn't lie i can scroll up and show you many texts of you lying

> You stole my $, when you know you have a free ATM to dump on livecoin. I'm destroyed by this

Not true. Anything that was said was true at the time

> Can't buy house we wanted

> Wedding venue changed

> A Jew is gonna swindle a Jew? It's not right, we aren't made like this

Jewish guilt only works from my wife and mother. I'm sorry for your struggles. Everything we were doing was true and real. Unfortunately Troy Jamie and Len were unable to execute, Kent and I

publicly until everything is completed.

SEC-DolgyJ-E-0000088

1:45

**Stephen**

Not true. Anything that was said was true at the time

> Can't buy house we wanted

> Wedding venue changed

> A Jew is gonna swindle a Jew? It's not right, we aren't made like this

Jewish guilt only works from my wife and mother. I'm sorry for your struggles. Everything we were doing was true and real. Unfortunately Troy Jamie and Len were unable to execute. Kent and I are not. We just will not speak publicly until everything is completed.

When we do things will be much different

> Too late man

Feb 4 2020 at 9 19 AM

> 4 sat lol what a fucking joke

> I'm gonna contact the media this is a joke

Delivered

+

SEC-DolgyJ-E-0000089

| Message | |
|---|---|
| **From:** | Jane Walker [jwalker@td.bm] |
| **Sent:** | 12/12/2018 6:36:40 PM |
| **To:** | Max Barber [max@siontradingfze.com]; GOLDBERG,JAMES goldberg [James_Goldberg@msn.com]; Ricky Sanders [ricky@siontradingfze.com]; Delroy Duncan [dduncan@td.bm] |
| **Subject:** | RE: Gold Resource Press Release Draft 1 |
| **Attachments:** | Arbitrade Ltd. - REGISTER OF DIRECTORS AND OFFICERS (30 Oct 2018).pdf; Arbitrade Properties (Victoria Hall) Ltd. - REGISTER OF MEMBERS.PDF; Amalgamation Certificate - Arbitrade Properties (Victoria Hall) Ltd. 26 Oct 18.pdf; Arbitrade Properties (Victoria Hall) Ltd. - REGISTER OF DIRECTORS AND OF....pdf; Amalgamation Agreement APVHL Front and APVHL Signature Page.pdf; image001.jpg |

Dear Max,

In relation to the concerns in relation to Troy we are able to confirm the following:

1) Troy Hogg is not a director of Arbitrade Ltd. nor is he involved in the day to day running or any major management of the Company. We attach a copy of the Register of Directors and Officers of Arbitrade Ltd.

2) Troy Hogg does not own the building Victoria Hall. The Building is owned by Arbitrade Properties (Victoria Hall) Ltd. ("APVHL") which is a 100% subsidiary of Arbitrade Property Holdings Ltd which is a 100% subsidiary of Arbitrade Ltd.. The property was acquired by way of APVHL amalgamating with the previous owner of the building Victoria Hall Company Limited and upon completion of the amalgamation agreement the property automatically vested in the amalgamated entity which was named Arbitrade Properties (Victoria Hall ) Ltd. and Register of Shareholders of APVHL is attached. I also attach a copy of the Amalgamation Certificate for APVHL.

3) Troy Hogg was not a signatory to the real estate purchase contract - the contract was an amalgamation agreement. Mr. Hogg is not a director or officer of APVHL nor does he have any signing authority on behalf of that company. Please see the attached Register of Directors and Officers of APVHL. I am also attaching a copy of the front and signature pages of the amalgamation agreement.

I hope that the above information gives you sufficient comfort to allay the concerns of Gold Resources. We would be obliged if you were able to provide reassurance without formally sharing any copy documents with them however if you do need to forward anything to them they will need to be placed under a strict undertaking not to disclose to any third parties.

Kind regards,

Jane


**Trott&Duncan**
BARRISTERS & ATTORNEYS

Jane Walker
**Senior Corporate Attorney**
Direct Tel: (441) 279-1230
Trott & Duncan Limited
Trott & Duncan Building
17A Brunswick St., Hamilton HM10, Bermuda
Tel: (441) 295-7444 Fax: (441) 295-6600
www.td.bm

-----Original Message-----
From: Max Barber [mailto:max@siontradingfze.com]

E-BAR-0001556

**DRAFT 5 FOR APPROVAL AND DATE TO BE RELEASED:**

# ı..''Λrbitrade

## ARBITRADE LTD. BOARD OF DIRECTORS ANNOUNCES THEY HAVE SECURED IN EXCESS OF $10 BILLION U. S. DOLLARS IN GOLD TO BACK THEIR TOKENS

*Confirmed today by Arbitrade Ltd. Chairman and Chief Executive Officer Len Schutzman*

Tuesday, November 6, 2018, Hamilton, BERMUDA and Beverly Hills CA.: Confirmed today, Len Schutzman, Chairman and Chief Executive Officer of Arbitrade Ltd., on behalf of the Board of Directors, announced today via its Agency of Record for Traditional and Non-Traditional Media, Creative Management Partners LLC (CMP), that Arbitrade Ltd. has received title of gold bullion stored at independent security facilities in the amount of 395,000 kgs with a current market value in excess of $10 Billion U.S.

Arbitrade has completed the required regulatory gold vaulting verification compliance:
As mandated, an independent public accounting firm has verified the account in good standing, confirmed Safe Keeping Receipt "SKR" totaling 395,000 kgs of gold, by direct confirmation from the independent secure vaulting company.

Mr. Schutzman added: "Since most crypto-currencies are not backed by gold, this feature should make purchase of Arbitrade's coins and tokens more attractive to the blockchain community".

Arbitrade, through its proprietary software and strategic partnerships, plans to be in all segments of the crypto-currency business, including currency mining, trading (The Arbitrade Exchange), gift cards, debit cards, money transfer, and Point of Sale processing

**ABOUT ARBITRADE LTD:**

The Arbitrade Ltd. platform, a holistic end-to-end system, aims to provide crypto-currency access to everyone-from unbanked individuals to seasoned traders. Arbitrade Ltd. seeks to provide this access with a mobile platform via ArbiPay, as well as by physical card systems. Integrating this retail access with Arbitrade Exchange creates a unique on-ramp for everyone from experienced traders to people simply seeking to enter the financial markets.

Arbitrade Ltd new crypto-currency merchant exchange Intellectual Property (IP), proprietary software has unique worldwide licensing potential through strategic partnerships, as an example, but not limited to the sectors of Financial Retail Sales and Services, Consumer Products, Food and Beverage Companies, Technology, Computer Companies, Media Companies in all segments of the crypto-currency business, including mining and trading (THE ARBITRADE EXCHANGE) with emphasis on currency mining e.g. Gift Cards, Debit Cards, Money Transfers and Point of Sale Processing.

CONFIDENTIAL

Robust crypto-currency mining facilities are required for transaction processing that support blockchain centric solutions, including those ArbiPay's crypto-currency transactions at the retail level or large scale trading on the Arbitrade Exchange. Arbitrade Mining supports these objectives by garnering mining rewards and processing fees. Each of these businesses reinforce the others.

Arbitrade Ltd. intends to offer a complete suite of token services which include, cryptocurrencies, altcoins, utility tokens, security tokens, asset tokens, reputation/reward tokens and other dApp coins. The company is partnering with existing global infrastructure to provide the fastest gateway to all trading counterparties in 50+ countries. The integration of ArbitradeX (exchange) with the world's largest trading counterparties is expected to provide liquidity, price transparency, high quality token/coin offerings, compliance and security through the world's most recognized and trusted institutions.

In addition, Arbitrade is building, buying and partnering to create a suite of Arbitrage Artificial Intelligence ("AI") to provide an important multiplier to these business results, leveraging return, and allowing Arbitrade to acquire additional hard assets supporting Arbitrade crypto-currencies.

## ABOUT ARBITRADE LTD. CORPORATE POLICY FOR COMMUNICATIONS:
Arbitrade Ltd. further announced their **Corporate Policy for Communications** by Chairman Schutzman:
Traditional and Non-Traditional Media, excluding Investor Relations will be under the engagement of Creative Management Partners LLC and it's CEO Alan Morell.
Questions from "Coin Holders" are under the counsel of Stephen Braverman.
Questions from Security or Cypto Industry Advisory Firms are under the counsel of John MacNeil.

**For More Information:**
https://arbitrade.io/
www.creativemanagementpartners.com
Stephen Braverman
Stephen.B@Arbitrade.IO
Chief Operating Officer,
Arbitrade Bermuda Exchange
Arbitrade Ltd., Hamilton, Bermuda

**Arbitrade Ltd. Agency of Record:**
Creative Management Partners LLC
433 North Camden Dr., 6thFloor
Beverly Hills, Ca. 90210
508-292-7900

Hogg_SEC_0009462



## Arbitrade Ltd. Hamilton, Bermuda: Announces its partner SION Trading FZE has secured Precious Metals Purchase Contract from Gold Resource Corporation

**December 19, 2018** – Arbitrade Ltd. procurement agent, Sion Trading FZE, has agreed to purchase all the gold and recovered precious metals from certain mining operations of Gold Resource Corporation to allow Arbitrade Ltd. to purchase gold on a monthly basis. Sion Trading FZE has provided a line of credit in the amount of $234 million, to facilitate Arbitrade Ltd.'s financing for the expected first year purchases of Gold.

This additional gold supply chain will increase our current holdings above and beyond $15 billion, creating more value to our coin holders.

Leonard Schutzman, Chairman and CEO of Arbitrade commented; *"With this new alliance between SION Trading FZE and Gold Resource Corporation, we now have the ability to expand our family of precious metals-backed crypto coins."*

Max Barber, the CFO of SION Trading FZE stated that; *"Gold Resource Corporation and Arbitrade Ltd. are both important clients, and we are delighted to imitate and facilitate this as 'win-win" strategic alliance"*

### About Arbitrade Ltd.

Arbitrade Ltd., a new crypto-currency merchant exchange of Intellectual Property (IP) and proprietary software, has unique worldwide licensing potential through strategic partnerships in, but not limited, to the sectors of Financial Retail Sales and Services, Consumer Products, Food and Beverage Companies, Technology, Computer Companies, Media Companies. Arbitrade Ltd. will operate in all segments of the crypto-currency business, including mining and trading (the Arbitrade Exchange) with emphasis on currency mining e.g. Gift Cards, Debit Cards, Money Transfers and Point of Sale Processing.

Arbitrade Ltd. intends to offer a complete suite of token services which include cryptocurrencies, altcoins, utility tokens, security tokens, asset tokens, reputation/reward tokens, and other App coins. The company is partnering with existing global infrastructure to provide the fastest gateway to all trading counterparties in 50+ countries. The integration of the Arbitrade Exchange with the world's largest trading counterparties is expected to provide liquidity, price transparency, high quality token/coin offerings, compliance and security through the world's most recognized and trusted institutions.

### About SION Trading FZE:

Established in the United Arab Emirates, Ras Al Khaimah Free Trade Zone, SION Trading FZE's Trade License authorizes Commercial Gold procurement, Trading, and selling.

1

CONFIDENTIAL

Hogg_SEC_0011979

SION Trading FZE leverages the benefits of the Free Trade Zone to facilitate its Physical gold import / export and procurement business. SION Trading FZE sources precious metals from its founding subsidiary, Scotia International of Nevada, Inc. and maintains multiple international client's. SION Trading FZE utilizes world class security companies, such as G4S, Brinks, and Transguard to provide secured logistics, storage, and the vaulting of precious metals.

## REPRINTED WITH PERMISSION OF SION TRADING FZE:



NEWS FEED- 12/14/2018

# SION TRADING FZE SECURES PRECIOUS METALS CONTRACT
## FROM DON DAVID GOLD MEXICO | GOLD RESOURCE CORPORATION

PRESS RELEASE DEC 14, 2018 00:00 EST.

SION TRADING FZE SECURES PRECIOUS METALS PURCHASE CONTRACT FROM DON DAVID GOLD MEXICO

December 14, 2018, SION Trading FZE (SION) is pleased to announce it has signed an agreement with Don David Gold Mexico SA de CV (DDGM), a 100% owned subsidiary of Gold Resource Corporation (NYSE American: GORO), to purchase precious metal dore produced from the miner's Oaxaca Mining Unit.

SION Trading FZE aims to provide mining companies with higher yields and services exceeding industry standards on miners' sales of precious metals.

SION is also the precious metals procurement agent for Arbitrade Ltd. SION plans to allocate the procurement of its precious metals, including those purchased from DDGM, to further enhance Arbitrade's existing gold assets.

Arbitrade Ltd. is a leading issuer of crypto-currency including its associated coins which are referred to as their Ingot Family of Tokens namely Dignity Token **DIG**, Namaste Token **NAM**, Orectic Token **ORE**, and Honor Token **HNR**. All four tokens will be partially backed by physical metals including gold, silver, platinum and palladium crypto coins. For more information on Arbitrade Ltd, visit arbitrade.io.

Senior Management at SION Trading FZE stated, "We are pleased to support Arbitrade with precious metals procured from respected mining companies and known sources."

2

About SION Trading FZE:
Established in the United Arab Emirates, Ras Al Khaimah Free Trade Zone, SION's Trade License authorizes Commercial Gold procurement, Trading, and selling. SION utilizes the benefits of the Free Trade Zone to facilitate its Physical gold import / export and procurement business. SION sources precious metals from its founding subsidiary, Scotia International of Nevada, Inc. and multiple international clients. SION Trading FZE utilizes world class security companies to provide secured logistics, storage, and vaulting of precious metals. For more information email: info@siontradingfze.com +1 844 773 7353

About Arbitrade Ltd.:
Arbitrade Ltd., a new crypto-currency merchant exchange of Intellectual Property (IP) and proprietary software, has unique worldwide licensing potential through strategic partnerships in, but not limited, to the sectors of Financial Retail Sales and Services, Consumer Products, Food and Beverage Companies, Technology, Computer Companies, Media Companies. Arbitrade will operate in all segments of the crypto-currency business, including mining and trading (he Arbitrade Exchange) with emphasis on currency mining e.g. Gift Cards, Debit Cards, Money Transfers and Point of Sale Processing.

Arbitrade Ltd. intends to offer a complete suite of token services which include cryptocurrencies, altcoins, utility tokens, security tokens, asset tokens, reputation/reward tokens, and other dApp coins. The company is partnering with existing global infrastructure to provide the fastest gateway to all trading counterparties in 50+ countries. The integration of Arbitrade Exchange with the world's largest trading counterparties is expected to provide liquidity, price transparency, high quality token/coin offerings, compliance and security through the world's most recognized and trusted institutions. For more information about Arbitrade, visit arbitrade.io

**Don David Gold SA de CV and Gold Resource Corporation, its subsidiaries and affiliates disclaims any responsibility for the adequacy or accuracy of this release, including any or all proposed plans that SION Trading FZE has or may have relating to precious metal dore sold to SION. Gold Resource Corporation and its subsidiaries have no affiliation to any company or entity referenced in this release beyond the sale of dore to SION Trading FZE. Furthermore, Gold Resource Corporation and its subsidiaries are not affiliated with and have no direct or implied association with any crypto currency.**
**Source: SION Trading FZE.**

**Cautionary Statements:**

This press release contains forward-looking statements that involve risks and uncertainties. The statements contained in this press release that are not purely historical are forward-looking statements within the meaning of Section 27A of the Securities Act and Section 21E of the Exchange Act. When used in this press release, the words "plan", "target", "anticipate," "believe," "estimate," "intend" and "expect" and similar expressions are intended to identify such forward-looking statements. Such forward-looking statements include, without limitation, the statements regarding Gold Resource Corporation's strategy, future plans for production, future expenses and costs, future liquidity and capital resources, and estimates of mineralized material.

All forward-looking statements in this press release are based upon information available to Gold Resource Corporation on the date of this press release, and the company assumes no obligation to update any such forward-looking statements. Forward looking statements involve a number of risks and uncertainties, and there can be no assurance that such statements will prove to be accurate. The Company's actual results could differ materially from those discussed in this press

3

Hogg_SEC_0011981

release. There can be no assurance that production will continue at any specific rate.  Factors that could cause or contribute to such differences include, but are not limited to, those discussed in the Company's 10-K filed with the SEC.

**For More Information:**
**https://arbitrade.io/**
Stephen Braverman
Stephen.B@Arbitrade.IO
Chief Operating Officer.
Arbitrade Exchange (Bermuda) Ltd.
Arbitrade Ltd., Hamilton, Bermuda, 508-292-7900

4

CONFIDENTIAL

Hogg_SEC_0011982

# Industry Veterans Launch Dignity Holdings, LLC

Newly-Formed Cryptocurrency and Mining Firm Acquires Cryptobontix

NEWS PROVIDED BY
Dignity Holdings, LLC →
25 Jul 2019 08 23 ET

SHARE THIS ARTICLE



NEW YORK, July 25, 2019 /PRNewswire/ -- Dignity Holdings, LLC, a leader in cryptocurrency and digital coin mining, today announced its official launch, and that its wholly owned subsidiaries Dignity Mining Group, LLC and Dignity Gold, LLC have acquired Cryotobontix, a family of tokens backed by SION Trading FZE's gold in Dubai. Through the acquisition, Dignity Gold now owns four of Crytobontix's digital cryptocurrencies: Dignity (DIG), Namaste (NAM), Honor (HNR) and Orectic (ORE). It will also continue the relationship with SION Trading FZE through the safe keeping receipt (SKR) for 395,000 kilograms of gold in addition to the tokens. The acquisition also includes Dignity Mining Group's acquisition of an extensive mining operation based in Upstate New York. The newly-formed companies are being led by investment, technology and real estate industry veterans Stephen Braverman, who will serve as President and CEO, and Kent M Swig, who will serve as Chairman.

"I am thrilled to announce the launch of Dignity Holdings and their subsidiaries," stated Braverman. "Our groundbreaking technology and top talent are unparalleled in the industry and I am eager to help grow our firm into one of the largest, most stable global cryptocurrencies."

Dignity Gold is initially focusing its business on its cryptocurrency coin known as Dignity, which is traded on Livecoin.net under the symbol DIG and backed by SION Trading FZE's gold. Dignity Mining Group also has an extensive mining operation, which is being overseen by mining expert Hayden Gill, Founder and CEO of Hash One, one of the premier cryptocurrency mining advisory firms. Additionally, Dignity Mining Group uses cutting-edge technology for its mining operations, including 708 AMD mining rigs each running 12 Powercolor TUL RX Vega 56 Nano graphics processing units.

Braverman brings with him more than 30 years of experience in securities trading and investment management. Prior to his current role, he was the Chief Operating Officer at Arbitrade Exchange, a centralized cryptocurrency exchange. He previously traded securities at Clearview Trading Advisors, Inc. and managed a discretionary account for a California based investment fund. Braverman also spent 10 years at Knight Capital Group, Inc., where he served as Managing Director of Listed Equity Trading. He is the founder and former Board of Directors Chairman of Liquid Holdings, a trading technology company.

CONFIDENTIAL

Hogg_SEC_0010695

≡STOKHOLM

Tritaurian Capital
430 Park Avenue, 19th Floor
New York, New York

Sent by e-mail to the following addresses:

info@tritauriancapital.com
jpreissler@tritaurian.com
info@dignitygold.com
ppm@dignitygold.com
compliance@dignitygold.com

Zürich, February 12, 2023

# REQUEST REGARDING DIG/DIGG/DIGAU TOKENS

Dear Tritaurian Capital

On behalf of my client, Mr. Arnoldus Koek, I urgently ask you to provide an update on my clients' investments in gold backed security tokens called "DIGG" (or their equivalent tokens, previous called DIG tokens, now DIGau tokens). So far, my client has not received any of the gold backed security tokens my client is entitled to.

## 1.     FACTS AND ASSUMPTIONS

1.1.     I represent Mr. Arnoldus Koek, Koningsspil 22, 3642 ZR Mijdrecht, The Netherlands.

1.2.     My client is a non-US accredited investor who received an offer from Dignity Corp. and Tritaurian Capital to subscribe for gold backed security tokens called "DIGG" (or their equivalent tokens, previous called DIG tokens, now DIGau tokens). Please find enclosed the "Accredited Investor Verification Letter" signed by the Dutch certified public accountant, Maarschalk Ligthart.

1.3.     The "Placement Memorandum" and "Subscription Agreement" issued by Dignity Corp. and Tritaurian Capital was sent to my client in an e-mail dated August 26, 2020, with the following content:

*Dear Arnoldus Koek,*

≡STOKHOLM

*Please review the attached placement memorandum and subscription agreement. If you would like to participate in the DIGG offering, please fill out the subscription agreement. Also include information about your prior DIG holdings such as proof of holdings, proof of purchase, how much you paid for the DIG tokens and any other relevant documentation and screenshots. We will follow up with you if necessary or if there are any questions. If you are BOTH accredited AND non-U.S. please select the Reg D option on the subscription agreement.*

*Everything should be sent to ppm@dignitygold.com from the email address you have registered from during the KYC process.*

*Please note, these documents are undersigned NDA and intended for the recipient only. Any dissemination or sharing could invalidate your ability to participate in the DIGG offering.*

1.4.   The "Placement Memorandum" and "Subscription Agreement" was followed by an e-mail dated August 26, 2020, from Tritaurian Capital with the following content:

*"Dear Arnoldus Koek,*

*The following information is being forwarded to you in advance of receiving the Dignity offering materials by Dignity on behalf of Tritaurian Capital:*

*Tritaurian is providing you the attached documents because we are a registered entity and are required to do so by the regulators under the newly enacted Regulation BI. Attached, please find the Firm's Customer Relationship Summary ("Form CRS") as well as the Firm's additional Disclosure Letter. We are required to send these to you prior to making a recommendation to you regarding a potential investment(s). The attached information will provide you with details relating to our Firm and the relationship between the Firm, you and the Firm's Registered Representatives.*

*Sincerely,*

*William B. Heyn*
*Chief Executive Officer*
*Tritaurian Capital, Incorporated"*

1.5.   The e-mail from Tritaurian Capital dated August 26, 2020, had the following attachments: A "Regulation Best Interest Disclosure Letter" and a "Client Relationship Summary".

1.6.   My client accepted the offer and signed the enclosed "Subscription Agreement" for gold back security tokens on September 2, 2020. My client included information about his prior DIG holdings such as proof of holdings, proof of purchase and any other relevant documentation and screenshots.

1.7.   The previous DIG token could only be bought on the Livecoin platform. My client bought and paid his tokens on this platform with crypto currencies and passed all relevant KYC/AML tests. Before the livecoin platform was closed, my client downloaded the .csv file to be able to prove his ownership to his DIG tokens and their provenance. Please find enclosed a .csv transaction file including all my clients DIG token holdings. No transactions have ever been made; they are still in the same cold wallet.

1.8.   My client has the following private wallet: 0xfa77E31B9C24124fD151A641eA1f7bE544c63232. The wallet contains 10,155,557.4234358 legit DIG tokens bought pre deadline January 18, 2020.

1.9.   My client has conducted several successful KYC updates as requested by Tritaurian Capital and Dignity Corp. The latest update is dated 28th of May 2021 with the following content:

≡STOKHOLM

*"Congratulations! You have passed the KYC/AML process and have moved forward to the compliance requirements. Dignity Corp will email you additional requests as necessary. Thank you for your patience.*

*Thank you,*
*Dignity Corp"*

1.10.   In a press release dated November 16, 2021, Dignity Gold announced the following:

a)   *"Dignity Corp. Issues DIGau Token To Bring Next Generation Precious Metals Investing to The Public".*

b)   *"The initial DIGau tokens will be issued to legitimate, verifiable and suitable private wallets that were previously holding the unaffiliated DIG token. These wallets have successfully completed KYC / AML and were deemed suitable and supplied completed proper documentation and subscription agreements".*

1.11.   In a press release dated January 6, 2022, Dignity Gold announced the following:

a)   *"Dignity Corp. DIGau Token Sets Date To List On CryptoSX Digital Asset Exchange".*

b)   *"Dignity Corp. ("Dignity Corp"), an established, US-based digital security that is crafting a revolutionary approach by backing a security token with gold reserves, announces that their native DIGau token will be listed on www.cryptosx.io on Tuesday, January 11th. CryptoSX is a Digital Assets Exchange that is active across Asia-Pacific and offers a multi-faceted platform for Security Token Offerings (STOs) backed by Fiat/Crypto conversion capabilities".*

1.12.   My client has in several e-mails tried to get an update from you, however without any answer. As example, please refer to the e-mail dated July 27, 2022, send to the following recipients:

info@tritauriancapital.com, jpreissler@tritaurian.com, compliance@dignitygold.com and info@dignitygold.com,

with the following request:

*"Dear all, pls let me know the status as per today I am still waiting any communication from your side, or better, the DIGau tokens that according to yourselves would be distributed to all NON US Accredited Investors with legit and verifiable DIG tokens that went through all proper procedures within the given deadlines.*

*Yours respectfully,*

*A.J.L. Koek MBA"*

## 2.   LEGAL COMMENTS

2.1.   My client is entitled to get an update on my clients' investments in the gold backed DIGG tokens (or their equivalent tokens, previous called DIG tokens, now DIGau tokens). It is stated in the Offering Memorandum issued by Dignity Corp. and Tritaurian Capital, that:

a)   *"Any request for information, documents or other data made by a prospective investor and/or their professional advisors or purchaser representatives should be made through the advisors to the Company, Tritaurian"* (page 39).

STOKHOLM

b) "*Tritaurian will answer all inquiries from prospective investors and/or their designated representatives or advisors concerning the Company, the DIGG tokens and any other matters relating to the organization of the Company and the offering and sale of the DIGG tokens and will afford to prospective investors and/or their purchaser representatives and professional advisors the opportunity to obtain any addition information (to the extent that Tritaurian or the Company possesses such information or can acquire it without unreasonable effort or expense) necessary to verify the accuracy of any representations or information set forth in this Memorandum*" (page 37).

2.2.   My client is entitled to receive gold backed DIGG tokens (or their equivalent tokens, previous called DIG tokens, now DIGau tokens). It is stated in the Offering Memorandum issued by Dignity Corp. and Tritaurian Capital, that:

a) "*The DIGG token is backed by gold bullion interests, specifically 0,02667 grams of gold per DIGG token*" (page 11).

b) "*80,000 kilograms of gold are held in a secure vault facility by SION in Manama, Kingdom of Bahrain. The gold is evidenced to the Company and held under a Safe Keeping Receipt ("SKR") held by Dignity Gold*" (page 29).

c) "*The DIGG token is one of the only crypto security tokens based in the United States*" (page 29)

d) "*DIGG tokens will be fully compliant securities*" (page 11).

e) "*Those individuals meeting certain criteria and owning legitimate and verifiable DIG tokens in private wallets with record dates prior to 8am Eastern Standard Time on January 18, 2020 ("Legitimate Wallet") may receive DIGG tokens equal to the number of DIG tokens in their wallet (on a 1 for 1 basis) at the time of validation, provide the DIG tokens remain in the wallet until you have received the new DIGG tokens*" (page 35).

2.3.   My client has signed the subscription document and proven his ownership of legitimate and verifiable DIG tokens purchased prior to January 18, 2020. My client has answered all e-mails and done everything requested by Dignity Corp. and Tritaurian Capital. My client is therefore entitled to receive the DIGG tokens (on a 1 for 1 basis) backed by gold bullion interests as described in the Offering Memorandum.

## 3.   SUPPORTING DOCUMENTS

3.1.   "Accredited Investor Verification Letter" signed by the Dutch certified public accountant, Maarschalk Ligthart, dated April 6, 2020.

3.2.   Tritaurian Capital Client Relation Summary, dated June 30, 2020

3.3.   Tritaurian Capital: Regulation Best Interest Disclosure Letter

3.4.   "Placement Memorandum"

3.5.   "Subscription Agreement", signed September 2, 2020

3.6.   CVC file with DIG transactions

**STOKHOLM**

\*\*\*

Please do not hesitate to contact me on mail: js@stokholm.ch or phone: +41 78 700 29 44, if you have any questions or comments to the above.

I expect to hear from you within 14 days, otherwise I am instructed to take legal action.

Yours sincerely,

Dr. Jeppe R. Stokholm

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF FLORIDA

CASE NO.: 22-cv-23171-DAMIAN/D'ANGELO

SECURITIES AND EXCHANGE COMMISSION,

Plaintiff,

v.

ARBITRADE LTD., CRYPTOBONTIX INC.,

TROY R. J. HOGG, JAMES L. GOLDBERG,

STEPHEN L. BRAVERMAN, and MAX W. BARBER,

Defendants.

_____/

NOTICE OF SERVICE

Defendants **Troy R. J. Hogg and James L. Goldberg**, appearing **pro se**, hereby certifies that on **May 29, 2026**, a true and correct copy of the following documents were served via email upon counsel for Plaintiff and the pro se co-defendants as listed below:

1. **JOINT REQUEST FOR JUDICIAL NOTICE OF INTERVENING SEC/CFTC INTERPRETIVE GUIDANCE ISSUED MARCH 17, 2026**

2. **JOINT FORMAL PRETRIAL OBJECTIONS OF DEFENDANTS TROY R.J. HOGG AND JAMES L. GOLDBERG TO PLAINTIFF'S SECOND SUPPLEMENTAL RULE 26 DISCLOSURES AND REQUEST FOR STATUS CONFERENCE**

3. **JOINT SUPPLEMENTAL NOTICE OF MATERIAL DISCLOSURE FACTS RELEVANT TO PLAINTIFF'S HOWEY THEORY, PURCHASER RELIANCE ALLEGATIONS, AND PENDING PROCEDURAL POSTURE**

4. **Exhibits** containing Exhibits A through G with declarations under 28 U.S.C. § 1746

**Served via email to:**

- **Alice Sum** (SEC Senior Trial Counsel) – sumal@sec.gov

- **James L. Goldberg**, pro se – james_goldberg@msn.com

- **Stephen L. Braverman**, pro se – sbraverman22@gmail.com

- **Max W. Barber**, pro se – maximas24@me.com

Respectfully submitted,

May 29, 2026



_____
**James L. Goldberg**

Pro Se Defendant
515 120th St
Miami, FL 33168
Tel: 305-785-6900
Email: James_Goldberg@msn.com

**Troy R. J. Hogg**

Pro Se Defendant

72859 Sunridge Crescent

Dashwood, Ontario, Canada

troyhogg2020@protonmail.com

(519) 330-6570